**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

**FILED.**

MAY 1 1 2015

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA.
BY_____,DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| **Plaintiff,** | ) |
| *ex rel.* | ) |
| [UNDER SEAL], | ) |
| | ) |
| **Plaintiff-Relator,** | ) |
| v. | ) |
| [UNDER SEAL], | ) |
| | ) |
| **Defendants.** | ) |

**CIV-15- 510 W**

Case No. _____

**PLAINTIFF-RELATORS'
COMPLAINT**

**FILED IN CAMERA AND UNDER SEAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| *Ex rel.*, | : | |
| | : | |
| MARK J. O'CONNOR and SARA F. | : | **Case No.:** |
| LEIBMAN, | : | |
| | : | **COMPLAINT** |
| Plaintiff-Relators, | : | |
| | : | **Filed Under Seal pursuant to the False** |
| v. | : | **Claims Act, 31 U.S.C. § 3730 (b)(2)** |
| | : | |
| U.S. CELLULAR CORPORATION, | : | |
| USCC WIRELESS INVESTMENT, INC., | : | |
| TELEPHONE AND DATA SYSTEMS | : | **JURY TRIAL DEMANDED** |
| INC., KING STREET WIRELESS, L.P., | : | |
| KING STREET INC., ADVANTAGE | : | |
| SPECTRUM, L.P., FREQUENCY | : | |
| ADVANTAGE, L.P., NONESUCH, INC., | : | |
| WILLIAM VAIL, and ALLISON CRYOR | : | |
| DINARDO, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| | : | |

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................. 1

II. PARTIES ........................................................................... 4

    A. Plaintiffs .................................................................. 4

    B. Defendants ............................................................... 5

        1. TDS & U.S. Cellular Defendants ............................... 5

        2. Advantage Defendants ........................................... 6

III. JURISDICTION AND VENUE ............................................. 8

IV. STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO
DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS ................... 9

    A. FCC Spectrum Auctions ............................................. 9

    B. Designated Entities ................................................. 14

    C. The False Claims Act ............................................... 19

V. SPECIFIC ALLEGATIONS OF THE DEFENDANTS' FALSE CLAIMS ................. 19

    A. Advantage Won Discounted Spectrum Licenses By Falsely Asserting That
It Was A Designated Entity ......................................... 19

    B. Advantage Is A Sham Used by U.S. Cellular ....................... 21

    C. U.S. Cellular And Advantage Lied to the FCC To Avoid Payment of More
Than $113 Million in Auction Payments ........................... 21

        1. U.S. Cellular and DiNardo Have Partnered for Twenty Years
To Obtain DE Licenses for U.S. Cellular's Use ................. 21

        2. King Street Is an Affiliate of Advantage ...................... 25

        3. U.S. Cellular Also Controls Advantage Directly .............. 30

            (a) Use of Facilities and Equipment........................... 31

            (b) Control of Day-to-Day Operations........................ 32

            (c) Control of Policy Decisions................................ 37

(d)  Personnel Responsibilities.................................................................. 39

(e)  Control of Financial Obligations ........................................................ 40

(f)  Receipt of Monies and Profits............................................................. 43

VI.    COUNTS............................................................................................................ 46

PRAYER FOR RELIEF ................................................................................................ 49

## I.    INTRODUCTION

1.      This is a *qui tam* action brought by the United States of America, by and through Plaintiff-Relators Mark O'Connor ("Relator O'Connor") and Sara Leibman ("Relator Leibman") (collectively "Relators"), against United States Cellular Corporation, USCC Wireless Investment, Inc., Telephone and Data Systems Inc. ("TDS") (collectively "U.S. Cellular"), King Street Wireless L.P., King Street Wireless, Inc., Advantage Spectrum, L.P., Frequency Advantage, L.P., Nonesuch, Inc., William Vail and Allison Cryor DiNardo (collectively "Defendants") to redress violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.

2.      The past thirty years have seen revolutionary advances in wireless communications, culminating in devices like the iPhone and the Surface tablet, which can send and receive large amounts of data wirelessly through the "electromagnetic radio frequency ('RF') spectrum." Congress charged the Federal Communications Commission ("FCC") with licensing commercial wireless carriers to use the RF spectrum, and in 1993, Congress gave the FCC authority to assign RF licenses via auctions. In doing so, Congress directed the FCC to ensure that legitimate small businesses are able to bid for licenses at auction and build networks to provide wireless services competitive with the offerings of large, established telecommunications companies.

3.      In furtherance of this goal, the FCC provides legitimate small businesses ("designated entities" or "DEs") with auction "bid credits" worth up to 25 percent of the spectrum license cost. At the same time, and pursuant to Congress' directive, the FCC

adopted a number of safeguards to prevent large companies from using DEs as "fronts" to obtain bidding discounts.

4.      In order to wrongfully and/or fraudulently avail itself of these credits, U.S. Cellular, a company with billions of dollars in yearly revenue, created and used a sham "very small" business, Advantage Spectrum, L.P. ("Advantage"), to purchase 124 licenses at a 2014-2015 FCC spectrum auction.

5.      U.S. Cellular is the fifth-largest wireless company in the United States and it is currently serving over 4.7 million customers. To reduce its spectrum acquisition expenditures – a major cost of providing wireless service – and thereby raise (or at least maintain) the profit margins of U.S. Cellular and its parent TDS, U.S. Cellular uses shell small businesses – including Defendant Advantage – to obtain discounted spectrum licenses from the FCC.

6.      In January 2015, Advantage – as a front for U.S. Cellular – was the high bidder on 124 licenses for AWS-3 spectrum in the FCC's Auction No. 97, with cumulative gross bids of $451,072,000, for which it paid a net total of $338,304,000 to the Federal Treasury.  U.S. Cellular/Advantage obtained "very small business" bid credits of almost $113 million.

7.      The FCC's rules specifically provide that only legitimate small and very small businesses can secure auction bidding credits.  FCC Rules provide that a DE cannot be "affiliated" with a larger company, nor can the larger company have a "controlling interest" in the DE.

8.     Although Advantage attested in its auction and license applications filed with the FCC that Defendant, William Vail, a retiree living in Florida, has both *de jure* and *de facto* control of Advantage, and that Advantage is not affiliated with U.S. Cellular, evidence compiled by Relators shows these statements to the FCC were false.  In particular, a complex web of understandings and arrangements among the Defendants leave Vail with virtually no independent authority over Advantage.

9.     U.S. Cellular provided all of the funds necessary for Advantage to pay the FCC for the 124 licenses and U.S. Cellular supplied Advantage with "employees" and a "management team," including Defendant DiNardo, who since 2002, has been U.S. Cellular's chosen ostensible owner of designated entities to participate on U.S. Cellular's behalf in FCC spectrum auctions.  The limited partnership, loan, bidding, and other agreements signed by Vail prevent him from obtaining financing from any source other than U.S. Cellular, from hiring his own employees or managers, and from choosing where to bid on licenses or how much to spend.  In essence, Vail has loaned his name and signature to U.S. Cellular in exchange for a modest fee so that U.S. Cellular could obtain $113 million in bidding discounts in Auction 97.

10.     As Advantage is a sham entity created by U.S. Cellular solely for the purpose of obtaining spectrum auction discounts meant for "very small businesses," relief under the False Claims Act is merited.

3

## II.    PARTIES

### A.    PLAINTIFFS

11.    Plaintiff-Relator Mark J. O'Connor is an attorney specializing in communications law.  He currently owns and runs Communications Consulting, LLC. After graduating from UCLA Law School in 1992, he practiced communications law at Fleischman & Walsh for a year before moving to Piper & Marbury (now part of DLA Piper) to practice communications law from 1993 through 1999.  From 1999 through 2012, he was a name partner at the communications law firm of Lampert, O'Connor & Johnston, L.L.C.

12.    Plaintiff-Relator Sara F. Leibman is an attorney specializing in communications law and, through Sara Leibman Consulting, she works for telecommunications companies, law firms, and subject matter experts (e.g., economists, technologists).  In 1987, Ms. Leibman graduated from Georgetown University Law School.  Previously, she was the Chief Counsel/Director at T-Mobile USA and a Member of the communications practice at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC in Washington DC.  From 1991 through 1995, she worked as an attorney at the FCC, one year in the Common Carrier Bureau, and then the following three years as Special Counsel in the FCC's Office of General Counsel where she, *inter alia*, worked on the DE and other FCC spectrum auction regulations and adjudications.

**B.    DEFENDANTS**

    **1.    TDS & U.S. Cellular Defendants**

13.    *Telephone and Data Systems Inc.* is a publicly-held Delaware corporation with its principal place of business at 30 N. LaSalle Street, Suite 4000, Chicago, Illinois. TDS owns approximately 80 percent of United States Cellular Corporation, which in turn through its wholly owned subsidiary, USCC Wireless Investment, Inc. ("USCCWI"), owns 90 percent of King Street and Advantage.  Through its TDS Telecom subsidiaries and through United States Cellular Corporation, TDS serves roughly 7 million wireline and wireless customers in 36 states.  TDS has been in the telecommunications service business since 1969 and for the last several years has had annual revenues of just over $5 billion.  TDS and U.S. Cellular are controlled by the Carlson Family Trust.

14.    *United States Cellular Corporation* is a publicly-held Delaware corporation with its principal place of business at 8410 West Bryn Mawr Avenue, Suite 700, Chicago, Illinois.  United States Cellular Corporation is currently the fifth largest commercial mobile phone operator in the United States, serving 4.7 million customers in 426 markets in 26 states.  TDS created United States Cellular Corporation in 1983 as a subsidiary of TDS.  United States Cellular Corporation, directly or through subsidiaries, holds hundreds of FCC commercial wireless licenses by which it offers mobile phone and data services.  United States Cellular Corporation reported revenues of approximately $3.9 billion in both 2013 and 2014.  United States Cellular Corporation wholly owns and controls USCC Wireless Investment, Inc. (USCCWI), which was incorporated on November 1, 2000 as a Delaware corporation.

### 2.   Advantage Defendants

15.   Advantage Spectrum, L.P., Frequency Advantage, L.P., King Street Wireless L.P., King Street Wireless, Inc., William Vail, and Allison Cryor DiNardo are, collectively, the "Advantage Defendants."

16.   *Advantage Spectrum, L.P.* ("Advantage") is the FCC license applicant that participated as U.S. Cellular's partner in Auction 97.  Advantage is organized as a limited partnership under the laws of Delaware, formed on or about August 22, 2014, with its business address listed as 224 E. Garden Street, Suite 5A, Pensacola, FL 32502.  On or about August 29, 2014, *Frequency Advantage, L.P.* and USCCWI executed the Advantage Spectrum Limited Partnership Agreement ("Auction 97 LP Agreement").  Advantage has one general partner, Frequency Advantage, L.P., and one limited partner, USCCWI.  Frequency Advantage has one general partner, Sunshine Spectrum, Inc., which owns 51% of Frequency Advantage and is wholly owned by Defendant *William Vail*.  Frequency Advantage has one limited Partner, Nonesuch, Inc., which owns 49% of Frequency Advantage and is wholly owned by Defendant *Allison Cryor DiNardo*.

17.   *King Street Wireless L.P.* ("King Street") is the FCC licensee that participated as U.S. Cellular's partner in Auction No. 73 in order to obtain 152 spectrum licenses in the 700 MHz band.  King Street is organized as a limited partnership under the laws of Delaware, formed on or about November 27, 2007, with its business address listed as 526 King Street, Suite 209, Alexandria, Virginia 22314.  King Street has one general partner, King Street Wireless, Inc., and one limited partner, USCCWI.  King

6

Street Wireless, Inc.'s sole shareholder is Defendant DiNardo, who resides in Alexandria, VA.

18.     As described in more detail below, Frequency Advantage and USCCWI entered into a Bidding Protocol Agreement dated September 11, 2014, which governed the bidding of Advantage in FCC Auction 97.  Further, Frequency and United States Cellular Corporation have a Loan and Security Agreement of September 19, 2014, and amended on February 6, 2015, which provides Frequency the necessary funding, approximately $6.8 million, to make its capital contribution into Advantage.  Advantage and United States Cellular Corporation also have a Loan and Security Agreement of September 19, 2014, and amended on February 6, 2015, which provides Advantage funding of approximately $272.5 million.

19.     Below is a chart that depicts the Defendants' equity relationships:



**FCC Auction 97 Licenses**

## III.   JURISDICTION AND VENUE

20.     Relators bring this action on behalf of themselves and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

21.     This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District.  In addition, acts prohibited by 31 U.S.C. § 3729 occurred in this District.  31 U.S.C. § 3732(a).

22.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District, including Defendants' bidding on and winning the right to apply for AWS-3 spectrum licenses in this district.

23.     Relators' claims and this Complaint are not substantially the same allegations or transactions publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media, as enumerated in 31 U.S.C. § 3730(e)(4)(A).

24.     To the extent that there has been a public disclosure unknown to the Relators, the Relators are the "original source" under 31 U.S.C. § 3730(e)(4)(B).  The Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information.  *Id.*

## IV.     STATUTORY AND REGULATORY PROVISIONS APPLICABLE TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A.     FCC SPECTRUM AUCTIONS

25.     The Federal Communications Act of 1934, as amended by Congress several times and as codified in Title 47 of the U.S. Code, 47 U.S.C. § 101, *et seq.*, sets out the requirements and the authority by which the Federal Communications Commission ("FCC") regulates interstate communications by radio, television, wire, satellite and cable in the United States.  The Communications Act establishes that the radio spectrum (a

subset of which is used for wireless communications – including use by wireless carriers

to provide mobile services – which is often called "spectrum" or "the airwaves") is

owned by and governed for the people of the United States.  The Communications Act

prohibits all private ownership of spectrum, but permits private and public organizations

to obtain licenses for the exclusive use of portions of the spectrum for several years so

long as that use is consistent with the "public interest, convenience and necessity."  47

U.S.C. § 307.  Consistent with the Communications Act, the FCC allocates a subset of

the radio frequencies for commercial purposes.  Subject to FCC regulation, several

companies offer commercial wireless services to the public today, including AT&T,

Verizon Wireless, T-Mobile, and Defendant U.S. Cellular.

26.     Over the last thirty years, there has been a revolution in mobile wireless

communications as cellphones, smartphones, tablets and other wireless devices have

grown in popularity and have become an integral part of American life for both voice and

data communications.  As the FCC observed in its most recent CMRS Competition

Report to Congress:

> Competition in mobile wireless services is a cornerstone of the Commission's
> mission and essential for driving innovation, investment, and consumer benefits.
> In recent years, mobile wireless services have gone from a luxury to a convenience
> to an absolutely central part of Americans' daily lives. Increasing numbers of
> users now have multiple devices connected to mobile networks. Handsets are no
> longer used just for voice communication, email, social networking, and web
> browsing, but increasingly as hubs for entertainment, mobile commerce, and to
> connect other personal devices such as smart watches and fitness monitors. These
> developments have helped make mobile wireless one of the most important sectors
> in the national economy.[1]

---

[1] *Seventeenth CMRS Competition Report*, 29 FCC Rcd. 15311, ¶ 1 (2014).

27.     Anticipating this increasing need for spectrum for wireless communications, Congress amended the Communications Act in 1993 to give the FCC the authority to award commercial spectrum licenses "through a system of competitive bidding," *i.e.*, by auction.  47 U.S.C. § 309(j)(1).  In doing so, Congress directed the FCC to design the rules and procedures of the auctions to balance three national objectives. *First*, the auctions are to be a means to best serve consumers by allocating spectrum efficiently and rapidly to wireless providers – the premise being that the businesses placing the highest value on the spectrum will win licenses at auction among other competing businesses because the winners anticipate a superior commercial strategy. *Second*, because the spectrum belongs to the American people, Congress required the auctions to "recover[] for the public a portion of the value of the public spectrum resource made available for commercial use and avoid[] unjust enrichment through the methods employed to award uses of that resource."  47 U.S.C. § 309(j)(3)(C). *Finally*, Congress required the FCC to design auction rules that would enable legitimate small businesses to obtain licenses when bidding against much larger incumbent providers, both to encourage the growth of small businesses and because small businesses are likely to offer innovative and different wireless services to consumers that are not offered by the large incumbent providers.  47 U.S.C. § 309(j)(3)(B) (FCC is directed to adopt auction rules to "ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses ...", which are commonly referred to as "designated entities").

28.     The FCC issues licenses (typically for ten years and usually renewable for additional years) to commercial companies, including AT&T, Verizon Wireless, and U.S. Cellular, for the exclusive privilege of offering wireless services, such as mobile voice and broadband Internet access, to the American public.  The American public owns the spectrum, but Congress delegated to the FCC the authority to regulate its use and to issue licenses to commercial entities.

29.     The FCC begins the licensed spectrum allocation process by identifying new frequency bands of RF spectrum that are considered suitable for future commercial use.  For example, in the early 1990s, the FCC determined that certain frequency blocks at and around 1.9 gigahertz (GHz) of the electromagnetic spectrum should be allocated specifically for broadband personal communications service (or broadband PCS) commercial mobile operations.  (In the wireless context, "Hertz" means "one cycle per second" of radiation – by analogy, a clock might also be said to tick at 1 Hertz.)  The FCC then establishes sub-blocks within the larger spectrum blocks that are designed for specific licenses.  For example, the AWS-3 spectrum in the FCC's Auction No. 97 had six available licenses in each geographic market, defined by the FCC and US Department of Congress as either Economic Areas ("EAs") or Cellular Market Areas ("CMAs").  At the same time that the spectrum allocation decisions are made, the FCC adopts specific service, technical, construction, and reporting requirements by which each licensee in that service must comply. All commercial mobile radio service ("CMRS") providers, for example, are subject to the FCC's Part 24 Rules, and all AWS-3 licensees must also comply with a subsection of the FCC's Part 27 rules.  Once the FCC's service and

technical rules are established, the FCC then prepares for and conducts multi-round auctions for the spectrum licenses in which many CMRS providers, including "very small businesses," participate to win licenses.

30.    Prices for licenses in an FCC auction reflect the value companies participating in the auction place on the exclusive rights to use that spectrum in particular markets, including the propagation characteristics of the frequencies and the carrier's need for additional spectrum capacity to meet customer demand in a given market.  For example, prices for licenses in Auction 97 were relatively high compared with prior auctions partly because the demand for suitable commercial spectrum has grown considerably in light of the explosion of mobile data usage by the American public. Similarly, the price for spectrum in an urban geographic region such as New York City will likely be much higher than the price for the same spectrum in less densely populated markets such as Boise, Idaho.

31.    After the FCC declares a bidder to be the "provisionally winning bidder" at the close of the auction, the bidder is entitled to file a non-competing license application (sometimes referred to as a Long Form application).  This licensing process is separate from the auction process because the FCC has a separate statutory obligation to issue licenses only if it determines that doing so would be in the "public interest, convenience and necessity." 47 U.S.C. § 309(a).  During the Long Form application review process, other auction bidders and parties-in-interest have the right to file a Petition to Deny the Long Form application and often raise arguments that the FCC

13

should not issue the license, or should condition the license grant, for various legal and policy reasons.

## B.   DESIGNATED ENTITIES

32.    To implement its small business objectives, Congress directed the FCC to design auction rules to encourage and enable small businesses to obtain licenses through the auction process.  47 U.S.C. § 309(j)(4)(D) (FCC rules shall favor small businesses in the auctions through "the use of tax certificates, bidding preferences, and other procedures").  Congress, however, required the FCC to balance this objective with the need to "prevent unjust enrichment as a result of the methods employed to issue licenses ...."  47 U.S.C. § 309(j)(4)(E).  The FCC, likewise, has emphasized repeatedly that "the integrity of the small business benefit program depends on ensuring that only entities eligible for benefits receive them."  *In the Matter of Updating Part 1 Competitive Bidding Rules, Notice of Proposed Rulemaking*, 29 FCC Rcd. 12426, ¶ 42 (2014); *see also RKO General, Inc. v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981) (noting that the FCC "must rely heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate").

33.    Congress also required the FCC to ensure that the DEs actually provide commercial wireless services using their licenses and remain primarily providers of facilities-based services offered directly to the public.  *In The Matter Of Promoting Efficient Use Of Spectrum Through Elimination Of Barriers To The Development Of Secondary Markets,* Second Report and Order, Order on Reconsideration, and Second

14

Further Notice of Proposed Rulemaking ("*Secondary Markets Second Report and Order*"), 19 FCC Rcd. 17503, ¶ 71 (2004) ("Congress explains that the reason for [the DE provisions] is to deter 'participation in the licensing process by those who have no intention of offering service to the public.' (quoting H.R. Rep. No. 103-111, at 257-58 (1993) (Conference Agreement adopted House provisions, in relevant part, with amendments. H.R. Conf. Rep. No. 103-213, at 483 (1993)). "While we believe that spectrum leasing by small businesses serves many policy goals, we cannot disregard Congress' stated intent that a licensee receiving designated entity or entrepreneur benefits be an entity that actually provides service under the license").

34.     To facilitate the successful participation of DEs in its auctions, the FCC provides auction bidding credits, which discount the payments DEs are required to make the Federal Treasury for licenses they win in an amount measured as a percentage of their gross winning bids. 47 C.F.R. § 1.2110(f)(2)(i)-(iii). For example, a company that meets the DE "very small business" criteria qualifies for a 25 percent bidding credit (a company that meets the DE "small business" criteria qualifies for a 20 percent bidding credit). Thus, if the "very small business" DE makes a winning bid of $500,000 for a license in that auction, it will be required to pay only $375,000 to obtain that license.

35.     To qualify as a DE during the relevant time period of this case, the FCC required that the DE certify in writing to the FCC that the DE's average annual gross revenues for the past three years, including the revenues of all affiliates and entities that control the DE, fall below certain annual revenue caps that vary with the service to be provided. 47 C.F.R. § 1.2111(d). *See Implementation of the Commercial Spectrum*

15

*Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 FCC Rcd. 4757, ¶ 9 (2006) ("*DE Second Report & Order*").

36.     The FCC relies upon all license applicants, including DEs, to be truthful when dealing with the agency.  The FCC is required to review tens of thousands of applications and license-related filings every year from thousands of applicants and licensees, and the staff cannot independently investigate and corroborate the truthfulness, completeness, candor, and accuracy of the statements made by each of its licensees.  The FCC's regulations, therefore, prohibit any person or entity from providing "material factual information that is incorrect or intentionally omit[ing] material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading ...."  47 C.F.R. § 1.17(a)(1).  *See also* 47 C.F.R. § 1.65(a) ("[e]ach applicant is responsible for the continuing accuracy and completeness of information furnished in a pending application or in Commission proceedings involving a pending application"); *In The Matter Of Vermont Telephone Company*, 29 FCC Rcd. 16052, ¶ 12 (2014) (holding that "[f]ull and accurate information concerning applicable gross revenues [of a DE] is necessary to meet our statutory obligation 'to prevent unjust enrichment as a result of the method employed to issue licenses' . . .  The Commission has a strong interest in ensuring that our auctions are fair to all participants and that only bidders that qualify for a bidding credit are able to bid with such a preference, and we rely on auction applicants to make complete, truthful and accurate disclosures in order to properly assess the merits

of an applicant's claim of entitlement to a bidding credit") (citing 47 U.S.C. §

309(j)(4)(E)).[2]

37.     After conducting several auctions in the late 1990s and early 2000s, it

became apparent that some putative DEs were "put[ting] themselves forward as small

companies in order to qualify for auction discounts," even though they had entered into

agreements to function as proxies to larger firms that were not entitled to such benefits.

*See Implementation of the Commercial Spectrum Enhancement Act and Modernization of*

*the Commission's Competitive Bidding Rules and Procedures*, 21 FCC Rcd. 1753, 1771

(2006) ("*DE Further Notice*") (Statement of Comm'r Copps).  Similarly, other DEs had

acquired licenses "not for the legitimate objective of developing or offering spectrum

services," but rather "as investments to be later sold for profit in the after-market." *United*

*States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 321-22 (S.D.N.Y. 2004) (internal

quotation marks and brackets omitted).

---

[2] *See also In re Application of Fox Television Stations, Inc.*, Memorandum Opinion and Order, 10 FCC
Rcd 8452, ¶ 59 (1995) ("[a] licensee's duty of candor is critical given the FCC's many duties. 'The FCC
has an affirmative obligation to license more than 10,000 radio and television stations in the public
interest, each required to apply for [periodic] renewal[s]. ... As a result, the Commission must rely
heavily on the completeness and accuracy of the submissions made to it, and its applicants in turn have an
affirmative duty to inform the Commission of the facts it needs in order to fulfill its statutory mandate.'
*RKO General, Inc. v. FCC*, 670 F.2d 215, 232 (D.C. Cir. 1981), *cert. denied*, 456 U.S. 927 and 457 U.S.
1119 (1982). There is thus no question that an applicant's candor is an issue of the utmost importance to
us. Lack of candor takes two basic forms: (1) misrepresentation, which involves false statements of fact;
and (2) failure to disclose, which involves concealment, evasion, or other failures to be fully
informative."). A licensee's failure to be truthful with the FCC and not disclosing controlling interests
and/or affiliates is a well-settled basis for the FCC to revoke its license. 47 U.S.C. § 312(a)(2); *Marc
Sobel, Decision*, 17 FCC Rcd. 1872 (2002) (revoking certain licenses based on false statements to the
FCC and an unauthorized *de facto* transfer of control); *Terry Keith Hammond, Order to Show Cause,
Notice of Opportunity for Hearing, and Hearing Designation Order*, 21 FCC Rcd. 10267 (2006)
(ordering licensee to show cause why its license should not be revoked for, *inter alia*, misrepresentations
and lack of candor violations).

38.     Because of these concerns, the FCC proposed changes in 2006 to its DE regulations.  During the rule-making process, the U.S. Department of Justice filed a statement asserting that in its "extensive experience reviewing DE's relationships with large wireless carriers in its numerous wireless merger investigations, it has often encountered DEs that are not independent of large enterprises."  Ex Parte Submission of the Department of Justice, *In the Matter of Implementation of the Commercial Spectrum Enhancement Act and the Modernization of the Commission's Competitive Bidding Rules and Procedures*, March 17, 2006 (publicly available at http://www.justice.gov/atr/public/comments/215145.htm).  As a result, the FCC added new requirements to its DE-related eligibility restrictions.

39.     Under the DE rules in effect during the relevant time period for this case, the FCC calculated a DE's average gross revenues for the previous three years – which are used in determining if an entity is a DE – by aggregating:

> a) the DE's own gross revenues;
>
> b) the revenues of the DE's "affiliates";
>
> c) the revenues of the DE's "controlling interests" (those entities that have *de jure* or *de facto* control over the applicant);
>
> d) the revenues of the affiliates of DE's controlling interests; and
>
> e) and the revenues of the entities with which the DE has an "attributable material relationship."

47 C.F.R. § 1.2110(b)(1).

37.    The Complaint alleges below that Defendants (other than Advantage) were either affiliates, controlling interests, or affiliates of controlling interests of Advantage, that Defendants withheld this status from the FCC through material false statements, and that the DE bidding credits the FCC granted to Advantage were, therefore, obtained on false pretenses.

### C.    THE FALSE CLAIMS ACT

40.    The Federal False Claims Act provides that any person who: (1) knowingly presents or causes to present a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; and/or (3) conspires to commit a violation of either (1) or (2) is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the government.  31 U.S.C. §§ 3729(a)(1)(A), (B), (C).

41.    The Federal False Claims Act also provides that any person who knowingly conceals or improperly avoids or decreases an obligation to pay or transmit money to the Government is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the government.  31 U.S.C. § 3729(a)(1)(G).

## V.    SPECIFIC ALLEGATIONS OF THE DEFENDANTS' FALSE CLAIMS

### A.    ADVANTAGE WON DISCOUNTED SPECTRUM LICENSES BY FALSELY ASSERTING THAT IT WAS A DESIGNATED ENTITY

42.    Between November 13, 2014 and January 29, 2015, the FCC auctioned 1,614 AWS-3 spectrum licenses ("Auction 97").  Advantage participated in FCC Auction 97 as a "very small business," claiming to the FCC that it qualified for a 25 percent

bidding credit under the FCC's "Designated Entity" rules because Vail was in *de facto* and *de jure* control of Advantage. Long Form App. Exh C. Advantage further claimed that it was eligible for bidding credits because "Applicant does not have any affiliates" except for three entities controlled by Vail, which are Frequency, Sunshine, and a personal family trust. *Id.* Advantage did not list as affiliates on its applications its 90 percent investor, U.S. Cellular, Allison DiNardo (the 49% owner of its general partner, Frequency), or King Street, which is a DE *de jure* controlled by DiNardo. By excluding the revenues of those associated parties, Advantage asserted to the FCC that its average gross revenues (combined with its affiliates and controlling entities) for the past three years were under $15 million.[3]

43.    On January 29, 2015, FCC Auction 97 closed and Advantage was the high bidder on 124 licenses with aggregate gross bids of $451,072,000, for which it paid a net total of $338,304,000 to the Federal Treasury on or about March 2, 2015. U.S. Cellular/Advantage obtained "very small business" bid credits of almost $113 million. All of the licenses Advantage won are either overlapping with or contiguous to U.S. Cellular's existing coverage areas. Advantage filed an FCC long form application for the 124 licenses on February 13, 2015 ("Long Form"), and the Advantage Long Form license application was accepted for filing by the FCC on April 29, 2015. FCC Wireless Telecommunications Bureau, Public Notice, DA 15-503 (April 29, 2015).

---

[3] 47 C.F.R. § 27.502. U.S. Cellular had gross operating revenues of $3.9 *billion* in 2013, gross operating revenues of $ 4.5 *billion* in 2012, and gross operating revenues of $ 4.3 *billion* in 2011. Defendant TDS, U.S. Cellular's parent, also reported operating revenues of a similar amount.

### B.   ADVANTAGE IS A SHAM USED BY U.S. CELLULAR

44.    U.S. Cellular created Advantage and used it to avoid paying the full costs of FCC spectrum licenses to the Federal Treasury in Auction 97, amounting to a $113 million discount for U.S. Cellular.  U.S. Cellular controls Advantage both directly and indirectly.  The direct control, as discussed in detail below, derives from U.S. Cellular's *de facto* control over Advantage under the FCC's well-established legal criteria. Moreover, U.S. Cellular has indirect control over Advantage because U.S. Cellular is affiliated with and controls King Street and because it is affiliated with Allison DiNardo. DiNardo is affiliated with Advantage through her *de facto* manager role in the Advantage bidding, her control over her employee, Stephen Hinz (Advantage's designated bidder in the auction), and her ability to block all third-party financing of Advantage.  U.S. Cellular thus controls Advantage through a complex web of understandings and arrangements that leave William Vail with almost no independent authority over Advantage.

45.    U.S. Cellular's exploitation of Advantage is but the most recent overt act in a longstanding conspiracy – with DiNardo as a key actor – to defraud the Government.

### C.   U.S. CELLULAR AND ADVANTAGE LIED TO THE FCC TO AVOID PAYMENT OF MORE THAN $113 MILLION IN AUCTION PAYMENTS

#### 1.  U.S. Cellular and DiNardo Have Partnered for Twenty Years To Obtain DE Licenses for U.S. Cellular's Use

46.    As numerous background checks commissioned by Relators have shown, U.S. Cellular and DiNardo have a relationship that started in 1996 and is continuing today with Advantage and Auction 97.  The main component of the DiNardo/U.S. Cellular relationship involves U.S. Cellular funneling money to various "very small

21

businesses" allegedly controlled by, or involving, DiNardo in order to obtain much-needed spectrum at a 20-25% auction discount from what U.S. Cellular should have paid the Federal Treasury.

47.     While these DiNardo/U.S. Cellular bidding entities won DE licenses to provide wireless service to the public, in all that time not a single one of them has ever done so. With at least two of these DEs (Carroll and Barat), after the unjust enrichment period expired, the licenses were transferred to U.S. Cellular for an "immaterial amount." In another (King Street), U.S. Cellular simply took the DE spectrum and used it to provide wireless service to its own U.S. Cellular customers.  U.S. Cellular relies heavily on its relationship with DiNardo to obtain spectrum at a discount compared with the spectrum costs of its competitors; U.S. Cellular has not participated in an FCC auction – except through a DE associated with DiNardo – since 2002.

48.     In 1996, DiNardo began working for the Kington Foundation and, shortly thereafter, for Kington Management Corp. (collectively "Kington") as a key employee and then later as an officer.  Prior to joining Kington, DiNardo had no telecommunications education or experience.  She had several jobs, including serving as a spokesperson for a travel agency industry interest group, a White House Deputy Associate Director of Presidential Personnel, and a fundraiser for the University of Virginia athletics department.

49.     Kington Management participated through various bidding entities as a DE in numerous FCC auctions.  For example, in 1996, it won two C block PCS licenses in FCC Auction No. 5 (the entire auction was reserved for "entrepreneurs" and small

businesses), through a bidding entity named Midwest Wireless Communications LLC

("Midwest Wireless").[4]  In 1997, Kington won nine DE licenses in FCC Auction No. 11

using a bidding entity named Midwest Wireless Communications Iowa, LLC.  In 1998, it

won four more DE licenses in FCC Auction No. 17, again with bidding entity Midwest

Wireless.  In 1999, Midwest Wireless won another three DE licenses in FCC Auction No.

22.  In 2001, via Black Crow PCS Inc., Kington won seventeen DE licenses in FCC

Auction No. 35 (DiNardo was listed as Black Crow's Vice President).  U.S. Cellular

eventually obtained and/or used all of these licenses.

     50.     In 2003, DiNardo unsuccessfully ran for Alexandria, VA city council.  In

response to an election questionnaire from Alexandrians for Sensible Growth, Inc.,

DiNardo stated that "she manages several wireless companies, partnering with US.

Cellular, the nation's eighth largest wireless telecommunications provider to purchase

and manage several U.S. markets."

     51.     By 2005, DiNardo had left Kington and began working even more closely

and directly with U.S. Cellular.  She partnered with U.S. Cellular to form the bidding

entity Carroll Wireless L.P. ("Carroll") in 2005, a limited partnership 90% owned by U.S.

Cellular, which won sixteen DE licenses in FCC Auction No. 58.  Carroll was later sold

to U.S. Cellular in 2012 for an "immaterial amount," but it had provided no wireless

services to the public prior to the acquisition.  In 2006, DiNardo and U.S. Cellular formed

Barat Wireless L.P., a limited partnership 90% owned by U.S. Cellular, which won

---

[4] An "entrepreneur," together with its affiliates and persons or entities that hold interests in the applicant
and their affiliates, must have had gross revenues of less than $125 million in each of the last two years
and must have total assets of less than $500 million.

seventeen DE licenses in FCC Auction No. 66. Barat Wireless was also later sold to U.S. Cellular in 2012 for an "immaterial amount," and it, too, had never provided wireless services to the public prior to the acquisition.

52.     In 2008, DiNardo partnered with U.S. Cellular to form King Street and won 152 discounted DE licenses in FCC Auction No. 73. As shown in detail in *United States ex rel. O'Connor and Leibman v. U.S. Cellular Corp.,* et al., W.D. Okla. Civil No. 15-CV-00370-L (*Under Seal*), DiNardo has essentially ceded all control of the King Street licenses to U.S. Cellular since 2010. Relators' evidence in that case shows that U.S. Cellular has incorporated the King Street licensed spectrum into its own network. U.S. Cellular paid for, constructed and owns the wireless networks that use the King Street licensed spectrum. U.S. Cellular offers service to its own customers through those networks and using the King Street spectrum; King Street itself offers no wireless services. Based on this evidence, King Street has been an affiliate of and under the control of U.S. Cellular since at least 2010, if not before. DiNardo's role in King Street is to act as an agent for U.S. Cellular. DiNardo has falsely asserted to the FCC since 2010 in annual DE Reports that she retains *de facto* control over the King Street licenses, and she has hidden the true agreements, understandings, and relationships between King Street and U.S. Cellular. DiNardo and U.S. Cellular have made numerous false statements to the FCC since 2010 regarding King Street in order to avoid unjust enrichment payments to the Federal Treasury of approximately $100 million.

53.     Also in 2008, DiNardo partnered with U.S. Cellular to form Aquinas Wireless L.P., a limited partnership 90% owned by U.S. Cellular, which won five DE licenses in FCC Auction No. 78.

54.     And, continuing her key role in U.S. Cellular's acquisition of government-discounted spectrum, DiNardo partnered with William Vail and U.S. Cellular in 2014 to form Advantage, which won 124 licenses as a DE in FCC Auction No. 97.

### 2. King Street Is an Affiliate of Advantage.

55.     FCC regulations define an "affiliate" of a DE as a person or entity that:

a) directly or indirectly controls or has the power to control the applicant;

b) is directly or indirectly controlled by the applicant;

c) is directly or indirectly controlled by a third party or parties that also controls or has the power to control the applicant; or

d) has an "identity of interest" with the applicant.

47 C.F.R. § 1.2110(c)(5)(i). The regulations further state that two entities are considered affiliates when they share common management or share common facilities. 47 C.F.R. § 1.2110(c)(5)(vii), (viii).

56.     In particular, under the FCC's rules, "Affiliation generally arises where officers, directors, or key employees serve as the majority or otherwise as the controlling element of the board of directors and/or the management of another entity." 47 C.F.R. § 1.2110(c)(5)(vii).[5] Although Advantage's Long Form application (Exhibit C) asserts that

---

[5] *In the Matter of Implementation of Section 309(j) of the Communications Act - Competitive Bidding*, Second Report and Order, 9 FCC Rcd 2348, n. 142 (1994) (explaining that "[a] key employee is an

Vail is the applicant's sole officer and director, the evidence uncovered by Relators, in conjunction with numerous agreements and understandings among Defendants, make clear that employees or officers of U.S. Cellular and DiNardo in fact manage and are the key employees of Advantage.

57.     Among other things, DiNardo herself, who is the 49% owner of Frequency (Advantage's general partner), is a *de facto* manager of Advantage, not merely a passive limited partner investor in Frequency.

58.     First, according to the Bidding Protocol Agreement (¶ 2), DiNardo is one of three members of the "Bidding Council," which also includes a U.S. Cellular representative and Vail. The Bidding Council reviews every Advantage bid prior to each round of the auction, and provides advice on each bid.  Significantly, the Bidding Protocol Agreement (Exhibit A) sets the Initial Maximum Price for Advantage's bidding on each license in the auction, and Advantage is permitted to exceed those initial bid amounts only with the unanimous consent of all members of the Bidding Council (*i.e.*, the U.S. Cellular representative and DiNardo).  Bidding Protocol Agreement, ¶ 6.  The Initial Maximum Price under the Agreement varies from a high of $1.33 per MHZ POP to a low of $0.40 per MHZ POP, but the average winning price of licenses in Auction 97 was approximately $2.33 per MHZ POP.  Therefore, early in Auction 97, average prices well exceeded the Initial Maximum Prices set in the agreement, meaning that Vail required the consent of both DiNardo and U.S. Cellular to proceed any further in the

employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern." *Citing* SBA Rule 13 C.F.R. § 121.405).

26

auction bidding.  At that point, the terms of the Bidding Protocol Agreement required Vail to concede all control over Advantage's bidding to DiNardo and U.S. Cellular.

59.     Second, Exhibit A of the Bidding Protocol Agreement effectively prevented Vail from bidding on any licenses other than those licenses that would be useful for U.S. Cellular.  The Initial Maximum Prices establish a hierarchy of maximum bidding allowances, with the highest bidding ($1.33 per MHz POP) permitted on those licenses that overlap U.S. Cellular's existing service areas by 90% or more, and maximum prices set in steeply descending order to $0.40 per MHz POP for those licenses with no overlap of U.S. Cellular's existing service areas.[6]  By setting certain bidding caps at "$0.00," Vail was precluded from bidding on Block A1 and B1 licenses entirely.  The Initial Maximum Price limits prevented Vail from winning licenses that were non-overlapping with U.S. Cellular's existing footprint, and prevented him from winning a set of licenses in the auction upon which to build an independent wireless business.  Not surprisingly, the control mechanisms over Vail established in the Bidding Protocol Agreement worked, and Advantage only won licenses in Auction 97 that are overlapping with or contiguous to U.S. Cellular's existing service areas.  Thus, Advantage's statement to the FCC in its Long Form Application (Exhibit C) "that William Vail has sole authority to determine which AWS-3 Licenses, and in which order, the Applicant would enter bids in each round" was materially false and deliberately designed to mislead the FCC into believing that Vail controlled the bidding of Advantage.

---

[6] MHz POP is a standard measure of the cost of wireless spectrum, and one MHz POP equals one MHz of bandwidth serving one person in coverage area. For example, a 50 MHz band of spectrum serving 100,000 individuals in a coverage area would constitute 5 million MHz POPs.

60.     Third, surveillance commissioned by Relators during the course of the auction showed that Vail conducted the Auction 97 bidding from the King Street Alexandria offices and that both DiNardo and an executive from U.S. Cellular were physically present during Vail's bidding.  Moreover, as the head of the Alexandria office, DiNardo controlled Vail's access to the bidding room and supporting computers and software necessary for Advantage to conduct the bidding.  The Frequency Limited Partnership Agreement confirms Relators' evidence, by noting that DiNardo will provide Vail with a "bidding room and assist in the conduct [*sic*] the bidding activities of the Auction Partnership during the Auction" and provide "bidding services."  Frequency LP Agreement (second "Whereas" clause and § 8.1).

61.     Fourth, the terms of the Frequency LP Agreement give DiNardo the power to prevent Vail from obtaining debt or equity financing from a third-party that is not affiliated with U.S. Cellular.  Specifically, Section 5.3 of the Frequency LP Agreement prevents the general partner from incurring any new debt or from re-financing any existing debt or from pledging any assets of the Limited Partnership, and so Vail cannot obtain third-party debt financing or even offer any collateral for such financing.  Further, Sections 3.4, 5.3, and 9.1 of the Frequency LP Agreement prevent the general partner (Vail's company, Sunshine) from adding a limited partner or transferring any general partnership interest without DiNardo's consent.  Under these limitations, Vail cannot obtain third-party equity financing without approval from DiNardo, since he cannot offer any general or limited partnership interests to a potential new investor.

28

62.     Fifth, Relators have uncovered evidence showing that Stephen Hinz, who is listed as the second designated bidder (Vail was the first) on Advantage's Short Form application for Auction 97, has been employed by King Street and Carroll and reported to Allison DiNardo for four years.[7]  Thus, DiNardo is Hinz's boss and employer, and she held that position of authority over him while he also functioned as a bidder for Advantage.  Given that Advantage's sole purpose thus far in its short existence has been to bid for licenses in Auction 97, Hinz, as one of two designated bidders, functioned in a key employee role for Advantage.  Accordingly, Hinz's employer, King Street, is affiliated with Advantage through Hinz's key employment for both.

63.     The FCC's rules also provide that, "Affiliation generally arises where one concern shares office space and/or employees and/or other facilities with another concern, particularly where such concerns are in the same or related industry or field of operations, or where such concerns were formerly affiliated, and through these sharing arrangements one concern has control, or potential control, of the other concern."  47 C.F.R. § 1.2110(c)(5)(viii).  Under this shared facilities test, Advantage is affiliated with King Street, and through King Street, Advantage is also affiliated with U.S. Cellular.

64.     While Auction 97 was ongoing, Relators commissioned private investigations of Vail and others associated with Advantage, as well as surveillance of locations used for bidding and a location specified in the applications and Agreements as Advantage's principal place of business.  Specifically, Vail listed 224 East Garden Street,

---

[7] Through inquiries, background checks, and additional surveillance, the LII investigators determined that Hinz has been the project manager for King Street since September 2011 and is 28 years old.

Suite 5A, Pensacola FL 32502, as Advantage's business address, but the investigators found the suite was vacant. They saw no signage for Advantage or Vail operating out of the building and, while they ultimately learned that Vail had rented an interior office connected to Suite 5, the landlord did not know anything about Vail "since he was never there."

65.     By contrast, surveillance commissioned by Relators of King Street's headquarters, located at 526 King Street, Suite 209, Alexandria VA 22314, during Auction 97 revealed the presence of, among others, Vail, DiNardo, Hinz, and a U.S. Cellular employee from Chicago, Mark Meyer. The Limited Partnership agreement between Sunshine (Vail) and Nonesuch (DiNardo) forming Frequency, moreover, confirms that Defendants' plan was to use the King Street headquarters to conduct bidding for Auction 97. Frequency LP Agreement (Whereas clause, and Section 8.1).

### 3. U.S. Cellular Also Controls Advantage Directly

66.     Controlling interests are defined as "individuals or entities with either *de jure* or *de facto* control of the applicant. *De jure* control is evidenced by holdings of greater than 50 percent of the voting stock of a corporation, or in the case of a partnership, general partnership interests. *De facto* control is determined on a case-by-case basis." 47 C.F.R. § 1.2110(c)(2)(i). In determining if an entity has *de facto* control of the DE, the FCC has looked at factors such as:

       1) use of facilities and equipment;

       2) control of day-to-day operations;

       3) control of policy decisions;

4) personnel responsibilities;

5) control of financial obligations; and

6) receipt of monies and profits.

47 C.F.R. § 1.2110(c)(2)(i). *See also Memorandum Opinion and Order and Hearing Designation Order, Application of Ellis Thompson Corp.*, 9 FCC Rcd. 7138, ¶¶ 9-10 (1994) ("*Ellis Thompson* Order"); *In Re Application of Baker Creek Communications, L.P.* 13 F.C.C.R. 18709 (1998) (citing *Intermountain Microwave* 24 Rad. Reg. 7 (P & F) 983, 984 (1963)); *In the Matter of Ronald Brasher*, 19 FCC Rcd. 18462 (2004); *Marc Sobel*, 17 FCC Rcd.1872 (2002), *aff'd, Kay v. FCC*, 396 F.3d 1184 (D.C. Cir. 2005).

67.    The false statements in Advantage's Short Form and Long Form applications, including that "[t]he General Partner shall have the exclusive right and power to manage, operate and control the Partnership and to make all decisions necessary or appropriate to carry on the business and affairs of the Partnership," Long Form, Exh. D (summarizing the Advantage LP Agreement), disguised that Vail has no control over either Frequency or Advantage.  To the contrary, Relators' evidence shows that U.S. Cellular has *de facto* control of Advantage under each of the FCC's six factors.

### (a) Use of Facilities and Equipment

68.    Advantage fails the FCC's first *de facto* control factor because neither it nor William Vail have unfettered access to facilities and equipment.  Although Advantage listed its principal place of business as an office suite in Pensacola, Florida, Relators' evidence shows that office was vacant during the bidding and that neither Vail nor Advantage had ever occupied that space.  By contrast, as described above, surveillance

done on behalf of Relators shows that Vail was present at the King Street headquarters during Auction 97 and that all the bidding took place from the King Street offices.

69.     Under similar circumstances (shared business space, applicant's use of larger partner's bidding facilities), the FCC found the applicant did not have unfettered access to the facilities. *See Application of Baker Creek Communications, L.P.*, 13 FCC Rcd 18709, ¶ 21 (1998) ("*Baker Creek*").  In particular, "The Commission has ruled that unfettered access to a facility is found where the applicant or licensee is the owner or primary lessee of a given site.  Here there are currently no facilities of record other than Baker Creek's offices which are located within Hyperion and Adelphia's joint places of business.  Because Baker Creek's access to these offices is derived from Hyperion and Adelphia's rights as owners or primary lessees of the property, Baker Creek does not have unfettered access to these facilities."

### (b)  Control of Day-to-Day Operations

70.     Relators' evidence confirms that Vail does not have control of Advantage's day-to-day operations.  While Vail was at one time a communications executive, Relators' background checks and other evidence show that prior to forming Sunshine, he was semi-retired and serving as a grocery store clerk for several years.

71.     Although there is no operational wireless network yet using the licenses Advantage won in Auction 97, an entity bidding in a multi-month, multi-billion dollar spectrum auction has plenty of day-to-day responsibilities, including securing office space, forming a management team and hiring employees, drafting and reviewing

corporate documents, making FCC and corporate filings, setting up technical facilities for

bidding, and analyzing bidding data on a round-by-round basis.

72.     William Vail is the sole officer of Advantage and he has no employees, yet

Advantage's Long Form Application asserts that the General Partner is authorized "to

manage the day-to-day operations of the Applicant, which include, but are not limited to,

the following rights and powers: (1) *the conduct of bidding activity in Auction No. 97*; (2)

the borrowing of money from banks, or other lending institutions; (3) the hiring and

terminating of employees; (4) the operation of the partnership business and enter into

contracts for the management and operation of such business; (5) the acquisition, use and

sale of real and personal property on behalf of the Partnership; (6) the making of all

payments required of the Partnership; and (7) the arranging for all federal, state and local

regulatory and tax filings. Long Form, Exh. D (summarizing Advantage LP Agreement)

(emphasis added).

73.     Relators' evidence shows that U.S. Cellular, or its proxy, Alison DiNardo –

and not Vail – controlled Advantage's day-to-day operations.  Indeed, the other

Defendants supplied everything for Vail, including office space and everything in it,

"employees", a "designated bidder", and a lawyer.[8]  Further, while Advantage asserted in

Exhibit D of its Long Form Application that "Frequency Advantage controls the

Applicant," and summarized the Advantage LP Agreement, as providing the general

---

[8] Advantage's attorney, Thomas Gutierrez, has been DiNardo's attorney for many years and has also
represented King Street, Carroll, and Barat before the Commission.  Mr. Gutierrez's firm also represents
U.S. Cellular before the FCC.  Moreover, as indicated at § 17.8 of the Frequency LP Agreement,
Gutierrez represents both the limited partner (DiNardo's company, Nonesuch) and the general partner
(Vail's company, Sunshine) of Frequency.

partner with broad authority over the Applicant, Advantage did not include summaries of all the other provisions in that agreement and others that specifically *negate* each and every one those alleged general partner powers.

74.    In particular, Section 5.3 of the Advantage LP Agreement requires a super-majority vote (effectively U.S. Cellular's approval) for Advantage to, among other things: "Issue interests in the Partnership to any Person and admit any such Person to the Partnership as a General Partner or an additional Limited Partner…"; "Modify the Bidding Protocol"; "Make any expenditure, or agree to make any expenditure, which would cause expenditures to exceed, by more than ten percent (10%), those budgeted in the annual budget…"; "Incur any indebtedness in the name of the Partnership; modify, extend, renew, refinance or restructure any debt; pledge, assign or otherwise utilize any assets of the Partnership as security for any indebtedness" (except for indebtedness of less than $500,000 once the licenses are granted); and "Sell, transfer, exchange, lease, mortgage, pledge or assign or enter into any agreement for the sale, transfer, exchange, lease or mortgage, pledge or assignment of any License, or of all or substantially all of the Partnership's assets."[9]  As such, Vail cannot obtain third-party debt or equity financing of Advantage for the build out of the wireless networks, as he is expressly

---

[9] The cumulative effect of these super-majority provisions vest U.S. Cellular with far more control than is necessary to protect its interests as a mere passive investor. *In the Matter of Implementation of Section 309(j) of the Communications Act - Competitive Bidding*, Fifth Memorandum Opinion and Order, 10 FCC Rcd 403, ¶ 82 (1994) ("while certain provisions benefitting non-majority investors may not give rise to a transfer of control when considered individually, the aggregate effect of multiple provisions could be sufficient to deprive the control group of *de facto* control, particularly if the terms of such provisions vary from recognized standards.").

prohibited from incurring indebtedness or issuing interests in the partnership. Vail's role is that of a caretaker of licenses for U.S. Cellular's benefit.

75.    Vail's limited and passive role relative to U.S. Cellular is further ensured through other sections of the Advantage LP Agreement. Section 5.4(a) of the Advantage LP Agreement provides that only one executive is expected to run Advantage prior to launch of commercial service, including during the build-out period of the wireless networks, and that executive is expected to work no more than one-half of his/her time to run the company. Such a role – expressly contemplated under the agreement – is wholly inconsistent with that of an independent DE general partner tasked with the ownership responsibilities of building out wireless networks in 124 markets across the country. Also, under Section 5.5(b) of the agreement, the entire "management" of the General Partner is entitled to no more $50,000 per year compensation. That limitation effectively prevents Vail from hiring and forming a management team or even hiring a single full-time employee, and so Advantage is a one-man "shell" company designed to have no meaningful management of the operations.

76.    U.S. Cellular also controls the financing of the future construction of the Advantage wireless networks. Section 5.6 of the Advantage LP Agreement limits the general partner to spending no more than $30 per MHz POP in any market where it has "no arrangement with another licensee," and it can spend no more than $10 per MHz POP where Advantage does have an arrangement with an existing licensee in the market. To meet these tight budget constraints, Advantage must work with an existing wireless operator in the key "$10 per MHz POP" markets and obtain significant financing in

markets where a new wireless network must be built. U.S. Cellular is Advantage's only ally in these markets, which puts U.S. Cellular in control of the costs and expenses of build out of the AWS networks.

77.     Other provisions of the Advantage LP Agreement effectively cabin Vail's ability to make decisions concerning the construction of the AWS networks or to alter those plans without U.S. Cellular's consent. Section 5.3(h) of the Advantage LP Agreement provides that Frequency cannot make "any material change in the Partnership's business of building and operating AWS systems." Section 5.4(b) also prevents Frequency and Vail from owning 5% or more of any entity that owns licenses in the Advantage markets, which means that Frequency cannot partner with a third-party wireless operator through a co-ownership arrangement in order to build out the Advantage networks. Moreover, Section 9.1(a) provides that Frequency cannot sell any of its partnership interests until after Advantage meets all of its FCC construction/build out requirements, which prevents Advantage from seeking third-party equity financing in any given market. In combination with Section 5.6, this means the Advantage network build-out has to be 100% financed by U.S. Cellular, a repeat of the King Street template discussed above.

78.     Finally, and perhaps most critically on the issue of day-to-day operations, Section 5.3(i) of the Advantage LP Agreement limits Advantage from spending more than $500,000 in expenses, including all of the network construction expenses, except for as provided in "*the Management Services Agreement between the Partnership and the affiliate of the Limited Partner*." (emphasis added). Neither the Advantage Long Form

nor the Short Form applications disclose the existence or substance of the Management

Services Agreement between Advantage and U.S. Cellular, even though Exhibit D of the

Long Form application asserts that Advantage has disclosed all relevant arrangements to

the FCC without any mention of such an agreement.  Given U.S. Cellular's prior cover-

up of the King Street-U.S. Cellular management services agreement, as described fully in

the related King Street action, it is likely that the Management Services Agreement with

Advantage effectively provides a cover for U.S. Cellular to control the build out and

ownership of the networks that will use the Advantage licenses, in much the same way as

the management service agreement functioned with respect to the relationship between

U.S Cellular and King Street.

### (c) Control of Policy Decisions

79.      U.S. Cellular, not Vail, controlled all of Advantage's policy decisions,

including where to bid on licenses, what licenses to bid on, and how much to spend.  As

U.S. Cellular announced to shareholders shortly after the bidding ended, "The licenses

expected to be awarded to Advantage Spectrum primarily cover areas that overlap or are

proximate or contiguous to areas covered by licenses that U.S. Cellular currently owns,

operates and/or consolidates."

http://www.streetinsider.com/Corporate+News/Telephone+%26+Data+Systems+(TDS)+

Updates+on+Results+of+Recent+AWS-3+Spectrum+Auction/10216640.html.

80.      As described above, and contrary to Advantage's statement in the Long

Form application (Exhibit D) and the Advantage LP Agreement that Vail would control

all the bidding activities, Relators' evidence and the details of the Defendants' own

Bidding Protocol Agreement, when considered in context, make clear that Vail had no say in policy decisions about Auction 97. Indeed, the Bidding Protocol Agreement does not permit Vail to bid on any licenses that are not useful to U.S. Cellular's operations; he is bound to bid only on licenses that have strategic importance to U.S. Cellular.[10]

81.     U.S. Cellular's control over policy decisions affecting Advantage is also evidenced by the fact that Advantage is represented by the same lawyer who provides legal and FCC regulatory service to all of US Cellular's DEs and also represents US Cellular in issues before the FCC. Representation by the same FCC counsel is a strong indication that a putative controlling interest lacks *de facto* control. In *La Star Cellular Telephone Co.*, for example, U.S. Cellular held a minority interest in applicant La Star. 9 FCC Rcd 7108, ¶ 27 (1994). La Star attempted to establish that its majority owner, SJI, had control over policy decisions at La Star with evidence that SJI had issued policy directives for La Star through SJI's attorney. *Id.* The Commission found, however, that SJI's attorney also acted as counsel to U.S. Cellular and that U.S. Cellular had thereby supervised the prosecution of La Star's application. *See id.*[11] Just as it did with La Star in

---

[10] While the Bidding Protocol Agreement leaves open the possibility of bidding on licenses that are not overlapping the U.S Cellular service area, Advantage is permitted to bid on such licenses only if that bid is: (a) three times the minimum opening bid set by the FCC for round one of the auction; or (b) $0.40 per MHz POP. This potential bid discretion was meaningless in practice, however, because the bid prices in Auction 97 quickly rose above twice the minimum opening bid price and the average Auction 97 winning bid price was $2.33 per MHz POP. As could have been reasonably expected, Vail's role in the auction was to bid for licenses of use to U.S. Cellular, and his ability to bid on other licenses quickly vanished as the rounds of the auction progressed and the per MHz POP prices rose.

[11] *See also Ellis Thompson*, 10 FCC Rcd 12554, ¶ 31 (majority shareholder maintained control over policy decisions in part because he "has always been represented by separate FCC counsel in all proceedings before the Commission and has maintained separate representation in all civil litigation").

1994, and again in auctions between 2006 and 2008, U.S. Cellular provided a lawyer to

Vail and Advantage who represents all the parties.

82.     Further, as described above in Section IV(c)(3)(b), the various provisions of

Advantage LP Agreement prevent Vail from making any future significant policy

decisions on behalf of Advantage.  He cannot form a management team, he has agreed to

permit U.S. Cellular to construct and manage the wireless networks, he is wholly

dependent on U.S. Cellular's financing and he is subservient to U.S. Cellular's business

plans for the AWS service.

### (d) Personnel Responsibilities

83.     With regard to the fourth factor under the FCC's *de facto* control test –

"*personnel responsibilities*"– Advantage also fails.  Vail has made no personnel

decisions of his own and, as described in detail above, while Advantage has no

employees, U.S. Cellular and DiNardo provided Vail with a custom-made King

Street/U.S. Cellular bidding team.  Vail was present during the bidding at the *King Street*

offices along with a *King Street* officer (DiNardo) and a few *King Street* employees.  One

of the King Street employees (Hinz) was Advantage's second designated bidder.  A U.S.

Cellular employee (Mark Meyer) was also present in the bidding offices.

84.     Further, as also discussed above, Section 5.5(b) of the Advantage LP

Agreement effectively prevents Vail from hiring a management team or other employees

for Advantage, and so controlling the personnel that operate the wireless networks using

the Advantage licenses is out of the question.  While the parties intend for U.S. Cellular

to manage and build out the wireless networks through the undisclosed Management

Services Agreement between Advantage and U.S. Cellular, Vail's inability to hire any management to supervise the U.S. Cellular build out of 124 markets, coupled with Vail's commitment to work less than one-half of his time on the business of the Partnership, means that Vail cannot plausibly retain any meaningful control over "personnel responsibilities" of the wireless networks using the Advantage licensed spectrum.

### (e) Control of Financial Obligations

85.    The fifth factor – "*control of financial obligations*" – also points entirely in the direction of a finding of *de facto* control by U.S. Cellular.  Under the FCC's interpretation of this factor, the central inquiry is "who is ultimately responsible for providing the money to pay for the applicant's commitments." *In Re Application of Baker Creek Communications, L.P.*, 13 FCC Rcd. 18709 (1998).  A purported passive investor will be deemed ultimately responsible for the applicant's commitments where (1) it contributes the overwhelming majority of the applicant's required capital; and (2) it places restrictions on the general partner's ability to incur debt on behalf of the partnership from outside lenders. *Id.*

86.    As the FCC has found in the past, financing provisions of large company investors in DEs that "have the effect of deterring potential outside lenders in the first instance and giving the Limited Partner control of whether [the DE] receives funds from outside sources should an outside source of capital be located" give the limited partner – here U.S. Cellular –"the power to dominate [the DE's] business affairs." *Baker Creek Communications,* 13 FCC Rcd. ¶ 24.  Further, as the Commission observed in, *In re Applications of Shawn Phalen, Memorandum Opinion and Order*, 7 FCC Rcd. 623, ¶ 14

40

(1992), "a financier can use that leverage as a bludgeon with which to bend a licensee to its will." *See also Heitmeyer v. FCC,* 95 F.2d 91, 99 (D.C. Cir. 1937) ("It is well known that one of the most powerful and effective methods of control of any business, organization, or institution ... is the control of its finances ... [T]he burden is and should be upon the applicant to satisfy the Commission, not only that he has financial ability to construct and operate a station, but financial ability to construct and operate it free of control, direct or indirect ....").

87.     Advantage is almost 100% financed by U.S. Cellular.  Under the Amended Loan and Security Agreement, U.S. Cellular loaned Advantage $272.5 million shortly before the Advantage final payment of $338 million to the Federal Treasury for the AWS-3 licenses.  Because Advantage is financed 80% debt and 20% equity,[12] Frequency and USCCWI had to contribute the difference of $66 million into Advantage in the form of capital contributions.  However, the ostensible ultimate owners of Frequency – Vail and DiNardo – never made that capital contribution from their own funds.[13]  Instead, U.S. Cellular loaned $6.8 million to Frequency in February 2015 so that Frequency could make its relative 10% capital contribution.  As the 90% equity investor, U.S Cellular made a capital contribution of approximately $66 million.  Moreover, both of the loans

---

[12] Advantage LP Agreement, § 3.2.

[13] As discussed below, Vail and DiNardo made only nominal initial capital contributions to Frequency. According to Schedule I of the Frequency LP Agreement, Vail (through Sunshine) made a capital contribution of $51,000 and DiNardo (through Nonesuch) contributed $49,000. Frequency, in turn, used this money to make its initial $100,000 capital contribution to Advantage, and USCCWI made an initial capital contribution of $900,000.  Advantage LP Agreement, Schedule I.  Moreover, Vail and DiNardo's ownership contributions and risks are temporary, at best, because Frequency and Advantage each make $50,000 annual payments to the general partners and a separate $50,000 payment is made to each of the general partners after the Advantage licenses are issued.

that U.S. Cellular made to Frequency and Advantage provide that neither Advantage nor Frequency have any obligation to make any *principal or interest payments in the first ten years* of the term of the loan.[14] If U.S. Cellular follows its *modus operandi,* it will buy Advantage for an "immaterial amount" before that time. Thus, even the nominal contributions made by Frequency were illusory and, as a practical matter, the owners of Advantage and Frequency (Vail and DiNardo) incurred no real obligations to pay back the debt incurred to make their capital contributions.[15] U.S. Cellular paid for all of the debt and capital contributions of Advantage. In return, the LP Agreements and loan agreements prevent Advantage and Frequency from obtaining any third-party debt or equity financing by prohibiting them from incurring new debt, from selling any new partnership interests, from selling any of the licenses, and from using any licenses (or any other assets of the partnership) as collateral.[16]

88.     U.S. Cellular also acknowledges in its Annual Reports that it has "financial control" over Advantage and Advantage's general partner, Frequency. U.S. Cellular's 2014 Annual Report states that it "consolidates variable interest entities [VIEs] in which it has a controlling financial interest and is the primary beneficiary." According to U.S.

---

[14] Advantage Loan and Security Agreement, § 1.03. Frequency Loan and Security Agreement, § 1.03.

[15] "Likewise, financing agreements may result in a finding of affiliation if the debt relationship essentially gives the creditor the power to control the enterprise – for example, if the size of the debt is particularly large, the terms of the loan are not commercially reasonable, and the definition of default is unconventional." *In the Matter of Implementation of Section 309(j) of the Communications Act - Competitive Bidding*, Second Report and Order, 9 FCC Rcd 2348, ¶ 272 (1994).

[16] *See, e.g.*, Advantage Loan and Security Agreement, § 5.01 (Advantage gives U.S. Cellular a first priority security interest in all of Advantage's present and future assets and property); Advantage LP Agreement, § 5.3 (Frequency must obtain U.S. Cellular's consent prior to selling or leasing any FCC licenses, incurring any debt or re-financing existing debt, or adding a new limited or general partner).

Cellular, "A controlling financial interest will have both of the following characteristics: (a) the power to direct the VIE activities that most significantly impact economic performance and (b) the obligation to absorb the VIE losses and right to receive benefits that are significant to the VIE."

89.     U.S. Cellular's Annual Reports and balance statements similarly make clear that it provided all the funding for Advantage to participate in Auction 97. In particular, the 2014 report states, "U.S. Cellular's capital contributions and advances made to its VIEs totaled $60.9 million in the year ended December 31, 2014" and that in "2013, there were no capital contributions or advances made to VIEs or their general partners that were not VIEs." Notably, U.S. Cellular's 2014 Annual Report also states that "to participate in [Auction 97], a $60.0 million deposit was made to the FCC in 2014."

### (f) Receipt of Monies and Profits

90.     With regard to the sixth factor under the FCC's *de facto* control test, *Receipt of Monies and Profits*, U.S. Cellular expects to reap the financial rewards from its 90% ownership of Advantage. As U.S. Cellular stated in its 2014 annual report to shareholders, U.S. Cellular "anticipates benefiting from or absorbing a majority of [Advantage's] expected gains or losses" and "it has a controlling financial interest and is the primary beneficiary" in Advantage. U.S. Cellular further states that it has a "controlling financial interest" in Advantage in part because it has "the obligation to absorb [Advantage's] losses and right to receive benefits that are significant to [Advantage]." *Id.*

43

91.    Moreover, the agreements and arrangements in place ensure that Vail bears none of the risks of ownership.  First, while Vail contributed $51,000 into Frequency in September 2014, he will be more than repaid that amount soon after the licenses are granted through provisions in the Frequency LP Agreement and the Advantage LP Agreement (Section 5.5(a) in each agreement).  These provisions provide that the general partner – Sunshine and Frequency – of each partnership shall each be paid a fee of $50,000 when the Advantage licenses are issued by the FCC, and then an annual $50,000 fee thereafter.  Therefore, Vail is essentially paid $75,000 (i.e., $50,000 as owner of Sunshine and $25,000 as 51% owner of Frequency) as soon as the FCC issues the Advantage licenses, which means he receives back his entire investment of $51,000 plus a 50% return on his money.  Thereafter, he receives the same $75,000 annually but he has no investment risk in either Frequency or Advantage.  Moreover, Vail is guaranteed to receive his initial investment back plus a profit because the LP Agreements provide that, if the licenses are not granted for any reason, or if control of the general partners is transferred within two years, then the general partners receive a $100,000 fee.  Thus, Vail's risks of ownership are not tied to the success or failure of the AWS wireless networks, but his profits are guaranteed merely for posing to the FCC as a DE bidder and license holder.

92.    Similarly, ownership profits and gains are not tied to the success of the AWS wireless networks.  Vail cannot receive any additional income from Advantage, except as described above, for the entire term of the partnership agreements.  Unless the licenses are transferred within the first two years, his first opportunity to realize a profit

on his 5% Advantage ownership stake is through a "put" right in years six or seven (*i.e.*, just after unjust enrichment period expires) in which he can sell the general partnership to U.S. Cellular in return for his capital contribution (i.e., $51,000) plus interest compounded annually (ranging from 8% to 19%, and depending on the stock price appreciation of U.S. Cellular). Advantage LP Agreement, § 9.5.[17] This guaranteed but relatively conservative return is simply not reflective of the true potential value or profits of Vail's 5% ownership of 124 commercial wireless networks, especially when the licenses alone are today worth more than $400 million.

93.     Relators' evidence relevant to each factor the FCC uses to determine *de facto* control shows that U.S. Cellular (and its 84 percent owner, TDS) has a controlling interest in Advantage and that Advantage made multiple material misrepresentations to the government in its Long Form and Short Form applications. Once U.S. Cellular's and TDS's billions of dollars in revenues, along with King Street's revenues, are added to Advantage's revenues, Advantage would no longer be a "very small business." Had Advantage or U.S. Cellular disclosed the true nature of their relationship, they would have owed the Federal Treasury an additional $113 million in final auction payments following Auction 97.

94.     Defendants have submitted claims for payment, and conspired to submit (and/or cause to be submitted) false claims or statements to the government in order to obtain and/or retain payments – in the form of auction bidding credits from the FCC – of

---

[17] Similarly, the Frequency LP Agreement (§ 9.5) provides Vail with a "put" option to sell the general partner to DiNardo in years five and six of the FCC licenses (*i.e.*, just after the unjust enrichment period), at a price of his initial capital contribution plus 10% interest compounded annually.

$113 million. Defendants submitted such claims for payment despite Defendants' knowledge that U.S. Cellular (and its 84 percent owner, TDS) is an affiliate of, and has a controlling interest in, Advantage. In reliance upon the above-described false claims and false statements, the United States has disbursed funds to the Defendants and/or Defendants have knowingly concealed or improperly avoided or decreased their obligations to pay or transmit money to the Federal Treasury.

95.    Collectively, these arrangements and practices belie Advantage's representation to the FCC that "Frequency Advantage controls the Applicant [*i.e.*, Advantage]".


## VI.    COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### (Against All Defendants)

Relators re-allege and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

By virtue of the misrepresentations and concealment described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for improper payment or approval from the FCC.

The United States, unaware of the falsity or fraudulent nature of the claims that Defendants presented, or caused to be presented, paid for claims that otherwise would not

have been allowed, or transferred property belonging to the United States to the Defendants.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWO
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### (Against All Defendants)

Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

By virtue of the misrepresentations and concealment described above, Defendants knowingly made, used, or caused to be made or used, a false record(s) or statement(s) material to a false or fraudulent claim with regard to payments from the FCC.

The United States, unaware of the falsity or fraudulent nature of the claims that Defendants submitted or caused to be submitted, paid for claims that otherwise would not have been allowed, or transferred property belonging to the United States to the Defendants.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)
### (Against All Defendants)

Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

Defendants knowingly made, used or caused to made or used a false record or statement material to an obligation to pay or transmit money to the Government and Defendants knowingly concealed and improperly avoided or decreased their obligation to pay such monies to the Government by concealing their relationship from the FCC in order to avoid paying the Federal Treasury the bidding credits the FCC awarded to Defendants.

As a result of Defendants' retention of the improperly obtained funds, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOUR
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)
### (Against All Defendants)

Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

By virtue of the conduct described above, Defendants knowingly conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) in violation of 31 U.S.C. § 3729(a)(1)(C).

The United States, unaware of the conspiracy among Defendants to submit false claims, make false statements or records, and/or to conceal and improperly avoid or decrease their obligation to pay funds to the Federal Treasury, paid for claims that otherwise would not have been allowed, transferred property belonging to the United States to the Defendants and/or failed to receive funds otherwise due.

By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, Relators request that judgment be entered against Defendants, ordering that:

a.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*;

b.      Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions;

c.      The Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

e.      The Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

f.      Defendants be enjoined from concealing, removing, encumbering or

disposing of assets which may be required to pay the civil monetary penalties imposed by

the Court;

g.      Defendants disgorge all sums by which it has been enriched unjustly by its

wrongful conduct; and

h.      The United States and the Relators recover such other relief as the Court

deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby

demand a trial by jury.

Dated: May 11, 2015                       Respectfully submitted,


Vicki Z. Behenna, OBA #10734
Thomas B. Snyder, OBA # 31428
CROWE & DUNLEVY, A Professional Corp.
324 North Robinson, Suite 100
Oklahoma City, OK 73102
Telephone: (405) 235-7700
Facsimile: (405) 239-6651
vicki.behenna@crowedunlevy.com
thomas.snyder@crowedunlevy.com

Benjamin J. Vernia, D.C. Bar # 441287
THE VERNIA LAW FIRM
1455 Pennsylvania Ave., N.W., Suite 400
Washington, D.C. 20004
Telephone: (202) 349-4053
Facsimile: (866) 572-6728
bvernia@vernialaw.com
*Pro hac vice application to be submitted*

**ATTORNEYS FOR RELATORS MARK J.
O'CONNOR AND SARA F. LEIBMAN**

## CERTIFICATE OF SERVICE

On May 11, 2015, I hereby certify that a copy of this Complaint was served upon

the following persons certified mail, return receipt requested:

United States Attorney General Loretta E.
Lynch
United States Department of Justice
950 Pennsylvania Ave., N.W.
Washington, D.C.  20530

United States Attorney General Loretta E.
Lynch
c/o Michael Granston, Director,
Commercial Litigation Branch - Fraud
Section
U.S. Department of Justice
Ben Franklin Station
950 Pennsylvania Avenue
P.O. BOX 261
Washington, D.C.  20530
(202) 307-0231
(202) 616-3085

United States Attorney for the Western
District of Oklahoma Sanford C. Coats
United States Attorney's Office
210 West Park Avenue, Suite 400
Oklahoma City, OK  73102
(405) 553-8700
(405) 553-8888 (fax)

51