# EXHIBIT F

## No. 1:20-cv-2070-TSC

LOAN AND SECURITY AGREEMENT

Dated as of September 19, 2014

Frequency Advantage, L.P., a Delaware limited partnership ("Borrower"), and UNITED STATES CELLULAR CORPORATION, a Delaware corporation (the "Lender"), agree as follows:

ARTICLE I
AMOUNTS AND TERMS OF THE ADVANCES

SECTION 1.01.  The Advances.  The Lender agrees, on the terms and conditions hereinafter set forth, to make advances (the "Advances") to the Borrower in an amount not to exceed at any time outstanding, $1,200,000.00 (the "Commitment").  The Commitment shall terminate on the earliest of the dates set forth in Section 1.03 below or as set forth in Section 6.01.  The proceeds of the Advances shall be used for the sole purpose of permitting the Borrower to make required capital contributions to Advantage Spectrum, L.P. ("Auction LP") of which such Borrower is a general partner in accordance with the terms of the partnership agreement for such Auction LP.

SECTION 1.02.  Making the Advances.  Each Advance shall be made on notice, in the form of Exhibit B attached hereto, given not later than 10:00 A.M. (Chicago time) on the fifth Business Day prior to the date of the proposed Advance, by the Borrower to the Lender, specifying the date and amount thereof; provided, however, that the notice for the initial Advance may be given on the date the initial Advance is requested to be made.  Not later than 1:00 P.M. (Chicago time) on the date of such Advance and upon fulfillment of the applicable conditions set forth in Article II, the Lender will make such Advance available to the Borrower in U.S. dollars at the Lender's address referred to in Section 7.02 in same day funds.  Each notice from the Borrower to the Lender requesting an Advance shall be irrevocable and binding on the Borrower.

SECTION 1.03.  Interest and Repayment; Promissory Note.  The Borrower shall pay interest on the aggregate unpaid principal amount of the Advances at the rate of eight percent (8.0%) per annum, compounded annually.  Such interest together with the aggregate unpaid principal amount of the Advances shall be payable on the earliest to occur of (i) the date of the receipt by the Borrower of the proceeds of the sale of all or substantially all of the assets of the Borrower, (ii) the date of the receipt by the Borrower of the proceeds of the sale of all or any portion of the Borrower's general partnership interest in Auction LP, (iii) the date of the receipt by any of the Borrower's partners of the proceeds of the sale of all or any portion of such partner's partnership interests in the Borrower, (iv) the date of receipt by any of the Borrower's partners of the proceeds of the sale of all or any portion of the capital stock of the partner, (v) the date of receipt by Auction LP of the proceeds of the sale of all or substantially all of Auction LP's assets, (vi) the tenth anniversary of the date of the execution and delivery of this Agreement, or (vii) in the event that the entire deposit made by Auction LP with the Federal Communications Commission ("FCC") for Auction No. 97 is returned to Auction LP, the date on which the deposit is so returned.  The Borrower's obligations to make such payments of interest

and repayments of principal shall also be evidenced by a promissory note of the Borrower, in substantially the form of Exhibit A hereto (the "Note").

SECTION 1.04. Optional Prepayments. The Borrower may, upon at least three Business Days' notice to the Lender stating the proposed date and principal amount of the prepayment, and if such notice is given the Borrower shall, prepay the outstanding principal amounts of the Advances in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid; provided, however, that each partial prepayment shall be in a principal amount of not less than $100,000.

SECTION 1.05. Payments and Computations. The Borrower shall make each payment hereunder and under the Note not later than 11:00 A.M. (Chicago time) on the day when due in U.S. dollars to the Lender at its address referred to in Section 7.02 in same day funds. All computations of interest shall be made by the Lender on the basis of a year of 365 days regardless of any leap year, in each case, for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable, compounded annually. Each determination by the Lender of an interest amount hereunder shall be conclusive and binding for all purposes, absent manifest error.

SECTION 1.06. Payment on Non-Business Days. Whenever any payment hereunder or under the Note shall be stated to be due on a day other than a day of the year on which banks are not required or authorized to close in Chicago, Illinois (any such other day being a "Business Day"), such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest.

ARTICLE II
CONDITIONS OF LENDING

SECTION 2.01. Conditions Precedent to Initial Advance. The obligation of the Lender to make its initial Advance is subject to the condition precedent that the Lender shall have received on or before the day of the Advance the following items listed in clauses (a) through (e) below, each dated such day, in form and substance satisfactory to the Lender:

(a)    This Agreement;

(b)    The Note;

(c)    A Pledge Agreement evidencing the pledge by Borrower of its interest as a general partner of Auction LP in the form of Exhibit C attached hereto;

(d)    Pledge Agreements evidencing the pledge by each of the partners of the Borrower of all of their partnership interest in Borrower in the form of Exhibit D attached hereto;

(e)    Pledge Agreements evidencing the pledge by all of the shareholders of the partners of Borrower of all of the outstanding shares of capital stock of each of the partners of the Borrower in the form of Exhibit E attached hereto;

ACTIVE 201687698v.2

(f)     A Limited Recourse Guaranty by each of the partners of the Borrower of the obligation of the Borrower under this Agreement, including the Promissory Note, in the form of Exhibit F attached hereto;

(g)     A Limited Recourse Guaranty by each of the shareholders of the partners of the Borrower of the obligation of the Borrower under this Agreement, including the Promissory Note, in the form of Exhibit F attached hereto;

(h)     Certified copies of the resolutions of the Borrower approving this Agreement, the Note and of all documents evidencing other necessary partnership action and governmental approvals, if any, with respect to this Agreement and the Note;

(i)     A certificate of the Secretary or an Assistant Secretary of the general partner of Borrower certifying (i) the names and true signatures of the officers of the general partner of Borrower authorized to sign this Agreement and the Note, and (ii) copies attached thereto of the organizational documents of the Borrower and the Certificate of Limited Partnership of Borrower and the Partnership Agreement of Borrower; and

(j)     Uniform Commercial Code financing statements covering the collateral referred to in Section 5.01, to be filed in the jurisdiction where the Borrower is organized.

SECTION 2.02.   Conditions Precedent to All Advances.  The obligation of the Lender to make each Advance (including the initial Advance) shall be subject to the further conditions precedent that (a) a duly executed Notice of Borrowing shall have been delivered to the Lender by the date required under Section 1.02, (b) on the date of such Advance the following statements shall be true (and each giving of the applicable notice requesting such Advance and the acceptance by the Borrower of the proceeds of such Advance shall constitute a representation and warranty by the Borrower that on the date of such Advance such statements are true):

(i)     The representations and warranties contained in Section 3.01 of this Agreement are correct on and as of the date of such Advance, before and after giving effect to such Advance and to the application of the proceeds therefrom, as though made on and as of such date; and

(ii)     No event has occurred and is continuing, or would result from such Advance or from the application of the proceeds therefrom, which constitutes an Event of Default (as defined in Section 6.01) or would constitute an Event of Default but for the requirement that notice be given or time elapse or both;

and (c) the Lender shall have received such other approvals, opinions or documents as the Lender may reasonably request.

<div align="center">

ARTICLE III
REPRESENTATIONS AND WARRANTIES

</div>

SECTION 3.01.   Representations and Warranties of the Borrower.  The Borrower represents and warrants as follows:

ACTIVE 201687698v.2

(a)     The Borrower is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)     The execution, delivery and performance by the Borrower of this Agreement and the Note, are within the Borrower's partnership powers, have been duly authorized by all necessary partnership action, and do not contravene (i) the Borrower's limited partnership agreement or other organizational documents or (ii) any law or contractual restriction binding on or affecting the Borrower.

(c)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the Borrower of this Agreement and the Note.

(d)     This Agreement and the Note are legal, valid and binding obligations of the Borrower enforceable against the Borrower in accordance with their respective terms.

(e)     The Borrower has not incurred any "Debt" (as defined in Section 4.02(a) below) other than the Debt under this Agreement and the Note.

(f)     The Borrower satisfies FCC requirements to be a general partner of Auction LP which is a "Designated Entity" within the meaning of Part 1 of the FCC's Rules and Regulations 47 C.F.R. § 1.2110(a) and as a very small business for purposes of being eligible to participate in auctions conducted by the FCC for FCC licenses for advanced wireless services systems.

(g)     The Borrower's chief executive office is located at 224 E. Garden St., Suite 5, Pensacola, FL  32502.

## ARTICLE IV
## COVENANTS OF THE BORROWER

SECTION 4.01.  Affirmative Covenants.  So long as any Advances or other obligations hereunder shall remain unpaid or the Lender shall have any Commitment hereunder, the Borrower shall, unless the Lender shall otherwise consent in writing:

(a)     Compliance with Laws, Agreements, Etc.  Comply in all material respects with (i) all applicable laws, rules, regulations and orders, such compliance to include, without limitation, paying before the same become delinquent all taxes, assessments and governmental charges imposed upon it or upon its property except to the extent contested in good faith, (ii) the limited partnership agreement of the Borrower, and (iii) the limited partnership agreement of Auction LP of which Borrower is the general partner.

(b)     Partnership Existence.  Maintain and preserve its limited partnership existence, rights, franchises, licenses and privileges in its jurisdiction of its organization and in all other jurisdictions in which such qualification is necessary in view of its business and operations and property and preserve, protect and keep in full force and effect its material rights and its governmental (including, without limitation, FCC) licenses, permits, franchises and approvals.

4

(c)    <u>General Reporting Requirements</u>.  Furnish to the Lender (i) as soon as possible and in any event within five days after the occurrence of each Event of Default and each event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, continuing on the date of such statement, a statement of the general partner of the Borrower setting forth details of such Event of Default or event and the action which the Borrower has taken and proposes to take with respect thereto and (ii) prompt written notice upon obtaining knowledge thereof of the filing or commencement of any action, suit or proceeding by or before any court or any governmental authority, which if adversely determined against the Borrower, would impose a material liability on the Borrower.

(d)    <u>Financial Reporting</u>.  Furnish to the Lender (i) within thirty (30) days after the end of each fiscal quarter of the Borrower, unaudited balance sheets and statements of operations of the Borrower as of the end of such fiscal quarter and for the then elapsed portion of the Borrower's fiscal year, and (ii) within forty (40) days after the end of each fiscal year of the Borrower, an annual audited financial statement of the Borrower, consisting of the balance sheets and statements of operations, income, partners' capital and cash flows, for such fiscal year, prepared in accordance with generally accepted accounting principles ("GAAP"), which consolidated financial statements and other above described financial information shall have been audited by a nationally recognized independent certified public accounting firm satisfactory to the Lender, and accompanied by such independent certified public accounting firm's unqualified opinion.  The Borrower shall furnish to the Lender concurrently with the provision of financial statements described above, a certificate of the Borrower's independent certified public accountant or the Borrower's general partner, as applicable, to the effect that the financial statements referred to in clause (i) or (ii) above, present fairly the financial position and results of operations of the Borrower and as having been prepared in accordance with GAAP consistently applied, in each case subject to normal year end audit adjustments except for the statements referred to in clause (ii) above.

(e)    <u>Use of Advance Proceeds</u>.  Use the proceeds of the Advances solely for the purposes specified in <u>Section 1.01</u>.

(f)    <u>Books and Records</u>.  Maintain accurate books and records of its business and operations in accordance with GAAP.

(g)    <u>Insurance</u>.  Maintain in full force and effect with respect to its insurable properties, insurance policies in such amounts and covering such risks as would be consistent with prudent industry practice.

SECTION 4.02.  <u>Negative Covenants</u>.  So long as any Advances or other obligations hereunder shall remain unpaid or the Lender shall have any Commitment hereunder, the Borrower shall not, without the prior written consent of the Lender:

(a)    <u>Liens, Etc</u>.  Create or suffer to exist any lien, security interest or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to any of its properties, whether now owned or hereafter acquired, or assign any right to receive income, in each case to secure or provide for the payment of any Debt (as defined below in this subsection (a)) of any person or entity.

5

"Debt" means (i) indebtedness for borrowed money, (ii) obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) obligations to pay the deferred purchase price of property or services, (iv) obligations as lessee under leases which shall have been or should be, in accordance with generally accepted accounting principles, recorded as capital leases, (v) reimbursement obligations, contingent or otherwise, with respect to letters of credit and banker's acceptances issued for the account of the Borrower and (vi) obligations under direct or indirect guaranties in respect of, and obligations under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (i) through (v) above.

(b)    <u>Sales of Assets</u>.  Sell, assign, transfer, lease, convey or otherwise dispose of any property, whether now owned or hereafter acquired, in excess of $1,000,000 in the aggregate.

(c)    <u>Mergers, Etc</u>.  Merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of, directly or indirectly (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to, or acquire all or substantially all of the assets of, any person or entity (whether in one transaction or a series of transactions).

(d)    <u>Incurrence of Other Debt</u>.  Incur any Debt other than the Debt under this Agreement and the Note and Debt that is subordinate to Debt under this Agreement and Note.

(e)    <u>Payments on Other Debt</u>.  Prepay or repay any principal payable in respect of any Debt incurred by the Borrower <u>unless</u> such payment is a regularly scheduled payment under such Debt.

(f)    <u>Restricted Payments</u>.  Make any payments or distributions to any of its partners except as may be permitted under those certain Pledge Agreements of even date herewith between the Borrower's partners and the Lender and in accordance with the terms of the Borrower's limited partnership agreement and any management services agreement between the Borrower and the Lender or any affiliate of the Lender.

ARTICLE V
COLLATERAL SECURITY

SECTION 5.01.  <u>Collateral Security</u>.  To secure payment and performance of all obligations of the Borrower under this Agreement and under the Note, including accrued interest, regardless of whether such interest accrues before or after the commencement of any case or proceeding in bankruptcy with respect to the Borrower, and regardless of whether or not allowed in the proceeding (the "Obligations"), the Borrower hereby grants to the Lender, to the extent permitted by law, a right of setoff against and a continuing security interest in and to all of the Borrower's tangible and intangible personal property, fixtures and real property leasehold and easement interests, whether now owned or existing, or hereafter acquired or arising, wheresoever located (collectively, the "Collateral"), including, without limitation, all of the following property, or interests in property:  (a) all machinery, equipment and fixtures, including without

6

limitation, fiber optic and other cables, transmission and switching equipment, transmission facilities, connection equipment, conduit, carrier pipes, junctions, regenerators, power sources, alarm systems, electronics, structures and shelters and cable laying equipment; (b) all accounts, accounts receivable, other receivables, contract rights, leases, chattel paper, investment property, and general intangibles of the Borrower (including, without limitation, goodwill, going concern value, patents, trademarks, trade names, service marks, blueprints, designs, product lines and research and development), including, without limitation, all of the Borrower's rights under all present and future governmental approvals, permits, licenses and franchises heretofore or hereafter granted to the Borrower for the operation and ownership of its assets (excluding licenses and permits issued by the FCC or any other governmental authority to the extent, and only to the extent, it is unlawful to grant a security interest in such licenses and permits, but including, to the maximum extent permitted by law, all rights incident or appurtenant to such licenses and permits, including, without limitation, the right to receive all proceeds derived from or in connection with the sale, assignment or transfer of such licenses and permits), whether now owned or hereafter acquired by the Borrower, or in which the Borrower may now have or hereafter acquire an interest; (c) all instruments, money, letters of credit, documents, policies and certificates of insurance, securities, bank deposits, deposit accounts, checking accounts and cash now or hereafter owned by the Borrower, or in which the Borrower may now have or hereafter acquire an interest; (d) all inventory, including all merchandise, raw materials, work in process, finished goods and supplies, now or hereafter owned by the Borrower or in which the Borrower may now have or hereafter acquire an interest; (e) all of the Borrower's leasehold interest in any real property, all of the Borrower's licenses, easements and rights of way with respect to real property; (f) all of the Borrower's commercial tort claims; (g) all accessions, additions or improvements to, substitutions for and all proceeds and products of, all of the foregoing, including proceeds of insurance; (h) all books, records, documents, computer tapes and discs relating to all of the foregoing; and (i) all of the issued and outstanding partnership interests of Auction LP now or at any time or times hereafter owned by the Borrower, whether or not such partnership interests are represented by certificates, and any certificates representing such partnership interests, and all of the distributions, cash, instruments, investment property and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of such partnership interests.

     SECTION 5.02.  <u>Preservation of Collateral and Perfection of Security Interests</u>. The Borrower shall execute and deliver to the Lender, and at any time or times thereafter at the request of the Lender, all financing statements or other documents (and pay the cost of filing or recording the same in all public offices deemed necessary by the Lender), as the Lender may request, in a form satisfactory to the Lender, to perfect and keep perfected the security interest in the Collateral granted by the Borrower to the Lender or to otherwise protect and preserve the Collateral (including, without limitation, mortgages on any real property acquired by the Borrower) and the Lender's security interest therein or to enforce the Lender's security interest in the Collateral.  Should the Borrower fail to do so, the Lender is authorized to sign any such financing statements as the Borrower's agent.  The Borrower further authorizes the Lender to file any such financing statements which do not require the signature of the Borrower and agrees that a carbon, photographic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.

ACTIVE 201687698v.2

ARTICLE VI
EVENTS OF DEFAULT; REMEDIES

SECTION 6.01.  Events of Default.  If any of the following events ("Events of Default") shall occur and be continuing:

(a)    The Borrower shall fail to pay any principal of, or interest on any Advance when the same becomes due and payable; or

(b)    Any representation or warranty made by the Borrower (or any of its officers) under this Agreement shall prove to have been incorrect in any material respect when made; or

(c)    The Borrower shall fail to perform or observe any other material term, covenant or agreement contained in this Agreement for a period of ten (10) days after written notice thereof shall have been given to the Borrower by the Lender; or

(d)    The Borrower shall generally not pay its debts as such debts become due, or shall admit in writing its inability to pay its debts generally, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower seeking to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property and, in the case of any such proceeding instituted against it (but not instituted by it), either such proceeding shall remain undismissed or unstayed for a period of 60 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for it, or for any substantial part of its property) shall occur; or the Borrower shall take any partnership action to authorize any of the actions set forth above in this subsection (d); or

(e)    Any judgment or order for the payment of money in excess of $100,000 shall be rendered against the Borrower and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of 10 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(f)    Any license, permit, franchise or other governmental approval or authorization necessary for the continuing operation of the Borrower or Auction LP, of which such Borrower is the general partner, or any of the Borrower's or Auction LP's telecommunications systems, shall cease to be in full force and effect, which in the case of an order of the FCC or any other governmental authority having jurisdiction with respect thereto, revoking or deciding not to renew any such license, permit, franchise or other governmental approval or authorization, shall occur upon the issuance of such order, and in any other case, shall occur when such order becomes final; or

8

(g)     An "Event of Default" shall occur under that certain Loan and Security Agreement of even date herewith between Auction LP and the Lender;

then, in any such event, the Lender may, by notice to the Borrower, (i) declare its obligations to make Advances to be terminated, whereupon the same shall forthwith terminate, and (ii) declare the Note, all accrued interest thereon and all amounts payable under this Agreement to be forthwith due and payable, whereupon the Note, all such interest and all such amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrower; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the Federal Bankruptcy Code, (A) the obligation of the Lender to make Advances shall automatically be terminated and (B) the Note, all such interest and all such amounts shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower.

SECTION 6.02.  Rights and Remedies Generally.  If an Event of Default occurs and is continuing, the Lender shall have, in addition to any other rights and remedies contained in this Agreement or in the Note, all of the rights and remedies of a secured party under the Uniform Commercial Code or other applicable laws, all of which rights and remedies shall be cumulative, and none exclusive, to the extent permitted by law.  In addition to all such rights and remedies, the sale, lease or other disposition of the Collateral, or any part thereof, by the Lender after the occurrence of an Event of Default may be for cash, credit or any combination thereof, and the Lender may purchase all or any part of the Collateral at public or, if permitted by law, private sale, and in lieu of actual payment of such purchase price, may set off the amount of such purchase price against the Obligations then owing.  Any sales of the Collateral may be adjourned from time to time with or without notice.  The Lender may, in its sole discretion, cause the Collateral to remain on the premises of the Borrower, at the expense of the Borrower, pending sale or other disposition of the Collateral.  The Lender shall have the right to conduct such sales on the premises of the Borrower, at the expense of the Borrower, or elsewhere, on such occasion or occasions as it may see fit.

SECTION 6.03.  Entry Upon Premises and Access to Information.  If an Event of Default occurs and is continuing, the Lender shall have the right to enter upon the premises of the Borrower where any Collateral is located (or is believed to be located) without any obligation to pay rent to the Borrower, or any other place or places where the Collateral is believed to be located and kept, and render the Collateral unusable or remove the Collateral therefrom to the premises of the Lender or any agent thereof, for such time as the Lender may desire, in order effectively to collect or liquidate the Collateral, and/or the Lender may require the Borrower to assemble the Collateral and make it available to the Lender at a place or places to be designated by the Lender.  If an Event of Default occurs and is continuing, the Lender shall have the right to obtain access to the Borrower's data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner the Lender deems appropriate.

SECTION 6.04.  Sale or Other Disposition of Collateral by the Lender.  Any notice required to be given by the Lender of a sale, lease or other disposition or other intended action by the Lender with respect to any of the Collateral which is deposited in the United States

9

mails, registered or certified, postage prepaid and duly addressed to the Borrower at the address specified in Section 7.02 below, at least ten days prior to such proposed action shall constitute fair and reasonable notice to the Borrower of any such action. The net proceeds realized by the Lender upon any such sale or other disposition, after deduction for the expense of retaking, holding, preparing for sale, selling or the like and the reasonable attorneys' fees and legal expenses incurred by the Lender in connection therewith, shall be applied as provided herein toward satisfaction of the Obligations. The Lender shall account for and pay to the Borrower any surplus realized upon such sale or other disposition, and the Borrower shall remain liable for any deficiency. The commencement of any action, legal or equitable, or the rendering of any judgment or decree for any deficiency shall not affect the Lender's security interest in the Collateral. The Borrower agrees that the Lender has no obligation to preserve rights to the Collateral against any other parties. The Lender is hereby granted a license or other right to use, without charge, the Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, and the Borrower's rights under all licenses and all franchise agreements shall inure to the Lender's benefit until the Obligations are paid in full.

SECTION 6.05.  Governmental Approvals.  In connection with the enforcement by the Lender of any remedies available to it as a result of any Event of Default, the Borrower agrees that it shall join and cooperate fully with, at the request of the Lender, any receiver referred to below and/or the successful bidder or bidders at any foreclosure sale in a filing of an application (and furnishing any additional information that may be required in connection with such application or which the Lender may believe relevant to such application) with the FCC and all other applicable governmental authorities, requesting their prior approval of (i) the operation or abandonment of all or the portion of any telecommunications system of the Borrower and/or (ii) the transfer of control of the Borrower or assignment of all licenses, certificates, governmental approvals and permits, issued to the Borrower by the FCC or any such governmental authorities with respect to any telecommunications system and the operation thereof, to the Lender, the receiver or to the successful bidder or bidders. In connection with the foregoing, the Borrower shall take such further actions, and execute all such instruments, as the Lender reasonably deems necessary or desirable. The Borrower agrees that the Lender may enforce any obligation of the Borrower as set forth in this section by an action for specific performance. In addition, the Borrower hereby irrevocably constitutes and appoints the Lender and any agent or officer thereof (which appointment is coupled with an interest) as its true and lawful attorney-in-fact with full irrevocable power and authority and in the place and stead of the Borrower and in the name of the Borrower or in its own name, from time to time in its discretion after the occurrence and during the continuance of an Event of Default and in connection with the foregoing, for the purpose of executing on behalf and in the name of the Borrower any and all of the above-referenced instruments and to take any and all appropriate action in furtherance of the foregoing. **The exercise of any rights or remedies hereunder or under the Note by the Lender that may require FCC or any other governmental authority approval shall be subject to obtaining such approval. Pending the receipt of any FCC or any other governmental authority approval, the Borrower shall not do anything to delay, hinder, interfere or obstruct the exercise of the Lender's rights or remedies hereunder in obtaining such approvals.**

ACTIVE 201687698v.2

SECTION 6.06.  Appointment of Receiver or Trustee.  In connection with the exercise of its remedies under this Agreement, the Lender may, upon the occurrence of an Event of Default, obtain the appointment of a receiver or trustee to assume, upon receipt of all necessary judicial, FCC or other governmental authority consents or approvals, control of or ownership of any of the governmental approvals, licenses, permits or franchises of the Borrower. Such receiver or trustee shall have all rights and powers provided to it by law or by court order or provided to the Lender under this Agreement.  Upon the appointment of such trustee or receiver, the Borrower agrees to cooperate, to the extent necessary or appropriate, in the expeditious preparation, execution and filing of an application to the FCC or any other governmental authority for consent to the transfer of control or assignment of any Borrower's governmental approvals, licenses, permits or franchises to the receiver or trustee.

ARTICLE VII
MISCELLANEOUS

SECTION 7.01.  Amendments, Etc.  No amendment or waiver of any provision of this Agreement or the Note, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

SECTION 7.02.  Notices, Etc.  All notices and other communications provided for hereunder shall be in writing (including telecopier or electronic communication) and mailed, telecopied, transmitted or delivered, if to the Borrower, c/o Will Vail, 224 E. Garden St., Suite 5, Pensacola, FL  32502, facsimile no.:  (850) 857-9610; and if to the Lender, at its address at 8410 W. Bryn Mawr, Chicago, Illinois  60631, Attention: Steven T. Campbell, facsimile no. (773) 399-8959; or, as to each party, at such other address as shall be designated by such party in a written notice to the other party.  All such notices and communications shall, when mailed, telecopied or transmitted, be effective when deposited in the mails, telecopied or confirmed by electronic receipt, respectively, except that notices to the Lender pursuant to the provisions of Article I shall not be effective until received by the Lender.

SECTION 7.03.  No Waiver; Remedies.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder or under the Note shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 7.04.  Indemnities.  The Borrower agrees to defend, protect, indemnify and hold harmless the Lender and each of its Affiliates and each of its and its Affiliates' directors, officers and employees (collectively, the "Indemnitees") from and against any and all liabilities, obligations, losses (other than loss of profits), damages, penalties, fees, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (excluding any taxes and including, without limitation, the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding, whether or not such Indemnitees shall be designated a party thereto), which any of them may incur and reasonably pay arising out of or relating to this Agreement or the Note or any of the transactions contemplated hereby or thereby or the direct or indirect application or

11

proposed application of the proceeds of any Advance, <u>provided</u>, <u>however</u>, the Borrower shall have no obligation to an Indemnitee hereunder with respect to any matter caused by or resulting from the willful misconduct or gross negligence of such Indemnitee, and, <u>provided</u>, <u>further</u>, that the Borrower shall not be deemed to be an Affiliate of the Lender for purposes of this <u>Section 7.04</u>. The Borrower, upon demand by the Lender, shall reimburse each Indemnitee for any reasonable legal or other expenses incurred in connection with investigating or defending any of the foregoing except if the same is directly due to the willful misconduct or gross negligence of such Indemnitee. If the undertaking to indemnify, pay and hold harmless set forth in this <u>Section 7.04</u> may be unenforceable because it is violative of any law or public policy, the Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all liabilities, obligations, losses, damages, penalties, fees, actions, judgments, suits, claims, costs, expenses or disbursements incurred by any Indemnitee.

SECTION 7.05. <u>Costs, Expenses and Taxes</u>. The Borrower agrees to pay on demand all costs and expenses, if any (including reasonable counsel fees and expenses), in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement and the Note, including, without limitation, reasonable counsel fees and expenses in connection with the enforcement of rights under this <u>Section 7.05</u>. In addition, the Borrower shall pay any and all stamp and other taxes payable or determined to be payable in connection with the execution and delivery of this Agreement and the Note and the other documents to be delivered hereunder, and agree to save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes.

SECTION 7.06. <u>Binding Effect; Assignability</u>. This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender. The Lender may at any time, without the consent of the Borrower, assign all or any portion of its rights under this Agreement and the Note. Any assignee or transferee of the Note agrees by acceptance thereof to be bound by all the terms and provisions of this Agreement and the Note.

SECTION 7.07. <u>Governing Law</u>. THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.

SECTION 7.08. <u>Limitation of Liability</u>. Nothing contained herein shall require any partner or manager of any Borrower to provide any funds to satisfy any obligations of the Borrower under this Agreement or the Note, and the Lender agrees not to seek any contribution of funds from any partner or manager of any Borrower in the absence of fraud committed by such partner or manager.

SECTION 7.09. <u>Certain Definitions</u>. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in Article 9 of the Uniform Commercial Code as in effect in the State of Delaware.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:                    FREQUENCY ADVANTAGE, L.P.

By:    Sunshine Spectrum, Inc.
Its:    General Partner

By: _____
Name:  Will Vail
Its:     President

LENDER:                      UNITED STATES CELLULAR CORPORATION

By: _____
Name:  Steven T. Campbell
Title:   Executive Vice President - Finance, Chief
         Financial Officer and Treasurer

**SIGNATURE PAGE TO
LOAN AND SECURITY AGREEMENT
BY AND BETWEEN
FREQUENCY ADVANTAGE, L.P.
AND
UNITED STATES CELLULAR CORPORATION**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:                  FREQUENCY ADVANTAGE, L.P.

By:      Sunshine Spectrum, Inc.
Its:     General Partner

By: _____
Name:  Will Vail
Its:     President

LENDER:                  UNITED STATES CELLULAR CORPORATION

By: _____
Name:  Steven T. Campbell
Title:   Executive Vice President - Finance, Chief
          Financial Officer and Treasurer

**SIGNATURE PAGE TO
LOAN AND SECURITY AGREEMENT
BY AND BETWEEN
FREQUENCY ADVANTAGE, L.P.
AND
UNITED STATES CELLULAR CORPORATION**

EXHIBIT A

FORM OF PROMISSORY NOTE

$[_____]                                        Dated: [_____] [_____], 2014

        FOR VALUE RECEIVED, the undersigned, FREQUENCY ADVANTAGE, L.P., a Delaware limited partnership (the "Borrower"), HEREBY PROMISES TO PAY to the order of UNITED STATES CELLULAR CORPORATION, a Delaware corporation (the "Lender"), the principal amount of [_____] DOLLARS ($[_____]) or, if less, the aggregate principal amount of all Advances made by the Lender to the Borrower pursuant to that certain Loan and Security Agreement of even date herewith between the Lender and the Borrower (the "Loan Agreement") on the dates specified in the Loan Agreement. Capitalized terms used herein and not otherwise defined herein are defined as defined in the Loan Agreement.

        The Borrower shall pay interest on the principal amount hereof from time to time outstanding from the date hereof until such principal amount is paid in full, at the rates and on the dates specified in the Loan Agreement.

        Both principal and interest are payable in lawful money of the United States of America to the Lender at 8410 West Bryn Mawr, Chicago, Illinois 60631, Attention: Steven T. Campbell, in same day funds. All Advances made by the Lender to the Borrower, and all payments made on account of the principal amount hereof, shall be recorded by the Lender and, prior to any transfer hereof, endorsed on the grid attached hereto which is part of this Promissory Note.

        This Promissory Note is the Note referred to in, and is entitled to the benefits of, the Loan Agreement. The Loan Agreement, among other things, (i) provides for the making of advances (the "Advances") by the Lender to the Borrower from time to time in an aggregate amount not to exceed at any time outstanding the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from each such Advance being evidenced by this Promissory Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.

        Demand, presentment, protest and notice of nonpayment and protest are hereby waived by the Borrower.

                   FREQUENCY ADVANTAGE, L.P.
                   By: Sunshine Spectrum, Inc.
                   Its: General Partner

                      By:  _____
                      Name:  Will Vail
                      Its:     President

Schedule A to Promissory Note

| Date | Principal Amount of Loan | Interest Rate | Payment of Principal | Payment of Interest | Notation By |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

EXHIBIT B

FORM OF
NOTICE OF BORROWING

To:    United States Cellular Corporation.
Dated: _____

Ladies and Gentlemen:

      The undersigned, Frequency Advantage, L.P., a Delaware limited partnership (the "Borrower"), refers to that certain Loan and Security Agreement dated as of September 19, 2014 (the "Loan Agreement"; the terms defined therein used herein as therein defined) between United States Cellular Corporation (the "Lender") and the "Borrower" (as defined therein), and hereby gives the Lender notice, pursuant to Section 1.02 of the Loan Agreement that the undersigned hereby requests an Advance, and in that connection sets forth below the information relating to such Advance (the "Proposed Advance"):

      (i)  The Business Day of the Proposed Advance is _____ 20__; and

      (ii)  The aggregate amount of the Proposed Advance is $_____.

      The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the Business Day of the Proposed Advance:

      (A)    The representations and warranties contained in Section 3.01 of the Loan Agreement are correct in all respects, before and after giving effect to the Proposed Advance as though made on as of such date;

      (B)  No event has occurred and is continuing, or would result from such Proposed Advance which constitutes either an Event of Default or an event which but for the requirement that notice be given and/or the elapse of time, would constitute an Event of Default; and

      (C) All agreements and all conditions to the Proposed Advance, contained in the Loan Agreement which are required to be performed or satisfied by the Borrowers on the date hereof or by the Business Day of the Proposed Advance have been and will be performed and satisfied.

      Very truly yours,

      Frequency Advantage, L.P.

      By: Sunshine Spectrum, Inc.
      Its:  General Partner

          By: _____
          Name:  Will Vail
          Its:    President

EXHIBIT C

FORM OF
PLEDGE AGREEMENT
FROM FREQUENCY ADVANTAGE, L.P.

THIS PLEDGE AGREEMENT ("Pledge Agreement"), dated as of [_____], 2014 is executed by FREQUENCY ADVANTAGE, L.P., a Delaware limited partnership (the "Pledgor"), in favor of UNITED STATES CELLULAR CORPORATION, a Delaware corporation (the "Lender").

WITNESSETH:

WHEREAS, the Lender may make advances to the Pledgor pursuant to that certain Loan and Security Agreement dated as of September 19, 2014 between Frequency Advantage, L.P., a Delaware limited partnership, and the Lender (the "Loan Agreement");

WHEREAS, the Lender has required as a condition precedent to making any advances to the Pledgor,  that the Pledgor execute and deliver this Pledge Agreement; and

WHEREAS, the Pledgor desires to secure the "Liabilities" (as hereinafter defined) to the Lender by the grant to the Lender of a first priority security interest in the "Pledged Collateral" (as hereinafter defined) in order to secure prompt and complete payment, observance and performance of all of the Pledgor's obligations under this Agreement, the Loan Agreement, and the "Note" (as defined in the Loan Agreement);

NOW, THEREFORE, for and in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Pledgor and the Lender hereby agree as follows:

1. Pledge. The Pledgor hereby pledges to the Lender, and grants to the Lender a security interest in, the following (collectively, the "Pledged Collateral"):

(a) all of the issued and outstanding partnership interests of Advantage Spectrum, L.P., a Delaware limited partnership (the "Partnership"), now or at any time or times hereafter owned by the Pledgor, whether or not such partnership interests are represented by certificates, and any certificates representing such partnership interests (as identified on Exhibit A attached hereto and made a part hereof), all of the options and warrants for the purchase of the partnership interests of the Partnership now or hereafter held in the name of the Pledgor (all of said partnership interests, options and warrants and all of the partnership interests held in the name of the Pledgor as a result of the exercise of such options or warrants being hereinafter collectively referred to as the "Pledged Partnership Interests"), and all of the dividends, cash, instruments, investment property and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of such partnership interests;

(b) all of the additional partnership interests of the Partnership from time to time acquired by the Pledgor in any manner, whether or not such partnership interests are represented by certificates and the certificates representing such additional partnership interests (any such

1

additional partnership interests shall constitute part of the Pledged Partnership Interests and shall be listed on Exhibit A), and all of the options, warrants, dividends, cash, instruments, investment property and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests;

(c) the property and interests in property described in Section 3 below; and

(d) all proceeds of any of the foregoing.

2. Security for Liabilities. The Pledged Collateral secures the prompt payment, performance and observance of (i) the "Obligations" (as defined in the Loan Agreement) and (ii) the Pledgor's obligations and liabilities under this Pledge Agreement and each agreement, document or instrument executed pursuant to or in connection with the Loan Agreement, the Note or this Pledge Agreement (all such obligations and liabilities described in (i) and (ii) above and now or hereafter existing being hereinafter referred to collectively as the "Liabilities").

The Pledgor shall cause the Partnership to make a notation on its records, which notation shall indicate the security interest granted hereby. The Pledgor agrees to execute and file financing statements pursuant to the Uniform Commercial Code as the Lender may reasonably request from time to time to perfect the security interest granted hereby and the Pledgor agrees to execute and deliver to the Partnership a Pledge Instruction in the form of Exhibit C.

3. Pledged Collateral Adjustments. If, during the term of this Pledge Agreement:

(a) any dividend, reclassification, readjustment or other change is declared or made in the capital structure of the Partnership, or any option included within the Pledged Collateral is exercised, or both, or

(b) subscription warrants or any other rights or options shall be issued in connection with the Pledged Collateral, then all of the new, substituted and additional partnership interests, warrants, rights, options, investment properties or other securities, issued by reason of any of the foregoing, shall be promptly delivered to and held by the Lender under the terms of this Pledge Agreement and shall constitute Pledged Collateral hereunder.

4. Subsequent Changes Affecting Pledged Collateral. The Pledgor represents and warrants that it has made its own arrangements for keeping informed of changes or potential changes affecting the Pledged Collateral (including, but not limited to, rights to convert, rights to subscribe, payment of dividends or rights to distributions, reorganization or other exchanges, tender offers and the voting rights), and the Pledgor agrees that the Lender shall have no obligation to inform the Pledgor of any such changes or potential changes or to take any action or omit to take any action with respect thereto. Subject to compliance with applicable Federal Communications Commission ("FCC") rules and regulations, the Lender may, after the occurrence of an "Event of Default" (as defined in the Loan Agreement), without notice and at its option, transfer or register the Pledged Collateral or any part thereof into its or its nominee's name with or without any indication that the Pledged Collateral is subject to the security interest hereunder.

2

5. <u>Representations and Warranties and Covenants</u>. The Pledgor represents and warrants as follows:

(a) the Pledgor is the sole legal and beneficial owner of that percentage of the issued and outstanding partnership interests of the Partnership set forth on <u>Exhibit A</u>, free and clear of any lien, charge, encumbrance or security interest of any kind (collectively, "Lien") except for the security interest created by this Pledge Agreement;

(b) the Pledgor has full power and authority (corporate or otherwise) to enter into this Pledge Agreement;

(c) other than such restrictions as may be imposed by laws affecting the transfer of securities generally and the rules and regulations of the FCC, there are no restrictions upon the voting rights associated with, or upon the transfer of, any of the Pledged Collateral;

(d) the Pledgor has the right to, pledge and grant a security interest in, the Pledged Collateral to the Lender free of any Lien;

(e) no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the pledge of the Pledgor's Pledged Collateral pursuant to this Pledge Agreement or for the execution, delivery or performance of this Pledge Agreement by the Pledgor or (ii) for the exercise by the Lender of the voting or other rights provided for in this Pledge Agreement or the remedies in respect of the Pledged Collateral pursuant to this Pledge Agreement;

(f) the pledge of the Pledged Collateral pursuant to this Pledge Agreement is intended to create a valid and perfected first priority security interest in the Pledged Collateral, in favor of the Lender, securing the payment and performance of the Liabilities; and

(g) the chief executive office address and the correct legal name and jurisdiction of the Pledgor are set forth on <u>Exhibit B</u> hereto.

6. <u>Voting Rights</u>. During the term of this Pledge Agreement, and except as provided in this <u>Section 6</u> below, the Pledgor shall have the right to vote the Pledged Partnership Interests on all questions submitted to a vote of the record owners of such pledged Partnership Interests in a manner not inconsistent with the terms of this Pledge Agreement, the Loan Agreement and any other agreement, instrument or document executed pursuant thereto or in connection therewith. After the occurrence and during the continuance of an Event of Default, the Lender may, at the Lender's option and following written notice from the Lender to the Pledgor, and with the prior approval and consent of the Federal Communications Commission (the "FCC"), exercise all voting powers and partnership rights pertaining to the Pledged Collateral, to the extent permitted by applicable law.

7. <u>Distributions</u>.

(a) So long as no Event of Default shall have occurred and be continuing:

3

(i) the Pledgor shall be entitled to receive and retain that portion of any and all distributions paid in respect of the Pledged Collateral required to pay federal and state income taxes due or accruing with respect to Pledgor's percentage interest of the taxable income from the Partnership; all other distributions of any nature paid or payable in respect of the Pledged Collateral, shall be forthwith delivered to the Lender to hold as, Pledged Collateral, and shall if received by the Pledgor, be received in trust for the Lender, be segregated from the other property or funds of the Pledgor, and be delivered immediately to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsement); and

(ii) the Lender shall execute and deliver (or cause to be executed and delivered) to the Pledgor all such proxies and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to receive the distributions which it is authorized to receive and retain pursuant to paragraph (i) above.

(b) After the occurrence and during the continuance of an Event of Default:

(i) All rights of the Pledgor to receive the distributions which it would otherwise be authorized to receive and retain pursuant to Section 7(a)(i) hereof shall cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to receive and hold as Pledged Collateral such distributions; and

(ii) the Pledgor shall, upon the request of the Lender, at the Pledgor's expense, do or cause to be done all such other acts and things as may be necessary to make any sale of the Pledged Collateral or any part thereof valid and binding and in compliance with applicable law.

(c) Subject to the rights of the Pledgor to retain those distributions described in Section 7(a)(i), at all times the Pledgor shall cause the Partnership to make all payments required under the Note directly to the Lender, on Pledgor's behalf.

(d) At all times all distributions which are received by the Pledgor contrary to the provisions of this Section 7 shall be received in trust for the Lender, shall be segregated from other funds of the Pledgor and shall be paid over immediately to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsements).

The Pledgor will reimburse the Lender for all expenses incurred by the Lender, including, without limitation, reasonable attorneys' and accountants' fees and expenses in connection with any of the foregoing.

8.  Transfers and Other Liens; Other Restrictions.  The Pledgor agrees that it will not (i) sell or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral without the prior written consent of the Lender, or (ii) create or permit to exist any Lien upon or with respect to any of the Pledged Collateral except for the security interest under this Pledge Agreement.  The Pledgor shall not change its name, type of organization, jurisdiction or organization or chief executive office or place of business, as applicable, unless, in each such case, the Pledgor shall have given Lender not less than thirty (30) days' prior written notice of such event or occurrence and Lender shall have either (x) determined that such event or occurrence will not adversely affect the validity, perfection or priority of Lender's security interest in the Pledged Collateral or (y) taken such steps (with the cooperation of the Pledgor to

4

the extent necessary or advisable) as are necessary or advisable to properly maintain the validity, perfection and priority of Lender's security interest in the Pledged Collateral.

9. Remedies.

(a)  The Lender shall have, in addition to any other rights given under this Pledge Agreement or by law, all of the rights and remedies with respect to the Pledged Collateral of a secured party under the Uniform Commercial Code as in effect in the State of Delaware, including the right to realize upon the Pledged Collateral after the occurrence of an Event of Default, subject to applicable law.  In addition, after the occurrence and during the continuance of an Event of Default, the Lender shall have such powers of sale and other powers as may be conferred by applicable law.  With respect to the Pledged Collateral or any part thereof which shall then be in or shall thereafter come into the possession or custody of the Lender or which the Lender shall otherwise have the ability to transfer under applicable law, including the rules and regulations of the FCC, the Lender may, in its sole discretion, without notice except as specified below, after the occurrence of an Event of Default, sell or cause the same to be sold at any exchange, broker's board or at public or private sale, in one or more sales or lots, at such price as the Lender may deem best, for cash or on credit or for future delivery, without assumption of any credit risk, and the purchaser of any or all of the Pledged Collateral so sold shall thereafter own the same, absolutely free from any claim, encumbrance or right of any kind whatsoever.  The Lender may, in its own name, or in the name of a designee or nominee, buy the Pledged Collateral at any public sale and, if permitted by applicable law, buy the Pledged Collateral at any private sale.  The Pledgor shall be liable to the Lender for all reasonable expenses (including, without limitation, court costs and reasonable attorneys' and paralegals' fees and expenses) of, or incident to, the enforcement of any of the provisions hereof and any sale of the Pledged Collateral.  Any surplus remaining after discharge of the Liabilities in full and payment of the above described expenses shall be paid to the Pledgor or as a court of competent jurisdiction shall direct.

(b)  Unless any of the Pledged Collateral threatens to decline speedily in value or is or becomes of a type sold on a recognized market, the Lender will give the Pledgor reasonable notice of the time and place of any public sale thereof, or of the time after which any private sale or other intended disposition is to be made.  Any sale of the Pledged Collateral conducted in conformity with reasonable commercial practices of banks, commercial finance companies, insurance companies or other financial institutions disposing of property similar to the Pledged Collateral shall be deemed to be commercially reasonable.  Notwithstanding any provision to the contrary contained herein, any requirements of reasonable notice shall be met if such notice is received by the Pledgor as provided in Section 19 below, at least ten days before the time of the sale or disposition.  Any other requirement of notice, demand or advertisement for sale is waived, to the extent permitted by law.

(c)  In view of the fact that federal and state securities laws may impose certain restrictions on the method by which a sale of the Pledged Collateral may be effected after an Event of Default, the Pledgor agrees that after the occurrence and during the continuance of an Event of Default, the Lender may, from time to time, subject to compliance with applicable requirements of the FCC with respect to assignments of licenses and transfers of control, attempt to sell all or any part of the Pledged Collateral by means of a private placement restricting the

5

bidders and prospective purchasers to those who are qualified and will represent and agree that they are purchasing for investment only and not for distribution. In so doing, the Lender may solicit offers to buy the Pledged Collateral, or any part of it, from a limited number of investors deemed by the Lender, in its reasonable judgment, to be financially responsible parties who might be interested in purchasing the Pledged Collateral. If the Lender solicits such offers from not less than three (3) such investors, then the acceptance by the Lender of the highest offer obtained therefrom shall be deemed to be a commercially reasonable method of disposing of the Pledged Collateral.

(d) In connection with the enforcement by the Lender of any remedies available to the Lender as a result of any Event of Default, the Pledgor agrees to, and to use its best efforts to cause the Partnership to join and cooperate fully, in each case at the Lender's election, with the Lender, any receiver referred to below and/or the successor bidder or bidders at any foreclosure sale in a filing of an application (and furnishing any additional information that may be required in connection with such application) with the FCC and all applicable federal, state and local governmental authorities, requesting their prior approval of (i) the operation and/or abandonment of all or any portion of any telecommunications system, (ii) the transfer of control of the Partnership or any of its telecommunications systems or assignment of all licenses, certificates, authorizations, approvals and permits, issued to the Partnership by the FCC or any such authorities with respect to their respective telecommunications systems and the operation thereof. In connection with the foregoing, the Pledgor agrees to, and agrees to use its best efforts to cause the Partnership to, take such further actions, and execute all such instruments, as the Lender reasonably deems necessary or desirable. The Pledgor agrees that the Lender may enforce any obligations of the Pledgor as set forth in this Section by an action for specific performance.

(e) Notwithstanding any other provision of this Pledge Agreement to the contrary, the exercise of any rights hereunder by the Lender that may require FCC approval shall be subject to obtaining such approval. Pending obtaining FCC approval the Pledgor will not do anything to delay, hinder, interfere or obstruct the exercise of the Lender's rights hereunder in obtaining such approvals.

(f) In connection with the exercise of its remedies under this Agreement, the Lender may, upon the occurrence and during the continuation of an Event of Default obtain the appointment of a receiver or trustee to assume, upon receipt of all necessary judicial, FCC or other governmental authority, consents or approvals, control of or ownership of any Pledged Collateral. Such receiver or trustee shall have all rights and powers provided to it by law or by court order or provided to the Lender under this Pledge Agreement. Upon the appointment of such trustee or receiver, the Pledgor agrees to cooperate, to the extent necessary or appropriate, in the expeditious preparation, execution and filing of an application to the FCC for consent to the transfer of control or assignment of the Partnership's licenses, permits, franchises and other governmental authorizations to the receiver or trustee.

10. Security Interest Absolute. All rights of the Lender and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

(i) any lack of validity or enforceability of the Loan Agreement, the Note or any other agreement or instrument relating thereto;

(ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Liabilities;

(iii) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Liabilities; or

(iv) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Liabilities or of this Pledge Agreement.

11. <u>Lender Appointed Attorney-in-Fact</u>. Subject to the prior consent of the FCC, which consent the Pledgor shall cooperate in obtaining, the Pledgor hereby appoints the Lender its attorney-in-fact (which appointment is coupled with an interest), with full authority, in the name of the Pledgor or otherwise, after the occurrence and during the continuance of an Event of Default, from time to time in the Lender's discretion, to take any action and to execute any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Pledge Agreement, including, without limitation, to receive, endorse and collect all instruments made payable to the Pledgor representing any dividend or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same and to arrange for the transfer of all or any part of the Pledged Collateral on the books of the Partnership to the name of the Lender or the Lender's nominee.

12. <u>Waivers</u>. The Pledgor waives presentment and demand for payment of any of the Liabilities, protest and notice of dishonor or Event of Default with respect to any of the Liabilities and all other notices to which the Pledgor might otherwise be entitled except as otherwise expressly provided herein or in the Loan Agreement.

13. <u>Term</u>. This Pledge Agreement shall remain in full force and effect until the Liabilities have been fully and indefeasibly paid and satisfied. Upon the termination of this Pledge Agreement as provided above (other than as a result of the sale of the Pledged Collateral), the Lender will release the security interest created hereunder.

14. <u>Definitions</u>. The singular shall include the plural and vice versa and any gender shall include any other gender as the context may require.

15. <u>Successors and Assigns</u>. This Pledge Agreement shall be binding upon and inure to the benefit of the Pledgor, the Lender and their respective successors and assigns. The Pledgor's successors and assigns shall include, without limitation, a receiver, trustee or debtor in possession of or for the Pledgor.

16. <u>Applicable Law; Severability</u>. This Pledge Agreement shall be governed by, and construed in accordance with, the internal laws (as opposed to the conflict of laws provisions) and decisions of the State of Delaware and the rules and regulations of the FCC. Whenever possible, each provision of this Pledge Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Pledge Agreement

shall be held to be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Pledge Agreement.

17.  Further Assurances.  The Pledgor agrees that it will cooperate with the Lender and will execute and deliver, or cause to be executed and delivered, all such other powers, proxies, instruments and documents, and will take all such other action, including, without limitation, the filing of financing statements, as the Lender may reasonably request from time to time in order to carry out the provisions and purposes of this Pledge Agreement.

18.  The Lender's Duty of Care.  The Lender shall not be liable for any acts, omissions, errors of judgment or mistakes of fact or law including, without limitation, acts, omissions, errors or mistakes with respect to the Pledged Collateral, except for those arising solely out of or solely in connection with the Lender's (i) gross negligence or willful misconduct, or (ii) failure to use reasonable care with respect to the safe custody of the Pledged Collateral in the Lender's possession.  Without limiting the generality of the foregoing, the Lender shall be under no obligation to take any steps necessary to preserve rights in the Pledged Collateral against any other parties but may do so at its option.  All expenses incurred in connection therewith shall be for the sole account of the Pledgor and shall constitute part of the Liabilities secured hereby.

19.  Notices.  All notices and other communications required or desired to be served, given or delivered hereunder shall be made in writing or by a telecommunications device capable of creating a written record and shall be addressed, if to the Pledgor, to the address set forth below the signature line of the Pledgor, and

if to the Lender, to

United States Cellular Corporation
8410 W. Bryn Mawr
Chicago, Illinois 60631
Attention: Steven T. Campbell
Telecopy:  (773) 399-8959
Confirmation: (773) 399-8900

or, as to each party, at such other address as designated by such party in a written notice to the other party hereto.  All such notices and communications shall be deemed to be validly served, given or delivered (i) five (5) days after mailing in the United States mails, by registered or certified mail, postage prepaid, return receipt requested; or (ii) upon receipt if sent by hand or by courier service or by any above described telecommunications device.

20.  Change of Address.  The Pledgor shall immediately notify the Lender of any change of address from the address set forth on Exhibit B hereto, and shall execute any financing statements requested by Lender to be executed in connection with such change in address.

21.  Amendments, Waivers and Consents.  No amendment or waiver of any provision of this Pledge Agreement nor consent to any departure by the Pledgor, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such

8

amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

22. <u>Section Headings</u>. The section headings herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

23. <u>Execution in Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall together constitute one and the same agreement.

IN WITNESS WHEREOF, the Pledgor and the Lender have executed and delivered this Pledge Agreement as of the date first above written.

FREQUENCY ADVANTAGE, L.P.
By:     Sunshine Spectrum, Inc., its general partner

By:     _____
Name:   Will Vail
Its:        President

Address:        c/o Will Vail
                224 E. Garden St.
                Suite 5
                Pensacola, FL  32502
Telecopy:       (850) 857-9610
Confirmation:   (224) 645-6768

UNITED STATES CELLULAR CORPORATION

By:     _____
Name:   Steven T. Campbell
Title:    Executive Vice President – Finance, Chief
            Financial Officer and Treasurer

**SIGNATURE PAGE
TO
PLEDGE AGREEMENT
FROM
FREQUENCY ADVANTAGE, L.P.**

EXHIBIT A

to

PLEDGE AGREEMENT

Pledged Partnership Interests

of Advantage Spectrum, L.P.

| Name of Pledgor | Percentage of Issued and Outstanding Partnership Interests pledged by Pledgor |
|---|---|
| Frequency Advantage, L.P. | 100% of general partner interest |

EXHIBIT B

to

PLEDGE AGREEMENT

PLEDGOR'S CHIEF EXECUTIVE OFFICE ADDRESS, LEGAL NAME AND
JURISDICTION OF ORGANIZATION

1.      c/o Will Vail
        224 E. Garden St.
        Suite 5
        Pensacola, FL  32502

2.      Legal Name:  Frequency Advantage, L.P.

3.      Jurisdiction of Organization:  Delaware

EXHIBIT C

to

PLEDGE AGREEMENT

PLEDGE INSTRUCTION

LIMITED PARTNERSHIP:               INTEREST OWNER:
Advantage Spectrum, L.P.               Frequency Advantage, L.P.

BY THIS PLEDGE INSTRUCTION, dated as of [＿＿＿＿＿＿＿], 2014, Frequency Advantage, L.P. ("Interest Owner"), hereby instructs Advantage Spectrum, L.P. (the "Partnership") to register a pledge in favor of United States Cellular Corporation (the "Pledgee") against, and a collateral assignment of, all of the Interest Owner's rights in connection with any partnership interest in the Partnership now and hereafter owned by the Interest Owner ("Partnership Interests").

     1.     <u>Pledge Instructions</u>.  The Partnership is hereby instructed by the Interest Owner to register all of the Interest Owner's right, title and interest in and to all of the Interest Owner's Partnership Interests as subject to a pledge and collateral assignment in favor of Pledgee who, upon such registration of pledge, shall become the registered pledgee of the Partnership Interests with all rights incident thereto.

     2.     <u>Initial Transaction Statement</u>.  The Partnership is further instructed by the Interest Owner to promptly inform Pledgee of the registration of the pledge by sending the initial transaction statement, in the form attached hereto as <u>Annex A</u>, to Pledgee at its office located at 8410 W. Bryn Mawr, Chicago, Illinois, 60631 Attn:  Steven T. Campbell.

     3.     <u>Warranties of the Interest Owner</u>.  The Interest Owner hereby warrants that (i) the Interest Owner is an appropriate person to originate this instruction; (ii) the Interest Owner is entitled to effect the instruction here given; and (iii) the Interest Owner's taxpayer identification number is 47-1702652.

\*     \*     \*     \*     \*

IN WITNESS WHEREOF, the Interest Owner has caused this Pledge Instruction to be duly signed and delivered by its officer duly authorized as of the date first above written.

FREQUENCY ADVANTAGE, L.P.
By:    Sunshine Spectrum, Inc., its general partner

By:    _____
Name:  Will Vail
Its:    President

## CONSENT OF THE PARTNERSHIP

The undersigned, ADVANTAGE SPECTRUM, L.P., hereby consents to, and agrees to cause to be registered on the books and records of ADVANTAGE SPECTRUM, L.P., the pledge of Partnership Interests referenced above and further agrees that it shall pay and remit to the Pledgee, for the account of the Interest Owner, all distributions and other amounts payable to the Interest Owner and upon receipt of written notice from the Pledgee that a default by the Interest Owner under the terms of any of the loan documents between the Interest Owner and Pledgee has occurred and is continuing, the Partnership shall pay and remit to the Pledgee, for the account of the Interest Owner, all distributions and other amounts payable to the Interest Owner.

ADVANTAGE SPECTRUM, L.P.,
By: FREQUENCY ADVANTAGE, L.P., its general
    partner
    By:    Sunshine Spectrum, Inc., its general partner

By:    _____
Name:  Will Vail
Its:    President

2

Annex A

to

Pledge Instruction

Form of Initial Transaction Statement

Frequency Advantage, L.P.
c/o Will Vail
224 E. Garden St.
Suite 5
Pensacola, FL  32502


United States Cellular Corporation
8410 W. Bryn Mawr
Chicago, Illinois 60631
Attn:   Steven T. Campbell

On [_____], 2014 the undersigned, Advantage Spectrum, L.P. (the "Partnership"), caused the pledge of all of the Partnership Interests ("Partnership Interests") of the undersigned owned by Frequency Advantage, L.P. in favor of United States Cellular Corporation (the "Lender") to be registered on the books and records of the Partnership.  Except for the pledge in favor of the Lender, to the knowledge of the undersigned (including, without limitation, any information which may appear on the undersigned's books and records) there are no liens, restrictions or adverse claims to which the Partnership Interests are, or may be subject, as of the date hereof.

ADVANTAGE SPECTRUM, L.P.
By: FREQUENCY ADVANTAGE, L.P., its general
     partner
    By:   Sunshine Spectrum, Inc., its general partner

By:   _____
Name:  Will Vail
Its:      President

EXHIBIT D

FORM OF
PLEDGE AGREEMENT
FROM THE PARTNERS OF FREQUENCY ADVANTAGE, L.P.

THIS PLEDGE AGREEMENT ("Pledge Agreement"), dated as of
[_____], 2014 is executed by [Sunshine Spectrum, Inc./Nonesuch, Inc.], a Delaware
corporation (the "Pledgor"), in favor of UNITED STATES CELLULAR CORPORATION, a
Delaware corporation (the "Lender").

WITNESSETH:

WHEREAS, the Lender may make advances to Frequency Advantage, L.P., a
Delaware limited partnership (the "Partnership") pursuant to that certain Loan and Security
Agreement dated as of September 19, 2014 between the Partnership and the Lender (the "Loan
Agreement");

WHEREAS, the Lender has required as a condition precedent to making any
advances to the Partnership, that the Pledgor execute and deliver a Limited Recourse Guaranty
and this Pledge Agreement;

WHEREAS, the Pledgor owns a partnership interest in the Partnership and the
Pledgor will derive direct and indirect economic benefit from the advances made to the
Partnership under the Loan Agreement; and

WHEREAS, the Pledgor desires to secure the "Liabilities" (as hereinafter
defined) to the Lender by the grant to the Lender of a first priority security interest in the
"Pledged Collateral" (as hereinafter defined) in order to secure prompt and complete payment,
observance and performance of all of the Pledgor's obligations under this Agreement, the Loan
Agreement, and the "Note" (as defined in the Loan Agreement);

NOW, THEREFORE, for and in consideration of the foregoing and for other
good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,
each of the Pledgor and the Lender hereby agree as follows:

1. Pledge. The Pledgor hereby pledges to the Lender, and grants to the Lender a
security interest in, the following (collectively, the "Pledged Collateral"):

(a) all of the issued and outstanding partnership interests of the Partnership, now
or at any time or times hereafter owned by the Pledgor, whether or not such partnership interests
are represented by certificates, and any certificates representing such partnership interests (as
identified on Exhibit A attached hereto and made a part hereof), all of the options and warrants
for the purchase of the partnership interests of the Partnership now or hereafter held in the name
of the Pledgor (all of said partnership interests, options and warrants and all of the partnership
interests held in the name of the Pledgor as a result of the exercise of such options or warrants
being hereinafter collectively referred to as the "Pledged Partnership Interests"), and all of the
dividends, cash, instruments, investment property and other property from time to time received,
receivable or otherwise distributed in respect of, or in exchange for, any or all of such
partnership interests;

1

(b) all of the additional partnership interests of the Partnership from time to time acquired by the Pledgor in any manner, whether or not such partnership interests are represented by certificates and the certificates representing such additional partnership interests (any such additional partnership interests shall constitute part of the Pledged Partnership Interests and shall be listed on Exhibit A), and all of the options, warrants, dividends, cash, instruments, investment property and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests;

(c) the property and interests in property described in Section 3 below; and

(d) all proceeds of any of the foregoing.

2. Security for Liabilities. The Pledged Collateral secures the prompt payment, performance and observance of (i) the "Obligations" (as defined in the Loan Agreement) and (ii) the Pledgor's obligations and liabilities under this Pledge Agreement and each agreement, document or instrument executed pursuant to or in connection with the Loan Agreement, the Note or this Pledge Agreement (all such obligations and liabilities described in (i) and (ii) above and now or hereafter existing being hereinafter referred to collectively as the "Liabilities").

The Pledgor shall cause the Partnership to make a notation on its records, which notation shall indicate the security interest granted hereby. The Pledgor agrees to execute and file financing statements pursuant to the Uniform Commercial Code as the Lender may reasonably request from time to time to perfect the security interest granted hereby and the Pledgor agrees to execute and deliver to the Partnership a Pledge Instruction in the form of Exhibit C.

3. Pledged Collateral Adjustments. If, during the term of this Pledge Agreement:

(a) any dividend, reclassification, readjustment or other change is declared or made in the capital structure of the Partnership, or any option included within the Pledged Collateral is exercised, or both, or

(b) subscription warrants or any other rights or options shall be issued in connection with the Pledged Collateral, then all of the new, substituted and additional partnership interests, warrants, rights, options, investment properties or other securities, issued by reason of any of the foregoing, shall be promptly delivered to and held by the Lender under the terms of this Pledge Agreement and shall constitute Pledged Collateral hereunder.

4. Subsequent Changes Affecting Pledged Collateral. The Pledgor represents and warrants that it has made its own arrangements for keeping informed of changes or potential changes affecting the Pledged Collateral (including, but not limited to, rights to convert, rights to subscribe, payment of dividends or rights to distributions, reorganization or other exchanges, tender offers and the voting rights), and the Pledgor agrees that the Lender shall have no obligation to inform the Pledgor of any such changes or potential changes or to take any action or omit to take any action with respect thereto. Subject to compliance with applicable Federal Communications Commission ("FCC") rules and regulations, the Lender may, after the occurrence of an "Event of Default" (as defined in the Loan Agreement), without notice and at its option, transfer or register the Pledged Collateral or any part thereof into its or its nominee's

2

name with or without any indication that the Pledged Collateral is subject to the security interest hereunder.

    5. <u>Representations and Warranties and Covenants</u>. The Pledgor represents and warrants as follows:

    (a) the Pledgor is the sole legal and beneficial owner of that percentage of the issued and outstanding partnership interests of the Partnership set forth on <u>Exhibit A</u>, free and clear of any lien, charge, encumbrance or security interest of any kind (collectively, "Lien") except for the security interest created by this Pledge Agreement;

    (b) the Pledgor has full power and authority (corporate or otherwise) to enter into this Pledge Agreement;

    (c) other than such restrictions as may be imposed by laws affecting the transfer of securities generally and the rules and regulations of the FCC, there are no restrictions upon the voting rights associated with, or upon the transfer of, any of the Pledged Collateral;

    (d) the Pledgor has the right to, pledge and grant a security interest in, the Pledged Collateral to the Lender free of any Lien;

    (e) no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the pledge of the Pledgor's Pledged Collateral pursuant to this Pledge Agreement or for the execution, delivery or performance of this Pledge Agreement by the Pledgor or (ii) for the exercise by the Lender of the voting or other rights provided for in this Pledge Agreement or the remedies in respect of the Pledged Collateral pursuant to this Pledge Agreement;

    (f) the pledge of the Pledged Collateral pursuant to this Pledge Agreement is intended to create a valid and perfected first priority security interest in the Pledged Collateral, in favor of the Lender, securing the payment and performance of the Liabilities; and

    (g) the chief executive office address and the correct legal name and jurisdiction of organization of the Pledgor are set forth on <u>Exhibit B</u> hereto.

    6. <u>Voting Rights</u>. During the term of this Pledge Agreement, and except as provided in this <u>Section 6</u> below, the Pledgor shall have the right to vote the Pledged Partnership Interests on all questions submitted to a vote of the record owners of such pledged Partnership Interests in a manner not inconsistent with the terms of this Pledge Agreement, the Loan Agreement and any other agreement, instrument or document executed pursuant thereto or in connection therewith. After the occurrence and during the continuance of an Event of Default, the Lender may, at the Lender's option and following written notice from the Lender to the Pledgor, and with the prior approval and consent of the Federal Communications Commission (the "FCC"), exercise all voting powers and partnership rights pertaining to the Pledged Collateral, to the extent permitted by applicable law.

    7. <u>Distributions</u>.

    (a) So long as no Event of Default shall have occurred and be continuing:

(i) the Pledgor shall be entitled to receive and retain that portion of any and all distributions paid in respect of the Pledged Collateral required to pay federal and state income taxes due or accruing with respect to Pledgor's percentage interest of the taxable income from the Partnership; all other distributions of any nature paid or payable in respect of the Pledged Collateral, shall be forthwith delivered to the Lender to hold as, Pledged Collateral, and shall if received by the Pledgor, be received in trust for the Lender, be segregated from the other property or funds of the Pledgor, and be delivered immediately to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsement); and

(ii) the Lender shall execute and deliver (or cause to be executed and delivered) to the Pledgor all such proxies and other instruments as the Pledgor may reasonably request for the purpose of enabling the Pledgor to receive the distributions which it is authorized to receive and retain pursuant to paragraph (i) above.

(b) After the occurrence and during the continuance of an Event of Default:

(i) All rights of the Pledgor to receive the distributions which it would otherwise be authorized to receive and retain pursuant to Section 7(a)(i) hereof shall cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to receive and hold as Pledged Collateral such distributions; and

(ii) the Pledgor shall, upon the request of the Lender, at the Pledgor's expense, do or cause to be done all such other acts and things as may be necessary to make any sale of the Pledged Collateral or any part thereof valid and binding and in compliance with applicable law.

(c) Subject to the rights of the Pledgor to retain those distributions described in Section 7(a)(i), at all times the Pledgor shall cause the Partnership to make all payments required under the Note directly to the Lender, on Pledgor's behalf.

(d) At all times all distributions which are received by the Pledgor contrary to the provisions of this Section 7 shall be received in trust for the Lender, shall be segregated from other funds of the Pledgor and shall be paid over immediately to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsements).

The Pledgor will reimburse the Lender for all expenses incurred by the Lender, including, without limitation, reasonable attorneys' and accountants' fees and expenses in connection with any of the foregoing.

8.  Transfers and Other Liens; Other Restrictions.  The Pledgor agrees that it will not (i) sell or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral without the prior written consent of the Lender, or (ii) create or permit to exist any Lien upon or with respect to any of the Pledged Collateral except for the security interest under this Pledge Agreement.  The Pledgor shall not change its name, type of organization, jurisdiction or organization or chief executive office or place of business, as applicable, unless, in each such case, the Pledgor shall have given Lender not less than thirty (30) days' prior written notice of such event or occurrence and Lender shall have either (x) determined that such event or occurrence will not adversely affect the validity, perfection or priority of Lender's security interest in the Pledged Collateral or (y) taken such steps (with the cooperation of the Pledgor to

4

the extent necessary or advisable) as are necessary or advisable to properly maintain the validity, perfection and priority of Lender's security interest in the Pledged Collateral.

9. Remedies.

(a) The Lender shall have, in addition to any other rights given under this Pledge Agreement or by law, all of the rights and remedies with respect to the Pledged Collateral of a secured party under the Uniform Commercial Code as in effect in the State of Delaware, including the right to realize upon the Pledged Collateral after the occurrence of an Event of Default, subject to applicable law. In addition, after the occurrence and during the continuance of an Event of Default, the Lender shall have such powers of sale and other powers as may be conferred by applicable law. With respect to the Pledged Collateral or any part thereof which shall then be in or shall thereafter come into the possession or custody of the Lender or which the Lender shall otherwise have the ability to transfer under applicable law, including the rules and regulations of the FCC, the Lender may, in its sole discretion, without notice except as specified below, after the occurrence of an Event of Default, sell or cause the same to be sold at any exchange, broker's board or at public or private sale, in one or more sales or lots, at such price as the Lender may deem best, for cash or on credit or for future delivery, without assumption of any credit risk, and the purchaser of any or all of the Pledged Collateral so sold shall thereafter own the same, absolutely free from any claim, encumbrance or right of any kind whatsoever. The Lender may, in its own name, or in the name of a designee or nominee, buy the Pledged Collateral at any public sale and, if permitted by applicable law, buy the Pledged Collateral at any private sale. The Pledgor shall be liable to the Lender for all reasonable expenses (including, without limitation, court costs and reasonable attorneys' and paralegals' fees and expenses) of, or incident to, the enforcement of any of the provisions hereof and any sale of the Pledged Collateral. Any surplus remaining after discharge of the Liabilities in full and payment of the above described expenses shall be paid to the Pledgor or as a court of competent jurisdiction shall direct.

(b) Unless any of the Pledged Collateral threatens to decline speedily in value or is or becomes of a type sold on a recognized market, the Lender will give the Pledgor reasonable notice of the time and place of any public sale thereof, or of the time after which any private sale or other intended disposition is to be made. Any sale of the Pledged Collateral conducted in conformity with reasonable commercial practices of banks, commercial finance companies, insurance companies or other financial institutions disposing of property similar to the Pledged Collateral shall be deemed to be commercially reasonable. Notwithstanding any provision to the contrary contained herein, any requirements of reasonable notice shall be met if such notice is received by the Pledgor as provided in Section 19 below, at least ten days before the time of the sale or disposition. Any other requirement of notice, demand or advertisement for sale is waived, to the extent permitted by law.

(c) In view of the fact that federal and state securities laws may impose certain restrictions on the method by which a sale of the Pledged Collateral may be effected after an Event of Default, the Pledgor agrees that after the occurrence and during the continuance of an Event of Default, the Lender may, from time to time, subject to compliance with applicable requirements of the FCC with respect to assignments of licenses and transfers of control, attempt to sell all or any part of the Pledged Collateral by means of a private placement restricting the

bidders and prospective purchasers to those who are qualified and will represent and agree that they are purchasing for investment only and not for distribution. In so doing, the Lender may solicit offers to buy the Pledged Collateral, or any part of it, from a limited number of investors deemed by the Lender, in its reasonable judgment, to be financially responsible parties who might be interested in purchasing the Pledged Collateral. If the Lender solicits such offers from not less than three (3) such investors, then the acceptance by the Lender of the highest offer obtained therefrom shall be deemed to be a commercially reasonable method of disposing of the Pledged Collateral.

(d)     In connection with the enforcement by the Lender of any remedies available to the Lender as a result of any Event of Default, the Pledgor agrees to, and to use its best efforts to cause the Partnership to join and cooperate fully, in each case at the Lender's election, with the Lender, any receiver referred to below and/or the successor bidder or bidders at any foreclosure sale in a filing of an application (and furnishing any additional information that may be required in connection with such application) with the FCC and all applicable federal, state and local governmental authorities, requesting their prior approval of (i) the operation and/or abandonment of all or any portion of any telecommunications system, (ii) the transfer of control of the Partnership or any of its telecommunications systems or assignment of all licenses, certificates, authorizations, approvals and permits, issued to the Partnership by the FCC or any such authorities with respect to their respective telecommunications systems and the operation thereof. In connection with the foregoing, the Pledgor agrees to, and agrees to use its best efforts to cause the Partnership to, take such further actions, and execute all such instruments, as the Lender reasonably deems necessary or desirable. The Pledgor agrees that the Lender may enforce any obligations of the Pledgor as set forth in this Section by an action for specific performance.

(e)     Notwithstanding any other provision of this Pledge Agreement to the contrary, the exercise of any rights hereunder by the Lender that may require FCC approval shall be subject to obtaining such approval. Pending obtaining FCC approval the Pledgor will not do anything to delay, hinder, interfere or obstruct the exercise of the Lender's rights hereunder in obtaining such approvals.

(f)     In connection with the exercise of its remedies under this Agreement, the Lender may, upon the occurrence and during the continuation of an Event of Default obtain the appointment of a receiver or trustee to assume, upon receipt of all necessary judicial, FCC or other governmental authority, consents or approvals, control of or ownership of any Pledged Collateral. Such receiver or trustee shall have all rights and powers provided to it by law or by court order or provided to the Lender under this Pledge Agreement. Upon the appointment of such trustee or receiver, the Pledgor agrees to cooperate, to the extent necessary or appropriate, in the expeditious preparation, execution and filing of an application to the FCC for consent to the transfer of control or assignment of the Partnership's licenses, permits, franchises and other governmental authorizations to the receiver or trustee.

10.     Security Interest Absolute. All rights of the Lender and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

      (i) any lack of validity or enforceability of the Loan Agreement, the Note or any other agreement or instrument relating thereto;

      (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the Liabilities;

      (iii) any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Liabilities; or

      (iv) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Liabilities or of this Pledge Agreement.

      11. <u>Lender Appointed Attorney-in-Fact</u>. Subject to the prior consent of the FCC, which consent the Pledgor shall cooperate in obtaining, the Pledgor hereby appoints the Lender its attorney-in-fact (which appointment is coupled with an interest), with full authority, in the name of the Pledgor or otherwise, after the occurrence and during the continuance of an Event of Default, from time to time in the Lender's discretion, to take any action and to execute any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Pledge Agreement, including, without limitation, to receive, endorse and collect all instruments made payable to the Pledgor representing any dividend or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same and to arrange for the transfer of all or any part of the Pledged Collateral on the books of the Partnership to the name of the Lender or the Lender's nominee.

      12. <u>Waivers</u>. The Pledgor waives presentment and demand for payment of any of the Liabilities, protest and notice of dishonor or Event of Default with respect to any of the Liabilities and all other notices to which the Pledgor might otherwise be entitled except as otherwise expressly provided herein or in the Loan Agreement.

      13. <u>Term</u>. This Pledge Agreement shall remain in full force and effect until the Liabilities have been fully and indefeasibly paid and satisfied. Upon the termination of this Pledge Agreement as provided above (other than as a result of the sale of the Pledged Collateral), the Lender will release the security interest created hereunder.

      14. <u>Definitions</u>. The singular shall include the plural and vice versa and any gender shall include any other gender as the context may require.

      15. <u>Successors and Assigns</u>. This Pledge Agreement shall be binding upon and inure to the benefit of the Pledgor, the Lender and their respective successors and assigns. The Pledgor's successors and assigns shall include, without limitation, a receiver, trustee or debtor in possession of or for the Pledgor.

      16. <u>Applicable Law; Severability</u>. This Pledge Agreement shall be governed by, and construed in accordance with, the internal laws (as opposed to the conflict of laws provisions) and decisions of the State of Delaware and the rules and regulations of the FCC. Whenever possible, each provision of this Pledge Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Pledge Agreement shall be held to be prohibited or invalid under applicable law, such provision shall be ineffective

only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Pledge Agreement.

17. <u>Further Assurances</u>. The Pledgor agrees that it will cooperate with the Lender and will execute and deliver, or cause to be executed and delivered, all such other powers, proxies, instruments and documents, and will take all such other action, including, without limitation, the filing of financing statements, as the Lender may reasonably request from time to time in order to carry out the provisions and purposes of this Pledge Agreement.

18. <u>The Lender's Duty of Care</u>. The Lender shall not be liable for any acts, omissions, errors of judgment or mistakes of fact or law including, without limitation, acts, omissions, errors or mistakes with respect to the Pledged Collateral, except for those arising solely out of or solely in connection with the Lender's (i) gross negligence or willful misconduct, or (ii) failure to use reasonable care with respect to the safe custody of the Pledged Collateral in the Lender's possession. Without limiting the generality of the foregoing, the Lender shall be under no obligation to take any steps necessary to preserve rights in the Pledged Collateral against any other parties but may do so at its option. All expenses incurred in connection therewith shall be for the sole account of the Pledgor and shall constitute part of the Liabilities secured hereby.

19. <u>Notices</u>. All notices and other communications required or desired to be served, given or delivered hereunder shall be made in writing or by a telecommunications device capable of creating a written record and shall be addressed, if to the Pledgor, to the address set forth below the signature line of the Pledgor, and

if to the Lender, to

United States Cellular Corporation
8410 W. Bryn Mawr
Chicago, Illinois 60631
Attention: Steven T. Campbell
Telecopy: (773) 399-8959
Confirmation: (773) 399-8900

or, as to each party, at such other address as designated by such party in a written notice to the other party hereto. All such notices and communications shall be deemed to be validly served, given or delivered (i) five (5) days after mailing in the United States mails, by registered or certified mail, postage prepaid, return receipt requested; or (ii) upon receipt if sent by hand or by courier service or by any above described telecommunications device.

20. <u>Change of Address</u>. The Pledgor shall immediately notify the Lender of any change of address from the address set forth on <u>Exhibit B</u> hereto, and shall execute any financing statements requested by Lender to be executed in connection with such change in address.

21. <u>Amendments, Waivers and Consents</u>. No amendment or waiver of any provision of this Pledge Agreement nor consent to any departure by the Pledgor, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

22. <u>Section Headings</u>.  The section headings herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

23. <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall together constitute one and the same agreement.

IN WITNESS WHEREOF, the Pledgor and the Lender have executed and delivered this Pledge Agreement as of the date first above written.

[Sunshine Spectrum, Inc./Nonesuch, Inc.]

By: _____
Name: [Will Vail/Allison Cryor DiNardo]
Its:    President


Address:    c/o [Will Vail/Allison Cryor DiNardo]
            [_____]
            [_____]
Telecopy:   [_____]
Confirmation: [_____]


UNITED STATES CELLULAR CORPORATION


By: _____
Name:  Steven T. Campbell
Title:   Executive Vice President – Finance, Chief
         Financial Officer and Treasurer


**SIGNATURE PAGE
TO
PLEDGE AGREEMENT
FROM
[SUNSHINE SPECTRUM, INC./NONESUCH, INC.]**

EXHIBIT A

to

PLEDGE AGREEMENT

Pledged Partnership Interests

of Frequency Advantage, L.P.

|  | Percentage of Issued and Outstanding Partnership |
| --- | --- |
| Name of Pledgor | Interests pledged by Pledgor |
| [Sunshine Spectrum, Inc./Nonesuch, Inc.] | 100% of [general/limited] partner interest |

EXHIBIT B

to

PLEDGE AGREEMENT

PLEDGOR'S CHIEF EXECUTIVE OFFICE ADDRESS, LEGAL NAME AND
JURISDICTION OF ORGANIZATION

1.      c/o [Will Vail/Allison Cryor DiNardo]
        [_____]
        [_____]


2.      Legal Name:  [Sunshine Spectrum, Inc./Nonesuch, Inc.]

3.      Jurisdiction of Organization:  Delaware

EXHIBIT C

to

PLEDGE AGREEMENT

PLEDGE INSTRUCTION

LIMITED PARTNERSHIP:                    INTEREST OWNER:
Frequency Advantage, L.P.               [Sunshine Spectrum, Inc./Nonesuch, Inc.]

BY THIS PLEDGE INSTRUCTION, dated as of [_____], 2014, [Sunshine Spectrum, Inc./Nonesuch, Inc.] ("Interest Owner"), hereby instructs Frequency Advantage, L.P. (the "Partnership") to register a pledge in favor of United States Cellular Corporation (the "Pledgee") against, and a collateral assignment of, all of the Interest Owner's rights in connection with any partnership interest in the Partnership now and hereafter owned by the Interest Owner ("Partnership Interests").

1.      Pledge Instructions.  The Partnership is hereby instructed by the Interest Owner to register all of the Interest Owner's right, title and interest in and to all of the Interest Owner's Partnership Interests as subject to a pledge and collateral assignment in favor of Pledgee who, upon such registration of pledge, shall become the registered pledgee of the Partnership Interests with all rights incident thereto.

2.      Initial Transaction Statement.  The Partnership is further instructed by the Interest Owner to promptly inform Pledgee of the registration of the pledge by sending the initial transaction statement, in the form attached hereto as Annex A, to Pledgee at its office located at 8410 W. Bryn Mawr, Chicago, Illinois, 60631 Attn:  Steven T. Campbell.

3.      Warranties of the Interest Owner.  The Interest Owner hereby warrants that (i) the Interest Owner is an appropriate person to originate this instruction; (ii) the Interest Owner is entitled to effect the instruction here given; and (iii) the Interest Owner's taxpayer identification number is [_____].

*        *        *        *        *

IN WITNESS WHEREOF, the Interest Owner has caused this Pledge Instruction to be duly signed and delivered by its officer duly authorized as of the date first above written.

[Sunshine Spectrum, Inc./Nonesuch, Inc.]

By: _____
Name: [Will Vail/Allison Cryor DiNardo]
Its:    President

## CONSENT OF THE PARTNERSHIP

The undersigned, FREQUENCY ADVANTAGE, L.P., hereby consents to, and agrees to cause to be registered on the books and records of FREQUENCY ADVANTAGE, L.P., the pledge of Partnership Interests referenced above and further agrees that it shall pay and remit to the Pledgee, for the account of the Interest Owner, all distributions and other amounts payable to the Interest Owner and upon receipt of written notice from the Pledgee that a default by Frequency Advantage, L.P. under the terms of any of the loan documents between Frequency Advantage, L.P. and Pledgee has occurred and is continuing, the Partnership shall pay and remit to the Pledgee, for the account of the Interest Owner, all distributions and other amounts payable to the Interest Owner.

FREQUENCY ADVANTAGE, L.P.
By:    Sunshine Spectrum, Inc., its general partner

By: _____
Name:  Will Vail
Its:     President

2

Annex A

to

Pledge Instruction

Form of Initial Transaction Statement

[Sunshine Spectrum, Inc./Nonesuch, Inc.]
c/o [Will Vail/Allison Cryor DiNardo]
[                    ]
[                    ]


United States Cellular Corporation
8410 W. Bryn Mawr
Chicago, Illinois 60631
Attn:   Steven T. Campbell

       On [                    ], 2014 the undersigned, Frequency Advantage, L.P. (the "Partnership"), caused the pledge of all of the Partnership Interests ("Partnership Interests") of the undersigned owned by [Sunshine Spectrum, Inc./Nonesuch, Inc.] in favor of United States Cellular Corporation (the "Lender") to be registered on the books and records of the Partnership. Except for the pledge in favor of the Lender, to the knowledge of the undersigned (including, without limitation, any information which may appear on the undersigned's books and records) there are no liens, restrictions or adverse claims to which the Partnership Interests are, or may be subject, as of the date hereof.

                FREQUENCY ADVANTAGE, L.P.
                By:    Sunshine Spectrum, Inc., its general partner

                        By:  _____
                        Name:  Will Vail
                        Its:     President

EXHIBIT E

FORM OF
PLEDGE AGREEMENT
FROM THE SHAREHOLDERS OF THE PARTNERS OF FREQUENCY ADVANTAGE, L.P.

THIS PLEDGE AGREEMENT ("Pledge Agreement"), dated as of
[_____], 2014 is executed by [Will Vail/Allison Cryor DiNardo] (the "Pledgor"), in
favor of UNITED STATES CELLULAR CORPORATION, a Delaware corporation (the
"Lender").

WITNESSETH:

WHEREAS, the Lender may make advances to partnerships owned in whole or in
part by corporations owned in whole or in part by the Pledgor pursuant to that certain Loan and
Security Agreement dated as of September 19, 2014 between Frequency Advantage, L.P., a
Delaware limited partnership ("DE L.P."), and the Lender (the "Loan Agreement");

WHEREAS, the Lender has required as a condition precedent to making any
advances under the Loan Agreement, that the Pledgor execute and deliver a Limited Recourse
Guaranty and this Pledge Agreement;

WHEREAS, the Pledgor owns all of the issued and outstanding capital stock of
[Sunshine Spectrum, Inc./Nonesuch, Inc.], a Delaware corporation ("Pledged Corp."), which is a
partner in DE L.P., and the Pledgor will derive direct and indirect economic benefit from the
advances made to DE L.P. under the Loan Agreement;

WHEREAS, the Pledgor may from time to time execute and deliver to the Lender
a supplement to this Pledge Agreement substantially in the form of Exhibit C hereto (each such
supplement, a "Pledge Supplement") setting forth additional corporations the capital stock of
which is owned by the Pledgor and shall be pledged to the Lender (the "Additional
Corporations"; the Additional Corporations and Pledged Corp. collectively referred to as the
"Pledged Corporations"); and

WHEREAS, the Pledgor desires to secure the "Liabilities" (as hereinafter
defined) to the Lender by the grant to the Lender of a first priority security interest in the
"Pledged Collateral" (as hereinafter defined) in order to secure prompt and complete payment,
observance and performance of all of the Pledgor's obligations under this Agreement and all of
the payment and performance obligations of each Borrower under the Loan Agreement and the
"Note" (as defined in the Loan Agreement);

NOW, THEREFORE, for and in consideration of the foregoing and for other
good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,
each of the Pledgor and the Lender hereby agree as follows:

1.    Pledge.  The Pledgor hereby pledges to the Lender, and grants to the Lender a security
interest in, the following (collectively, the "Pledged Collateral"):

a)    all of the issued and outstanding shares of capital stock the Pledged Corporations, now or at any time or times hereafter owned by the Pledgor and the certificates representing all shares of such capital stock (as identified on <u>Exhibit A</u> attached hereto and made a part hereof or on any <u>Exhibit A</u> to any applicable Pledge Supplement),  all of the options and warrants for the purchase of shares of the Pledged Corporations now or hereafter held in the name of the Pledgor (all of said capital stock, options and warrants and all capital stock held in the name of the Pledgor as a result of the exercise of such options or warrants being hereinafter collectively referred to as the "<u>Pledged Stock</u>"), herewith delivered to the Lender accompanied by stock powers in the form of <u>Exhibit B</u> attached hereto and made a part hereof duly executed in blank and all of the dividends, cash, instruments, investment property and other property from time to time received, receivable or otherwise distributed in respect of, or in exchange for, any or all of such shares;

b)    all additional shares of stock of the Pledged Corporations from time to time acquired by the Pledgor in any manner and the certificates representing such additional shares (any such additional shares shall constitute part of the Pledged Stock and shall be listed on <u>Exhibit A</u> or any <u>Exhibit A</u> attached to any applicable Pledge Supplement), and all of the options, warrants, dividends, cash, instruments, investment property and other rights and options from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares;

c)    the property and interests in property described in <u>Section 3</u> below; and

d)    all proceeds of any of the foregoing.

2.    <u>Security for Liabilities</u>.  The Pledged Collateral secures the prompt payment, performance and observance of (i) the "Obligations" (as defined in the Loan Agreement) and (ii) the Pledgor's obligations and liabilities under this Pledge Agreement and each agreement, document or instrument executed pursuant to or in connection with the Loan Agreement, the Note or this Pledge Agreement (all such obligations and liabilities described in (i) and (ii) above and now or hereafter existing being hereinafter referred to collectively as the "<u>Liabilities</u>").

The Pledgor shall cause each Pledged Corporation to make a notation on its records, which notation shall indicate the security interest granted hereby, and the Pledgor agrees to execute and file financing statements pursuant to the Uniform Commercial Code as the Lender may reasonably request from time to time to perfect the security interest granted hereby.

3.    <u>Pledged Collateral Adjustments</u>.  If, during the term of this Pledge Agreement:

a)    any dividend, reclassification, readjustment or other change is declared or made in the capital structure of any Pledged Corporation, or any option included within the Pledged Collateral is exercised, or both, or

b)     subscription warrants or any other rights or options shall be issued in connection with the Pledged Collateral, then all of the new, substituted and additional shares, warrants, rights, options, investment properties or other securities, issued by reason of any of the foregoing, shall be promptly delivered to and held by the Lender under the terms of this Pledge Agreement and shall constitute Pledged Collateral hereunder.

4.     <u>Subsequent Changes Affecting Pledged Collateral</u>. The Pledgor represents and warrants that it has made its own arrangements for keeping informed of changes or potential changes affecting the Pledged Collateral (including, but not limited to, rights to convert, rights to subscribe, payment of dividends or rights to distributions, reorganization or other exchanges, tender offers and the voting rights), and the Pledgor agrees that the Lender shall have no obligation to inform the Pledgor of any such changes or potential changes or to take any action or omit to take any action with respect thereto. Subject to compliance with applicable Federal Communications Commission ("FCC") rules and regulations, the Lender may, after the occurrence of an "Event of Default" (as defined in the Loan Agreement), without notice and at its option, transfer or register the Pledged Collateral or any part thereof into its or its nominee's name with or without any indication that the Pledged Collateral is subject to the security interest hereunder.

5.     <u>Representations and Warranties and Covenants</u>.

The Pledgor represents and warrants as follows:

a)     the Pledgor is the sole legal and beneficial owner of that percentage of the issued and outstanding shares of capital stock of each Pledged Corporation set forth on <u>Exhibit A</u> attached hereto and <u>Exhibit A</u> to each Pledge Supplement, free and clear of any lien, charge, encumbrance or security interest of any kind (collectively, "Lien") except for the security interest created by this Pledge Agreement;

b)     the Pledgor has full power and authority (corporate or otherwise) to enter into this Pledge Agreement;

c)     other than such restrictions as may be imposed by laws affecting the transfer of securities generally and the rules and regulations of the FCC, there are no restrictions upon the voting rights associated with, or upon the transfer of, any of the Pledged Collateral;

d)     the Pledgor has the right to, pledge and grant a security interest in, the Pledged Collateral to the Lender free of any Lien;

e)     no authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required either (i) for the pledge of the Pledgor's Pledged Collateral pursuant to this Pledge Agreement or for the execution, delivery or performance of this Pledge Agreement by the Pledgor or (ii) for the exercise by the Lender of the voting or other rights provided for in this

Pledge Agreement or the remedies in respect of the Pledged Collateral pursuant to this Pledge Agreement; and

f)  the pledge of the Pledged Collateral pursuant to this Pledge Agreement is intended to create a valid and perfected first priority security interest in the Pledged Collateral, in favor of the Lender, securing the payment and performance of the Liabilities.

6.  <u>Voting Rights</u>.  During the term of this Pledge Agreement, and except as provided in this <u>Section 6</u> below, the Pledgor shall have the right to vote the Pledged Stock on all questions submitted to a vote of the record owners of such Pledged Stock in a manner not inconsistent with the terms of this Pledge Agreement, the Loan Agreement and any other agreement, instrument or document executed pursuant thereto or in connection therewith. After the occurrence and during the continuance of an Event of Default, the Lender may, at the Lender's option and following written notice from the Lender to the Pledgor, and with the prior approval and consent of the FCC, exercise all voting powers and corporate rights pertaining to the Pledged Collateral, to the extent permitted by applicable law.

7.  <u>Distributions</u>.

a)  So long as no Event of Default shall have occurred and be continuing:

i.  the Pledgor shall be entitled to receive and retain that portion of any and all distributions paid in respect of the Pledged Collateral required to pay federal and state income taxes due or accruing with respect to Pledgor's percentage interest of the taxable income from the Partnership; all other distributions of any nature paid or payable in respect of the Pledged Collateral, shall be forthwith delivered to the Lender to hold as, Pledged Collateral, and shall if received by the Pledgor, be received in trust for the Lender, be segregated from the other property or funds of the Pledgor, and be delivered immediately to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsement); and

ii.  all other dividends and distributions of any nature paid or payable in respect of the Pledged Collateral, shall be forthwith delivered to the Lender to hold as, Pledged Collateral, and shall if received by the Pledgor, be received in trust for the Lender, be segregated from the other property or funds of the Pledgor, and be delivered immediately to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsement).

b)  After the occurrence and during the continuance of an Event of Default:

i.  all rights of the Pledgor to receive the distributions which it would otherwise be authorized to receive and retain pursuant to Section 7(a)(i) hereof shall cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to receive and hold as Pledged Collateral all such dividends and distributions; and

4

    ii.    the Pledgor shall, upon the request of the Lender, at the Pledgor's expense, do or cause to be done all such other acts and things as may be necessary to make any sale of the Pledged Collateral or any part thereof valid and binding and in compliance with applicable law.

Subject to the rights of the Pledgor to retain those distributions described in Section 7(a)(i), at all times all dividends and distributions which are received by the Pledgor contrary to the provisions of this <u>Section 7</u> shall be received in trust for the Lender, shall be segregated from other funds of the Pledgor and shall be paid over immediately to the Lender as Pledged Collateral in the same form as so received (with any necessary endorsements).

8.    <u>Transfers and Other Liens</u>.  The Pledgor agrees that it will not (i) sell or otherwise dispose of, or grant any option with respect to, any of the Pledged Collateral without the prior written consent of the Lender, or (ii) create or permit to exist any Lien upon or with respect to any of the Pledged Collateral except for the security interest under this Pledge Agreement.

9.    <u>Remedies</u>.

    a)    The Lender shall have, in addition to any other rights given under this Pledge Agreement or by law, all of the rights and remedies with respect to the Pledged Collateral of a secured party under the Uniform Commercial Code as in effect in the State of Delaware, including the right to realize upon the Pledged Collateral after the occurrence of an Event of Default, subject to applicable law.  In addition, after the occurrence and during the continuance of an Event of Default, the Lender shall have such powers of sale and other powers as may be conferred by applicable law.  With respect to the Pledged Collateral or any part thereof which shall then be in or shall thereafter come into the possession or custody of the Lender or which the Lender shall otherwise have the ability to transfer under applicable law, including the rules and regulations of the FCC, the Lender may, in its sole discretion, without notice except as specified below, after the occurrence of an Event of Default, sell or cause the same to be sold at any exchange, broker's board or at public or private sale, in one or more sales or lots, at such price as the Lender may deem best, for cash or on credit or for future delivery, without assumption of any credit risk, and the purchaser of any or all of the Pledged Collateral so sold shall thereafter own the same, absolutely free from any claim, encumbrance or right of any kind whatsoever.  The Lender may, in its own name, or in the name of a designee or nominee, buy the Pledged Collateral at any public sale and, if permitted by applicable law, buy the Pledged Collateral at any private sale.  The Pledgor shall be liable to the Lender for all reasonable expenses (including, without limitation, court costs and reasonable attorneys' and paralegals' fees and expenses) of, or incident to, the enforcement of any of the provisions hereof and any sale of the Pledged Collateral.  Any surplus remaining after discharge of the Liabilities in full and payment of the above described expenses shall be paid to the Pledgor or as a court of competent jurisdiction shall direct.

b)    Unless any of the Pledged Collateral threatens to decline speedily in value or is or becomes of a type sold on a recognized market, the Lender will give the Pledgor reasonable notice of the time and place of any public sale thereof, or of the time after which any private sale or other intended disposition is to be made. Any sale of the Pledged Collateral conducted in conformity with reasonable commercial practices of banks, commercial finance companies, insurance companies or other financial institutions disposing of property similar to the Pledged Collateral shall be deemed to be commercially reasonable. Notwithstanding any provision to the contrary contained herein, any requirements of reasonable notice shall be met if such notice is received by the Pledgor as provided in Section 19 below, at least ten days before the time of the sale or disposition. Any other requirement of notice, demand or advertisement for sale is waived, to the extent permitted by law.

c)    In view of the fact that federal and state securities laws may impose certain restrictions on the method by which a sale of the Pledged Collateral may be effected after an Event of Default, the Pledgor agrees that after the occurrence and during the continuance of an Event of Default, the Lender may, from time to time, subject to compliance with applicable requirements of the FCC with respect to assignments of licenses and transfers of control, attempt to sell all or any part of the Pledged Collateral by means of a private placement restricting the bidders and prospective purchasers to those who are qualified and will represent and agree that they are purchasing for investment only and not for distribution. In so doing, the Lender may solicit offers to buy the Pledged Collateral, or any part of it, from a limited number of investors deemed by the Lender, in its reasonable judgment, to be financially responsible parties who might be interested in purchasing the Pledged Collateral. If the Lender solicits such offers from not less than three (3) such investors, then the acceptance by the Lender of the highest offer obtained therefrom shall be deemed to be a commercially reasonable method of disposing of the Pledged Collateral.

d)    In connection with the enforcement by the Lender of any remedies available to the Lender as a result of any Event of Default, the Pledgor agrees to, and to use its best efforts to cause the Pledged Corporations to join and cooperate fully, in each case at the Lender's election, with the Lender, any receiver referred to below and/or the successor bidder or bidders at any foreclosure sale in a filing of an application (and furnishing any additional information that may be required in connection with such application) with the FCC and all applicable federal, state and local governmental authorities, requesting their prior approval of (i) the operation and/or abandonment of all or any portion of any telecommunications system, (ii) the transfer of control of the Pledged Corporations or any of their respective telecommunications systems or assignment of all licenses, certificates, authorizations, approvals and permits, issued to the Pledged Corporations by the FCC or any such authorities with respect to their respective telecommunications systems and the operation thereof. In connection with the foregoing, the Pledgor agrees to, and agrees to use its best efforts to cause the Pledged Corporations to, take such further actions, and execute all such instruments, as the Lender

reasonably deems necessary or desirable. The Pledgor agrees that the Lender may enforce any obligations of the Pledgor as set forth in this Section by an action for specific performance.

e)  Notwithstanding any other provision of this Pledge Agreement to the contrary, the exercise of any rights hereunder by the Lender that may require FCC approval shall be subject to obtaining such approval. Pending obtaining FCC approval the Pledgor will not do anything to delay, hinder, interfere or obstruct the exercise of the Lender's rights hereunder in obtaining such approvals.

f)  In connection with the exercise of its remedies under this Agreement, the Lender may, upon the occurrence and during the continuation of an Event of Default obtain the appointment of a receiver or trustee to assume, upon receipt of all necessary judicial, FCC or other governmental authority, consents or approvals, control of or ownership of any Pledged Collateral. Such receiver or trustee shall have all rights and powers provided to it by law or by court order or provided to the Lender under this Pledge Agreement. Upon the appointment of such trustee or receiver, the Pledgor agrees to cooperate, to the extent necessary or appropriate, in the expeditious preparation, execution and filing of an application to the FCC for consent to the transfer of control or assignment of the Pledged Corporations' licenses, permits, franchises and other governmental authorizations to the receiver or trustee.

10.  <u>Security Interest Absolute</u>. All rights of the Lender and security interests hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

a)  any lack of validity or enforceability of the Loan Agreement, the Note or any other agreement or instrument relating thereto;

b)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Liabilities;

c)  any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Liabilities; or

d)  any other circumstance which might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Liabilities or of this Pledge Agreement.

11.  <u>Lender Appointed Attorney-in-Fact</u>. Subject to the prior consent of the FCC, which consent the Pledgor shall cooperate in obtaining, the Pledgor hereby appoints the Lender its attorney-in-fact (which appointment is coupled with an interest), with full authority, in the name of the Pledgor or otherwise, after the occurrence and during the continuance of an Event of Default, from time to time in the Lender's discretion, to take any action and to execute any instrument which the Lender may deem necessary or advisable to accomplish the purposes of this Pledge Agreement, including, without limitation, to

7

receive, endorse and collect all instruments made payable to the Pledgor representing any dividend or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same and to arrange for the transfer of all or any part of the Pledged Collateral to the name of the Lender or the Lender's nominee.

12.  Waivers.  The Pledgor waives presentment and demand for payment of any of the Liabilities, protest and notice of dishonor or Event of Default with respect to any of the Liabilities and all other notices to which the Pledgor might otherwise be entitled except as otherwise expressly provided herein or in the Loan Agreement.

13.  Term.  This Pledge Agreement shall remain in full force and effect until the Liabilities have been fully and indefeasibly paid and satisfied.  Upon the termination of this Pledge Agreement as provided above (other than as a result of the sale of the Pledged Collateral), the Lender will release the security interest created hereunder.

14.  Definitions.  The singular shall include the plural and vice versa and any gender shall include any other gender as the context may require.

15.  Successors and Assigns.  This Pledge Agreement shall be binding upon and inure to the benefit of the Pledgor, the Lender and their respective successors and assigns.  The Pledgor's successors and assigns shall include, without limitation, a receiver, trustee or debtor in possession of or for the Pledgor.

16.  Applicable Law; Severability.  This Pledge Agreement shall be governed by, and construed in accordance with, the internal laws (as opposed to the conflict of laws provisions) and decisions of the State of Delaware and the rules and regulations of the FCC.  Whenever possible, each provision of this Pledge Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but, if any provision of this Pledge Agreement shall be held to be prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Pledge Agreement.

17.  Further Assurances.  The Pledgor agrees that it will cooperate with the Lender and will execute and deliver, or cause to be executed and delivered, all such other powers, proxies, instruments and documents, and will take all such other action, including, without limitation, the filing of financing statements, as the Lender may reasonably request from time to time in order to carry out the provisions and purposes of this Pledge Agreement.

18.  The Lender's Duty of Care.  The Lender shall not be liable for any acts, omissions, errors of judgment or mistakes of fact or law including, without limitation, acts, omissions, errors or mistakes with respect to the Pledged Collateral, except for those arising solely out of or solely in connection with the Lender's (i) gross negligence or willful misconduct, or (ii) failure to use reasonable care with respect to the safe custody of the Pledged Collateral in the Lender's possession.  Without limiting the generality of the foregoing, the Lender shall be under no obligation to take any steps necessary to preserve rights in the Pledged Collateral against any other parties but may do so at its option.  All

expenses incurred in connection therewith shall be for the sole account of the Pledgor and shall constitute part of the Liabilities secured hereby.

19.     Notices.  All notices and other communications required or desired to be served, given or delivered hereunder shall be made in writing or by a telecommunications device capable of creating a written record and shall be addressed, if to the Pledgor, to the address set forth below the signature line of the Pledgor, and

if to the Lender, to

> United States Cellular Corporation
> 8410 W. Bryn Mawr
> Chicago, Illinois 60631
> Attention: Steven T. Campbell
> Telecopy:  (773) 399-8959
> Confirmation: (773) 399-8900

or, as to each party, at such other address as designated by such party in a written notice to the other party hereto.  All such notices and communications shall be deemed to be validly served, given or delivered (i) five (5) days after mailing in the United States mails, by registered or certified mail, postage prepaid, return receipt requested; or (ii) upon receipt if sent by hand or by courier service or by any above described telecommunications device.

20.     Change of Address.  The Pledgor shall immediately notify the Lender of any change of address from the address set forth on the signature line hereto, and shall execute any financing statements requested by Lender to be executed in connection with such change in address.

21.     Amendments, Waivers and Consents.  No amendment or waiver of any provision of this Pledge Agreement nor consent to any departure by the Pledgor, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

22.     Section Headings.  The section headings herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

23.     Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which shall together constitute one and the same agreement.

*     *     *     *     *

IN WITNESS WHEREOF, the Pledgor and the Lender have executed and delivered this Pledge Agreement as of the date first above written.

_____

[Will Vail/Allison Cryor DiNardo]

Address:  [_____]
          [_____]
Telecopy:    [_____]
Confirmation: [_____]

UNITED STATES CELLULAR CORPORATION

By:    _____
Name:  Steven T. Campbell
Title:  Executive Vice President – Finance, Chief Financial
        Officer and Treasurer

**SIGNATURE PAGE TO PLEDGE AGREEMENT
BY
[WILL VAIL/ALLISON CRYOR DINARDO]
IN FAVOR OF
U.S. CELLULAR**

10

EXHIBIT A

to

PLEDGE AGREEMENT

Pledged Stock

of [Sunshine Spectrum, Inc./Nonesuch, Inc.]

|  | Percentage of Issued and Outstanding Shares of Capital Stock pledged by Pledgor |
|---|---|
| Name of Pledgor | |
| [Will Vail/Allison Cryor DiNardo] | 100% |

EXHIBIT B

to

PLEDGE AGREEMENT

Form of Stock Power

STOCK POWER

       FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer to _____ _____ shares of capital stock of [Sunshine Spectrum, Inc./Nonesuch, Inc.], a Delaware corporation, represented by Certificate Nos. _____ (the "Equity Interests"), standing in the name of the undersigned on the books of said corporation and does hereby irrevocably constitute and appoint _____ as the undersigned's true and lawful attorney, for it and in its name and stead, to sell, assign and transfer all or any of the Equity Interests, and for that purpose to make and execute all necessary endorsements or other acts of assignment and transfer thereof; and to substitute one or more persons with like full power, hereby ratifying and confirming all that said attorney or substitute or substitutes shall lawfully do by virtue hereof.

Dated: _____

                                                _____

                                                [Will Vail/Allison Cryor DiNardo]

EXHIBIT C

to

PLEDGE AGREEMENT

Form of Pledge Supplement

Reference is hereby made to the Pledge Agreement (the "Pledge Agreement") dated as of [_____], 2014, by and between [Will Vail/Allison Cryor DiNardo] (the "Pledgor"), and United States Cellular Corporation, a Delaware corporation (the "Lender"), whereby the Pledgor has pledged certain capital stock to the Lender. This Supplement is a "Pledge Supplement" as defined in the Pledge Agreement and is, together with the acknowledgments, certificates, powers or pledge instructions delivered herewith, subject in all respects to the terms and provisions of the Pledge Agreement. Capitalized terms used herein and not defined herein shall have the meanings given to them in the Pledge Agreement.

By its execution below, the Pledgor hereby agrees that (i) the capital stock of the corporation(s) listed on the Exhibit A hereto shall be pledged to the Lender as additional collateral pursuant to Section 1 of the Pledge Agreement, (ii) such property shall be considered Pledged Stock under the Pledge Agreement and be a part of the Pledged Collateral pursuant to Section 1 of the Pledge Agreement, and (iii) each such corporation listed on Exhibit A hereto shall be considered a Pledged Corporation for purposes of the Pledge Agreement.

By its execution below, the Pledgor represents and warrants that it has full capacity to execute this Pledge Supplement and that the representations and warranties contained in Section 5 of the Pledge Agreement are true and correct in all respects as of the date hereof and after taking into account the pledge of the additional Pledged Stock relating hereto, except to the extent any such representation or warranty relates solely to a date other than the date of this Pledge Supplement.

IN WITNESS WHEREOF, the Pledgor has executed and delivered this Pledge Supplement to the Pledge Agreement as of this _____ day of [_____], 20__.


_____

[Will Vail/Allison Cryor DiNardo]

SCHEDULE I

TO

PLEDGE SUPPLEMENT

**Additional Pledged Stock**

Pledged Stock Certificates

| Name | Percentage of Shares of Common Stock owned by the Pledgor subject to Pledge | Shares of Common Stock owned by the Pledgor subject to Pledge | Certificate Number |
|------|------|------|------|
|      |      |      |      |

ACKNOWLEDGMENT

TO

PLEDGE SUPPLEMENT

       The undersigned hereby acknowledges receipt of a copy of the foregoing Pledge Agreement, agrees promptly to note on its books the security interests granted under such Pledge Agreement, and waives any rights or requirement at any time hereafter to receive a copy of such Pledge Agreement in connection with the registration of any Pledged Collateral in the name of the Lender or its nominee or the exercise of voting rights by the Lender.

                [NAME(S) OF ADDITIONAL PLEDGED CORPORATION(S)]

_____

Name:

Title:

EXHIBIT F

FORM OF
LIMITED RECOURSE GUARANTY

**THIS LIMITED RECOURSE GUARANTY** (this "Guaranty") is dated as of [_____], 2014, and is made by [Sunshine Spectrum, Inc./Nonesuch, Inc./Will Vail/Allison Cryor DiNardo], [a corporation organized and existing under the laws of the State of Delaware] [an individual] (the "Guarantor"), in favor of United States Cellular Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Lender").

### Background

A.    The Guarantor is a direct or indirect owner of equity interests in Frequency Advantage, L.P., a Delaware limited partnership (the "Borrower").  The Guarantor has requested the Lender to enter into a loan agreement (the "Loan Agreement") with the Borrower, and the Lender is willing to do so upon certain conditions, including, without, limitation, (i) the Guarantor's execution and delivery of this Guaranty to secure the payment and performance of all the Borrower's obligations under the Loan Agreement and (ii) the Guarantor's execution and delivery to the Lender of a pledge agreement which provides for the pledge of all the equity interests that the Guarantor owns in [the Borrower] /[Nonesuch, Inc.]/[Sunshine Spectrum, Inc.] to Lender as collateral security (the "Collateral") for the payment and performance of the Guarantor's obligations under this Guaranty.

B.    The Guarantor understands and acknowledges that the Lender has relied on this Guaranty in entering into the Loan Agreement and making any loans to the Borrower contemplated thereby and that, in the absence of this Guaranty, the Lender would not have done so.

### Agreement

In consideration of the foregoing and the representations, covenants and warranties contained herein, the Guarantor, intending to be bound legally, agrees with the Lender as follows:

Section 1.    Guaranty.  The Guarantor does hereby absolutely, unconditionally and irrevocably guaranty to the Lender and its successors and assigns the prompt satisfaction when due, whether by acceleration or otherwise, of any and all of the following:  (a) the outstanding principal balance of all loans made under the Loan Agreement, accrued and unpaid interest thereon, and all fees payable thereunder; (b) all other indebtedness, liabilities and obligations of the Borrower under or in respect of the Loan Agreement; (c) all other amounts payable by the Borrower or the Guarantor hereunder or under the Loan Agreement or any other document related hereto or thereto, including without limitation, any interest which accrues after the commencement of any case, proceeding or other action relating to the bankruptcy, insolvency or reorganization of the Borrower, or which would accrue but for the commencement of such case, proceeding or other action, whether or not allowed or allowable as a claim in any such proceeding, and any interest which accrues through the date of payment on this Guaranty; (d)

all out-of-pocket legal fees and expenses incurred by the Lender in the enforcement of this Guaranty or the Loan Agreement; (e) all out-of-pocket legal fees, costs, losses and expenses incurred by the Lender in connection with any collateral provided by the Guarantor or the Borrower; and (f) any renewals or extensions, replacements, modifications, substitutions, amendments and restatements of any of the foregoing (collectively, the "Indebtedness").

Section 2.    Payment.  The Guarantor agrees that if any of the Indebtedness is not satisfied when due, after giving effect to any applicable grace period, the Guarantor will, upon written demand by the Lender, forthwith satisfy such Indebtedness without setoff, counterclaim, withholding or other deduction of any nature.  No such satisfaction shall discharge the liability of the Guarantor hereunder until all Indebtedness shall have been satisfied in full (other than contingent indemnification and reimbursement obligations for which no claim has been made).

Section 3.    Continuing Guaranty; Obligations Absolute; Certain Waivers.  (a) This Guaranty is a continuing guaranty and shall continue in full force and effect until the payment and satisfaction in full of the Indebtedness, subject to reinstatement in accordance with Section 6 below.  Without limiting the generality of the foregoing, the Guarantor hereby irrevocably waives any right to terminate or revoke this Guaranty.  This Guaranty is a guaranty of payment and not collection.  The Guarantor expressly waives any right to require that any action be brought or steps be taken against the Borrower or any other person or entity, or to join the Borrower in any suit by the Lender against the Guarantor, or to require that the Lender resort to any security, collateral, deposit account, or credit on its books in the name of the Borrower or any other person or entity, other than the Collateral, or to any other right or remedy that the Lender may have.

(b)    The Guarantor's liability hereunder is absolute and unconditional and shall not be reduced, limited waived or released in any way by reason of (i) the invalidity, unenforceability, avoidance or subordination of any of the Indebtedness, (ii) the election of any remedy by, or on behalf of, the Lender with respect to all or any part of the Indebtedness, (iii) the amendment, waiver, supplement, modification, consent, extension, forbearance or granting of any indulgence by, or on behalf of, the Lender with respect to any provision of the Loan Agreement, (iv) the election by, or on behalf of, the Lender, in any proceeding instituted with respect to the Borrower under Chapter 11 of Title 11 of the United States Code (11 U.S.C. 101 et seq.) (the "Bankruptcy Code"), of the application of Section 1111(b)(2) of the Bankruptcy Code, (v) any borrowing or grant of a security interest by Borrower, as debtor-in-possession, under Section 364 of the Bankruptcy Code, (vi) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of the claims of the Lender for repayment of all or any part of the Indebtedness or any other amounts due hereunder, or (vii) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of the Borrower or the Guarantor other than indefeasible payment in full (in cash) of the Indebtedness.

(c)    The Guarantor hereby waives and releases the following rights and remedies available to the Guarantor: (i) all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of default or demand, notices of acceptance of and reliance on this Guaranty and of the existence, creation, or incurring of new or additional indebtedness, notices of renewal, extension or modification of

2

the indebtedness; (ii) the right to notice of any and all favorable and unfavorable information, whether financial or other, about the Borrower, heretofore, now, or hereafter learned or acquired by the Lender and all other notices to which the Guarantor might otherwise be entitled, it being understood that the Guarantor shall independently makes the Guarantor's own arrangements for obtaining financial information with respect to the Borrower; (iii) any and all suretyship defenses now or hereafter available to the Guarantor under applicable law; (iv) the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement hereof; (v) until all Indebtedness has been paid in full in cash, the right of subrogation, indemnity or contribution, all right to enforce any remedy the Lender may have against the Borrower or any other person or entity, and any right to participate in security now or hereafter held by the Lender; and (vi) all notices that the principal amount, or any portion thereof, and/or any interest on any instrument or document evidencing all or any part of the Indebtedness is due, notices of any and all proceedings to collect from the maker, any endorser or any other guarantor of all or any part of the Indebtedness, or from any other person or entity, and, to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to the Lender to secure payment of all or any part of the Indebtedness.

(d)    Any and all present and future debts and obligations of the Borrower to the Guarantor are hereby postponed in favor of and subordinated to the full payment and performance of all Indebtedness of the Borrower to the Lender.  The Guarantor expressly waives all suretyship defenses.  Except as otherwise provided in Section 3(c) above, the Guarantor waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which the Guarantor may now or hereafter have against the Borrower or any guarantor of the Indebtedness arising from the existence or performance of this Guaranty until the Indebtedness shall have been repaid in full in cash.  Guarantor acknowledges that the waivers provided in this Guaranty are made with Guarantor's full knowledge of the significance and consequence of such waivers, and that the Lender is relying on such waivers.

Section 4.    <u>Representations and Warranties</u>.    The Guarantor hereby represents, warrants and covenants to the Lender that:

(a)    the execution, delivery and performance by the Guarantor of this Guaranty shall not: (i) violate any law or regulation by which the Guarantor is bound in any material respect; (ii) constitute an event of default under any material agreement to which the Guarantor is now a party or by which the Guarantor may be bound or (iii) if the Guarantor is not an individual, violate any of the organizational documents of the Guarantor;

(b)    there are not presently any actions or proceedings pending by or against the Guarantor before any court or administrative agency, and the Guarantor has no knowledge of any pending, threatened or imminent litigation, governmental investigations or claims, complaints, actions or prosecutions involving the Guarantor, except as previously disclosed in writing to the Lender or which would not reasonably be expected to have a material adverse effect on the financial condition of the Guarantor or the ability of the Guarantor to perform the Guarantor's obligations under this Guaranty; and

3

      (c)     the Guarantor is [a corporation duly organized, validly existing and in good standing under the laws of Delaware, and has the power to enter into this Guaranty]/[an individual residing at [_____].

      The Guarantor's warranties and representations set forth in this Section shall be true and correct in all material respects at the time of execution of this Guaranty by the Guarantor, as of each date that a loan is made to the Borrower under the Loan Agreement, and shall constitute continuing representations and warranties as long as any of the Indebtedness remains unpaid or unperformed (other than contingent indemnification and reimbursement obligations for which no claim has been made).

      Section 5.    <u>Acknowledgments of the Guarantor</u>.  (a)  It is the intent hereof that the Guarantor shall remain liable as provided for hereunder until all Indebtedness shall have been satisfied in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made) notwithstanding any act, omission, event or thing that might otherwise act as a legal or equitable discharge of the Guarantor.

      (b)     The Guarantor hereby acknowledges and agrees that the Lender may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of the Guarantor, amend, otherwise modify or waive any provision of the Loan Agreement without the consent of the Guarantor and without in any way impairing or affecting this Guaranty.

      (c)     No failure or delay on the part of the Lender in exercising any right, remedy, power or privilege hereunder and no course of dealing between the Guarantor and the Lender shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege hereunder.

      Section 6.    <u>Avoided Payments</u>.  To the extent that the balance of the Indebtedness is reduced or paid in full by reason of any payment to the Lender by any party and all or any part of such payment is rescinded, avoided or recovered from the Lender for any reason whatsoever, including, but not limited to, proceedings in connection with the insolvency, bankruptcy or reorganization of the paying party, the amount of such rescinded, avoided or recovered payment shall be added to the principal balance of the Indebtedness, and all terms and provisions hereof shall thereafter apply thereto as if such reduction or payment of the Indebtedness had not occurred.

      Section 7.    <u>Further Assurances</u>.  From time to time, the Guarantor will execute and deliver, or will cause to be executed and delivered, to the Lender such additional documents and will provide such additional information as the Lender may reasonably require to carry out the terms hereof.  The Lender agrees to execute a release or other document reasonably requested by the Guarantor following repayment in full in cash of the Indebtedness (other than contingent indemnification and reimbursement obligations for which no claim has been made) at the sole cost and expense of the Guarantor.

Section 8.     <u>Governing Law</u>.     **THE GUARANTOR AND THE LENDER AGREE THAT THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.**

Section 9.     <u>Notices</u>.  Any notice or consent required or permitted by this Guaranty shall be in writing and shall be deemed effectively delivered or given when manually delivered or when indicated to have been delivered by a written receipt and mailed within the United States by registered or certified mail, postage prepaid, return receipt requested, addressed to the intended party at the address set forth below (or at such other address as the party shall hereinafter specify to the other party in writing). The foregoing shall not be construed as prohibiting or rendering insufficient other reasonable methods of delivery of written notice.

(a)     If to the Lender:

> United States Cellular Corporation
> 8410 W. Bryn Mawr Ave.
> Chicago, Illinois  60631
> Attn:  Steven T. Campbell

With a copy to:

> Sidley Austin LLP
> One South Dearborn Street
> Chicago, IL  60603
> Attn: Stephen P. Fitzell

(b)     If to the Guarantor:

> [_____]

With a copy to:

> Lukas, Nace, Gutierrez & Sachs, LLP
> 8300 Greensboro Drive
> Suite 1200
> McLean, Virginia  22102
> Attn: Thomas Gutierrez

Section 10.     <u>Successors and Assigns</u>.  This Guaranty shall be binding upon, and inure to the benefit of, the Lender and the Guarantor, and their respective heirs, executors, administrators, successors and assigns, <u>provided</u> that the Guarantor may not assign this Guaranty.

Section 11.     <u>Entire Agreement</u>.  The provisions of this Guaranty constitute the entire understanding and agreement between the parties hereto pertaining to the subject matter

hereof and completely and fully supersede all prior and contemporaneous understandings, both written and oral.

    Section 12.   <u>Remedies Cumulative</u>.  All rights and remedies of the Lender are cumulative and the exercise of any one right or remedy shall not be deemed to waive or release any other right or remedy.

    **Section 13.**  <u>**LIMITED RECOURSE**</u>.  **NOTWITHSTANDING ANY PROVISION TO THE CONTRARY HEREIN, IN THE ABSENCE OF FRAUD OF THE GUARANTOR, THE LENDER'S RECOURSE AGAINST THE GUARANTOR WITH RESPECT TO ANY INDEBTEDNESS OWING UNDER THIS GUARANTY SHALL BE LIMITED SOLELY TO THE COLLATERAL.**

    Section 14.   <u>Amendments</u>.  No amendment, modification, termination, or waiver of any provision of this Guaranty or any agreement, instrument or other document contemplated hereby, nor consent to any departure by the Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Guarantor and the Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Guarantor in any case shall entitle the Guarantor to any other or further notice or demand in similar or other circumstances.

    Section 15.   <u>Severability</u>.  In case any one or more of the provisions contained in this Guaranty, or any of the documents or agreements contemplated hereby, should be determined to be invalid, illegal or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein, or therein, shall not be in any way affected or impaired thereby.

    **Section 16.**  <u>**WAIVER OF JURY TRIAL AND OTHER WAIVERS:**</u> **(a) EACH OF THE GUARANTOR AND THE LENDER WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS GUARANTY OR UNDER ANY AGREEMENT, INSTRUMENT OR OTHER DOCUMENT CONTEMPLATED HEREBY OR RELATED HERETO AND IN ANY ACTION DIRECTLY OR INDIRECTLY RELATED TO OR CONNECTED WITH THE INDEBTEDNESS, OR ANY CONDUCT RELATING TO THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT OF THE INDEBTEDNESS OR THIS GUARANTY OR ARISING FROM THE DEBTOR/CREDITOR RELATIONSHIP OF THE GUARANTOR AND LENDER. EACH OF THE GUARANTOR AND THE LENDER ACKNOWLEDGES THAT THIS WAIVER MAY DEPRIVE THE GUARANTOR OF AN IMPORTANT RIGHT AND THAT SUCH WAIVER HAS KNOWINGLY BEEN AGREED TO BY SUCH PARTY AFTER CONSULTATION WITH LEGAL COUNSEL.**

    (b)    Except as prohibited by law, the Guarantor waives any right which the Guarantor may have to claim or recover in any litigation referred to in the preceding sentence any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages.

6

(c)     Each party hereto certifies that neither the other party hereto nor any representative, agent or attorney of such other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waivers, and acknowledges that, in entering into the transactions contemplated herein, each party is relying upon, among other things, the waivers and certifications contained in this Section 16.

[Signature Page to Follow]

**IN WITNESS WHEREOF**, the Guarantor, intending to be legally bound hereby, has duly executed this Limited Recourse Guaranty as of the date and year first above written.

<div style="margin-left: 40%">

**THE GUARANTOR:**

[Sunshine Spectrum, Inc./Nonesuch, Inc./Will Vail/Allison Cryor DiNardo]

By:_____
    Name:
    Title:

</div>

**Accepted and agreed:**

**UNITED STATES CELLULAR CORPORATION**

By:_____
    Steven T. Campbell
    Executive Vice President – Finance, Chief Financial Officer
    and Treasurer

<div style="text-align: center">

**SIGNATURE PAGE TO LIMITED RECOURSE GUARANTY
FROM
[SUNSHINE SPECTRUM, INC./NONESUCH, INC./WILL VAIL/ALLISON CRYOR
DINARDO]**

</div>