**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* MARK J. O'CONNOR and SARA F. LEIBMAN,<br><br>      Plaintiffs,<br><br>   v.<br><br>UNITED STATES CELLULAR CORPORATION, *et al.*,<br><br>      Defendants. | ORAL HEARING REQUESTED<br><br>Case No. 20-CV 2070-TSC |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE MOTION TO DISMISS OF DEFENDANTS ADVANTAGE SPECTRUM, L.P. AND NONESUCH, INC.**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 4

I.      Relators' Claims Must Be Dismissed Pursuant To The Public Disclosure Bar. ............... 4

        A.      Relators Misstate The Legal Test For The Public Disclosure Bar............................. 6

        B.      The Public Facts Disclosed In Advantage's Filings Were More Than Sufficient To Alert The Government To Relators' Fraud Theory. ......................................................... 8

        C.      The 2008 Complaint Further Disclosed Relators' Fraud Theory. .......................... 14

        D.      Relators Are Not An Original Source. .................................................................. 15

II.     Relators Do Not Plausibly Allege Facts Establishing Required Elements Of The FCA.. 17

        A.      The Complaint Lacks Plausible Allegations Of Materiality................................... 17

        B.      The Complaint Lacks Plausible Allegations Of Scienter. .................................... 20

        C.      The Complaint Lacks Plausible Allegations Of Falsity......................................... 22

III.    All Claims Should Be Dismissed With Prejudice.............................................................. 23

CONCLUSION .......................................................................................................... 24

**TABLE OF AUTHORITIES**

Page(s)

Cases

*In re Alaska Native Wireless LLC,*
  17 FCC Rcd. 4231 (2002) ................................................................................... 3, 22

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................... 18

*Auction of Advanced Wireless Service (AWS-3) Licenses Status of Short-Form
  Applications to Participate in Auction 97,*
  29 FCC Rcd. 11606 (Oct. 1, 2014) ....................................................................... 12

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,*
  297 F. Supp. 2d 272 (D.D.C. 2004) ................................................................... 22-23

*Cimino v. International Business Machines Corp.,*
  2019 WL 4750259 (D.D.C. Sept. 30, 2019) ....................................................... 19-20

*United States ex rel. Doe v. Staples, Inc.,*
  773 F.3d 83 (D.C. Cir. 2014) ......................................................................... *passim*

*United States ex rel. Doe v. Staples, Inc.,*
  932 F. Supp. 2d 34 (D.D.C. 2013) ........................................................................ 16

*United States ex rel. Findley v. FPC-Boron Employees' Club,*
  105 F. 3d 675 (D.C. Cir. 1997) ....................................................................... *passim*

*United States ex rel. Folliard v. Comstor Corp.,*
  308 F. Supp. 3d 56 (D.D.C. 2018) ............................................................. 6-7, 19, 20

*United States ex rel. Groat v. Boston Heart Diagnostics Corp.,*
  255 F. Supp. 3d 13 (D.D.C. 2017) ........................................................................ 23

*United States ex rel. Harman v. Trinity Industries Inc.,*
  872 F.3d 645 (5th Cir. 2017) ................................................................................. 23

*United States ex rel. Hawkins v. Mantech Int'l Corp.,*
  2020 WL 435490 (D.D.C. Jan. 28, 2020) .............................................................. 20

*United States ex rel. Hutchins v. DynCorp Int'l, Inc.,*
  342 F. Supp. 3d 32 (D.D.C. 2018) ..................................................................... 19-20

*United States ex rel. Janssen v. Lawrence Mem'l Hosp.,*
  949 F.3d 533 (10th Cir. 2020) .............................................................................. 23

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
   929 F.3d 721 (D.C. Cir. 2019) .............................................................................23

*United States ex rel. McBride v. Halliburton Co.*,
   848 F.3d 1027 (D.C. Cir. 2017) ...........................................................................20

*In re Northstar Wireless, LLC*,
   30 FCC Rcd. 8887 (Aug. 18, 2015), *affirmed in part and remanded on other*
   *grounds*, *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir.
   2017) ..................................................................................................... *passim*

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
   826 F.3d 466 (D.C. Cir. 2016) ..................................................................... *passim*

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
   857 F.3d 1148 (11th Cir. 2017) ............................................................................21

*United States ex rel. Purcell v. MWI Corp.*,
   807 F.3d 281 (D.C. Cir. 2015) .............................................................................21

*Razzoli v. Federal Bureau of Prisons*,
   230 F.3d 371 (D.C. Cir. 2000) .............................................................................24

*United States ex rel. Reed v. KeyPoint Gov't Solutions*,
   923 F.3d 729 (10th Cir. 2019) .............................................................................14

*United States ex rel. Scollick v. Narula*,
   2020 WL 6544734 (D.D.C. Nov. 6, 2020) .................................................... 18-19

*United States ex rel. Settlemire v. District of Columbia*,
   198 F.3d 913 (D.C. Cir. 1999) ...................................................................... 7, 12-14

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
   214 F.3d 1372 (D.C. Cir. 2000) ...........................................................................23

*SNR Wireless LicenseCo, LLC v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017) .................................................................... 3, 19-21

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
   14 F.3d 645 (D.C. Cir. 1994) ........................................................................... 7-8

*Tel. & Data Sys. Inc. v. FCC*,
   19 F.3d 42 (D.C. Cir. 1994) .................................................................................21

*United Health Services, Inc. v. United States ex rel. Escobar*,
   136 S. Ct 1989 (2016) .................................................................................... 17-20

*United States v. Kellogg Brown & Root Servs.*,
    800 F. Supp. 2d 143 (D.C. Cir. 2011) ............................................................. 23

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ......................................................................... 23

**Statutes**

31 U.S.C. § 3729(a)(1)(B) ..................................................................................... 18

31 U.S.C. § 3729(a)(1)(G) .................................................................................... 18

31 U.S.C. § 3729(b)(4) .......................................................................................... 18

31 U.S.C. § 3730(e)(4)(A) ................................................................................... 5-6

31 U.S.C. § 3730(e)(4)(B) ................................................................................. 15-16

False Claims Act ........................................................................................... *passim*

**Other Authorities**

*Auction of FM Translator Construction Permits Scheduled for June 21, 2018*
    *Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments,*
    *and Other Procedures for Auction* 83, 33 FCC Rcd. 2292, 2306 (Mar. 16,
    2018) .............................................................................................................. 12

*Caressa D. Bennet, et al.*, 31 FCC Rcd. 8993 (Aug. 19, 2016) ............................. 12

U.S. Dep't of Justice, Criminal Resource Manual § 4-4.11 .................................... 18

Rule 12(b)(6) ................................................................................................. *passim*

## INTRODUCTION

Relators' opposition to Advantage's motion to dismiss is, ultimately, an unsuccessful exercise in running away from Relators' own pleading.[1]  The bulk of Relators' Complaint consists of dozens of paragraphs parsing Advantage's publicly disclosed arrangements with U.S. Cellular and King Street and asserting that those arrangements created an impermissible degree of corporate control.  According to Relators, merely reading those agreements reveals that Advantage is a "one-man 'shell' company designed to have no meaningful management of [its] operations," that Advantage is organized in a manner "wholly inconsistent with that of an independent [Designated Entity] general partner," and that Advantage "concede[ed] all control over [its] bidding" to U.S. Cellular.  Compl. ¶¶ 58, 75.  Advantage denies that its agreements establish any such thing.  But if the Court accepts as true (as it must at this stage) Relators' allegation that Advantage's publicly disclosed agreements reveal impermissible corporate control, then there is no place for Relators' claims under the FCA.  That is because Relators effectively allege that Advantage *voluntarily supplied to the FCC and the public at large* the very materials that gave rise to the inference of fraud underlying Relators' claims.  The FCA does not recognize a claim in those circumstances, both because of the public disclosure bar and because key elements of an FCA claim—materiality, scienter, and falsity—cannot be plausibly alleged where the defendant disclosed to the government the very documents that Relators say reveal the truth.

Tacitly recognizing that they have pleaded themselves out of Court, just like the relator in *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 88 (D.C. Cir. 2014), Relators here spend most of their opposition pretending that their Complaint does not contain page after page drawing

---

[1] Capitalized terms and acronyms have the meaning given to them in Advantage's opening brief, *see* Mem. of Law in Support of the Mot. to Dismiss of Defs. Advantage Spectrum, L.P. and Nonesuch, Inc. ("Adv. Br."), ECF No. 153.  Citations to "Opp." are to Relators' Consolidated Resp. in Opposition to Defendants' Motions to Dismiss.

alleged inferences of fraud from publicly-disclosed agreements.  Instead, Relators attempt to focus on three handpicked snippets of "facts" that they contend Advantage did not disclose and were somehow the key to revealing an alleged fraud.  But these "facts" are, at most, details of matters that Relators themselves allege were made clear in Advantage's public filings.  The Complaint itself alleges that Advantage *disclosed* the principal substance of each point, namely:  that Advantage would use an office supplied by Ms. DiNardo's company as its "bidding room" rather than its own office (Compl. ¶ 65); that Advantage would participate in a "Bidding Council" along with representatives of U.S. Cellular and King Street to make decisions about bidding (*id.* ¶ 58); and that Advantage would rely on Ms. DiNardo's company for "bidding services" and not hire its own employees (*id.* ¶¶ 60, 75).  Relators cannot avoid the public disclosure bar with a handful of additional details about publicly-disclosed transactions that Relators themselves contend already raised an inference of fraud.

Nor do Relators have any cogent response to their failure to adequately plead multiple required elements of their FCA claims.  Relators ignore the undisputed regulatory context of this case that speaks volumes:  just months after *denying* "Designated Entity" status to two other small business participants in the same auction at issue here (following objections by other bidders, the NAACP, and other public interest groups) based upon the corporate agreements in those cases, the FCC *approved* Advantage as a legitimate, independent small business (against whom no objections had been filed) based upon Advantage's materially different agreements.  Relators fail to identify any factual representation that Advantage made to the FCC that was false in any respect, any information Advantage supposedly withheld that was *material* to the FCC's analysis, or any plausible reason to believe Advantage *knew* its filings with the FCC were misleading.  The FCC had all of the same publicly disclosed agreements as Relators and did not find an impermissible

degree of control.  Relators disagree with that determination, but they are not entitled to use the club of an FCA lawsuit suit to revisit the FCC's regulatory conclusion.

Indeed, the FCC makes determinations of control based upon a complex, multi-factor test, which the D.C. Circuit has recognized "did not . . . delineate a clear line between permissible influence and *de facto* control" at the time of Auction 97.  *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1026 (D.C. Cir. 2017).  The FCC has openly sought to *expand* the participation of small businesses like Advantage in public auctions of wireless spectrum that often result, as in Auction 97, with winning bids in the hundreds of millions of dollars.  Obviously, to compete at that level, small businesses must enter agreements to obtain capital and technical support from other, larger companies.  And, as the FCC has recognized, companies that back small businesses with the resources necessary to compete, naturally seek agreements regarding how their investments may be used.  *E.g.*, *In re Alaska Native Wireless,* LLC, 17 FCC Rcd. 4231, 4238–39 (2002).  Given that background, the FCC has emphasized that it will assess questions of control based on "the totality of circumstances in each particular case" and "individually for [each] particular applicant."  *In re Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8929 (Aug. 18, 2015) ("*Northstar Wireless*"), *affirmed in part and remanded on other grounds*, *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017); *In re Alaska Native Wireless*, 17 FCC Rcd. at 4238.  The FCC has stressed that "[a]ny one of the[] [same] factors [establishing control in one case] or even combinations of them might not amount to *de facto* control" under different facts.  *Northstar Wireless*, 30 FCC Rcd. at 8890.

At bottom, Relators here simply disagree with the FCC's regulatory determination regarding Advantage's application.  Relators cannot use the FCA, however, to turn this Court into a "super-FCC" that reassesses how the FCC should have applied its facts-and-circumstances

analysis.  Nor is there any reason to do so.  As the Complaint makes clear, the record before the

FCC disclosed every material aspect of Advantage's relationships with U.S. Cellular and King

Street.  The Complaint should be dismissed without leave to amend.

## ARGUMENT

Relators have failed to allege facts establishing claims under the FCA.  The vast majority

of the allegations in the Complaint are expressly drawn from Advantage's own publicly-filed

agreements, an unmistakable signal that the public disclosure bar applies.  *See* Section I.  Relators

also fail to adequately allege key elements of their claims—materiality, scienter, and falsity.  *See*

Section II.  All of Relators' claims should be dismissed with prejudice.  *See* Section III.

## I.    Relators' Claims Must Be Dismissed Pursuant To The Public Disclosure Bar.

In its opening brief, Advantage established that the public disclosure bar precludes

Relators' Complaint because the essential elements of the fraud Relators allege were disclosed in

public filings before Relators filed this action.  Adv. Br. at 15–22.  The gravamen of Relators'

claims is that Advantage was controlled by or affiliated with U.S. Cellular and/or Ms. DiNardo,

contrary to Advantage's representations to the FCC that it was controlled by Mr. Vail.  Compl. ¶¶

8–10.  Relators' own Complaint, however, makes clear that the basis of U.S. Cellular's and Ms.

DiNardo's alleged control over Advantage was the *written agreements* governing Advantage,

which were disclosed publicly in Advantage's FCC's filings.[2]  In dozens of paragraphs throughout

the Complaint, Relators extensively quote from and cite to those publicly-filed agreements as the

---

[2] That control arises—or does not arise—from formal agreements between a small business and a larger financial backer is consistent with the FCC's focus and analysis in other cases, such as *Northstar Wireless*, *supra*, which involved the same auction at issue here.  *See generally* 30 FCC Rcd. at 8909–40.  Given the hundreds of millions of dollars that must be put forth to allow a small business to participate in an FCC auction for wireless spectrum (Advantage's licenses here cost it $338 million, Compl. ¶ 43), the issue of control not surprisingly will be principally defined by the formal agreements between the small business and its necessary, larger financial backer.

very *mechanism* of control and affiliation that they claim Advantage misstated. *E.g.*, Compl. ¶¶ 9, 16, 18–19, 42–43, 56, 58–62, 64–65, 67–68, 72–78, 80, 82, 84, 87, 91–92, 95. Relators themselves allege that a review of those publicly-filed agreements would reveal the alleged falsity of Advantage's representations that it was not controlled by or affiliated with another company, or at a minimum, would raise an inference that Advantage's certification was false. In Relators' own words: "[t]he *limited partnership, loan, bidding, and other agreements signed by Vail* prevent him from obtaining financing from any source other than U.S. Cellular, from hiring his own employees or managers, and from choosing where to bid on licenses or how much to spend." *Id.* ¶ 9 (emphasis added). According to Relators, those same agreements established Advantage as a "one-man shell company" with a structure that was "wholly inconsistent with that of an independent DE general partner." *Id.* ¶ 75.

As Advantage established (Adv. Br. at 17–22), Relators' own allegations therefore demonstrate that the public disclosure bar applies. That rule prohibits an FCA *qui tam* complaint when "substantially the same . . . transactions" covered by the complaint were "publicly disclosed" through specified channels. 31 U.S.C. § 3730(e)(4)(A). This is because "[o]nce the information is in the public domain . . . [a]llowing *qui tam* suits after that point may either pressure the government to prosecute cases when it has good reasons not to or reduce the government's ultimate recovery" because it is required to share recoveries with "parasitic" relators. *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F. 3d 675, 685 (D.C. Cir. 1997). Here, Relators' own lengthy account of Advantage's publicly disclosed arrangements with U.S. Cellular and Ms. DiNardo's company make clear that virtually everything alleged by Relators was already in the public domain before Relators instituted this action.

In response, Relators largely ignore the allegations of their own Complaint.  Nowhere to be found are the scores of detailed allegations in the pleading describing Advantage's publicly-filed corporate documents and agreements with DiNardo and U.S. Cellular.  *E.g.*, Compl. ¶¶ 9, 16, 18–19, 42–43, 56, 58–62, 64–65, 67–68, 72–78, 80, 82, 84, 87, 91–92, 95.  Instead, Relators attempt to narrow the focus of their fraud theory to three alleged facts that they claim were not publicly disclosed:  (i) "the bidding room was actually located in King Street's offices"; (ii) a "King Street employee" was listed as an alternative bidder on Advantage's application; and (iii) Mr. Vail "apparently" was not using an office he rented for Advantage in Florida at the time of the auction.  Opp. at 13, 20.  According to Relators, those three allegations—and not the pages and pages in their Complaint regarding Advantage's publicly disclosed arrangements—are what "exposed the fraudulent transaction in this case."  *Id.* at 13.  Relators, however, misunderstand both the legal framework and the immateriality of their alleged non-public facts.

### A.    Relators Misstate The Legal Test For The Public Disclosure Bar.

Much of Relators' argument hinges on misstating the law.  Relators essentially argue that so long as they allege *any* information that is not "'substantially the same' as the information in the publicly disclosed documents," then the public disclosure bar does not apply.  Opp. at 12.  But that is not the test.  The public disclosure bar does not ask whether every speck of information alleged in the complaint can be located in a public document; rather, it asks whether "substantially the same allegations *or transactions* as alleged in the action *were publicly disclosed*."  31 U.S.C. § 3730(e)(4)(A) (emphasis added).  The independent importance of publicly disclosed *transactions* did not change in the 2010 amendments to the FCA.  *Id.*; *see also United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 3d 56, 71 (D.D.C. 2018) ("[U]nder both the pre- and post-amendment versions of § 3730(e)(4)(A), a court must decide if either 'the *allegation* of fraud itself' *or* 'the *transactions* that give rise to an inference of fraud' have been publicly disclosed") (emphasis in

original).   And, as Relators concede, the test for whether a *transaction* that gives rise to an inference of fraud has been disclosed remains the familiar formulation of "X + Y = Z."   *See* Opp. at 11.   That is, the bar applies where "readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed" from comparing the public disclosure of an alleged misrepresentation ("X") and the publicly disclosed true facts ("Y").   *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994).

The D.C. Circuit has repeatedly held that the public disclosure bar does not require that the publicly disclosed true information (or the "Y") actually "*prove* a case of fraud," but rather merely "raise the inference of fraud" that "enable[s] the government to adequately investigate the case and to make a decision whether to prosecute."   *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999) (emphasis added); *see also Findley*, 105 F.3d at 687.   Relators themselves therefore admit that "'[t]he *key question*'" for the public disclosure bar "is 'whether the publicly disclosed information could have formed the basis for a governmental decision on prosecution, *or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing*.'"   Opp. at 12 (quoting *Comstor*, 308 F. Supp. 3d at 75) (emphasis added).   Thus, even if a relator alleges "specific instances of fraud" that are not in the public record, the public disclosure bar requires dismissal so long as "a hypothetical government investigator aware of the [public facts] would be alerted to the likelihood that the [defendant] was falsely certifying compliance with the relevant provisions."   *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 472–74 (D.C. Cir. 2016) (internal quotations and alterations omitted).

Relators attempt to turn those principles on their head.   They ask the Court to ignore Advantage's public filings and focus on only the three snippets that they supposedly developed in their investigation.   Opp. at 13, 20.   The public disclosure bar, however, "focuses *not* on the

additional [allegedly] incriminating information a relator supplies, but instead on whether 'the quantum of information *already in the public sphere*' was sufficient to 'set government investigators on the trail of fraud.'" *Staples*, 773 F.3d at 87 (quoting *Springfield Terminal*, 14 F.3d at 654–55) (emphasis added). Thus, for example, a public disclosure of a cigarette company's "general practice" of selling cigarettes at lower prices to some customers was sufficient to preclude an FCA claim based on an allegedly false "most favored customer" representation. *Oliver*, 826 F.3d at 471, 473. The relator's allegations of "specific details" regarding the fraud not found in the public record, such as specific price differentials and sales locations "[did] not mean the transaction was not already publicly disclosed." *Id.* at 473. Similarly, in *Staples*, public reports disclosed some characteristics of pencils manufactured in China, whereas the relator's complaint "catalogue[d] characteristics . . . that are unmentioned in the [public] reports." 773 F.3d at 87. The public disclosure bar applied because, despite the detail supplied by the relators, the information in the public reports was "sufficient to 'enable the government adequately to investigate the case . . . .'" *Id.* at 88. As shown next, there can be no doubt that the information disclosed by Advantage in its public filings was more than sufficient to meet the same standard.

### B. The Public Facts Disclosed In Advantage's Filings Were More Than Sufficient To Alert The Government To Relators' Fraud Theory.

Relators' own Complaint establishes that Advantage's FCC filings disclosed the allegedly fraudulent "transaction" that forms the basis of Relators' fraud theory. Relators allege that both the "X" and the "Y" were publicly disclosed, *i.e.*: (X) Advantage publicly certified that it was not controlled by or affiliated with anyone other than Mr. Vail; but (Y) Advantage filed publicly with the FCC agreements and other legal documents that, according to Relators, showed that U.S. Cellular and Ms. DiNardo actually controlled Advantage; raising an inference (Z) that Advantage's certification was false. Indeed, Relators themselves allege *that merely reading Advantage's*

*publicly-filed agreements* would reveal that Advantage's certification regarding corporate control was false.  For example, Relators themselves allege:

- "[U]nder Section 5.5(b) of the [Advantage LP Agreement], the entire 'management' of the General Partner is entitled to no more [than] $50,000 per year compensation.  *That limitation effectively prevents Vail from hiring and forming a management team or even hiring a single full-time employee, **and so Advantage is a one-man 'shell' company designed to have no meaningful management of the operations.***"  Compl. ¶ 75 (emphasis added).

- "Section 5.4(a) of the [same agreement] provides that only one executive is expected to run Advantage prior to launch of commercial service . . . and that executive is expected to work no more than one-half of his/her time to run the company.  ***Such a role – expressly contemplated under the agreement – is wholly inconsistent with that of an independent DE general partner[.]***"  *Id.* (emphasis added).

- "[T]he terms of the Bidding Protocol Agreement required Vail to ***concede all control over Advantage's bidding to DiNardo and U.S. Cellular***."  *Id.* ¶ 58 (emphasis added).

- "[T]he Bidding Protocol Agreement does not permit Vail to bid on any licenses that are not useful to U.S. Cellular's operations; ***he is bound to bid only on licenses that have strategic importance to US. Cellular.***"  *Id.* ¶ 80 (emphasis added).

- "[T]he various provisions of [the] Advantage LP Agreement prevent Vail from making any future significant policy decisions on behalf of Advantage.  *He cannot form a management team, he has agreed to permit U.S. Cellular to construct and manage the wireless networks, he is wholly dependent on U.S. Cellular's financing and **[Vail] is subservient to U.S. Cellular's business plans[.]***"  *Id.* ¶ 82 (emphasis added).

- [T]he Advantage LP Agreement effectively prevents Vail from hiring a management team or other employees for Advantage, ***and so controlling the personnel that operate the wireless networks using the Advantage licenses is out of the question.***"  *Id.* ¶ 84 (emphasis added).

- "The limited partnership, loan, bidding, and other agreements signed by Vail *prevent him from obtaining financing from any source other than U.S. Cellular, **from hiring his own employees** or managers, and from choosing where to bid on licenses or how much to spend.*"  *Id.* ¶ 9 (emphasis added).[3]

---

[3] Relators incorrectly assert that Ms. DiNardo had a 49% ownership interest in Advantage.  Opp. at 37.  Although it does not affect the issues raised in Advantage's motion, Advantage's public

In the above allegations—and in dozens of similar allegations throughout the Complaint—*Relators themselves* allege that an inference of fraud arose from Advantage's public agreements. In each paragraph quoted above, the emphasized portion represents Relators' *own inference* drawn from the publicly-filed agreements that Advantage's certifications about Mr. Vail's control were false. If Relators were able to draw those inferences from Advantage's public filings, then the Complaint itself establishes that Advantage's filings were themselves "sufficient to raise the inference of fraud." *Findley*, 105 F.3d at 687; *see also Oliver*, 826 F.3d at 474 (relator's allegation of fraud based on an "inference" from public contracts was precluded). Indeed, if Relators are correct (as the Court assumes at this stage) that Advantage's publicly disclosed contracts were "wholly inconsistent" with its certifications related to the DE program (Compl. ¶ 75), then the same public filings "were also sufficient to 'enable the government adequately to investigate.'" *Staples*, 773 F.3d at 88. In similar circumstances, where a relator himself alleges that a false certification could be inferred from public information, the relator has been held to have "ple[aded] himself out of court." *Id.* at 88.

Relators essentially ignore all of the above and instead pretend that their "investigation" revealed three alleged facts "that exposed the fraudulent transaction in this case." Opp. at 13. But, particularly in light of the voluminous public disclosures outlined above and further detailed in Advantage's motion (Adv. Br. at 15–22), it is apparent that Relators' three snippets could not plausibly make the difference in terms of "rais[ing] an inference of fraud." *Findley*, 105 F.3d at 687. Especially as the public disclosure inquiry focuses on the "information already in the public

---

filings reflect that Ms. DiNardo actually owned 49% of Frequency Advantage, LP, which held a 10% ownership of Advantage. *See* Adv. Br. Ex. at § 3.1.

sphere," *not* any additional "information a relator supplies," Realtors' three alleged additional facts do not alter the public disclosure analysis. *Staples*, 773 F.3d at 87.

In any event, none of Relators' alleged "additional" facts add anything material:

<u>First</u>, Relators argue that their investigation established that the "bidding room was actually located in King Street's offices." Opp. at 13. But the publicly disclosed Frequency LP Agreement expressly stated that one of Ms. DiNardo's companies would provide services to Advantage related to the auction, including "establish[ing] a bidding room" for Advantage. Compl. ¶ 60; Adv. Br. Ex. E at 1; *see also* Adv. Br. Ex. E. at §8.1. There was thus little mystery about who was providing the bidding room. Even Relators therefore admit that the Frequency LP Agreement "*confirm[ed]* that Defendants' plan was to *use the King Street headquarters* to conduct bidding." Compl. ¶ 65 (emphasis added). To the extent that some inference could be drawn from DiNardo's involvement with providing office space to Advantage, that inference was already raised in Advantage's own public filings.[4]

<u>Second</u>, Relators argue that they discovered that Stephen Hinz, Advantage's "second designated bidder" listed on its Short Form Application, had been employed by King Street. Compl. ¶ 62; Opp. at 17. Relators argue that Hinz's employment status was an important discovery, even though they admit that the Complaint does not contain a single allegation that Hinz did anything regarding the auction (or anything else). Opp. at 17. Regardless, Relators themselves allege that Advantage's public filings disclosed that: (a) Advantage was a "one-man

---

[4] Relators argue that there is special legal importance regarding office space (Opp. at 16), but even assuming that is true, the *fact* that DiNardo's company was establishing a bidding room for Advantage was publicly disclosed. Any alleged legal significance of that fact is not relevant to the public disclosure bar, because "[a] relator's ability to recognize the legal consequences of a publicly disclosed fraudulent transaction does not alter the fact that the material elements of the violation already have been publicly disclosed." *Findley*, 105 F.3d at 688.

'shell' company" and could not hire even "a single full-time employee," including, presumably, Hinz (Compl. ¶ 75); (b) DiNardo's company agreed to "assist [Advantage] in the conduct [of] the bidding activities" and provide "bidding services" to Advantage (*id.* ¶ 60); and (c) by virtue of the publicly disclosed Bidding Protocol, "Vail [was required] to *concede all control* over Advantage's bidding to DiNardo and U.S. Cellular" (*id.* ¶ 58, emphasis added). Thus, according to Relators' own allegations, an alleged inference regarding control over Advantage's bidding was apparent without reference to Hinz's employment status. "[M]ore specific details about what happened" are not relevant to the public disclosure bar where "the general [fraudulent] practice has already been publicly disclosed." *Settlemire*, 198 F.3d at 919.[5]

Third, Relators argue that their "investigation" of Advantage's office in Florida revealed that Advantage lacked a "legitimate place of business" (Opp. at 13), but there is much less here than Relators suggest. The Complaint alleges only that Mr. Vail "rented an interior office" for Advantage in a building in Pensacola, Florida, and that office was "connected to" a vacant suite. Compl. ¶ 64. Relators further allege that someone affiliated with the Florida landlord said that Mr. Vail "was never there," though Relators admit that they conducted their surveillance during the very time that "Auction 97 was ongoing," *i.e.*, when Advantage was using the publicly disclosed

---

[5] Further, contrary to the importance that Relators attempt to attach to Mr. Hinz, the FCC treats the identities of "authorized bidders" as a ministerial matter. The "deletion and addition of authorized bidders (to a maximum of three)" was considered a "permissible minor change" or an "administrative and minor change." *Auction of Advanced Wireless Service (AWS-3) Licenses Status of Short-Form Applications to Participate in Auction 97*, 29 FCC Rcd. 11606, 11608–09 (Oct. 1, 2014); *Auction of FM Translator Construction Permits Scheduled for June 21, 2018 Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 83*, 33 FCC Rcd. 2292, 2306 (Mar. 16, 2018). The FCC's rules for Auction 97 further contemplated that a participant might designate multiple authorized bidders simply for administrative purposes—*e.g.*, "a bidder can designate multiple authorized bidders and can change their authorized bidders as often as necessary to address scheduling other bidding conflicts." *Caressa D. Bennet, et al.*, 31 FCC Rcd. 8993, 8995 n.14 (Aug. 19, 2016).

bidding room provided by Ms. DiNardo. *Id.* ¶ 64. Given that Advantage's public disclosures indicated that it would be using "the King Street headquarters to conduct bidding" (Compl. ¶ 65), as Relators allege, it is not surprising that Advantage was not using the Florida office at the same time, especially when Relators allege that Advantage's publicly disclosed agreements did not allow it to hire other employees. *Id.* ¶ 84. Nor do Relators explain what type of activity they expected to find in Advantage's office before the conclusion of Auction 97 in January 2015—that is, before Advantage even knew whether it had won the auction, and more than a year before the FCC awarded Advantage its licenses in July 2016. *See* Compl. ¶¶ 43, 64.

Relators nonetheless attempt to bolster the importance of their three alleged facts by arguing that, because the FCC's test for *de facto* control is based on the "totality of the circumstances," *any* fact that the FCC supposedly lacked "supplies the Y in the X + Y = Z equation." Opp. at 15–16. That is not the law. The question is whether Advantage's certifications with respect to corporate control and affiliation (the X) were sufficiently different from the "true state of facts" as shown in its public filings (the Y) to raise an inference of fraud. *Findley*, 105 F.3d at 687; *see also Oliver*, 826 F. 3d at 473 (bar applies where discrepancy between X and Y "alert[] law-enforcement authorities to the likelihood of wrongdoing") (internal alterations and quotations omitted). Here, based solely on Relators' own inferences drawn from Advantage's public filings, there was more than enough to "set government investigators on the trail." *Staples,* 773 F.3d at 87. In the face of those public disclosures, Relators' alleged additional facts here are no different than the "more specific details" relied on by relators in *Settlemire*, 198 F.3d at 919; the "greater detail" in *Staples*, 773 F.3d at 87; and the "more specific . . . instances of fraud where the general practice has already been publicly disclosed" in *Oliver*, 826 F.3d at 472. As in each of those cases, the public disclosure bar precludes Relators' claims.

### C.      The 2008 Complaint Further Disclosed Relators' Fraud Theory.

Relators' claims are additionally precluded because, even before Auction 97, the 2008 Complaint put squarely in the public record the allegation that U.S. Cellular and Ms. DiNardo have defrauded the government with DEs that they control.  *See* Compl. ¶¶ 45, 52; *see also* Adv. Br. at 12, 21.  Relators' own Complaint alleges that the claims in this case directly relate to misconduct alleged against U.S. Cellular and Ms. DiNardo in the 2008 action.  *See* Compl. ¶ 45 (U.S. Cellular's conduct with respect to Advantage is "but the most recent overt act in a longstanding conspiracy— with DiNardo as a key actor.")  The 2008 lawsuit thus represents an additional public disclosure of Relators' fraud theory (the "Z"), precluding Relators' subsequent claims.  *E.g.*, *United States ex rel. Reed v. KeyPoint Gov't Solutions*, 923 F.3d 729, 752–53 (10th Cir. 2019) (prior *qui tam* suits represent public disclosure barring subsequent complaint).

In response, Relators first argue that the 2008 Complaint could not trigger the public disclosure bar because "there were more than five years between the unsealing of the 2008 Complaint and Auction 97."  Opp. at 14.  But the public disclosure bar precludes lawsuits with much longer periods between the disclosure and the FCA lawsuit.  The D.C. Circuit has held that "disclosures going back as far as *forty years* prior to the relator's lawsuit were sufficient to disclose the practices which formed the basis of the relator's suit."  *Settlemire*, 198 F.3d at 919 (emphasis added); *see also Oliver,* 826 F.3d at 472–73 (holding that 1999 memorandum precluded 2008 lawsuit).  Relators do not identify any authority holding that a particular disclosure was too distant in time to preclude a lawsuit concerning the same alleged fraudulent practice.

Relators next argue that even if the "strategy of the alleged conspiracy was previously alleged in another publicly disclosed complaint," the determinative "issue is whether *the specific allegations in this Complaint* were in the public domain."  Opp. at 14 (emphasis added).  Relators again misstate the law.  Where a "general practice" of alleged misconduct is publicly disclosed, a

plaintiff cannot avoid the public disclosure bar by alleging "more specific details" about a particular instance of that misconduct.  *Oliver*, 826 F.3d at 473.  So too here; Relators allege that U.S. Cellular and Ms. DiNardo have "partnered for twenty years" to "funnel[] money to various 'very small businesses'" that falsely applied for DE status.  Compl. ¶ 46.  This alleged "general practice" was the centerpiece of the 2008 Complaint.  *See* Am. Compl. No. 1:07-cv-00800-JDB (D.D.C. Apr. 24, 2008), ECF No. 11, at ¶¶ 3–10, 25, 26–28, 48–49, 51–85.  Details about a particular instance of that alleged practice—*i.e.*, "the most recent overt act in a longstanding conspiracy" (Compl. ¶ 45)—are insufficient to avoid the public disclosure bar.

Relators' final argument about the 2008 Complaint is the mistaken notion that, because U.S. Cellular and Ms. DiNardo's company denied the allegations of that prior lawsuit, the FCC "cannot now be deemed to have known of the actual state of the relationship between U.S. Cellular, King Street, and Advantage."  Opp. at 15.  But the public disclosure bar does not depend on a defendant *admitting* to fraudulent practices or require that the government *know* that a fraud has taken place.  Rather, as discussed, the prohibition applies where the prior disclosures "raise[] the specter of 'foul play'" and "enable the government to adequately investigate the case."  *Findley*, 105 F.3d at 687–88.  The 2008 Complaint more than satisfies those requirements.

### D.    Relators Are Not An Original Source.

In a last-ditch effort to dodge the public disclosure bar, Relators contend that they are the "original source of the allegations in the complaint" and thus may proceed with their FCA claims notwithstanding all of the disclosures reviewed above.  Opp. at 19.  But Relators never allege facts that could qualify them as an original source.  Under the FCA, a relator seeking original source status must allege facts establishing that:  "(1) prior to [the] public disclosure . . . [they] voluntarily disclosed to the Government the information on which the allegations or transactions in a claim are based, or (2) [they] ha[ve] knowledge that is independent of and materially adds to the publicly

disclosed allegations or transactions, and [they] [] voluntarily provided the information to the Government before filing an action under" the FCA's *qui tam* provision.   31 U.S.C. § 3730(e)(4)(B).  Relators satisfy neither of those requirements.

In the first place, both statutory subparts require that relators provide their information to the government *before* there is a public disclosure of the basis of the relator's FCA claim or the filing of relator's action.  *Id.*  The Complaint in this case, however, merely recites that "Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information."  Compl. ¶ 24.  Other than this rote assertion, the Complaint contains no information about the "independent material knowledge" that Relators allegedly disclosed to the government, when they disclosed it, and what agency or person they disclosed it to.  Alleging "mere conclusions" cannot satisfy the requirements of original source status.  *United States ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34, 41 (D.D.C. 2013).

Separately, as reviewed above, Relators do not identify any information they developed that added anything material to the facts and transactions already disclosed in Advantage's own FCC filings.  As discussed, Relators allege Advantage's publicly-filed agreements disclosed that: (i) Advantage would use an office supplied by DiNardo to conduct its bidding (Compl. ¶ 60); (ii) Ms. DiNardo and representatives of U.S. Cellular would be actively involved in Advantage's bidding decisions as part of Advantage's "Bidding Council" (*id.* ¶ 58); and (iii) Mr. Vail was prevented from "hiring his own employees or manager" (*id.* ¶ 9.)  Given those publicly disclosed alleged facts and the many others detailed above, it is clear that Relators have "at best verified" information already disclosed publicly, which is insufficient for the original source exception.  *Oliver*, 826 F.3d at 479.  For each reason, Relators are not original sources under the FCA.

## II.     Relators Do Not Plausibly Allege Facts Establishing Required Elements Of The FCA.

As an independent matter, and as Advantage established in its opening brief, Relators'

Complaint lacks plausible allegations establishing the required elements of materiality, scienter,

and falsity.  Each deficiency, on its own, requires dismissal.  Relators have no valid argument to

the contrary.

### A.     The Complaint Lacks Plausible Allegations Of Materiality.

As Advantage showed (Adv. Br. at 22–24), Relators have not met the demanding

materiality standard required to support an FCA claim.  *See United Health Services, Inc. v. United*

*States ex rel. Escobar*, 136 S. Ct 1989, 2003 (2016) (describing the requirement as "demanding"

because the FCA is not "an all-purpose antifraud statute" or "a vehicle for punishing garden-variety

breaches of contract or regulatory violations.")  To plead materiality, it is not enough to allege that

the government could have rejected a claim had it known about an alleged violation; the complaint

must allege facts establishing that the government likely would have done so.  *Id.*  ("Nor is it

sufficient for a finding of materiality that the Government would have the option to decline to

pay").  That is because "materiality 'look[s] to the effect on the likely or actual behavior of the

recipient of the alleged misrepresentation.'"  *Id.* at 2002.  Here, the FCC was aware of all of the

publicly disclosed facts outlined above and awarded Advantage the DE bidding credits.  Indeed,

the federal government was aware of Relators' Complaint in this case, filed in May 2015, more

than a year before the FCC made its award to Advantage in July 2016.[6]  There is thus no reason to

think that anything Relators allege made any difference to the FCC.

---

[6] Relators argue that they are "[c]onfus[ed]" by Advantage's assertion that the FCC was aware of Relators' May 2015 Complaint because the Complaint was not unsealed until December 2019. Opp. 27 n.20.  But Relators' "confusion" is belied by the government's published procedures regarding *qui tam* lawsuits.  The Department of Justice Manual expressly provides that "[i]n any

In response, Relators first argue that the standard for materiality articulated in *Escobar* does not apply in this case.  Opp. at 24–25.  Relators point to the recent decision in *United States ex rel. Scollick v. Narula*, 2020 WL 6544734 (D.D.C. Nov. 6, 2020), to argue that *Escobar* applies only to claims alleging a false "implied certification," not a claim alleging "fraud in the inducement."  Opp. at 24.  Relators are mistaken.  While *Escobar* was decided in the context of a *qui tam* case that invoked the implied false certification theory, the Court's discussion of the "rigorous" materiality standard was not so limited.  Indeed, as *Escobar* recognized, one of the core provisions of the statute imposing direct FCA liability requires that a defendant "knowingly make[], use[], or cause[] to be made or used, a false record or statement *material to a false or fraudulent claim*."  31 U.S.C. § 3729(a)(1)(B) (emphasis added).  And as the Supreme Court noted, the statute defines the word "material" (which is also used explicitly in the reverse false claims provision, 31 U.S.C. § 3729(a)(1)(G)) to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4); *see also Escobar*, 136 S. Ct. at 2002.  *Escobar* thus used broad language to refer to "§ 3729(a)(1)(A)'s materiality requirement" and the need to "evaluat[e] materiality under the False Claims Act"—without limiting its analysis to the specific theory at issue in that case.  136 S. Ct. at 2002–03.

*Scollick* thus did not hold that pleading materiality is unnecessary in the context of a fraud in the inducement claim; indeed, *Scollick* recognized that a "fraud in the inducement theory already

---

False Claims Act matter, the [U.S. Attorney's Office] . . . *will confer with the relevant agency during the investigative, litigation, and settlement phases of the matter*."  U.S. Dep't of Justice, Criminal Resource Manual § 4-4.110 (emphasis added).  The Department confers with the agency to "solicit the agency's views on the False Claims Act matter, *including, for example, on the falsity and materiality aspects of any alleged violations of the relevant agency requirements . . . .*" *Id.* (emphasis added).  The Court, in considering a Rule 12(b)(6) motion, "draw[s] on its judicial experience and common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Here, Relators allege no facts that would suggest that the Department of Justice failed to timely confer with the FCC, consistent with the Justice Manual.

has a strict materiality requirement baked in."  2020 WL 6544734, at *9.  Specifically, the relator

pursuing such a theory must allege facts showing that the "misrepresentation in the defendant's

bid must have *caused* the government to award the contract."  *Id.* (emphasis in original).  Relators

here have failed to plausibly plead such a claim.  As reviewed, Advantage disclosed to the

government, *before* the government made its award, extensive information about its corporate

structure and its arrangements with U.S. Cellular and King Street.  *See* Adv. Br. at 19–21, 24.

Indeed, Relators themselves argue that Paragraphs 65–95 of their Complaint allege "a plethora of

specific and material facts" that would have caused the FCC not to award bidding credits to

Advantage (Opp. at 28), but the vast majority of those paragraphs simply quote and interpret

Advantage's *filings with the FCC*.  *E.g.*, Compl. ¶¶ 74–78, 80–84, 87–89, 91–93.  Relators thus

cannot establish, under any theory, that the facts they allege were unknown to the FCC or would

have altered the FCC's decision.  Dismissal is appropriate in those circumstances.  *E.g.*, *Comstor*,

308 F. Supp. 3d at 86 (dismissing for lack of materiality where "the government was fully informed

for years about the relator's allegations regarding the defendants' purported role in the fraudulent

scheme" and continued payment); *United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F.

Supp. 3d 32, 55 n.22 (D.D.C. 2018) (dismissing claim where materiality was lacking because "the

Army was aware of the practice and paid [the defendant] anyway").[7]

Relators also ignore that the FCC has acted to *deny* DE bidding credits in connection with

Auction 97 where it concluded that a DE was subject to too much control by its backers, *see SNR*

---

[7] Relators suggest that materiality cannot be decided on a motion to dismiss, but *Comstor* and *Hutchins* did just that.  *See also Cimino v. International Business Machines Corp.*, 2019 WL 4750259, at *7 (D.D.C. Sept. 30, 2019) (dismissing for lack of materiality where government paid a "substantial portion" of a licensing agreement after the filing of a qui tam case alleging that the agreement was fraudulent).  *Escobar* itself *rejected* the argument that "materiality is too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss."  136 S. Ct. at 2004 n.6.

*Wireless*, 868 F.3d at 1028, but it has taken no such action here.  As the D.C. Circuit has held, "courts need not opine in the abstract when the record offers insight into the Government's actual payment decisions."  *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1032 (D.C. Cir. 2017).  For this reason also, Relators allegations do not meet the FCA's stringent requirements with respect to materiality.

### B.   The Complaint Lacks Plausible Allegations Of Scienter.

As a separate matter, and as Advantage established in its opening brief, Relators have not alleged facts that plausibly support a finding of scienter.  Adv. Br. at 24–27.  The FCA's scienter requirement must be "strict[ly] enforce[d]," including at the pleading stage.  *See Escobar*, 136 S. Ct. at 2002; *United States ex rel. Hawkins v. Mantech Int'l Corp.*, 2020 WL 435490, at *4 (D.D.C. Jan. 28, 2020) ("[C]ourts require 'plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent.'").  As reviewed above, Relators themselves allege that Advantage *itself* disclosed to the FCC facts sufficient to conclude that Advantage was a "shell company" controlled by or affiliated with the other defendants.  *E.g.*, Compl. ¶ 75.  Relators cannot explain how Advantage acted with an intention to deceive the FCC while voluntarily disclosing those alleged facts to the FCC.

Instead, Relators argue that the Court should not address scienter at the pleading stage (Opp. at 31), but Relators are wrong.  Courts in this District regularly dismiss FCA cases at this stage where the plaintiff has failed to adequately plead the required elements.  *See Escobar*, 136 S. Ct. at 2002; *Hawkins*, 2020 WL 435490, at *4; *Comstor*, 308 F. Supp. 3d at 86; *Hutchins*, 342 F. Supp. 3d at 55 n.22; *Cimino*, 2019 WL 4750259, at *7.

Relators also mischaracterize Advantage's discussion of scienter and the FCC's multifactor assessment of *de facto* control.  *See* Opp. at 30–31.  Advantage does not contend that it suffered from "confusion about the meaning of the rules" (*id.* at 30); rather, Advantage has pointed out that

the D.C. Circuit has recognized the broad "flexibility" of the FCC's facts-and-circumstances approach, which created "considerable uncertainty about the test at the time of Auction 97." *SNR Wireless*, 868 F.3d at 1044; *see also Tel. & Data Sys. Inc.* v. FCC, 19 F.3d 42, 50 (D.C. Cir. 1994) (holding that FCC's *de facto* control test can be applied to "find compliance or noncompliance" depending on how each factor is weighed in a given case).  Given the flexible nature of the FCC's inquiry, Relators cannot adequately plead scienter merely because *Relators* would reach a different conclusion than Advantage based on the same facts disclosed to the FCC.  A "disputed interpretative question" is a weak foundation for "establishing even the loosest standard of knowledge."  *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C. Cir. 2015).

Relators do not identify any reason why such a disputed interpretative question would support an inference of scienter here.  Relators rely on *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148 (11th Cir. 2017), but that case also recognized that scienter must be assessed "in light of any ambiguity at the time of the alleged violation." *Id.* at 1155.  If a defendant has "*actual knowledge* of a different authoritative interpretation" than its own interpretation, then scienter may be established, *id.* (emphasis added), but nothing like that is alleged here.  Relators do not, for example, identify any particular FCC interpretation "warning off" Advantage from the interpretive conclusions it reached in its applications.  *Purcell*, 807 F.3d at 290.  Relators' rote assertion that the FCC has "provided clear guidance to the Defendants that their actions were in violation of the DE rules" (Opp. at 31), is unsupported by anything other than vague citations to the FCC's generalized facts-and-circumstances multifactor approach.

Indeed, Relators simply ignore the FCC's own treatment of scienter in this context.  In *Northstar* (unlike in this case), the FCC held that it disagreed with proposed DEs' conclusions that they were not subject to *de facto* control.  *Northstar Wireless*, 30 FCC Rcd. at 8940–41.  But, even

though the FCC disagreed on that interpretive question, it held that the applicants did *not* act with "a lack of truthfulness" because they disclosed to the FCC "their ownership structures and related Agreements," which "enable[] both the [FCC and [objectors] to fully evaluate and independently assess [the applicants'] claims to DE status." *Id.*  Nothing in the Complaint suggests that a different result applies in this case.

## C.    The Complaint Lacks Plausible Allegations Of Falsity.

As Advantage also established (Adv. Br. at 27–28), Relators fail to allege facts establishing the required element of falsity.  As reviewed, Relators' own Complaint establishes that Advantage disclosed the relevant facts of its arrangements with the other Defendants to the FCC.  The heart of Relators' fraud theory is not that Advantage misrepresented any fact, or even that it failed to disclose some controlling fact, but rather that Advantage reached an incorrect *legal conclusion* about how the facts would be weighed under the FCC's facts-and-circumstances approach. Whether particular arrangements confer *de facto* control hinges on the "totality of circumstances" in each case, with determinations about control "made individually for a particular applicant."  *In re Alaska Native Wireless LLC*, 17 FCC Rcd. at 4238.  Even where the FCC has found *de facto* control under one set of facts, it has stressed that "[a]ny one of these [same] factors or even combinations of them might not amount to *de facto* control" under different facts.  *Northstar Wireless*, 30 FCC Rcd. at 8890.

In those circumstances, Relators' disagreement with Advantage's legal assessment cannot establish falsity.  As Advantage showed (Adv. Br. at 26–28), "[d]isputed legal issues do not constitute fraud" under the statute.  *United States ex rel. Bettis v. Odebrecht Contractors of Cal.,*

*Inc.*, 297 F. Supp. 2d 272, 291 (D.D.C. 2004).[8]  Relators simply decline to address the authorities Advantage cited on this point.  Instead, Relators argue that it is possible to allege an FCA claim based on a "legally false" certification.  Opp. at 32.  Relators' "legally false" cases, however, concern circumstances in which a defendant was alleged to have withheld material information from the government that would render a legal certification false, *not* circumstances in which the relator simply disagrees with the defendant's legal conclusion based on disclosed information.[9]  Although Relators disagree with Advantage's conclusions about the FCC's multifactor and fact-specific tests, that disagreement does not establish a false statement for purposes of the FCA.

**III.    All Claims Should Be Dismissed With Prejudice.**

As Advantage demonstrated, each of Relators four claims must be dismissed for the reasons outlined in Advantage's opening brief and above.  *See* Adv. Br. at 28.  Relators do not disagree that each of their Counts One, Two, and Three require allegations establishing materiality, scienter, and falsity.  *See United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020).  Count Four, for an alleged FCA conspiracy, fails without an "underlying FCA violation."  *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019).  Thus, each claim should be dismissed.  Moreover, there is no reason to

---

[8] *See also United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) ("[A]rgumentation and possibility" about legal conclusions insufficient to establish fraud); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 377 (4th Cir. 2008) ("[D]ifferences in interpretation" regarding legal question "not false under the FCA"); *United States ex rel. Harman v. Trinity Industries Inc.*, 872 F.3d 645, 656 (5th Cir. 2017) ("[D]isagreement" regarding regulatory provision "is not the stuff of fraud.").

[9] *See United States v. Kellogg Brown & Root Servs.*, 800 F. Supp. 2d 143, 158 (D.D.C. 2011) ("legally false" claim possible where government "show[s] that the contractor *withheld information* about its noncompliance with material contractual requirements." (emphasis added, internal quotations omitted); *United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 255 F. Supp. 3d 13, 24 (D.D.C. 2017) (assessing "legally false" claim on the basis of undisclosed practice of submitting claims for medical tests used only for screening).

believe that Relators could cure any of the problems in the Complaint at issue in this motion. Therefore the Complaint should be dismissed with prejudice. *Razzoli v. Federal Bureau of Prisons*, 230 F.3d 371, 377 (D.C. Cir. 2000) (holding that dismissal without leave to amend is appropriate where "the claimant cannot possibly win relief" and that "this will be the case . . . when the facts alleged affirmatively preclude relief . . . .").

## CONCLUSION

For each reason, the Court should dismiss the claims against Advantage with prejudice.

Dated: December 16, 2020

Respectfully submitted,

/s/ David W. DeBruin

David DeBruin
David Bitkower
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001
Telephone:  202.639.6048
Fax:  202.639.6066
ddebruin@jenner.com
dbitkower@jenner.com

Daniel J. Weiss*
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Telephone:  312.222.9350
Fax:  312.527.0484
dweiss@jenner.com

*Attorneys for Defendants Advantage Spectrum, LP and Sunshine Spectrum, Inc. (as successor to Nonesuch, Inc.)*

*\*Admitted pro hac vice*

24