# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*,<br><br>          Plaintiffs,<br><br><br>MARK J. O'CONNOR and SARA F. LEIBMAN,<br><br>          Plaintiffs-Relators,<br><br>      v.<br><br>UNITED STATES CELLULAR CORPORATION, USCC WIRELESS INVESTMENT, INC., TELEPHONE AND DATA SYSTEMS INC., KING STREET WIRELESS, L.P., KING STREET INC., ADVANTAGE SPECTRUM, L.P., FREQUENCY ADVANTAGE, L.P., SUNSHINE SPECTRUM, INC., NONESUCH, INC., and ALLISON CRYOR DINARDO,<br><br>          Defendants. | Civil Action No.: 1:20-cv-02070-TSC<br><br>**AMENDED COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................... 1

II.   THE PARTIES ............................................................................................... 3

    A.    Plaintiffs ............................................................................................ 3

    B.    Defendants ........................................................................................ 4

III.  JURISDICTION AND VENUE ..................................................................... 7

IV.   RELEVANT STATUTES AND REGULATIONS ......................................... 9

    A.    The False Claims Act ....................................................................... 9

    B.    The Federal Communications Act .................................................. 10

    C.    FCC Spectrum Auctions and Licensing Regulations ..................... 11

        1.    Designated Entity Eligibility Requirements ....................... 11

        2.    Attributable and Disclosable Interest Holder Requirements ................... 13

        3.    Short-Form Application to Participate in an Auction ............. 16

        4.    Long-Form Application to be Granted the Licenses ............. 17

        5.    Post-Licensing Requirements ............................................. 19

V.    FACTS ......................................................................................................... 22

    A.    U.S. Cellular and DiNardo Have Created and Used Sham DEs to Acquire Licenses for U.S. Cellular with Hundreds of Millions of Dollars in Bid Credits Provided by the Government ....................... 22

    B.    U.S. Cellular and DiNardo Used Advantage as a Front to Acquire Spectrum Licenses With DE Bid Credits in FCC Auction 97 ............ 23

        1.    As a Front for U.S. Cellular, Advantage Filed a False and Fraudulent Application for Very Small Business DE Bid Credits in FCC Auction 97 ................................................ 24

        2.    U.S. Cellular and DiNardo, Not Vail, Controlled Advantage's Bidding in FCC Auction 97 ................................. 26

3. As a Front for U.S. Cellular, Advantage Filed a False and Fraudulent Application to be Issued the Licenses as a Very Small Business DE....... 30

4. To Induce the FCC to Issue the Licenses, U.S. Cellular and Advantage Made Further False and Fraudulent Certifications in Support of Advantage's Claims of DE Eligibility ...................................................... 33

C. Post-Licensing, Advantage's Only Function Was to Serve as a Facility for U.S. Cellular to "Park" the Licenses During the Unjust Enrichment Period in Order to Retain and Avoid Having to Repay the DE Bid Credits...................................... 35

1. Advantage's DE Annual Reports Falsely and Fraudulently Concealed Its Control by U.S. Cellular ..................................................................... 35

2. As a Front for U.S. Cellular, Advantage Was Never Intended to Function as a Telecommunications Company or to Control its Licenses ................ 37

D. To Preserve the DE Bid Credits for as Long as Possible, While Also Meeting the Construction Requirements, U.S. Cellular and Advantage Falsely and Fraudulently Entered Into a Spectrum Manager Leasing Arrangement .............. 38

1. The Spectrum Manager Leases Were Intended to Minimize and/or Avoid Any Unjust Enrichment Payments ............................................................ 38

2. Under the Lease, and as a Front for U.S. Cellular, Advantage Filed False and Fraudulent Construction Notices........................................................ 40

E. Through Advantage, U.S. Cellular Falsely and Fraudulently Obtained Licenses and Almost $113 Million in Bid Credits For Which Advantage Was Never Eligible ......................................................................................................... 41

VI. COUNTS................................................................................................................... 42

VII. PRAYER FOR RELIEF ........................................................................................... 49

VIII. REQUEST FOR TRIAL BY JURY ......................................................................... 50

On behalf of the United States of America, Plaintiff-Relators Mark O'Connor ("Relator O'Connor") and Sara Leibman ("Relator Leibman") (collectively "Relators") bring this action for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 3733, against United States Cellular Corporation ("U.S. Cellular"), USCC Wireless Investment, Inc. ("USCC"), Telephone and Data Systems Inc. ("TDS") (also referred to collectively throughout as "U.S. Cellular"), King Street Wireless L.P., King Street Wireless, Inc. (also referred to collectively throughout as "King Street" or "King Street Wireless"), Advantage Spectrum, L.P. ("Advantage" or "Advantage Spectrum"), Sunshine Spectrum, Inc.; Frequency Advantage, L.P.,  Nonesuch, Inc., and Allison Cryor DiNardo (all collectively "Defendants") and, based upon personal knowledge, relevant documents, unique investigation and interviews, information and belief, allege as follows:

## I.      INTRODUCTION

1.      In 2015, Defendant U.S. Cellular was the fifth largest wireless company in the United States, serving 4.7 million customers in 426 markets in 26 states, and with billions of dollars in revenues.

2.      Between 2014 and 2016, the Defendants used Advantage, which they formed as a sham "very small business" to fraudulently acquire wireless communications spectrum licenses in FCC Auction 97 using nearly $113 million in Government-provided bid credits that were reserved exclusively for legitimate very small businesses.

3.      In January 2015, Advantage — as a front for U.S. Cellular — was the high bidder on 124 licenses for AWS-3 spectrum in the FCC's Auction No. 97, with cumulative gross bids of $451,072,000.  U.S. Cellular, through Advantage, paid a net total of

$338,304,000 to the Federal Treasury, and the U.S. Government provided $112,768,000 in bid credits for these licenses.

4.      Defendants secretly agreed, planned, and intended that U.S. Cellular, with DiNardo, would determine which licenses to bid on, that the licenses would be in markets in and adjacent to markets already served by U.S. Cellular, that U.S. Cellular would control and manage the licensed spectrum, and that, once sufficient time had elapsed, Advantage would formally transfer the licenses to U.S. Cellular.

5.      Advantage has never provided wireless services to the public. Since it was formed in 2014, and as the nominal owner of 124 spectrum licenses worth more than $400 million, Advantage has variously claimed as its business office an unoccupied interior room in a condo complex, a storefront in a strip mall, and its managing partner's home in a retirement community, while, in fact, ceding management and control of the licenses to U.S. Cellular.

6.      U.S. Cellular, which financed the licenses with the intended objects of eventually acquiring, merging, and incorporating them with their existing spectrum without having to pay the full cost of the licenses, controlled Advantage and its licensed spectrum.

7.      Pursuant to various fraudulent agreements between the Defendants, which were concealed from the FCC, U.S. Cellular has incorporated Advantage's discounted spectrum into its own network, and has been providing wireless services to its customers using Advantage's licenses.

8.      As a sham entity controlled by U.S. Cellular, Advantage's applications and express certifications that it qualified and was eligible for nearly $113 million in very small business bid credits were false and fraudulent, in violation of the False Claims Act.

9.      To retain these fraudulently obtained bid credits, Defendants filed and caused to be filed numerous false records and statements, including false and fraudulent express certifications of eligibility for the Government-funded benefits, with the Federal Communications Commission ("FCC"), which concealed that the alleged very small business was merely a means for U.S. Cellular to fraudulently acquire discounted spectrum licenses with bid credits, in violation of FCC rules, and which were intended to avoid being required to return the funds to the Government, in further violation of the False Claims Act.

## II.      THE PARTIES

### A.      Plaintiffs

10.      **Plaintiff-Relator Mark J. O'Connor** is an attorney specializing in communications law. After graduating from UCLA Law School in 1992, he practiced communications law at Fleischman & Walsh for a year before moving to Piper & Marbury (now part of DLA Piper), where he continued to practice communications law from 1993 through 1999. From 1999 through 2012, he was a name partner at the communications law firm of Lampert, O'Connor & Johnston, P.C. Since that time, he was on the senior management team of a small wireless equipment manufacturer, and is a board member of a small broadband wireless Internet service provider. Mr. O'Connor is currently a co-founding member of a DC-based communications law firm.

11.     **Plaintiff-Relator Sara F. Leibman** is an attorney specializing in communications law. In 1987, Ms. Leibman graduated from the Georgetown University Law Center. From 1991 through 1995, she worked as an attorney at the FCC; one year in the Common Carrier Bureau, and then the following three years as Special Counsel in the FCC's Office of General Counsel where she, *inter alia*, worked on the FCC's designated entity ("DE") and other FCC spectrum auction regulations and adjudications. Subsequently, she was a Member of the communications practice at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC in Washington, DC and Director/Chief Counsel for Regulatory Affairs at T-Mobile USA. Through Sara Leibman Consulting, Ms. Leibman works with telecommunications companies, law firms, and related-field subject matter experts (*e.g.*, economists, technologists).

**B.     Defendants**

12.     **Defendant Telephone and Data Systems Inc.** ("TDS") is a publicly held Delaware corporation with its principal place of business in Chicago, Illinois. TDS owns between approximately 80 and 85 percent of United States Cellular Corporation ("U.S. Cellular"), which, through its wholly-owned subsidiary, USCC Wireless Investment, Inc. ("USCC"), owns 90 percent of Advantage and King Street. Through its TDS Telecom subsidiaries and through U. S. Cellular, TDS serves roughly 7 million wireline and wireless customers in 36 states. TDS has been in the telecommunications service business since 1969 and for the last several years has had annual revenues of over $5 billion. For the years ended 2021 and 2020, TDS reported total operating revenues of more than $5.3

billion and $5.2 billion, respectively. TDS and U.S. Cellular are controlled by the Carlson Family Trust.

13.     **Defendant United States Cellular Corporation** ("U.S. Cellular") is a publicly held Delaware corporation with its principal place of business in Chicago, Illinois, which is approximately 80 percent owned by TDS. In 2015, U.S. Cellular Corporation was the fifth largest commercial mobile phone operator in the United States, serving 4.7 million customers in 426 markets in 26 states. Currently, U.S. Cellular is the fourth largest commercial mobile phone operator in the United States, serving 5.1 million customers in 21 states. Directly or through its subsidiaries, U.S. Cellular holds hundreds of FCC commercial wireless licenses by which it offers mobile phone and data services. From 2005 through 2021, U.S. Cellular has reported annual revenues ranging from $3.0 billion to $4.1 billion; for the year ending on December 31, 2021, U.S. Cellular reported over $3.1 billion in service revenues.

14.     **Defendant USCC Wireless Investment, Inc.** ("USCC") was incorporated in Delaware on November 1, 2000 and is a wholly-owned subsidiary of U.S. Cellular.

15.     USCC is the limited partner and 90% owner of **Defendant Advantage Spectrum, L.P.**, which is the nominal holder of 124 AWS-3 spectrum licenses that were auctioned in FCC Auction 97.

16.     Between August 22, 2014 and December 31, 2016, **Defendant Frequency Advantage, L.P.** was the general partner and 10 percent owner of Advantage Spectrum, L.P.

17.     Initially, the general partner and 51 percent owner of Frequency Advantage, L.P. was **Defendant Sunshine Spectrum, Inc.**, whose 100 percent owner was a retired former telecommunications employee, William Vail, living in Florida.

18.     Initially, the limited partner and 49 percent owner of Frequency Advantage, L.P. was **Defendant Nonesuch, Inc.**, whose 100 percent owner was **Defendant Allison Cryor DiNardo**. At the time of the auction and for some period after Advantage's application for the licenses and several amendments were filed, DiNardo was a 4.9 percent owner of Advantage Spectrum, L.P. *(See Exhibit 1; Ownership Chart).*

19.     Between 2002 and 2016, Allison Cryor DiNardo was the owner and shareholder of various alleged "very small businesses," associated or formed in partnership with U.S. Cellular, including **Defendant King Street Wireless, L.P.**, that participated as very small businesses, or DEs in FCC spectrum auctions. DiNardo owns 10% of King Street Wireless, L.P. through her 100% ownership of **Defendant King Street Wireless, Inc.**; as with Advantage Spectrum, USCC owns the other 90% of King Street Wireless, L.P.  During this period, the only licenses U.S. Cellular acquired in FCC spectrum auctions were through sham "very small businesses" owned by DiNardo.  In 2012, following the end of the "unjust

enrichment periods," *i.e.,* when some or all of the bid credits would have had to be repaid, DiNardo sold two of these companies and their licenses to U.S. Cellular for an "immaterial amount." In 2018, again following the end of an unjust enrichment period, during which King Street had obtained and retained $100.2 million in bid credits for 152 licenses on behalf of U.S. Cellular, DiNardo submitted an application to the FCC to formally transfer ownership of King Street and its licenses to U.S. Cellular.

20.     Effective December 31, 2015, DiNardo transferred her ownership interest in Nonesuch, Inc. to Sunshine Spectrum, thereby indirectly giving William Vail 10 percent equity ownership of Advantage Spectrum, L.P.  On April 12, 2017, the FCC approved Vail's application to merge Nonesuch into Sunshine, thereby dissolving Frequency Advantage and leaving Sunshine as the sole general partner of Advantage Spectrum.

21.     Advantage Spectrum, L.P. was formed as a limited partnership under the laws of Delaware, on or about August 22, 2014 with its business address listed as 224 E. Garden Street, Suite 5A, Pensacola, FL 32502. On or about August 29, 2014, less than three weeks prior to the deadline to file applications to participate in Auction 97, Frequency Advantage, L.P. and USCC executed the Advantage Spectrum Limited Partnership Agreement.

### III.     JURISDICTION AND VENUE

22.     Relators bring this action on behalf of themselves and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court

has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

23.     This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District, and because Defendants performed acts in furtherance of their conspiracy in this District. In addition, acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

24.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District, and Defendants performed numerous acts proscribed by 31 U.S.C. § 3729, including the filing of false and fraudulent claims, reports and documents with the FCC, which is located in this District.

25.     Relators' claims and this Complaint are not based upon prior public disclosures of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government is already a party, or in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation, or from the news media. 31 U.S.C. § 3730(e)(4)(A).

26.     To the extent there has been a public disclosure unknown to the Relators, the Relators are the "original source" under 31 U.S.C. § 3730(e)(4)(B). The Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information. *Id*.

## IV.    RELEVANT STATUTES AND REGULATIONS

**A.    The False Claims Act**

27.    The False Claims Act ("FCA") provides that any person who:

> (A)    knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; (31 U.S.C. §§ 3729(a)(1)(A)),
>
> (B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (31 U.S.C. §§ 3729(a)(1)(B)) [and/or. . .]
>
> (G)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, (31 U.S.C. §§ 3729(a)(1)(G)),

is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of damages sustained by the Government. 31 U.S.C. §§ 3729(a)(1)(A), (B), (G).

28.    The FCA further provides that any person who *conspires* to commit a violation of any of the subsections, 31 U.S.C. § 3729(a)(1)(A, B, D, E, F, G), is liable for a civil penalty of up to $11,000 for each such violation, plus three times the amount of damages sustained by the Government. 31 U.S.C. § 3729(a)(1)(C).

29.    A conspiracy to violate the FCA arises when two or more individuals or entities form an agreement to commit a violation of the FCA, and engage in some overt action in furtherance of that violation.

30.    Pursuant to the Civil Monetary Penalties Inflation Adjustment Act, Pub. L. 104-134, the False Claims Act penalty range for violations on or before November 2,

2015 is $5,500 to $11,000 for each violation. *See id.*, 28 C.F.R. § 85.3. Pursuant to the

Bipartisan Budget Act of 2015, Public Law 114-74, section 701 (Nov. 2, 2015) the civil

penalties for violations are linked to inflation, and the range is currently from $11,803 to

$23,607 for each violation. *See* 28 C.F.R. § 85.5.

      **B.**    **The Federal Communications Act**

     31.    Pursuant to the Federal Communications Act of 1934 (the "Communications

Act"), the FCC regulates all non-federal uses of radio frequency spectrum in the United

States, 47 U.S. Code, §§ 101, *et seq.* The Communications Act establishes that the radio

frequency spectrum (a portion of which is used for commercial wireless communications) is

owned by and governed for the people of the United States. Private and public organizations

may obtain licenses for the exclusive use of portions of the spectrum for a period of time –

as long as that use is consistent with the "public interest, convenience and necessity." 47

U.S.C. § 307.

     32.    In 1993, Congress amended the Communications Act to give the FCC the

authority to assign commercial spectrum licenses through auctions. 47 U.S.C. § 309(j)(1). In

designing a system of competitive bidding, Congress expressly directed that the FCC seek

to promote certain specified objectives, including "the development and rapid deployment

of new technologies, products, and services for the benefit of the public," and "ensuring that

new and innovative technologies are readily accessible to the American people by avoiding

excessive concentration of licenses and by disseminating licenses among a wide variety of

applicants, including small businesses, rural telephone companies, and businesses owned by

members of minority groups and women." 47 U.S.C. § 309(j)(3)(A)-(B).

33.     To promote economic opportunity and competition for small businesses,

Congress expressly directed the FCC to develop regulations to:

> [P]rescribe area designations and bandwidth assignments that promote (i)
> an equitable distribution of licenses and services among geographic areas,
> (ii) economic opportunity for a wide variety of applicants, including small
> businesses, rural telephone companies, and businesses owned by members
> of minority groups and women, and (iii) investment in and rapid
> deployment of new technologies and services; [and]
>
> [E]nsure that small businesses, rural telephone companies, and businesses
> owned by members of minority groups and women are given the
> opportunity to participate in the provision of spectrum-based services, and,
> for such purposes, consider the use of tax certificates, bidding preferences,
> and other procedures.

47 U.S.C. § 309(j)(4)(C)-(D).

34.     To avoid unjust enrichment through exploitation of the system of

competitive bidding, Congress further directed the FCC to "require such transfer

disclosures and anti-trafficking restrictions and payment schedules as may be necessary

to prevent unjust enrichment as a result of the methods employed to issue licenses and

permits." 47 U.S.C. § 309(j)(4)(E). See also § 309(j)(3) (The FCC's auction rules "shall

include safeguards to protect the public interest in the use of the spectrum," including the

"avoidance of unjust enrichment...").

35.     The FCC has implemented regulations to comply with these directives.

### C.     FCC Spectrum Auctions and Licensing Regulations

#### 1.     Designated Entity Eligibility Requirements

36.     The FCC provides auction bidding credits to "very small business" and "small business" DEs, which are expressed as percentage discounts in the prices they are required to pay for the licenses they win at auction.

37.     To ensure that bid credits flow to small and very small businesses, and not to large companies seeking to game the system by using these businesses to obtain auction discounts, the FCC requires DEs (1) to meet the small or very small business size standard, which is measured by their attributable revenues, and (2) to retain control over the spectrum associated with the licenses for which it received small business benefits. See 47 C.F.R. §§ 1.2110(b)(1)-(3), 1.2111(b)(1). These requirements are designed to ensure that the applicant is not actually controlled by a large company seeking to use the program to lower its license acquisition costs.

38.     To meet the FCC's DE size requirements, an applicant's average gross revenues for the previous three years must be within the ranges specified by the FCC. *See* 47 C.F.R. § 1.2110(b); 27.1106(a)(1)&(2). In determining whether an applicant is eligible for DE status, the gross revenues of the applicant's affiliates, its controlling interests, and the affiliates of its controlling interests are attributed to, and aggregated with those of, the applicant. A very small business is eligible for 25 percent bid credits if its *aggregated* average gross revenues do not exceed $15 million, while a small business is eligible for 15 percent bidding credits if its *aggregated* average gross revenues are greater than $15 million and less than $40 million. 47 C.F.R. §§ 1.2110(f)(2)(i); 27.1106(a)(1)&(2). Thus, with a "very small business" credit of 25 percent, a DE with a winning bid of $500,000 would pay $375,000 for that license; with a "small business" credit of 15 percent, the DE

12

would pay $425,000. Advantage Spectrum, L.P., like DiNardo's other purported DEs in previous FCC auctions, applied for bid credits as a "very small business."

### 2. Attributable and Disclosable Interest Holder Requirements

39.    If the aggregated average gross revenues of the applicant or licensee, its affiliates, controlling interests, and the affiliates of its controlling interests exceed the relevant revenue thresholds, the applicant or licensee is ineligible for the auction benefits, and/or to retain them. 47 C.F.R § 1.2110(b)(i); 1.2111(b).

40.    The FCC has adopted the following controlling interest and affiliation standards to identify or determine whether an entity has such an interest in a DE that its gross revenues must be attributed to, and aggregated with those of, the DE applicant or licensee. 47 C.F.R. § 1.2110(c).

### a. "Controlling Interests" Rule

41.    A "controlling interest" exists when an individual or entity has either *de jure* or *de facto* control of the applicant or licensee. 47 C.F.R. § 1.2110(c)(2)(i). *De jure* control is evidenced by holdings of greater than 50 percent of the voting stock of a corporation or, in the case of a limited partnership, general partnership interests. *De facto* control is determined on a case-by-case basis under well-established FCC precedent.[1] *Id.* An entity must disclose its equity interest and demonstrate at least the following indicia of control to establish that it retains *de facto* control of the applicant:

(A) The entity constitutes or appoints more than 50 percent of the board of directors or management committee;

---

[1] *See Application of Ellis Thompson Corp.*, Memorandum Opinion and Order and Hearing Designation Order, 9 FCC Rcd. 7138, ¶¶ 9-10 (1994); *Application of Baker Creek Communications, L.P.* 13 FCC Rcd. 18709 (1998) (citing *Intermountain Microwave* 24 Rad. Reg. 7 (P & F) 983, 984 (1963)).

(B) The entity has authority to appoint, promote, demote, and fire senior executives that control the day-to-day activities of the licensee; and

(C) The entity plays an integral role in management decisions. *Id.*

42.     The controlling interest rule further provides that "the gross revenues … of any disclosable interest holder of an applicant or licensee are also attributable to the applicant or licensee, on a license-by-license basis, if the disclosable interest holder uses, or has an agreement to use, more than 25 percent of the spectrum capacity of a license awarded with bidding credits." *Id.*, § 1.2110(c)(2)(iii)(J).

### b.     "Affiliation Rule"

43.     An "affiliate" of a DE applicant is any person or entity that:

(A) Directly or indirectly controls or has the power to control the applicant,

(B) Is directly or indirectly controlled by the applicant,

(C) Is directly or indirectly controlled by a third party or parties that also controls or has the power to control the applicant, or

(D) Has an "identity of interest" with the applicant.

47 C.F.R. § 1.2110(c)(5)(i).

44.     In determining affiliation, the FCC looks at the nature of the control:

(A) Every business concern is considered to have one or more parties who directly or indirectly control or have the power to control it. Control may be affirmative or negative and it is immaterial whether it is exercised so long as the power to control exists.

(B) Control can arise through stock ownership; occupancy of director, officer or key employee positions; contractual or other business relations; or combinations of these and other factors. A key employee is an employee who, because of his/her position in the concern, has a critical influence in or substantive control over the operations or management of the concern.

*Id.*, § 1.2110(c)(5)(ii)(A)-(B).

45.     Affiliations arise under various circumstances, including "agreements to merge (including agreements in principle)," which "are generally considered to have a present effect on the power to control the concern." *Id.*, § 1.2110(c)(5)(ii)(A)-(B). Similarly, "[a]ffiliation generally arises where officers, directors, or key employees serve as the majority or otherwise as the controlling element of the board of directors and/or the management of another entity;" and "where one concern shares office space and/or employees and/or other facilities with another concern, particularly where such concerns are in the same or related industry or field of operations, or where such concerns were formerly affiliated, and through these sharing arrangements one concern has control, or potential control, of the other concern." *Id.*, § 1.2110(c)(5)(v), (vii), & (viii).

### c.     "Joint Venture Rule"

46.     Affiliation also arises where the parties are engaged in a joint venture arrangement. A "joint venture" exists where there is "an association of concerns and/or individuals, with interests in any degree or proportion, formed by contract, express or implied, to engage in and carry out a single, specific business venture for joint profit for which purpose they combine their efforts, property, money, skill and knowledge, but not on a continuing or permanent basis for conducting business generally." 47 C.F.R. § 1.2110(c)(5)(x)(A)-(B). The determination whether an entity is a joint venture rests on the facts of the business operation, "regardless of how the business operation may be designated by the parties involved." *Id.*

15

### 3.   Short-Form Application to Participate in an Auction

47.     Approximately 45-60 days before a spectrum auction, individuals or

entities seeking to participate in the auction must submit a short-form application (FCC

Form 175) to the FCC. A DE applicant must disclose in its application, separately and in

the aggregate, the gross revenues for each of the previous three years of the applicant, its

affiliates, its controlling interests, and the affiliates of its controlling interests. 47 C.F.R. §

1.2110(b)(1)(i); 27.1106(a)&(b). All short-form applicants must disclose "[t]he identity

of the person(s) authorized to make or withdraw a bid." 47 C.F. R. § 1.2105(a)(2)(iii).

48.     All information, statements, certifications and declarations submitted in the

Form 175 application are expressly made under penalty of perjury, including, *e.g.*: (1) the

applicant's ownership and other information set forth in 47 C.F.R. § 1.2112(a); (2) that

the applicant is a qualified DE under 47 C.F.R. § 1.2110; (3) that the applicant has

identified each party to any partnerships, joint ventures, consortia or other agreements,

arrangements, or understandings relating to the licenses being auctioned, regarding

bidding strategies, or post-auction market structure, to which the applicant, or any party

that controls or is controlled by the applicant, is a party; and (4) that the applicant has not

entered and will not enter into any explicit or implicit agreements, arrangements or

understandings of any kind with any parties other than those identified in the application

regarding the amount of their bids, bidding strategies or the particular licenses on which

the applicant  will or will not bid. *See, e.g.*, 47 C.F.R. §§ 1.2105(a)(2)(ii)(B); (iv); (viii);

(ix).

49. The FCC relies upon the truthfulness and completeness of this information and these certifications in deciding whether a bidder is eligible to participate in the auction as a DE.

### 4. Long-Form Application to be Granted the Licenses

50. Once the auction is completed, the winning bidders must submit a long-form application (FCC Form 601) to be issued the licenses. 47 C.F.R. § 1.2107(c). The long-form application also requires the applicant to disclose, separately and in the aggregate, the gross revenues for each of the previous three years of the applicant, its affiliates, its controlling interests, and the affiliates of its controlling interests, as well as to summarize and provide all agreements that affect its status as a DE. 47 C.F.R. § 1.2110(b)(1)(i) & (j).

51. Long-form applicants must expressly certify that all statements made in the application and in the exhibits, attachments, or documents incorporated by reference are "material, are part of this application, and are true, complete, correct, and made in good faith." These express material certifications include, *e.g*, that: (1) the grant of the application would not cause the applicant to be in violation of any pertinent or cross-attribution rules; (2) the applicant has reviewed the appropriate Commission rules defining eligibility to hold the requested licenses, and is eligible to hold the requested licenses; (3) the applicant is eligible to obtain the licenses for which it applies; and (4) the applicant has provided separate gross revenue and total asset information for itself, its officers and directors, its other controlling interests, its affiliates, and each affiliate of its officers, directors, and other controlling interests.

17

52.     DE applicants must also describe and expressly certify how they satisfy the DE requirements, and list and summarize "all agreements that affect designated entity status, such as partnership agreements, shareholder agreements, management agreements, spectrum leasing arrangements, spectrum resale (including wholesale) arrangements, spectrum use agreements, and all other agreements, including oral agreements, establishing as applicable, *de facto* or *de jure* control of the entity." 47 C.F.R. § 1.2110(j). Applicants must provide the date(s) on which they entered into each of the agreements listed, as well as a copy of each agreement. *Id.*

53.     As an exhibit to its long-form application, the applicant must provide a detailed explanation of the terms and conditions and parties involved in any bidding consortia, joint venture, partnership or other agreement or arrangement it had entered into relating to the competitive bidding process prior to the time bidding was completed. 47 C.F.R. § 1.2107(d). The applicant must also submit FCC Form 602, providing all ownership information required under 47 C.F.R. § 1.2112, with the long-form application. 47 C.F.R. §§ 1.2107(f); 1.1919.

54.     The FCC, which reviews hundreds of thousands of license applications annually, relies upon the truth and completeness of these disclosures and certifications in deciding whether a bidder is eligible for the DE licenses and bid credits.

55.     Each applicant is responsible for the *continuing* accuracy and completeness of information furnished in a pending application or in FCC proceedings involving a pending application. *See* 47 C.F.R. § 1.65(a). If the information is no longer substantially accurate and complete in all significant respects, the applicant must amend or seek to

amend the application to reflect the additional or corrected information. *Id.* Similarly, if there has been a substantial change that may affect the Commission's decision, the applicant must submit a statement furnishing the additional or corrected information. *Id.*

### 5. Post-Licensing Requirements

#### a. Reporting and Disclosure Requirements

56.    Once a company has been issued a license as a DE, the FCC requires regular reports and express certifications that it *continues* to meet the eligibility requirements during the five-year post-licensing unjust enrichment period. Each licensee must certify and file a DE Annual Report, which includes "at a minimum, a list and summaries of all agreements and arrangements (including proposed agreements and arrangements) that relate to eligibility for designated entity benefits." 47 C.F.R. § 1.2110(n). "This list must include the parties (including affiliates, controlling interests, and affiliates of controlling interests) to each agreement or arrangement, as well as the dates on which the parties entered into each agreement or arrangement." *Id.*

57.    DE licensees also must report any event during the five-year unjust enrichment period that would affect their eligibility to retain their DE bid credits for the remainder of the period. (FCC Form 608). A "reportable eligibility event" includes any event "that would lead to a change in the eligibility of a licensee for designated entity benefits." 47 C.F.R. § 1.2114(a).

58.    If a DE licensee leases or has an agreement to lease more than 25 percent of the spectrum capacity of a license awarded with bidding credits to a disclosable interest holder (defined as any individual or entity holding a ten percent or greater interest of any

kind in the DE), the gross revenues of the disclosable interest holder must be attributed to the DE licensee on a license-by-license basis. 47 C.F.R. § 1.2110(c)(2)(ii)(J). The amount of the spectrum leased thus affects whether, after aggregating its revenue with the disclosable interest holder/lessee, the DE *continues* to be eligible for the bid credits associated with that license or whether it must repay some or all of the credits under the unjust enrichment rule.

### b.    "Unjust Enrichment Rule"

59.    Licenses, or control of a licensee, may be transferred only upon application to and approval by the FCC. 47 C.F.R. § 1.948(a).

60.    If, during the five-year post-licensing unjust enrichment period, a DE licensee "seeks to assign or transfer control of a license to an entity that does not meet the eligibility criteria for a bidding credit, [it] will be required to reimburse the U.S. Government for the amount of the bidding credit, plus interest based on the rate for ten year U.S. Treasury obligations applicable on the date the license was granted, as a condition of Commission approval of the assignment or transfer." 47 C.F.R § 1.2111(b)(1).

61.    The FCC has established a sliding scale that reduces the amount of the repayment based on the length of time the unjust enrichment period has been in effect for the license.  If the change in status occurs in the first two years, the licensee must repay 100% of the bidding credit(s); a change in year 3 requires a repayment of 75%; a transfer in year 4 results in a repayment of 50%; and a transfer in year 5 reduces the repayment to 25%. *See* 47 C.F.R § 1.2111(b)(2)(i)(A)-(D).

62.     Once the unjust enrichment period is over, the licensee may, with approval of the FCC, assign or transfer control of a license without restrictions or penalties. Advantage's unjust enrichment period for its FCC Auction 97 licenses ended on July 5, 2021.

### c.     Construction and Service Performance Requirements

63.     In granting spectrum licenses to telecommunications providers, Congress intended that FCC regulations "include performance requirements, such as appropriate deadlines and penalties for performance failures." 47 U.S.C. §§ 307, 309(j)(4)(B). To this end, the FCC has enacted interim and end-of-term network signal coverage and service offering requirements for certain categories of licenses.

64.     Licensees with AWS authorizations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz bands (such as Advantage) are required to "provide reliable signal coverage and offer service within six (6) years from the date of the initial license to at least forty (40) percent of the population in each of its licensed areas ('Interim Buildout Requirement')," and to "provide reliable signal coverage and offer service within twelve (12) years from the date of the initial license to at least seventy-five (75) percent of the population in each of its licensed areas ('Final Buildout Requirement')." 47 CFR § 27.14(s)(1)-(2).

65.     In addition, "[i]f a licensee fails to establish that it meets the Interim Buildout Requirement for a particular licensed area, then the Final Buildout Requirement ... and the AWS license term … for each license area in which it fails to meet the Interim

Buildout Requirement shall be accelerated by two (2) years (from twelve (12) to ten (10) years)." 47 CFR § 27.14(s)(3).

66.     Advantage's Interim Buildout Period ends on July 5, 2022.

### V.     FACTS

67.     Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

> **A.     U.S. Cellular and DiNardo Have Created and Used Sham DEs to Acquire Licenses for U.S. Cellular with Hundreds of Millions of Dollars in Bid Credits Provided by the Government**

68.     Since at least 2002, DiNardo has been the owner and shareholder of various businesses, associated or formed in partnership with U.S. Cellular, that have participated in FCC spectrum auctions as very small business DE fronts for U.S. Cellular, including, *e.g.,* Carroll Wireless, L.P. (FCC Auction 58), Barat Wireless, L.P. (FCC Auction 66), and King Street Wireless, L.P. (FCC Auction 73). In every instance, these entities have ceded control (first, secretly and then, once the unjust enrichment periods had expired, formally) of their spectrum to U.S. Cellular, which has used their licenses to expand its network and provide service to its customers.

69.     In 2008, in FCC Auction 73, as a front for U.S. Cellular, King Street acquired 152 licenses in the 700 MHZ band with $100.2 million in government-provided DE bid credits. King Street's unjust enrichment period for these licenses did not end until December 27, 2014.

70.     In 2011, U.S. Cellular and DiNardo/King Street had entered into a secret leasing agreement under which U.S. Cellular had, *inter alia*, incorporated the King Street

spectrum into its own mobile 4G LTE network, was providing service to its own customers using the King Street spectrum, and was financing/building the required networks.

71.    To conceal that U.S. Cellular controlled King Street and its spectrum, and avoid having to repay the bid credits under the unjust enrichment rule, DiNardo/King Street and U.S. Cellular did not disclose their secret leasing agreement to the FCC.

72.    Relators independently discovered the existence of the secret agreement, which was demonstrated through engineering field tests that showed that U.S. Cellular had incorporated King Street licensed spectrum blocks in the Cedar Rapids, Iowa, and Iowa City, Iowa markets into its own network.

73.    Under the secret leasing agreement, in exchange for the use of its spectrum, U.S. Cellular had engaged to make usage-based payments to King Street. In fact, these payments were largely "credited" against the "loans" U.S. Cellular made to King Street to finance the acquisition of the licenses and the construction of the networks. *On paper, however,* it would have appeared that King Street had significant gross revenues – which would have affected the DE eligibility of another DiNardo-owned company to participate as a DE in FCC Auction 97.

   **B.    U.S. Cellular and DiNardo Used Advantage as a Front to Acquire Spectrum Licenses With DE Bid Credits in FCC Auction 97**

74.    On May 19, 2014, the FCC announced an auction of 1,614 licenses in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 bands (the "AWS-3" bands), which was scheduled to begin on November 13, 2014. (FCC Auction 97). Each license was for a

term of twelve years, and licensees were required to provide reliable signal coverage and offer service to at least 40 percent of the geographic license areas within six years, and at least 75 percent of the geographic license areas within twelve years, or by the end of the license term.

75.     To prevent FCC scrutiny of King Street/DiNardo, which also would have jeopardized King Street's possession of its licenses and bid credits, and still be able to acquire spectrum licenses with DE bid credits, it was necessary, therefore, for U.S. Cellular and DiNardo to establish a DE that could be made to appear to be controlled by someone other than DiNardo.

76.     To that end, U.S. Cellular and DiNardo engaged with William Vail, a retired former telecommunications employee living in Florida, to form a company that could participate as a DE in FCC Auction 97. On August 22, 2014, Vail registered Advantage Spectrum as a limited partnership in Delaware, with Frequency Advantage, L.P., 224 East Garden Street, Suite 5A, Pensacola, Florida listed as the general partner, Sunshine Spectrum as the general partner of Frequency Advantage, and himself as the President of Sunshine Spectrum. *(Exhibit 2; Certificate of Incorporation).*

**1.     As a Front for U.S. Cellular, Advantage Filed a False and Fraudulent Application for Very Small Business DE Bid Credits in FCC Auction 97**

77.     On November 11, 2014, through Vail, Advantage Spectrum, L.P. submitted its FCC Form 175 short-form application to participate in FCC Auction 97 as a "very small business," with less than $15 million in average gross revenues for revenues for the

previous three years, and seeking 25 percent bid credits. (*Exhibit 3; Advantage Spectrum, L.P., FCC Auction 97 Form 175*).

78.     In the application, Vail expressly certified falsely and fraudulently that Frequency Advantage, L.P., Sunshine Spectrum, Inc., and Vail, himself, held the controlling interests in Advantage Spectrum, L.P., and that, based on Vail's *de jure* and *de facto* control of Frequency Advantage, and his 100 percent ownership of Sunshine Spectrum, he had a controlling interest in Advantage Spectrum. Vail further expressly certified falsely and fraudulently that, "No other individual or entity has a controlling interest in the Applicant." *(Exhibit 4; Exhibits to Advantage Form 175).*

79.     Advantage's Ownership statement identified U.S. Cellular, USCC, and DiNardo as "Disclosable Interest Holders" with "Indirect Ownership" in Advantage. Through Vail, Advantage expressly certified falsely and fraudulently that the revenues of each of these owners were not attributable to Advantage, because they were not affiliates of Advantage: "This Disclosable Interest Holder is not an Affiliate of the Applicant within the meaning of the Commission's rules and, therefore, no revenue information for this Disclosable Interest Holder will be provided." *(Exhibit 3, pp. 38, 87, 108).*

80.     Vail further expressly certified falsely and fraudulently in his claim for "Bidding Credit Eligibility" that Advantage "does not have any affiliates, except for those entities listed in the application herein, which are affiliates of Mr. Vail." The only entities identified were Frequency Advantage, L.P., Sunshine Spectrum, Inc., and the William S. Vail and Lorraine C. Vail Living Trust. *(Exhibit 4).*

81.     These express certifications were false and fraudulent because, by several measures, including the affiliation and joint venture rules, as well as the factors establishing *de facto* control, U.S. Cellular and DiNardo were and had the controlling interests in Advantage Spectrum. U.S. Cellular, with DiNardo, had formed and caused Advantage Spectrum to be formed in partnership with Vail and DiNardo specifically so Advantage could participate in FCC Auction 97 as a DE front for U.S. Cellular. Under the FCC's regulations, U.S. Cellular's billions of dollars in gross revenues, as well as King Street's gross revenues under the secret lease agreement, were, in fact, required to be attributed to Advantage Spectrum, which would have disqualified Advantage from being eligible for, and receiving, DE bid credits.

82.     These false and fraudulent certifications were expressly material because, *inter alia*, they were specifically identified as material in the application, applicants were required to certify that they were material, they were made under penalty of perjury, and the FCC would not have awarded Advantage Spectrum DE bid credits without Advantage's false and fraudulent certification that it was eligible for the credits as a very small business with less than $15 million in revenue.

## 2.     U.S. Cellular and DiNardo, Not Vail, Controlled Advantage's Bidding in FCC Auction 97

83.     U.S. Cellular, DiNardo, and Vail formed and caused Advantage to be formed specifically so that U.S. Cellular could acquire discounted spectrum licenses in FCC Auction 97 using DE bid credits. Defendants concealed and failed to disclose to the FCC their secret agreement and understanding that Advantage existed solely to provide a

facility for U.S. Cellular to "park" the licenses until the unjust enrichment period expired, as well as their secret agreement and understanding that, once the unjust enrichment period expired, Advantage would be formally acquired by, and merged with, U.S. Cellular.

84.     Prior to the auction, on September 11, 2014, U.S. Cellular, through USCC, Frequency Advantage, and Advantage Spectrum entered into a purported "Bidding Protocol Agreement" regarding Advantage Spectrum's participation in FCC Auction 97. As part of its long-form Form 601 application for the licenses, Advantage was required to summarize and provide the agreement to the FCC. In summarizing the agreement, however, Advantage falsely and fraudulently stated that William Vail had "sole authority to determine which AWS-3 licenses, and in which order [Advantage] would enter bids in each round . . . consistent with the overall investment parameters" in Advantage's governing documents.

85.     FCC Auction 97 opened on November 14, 2014 and closed on January 29, 2015, after 341 rounds of bidding held over 45 days.

86.     Advantage's bidding strategy in FCC Auction 97 was controlled and directed by U.S. Cellular and DiNardo, as U.S. Cellular's proxy, solely for U.S. Cellular's benefit, and was designed solely to add to or expand U.S. Cellular's existing spectrum.

          i.   **Advantage Rented Space Solely to Appear to Have a Business Address Separate from U.S. Cellular and DiNardo**

87.     Advantage's purported place of business at the time of the auction, 224 East Garden Street, Suite 5A, Pensacola FL 32502, is not listed with the Escambia County Property Appraiser.  Relators' observation of the premises during the auction period found "Suite 5," which was vacant without any furniture or signage to indicate there was a business operating from or within the office.  A "For Rent" sign was posted on the office door of the suite.  (*Exhibit 5*).

88.     Inside the 1100 square foot suite, however, there was an interior room labeled "5A." According to the landlord's assistant, this room was rented by a man who sold items online, and who was going to move out in August 2015 when his lease expired. The assistant stated that she did not know his name, as they had never seen him in the office. The landlord later identified the renter as William Vail, but also could not say much about Mr. Vail since he was never there.

89.     Advantage's Auction 97 bidding was conducted from DiNardo's offices at 526 King Street Suite 209 Alexandria VA 22314. Relators' surveillance revealed that, in addition to King Street Wireless, this suite also serves as the registered address for at least three of DiNardo's other companies that have participated as very small business DE fronts for U.S. Cellular in FCC spectrum auctions, and is the office where King Street's small group of employees work.

ii.   **U.S. Cellular/DiNardo Controlled and Conducted the Auction Bidding Through Vail**

90.     Although William Vail was a retired former telecommunications employee, his experience was largely as a general manager of local or regional cellular telephone

systems. He had no prior involvement or experience in spectrum auctions, including the law and FCC regulations associated with bidding and acting as a DE. Because of this, in the few weeks between setting up Advantage and the start of FCC Auction 97, U.S. Cellular hired experts and consultants to educate Vail in the mechanics of placing bids, and arranged for DiNardo to oversee Vail's participation in FCC Auction 97.

91.     Advantage's short-form application identified Vail and Stephen Hinz as its only authorized bidders. Hinz, who was employed by King Street Wireless/DiNardo, had no association with Advantage or Vail, and DiNardo, not Vail, asked him to be listed as a bidder for Advantage. In fact, Hinz was identified as an authorized bidder to conceal DiNardo's active role in the bidding decisions. As Hinz's employer, DiNardo/King Street, not Vail/Advantage, controlled and had the power to control Hinz's role and bidding in the auction. Thus, while Hinz, as DiNardo's proxy, had the power, independently of Advantage, to place, withdraw, and take other bidding actions in the auction, Vail/Advantage had no power or control over Hinz's actions – or over DiNardo's actions through Hinz.

92.     Relators' independent observation during the auction and contemporaneous investigation revealed that, during the auction, DiNardo and one or more U.S. Cellular/TDS senior employees were present for and participated in the bidding decisions.

93.     These facts and circumstances were not disclosed in the Bidding Protocol Agreement or in any required submissions to the FCC. Defendants further concealed this information from the FCC, asserting falsely and fraudulently that Vail had "sole authority

to determine which AWS-3 licenses, and in which order [Advantage] would enter bids in each round . . . consistent with the overall investment parameters" in Advantage's governing documents.

94.     Virtually all of the licenses Advantage won were identified and selected by U.S. Cellular/DiNardo, and were in markets that were either adjacent to or overlapping with U.S. Cellular wireless service areas. *(See Exhibit 6).* The decisions on which licenses to bid on, in which markets, and when to place the bids were entirely subject to U.S. Cellular's control and approval.

### 3.     As a Front for U.S. Cellular, Advantage Filed a False and Fraudulent Application to be Issued the Licenses as a Very Small Business DE

95.     As the nominal winner of 124 DE licenses, or approximately 7.7 percent of the total number of licenses available in the auction, Advantage, funded by U.S. Cellular, paid $338,304,000, and the U.S. Government provided $112,768,000 in DE bid credits, for the licenses.

96.     On February 12, 2015, Advantage submitted its Form 601 long-form application for the licenses, which was replete with false and fraudulent express certifications of Advantage's eligibility for DE bid credits, and Vail as its sole controlling interest. (*Exhibit 7; Advantage Spectrum,, L.P., FCC Auction 97 Form 601).*

97.     In response to the specific question, "Have you entered into any agreements which would impact your Designated Entity or closed bidding status?" Vail expressly certified falsely and fraudulently, "No." *(Id., p. 15).*

98.     In Schedule B of the application, Advantage further expressly certified falsely and fraudulently that it was eligible to obtain the DE licenses as a very small business. (*Id., p. 31*).

99.     In "Exhibit C ("Designated Entities"), Vail expressly certified falsely and fraudulently that Advantage Spectrum's only "Controlling Interests" were Frequency Advantage, L.P.; Sunshine Spectrum, Inc., and William Vail, and that Vail ultimately had "both *de jure* and *de facto* control in the General Partner of the Applicant." and that "[n]o other individual or entity has a controlling interest in the Applicant." Specifically, he stated that, as the 100 percent owner of Sunshine Spectrum, which was the general partner of Frequency Advantage, which was, in turn, the general partner of Advantage Spectrum, "he has a controlling interest in the Applicant." The further express certification was also false and fraudulent in that it stated, "No other individual has a controlling interest in [Advantage Spectrum]." *(Exhibit 8; Exhibits to Advantage Form 601).*

100.    Exhibit C compounded the false and fraudulent certifications in the application with the false and fraudulent express certification that Advantage did not have any affiliates except for those entities listed in the application, "which are affiliates of Mr. Vail." The only affiliates Vail attributed to himself "by virtue of [his] controlling these affiliates" were Frequency Advantage, Sunshine Spectrum, and the William S. Vail and Lorraine C. Vail Living Trust. (*Id.*).

101.    In Exhibit D, Advantage Spectrum expressly falsely and fraudulently certified that, with the sole exception of the Bidding Protocol Agreement, "it has entered into no partnerships, joint venture, consortia or other agreements, arrangements or

understandings of any kind with third parties relating to the licenses being auctioned, including any such agreements relating to the post-auction market structure." (*Id.*).

102.    Advantage falsely and fraudulently certified that the Bidding Protocol Agreement "provides that William Vail has sole authority to determine which AWS-3 Licenses, and in which order, the Applicant would enter bids in each round, provided that the bids are consistent with the overall investment parameters set forth in the Applicant's governing documents." (*Id*). In fact, the purported Bidding Protocol Agreement was a false document, which was created to conceal the undisclosed agreements, particularly the bidding arrangements, between U.S. Cellular, Vail, and DiNardo that ceded control of the bidding to U.S. Cellular and DiNardo.

103.    Advantage Spectrum and Frequency Advantage entered into numerous undisclosed agreements, arrangements, and understandings with U.S. Cellular and DiNardo/King Street to serve as a very small business DE in FCC Auction 97. These undisclosed agreements included, *e.g.*, that Advantage/Vail would bid on licenses that added to and complemented U.S. Cellular's networks; that Advantage/Vail would hold the licenses during the unjust enrichment period; that throughout this period, Advantage/Vail would file false and fraudulent reports with the FCC certifying Advantage's continuing eligibility for DE bid credits; that U.S. Cellular, not Advantage/Vail, would build the networks and provide coverage using the Advantage spectrum; and that eventually when the unjust enrichment period had expired, Advantage/Vail would *formally* transfer control and the licenses to U.S. Cellular, as DiNardo had previously done with her sham DEs.

104.    The long-form application also required Advantage to disclose any agreements, arrangements and understandings regarding the licenses in FCC Auction 97, including any and all leases held by its disclosable interest holder, U.S. Cellular. As described previously, U.S. Cellular was then secretly leasing and using King Street Wireless's spectrum. The Defendants knowingly and intentionally omitted the secret lease agreement from the list of U.S. Cellular's Spectrum Manager Lease Agreements in the application, both to prevent King Street from being linked with Advantage (and possibly having its revenues attributed to it), and to protect King Street's fraudulent retention of the DE bid credits. (*Id.*).

105.    On December 31, 2015, the Defendants further limited Advantage's visible connection to King Street, when DiNardo sold her ownership interest in Advantage by selling Nonesuch to Vail for an immaterial amount.

**4.     To Induce the FCC to Issue the Licenses, U.S. Cellular and Advantage Made Further False and Fraudulent Certifications in Support of Advantage's Claims of DE Eligibility**

106.    In January 2016 and again in March 2016, Vail and U.S. Cellular filed and caused to be filed further, almost identical certifications with the FCC in which they falsely and fraudulently certified that "the Agreements listed in Schedule B [*sic*]"[2] of the long-form application "consist of the entirety of agreements, oral and written, including letters of intent entered into by the Applicant and/or its current or former[3] disclosable

---

[2]The referenced Agreements are actually required to be listed on Schedule D.
[3]The phrase "current or former" was added in the March certification to take into account the December 2015 transfer of DiNardo's interest in Nonesuch to Vail.

interest holders that are or were required to be listed on Schedule B of the Form 601."[4] *(Exhibit 9).*

107.   Advantage certified specifically that the long-form application, when it was filed on December 23, 2015 and amended in February and March 2016, had "listed and summarized all agreements and understandings, of any kind, that are in any way relevant to its eligibility as a very small business under the applicable Designated Entity provisions, including the establishment of *de facto* and/or *de jure* control or the presence or absence of material disclosable interests, associated with the Applicant," and that it "acknowledges and agree [*sic*] that such relevant agreements and interests include, but are not limited to, . . . spectrum leasing arrangements, spectrum leasing (including wholesale) arrangements, [and] spectrum use or network sharing arrangements . . . " *(Id.).*

108.   This express certification was false and fraudulent in that neither the application nor the amendments listed the secret spectrum leasing agreement between U.S. Cellular, a current disclosable interest holder, and DiNardo/King Street, a former disclosable interest holder of Advantage.

109.   Advantage further expressly certified falsely and fraudulently that, "Neither Applicant nor any party acting on behalf of Applicant, has discussed or contemplated with any person or entity future agreements or arrangements of any of the types, including management services agreements, discussed above."

---

[4]These unusual certifications were made after the FCC had issued a Memorandum Opinion and Order finding that two other DE bidders in Auction 97 were not entitled to very small business discounts because they were *de facto* controlled by their large investor, DISH Network Corporation, and were designed to induce the FCC to issue Advantage the licenses with its bid credits intact.

110.    This express certification was also false and fraudulent in that U.S. Cellular and Vail/Advantage had entered into numerous agreements that were never disclosed, including, *e.g.*, agreements regarding the establishment of Advantage as a sham DE, the terms and conditions for the bidding in Auction 97, the management of the licenses during the unjust enrichment period, the filing of false and fraudulent reports with the FCC, and the planned eventual formal transfer of the licenses to U.S. Cellular.

111.    Relying on the numerous false and fraudulent express certifications made by Advantage throughout the process, the FCC issued Advantage Spectrum its licenses with DE bid credits on July 5, 2016; the unjust enrichment period ended on July 5, 2021.

**C.     Post-Licensing, Advantage's Only Function Was to Serve as a Facility for U.S. Cellular to "Park" the Licenses During the Unjust Enrichment Period in Order to Retain and Avoid Having to Repay the DE Bid Credits**

**1.     Advantage's DE Annual Reports Falsely and Fraudulently Concealed Its Control by U.S. Cellular**

112.    On September 26, 2016, Advantage Spectrum submitted its first DE Annual Report, falsely and fraudulently expressly certifying that, "Except for the Agreements described below (which was previously submitted to and reviewed by the Commission), Advantage Spectrum has not entered into any agreements or arrangements (including proposed agreements and arrangements) that relate to Advantage Spectrum's eligibility for designated entity benefits for any designated entity license covered by this annual report." (*Exhibit 10; 2016 DE Annual Report).*

113.    On September 26, 2017, Advantage submitted its second DE Annual Report, repeating verbatim the false and fraudulent express assertion that it had not entered into any agreements or arrangements (including proposed agreements and

arrangements) related to its eligibility for DE benefits. Advantage also reported the December 2016 corporate restructuring that had resulted in the dissolution of Frequency Advantage and Sunshine Spectrum, and William Vail's sole ownership of the general partner. (*Exhibit 11*; *2017 DE Annual Report*).

114.    In its third DE Annual Report, submitted on September 28, 2018, Advantage simply referred the FCC to its 2017 report, falsely and fraudulently expressly certifying that it "lists and summarizes the agreements and arrangements that relate to [Advantage's] designated entity benefits," and further expressly certifying falsely and fraudulently that the documents listed there "remain current." (*Exhibit 12; 2018 DE Annual Report*).

115.    Along with the purported summary of its agreements and arrangements, Advantage also submitted a false and fraudulent express certification of its "progress in meeting construction requirements," asserting that Advantage "is in the planning stages of construction and is considering equipment capabilities."  (*Id.*). In fact, U.S. Cellular, not Advantage or Vail, planned and constructed the networks.

116.    Advantage's fourth DE Annual Report, submitted on September 25, 2019, was identical to the 2018 report. *(Exhibit 13; 2019 DE Annual Report).*

117.    On September 29, 2020, Advantage's fifth DE Annual Report contained the same false and fraudulent express certification in Exhibit 1 that it had made in the 2018 and 2019 reports. Exhibit 2 also contained identical language to the false and fraudulent express certifications in the 2018 and 2019 reports, but included a footnote stating that Advantage "is currently leasing multiple Licenses as well as a portion of multiple

Licenses to USCC Services, LLC pursuant to a Spectrum Manager Lease." *(Exhibit 14; 2020 DE Annual Report)*.

> **2.   As a Front for U.S. Cellular, Advantage Was Never Intended to Function as a Telecommunications Company or to Control its Licenses**

118.    The 124 licenses Advantage won in Auction 97 were for spectrum covering a significant total geographic area and population. Although planning and providing service for those areas and population would require a great deal of effort, Advantage has never had any employees, other than William Vail. Advantage has never disclosed or reported entering into a Management Agreement involving its licenses with U.S. Cellular or any other entity.

119.    Advantage has none of the indicia of a wireless company in *de facto* control of its licenses and spectrum, or of the networks operating over those licenses and spectrum. There is no management committee, there are no senior executives, and Advantage makes no management decisions regarding its licenses.

120.    Advantage's only business presence is on paper, and was intended solely to mislead the FCC that it does not share office space with U.S. Cellular (or King Street), and operates independently. In August 2015, Advantage vacated its initially claimed office space, 224 E. Garden Street, Suite 5A, Pensacola, FL 32502, which was, as Relators found, nothing more than an inner office in an unoccupied suite. Since that time, Advantage has interchangeably listed two other Florida addresses with the FCC:  7012 SE Hwy 25A, Bellview, FL 34420, and 17180 SE 115th Terrace Rd., Summerfield, FL 34491. The first address, 7012 SE Hwy 25A, Bellview, FL 34420, is for a small strip mall-type building housing various

appliance, alterations, and counseling/hypnosis storefronts. Relators have discovered that Vail is essentially an "absentee tenant" of this location, and that his landlord understands that the space is being used as storage for an on-line business that Vail relocated from his garage.  The second address, 17180 SE 115th Terrace Rd., Summerfield, FL 34491, is or was Vail's home address. *(See Exhibit 5).*

121.    Relators have found that Advantage does not appear to have a business phone number in its name, while the numbers listed in documents provided to the FCC are associated either with Vail or his family members, personally, or with other, unrelated businesses that may be associated with Vail.

122.    In short, a company purporting that, for almost six years, it has had *de facto* control of 124 spectrum licenses worth more than $400 million has variously claimed as its business addresses an unoccupied interior room in a condo complex, a storefront in a strip mall, and a home address in a retirement community.

> **D.     To Preserve the DE Bid Credits for as Long as Possible, While Also Meeting the Construction Requirements, U.S. Cellular and Advantage Falsely and Fraudulently Entered Into a Spectrum Manager Leasing Arrangement**
>
> **1.     The Spectrum Manager Leases Were Intended to Minimize and/or Avoid Any Unjust Enrichment Payments**

123.    As conditions for the licenses, Advantage was required to provide reliable signal coverage and offer service to at least 40 percent of the geographic license areas within six years, and at least 75 percent of the geographic license areas within twelve years, or by the end of the license term. Advantage's first construction benchmark is July 5, 2022 – or, exactly one year after the unjust enrichment period ended.

124.   To enable Advantage to begin to appear to meet the construction and service requirements, U.S. Cellular (through USCC Services, LLC) and Advantage purported to enter into three Spectrum Manager Leases for some or all of Advantage's spectrum in 120 markets.  The three Spectrum Manager Leases were necessary because U.S. Cellular did not want to risk having the license terms reduced from twelve to ten years, pursuant to 47 CFR § 27.14(s)(3), if Advantage failed to meet the Interim Construction benchmark before the licenses were formally transferred to U.S. Cellular.

125.   To minimize the bid credit repayments for these licenses, U.S. Cellular and Advantage filed and caused to be filed notifications seeking FCC approval of the leases beginning on July 9, 2020 - or several days into year 5 of the unjust enrichment period, when any repayments would be reduced to 25% of the value of the bid credits. (*Exhibit 15; Public Interest Statements of Spectrum Manager Lease Applications)*.

126.   With respect to the Spectrum Manager Lease for most of licenses, however, U.S. Cellular and Advantage sought to retain the bid credits in full. To prevent U.S. Cellular's gross revenues from being attributed to Advantage as a "disclosable interest holder" using more than 25 percent of the spectrum, U.S. Cellular and Advantage falsely and fraudulently claimed that the lease for 76 of the licenses only gave U.S. Cellular authority to use the 5 MHz *downlink* band, or less than 50% of available spectrum in geographic areas with less than 50% of each market's total population. This, they claimed, resulted in a lease for less than 25% of the spectrum in each market, and, therefore, did not require an unjust enrichment payment. *See* 47 C.F.R. §1.2110(c)(2)(ii)(J).

127.   In the lease notifications filed with the FCC, U.S. Cellular and Advantage falsely and fraudulently certified that, under the leases, Advantage retained *de facto* control of the licenses, and continued to be eligible to retain the bidding credits for the subject licenses. (*Id.*).

128.   U.S. Cellular and Advantage also falsely and fraudulently certified that U.S. Cellular was not a "controlling interest holder" or "affiliate" of Advantage. (*Id.*).

> **2.   Under the Lease, and as a Front for U.S. Cellular, Advantage Filed False and Fraudulent Construction Notices**

129.   Since March 28, 2022, U.S. Cellular and Advantage have filed and caused to be filed at least 21 Construction Notices purporting to show Advantage's compliance with the Interim July 5, 2022 construction and coverage requirements. Based on the July 2020 Spectrum Manager Leases with U.S. Cellular, Advantage has stated that "Advantage is permitted to rely on the USCC [4G LTE] coverage in its licensed area to meet the interim-term build obligation." *(Exhibit 16; Construction Notice Example).*

130.   Advantage has further certified that U.S. Cellular was providing 40% or more coverage in the Advantage-licensed areas, and that, in view of this, "Advantage has met the build-out construction requirements." *(Id.).*

131.   Relators have independently verified that, to offer the mobile 4G LTE services described in the Advantage Construction Notices, the provider must control *both* the downlink *and* the uplink spectrum, or at least 10 MHz, rather than the 5 MHz purportedly leased to U.S. Cellular under the 76-license Spectrum Manager Lease. U.S. Cellular's use of both the uplink and downlink spectrum beyond what the lease

notification stated, and the unjust enrichment rule allows, is further evidence that, pursuant to numerous undisclosed agreements and understandings, U.S. Cellular, not Advantage or Vail, controls the licenses and spectrum nominally won by Advantage in FCC Auction 97.

> **E.      Through Advantage, U.S. Cellular Falsely and Fraudulently Obtained Licenses and Almost $113 Million in Bid Credits For Which Advantage Was Never Eligible**

132.    Under the DE controlling interest and affiliation standards the FCC has adopted to identify disclosable and attributable interest holders, (*e.g.*, the Controlling Interests Rule and the Affiliation Rule), U.S. Cellular's billions of dollars in revenues, as well as King Street's gross revenues under the secret lease, should have been disclosed and attributed to Advantage in its FCC Auction 97 applications, as well as disclosed and attributed to Advantage in the DE Annual Reports throughout the unjust enrichment period.

133.    U.S. Cellular is and was the *de facto* controlling interest in Advantage. U.S. Cellular/DiNardo controlled the facilities Advantage used to participate in the auction, its bidding strategy and the selection of which licenses to bid on, the personnel needed to conduct the auction, and the filings submitted to the FCC.  U.S. Cellular controlled the construction of the networks, use of Advantage's licensed spectrum, and use of the networks for its own customers. Advantage Spectrum, which existed only through William Vail and only when it was needed as part of the fraudulent scheme, lacked the capacity to control or perform any of these operations.

134.     Through U.S. Cellular's control of Advantage, as well as the Defendants' mutual interest in using DE bid credits to acquire licenses that would benefit U.S. Cellular, Advantage and U.S. Cellular were affiliates.

135.     U.S. Cellular, DiNardo, and Advantage were also engaged in a joint venture in violation of the Joint Venture Rule. 47 C.F.R. § 1.2110(c)(5)(x). The parties entered into numerous contracts and arrangements (only some of which they disclosed to the FCC and many of which were concealed), "to engage in and carry out a single, specific business venture for joint profit."

136.     Advantage never met the FCC's requirements for a very small business DE and was never eligible to obtain and retain almost $113 million in DE benefits.

137.     Since at least August 2014, when U.S. Cellular, Vail and DiNardo formed and caused to be formed Advantage Spectrum, L.P. and Frequency Advantage, L.P., U.S. Cellular and Advantage have been operating pursuant to numerous undisclosed agreements under which Advantage would use DE bid credits to acquire licenses on behalf of U.S. Cellular, hold the licenses during the unjust enrichment period, and eventually turn over use of the spectrum, including all responsibilities for the licenses, to U.S. Cellular, all in violation of the False Claims Act.

## VI.     COUNTS

138.     This civil action is brought by Relators on behalf of the United States against Defendants under the False Claims Act, 31 U.S.C. §§ 3729-33.

## COUNT ONE – CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT
### FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(C)

139.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

140.    The Defendants and others, known and unknown, conspired to violate the FCA, and to obtain money and property from the Government, and to avoid their obligations to return money and property to the Government, by making and using false and fraudulent claims, records, and statements and by concealing their obligations to return money and property to the Government.

141.    The Defendants and others, known and unknown, agreed and conspired to violate the False Claims Act by having Advantage Spectrum, L.P. acquire and hold wireless spectrum licenses for U.S. Cellular, using almost $113 million in bid credits reserved for small businesses in FCC Auction 97. These agreements included, but were not limited to:

(a)    The agreement to form Advantage Spectrum, L.P. so that Advantage Spectrum could participate as a Designated Entity in FCC Auction 97,

(b)    The agreement to divide ownership of the General Partner in Advantage Spectrum, Frequency Advantage, L.P., between entities owned by DiNardo and Vail,

(c)    The agreement to have DiNardo sell her interest in Frequency Advantage, L.P. to Vail,

(d)    The agreement that Advantage Spectrum would bid on licenses adjacent to and overlapping with U.S. Cellular's licenses,

(e)     The agreement that Advantage Spectrum would hold the licenses until the end of the unjust enrichment period and then transfer them to U.S. Cellular,

(f)     Upon information and belief other oral or implied agreements that were necessary to carry out the conspiracy.

142.    The Defendants carried out the conspiracy by, *inter alia*, filing and causing to be filed, false and fraudulent applications to acquire spectrum licenses with DE bid credits for which they were not eligible,  by filing and causing to be filed false and fraudulent DE Annual Reports to retain and avoid having to repay nearly $113 million to the government, and by omitting and concealing information from the FCC to prevent being required to repay the funds.

**OVERT ACTS**

143.    The Defendants performed numerous overt acts publicly and secretly in furtherance of the conspiracy, including, but not limited to:

(a)     Entering into agreements establishing and funding Advantage Spectrum, as described in ¶¶ 76, 83, 90, 95;

(b)     Filing and causing to be filed a false and fraudulent short-form Form 175 application for Advantage Spectrum to participate in FCC Auction 97 as a DE, including by falsely and fraudulently expressly certifying that Advantage was eligible for DE bid credits, as described in ¶¶ 77-82;

(c)     Entering into a Bidding Protocol Agreement for disclosure to the FCC, but secretly agreeing that Advantage Spectrum would bid on licenses that

44

were adjacent to or overlapped with U.S. Cellular's pre-existing licenses, and that could be incorporated into U.S. Cellular's existing network, as described in ¶¶ 84, 86,91-94;

(d)     Filing and causing to be filed a false and fraudulent long-form Form 601 application for Advantage Spectrum to be issued DE licenses, including by falsely and fraudulently expressly certifying that Advantage was eligible for DE bid credits, as described in ¶¶ 96-104;

(e)     Filing and causing to be filed additional false certifications to induce the FCC to issue the spectrum licenses to Advantage with DE bid credits, as described in ¶¶ 106-111;

(f)     Filing and causing to be filed, false and fraudulent DE Annual Reports in order to retain and avoid having to repay the DE bid credits, as described in ¶¶ 112-117;

(g)     Secretly agreeing and concealing from the FCC that Advantage Spectrum would hold the DE licenses for the duration of the unjust enrichment period and/or until they could formally be transferred to U.S. Cellular without being required to repay the DE bid credits, as described in ¶¶ 118-122;

(h)     Filing and causing to be filed false and fraudulent Spectrum Manager Lease Form 608 Notifications, including falsely and fraudulently expressly certifying that Advantage Spectrum continued to be eligible to retain the bid credits, as described in ¶¶ 123-128;

(i)     Filing and causing to be filed false and fraudulent Construction

Notices, as described in ¶¶ 129-131; and

(j)     Concealing and causing to be concealed from the FCC that U.S.

Cellular controlled Advantage and its spectrum, as described in ¶¶ 132-137 and

throughout.

144.    In reliance on the accuracy of the Defendants' claims, statements, and

records, the United States provided Defendants with millions of dollars in benefits that, in

the absence of the Defendants' explicit false claims, statements, and records, would not

have been provided to them, and was deprived of the repayment and return of these

benefits by Defendants' concealment, through explicit false claims, statements, records

and omissions of material facts, of the nature and extent of their association.

145.    By reason of the Defendants' fraud, the United States has been damaged,

and continues to be damaged, in a substantial amount.

146.    By the acts and conduct described above, Defendants have knowingly

conspired to commit violations of:

(a)     31 U.S.C. §§ 3729(a)(1)(A), by knowingly presenting and causing to

be presented false and fraudulent claims for benefits as a DE, for which they were

ineligible, for payment and approval;

(b)     31 U.S.C. §§ 3729(a)(1)(B), by making, using, and causing to be

made and used false records and statements material to, and in furtherance of,

these false and fraudulent claims;

(c)     31 U.S.C. §§ 3729(a)(1)(G), by knowingly making, using, and causing to be made and used false records and statements material to an obligation to pay and transmit money and property to the Government, and by concealing and improperly avoiding and decreasing their obligations to repay DE funds to the Government, and to pay for, or return, the "closed" licenses to the Government,

All in violation of 31 U.S.C. § 3729(a)(1)(C).

## COUNT TWO – FALSE AND FRAUDULENT CLAIMS FOR PAYMENT
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A)

147.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

148.    By virtue of the conduct described above, Defendants knowingly presented, and caused to be presented, false and fraudulent claims and applications for the payment and approval from the FCC of benefits as a DE, including Advantage Spectrum's short- and long-form Form 175 and Form 601 applications for DE bid credits in FCC Auction 97.

149.    The United States, in reliance on the accuracy of the claims and application, paid Defendants nearly $113 million in DE benefits that otherwise would not have been provided.

150.    By reason of these payments and benefits, the United States has been damaged, and continues to be damaged, in a substantial amount.

All in violation of 31 U.S.C. § 3729(a)(1)(A).

## COUNT THREE – FALSE RECORDS AND STATEMENTS
## FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B)

151.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as though set forth fully herein.

152.    By virtue of the conduct described above, Defendants knowingly made, used, and caused to be made and used, false records and statements material to false and fraudulent claims to the FCC, including Advantage Spectrum's short- and long-form Form 175 and Form 601 applications for DE bid credits in FCC Auction 97; Advantage Spectrum's DE Annual Reports, and Advantage Spectrum's Form 608 Leasing Application.

153.    The United States, in reliance on the accuracy of the records and statements, which were material to the Defendants' claims for benefits as a DE, paid for claims which it otherwise would not have paid.

154.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

All in violation of 31 U.S.C. § 3729(a)(1)(B).

## COUNT FOUR – FAILURE TO RETURN PAYMENTS TO THE GOVERNMENT FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(G)

155.    Relators re-allege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

156.    Defendants knowingly made, used, and caused to be made and used false records and statements, including false and fraudulent DE Annual Reports material to their obligation to pay and transmit money and property to the Government, and

knowingly concealed, and improperly avoided and decreased their obligation to pay and transmit money, or unjust enrichment payments, to the Government.

157.   As a result of Defendants' unlawful retention of millions of dollars in improperly obtained bid credits, the United States has been damaged, and continues to be damaged, in a substantial amount.

All in violation of 31 U.S.C. § 3729(a)(1)(G).

### VII.   PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States and on their behalf, request that judgment be entered against Defendants, ordering that:

(i)   Defendants violated the False Claims Act, 31 U.S.C. §§ 3729 et seq.;

(ii)   Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions;

(iii)   Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 that occurred before November 2, 2015, and not more than the current maximum penalty linked to inflation for each violation that occurred after November 2, 2015, See 28 C.F.R. § 85.5;

(iv)   The Relators be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

(v)   The Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

(vi)     Defendants be enjoined from concealing, removing, encumbering or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

(vii)    The United States and the Relators recover all such other relief as the Court deems just and proper.

## VIII.   REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relators hereby demand a trial by jury.

Dated:  April 29, 2022                     Respectfully submitted,

/s/Sara M. Lord
Sara M. Lord
Adriaen M. Morse
ARNALL GOLDEN GREGORY, LLP
1775 Pennsylvania Avenue, N.W.
Suite 1000
Washington, D.C. 20006
Tel: (202) 677-4054
Fax: (202) 677-4055
sara.lord@agg.com
adriaen.morse@agg.com

Benjamin J. Vernia
THE VERNIA LAW FIRM
1455 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20004
Tel: (202) 349-4053
Fax: (866) 572-6728
bvernia@vernialaw.com

*Attorneys for Relators Mark J. O'Connor
and Sara F. Leibman*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on this 29th day of April, 2022, she caused an electronic copy of the foregoing document, the Amended Complaint, to be served on counsel listed below by filing it in the court's electronic-filing (CM/ECF) system, as Local Civil Rule 5.4(d) authorizes:

*Attorneys for Defendants Advantage Spectrum, L.P. and Sunshine Spectrum, Inc. (as successor to Nonesuch, Inc.)*

David W. DeBruin, Esq.
David Bitkower, Esq.
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001
Telephone: 202.639.6048
Fax: 202.639.6066
ddebruin@jenner.com
dbitkower@jenner.com

Daniel J. Weiss, Esq.
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60618
Telephone: 312.222.9350
Fax: 312.527.0484
dweiss@jenner.com

*Attorneys for Defendants United States Cellular Corporation, USCC Wireless Investment, Inc., and Telephone and Data Systems, Inc.*

Frank R. Volpe, Esq.
Robert Joseph Conlan, Jr., Esq.
Benjamin M. Mundel
Gabriel Schonfeld
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711
fvolpe@sidley.com
rconlan@sidley.com

*Attorneys for Defendants King Street Wireless, L.P., King Street Wireless, Inc., and*
Andrew S. Tulumello, Esq.
Chantale Fiebig
Weil, Gotshall & Manges LLP
2001 M Street, N.W.
Suite 600
Washington, DC 20036-5306
Drew.tulumello@weil.com
Chantale.fiebig@weil.com

*Attorney for Interested Party United States of America*

Darrell C. Valdez
DOJ-USAO
Patrick Henry Building
601 D Street, N.W.
Washington, DC 20530
(202) 252-2507
darrell.valdez@usdoj.gov

*/s/ Sara M. Lord*
Sara M. Lord