**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. MARK J. O'CONNOR and SARA F. LEIBMAN, | |
| Plaintiffs, | |
| v. | Case No. 20-CV-2070-TSC |
| UNITED STATES CELLULAR CORPORATION, USCC WIRELESS INVESTMENT, INC., TELEPHONE AND DATA SYSTEMS, INC., KING STREET WIRELESS, L.P., KING STREET INC., ADVANTAGE SPECTRIUM, L.P., FREQUENCY ADVANTAGE, L.P., SUNSHINE SPECTRUM, INC., NONESUCH, INC., and ALLISON CRYOR DINARDO, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION TO DISMISS OF DEFENDANTS KING STREET WIRELESS, L.P.,**
**KING STREET WIRELESS, INC., AND ALLISON CRYOR DINARDO**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ...................................................................................................... 1

II.  BACKGROUND ........................................................................................................ 2

    A.   Congress Mandated That The FCC Enable Small Businesses To Participate And
Compete In Spectrum Auctions............................................................................. 2

    B.   Advantage Spectrum Received Designated Entity Bidding Credits For Auction 97. ...... 5

    C.   This Court Dismissed The Complaint Based On The Public Disclosure Bar. ................. 8

III. LEGAL STANDARD ................................................................................................. 8

IV.  ARGUMENT ............................................................................................................. 9

    A.   Relators' Claims Are Precluded By The FCA's Public Disclosure Bar. ........................ 9

        1.   The Amended Complaint's Essential Allegations Are Drawn From Public FCC
Filings.......................................................................................................... 10

        2.   Relators' Surveillance And Private Investigation Are Substantially The Same
As The Public FCC Filings. .......................................................................... 14

        3.   The Allegations From O'Connor *II* Are Also Publicly Available, And Do Not
Materially Add To The Allegations Or Transactions In This Case. ....................... 18

        4.   The Prior *Qui Tam* Lawsuit Independently Warrants Dismissal. ........................... 21

    B.   Relators Fail To Plead Core FCA Elements. ................................................................ 27

        1.   Relators Fail To Plead Presentment. ............................................................. 28

        2.   Relators' Reverse False Claims And Conspiracy Claims Are Legally
Defective. ..................................................................................................... 32

        3.   Relators Cannot Establish Scienter. ............................................................. 33

        4.   The FCA's Rigorous Materiality Standard Dooms Relators' Claims.................... 37

    C.   Dismissal Should Be With Prejudice. ......................................................................... 39

V.   CONCLUSION.......................................................................................................... 40

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................8, 17

*Baker v. Henderson*,
    150 F. Supp. 2d 13 (D.D.C. 2001) .....................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................8, 17

*Burnside v. Dep't of Justice*,
    20-cv-2309 (TSC), 2022 WL 715181 (D.D.C. Mar. 10, 2022) ...............................7

*Corporate Sys. Res. v. WMATA*,
    31 F. Supp. 3d 124 (D.D.C. 2014) ...................................................................39

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) .........................................................................7

*In re Interbank Funding Corp. Sec. Litig.*,
    629 F.3d 213 (D.C. Cir. 2010) .......................................................................39

*Pearson v. District of Columbia*,
    644 F. Supp. 2d 23 (D.D.C. 2009) .....................................................................7

*Pencheng Si v. Laogai Rsch. Found.*,
    71 F. Supp. 3d 73 (D.D.C. 2014)................................................................28, 32

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)................................................................................34, 36

*Scollick ex rel. United States v. Narula*,
    14-cv-1339 (RCL), 2021 WL 737077 (D.D.C. Feb. 25, 2021) ...............................31

*Silbersher v. Valeant Pharmas. Int'l, Inc.*,
    445 F. Supp. 3d 393 (N.D. Cal. 2020) ..............................................................21

*Smith v. Athena Constr. Grp.*,
    18-cv-2080 (APM), 2022 WL 888188 (D.D.C. Mar. 25, 2022).....................18, 25, 26, 27, 39

*SNR Wireless LicenseCo, LLC v. FCC*,
    868 F.3d 1021 (D.C. Cir. 2017).......................................................................35, 38

*Tel. & Data Sys., Inc. v. FCC,*
    19 F.3d 42 (D.C. Cir. 1994) ...........................................................................34

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.,*
    297 F. Supp. 2d 272 (D.D.C. 2004) ...............................................................33

*United States ex rel. Bogina v. Medline Indus., Inc.,*
    809 F.3d 365 (7th Cir. 2016) ..........................................................................21

*United States ex rel. Boothe v. Sun Healthcare Grp., Inc.,*
    496 F.3d 1169 (10th Cir. 2007) ......................................................................27

*United States ex rel. Cimino v. IBM,*
    3 F.4th 412 (D.C. Cir. 2021) .....................................................................28, 29

*United States ex rel. Conteh v. IKON Office Sols., Inc.,*
    103 F. Supp. 3d 59 (D.D.C. 2015) .................................................................32

*United States ex rel. Davis v. Dist. of Columbia,*
    679 F.3d 832 (D.C. Cir. 2012) .........................................................................9

*\*United States ex rel. Doe v. Staples, Inc.,*
    773 F.3d 83 (D.C. Cir. 2014) ....................................................................25, 39

*United States ex rel. Estate of Cunningham v. Millennium Labs. of Cal.,*
    713 F.3d 662 (1st Cir. 2013) ...........................................................................27

*United States ex rel. Godfrey v. KBR, Inc.,*
    360 F. App'x 407 (4th Cir. 2010) ...................................................................33

*United States ex rel. Hockett v. Columbia HCA Healthcare Corp.,*
    498 F. Supp. 2d 25 (D.D.C. 2007) .................................................................25

*United States ex rel. Holloway v. Heartland Hospice, Inc.,*
    960 F.3d 836 (6th Cir. 2020) ...........................................................22, 25, 27

*United States ex rel. Jones v. Sutter Health,*
    18-cv-02067-LHK, 2021 WL 3665939 (N.D. Cal. Aug. 18, 2021) (Koh, J.) ........14

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.,*
    929 F.3d 721 (D.C. Cir. 2019) .......................................................................33

*United States ex rel. McBride v. Halliburton Co.,*
    848 F.3d 1027 (D.C. Cir. 2017) .....................................................................37

*\*United States ex rel. Oliver v. Philip Morris USA Inc.,*
    826 F.3d 466 (D.C. Cir. 2016) ..................................................................19, 25

iii

*United States ex rel. Purcell v. MWI Corp.,
   807 F.3d 281 (D.C. Cir. 2015) .................................................................34, 35

United States ex rel. Reed v. KeyPoint Gov't Sols.,
   923 F.3d 729 (10th Cir. 2019) ............................................................................25

*United States ex rel. Scott v. Pac. Architects and Eng'rs, Inc.,
   13-cv-1844 (CKK), 2020 WL 224504 (D.D.C. Jan. 15, 2020) .......................13, 39

United States ex rel. Settlemire v. Dist. of Columbia,
   198 F.3d 913 (D.C. Cir. 1999) ...........................................................................25

United States ex rel. Shea v. Cellco P'ship,
   863 F.3d 923 (D.C. Cir. 2017) ........................................................................9, 22

United States ex rel. Sheldon v. Allergan Sales, LLC,
   24 F.4th 340 (4th Cir. 2022), re-hr'g en banc granted ........................................36

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn,
   14 F.3d 645 (D.C. Cir. 1994) .........................................................................25, 27

United States ex rel. Staggers v. Medtronic, Inc.,
   15-cv-392 (TSC), 2019 WL 13132849 (D.D.C. Mar. 25, 2019) ............................9

United States ex rel. Williams v. Martin Baker Aircraft Co.,
   389 F.3d 1251 (D.C. Cir. 2004) ..........................................................................34

United States v. Mathis,
   216 F.3d 18 (D.C. Cir. 2000) .............................................................................32

United States v. Sci. Applics. Int'l Corp.,
   626 F.3d 1257 (D.C. Cir. 2010) ..........................................................................34

*Universal Health Servs., Inc. v. United States ex rel. Escobar,
   579 U.S. 176 (2016) ...............................................................................33, 37, 39

Vermont Nat'l Tel. Co. v. Northstar Wireless,
   2022 WL 1548488 (D.C. Cir. May 17, 2022) ......................................................38

W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.,
   235 F.3d 629 (D.C. Cir. 2001) ...........................................................................11

## Statutes

31 U.S.C. § 3729(a)(1)(A) ..................................................................28, 29, 33

31 U.S.C. § 3729(a)(1)(B) ........................................................................29, 33

31 U.S.C. § 3729(a)(1)(D) ...............................................................................33

iv

31 U.S.C. § 3729(a)(1)(G) .................................................................29, 32, 33

31 U.S.C. § 3729(b)(1) ...............................................................................33

31 U.S.C. § 3730(e)(4)(a)(i) ........................................................................22

31 U.S.C. § 3730(e)(4)(A)(ii) .......................................................................21

31 U.S.C. § 3730(e)(4)(B) ...........................................................................10

47 U.S.C. § 309(j)(3)(B) ...............................................................................2

47 U.S.C. § 309(j)(4)(C)-(D) .........................................................................2

**Regulations**

47 C.F.R. 1.9020(d)(5)(i) .............................................................................20

47 C.F.R. § 1.2105(b)(2) ..............................................................................30

47 C.F.R. § 1.2110(b)–(c) (2012) ...................................................................3

47 C.F.R. § 1.2110(b)(1)(i) .........................................................................3, 4

47 C.F.R. § 1.2110(f) ....................................................................................3

47 C.F.R. § 1.2110(f)(2)(i)–(iii) (2012) ...........................................................4

47 C.F.R. § 1.2110(n) ...................................................................................3

47 C.F.R. § 1.2111(d)(1) (2012) .....................................................................4

47 C.F.R. § 1.2111(d)(2)(i)(E) (2012) ...........................................................20

47 C.F.R. § 1.2112(b)(1)(iii) ..........................................................................3

**Other Authorities**

*In the Matter of Amendment of the Comm'n Rules with Regard to Comm.*
  *Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz*
  *Bands*,
  29 FCC Rcd. 4610 (Mar. 31, 2014) ............................................................16

*Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for Nov. 13,*
  *2014*,
  29 FCC Rcd. 8386 (July 23, 2014) .............................................................30

FCC Public Notice, DA 15-503 (Aug. 29, 2015) ...........................................38

*Implementation of Sec. 309(j) of the Communications Act – Competitive Bidding*,
Fifth Report & Order, 9 FCC Rcd. 5532 (July 15, 1994) ..........................................................4

Letter from R. Noel to T. Gutierrez Re: Auction 73 Application of King Street
Wireless, L.P., 24 FCC Rcd. 4527, 2009 WL 1012832 (Apr. 14, 2009)................................21

*Mem. Op. and Order and Second Report and Order*,
17 FCC Rcd. 9614 (May 23, 2002)........................................................................................16

*In re Minnesota PCS, L.P.*,
17 FCC Rcd. 126 (Jan. 2, 2002)............................................................................................36

*In the Matter of Northstar Wireless, LLC*,
30 FCC Rcd. 8887 (Aug. 18, 2015) .........................................................................................3

*Promoting Interoperability in the 700 Mhz Com. Spectrum*,
27 FCC Rcd. 3521 (Mar. 21, 2012) ..................................................................................17, 19

*In the Matter of Updating Part 1 Competitive Bidding Rules*,
Third Report & Order, 30 FCC Rcd. 7493 (July 21, 2015)..................................................3, 4

## I.    INTRODUCTION

For the second time, Relators try to assert False Claims Act allegations against a wide range of defendants based on $113 million in bidding credits that the FCC awarded to a very small business named Advantage Spectrum, L.P. ("Advantage").  In March 2022, this Court dismissed this action because the "public disclosure bar" expressly prohibits FCA suits that free ride off publicly-available information, and, as this Court observed, the complaint's core allegations were all contained in "Advantage's public FCC filings."  Dkt. No. 170 ("Mem. Op.") at 10.

This Court gave Relators leave to amend based on their representation that they could assert new facts to overcome the public disclosure bar.  Mem. Op. at 13, 14.  Regrettably, Relators have completely abused this Court's leave.   Instead of providing well-pled facts that add new information, the Amended Complaint resorts to artifice.  Relators rely on the exact same publicly-available information, but they have ***deleted all of the citations and references to the public FCC filings that were in the original complaint.***  This gambit—well known to courts in the False Claims Act space—compels dismissal because it is no substitute for legitimate amendment. Deleting cites to FCC public disclosures cannot evade the public disclosure bar.

Relators also incorporate allegations from the parallel case pending in this Court, which Relators have already had multiple opportunities to amend.  *See* 2d Am. Compl., *United States ex rel. O'Connor v. U.S. Cellular Corp.*, 20-cv-2071-TSC (D.D.C. June 2, 2020) ("*O'Connor II*"), D.E. 118 ("SAC").  Relators' strategy with respect to these "imported" allegations from *O'Connor II* is the same. Relators assert that the Defendants entered into "secret" agreements, while deleting reference to ***all the FCC materials they previously cited*** where these supposed "secret" arrangements ***were disclosed to the FCC***.  Relators cannot overcome the public disclosure bar by deleting cites to public sources and adding the word "secret" or "secretly" sixteen times in the

Amended Complaint.  Relators have tried to obfuscate their complete reliance on public information.  But the public disclosures have not changed since the original complaint—and they foreclose Relators' claims.  As demonstrated below, few cases warrant application of the public disclosure bar more than this one.

The Amended Complaint's defects do not end there.  After years of gratuitously dragging an individual and her small business through the mud, Relators still do not and cannot allege that the King Street Defendants (Allison Cryor DiNardo, King Street Wireless, Inc., and King Street Wireless, L.P.)—who received **no licenses and no bidding credits** in Auction 97, which is the only auction at issue here—"submitted" or "caused to be submitted" any claims for payment or other false statements to the government.  This abject failure to plead "presentment"—as well as the rigorous scienter and materiality elements of the False Claims Act—doom the Amended Complaint.  These defects would be fatal even if the public disclosure bar did not exist.

This Court exercised its discretion to grant Relators leave to amend, and Relators abused that process.  Relators have added nothing new of substance, and their Amended Complaint, like the original complaint, remains legally defective to its core.  This Court should dismiss—this time with prejudice.

## II.     BACKGROUND

### A.     Congress Mandated That The FCC Enable Small Businesses To Participate And Compete In Spectrum Auctions.

When Congress authorized the FCC to assign radio spectrum by auction, it was concerned that all of the licenses would end up exclusively in the hands of large incumbents.  To address this concern, Congress charged the FCC with ensuring that small businesses and businesses owned by women and minorities could meaningfully participate in auctions for electromagnetic spectrum in the United States.  *See* 47 U.S.C. §§ 309(j)(3)(B), 309(j)(4)(C)–(D); Dkt. No. 174 ("Am. Compl.")

¶¶ 32–33.  To this end, the FCC provides certain small businesses, women-owned businesses, and other designated entities ("DEs") with "bidding credits."  *See* 47 C.F.R. § 1.2110(f).  As the FCC has acknowledged, this approach recognizes  "the difficulties that small businesses . . . confront in today's marketplace, including raising capital to compete in an auction, securing the far greater financial resources necessary to support the construction and operation of a wireless broadband network, and developing a successful business model based on current market structures and consumer needs."  *In the Matter of Updating Part 1 Competitive Bidding Rules*, Third Report & Order, 30 FCC Rcd. 7493, 7495 (¶ 5) (July 21, 2015).

Before awarding bidding credits, the FCC "closely examines the totality of the facts and circumstances of each case to ensure that the applicant is truly a small business unaffiliated with or controlled by entities that do not qualify as such."  *In the Matter of Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8889 (Aug. 18, 2015).  As part of that examination, FCC requires bidders to submit detailed, voluminous information on both Short-Form (pre-auction) and Long-Form (post-auction) applications concerning their business relationships and other factors affecting their DE eligibility. *See* Am. Compl. ¶¶ 47, 50; *see also* 47 C.F.R. § 1.2110(b)(1)(i).  The FCC also imposes additional post-licensing requirements to ensure DEs maintain their eligibility.  *See* Am. Compl. ¶ 56 (citing 47 C.F.R. § 1.2110(n)).  The required submissions include a list and summary of all agreements affecting the applicant's eligibility as a DE.  *See* 47 C.F.R. § 1.2112(b)(1)(iii).  Many applicants, including Advantage here, satisfy this requirement by submitting complete copies of the relevant agreements.  *See generally* FCC ULS File No. 0006668843.  All aspects of the examination process are public, as are all DE submissions to the FCC.  *See* FCC, Universal Licensing System, https://wireless2.fcc.gov/UlsApp/ApplicationSearch/searchAppl.jsp.

Advantage requested and received DE eligibility as a "very small business."  *See* 47 C.F.R.

§§ 1.2110(b)–(c), 1.2111(d)(1) (2012); *see also* Mem. Op. at 2 & n.1 (relying "on the regulation as it existed in 2014"). The FCC determines whether an applicant qualifies as a small business by aggregating its gross revenues with those of its "affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it ha[d] an attributable material relationship." 47 C.F.R. § 1.2110(b)(1)(i) (2012). If the aggregated revenues exceeded $40 million, then the entity would be ineligible for DE status. *See* 47 C.F.R. § 1.2110(f)(2)(i)–(iii) (2012).[1]

In fulfilling its mandate to ensure that small businesses could participate and compete in spectrum auctions, the FCC crafted its DE rules to both allow DEs "flexibility to engage in business ventures" while also maintaining "the ability to attract capital investment, *even from large providers.*" *Updating Part 1*, 30 FCC Rcd. at 7504 (¶ 22) (emphasis added); *see also Implementation of Sec. 309(j) of the Communications Act – Competitive Bidding*, Fifth Report & Order, 9 FCC Rcd. 5532, ¶ 15 (July 15, 1994) (recognizing that DEs require access to capital that larger companies provide, and "encourag[ing] large companies to invest in designated entities"). This Court previously recognized large telecommunication providers play an important role in the DE program. *See* Mem. Op. at 3 ("[T]he FCC seeks to promote economic opportunity for DE owners, especially those owned by minorities or women—by encouraging large companies to invest in DEs to avail themselves of their licensed spectrum.") (citing *Implementation of Sec. 309(j)*, 9 FCC Rcd. at ¶ 15). The Court also observed that spectrum auction bids are expensive—often prohibitively so for any stand-alone individual or small businesses. *See* Mem. Op. at 2 (citing Press Release, FCC, *FCC Concludes Largest Ever Spectrum Auction* (Mar. 12, 2020), https://www.fcc.gov/document/fcc-concludes-largest-ever-spectrum-auction).

---

[1] On July 21, 2015, the FCC amended its aggregation rules but applied those amendments only prospectively. Because Advantage filed its Long-Form Application on February 12, 2015, those amendments do not apply to Advantage's participation in Auction 97.

### B.      Advantage Spectrum Received Designated Entity Bidding Credits For Auction 97.

Advantage was a DE formed in August 2014 as a Delaware limited partnership between general partner Frequency Advantage, L.P. ("Frequency"), and limited partner USCC Wireless Investment, Inc. ("USCCWI"), a subsidiary of United States Cellular Corporation ("U.S. Cellular"). Frequency was comprised of general partner Sunshine Spectrum, Inc. ("Sunshine"), and limited partner Nonesuch, Inc. ("Nonesuch"). William Vail was the sole owner of Sunshine, which owned 51% of Frequency. Ms. DiNardo was the sole owner of Nonesuch, which owned 49% of Frequency. Thus, Ms. DiNardo (through Nonesuch) had only a minority, non-controlling, limited partnership interest in Frequency, and thus non-controlling interest in Advantage. The diagram that follows illustrates these relationships.[2] Significantly, Relators do not dispute this structure or the ownership percentages. *See* Am. Compl. ¶¶ 12–19.

*[Intentionally left blank]*

---

[2] This diagram is reproduced without alteration (except the highlighting) from an ownership disclosure Advantage publicly filed with the FCC on February 12, 2015. *See* FCC File No. 0006668827, https://wireless2.fcc.gov/UlsEntry/attachments/attachmentViewRD.jsp?applType=search&fileKey=4131621&attachmentKey=19598670&attachmentInd=applAttach.



As this ownership structure makes clear, King Street Wireless, Inc. and King Street Wireless, L.P. were never investors nor partners in Advantage.  They never held any ownership interest in Advantage.  *See* Am. Compl. ¶ 19.  Moreover, in a transaction that closed on December 31, 2015, before the FCC granted spectrum licenses to Advantage, Mr. Vail purchased the entirety of Ms. DiNardo's indirect, minority interest in Advantage.  *See id.* ¶ 20.  After that date, Ms. DiNardo had no ownership of or involvement with Advantage—either directly or indirectly.  That transaction was publicly disclosed in February 2016.  *See* Stock Purchase Agreement, FCC ULS File No. 0006668843 (Feb. 7, 2016) (attached as Declaration of Brian Liegel ("Liegel Decl."), Ex. A); *see also* Amendment to Long-Form Application, Ex. D, FCC ULS File No. 0006668843 (Feb. 7, 2016), at 6 (noting Mr. Vail is the 100% owner of both Sunshine and Nonesuch, and prior to December 31, 2015, Ms. DiNardo was the owner of Nonesuch) (attached as Liegel Decl., Ex. B).[3]

---

[3] "In considering a Rule 12(b)(6) challenge, a court is generally limited to consideration of the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters

Auction 97—the only auction at issue in the Amended Complaint—ran from November 13, 2014 to January 29, 2015.  Am. Compl. ¶ 85.  Advantage won 124 licenses in Auction 97 and obtained DE bidding credits for which Advantage allegedly was not eligible.  *See id.* ¶ 3, 95.  However, Relators do not allege that either Ms. DiNardo or any other King Street Defendant received any licenses, received any bidding credits, or was a signatory to any of the allegedly false and fraudulent submissions to the FCC.  *See, e.g.*, *id.* ¶¶ 78–80 (Short-Form Application); 84, 96–102, 106–11 (Long-Form Application and amendments); 112–117 (DE Annual Reports); 126–28 (lease notifications); 129 (construction notices).

Relators filed this FCA case in May 2015, *see* ECF No. 2, shortly after Auction 97.  The government did not grant any licenses to Advantage until July 5, 2016—after the original complaint was filed, and more than six months after Ms. DiNardo divested her ownership interest in Advantage.  *See generally* FCC Applic. File No. 0006457325; FCC ULS File No. 0006668843.  Advantage amended its Long-Form Application six times between Ms. DiNardo's departure and the granting of the licenses, and Ms. DiNardo is not alleged to have played any role in these amendments.  *See generally* FCC ULS File No. 0006668843.  In November 2019, the Department of Justice declined to intervene in this case, ECF No. 43, just as it did in *O'Connor II*—the related case pending before this Court, Case No. 20-2071, ECF No. 47.

Relators voluntarily dismissed Mr. Vail—the control person in Advantage—from this case

---

of which a court may take judicial notice, and matters of public record."  *Burnside v. Dep't of Justice*, 20-cv-2309 (TSC), 2022 WL 715181, at *3 (D.D.C. Mar. 10, 2022) (Chutkan, J.) (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)); *see also, e.g.*, *Baker v. Henderson*, 150 F. Supp. 2d 13, 15 (D.D.C. 2001) ("[T]he court may take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment.").  In addition, "[c]ourts may consider 'documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss.'"  *Burnside*, 2022 WL 715181 at *4 (quoting *Pearson v. District of Columbia*, 644 F. Supp. 2d 23, 29 n.1 (D.D.C. 2009)).

on March 25, 2020.  *See* ECF Nos. 59, 85.

###### C.    This Court Dismissed The Complaint Based On The Public Disclosure Bar.

On March 31, 2022, this Court granted Defendants' motions to dismiss based on the public disclosure bar.  The Court did so because Relators' allegations that "U.S. Cellular directly and indirectly controls Advantage" were "substantially similar to what ha[d] already been publicly disclosed" in public filings to the FCC.  Mem. Op. at 8, 13.  These filings "would have given the Government sufficient notice to adequately investigate the case and to make a decision whether to prosecute."  *Id.* at 10.  The Court also rejected Relators' attempt to evade the public disclosure bar through allegations that they discovered the alleged misconduct through their own "surveillance and private investigations."  *Id.* at 8.  Even "[c]onstruing Plaintiff-Relators' claims as true, their surveillance and private investigation" merely "add[ed] information to that contained in the public FCC filings" and did not grant them "original source" status.  *Id.* at 10–11.

However, based on Relators' representations that they could provide "more information showing 'in great detail' the degree to which U.S. Cellular actually controlled Advantage through King Street, L.P.," the Court granted Relators leave to amend.  *Id.* at 13.  Relators filed the Amended Complaint on April 29, 2022.

### III.    LEGAL STANDARD

The Amended Complaint can survive a motion to dismiss only if it alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  It is axiomatic that on a Rule 12(b)(6) motion, conclusory assertions and labels unsupported by factual allegations are "not entitled to be assumed true."  *Id.* at 681 (citing *Twombly*, 550 U.S. at 554–55); *id.* at 681 (the "conclusory nature of [a plaintiff's] allegations . . . disentitles them to the presumption of truth.")  Moreover, the Amended Complaint must satisfy Rule 9(b)'s high

pleading standard, which requires it to "state with particularity the circumstances constituting fraud or mistake" and set forth "in sufficient detail the time, place, and manner" of the alleged "scheme to defraud the government."  *United States ex rel. Staggers v. Medtronic, Inc.*, 15-cv-392 (TSC), 2019 WL 13132849, at *1 (D.D.C. Mar. 25, 2019) (Chutkan, J.) (citations omitted).  This standard, "requires particularity as to who, what, where, and when" the alleged fraud took place.  *Id.* (alterations adopted, citation omitted).

## IV.    ARGUMENT

### A.    Relators' Claims Are Precluded By The FCA's Public Disclosure Bar.

This Court previously held that Relators' core allegation "that U.S. Cellular controls Advantage" was precluded by the FCA's public disclosure bar.  Mem. Op. at 8.  The Amended Complaint makes the very same core allegation and this Court's prior decision applies with equal force here.

The public disclosure bar applies to "allegations or transactions that are substantially similar to those in the public domain."  Mem. Op. at 7.  The key question is whether "the government already had enough information to investigate the case and to make a decision whether to prosecute or [whether] the information could at least have alerted law-enforcement authorities to the likelihood of wrongdoing."  *Id.* (quoting *United States ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012)).  The public disclosure bar is often expressed algebraically: "If an allegation of fraud (Z) requires both a misrepresented state of facts (X) and a true state of facts (Y), such that X + Y = Z, then the public disclosure bar applies if both X and Y are in the public domain and would alert the government to 'the likelihood of wrongdoing.'"  *Id.* at 8 (quoting *United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923, 933 (D.C. Cir. 2017)).  The public disclosure bar can be overcome only in very narrow circumstances—as relevant here, when a relator is an "original source" because he or she has knowledge that is "independent of and

materially adds to the publicly disclosed allegations or transactions."  31 U.S.C. § 3730(e)(4)(B).

As this Court explained in dismissing the original complaint, Relators tried to support their allegation that "U.S. Cellular controls Advantage" through three categories of evidence:

- "Advantage's Auction 97 FCC Filings";

- "[S]urveillence and private investigations of Advantage's and King Street L.P.'s office and employees;" and

- "[E]vidence shown in detail in a separate case before this court [Case No. 20-2071, *O'Connor II*]"

Mem. Op. at 8 (citations and quotations omitted).  The Court concluded it could not consider the allegations from *O'Connor II*, and that the other allegations were publicly available and did not grant Relators "original source" status.  *Id.* at 13.

In the Amended Complaint, nothing has changed:  Relators make the same core allegation that "U.S. Cellular . . . controlled Advantage and its licensed spectrum."  Am. Compl. ¶ 6.  Relators rely on the same public FCC filings and the same "surveillance" this Court already considered in its prior dismissal.  And while Relators have added some allegations from *O'Connor II*, the "X" and the "Y" of each of those allegations were publicly available, and do not materially add to the "X" and "Y" of this case.  This Court's prior decision—and its straightforward application of the public disclosure bar—mandates dismissal.

### 1.     The Amended Complaint's Essential Allegations Are Drawn From Public FCC Filings.

The Court dismissed Relators' original complaint because Relators' claims rested on "substantially the same allegations or transactions" as those disclosed in six public FCC filings that the original complaint "rel[ied] on": "(1) the Frequency partnership agreement between DiNardo and Vail [the Frequency LP Agreement]; (2) the Advantage partnership agreement between Frequency and U.S. Cellular [the Advantage LP Agreement]; (3) the Bidding Protocol

[Agreement] defining how Advantage would bid during Auction 97; (4) the Frequency and (5) Advantage Loan and Security Agreements governing U.S. Cellular's extension of credit for Frequency; and (6) U.S. Cellular's 2014 annual report to shareholders describing its participation in Auction 97 through its financial interest in Advantage." Mem. Op. at 9, 11 (internal quotations and citations omitted).

Relators' "amendments" deleted citations and references to these same public filings while nonetheless making allegations ***based entirely on the information in them***.  For example, the Amended Complaint asserts that "Advantage's bidding strategy in FCC Auction 97 was controlled and directed by U.S. Cellular and DiNardo."  Am. Compl. ¶ 86.  The original complaint alleged that "the terms of the Biding Protocol Agreement"—a publicly available FCC filing—"required Vail to concede all control over Advantage's bidding to DiNardo and U.S. Cellular." Dkt No. 2 ("Compl.") ¶ 58.  The only thing that is "new" is that Relators deleted the reference to the "Bidding Protocol Agreement"—but their allegation is still drawn from that publicly-available document.

Rather than provide "more information . . . 'in great detail'" as promised, Mem. Op. at 13, Relators attempt to evade the public disclosure bar through obfuscation.  The Amended Complaint uses this same trick pervasively.  The table that follows demonstrates this by comparing the allegations in the Amended Complaint to those in the original complaint.[4]  It shows that the Amended Complaint contains the same allegations as the original complaint and that the only meaningful differences are the deletions to the public FCC filings in the original complaint— namely, the Frequency LP Agreement, Advantage LP Agreement, and Bidding Protocol Agreement (highlighted below):

---

[4] A district court may "[c]ompar[e] the amended complaint with the original complaint" when deciding a motion to dismiss.  *W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001).

| Core Allegation | Amended Complaint | Original Complaint |
|---|---|---|
| DE did not make independent bidding decisions. | "Advantage's bidding strategy in FCC Auction 97 was controlled and directed by U.S. Cellular and DiNardo, as U.S. Cellular's proxy, solely for U.S. Cellular's benefit, and was designed solely to add to or expand U.S. Cellular's existing spectrum." ¶ 86 | "[T]he terms of **the Bidding Protocol Agreement** required Vail to concede all control over Advantage's bidding to DiNardo and U.S. Cellular." ¶ 58. |
| DE won spectrum licenses for solely for a larger carrier's benefit. | "Virtually all of the licenses Advantage won were identified and selected by U.S. Cellular/DiNardo, and were in markets that were either adjacent to or overlapping with U.S. Cellular wireless service areas." ¶ 94. | "Exhibit A of the **Bidding Protocol Agreement** effectively prevented Vail from bidding on any licenses other than those licenses that would be useful for U.S. Cellular." ¶ 59.<br><br>"Indeed, **the Bidding Protocol Agreement** does not permit Vail to bid on any licenses that are not useful to U.S. Cellular's operations; he is bound to bid only on licenses that have strategic importance to U.S. Cellular." ¶ 80. |
| U.S. Cellular employees were present for the bidding decisions. | "Relators' independent observation during the auction and contemporaneous investigation revealed that, during the auction, DiNardo and one or more U.S. Cellular/TDS senior employees were present for and participated in the bidding decisions." ¶ 92. | "[A]ccording to the **Bidding Protocol Agreement** (¶ 2), Dinardo is one of three members of the "Bidding Council," which also includes a U.S. Cellular representative and Vail." ¶ 58.<br><br>"[B]oth DiNardo and an executive from U.S. Cellular were physically present during Vail's bidding . . . **The Frequency Limited Partnership Agreement** confirms Relators' evidence . . . .'" ¶ 60. |

| Core Allegation | Amended Complaint | Original Complaint |
|---|---|---|
| DE's business address was vacant during the FCC Auction. | "Advantage's purported place of business at the time of [Auction 97] . . . was vacant without any furniture or signage to indicate there was a business operating from or within the office." ¶ 87 | "**The [Frequency] Limited Partnership agreement** between Sunshine (Vail) and Nonesuch (DiNardo) forming Frequency, moreover, confirms that Defendants' plan was to use the King Street headquarters to conduct bidding for Auction 97." ¶ 65. |
| DE had no other employees or management. | "Although planning and providing service for those areas and population [covered by the Auction 97 leases] would require a great deal of effort, Advantage has never had any employees, other than William Vail." ¶ 118.<br><br>"There is no management committee, there are no senior executives, and Advantage makes no management decisions regarding its licenses." ¶ 119. | "Section 5.4(a) of **the Advantage LP Agreement** provides that only one executive is expected to run Advantage prior to launch of commercial service, including during the build-out period of the wireless networks, and that executive is expected to work no more than one-half of his/her time to run the company." ¶ 75. |
| DE lacked independent control of the spectrum it acquired. | "U.S. Cellular controlled the construction of the networks, use of Advantage's licensed spectrum, and use of the networks for its own customers." ¶ 133 | "Other provisions of **the Advantage LP Agreement** effectively cabin Vail's ability to make decisions concerning the construction of the AWS networks or to alter those plans without U.S. Cellular's consent." ¶ 77 |

The public disclosure bar cannot be defeated so inelegantly. Indeed, this approach is not new—several relators have tried it, and courts routinely reject it as a legally invalid (and potentially bad faith) gambit. A recent decision in this District is instructive. *See United States ex rel. Scott v. Pac. Architects and Eng'rs, Inc.*, 13-cv-1844 (CKK), 2020 WL 224504 (D.D.C. Jan. 15, 2020). In that FCA case, the relators amended their complaint and "deleted most of [relators'] direct references to [a] State Department audit." *Id.* at *6. The Court looked beyond that cosmetic

13

change to evaluate whether the substance of the allegations were in the public domain.  The Court

held the public disclosure bar still precluded the relators' claims because the core "allegations in

[r]elators' action [we]re substantially similar to allegations that were already publicly disclosed

[in the government's audit]."  *Id.*

Even more recently, on the opposite end of the country, a district court admonished relators

in a nearly identical situation.  *See United States ex rel. Jones v. Sutter Health*, 18-cv-02067-LHK,

2021 WL 3665939 at *10 (N.D. Cal. Aug. 18, 2021).  The district court dismissed the original

complaint because it derived its core allegations from publicly-available documents—namely, "the

Centers for Medicare and Medicaid Services' response to [relators] FOIA request."  *Id.*  The

district court granted relators leave to amend, but the amendments "simply removed the references

to the . . . FOIA request"—even though the core factual allegations were the same.  *Id.*  The district

court therefore dismissed the case again—this time with prejudice—recognizing that relator's

actions "may reflect bad faith . . . because [the] [r]elator may be trying to circumvent the dismissal

of her lawsuit on lawful grounds" by merely deleting the prior citations to public documents.  *Id.*

These sound decisions from coast to coast demonstrate that this Court should not endorse

Relators' maneuvering.  Because Relators' material allegations about how the Defendants violated

the False Claims Act are still drawn from public FCC filings, dismissal is required.  *See* Mem. Op.

at 9–11.

> ### 2.    Relators' Surveillance And Private Investigation Are Substantially The Same As The Public FCC Filings.

This Court previously held that the "surveillance information" touted by Relators failed to

"provide enough information to make the entire body of evidence in a claim not 'substantially the

same' as what has already been publicly disclosed."  Mem. Op. at 10.  This Court also specifically

rejected Relators' allegations that "(1) a U.S. Cellular executive was present at the Auction 97

bidding; (2) Advantage conducted this bidding from King Street's Virginia offices; (3) one of Advantage's designated bidders—Stephen Hinz—was a King Street employee; (4) Advantage's Florida offices were unused; and (5) Advantage and King Street shared a lawyer." *Id.* at 10–11 (internal citations omitted).  The Amended Complaint simply re-alleges these same surveillance efforts—namely, that (1) "one of more U.S. Cellular/TDS senior employees were present for and participated in the bidding decisions," Am. Compl. ¶ 92; (2) "Advantage's Auction 97 bidding was conducted from DiNardo's offices [in Alexandria, Virginia]," *id.* ¶ 89; (3) "Hinz . . . was employed by King Street Wireless/DiNardo," *id.* ¶ 91; and (4) Advantage's Florida office was "vacant without any furniture or signage" during Auction 97, *id.* ¶ 87.  Yet again, Relators' attempts to repackage and reorganize their allegations cannot avoid the public disclosure bar.[5]

Relators say they have offered "new" information that supposedly flows from their "surveillance efforts," but in actuality the Amended Complaint contains nothing new or substantive.  For example, Relators allege that Advantage has listed "Vail's home address" as one of its business addresses, and that Advantage "does not appear to have a business phone," *id.* ¶¶ 120–21.  But this allegation is substantially the same as the allegation in the original complaint that Advantage's office was vacant and had never been used, which "fails" to overcome the public disclosure bar.  Mem. Op. at 10.  Relators cannot evade the public disclosure bar by asserting their "surveillance efforts" uncovered information that was publicly-available.  Relators also allege, confusingly and incorrectly, that a 76-license spectrum manager lease is "further evidence" that U.S. Cellular controls Advantage through "undisclosed agreements and understandings."  Am. Compl. ¶ 126, 131.  But as Relators' own Exhibit 15 to the Amended Complaint demonstrates, U.S. Cellular ***specifically disclosed*** to the FCC that it entered into that agreement with Advantage

---

[5] The Amended Complaint does not re-allege that Advantage and King Street shared a lawyer.

"to improve and enhance its voice and data service offerings." Am. Compl., Ex. 15 at 2. Relators'
own exhibits negate any claim of a "secret" lease agreement.

Relators also bizarrely assert that the 76-license lease was described "falsely and
fraudulently." Am. Compl. ¶ 126. Relators seem to posit that, in order for U.S. Cellular to provide
the service it offered, it "must" have leased more spectrum from Advantage than the lease
disclosed. Relators say they have "independently verified that . . . [U.S. Cellular] must control
*both* the downlink *and* the uplink spectrum, or at least 10 MHz, rather than the 5 MHz purportedly
leased to U.S. Cellular under the 76-license Spectrum Manager Lease." *Id.* ¶ 131. Relators' ignore
the reality that the 5 MHz of leased spectrum would be used to supplement existing U.S. Cellular
spectrum and not to establish stand-alone operations.

This supplementation is all expressly set out in public disclosures. The FCC expressly
permits the creation of "two-way service" "whereby [one licensed band] could be used for a
'downstream' path, and the 'upstream' (or return) path could be located outside of the [licensed]
band in other available spectrum." *Mem. Op. and Order and Second Report and Order*, 17 FCC
Rcd. 9614, 9668, ¶ 137 (May 23, 2002); *see also In the Matter of Amendment of the Comm'n Rules
with Regard to Comm. Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz
Bands*, 29 FCC Rcd. 4610, 4625 (¶ 29) (Mar. 31, 2014) ("[N]o regulation would prohibit licensees
from pairing this uplink band with another present or future licensed downlink band."). Relators
admit that Advantage's licenses "were in markets that were either adjacent to or overlapping with
U.S. Cellular wireless service areas." Am. Compl. ¶ 94. This overlap was also publicly disclosed
in both the exhibits attached to the Amended Complaint, as well as in Defendants' FCC and SEC
filings. *See* Am. Compl., Ex. 15 at 2 (leases will allow U.S. Cellular to "improve and enhance" its
own, pre-existing service); *id.* at 3 ("In a number of Advantage license areas, [U.S. Cellular]

already provides wireless services . . . ."); Bidding Protocol Agreement, Ex. A, FCC File No. 0006668843 (Mar. 20, 2015) (prioritizing markets overlapping with U.S. Cellular's service areas) (attached as Liegel Decl., Ex. C); U.S. Cellular, Current Report (Form 8-K) (Feb. 2, 2015) ("The licenses expected to be awarded to Advantage Spectrum primarily cover areas that overlap or are proximate or contiguous to areas covered by licenses that U.S. Cellular currently owns, operates and/or consolidates.") (attached as Liegel Decl., Ex. D).

Notably, Relators **never allege** that U.S. Cellular did not—as it told the FCC—create two-way service by pairing a "downlink" band using 5 MHz Advantage leased spectrum with an "uplink" band using U.S. Cellular's own, overlapping spectrum.  And Relators cannot survive a motion to dismiss simply by categorizing a publicly disclosed lease as "secret" or "fraudulent" with **no facts at all** to support that conclusion.  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555).  Thus, the "conclusory nature of [Relators'] allegations . . . disentitles them to the presumption of truth.  *Id.* at 681.  Relators cannot survive a motion to dismiss based on the totally unsupported *ipse dixit* that a document is fraudulent.

Moreover, the FCC was well aware that U.S. Cellular was actively using the licenses of partner DEs.  *See Promoting Interoperability in the 700 Mhz Com. Spectrum*, 27 FCC Rcd. 3521, 3534 & n.77 (Mar. 21, 2012) ("U.S. Cellular recently announced the planned launch of a 4G LTE network that will cover 25 percent of U.S. Cellular's customers and will use 700 MHz licenses of its partner, King Street Wireless.").  In light of this disclosure, Relators' suggestion that Advantage's publicly disclosed leases to U.S. Cellular were either "secret" or "false" do not "materially add" to the body of publicly disclosed information and do not carry Relators' burden to show they are an original source.

It is Relators' burden to "demonstrate that [they are] an original source." *Smith v. Athena Constr. Grp., Inc.*, 18-cv-2080 (APM), 2022 WL 888188, at *9 (D.D.C. Mar. 25, 2022). Because Relators' surveillance efforts "merely add[ed] information to that contained in the public FCC filings," the public disclosure bar applies and compels dismissal—just as this Court previously held. Mem. Op. at 11.

### 3.   The Allegations From O'Connor *II* Are Also Publicly Available, And Do Not Materially Add To The Allegations Or Transactions In This Case.

Relators' last-ditch effort is to port-over allegations from *O'Connor II* into this case. The key allegations ported over appear in Paragraphs 69, 70, and 71 of the Amended Complaint, in which Relators purport to have uncovered a "secret agreement" by which King Street surreptitiously leased its spectrum to U.S. Cellular. These allegations are also foreclosed by the public disclosure bar.

Relators allege that "U.S. Cellular and DiNardo/King Street had entered into a secret leasing agreement under which U.S. Cellular . . . was providing service to its own customers using King Street spectrum." Am. Compl. ¶ 70. Relators are referring to the "2011 network sharing agreement" between King Street and U.S. Cellular, which King Street discusses at length in its pending Motion to Dismiss in *O'Connor II*. As explained at length there, ***the FCC was demonstrably aware of the precise business relationship this alleged "secret agreement" embodies.*** In numerous public filings on the FCC docket, U.S. Cellular and King Street ***repeatedly*** disclosed its plans to offer LTE services to U.S. Cellular customers "using" King Street's spectrum, including through the network sharing agreement. *See, e.g.*, King Street Notice of *Ex Parte* Communication, FCC WT Docket 11-18 (Nov. 30, 2011), at 1 (stating provision of services would be a "joint effort" of "King Street, in conjunction with U.S. Cellular" to "provide LTE services in select markets") (attached as Liegel Decl., Ex. E); U.S. Cellular *Ex Parte* Presentation,

FCC WT Docket 12-69 (Dec. 3, 2012), at 16 ("[King Street] is partnering with U.S. Cellular to deliver high speed 4G LTE service to U.S. Cellular's customers in several of the carrier's markets.") (attached as Liegel Decl., Ex. F); U.S. Cellular Auction 901 Long-Form Application, Am. Ex. 2 (Redacted – For Public Inspection), FCC Applic. File No. 0005476908 (June 5, 2013), at 1 ("Pursuant to a Network Sharing Agreement . . . King Street agreed to provide 4G services, to be managed by [U.S. Cellular] . . . via King Street's Spectrum.") (attached as Liegel Decl., Ex. G). Moreover, **the FCC itself** publicly declared that U.S. Cellular's 4G LTE network would "*use* the 700 MHz licenses of its partner, King Street Wireless." *Promoting Interoperability in the 700 MHz Com. Spectrum*, 27 FCC Rcd. at 3534 & n.77. Thus, the very arrangement Relators allege is "secret" in fact was publicly disclosed—both by the entities Relators alleged concealed it, and by the very agency from whom it was supposedly concealed.[6]

Relators also seek to avoid the public disclosure bar by averring they have "discovered" the "secret" lease agreement through "engineering field tests." Am. Compl. ¶ 72. But these supposed "engineering field tests" did not occur until February 2015—**years after** the public disclosures described above. *See* SAC, *O'Connor II*, ECF No. 118 ¶ 98; *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 479 (D.C. Cir. 2016) ("*Oliver II*") (no original

---

[6] These disclosures continued over time, thereby repeatedly repudiating the existence of a supposed "secret" agreement. *See, e.g.*, U.S. Cellular *Ex Parte* Filing, Docket No. IB 11-149 (Feb. 8, 2012) at 1 (referring to "the impending launch by *U.S. Cellular and its partner, King Street Wireless*, L.P. of 4G LTE devices to approximately 25% of U.S. Cellular's customer base") (emphasis added) (attached as Liegel Decl., Ex. H); U.S. Cellular *Ex Parte* Filing, FCC WT Docket 12-69 (Jan. 24, 2013), at 1-2 ("[B]y the end of 2013, *U.S. Cellular in conjunction with King Street Wireless*, L.P. would have 4G LTE service deployed to 87% of its customers.") (emphasis added) (attached as Liegel Decl., Ex. I); Letter from Telephone & Data Systems, Inc. to Larry Spirgel, Assistant Director, SEC (Aug. 3, 2017), at 5 ("The Company has a Network Sharing Agreement ("NSA") with King Street Wireless, which generally provides for *U.S. Cellular to compensate King Street Wireless for the use of its spectrum* and *King Street Wireless to compensate U.S. Cellular for use of portions of U.S. Cellular's wireless network.*") (emphasis added) (attached as Liegel Decl., Ex. J).

source status where "at best verif[y] [] information contained in" the public FCC filings).  Nor do these "engineering field tests" materially add to the veritable library of publicly-disclosed documents detailing King Street's agreements with U.S. Cellular.[7]

And even if Relators' field tests somehow materially added to their allegations or transactions related to **King Street's and U.S. Cellular's** licenses, this Amended Complaint is expressly focused on licenses that **Advantage** received.  King Street's network sharing agreements with U.S. Cellular are irrelevant to this case.  Again, Relators do not (and cannot) allege that King Street bid on or received any spectrum licenses or bidding credits in Auction 97.  King Street received licenses in an entirely different auction (Auction 73), which occurred years before Auction 97.  Relators cannot save their claims challenging the award of licenses and bidding credits to Advantage in Auction 97 by incorporating irrelevant allegations about King Street involving different auctions and different licenses.[8]

In short, Relators' "new" allegations from *O'Connor II* are drawn from public sources and do not overcome the public disclosure bar or satisfy Relators' burden to show they are entitled to "original source" status.  *See* Mem. Op. at 13.  Relators cannot avoid the public disclosure bar by

---

[7] Relators' field tests did not occur until *after* the five-year restricted DE period for King Street from Auction 73—at which point there can be no FCA liability because King Street could not have owed *any* unjust enrichment payments to the FCC.  *See* 47 C.F.R. § 1.2111(d)(2)(i)(E) (2012).

[8] Relators also claim to have independently discovered that U.S. Cellular was involved in the build out of Advantage's and King Street's networks.  *See* Am. Compl. ¶ 115.  But FCC regulations expressly authorize a licensee (i.e. Advantage) to meet its construction buildout requirements by "attribut[ing] to itself the build-out or performance activities of its spectrum lessees(s)."  47 C.F.R. 1.9020(d)(5)(i).  In addition, the fact that U.S. Cellular was one such "spectrum lessee" was publicly disclosed in the Public Interest Statement attached to the Amended Complaint.  Am. Compl., Ex. 15.  Thus, Relators' allegation that U.S. Cellular "planned and constructed the networks," Am. Compl. ¶ 115, was both publicly disclosed and plainly authorized under FCC regulations.  Relators' allegation additionally fails because it does not establish falsity.  Whether **U.S. Cellular** "planned or constructed" wireless service networks has no bearing on whether **Advantage** also "[was] in the planning stages of construction," as Advantage certified to the FCC. *Id.*

inserting the words "secret agreement" into the Amended Complaint where, as here, the purported "secret" is public information.  *See, e.g.*, *Silbersher v. Valeant Pharmas. Int'l, Inc.*, 445 F. Supp. 3d 393, 403 (N.D. Cal. 2020) (public disclosure bar cannot be overcome by "wholly conclusory allegations unsupported by any facts" that are "also inconsistent with the panoply of public materials that are discussed in the [complaint]") (internal citation omitted); *United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016) (conclusory allegations of continuing fraud cannot avoid public disclosure bar).

### 4.    The Prior *Qui Tam* Lawsuit Independently Warrants Dismissal.

Even setting aside the public FCC filings that bar Relators' claims, an independent barrier to the Amended Complaint is the prior *qui tam* lawsuit filed by the law firm in which one of the Relators was formerly a partner.  The prior *qui tam* suit was itself a "public disclosure" that DOJ and the FCC actually investigated and thereafter declined to take action.  *See* Am. Compl., No. 1:07-cv-00800-JDB (D.D.C. Apr. 24, 2008), ECF No. 11 (the "2008 Complaint") (attached as Liegel Decl., Ex. K).  This Court did not consider the 2008 Complaint when dismissing the original complaint, but it independently warrants dismissal as well.

The 2008 Complaint indisputably triggers the public disclosure bar because it is a disclosure in a "civil . . . hearing."  31 U.S.C. § 3730(e)(4)(A)(ii).  The 2008 Complaint was publicly available over five years before Relators brought this case:  It was published on Westlaw in April 2009, *see* FCC Letter to Mr. Thomas Gutierrez Re: Auction 73 Application of King Street Wireless, L.P., 24 FCC Rcd. 4527, 2009 WL 1012832 (Apr. 14, 2009), and unsealed in full later that year, *see* Min. Order, *Lampert & O'Connor, P.C. v. Carroll Wireless, L.P.*, No. 1:07-cv-00800-JDB (D.D.C. Oct. 22, 2009).[9]

---

[9] Because the 2008 Complaint preceded the 2010 amendments to the public disclosure bar, this Court need not decide whether the prior *qui tam* suit qualifies as a proceeding "in which the

The dispositive question for purposes of the public disclosure bar is whether the allegations in the 2008 Complaint are similar enough to the allegations here to have "alert[ed] the government to 'the likelihood of wrongdoing.'"  Mem. Op. at 8 (quoting *Shea*, 863 F.3d at 933).  They are.  As the table that follows demonstrates, comparing the 2008 Complaint to the Amended Complaint reveals that all of the essential allegations on which the Amended Complaint rests are drawn directly from the 2008 Complaint—including Relators' core allegation that Defendants used "DE fronts" to obtain bidding credits in FCC spectrum auctions.

*[Intentionally left blank]*

---

Government or its agent is a party." 31 U.S.C. § 3730(e)(4)(a)(i).  That requirement was only added in 2010, and even so, a *qui tam* relator is the government's "agent" for purposes of application of the public disclosure bar in cases in which the government has declined to intervene. *See United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 845 (6th Cir. 2020).

| Core Allegation | Amended Complaint | 2008 Complaint |
|---|---|---|
| Parties engaged in a scheme to obtain DE bidding credits. | "U.S. Cellular, DiNardo, and Vail formed and caused Advantage to be formed specifically so that U.S. Cellular could acquire discounted spectrum licenses in FCC Auction 97 using DE bid credits."  ¶ 83. | "Defendants US Cellular and TDS created and have maintained the sham entities [including King Street Wireless] . . . to file FCC applications to qualify as [a] 'very small business' for bidding credits . . . ."  ¶ 54 |
| DEs failed to attribute revenues of large carriers. | "U.S. Cellular's billions of dollars in gross revenues, as well as King Street's gross revenues under the secret lease, should have been disclosed and attributed to Advantage in its FCC Auction 97 applications, as well as disclosed and attributed to Advantage in the DE Annual Reports throughout the unjust enrichment period."  ¶ 132. | "[Defendants] knowingly failed to attribute the revenues of Defendants US Cellular, USCCWI, and TDS." ¶ 83 |
| DEs are actually sham entities that do not operate as businesses. | "Advantage's only business presence is on paper, and was intended solely to mislead the FCC that it does not share office space with U.S. Cellular (or King Street), and operates independently."  ¶ 120. | "Defendants Carroll Wireless, Barat Wireless, and King Street Wireless . . . did not and do not operate or function as actual businesses" and "the Defendants provided to the FCC addresses and telephone numbers that were associated with non-operating business fronts."  ¶ 61. |
| DEs did not make bidding decisions. | "Advantage's bidding strategy in FCC Auction 97 was controlled and directed by U.S. Cellular and DiNardo, as U.S. Cellular's proxy, solely for U.S. Cellular's benefit, and was designed solely to add to or expand U.S. Cellular's existing spectrum." ¶ 86 | "The scope and terms of the FCC Applicants' bidding activity . . . were essentially dictated to the FCC Applicants by the TDS Group.  This activity was effectively ceded over to the TDS Group through Bidding Agreements for Auctions 58, 66 and 73, and the many subsequent amendments to those Agreements struck during the course of the auctions . . . ." ¶ 69. |

| Core Allegation | Amended Complaint | 2008 Complaint |
|---|---|---|
| DEs lacked independent control. | "U.S. Cellular controlled the construction of the networks, use of Advantage's licensed spectrum, and use of the networks for its own customers." ¶ 133 | "In this case, Defendants US Cellular, USCCWI, and TDS were the actual parties in control, and Defendants Carroll Wireless, Caroll Inc., Barat Wireless, Barat Inc., King Street Wireless [L.P.], King Street [Wireless,] Inc., and DiNardo were simply proxies used to deceive the FCC." ¶ 6. |
| DE's business address was vacant during the FCC Auction. | "Advantage's purported place of business at the time of [Auction 97] . . . was vacant without any furniture or signage to indicate there was a business operating from or within the office." ¶ 87 | "To induce the Government to believe that [Carroll Wireless, Barat Wireless, and King Street Wireless] were bona fide enterprises, however, the Defendants provided to the FCC addresses and telephone numbers that were associated with non-operating business fronts." ¶ 61. |
| DE owner lacked experience. | Mr. Vail "had no prior involvement or experience in spectrum auctions, including the law and FCC regulations associated with bidding and acting as a DE." ¶ 90. | "Ms. DiNardo had no experience or background in telecommunications operations or spectrum license development or services and, under arms-length circumstances, could not have raised the many hundreds of millions of dollars necessary to fund the acquisition of the spectrum licenses in Auction 58, 66, or 73." ¶ 63. |
| DE won spectrum licenses for large carrier's benefit. | "Virtually all of the licenses Advantage won were identified and selected by U.S. Cellular/DiNardo, and were in markets that were either adjacent to or overlapping with U.S. Cellular wireless service areas." ¶ 94. | DEs obtained licenses that "cover markets that overlap with, are contiguous with, or otherwise complement US Cellular's operating wireless markets." ¶ 70. |
| DE's business address was a personal residence. | Advantage's business addresses "is or was Vail's home address." ¶ 120. | DE entities listed Ms. DiNardo's "residence" as a business address. ¶ 61. |

24

That this case involves a different bidding entity, or a different FCC Auction, "does not change the calculus." *Smith*, 2022 WL 888188, at \*9; *see also Scott*, 2020 WL 224504 at \*6 (whether a relator brings allegations of additional, specific instances of fraud "is of no consequence"). A prior *qui tam* complaint triggers the public disclosure bar ***even if*** the prior complaint named ***different*** defendants altogether. *See, e.g.*, *United States ex rel. Hockett v. Columbia HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 49 (D.D.C. 2007); *see also United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 738 (10th Cir. 2019). Differences among the different DEs involved are irrelevant where, as here, allegations are "levied against the same corporate parent for the same type of fraud." *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 848–49 (6th Cir. 2020). Moreover, "the time difference" between the 2008 Complaint and Auction 97 "does not undermine the disclosure of [the] general practice," and the D.C. Circuit "ha[s] found disclosures going back as far as forty years prior to the relator's lawsuit . . . sufficient to disclose the practices which formed the basis of the relator's suit." *Oliver II*, 826 F.3d at 473 (internal quotation marks omitted). The law is clear that the public disclosure bar is triggered so long as the "general practice" is disclosed. *United States ex rel. Settlemire v. Dist. of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999); *see also Reed*, 923 F.3d at 745 (public disclosure bar does not require "a complete identity of allegations").

The Court need not speculate about whether the 2008 Complaint was sufficient to put the government on notice of the alleged fraudulent scheme because it ***actually*** "set government investigators on the trail of fraud." *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 87 (D.C. Cir. 2014) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 655 (D.C. Cir. 1994)). The FCC investigated the 2008 Complaint and publicly requested that King Street respond, in a public submission, to the 2008 Complaint's FCA allegations. *See* Letter from

R. Noel to T. Gutierrez Re: Auction 73 Application of King Street Wireless, L.P., 24 FCC Rcd. at 4527 (seeking "a written response and any supporting documentation that [King Street] deem[s] pertinent in responding to these allegations").  King Street fully responded to the FCC's request. *See* Resp. to Bureau Inquiry (Redacted), FCC ULS File No. 0003379814 (May 8, 2009) (attached as Liegel Decl., Ex. L).  And, after receiving King Street's response, the FCC ***granted*** licenses and bidding credits to King Street.  Further, the FCC was not alone in investigating the 2008 Complaint—the Department of Justice also investigated those allegations, and after investigating, declined to intervene in this case.[10]  The government's actual conduct confirms that the 2008 Complaint provided the government with "sufficient notice" of an alleged fraudulent scheme by U.S. Cellular to use sham Designated Entities to obtain control of spectrum licenses at an unlawfully steep discount.

Indeed, a recent decision by Judge Mehta in another *qui tam* FCA case, *Smith v. Athena Construction Group*, 18-cv-2080 (APM), 2022 WL 888188 (D.D.C. Mar. 25, 2022), is directly on point and powerfully demonstrates why the public disclosure bar applies in light of the 2008 Complaint.  In *Smith*, relators alleged ten specific instances of "pass-through fraud," in which the defendant "sold" its status as a certified small business to prime contractors, allowing those prime contractors to gain preferential treatment in the government contracting process.  *Id.* at *9.  Yet the district court recognized that an earlier *qui tam* complaint alleged that the same defendant "had participated in a similar pass-through scheme" in another state.  *Id.* at *7.  The district court dismissed relators' pass-through claims with prejudice, holding that, although the prior complaint

---

[10] The FCC likewise scrutinized the same allegations before awarding spectrum and bidding credits to Carroll and Barat—entities Relators admit in Case No. 20-2071 had functionally the same ownership structure and relationship to U.S. Cellular as King Street had.  *See* SAC, Case No. 20-2071, ECF No. 118, ¶¶17, 28–32.

was "limited to a single contract in a single state," and although the prior complaint "did not give the government notice of *all* potential instances of pass-through fraud" it nevertheless "provided the government *sufficient notice of that scheme* such that further investigation likely would have revealed similar instances of fraud." *Id.* at *9 (second emphasis added).[11]

*Smith*'s reasoning is persuasive and should be followed here. Just as in *Smith*, the 2008 Complaint could have—and did—put the government on the trail of the alleged fraud. The 2008 Complaint placed each of the X + Y = Z into the public domain. *See Springfield Terminal*, 14 F.3d at 654. And while the 2008 Complaint "did not give the government notice of *all* potential instances of [] fraud," *Smith*, 2022 WL 888188, at *9 (emphasis in original), just like in *Smith*, it nevertheless "provided the government *sufficient notice of that scheme* such that further investigation likely would have revealed similar instances of fraud." *Id.* (emphasis added). The 2008 Complaint—independently and also in conjunction with all other public filings—bars the Amended Complaint.

## B.    Relators Fail To Plead Core FCA Elements.

The public disclosure bar alone compels dismissal of this case. Even if Relators could overcome it, dismissal would be warranted because the Amended Complaint also fails to plausibly allege multiple core FCA elements with particularity as to the King Street Defendants, including

---

[11] The well-reasoned decision in *Smith* is one of the latest in a long line of cases applying the public disclosure bar based on prior complaints. *See, e.g.*, *Holloway*, 960 F.3d at 851 (applying public disclosure bar where "Holloway's allegations are substantially the same as those made in the South Carolina complaints"); *United States ex rel. Estate of Cunningham v. Millennium Labs. of Cal.*, 713 F.3d 662, 673 (1st Cir. 2013) (applying public disclosure bar where "the allegations in Relator's complaint and the California suit both concern fraudulent billing of confirmation tests when such tests were purportedly unnecessary, and they link that practice with Millennium's billing model which benefits Millennium and the physician defendants"); *cf. United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1174 (10th Cir. 2007) (Gorsuch, J.) (applying pre-2010 public disclosure bar where Relator alleged "fraudulent schemes, the substance of which [was] 'derived from' the claims of qui tam relators who have come before her").

Ms. DiNardo—namely: (1) presentment; (2) an obligation to pay in support of the reverse FCA claim or an overt act in support of the conspiracy claim; (3) scienter; and (4) materiality.  Rules 9(b) and 12(b)(6) therefore require dismissal as to the King Street Defendants.

### 1.    Relators Fail To Plead Presentment.

Relators bring FCA claims against the King Street Defendants—including an individual, Allison DiNardo, sued cavalierly and inexplicably in her personal capacity—even though the King Street Defendants received no licenses or bidding credits from the government in Auction 97.[12] But FCA liability cannot lie against an individual or entities that did not "present[], or caus[e] to be presented a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A). Likewise, "false statement" liability under § 3729(a)(1)(B) of the FCA similarly requires that a defendant have "ma[de], or use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim."  *Id.*  Rule 9(b) thus requires that a relator plead "details about the presentment, including when the false claims were presented *and who presented those claims*."  *United States ex rel. Cimino v. IBM*, 3 F.4th 412, 424 (D.C. Cir. 2021) (emphasis added); *see also Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 85 (D.D.C. 2014) (Brown Jackson, J.) ("Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b), which [include] . . . to protect reputations of . . . professionals from scurrilous and baseless allegations of fraud.") (internal quotations and citations omitted).

Here, Relators fail to plausibly allege presentment.  The Amended Complaint does not even allege that any of the King Street Defendants submitted any allegedly false "claim."  Nor could it:

---

[12] Relators voluntarily dismissed Mr. Vail—the control person in Advantage—from this case on March 25, 2020.  *See* ECF Nos. 59, 85.  The government consented to that dismissal, concluding that "such a dismissal is commensurate with the public interest."  ECF No. 82.  Accordingly, Ms. DiNardo remains the only natural person named as a defendant.

The King Street Defendants are not alleged to have bid in Auction 97 or to have signed any submission to the government, including the Short-Form Application or Long-Form Application to the FCC.  *See, e.g.*, Am. Compl. ¶ 77 (alleging "through Vail, Advantage Spectrum, L.P." submitted the Short-Form Application); *id.* ¶ 106 (alleging "Vail and U.S. Cellular filed and caused to be filed" Long-Form Application); *id.* ¶ 129 (alleging "U.S. Cellular and Advantage have filed and caused to be filed at least 21 Construction Notices").  Moreover, by the time the operative amended Long-Form Application was filed with and granted by the FCC, Ms. DiNardo had transferred her entire indirect, minority, and non-controlling interest in Advantage to Mr. Vail. *See* Liegel Decl., Ex. A (Stock Purchase Agreement); Liegel Decl., Ex. B (amending Advantage's Long-Form Application to reflect the Stock Purchase Agreement).  Relators' failure to plead presentment requires dismissal of the King Street Defendants from this action.

Nor does the Amended Complaint reach any King Street Defendant on the theory that they "cause[d]" violations of the False Claims Act.  31 U.S.C. §§ 3729(a)(1)(A), (B), (G).  As the D.C. Circuit has recognized, causation means "*actual cause* under the but-for standard."  *Cimino*, 3 F.4th at 421 (emphasis added).  Relators plead no facts establishing that the King Street Defendants were the but-for cause of any of Advantage's submissions for any claim for payment related to Auction 97.  Instead, Relators simply lump together the multiple defendants without particularized allegations of the King Street Defendants' role in the alleged fraud.

Relators try to put the King Street Defendants on the hook for Auction 97 in five ways, but every way is legally inadequate and grasping.

*First*, Relators allege that "Advantage's Auction 97 bidding was conducted from DiNardo's offices."  Am. Compl. ¶ 89.  But Relators do not allege that by allowing the bidding to be conducted from her offices, Ms. DiNardo made, or caused to be made, any statements in

Advantage's applications to the FCC.  Indeed, the publicly-disclosed Frequency LP Agreement explicitly provided that Ms. DiNardo, through Nonesuch, "*shall not*, except as otherwise provided in this Agreement, take part in . . . the conduct or control of the [Frequency] Partnership business, *nor shall* [Nonesuch] have any right or authority to act for or bind the Partnership."  Frequency LP Agreement § 8.1 (attached as Liegel Decl., Ex. M) (emphases added); *see also* Liegel Decl., Ex. C (Bidding Protocol Agreement) ¶ 3 (bids are to be submitted by Mr. Vail "at his discretion").

     *Second*, Relators allege that "[Stephen] Hinz, who was employed by King Street Wireless/DiNardo . . . was identified as an authorized bidder to conceal DiNardo's active role in the bidding decisions."  Am. Compl. ¶ 91.  But the FCC expressly permitted the "addition of authorized bidders" to an applicant's application and deemed such an amendment a "minor change" that did not affect DE eligibility.  *See Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for Nov. 13, 2014*, 29 FCC Rcd. 8386, 8417 (July 23, 2014) (stating that addition of authorized bidders qualified as a minor change); 47 C.F.R. § 1.2105(b)(2) (distinguishing between "minor amendments" and "[m]ajor amendments").  Moreover, Relators do not allege that Mr. Hinz actually took any action during the auction, let alone action that was a "but-for" cause of any submitted claim or application.  Indeed, Mr. Hinz does not appear as a signatory or decision-maker on any bids or other auction documents on the FCC Docket, *see generally* FCC Applic. File No. 0006457325; FCC ULS File No. 0006668843, much less on the Long-Form Application that formed the basis for the award of the spectrum licenses and bid credits.

     *Third*, Relators allege that Ms. DiNardo was "present for and participated in the bidding decisions."  Am. Compl. ¶ 92.  Ms. DiNardo's participation is unsurprising, given that she was one of three members of the Bidding Council, as publicly disclosed in the Bidding Protocol

Agreement.   Liegel Decl., Ex. C (Bidding Protocol Agreement) ¶ 2.   And Relators' vague allegation that Ms. DiNardo "participated" in bidding decisions falls well-short of alleging she was a "but-for" cause of any such decision.   Indeed, the Bidding Protocol Agreement permitted Ms. DiNardo to participate by "review[ing] the bids," but left the bidding decision to Mr. Vail "at his discretion."   *Id.* ¶ 3.

*Fourth*, Ms. DiNardo was no longer even an indirect limited partner in Advantage after she and Mr. Vail consummated the December 31, 2015 stock purchase agreement, pursuant to which she relinquished her entire minority ownership in Frequency and therefore her indirect interest in Advantage.   It is therefore impossible that Ms. DiNardo could have exercised any control over Advantage after that date, or caused Advantage to submit any claim to the government. Accordingly, Ms. DiNardo could not have been a "but-for" cause of six amendments of Advantage's Long-Form Application, the final version of the Long-Form Application that the FCC acted upon in granting the spectrum licenses and bidding credits, or the annual DE certifications and construction notices.   *See generally* FCC Applic. File No. 0006457325; FCC ULS File No. 0006668843.

*Finally*, Relators at times allege the involvement of King Street Defendants by lumping them together with another Defendant.   *See, e.g.*, Am. Compl. ¶ 94 ("Virtually all of the licenses Advantage won were identified and selected by U.S. Cellular/DiNardo . . . ."); *id.* ¶ 103 ("Advantage Spectrum and Frequency Advantage entered into numerous undisclosed agreements . . . with U.S. Cellular and DiNardo/King Street.").   Relators' "A/B" allegations fail to satisfy Rule 9(b)'s particularity requirement.   *See Scollick ex rel. United States v. Narula*, 14-cv-1339 (RCL), 2021 WL 737077, at *10 (D.D.C. Feb. 25, 2021) ("Alleging that Dr. Shobha Mehta *and/or* Dr. Nitin Mehta acted in some way is akin to alleging that either (1) Dr. Shobha Mehta acted, or (2)

Dr. Nitin Mehta acted, or (3) both doctors acted.  This "and/or" pleading does not identify, with particularity, the individuals involved.") (emphasis in original).

Altogether, Relators fail to plausibly allege that the King Street Defendants either submitted any claims in Auction 97, or were a "but-for" cause of any of the claims submitted in Auction 97.  Thus, Relators' claims against the King Street Defendants must be dismissed separate and apart from the public disclosure bar.

### 2.    Relators' Reverse False Claims And Conspiracy Claims Are Legally Defective.

Relators' so-called "reverse false claims" allegations fail for similar reasons.  Section 3729(a)(1)(G) of the False Claims Act requires the existence of an "*obligation* to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Here, Ms. DiNardo and the King Street entities were not awarded any licenses or bidding credits in Auction 97, so there is nothing they could be "obligat[ed] to pay or transmit" to the FCC.  *See Pencheng Si*, 71 F. Supp. 3d at 96 (Brown Jackson, J.) (dismissing reverse false claims allegations for failure to plead an "obligation" with particularity).  Indeed, Ms. DiNardo had no interest in Advantage at the time the FCC awarded the spectrum licenses and bidding credits.

Relators' conspiracy allegations as to the King Street Defendants also fail under Rule 9(b) because Relators make "no specific allegations of an agreement [to defraud the government] or the commission of an overt act."  *United States ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 68 (D.D.C. 2015).  Count One does not specify an overt act involving any King Street Defendant in furtherance of the alleged conspiracy.  The Amended Complaint lacks particularized allegations tying the King Street entities to any alleged conspiracy involving Advantage; at best, it alleges separate conspiracies both involving U.S. Cellular at the "hub."  *See United States v. Mathis*, 216 F.3d 18, 24 (D.C. Cir. 2000) ("Our caselaw, however, teaches that competing spoke

suppliers in a hub conspiracy must not only have a connection to the hub sellers but must also have *interdependence among each other* in order to form a rim and constitute a single conspiracy.") (emphasis added).  Relators cannot state an FCA conspiracy claim against the King Street Defendants given these gaping holes.

Moreover, Relators' conspiracy and reverse False Claims Act claims also must be dismissed because there is no underlying FCA violation.  Conspiracy liability requires a relator to "establish an underlying FCA violation," which Relators here have failed to do.  *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019); *see also United States ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407, 413 (4th Cir. 2010).

### 3.    Relators Cannot Establish Scienter.

FCA liability hinges on the existence of a falsehood that is committed knowingly.  *See* 31 U.S.C. §§ 3729(a)(1)(A), (B), (D), (G); *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 n.2 (2016).  The FCA defines "knowingly" to mean that a defendant "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  Mere negligence is insufficient for alleging scienter under the FCA.  *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F. Supp. 2d 272, 277 (D.D.C. 2004).  Relators cannot satisfy this "rigorous" FCA scienter requirement, *Escobar*, 579 U.S. at 192, as a matter of law for two reasons.

*First*, the Amended Complaint contains no particular allegations suggesting that the King Street Defendants even *knew* the contents of the claims Advantage submitted to the FCC in connection with Auction 97.  Just as Relators fail to plead that Ms. DiNardo "presented" any claim for payment, *see supra* at 28, Relators also do not allege that Ms. DiNardo reviewed Advantage's applications or other submissions made to the FCC.  *See, e.g.*, Am. Compl. ¶ 77 (no allegation that

King Street Defendants reviewed Advantage's Short-Form Application); *id.* ¶ 106 (no allegation that King Street Defendants reviewed Advantage's Long-Form Application); *id.* ¶ 129 (no allegation that King Street Defendants reviewed Advantage's Construction Notices).  Without knowing what the submissions said, the King Street Defendants could not have known, deliberately ignored, or recklessly disregarded that the submissions were false.  Relators fail to "identify individuals allegedly involved in the fraud," and thus fail to satisfy Rule 9(b).  *United States ex rel. Williams v. Martin Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004).

*Second,* Relators cannot plead scienter because they cannot allege that Defendants adopted an "objectively unreasonable" interpretation of an unambiguous rule that the FCC "warned [them] away" from.  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69, 70 (2007).  As the D.C. Circuit has repeatedly recognized, the FCA cannot "penaliz[e] a private party for violating a rule without first providing adequate notice of the substance of the rule."  *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015).  "Strict enforcement of the FCA's knowledge requirement" is necessary to avoid such affronts to due process.  *Id.*; *see also United States v. Sci. Applics. Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) ("Congress clearly had no intention to turn the FCA . . . into a vehicle for . . . punishing honest mistakes or incorrect claims submitted through mere negligence.") (internal quotations and citation omitted).

The Amended Complaint itself recognizes the ambiguous, fact-sensitive nature of applying the DE rules here.  *See, e.g.*, Am. Compl. ¶ 45 ("Affiliations arise under various circumstances . . . ."); *id.* ¶ 46 ("The determination whether an entity is a joint venture rests on the facts of the business operation . . . .").  As the D.C. Circuit has recognized, the FCC's DE program is governed by a vast array of complex and ambiguous rules.  *See Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994) (criticizing *de facto* control test as a "meaningless recitation" of words

34

enabling the FCC to "find compliance or noncompliance . . . arbitrarily"); *see also SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1044 (D.C. Cir. 2017) ("[T]here was considerable uncertainty at the time of Auction 97 about the degree of control [the FCC's DE] rules would tolerate.").

Relators make no allegation that Defendants' interpretation was "objectively unreasonable" in light of "necessary 'authoritative guidance.'" *Purcell*, 807 F.3d at 289.  There is no allegation that the FCC ever conveyed to any of the Defendants that their interpretation of the DE regulations was faulty.  To the contrary, far from "warning away" the King Street Defendants, the FCC ***granted*** King Street DE bidding credits after investigating the substantially similar allegations in the 2008 Complaint, and after requesting and reviewing King Street's response to those allegations.  Specifically, the FCC asked King Street to respond to allegations that it was a "sham entit[y] created solely to facilitate the acquisition of telecommunications licenses at substantial discounts to which the TDS Group and its affiliates were otherwise not entitled."  Letter from R. Noel to T. Guttierez, 24 FCC Rcd. at 4528 (quoting 2008 Complaint at ¶ 3).  In a response letter, King Street rebutted those allegations by submitting evidence of Ms. DiNardo's control over King Street, including her responsibilities of assessing "primary auction parameters," "r[unning] and control[ing] the bidding for all of the Licenses," and "negotiat[ing] with Commission staff numerous changes to the organizational and funding documents associated with the licenses."  Liegel Decl., Ex. L (Resp. to Bureau Inquiry (Redacted)) at 18–19.  After reviewing King Street's response, and the numerous declarations and exhibits attached thereto, *see id.* at 30–31, the FCC granted the licenses and bidding credits to King Street.

Moreover, the Amended Complaint alleges that "[s]ince at least 2002 . . . entities [owned by Ms. DiNardo and associated or formed in partnership with U.S. Cellular] have ceded control

. . . of their spectrum to U.S. Cellular, which has used their licenses to expand its network and provide service to its customers." Am. Compl. ¶ 68.  Given the FCC's consistent award of licenses and DE bidding credits to other DEs associated with Ms. DiNardo—including before and after a DOJ and FCC review of its practice following the filing of a *qui tam* complaint in 2008—the King Street Defendants, on the alleged facts of this case, had no reason to doubt the propriety of Advantage arrangements and thus could not have acted with FCA scienter.[13]

Relators cannot plead scienter when they failed to plead facts showing that a defendant's interpretation of a complex regulatory regime was "objectively unreasonable." *Safeco*, 551 U.S. at 69; *see also United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340, 350 (4th Cir. 2022) ("It is profoundly troubling to impose such massive liability on individuals or companies without any proper notice as to what is required.  *Safeco* avoids this trouble . . . ."), *re-hr'g en banc granted*.  No such allegations appear here.  To the contrary, the Amended Complaint makes clear that the King Street Defendants had every reason to believe that their arrangements were entirely appropriate.  Relators' dispute is not aimed at the King Street Defendants' submission of a false or fraudulent claim, but is rather aimed at the DE regulatory regime itself.  To the extent Relators wish to challenge that regime, they are free to petition the FCC; but their regulatory challenge does

---

[13] The FCC also scrutinized, ***and expressly approved***, substantially similar DE arrangements involving U.S. Cellular in 2002.  *In re Minnesota PCS, L.P.*, 17 FCC Rcd. 126 (Jan. 2, 2002).  In *Minnesota PCS*, the FCC specifically rejected allegations that a DE had "confer[red] *de facto* control [over its licenses] on [U.S. Cellular]."  *Id.* at 131 (¶ 12).  The FCC determined that contractual provisions such as "[the DE's] put rights, [U.S. Cellular's] right of first refusal and [U.S. Cellular's] right to veto extraordinary expenditure" were "[t]he types of provisions . . . contemplated by the Commission when formulating the applicable rules," and thus did not raise concerns regarding *de facto* control.  *Id.*  The FCC also held that allegations that "[the DE] is a venture capitalist with no 'hands on' operation experience . . . is sheer speculation."  *Id.* at 131–32 (¶ 13).  This mirrors Relators' allegations that Mr. Vail "had no prior involvement or experience in spectrum auctions."  Am. Compl. ¶ 90.  The FCC's approval of these similar DE arrangements, also involving U.S. Cellular, shows that the Defendants could not have acted with scienter as a matter of law.

not sustain an FCA claim.

> **4.** **The FCA's Rigorous Materiality Standard Dooms Relators' Claims.**

The Supreme Court has explained that a misrepresentation about compliance with a regulatory requirement, by itself, is insufficient for FCA liability.  Instead, the requirement "must be material to the Government's payment decision in order to be actionable under the False Claims Act."  *Escobar*, 579 U.S. at 192.  This "rigorous" materiality standard is one that courts must enforce "strict[ly]," *id.*, including at the pleadings stage, *id.* at 195 n.6; *see also id.* at 194 ("The materiality standard is demanding.").

In *Escobar*, the Supreme Court held that when "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."  *Id.* at 195.  That principle controls this case because the FCC had actual knowledge about Relators' specific allegations before it awarded bidding credits and spectrum licenses to Advantage in Auction 97.  The FCC finally granted Advantage's Long-Form Application—thereby awarding its licenses and bidding credits—in July 2016—**over a year after Relators filed this lawsuit**, and nearly two years after Auction 97 commenced.  The government was fully aware of Relators' allegations of fraud well before it awarded the spectrum licenses and bidding credits to Advantage.

As the D.C. Circuit has explained, courts "have the benefit of hindsight and should not ignore what actually occurred" when the government learned of a claim's purported falsity.  *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017).  In *McBride*, the applicable government agency, the Defense Contract Audit Agency, investigated the relator's allegations that a government contractor had overbilled the government.  *Id.*  The government continued to give the contractor "an award fee for exceptional performance" under the contract "even after the Government learned of [relator's] allegations."  *Id.*  The D.C. Circuit concluded

that the government's decision to keep paying the contractor in the face of the relator's claims was "very strong evidence" that the contractor's allegedly fraudulent conduct was "not material." *Id.* (internal quotation marks omitted).  The same is true here.

By contrast, the FCC decided two other bidders in Auction 97 were *de facto* controlled by a large business (DISH) and therefore were not entitled to DE bidding credits.  *See SNR Wireless*, 868 F.3d at 1028.  The FCC reviewed Advantage's applications in the same auction and concluded that Advantage, unlike the DISH-related entities, *was* entitled to the DE bidding credits it received. FCC Public Notice, DA 15-503 (Aug. 29, 2015).  The FCC's completely different treatment of Advantage and the DISH-related entities is compelling confirmation that Relators' allegations against Advantage were not infractions in the eyes of the FCC.

This completely different treatment also shows why Relators' allegations of materiality are different from those that the D.C. Circuit recently addressed in *Vermont National Telephone Company v. Northstar Wireless*, 34 F.4th 29 (D.C. Cir. 2022).  In *Vermont National* (unlike here) the FCC **denied** defendants' application for DE bidding credits.  As a result, the *Vermont National* defendants argued that the alleged misrepresentations were immaterial because they "would not have changed the Commission's ultimate decision to deny bidding credits because the Commission found [defendants] ineligible for credits *even without*" considering the alleged misrepresentations. *Id.* at 37 (emphasis added).  The D.C. Circuit rejected this argument, concluding the alleged misrepresentations had the "*potential to* affect the Commission's eligibility determination," even if the FCC's decision had other bases.  *Id.* (emphasis added).

Here, in contrast, the core misrepresentations that Relators allege **were in fact disclosed to the FCC** in the 2008 Complaint.  The FCC was aware of that alleged noncompliance, considered and independently investigated those allegations, and then actually decided to grant King Street

DE bidding credits.  And the FCC continued to grant other licenses to other DEs under similar circumstances, including the other DEs named in the 2008 Complaint and Advantage in this case. Because "materiality 'look[s] to the effect on the likely *or actual behavior* of the recipient of the alleged misrepresentation,'" *Escobar*, 579 U.S. at 193 (emphasis added), the misrepresentations alleged here—which were all known to the government—did not have the "potential to affect" the FCC's decision making (and they did not actually affect it either).  This defeats materiality.

### C.     Dismissal Should Be With Prejudice.

Dismissal of a complaint with prejudice is appropriate where the complaint fails to state a claim and amendment would be futile.  *Corporate Sys. Res. v. WMATA*, 31 F. Supp. 3d 124, 135 (D.D.C. 2014).  Amendment may be deemed futile if an amended complaint "would not survive a motion to dismiss."  *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) (citation and internal quotation marks omitted).

Here, Relators amendments show that they cannot overcome the public disclosure bar.  The disclosures made through public FCC filings, the inherently public nature of the 2008 Complaint, and the King Street Defendants' distance from Auction 97, will not change.  Nothing Relators can plead in a second amended complaint will change the fact that the FCC considered ***the very facts*** at the center of Relators' case, and the agency nonetheless granted bidding credits and spectrum licenses to Advantage.

District courts in this Circuit routinely deny leave to amend where, as here, the public disclosure bar applies.  *See, e.g., Smith*, 2022 WL 888188, at *14; *Scott*, 2020 WL 224504, at *12. Even if Relators *could* supply "additional incriminating information" (despite having already been provided the opportunity to do so), none of Relators' potential amendments could change "whether the quantum of information *already in the public sphere* was sufficient to set government investigators on the trail of fraud."  *Smith*, 2022 WL 888188, at *8 (quoting *Staples*, 773 F.3d at

87) (emphasis added).  Merely removing references to publicly filings in a pleading, as Relators have done here, does not remove that information from the public sphere.

Even when they are meritless, these lawsuits take a toll on private individuals named as defendants.  The interests of justice now compel dismissal with prejudice for the King Street Defendants.

## V.   CONCLUSION

This Court granted leave to amend because Relators said they could allege "more information showing 'in great detail' the degree to which U.S. Cellular actually controlled Advantage through King Street, L.P."  Mem. Op. at 13.  Relators have not come close to doing so. As in the original complaint, the essential allegations in the Amended Complaint were publicly available years before Relators filed this action.  The public disclosure bar squarely applies here and compels dismissal of Relators' claims.  Even if the bar did not apply, Relators also cannot plausibly allege numerous FCA elements, or satisfy Rule 9(b)'s stringent pleading requirements. The Court should dismiss the Amended Complaint—this time with prejudice.

Dated: June 13, 2022

By: */s/ Andrew S. Tulumello*

Andrew S. Tulumello, DC Bar No. 468351
Chantale Fiebig, DC Bar No. 487671
**WEIL, GOTSHAL & MANGES LLP**
2001 M Street, N.W.
Washington, DC 20036
Telephone: (202) 682-7100
Facsimile: (202) 857-0940
drew.tulumello@weil.com
chantale.fiebig@weil.com

*Attorneys for Defendants King Street*
*Wireless, L.P., King Street Wireless, Inc.,*
*and Allison Cryor DiNardo*

41