# EXHIBIT A

**STOCK PURCHASE AGREEMENT**

**Dated as of December 31, 2015**

**Between**

**Allison Cryor DiNardo**

**and**

**Will Vail**

ARTICLE I DEFINITIONS AND INTERPRETATION.................................................................1

    1.1.   Definitions ...................................................................................................................1

ARTICLE II PURCHASE AND SALE OF SHARES; PURCHASE PRICE .................................3

    2.1.   Purchase and Sale of Shares ......................................................................................3
    2.2.   Purchase Price ............................................................................................................3
    2.3.   Cash at Closing ..........................................................................................................3

ARTICLE III CLOSING ...............................................................................................................3

    3.1.   Closing Date ...............................................................................................................3
    3.2.   Seller's Deliveries......................................................................................................3
    3.3.   Buyer's Deliveries .....................................................................................................4

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ...................................4

    4.1.   Authority of Seller .....................................................................................................4
    4.2.   Organization and Capital Structure of the Company..................................................5
    4.3.   Employees, Subsidiaries and Investments .................................................................5
    4.4.   Operation of Business.................................................................................................6
    4.5.   Taxes ..........................................................................................................................6
    4.6.   Governmental Permits................................................................................................6
    4.7.   No Violation, Litigation or Regulatory Action..........................................................6
    4.8.   Bank Accounts; Powers of Attorney; Minute Books .................................................6
    4.9.   No Finder ...................................................................................................................7
    4.10.  Disclosure ..................................................................................................................7
    4.11.  Litigation ...................................................................................................................7

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER......................................7

    5.1.   Authority of Buyer .....................................................................................................7
    5.2.   No Finder ...................................................................................................................8
    5.3.   Investment Representation .........................................................................................8
    5.4.   Litigation....................................................................................................................8
    5.5.   Disclosure ..................................................................................................................8

ARTICLE VI ACTION PRIOR TO THE CLOSING DATE ........................................................8

    6.1.   Preserve Accuracy of Representations and Warranties ..............................................8
    6.2.   Consents of Third Parties; Governmental Approvals.................................................8
    6.3.   Notification of Certain Matters...................................................................................9
    6.4.   Access to Records after Closing ................................................................................9
    6.5.   Confidential Nature of Information ..........................................................................10
    6.6.   No Public Announcement.........................................................................................10
    6.7.   Expenses ..................................................................................................................10
    6.8.   Further Assurances ...................................................................................................10

6.9. Conditions to Buyer's Obligations ................................................................10
6.10. Conditions to Seller's Obligations ...............................................................11

ARTICLE VII TAX MATTERS .......................................................................................12
7.1. Liability for Taxes ........................................................................................12
7.2. Tax Returns...................................................................................................12
7.3. Contest Provisions ........................................................................................13
7.4. Assistance and Cooperation .........................................................................13
7.5. Survival of Obligations.................................................................................14
7.6. Section 338(h)(10) Election ..........................................................................14

ARTICLE VIII INDEMNIFICATION...............................................................................14
8.1. Indemnification by Seller .............................................................................14
8.2. Indemnification by Buyer .............................................................................15
8.3. Notice of Claims ...........................................................................................15
8.4. Third Person Claims .....................................................................................16

ARTICLE IX TERMINATION .........................................................................................17
9.1. Termination...................................................................................................17
9.2. Notice of Termination ..................................................................................18
9.3. Effect of Termination ...................................................................................18

ARTICLE X GENERAL PROVISIONS ...........................................................................18
10.1. Survival of Obligations.................................................................................18
10.2. Notices ..........................................................................................................18
10.3. Successors and Assigns .................................................................................19
10.4. Entire Agreement; Amendments ..................................................................20
10.5. Waivers ..........................................................................................................20
10.6. Partial Invalidity ...........................................................................................20
10.7. Execution in Counterparts ............................................................................20
10.8. Governing Law ..............................................................................................20
10.9. Submission to Jurisdiction ............................................................................21

# STOCK PURCHASE AGREEMENT

**STOCK PURCHASE AGREEMENT** (the "Agreement"), dated as of December 31, 2015, is between Will Vail, a resident of Florida ("Buyer"), and Allison Cryor DiNardo, a resident of Virginia ("Seller").

## PRELIMINARY STATEMENT

Seller is the owner, beneficially and of record, of all of the issued and outstanding capital stock of Nonesuch, Inc., a Delaware corporation (the "Company"). Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of the capital stock of the Company on the terms and subject to the conditions set forth herein.

Accordingly, in consideration of the mutual agreements hereinafter set forth, Buyer and Seller agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

1.1.   Definitions.  In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person; provided that the Company shall not be deemed an Affiliate of Seller.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company Group**" means any "affiliated group" (as defined in Section 1504(a) of the Code without regard to the limitations contained in Section 1504(b) of the Code) that, at any time on or before the Closing Date, includes or has included the Company or any predecessor of or successor to the Company (or another such predecessor or successor), or any other group of corporations that, at any time on or before the Closing Date, files or has filed Tax Returns on a combined, consolidated or unitary basis with the Company or any predecessor of or successor to the Company (or another such predecessor or successor).

"**Court Order**" means any judgment, order, award or decree of any foreign, federal, state, local or other court or tribunal and any award in any arbitration proceeding.

"**Encumbrance**" means any lien (statutory or other), claim, charge, security interest, mortgage, deed of trust, pledge, hypothecation, assignment, conditional sale or other title retention agreement, preference, priority or other security agreement or preferential arrangement of any kind or nature, and any easement, encroachment, covenant, restriction, right of way, defect in title or other encumbrance of any kind.

"**Expense**" means any and all expenses incurred in connection with investigating, defending or asserting any claim, action, suit or proceeding incident to any matter indemnified

1

against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, consultants, accountants and other professionals).

"**FCC**" means the Federal Communications Commission.

"**Governmental Body**" means any foreign, federal, state, local or other governmental authority or regulatory body.

"**IRS**" means the Internal Revenue Service.

"**Losses**" means any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, expenses, deficiencies or other charges.

"**Permitted Encumbrances**" means:  liens for taxes not yet due or paid and for other governmental charges and assessments arising in the ordinary course of business which are not yet due and payable.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or Governmental Body.

"**Requirements of Laws**" means any foreign, federal, state and local laws, statutes, regulations, rules, codes or ordinances enacted, adopted, issued or promulgated by any Governmental Body (including those pertaining to electrical, building, zoning, subdivision, land use, environmental and occupational safety and health requirements) or common law.

"**Shares**" means all of the issued and outstanding shares of capital stock of the Company.

"**Subsidiaries**" means any corporation, partnership, limited liability company, joint venture or other entity in which the Company (a) owns, or at any relevant time owned, directly or indirectly, 50% or more of the outstanding voting securities or equity interests or (b) is a general partner.

"**Tax**" (and, with correlative meaning, "Taxes" and "Taxable") means:

1.       any federal, state, local or foreign net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, payroll, withholding, alternative or add-on minimum, ad valorem, value-added, transfer, stamp, or environmental tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, addition to tax or additional amount imposed by any governmental authority; and

2.       any liability of the Company for the payment of amounts with respect to payments of a type described in clause (1) as a result of being a member of an affiliated, consolidated, combined or unitary group, or as a result of any obligation of the Company under any Tax Sharing Arrangement or Tax indemnity arrangement.

2

**"Tax Return"** means any return, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including, without limitation, any information return, claim for refund, amended return or declaration of estimated Tax.

**"Tax Sharing Arrangement"** means any written or unwritten agreement or arrangement for the allocation or payment of Tax liabilities or payment for Tax benefits with respect to a consolidated, combined or unitary Tax Return which Tax Return includes the Company.

## ARTICLE II

## PURCHASE AND SALE OF SHARES; PURCHASE PRICE

2.1.    <u>Purchase and Sale of Shares</u>.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Seller, the Shares, free and clear of all Encumbrances (except for Permitted Encumbrances.

2.2.    <u>Purchase Price</u>.  The purchase price for the Shares (the "<u>Purchase Price</u>") shall be fifty-four thousand seven hundred fifty-one U.S. Dollars ($54,751).

2.3.    <u>Cash at Closing</u>.  On the Closing Date, by noon Eastern Standard Time, Buyer agrees to pay to Seller the Purchase Price by wire transfer of immediately available funds to an account designated by Seller.

## ARTICLE III

## CLOSING

3.1.    <u>Closing Date</u>.  The Closing shall take place upon execution of this Agreement and the satisfaction or waiver of all conditions precedent to Closing set forth in this Agreement or such later date as may be mutually agreed upon by Buyer and Seller after the conditions set forth in this Agreement have been satisfied, at 10:00 a.m. local time at the offices of Lukas, Nace, Gutierrez and Sachs, Chartered, or at such other place or at such other time as shall be agreed upon by Buyer and Seller.  The closing shall become effective as of 12 o'clock midnight on the closing date.  The time and date on which the Closing is actually held are sometimes referred to herein as the "<u>Closing Date</u>."

3.2.    <u>Seller's Deliveries</u>.  At Closing Seller shall deliver to Buyer all of the following:

(a)    One or more certificates, or clean copies thereof, representing the Shares, duly endorsed for transfer to Buyer;

(b)    Copies of the Certificate of Incorporation of the Company certified as of a recent date by the Secretary of State of the State of Delaware;

(c)    Certificate of good standing of the Company issued as of a recent date by the Secretary of State of the State of Delaware;

3

(d)    Certificate of Seller, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, as to no amendments to the (i) Certificate of Incorporation of the Company since the date of the certification by the Secretary of State; or (ii) the by-laws of the Company;

(e)    All consents, waivers or approvals obtained by Seller, the Company or the Partnership with respect to the consummation of the transactions contemplated by this Agreement except for any consent, waiver or approval required from Buyer or any affiliate of Buyer, all of which are hereby granted; and

(f)    A signed resignation by each of the directors and officers of the Company.

3.3.    <u>Buyer's Deliveries</u>.

(a)    The Purchase Price.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, Seller represents and warrants to Buyer and agrees as follows:

4.1.    <u>Authority of Seller</u>.

(a)    Seller has full power and authority to execute, deliver and perform this Agreement.  This Agreement has been duly executed and delivered by Seller and is the legal, valid and binding obligation of Seller enforceable in accordance with its terms.

(b)    Neither the execution nor delivery of this Agreement nor the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

    (i)    conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any of the assets or properties of Seller or the Company, under (1) the charter or By-laws of the Company, (2) any note, instrument, agreement, mortgage, lease, license, franchise, permit or other authorization, right, restriction or obligation to which Seller or the Company is a party or any of the respective assets or properties of Seller or the Company is subject or by which Seller or the Company is bound, (3) any Court Order to which Seller or the Company is a party or any of the respective assets or properties of Seller or the Company is subject or by which Seller or the Company is bound, or (4) any Requirements of Laws affecting Seller, the Company or their respective assets or properties, provided, however, that where any such obligations or limitations have been formally waived, they shall not constitute a conflict; or

4

   (ii)  require the approval, consent, authorization or act of, or the making by Seller or the Company of any declaration, filing or registration with, any Person.

  4.2. Organization and Capital Structure of the Company.

  (a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and Virginia and is a valid S-Corporation under the Code. No other jurisdiction has demanded, requested or otherwise indicated that the Company is required to so qualify. The Company has full power and authority to own or lease and to operate and use its properties and assets and to carry on its business as now conducted.

  (b)  The authorized capital stock of the Company consists solely of 1,000 shares of Common Stock, par value $.01 per share, of which 1,000 shares are issued and outstanding and all of which have been issued to Seller ("Company Common Stock"). Except for this Agreement, there are no agreements, arrangements, options, warrants, calls, rights or commitments of any character that provide for the issuance, sale, purchase or redemption of any shares of capital stock of the Company or to the partnership interests held by the Company. No holder of Company Common Stock has any preemptive, stock purchase or other rights to acquire Company Common Stock or to the partnership interests held by the Company.

  (c)  All of the outstanding shares of the Company Common Stock are validly issued, fully paid and nonassessable and were not issued in violation of any preemptive or similar rights. Seller is the record and beneficial owner of all of the shares of Company Common Stock, and the Company is the record and beneficial owner of the 49% limited partner interest in the partnership, which interest is owned free and clear of all Encumbrances of any kind, except Permitted Encumbrances. All of such shares of Company Common Stock are so owned free from all Encumbrances of any kind, except the Permitted Encumbrances; however, on the Closing Date, such shares of the Company Common Stock shall be owned free from all Encumbrances.

  (d)  True and complete copies of the certificate or articles of incorporation and all amendments thereto, of the By-laws, as amended to date, and of the stock ledger, have been delivered to Buyer or shall be delivered promptly upon request.

  4.3. Employees, Subsidiaries and Investments.

  Since its incorporation, (i) the sole purpose of the Company has been to own a 49% limited partner interest (the "Partnership Interest") in Frequency Advantage, L.P. (the "Partnership") which in turn owns a 10% limited partner interest in Advantage Spectrum, L.P., a participant in the FCC's Auction No. 97; and (ii) the Company has never had any employees. The Company has no Subsidiaries. The Company does not (and will not) have any amounts due, or other liabilities or obligations, to any third party. Other than the Partnership Interest, the Company does not, directly or indirectly, own, of record or beneficially, any outstanding voting securities or other equity interests in or control any corporation, limited liability company, partnership, trust, joint venture or other entity nor has it engaged in any other business.

4.4.   Operation of Business

(a)   Neither the Company nor the Partnership is indebted to or otherwise obligated to any third party with respect to the ownership of any asset or the operation of the business of the Partnership, except for:

(i)   amounts owed to United States Cellular Corporation by the Partnership under the promissory note dated September 19, 2014 in the amount of $1,200,000 plus accrued interest (the "Partnership Note"); and

(ii)   Taxes, as described in Section 4.5.

4.5.   Taxes.  Except to the extent that the Company is necessarily relying in part on tax filings prepared by the Partnership and could therefore include immaterial errors of which the Company could not discover in the exercise of due diligence (i) the Company has filed all Tax Returns required to have been required to have been filed; (ii) all such Tax Returns are complete and accurate and disclose all Taxes required to be paid by the Company for the periods covered thereby and all Taxes shown to be due on such Tax Returns have been timely paid; (iii) all Taxes (whether or not shown on any Tax Return) owed by the Company or any Company Group have been timely paid; (iv) none of the Company or any member of any Company Group has waived or been requested to waive any statute of limitations in respect of Taxes which waiver is currently in effect; (v) there is no action, suit, investigation, audit, claim or assessment pending or proposed or threatened with respect to Taxes of the Company or any Company Group and, no basis exists therefor; (vi) there are no liens for Taxes upon the assets of the Company, except liens relating to current Taxes not yet due; (vii) all Taxes which the Company or any Company Group are required by law to withhold or to collect for payment have been duly withheld and collected, and have been paid or accrued, reserved against and entered on the books of the Company.

4.6.   Governmental Permits.  The Partnership owns, holds or possesses all licenses, franchises, permits, privileges, immunities, approvals and other authorizations from a Governmental Body which are necessary to entitle it to own or lease, operate and use its assets and to carry on and conduct its business substantially as currently conducted (herein collectively called "Governmental Permits".

4.7.   No Violation, Litigation or Regulatory Action.

(i)   the Company has complied with all Requirements of Laws and Court Orders which are applicable to its assets or business; and

(ii)   there are no lawsuits, claims, suits, proceedings or investigations pending or, to Seller's knowledge threatened, against or affecting the Company nor is there any basis for any of the same, and there are no lawsuits, suits or proceedings pending in which the Company is the plaintiff or claimant.

4.8.   Bank Accounts; Powers of Attorney; Minute Books.

(a)   There are no active bank accounts or safe deposit boxes of the Company.

6

(b)      True and complete copies of the minute books of the Company have been provided to the Buyer for review or will be delivered to Buyer upon request.  To Seller's knowledge, such minute book contains true and complete records of all meetings and other corporate action taken by the Board of Directors and stockholders of the Company.

4.9.   <u>No Finder</u>.  Neither Seller nor any Person acting on her behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

4.10.   <u>Disclosure</u>.  None of the representations or warranties of Seller contained herein, and none of the other information or documents furnished to Buyer or any of its representatives by Seller or its representatives pursuant to the terms of this Agreement, is false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements herein or therein not misleading in any material respect.  There is no fact which adversely affects or in the future is likely to adversely affect the Company or its business in any material respect which has not been set forth or referred to in this Agreement or the Schedules hereto.

4.11.   <u>Litigation</u>.  There are no lawsuits, claims, proceedings or investigations pending or threatened against or affecting Seller or the Company that would impact upon Seller's ability to consummate the transaction contemplated herein, nor is there any basis for any of the same.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer hereby represents and warrants to Seller and agrees as follows:

5.1.   <u>Authority of Buyer</u>.

(a)      Buyer has full power and authority to execute, deliver and perform this Agreement.  This Agreement has been duly executed and delivered by Buyer and is the legal, valid and binding obligation of Buyer enforceable in accordance with its terms.

(b)      Neither the execution nor delivery of this Agreement nor the consummation of any of the transactions contemplated hereby and compliance with or fulfillment of the terms, conditions and provisions hereof will:

(i)      conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under (1) any material note, instrument, agreement, mortgage, lease, license, franchise, permit or other authorization, right, restriction or obligation to which Buyer is a party or any of its properties is subject or by which Buyer is bound, (2) any Court Order to which Buyer is a party or by which it is bound or (3) any Requirements of Laws affecting Buyer; or

7

(ii)    require the approval, consent, authorization or act of, or the making by Buyer of any declaration, filing or registration with, any Person other than the FCC.

5.2.    <u>No Finder</u>.  Neither Buyer nor any Person acting on his behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

5.3.    <u>Investment Representation</u>.  The Shares are being acquired by Buyer for his own account for investment, and not with a view to the sale or distribution of any part thereof without registration under the Securities Act of 1933 or pursuant to an applicable exemption therefrom.

5.4.    <u>Litigation.</u>  There are no lawsuits, claims, proceedings or investigations pending or threatened against or affecting Buyer that would impact upon Buyer's ability to consummate the transaction contemplated herein, nor is there any basis for any of the same.

5.5.    <u>Disclosure.</u>  None of the representations or warranties of Buyer contained herein, and none of the other information or documents furnished to Seller or any of its representatives by Buyer pursuant to the terms of this Agreement, is, to Buyer's Knowledge, and to the extent that any exceptions from such would not have a material adverse effect, false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements herein or therein not misleading in any material respect. There is no fact which adversely affects or in the future is likely to adversely affect the transaction contemplated herein in any material respect which is known to Buyer and has not been set forth or referred to in this Agreement or the Schedules hereto.

ARTICLE VI

ACTION PRIOR TO THE CLOSING DATE

The respective parties hereto covenant and agree to take the following actions between the date hereof and the Closing Date:

6.1.    <u>Preserve Accuracy of Representations and Warranties</u>.  Each of the parties hereto shall refrain from taking, or failing to take, any action which would render any representation or warranty contained in <u>Article IV</u> or <u>V</u> of this Agreement inaccurate as of the Closing Date.  Each party shall promptly notify the other of any action, suit or proceeding that shall be instituted or threatened against such party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.  Each party shall promptly notify the other of any matter that would cause any representation or warranty contained in <u>Article IV</u> or <u>V</u> to be untrue in any material respect.

6.2.    <u>Consents of Third Parties; Governmental Approvals</u>.

(a)    Each of the parties hereto will act diligently and reasonably to secure, before the Closing Date, the consent, approval or waiver, in form and substance reasonably satisfactory to the other party, from any party to any Partnership Agreement required to be obtained to permit the consummation of the transactions contemplated by this Agreement or to otherwise satisfy the

8

conditions set forth in this Article VI; provided that (i) neither Seller, the Company, the Partnership nor Buyer shall have any obligation to offer or pay any consideration in order to obtain any such consents or approvals; and (ii) neither Seller nor the Company shall make or permit the Partnership to make any agreement or understanding affecting the assets or business of the Company or the Partnership as a condition for obtaining any such consents or waivers except with the prior written consent of Buyer.  During the period prior to the Closing Date, Buyer shall act diligently and reasonably to cooperate with Seller and the Company to obtain the consents, approvals and waivers contemplated by this Section 6.2(a).

(b)     During the period prior to the Closing Date, Seller and Buyer shall (and Seller shall cause the Company to) act diligently and reasonably, and shall cooperate with each other, in making any required filing or notification and in securing any consents and approvals of any Governmental Body required to be obtained by them in order to permit the consummation of the transactions contemplated by this Agreement, or to otherwise satisfy the conditions set forth in this Article VI; provided that neither Seller nor the Company shall make or permit the Partnership to make any agreement or understanding affecting the assets or business of the Company or the Partnership as a condition for obtaining any such consents or approvals except with the prior written consent of Buyer.

6.3.     Notification of Certain Matters.  During the period prior to the Closing Date, each party will promptly advise the other in writing of (i) any change in circumstances that would have a Material Adverse Effect upon the Company, the Partnership or the condition of its assets, properties or business, or the party's ability to consummate the transactions contemplated herein (ii) any notice or other communication from any third Person alleging that the consent of such third Person is or may be required in connection with the transactions contemplated by this Agreement, and (iii) any material default under any Partnership Agreement or event which, with notice or lapse of time or both, would become such a default on or prior to the Closing Date and of which either party has knowledge.

6.4.     Access to Records after Closing.

(a)     For a period of six years after the Closing Date, Seller and its representatives shall have reasonable access to all of the books and records of the Company and the Partnership to the extent that such access may reasonably be required by Seller in connection with matters relating to or affected by the operations of the Company or the Partnership prior to the Closing Date. Such access shall be afforded by Buyer upon receipt of reasonable advance notice and during normal business hours.  Seller shall be solely responsible for any costs or expenses incurred by it pursuant to this Section.  If Buyer shall desire to dispose of any of such books and records, after the close of the first year, but prior to the expiration of such six-year period, Buyer shall, prior to such disposition, give Seller a reasonable opportunity, at Seller's expense, to segregate and remove such books and records as Seller may select.

(b)     For a period of six years after the Closing Date, Buyer and its representatives shall have reasonable access to all of the books and records relating to the Company which Seller or any of its Affiliates may retain after the Closing Date.  Such access shall be afforded by Seller and its Affiliates upon receipt of reasonable advance notice and during normal business hours.

9

Buyer shall be solely responsible for any costs and expenses incurred by it pursuant to this Section. If Seller or any of its Affiliates shall desire to dispose of any of such books and records after the close of the first year, but prior to the expiration of such six-year period, Seller shall, prior to such disposition, give Buyer a reasonable opportunity, at Buyer's expense, to segregate and remove such books and records as Buyer may select.

6.5.     Confidential Nature of Information. Each party agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other party during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, each party will return to the other party all copies of nonpublic documents and materials which have been furnished in connection therewith. The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes lawfully available to such party from a source other than the furnishing party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents, (iii) is required to be disclosed under applicable law or judicial process, but only to the extent it must be disclosed, or (iv) such party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby.

6.6.     No Public Announcement. Neither Buyer nor Seller shall (nor shall Seller permit the Company to), without the approval of the other, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by law or the rules of any stock exchange or quotation system, in which case the other party shall be advised and the parties shall use their best efforts to cause a mutually agreeable release or announcement to be issued; provided that the foregoing shall not preclude communications or disclosures necessary to implement the provisions of this Agreement or to comply with the accounting and Securities and Exchange Commission disclosure obligations.

6.7.     Expenses. Each party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel and accountants.

6.8.     Further Assurances. From time to time following the Closing, Seller shall execute and deliver, or cause to be executed and delivered such other bills of sale, deeds, endorsements, assignments and other instruments of conveyance and transfer as Buyer, the Company or the Partnership may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, the Company any part of the assets or properties of the Company not in its possession on the Closing Date.

6.9.     Conditions to Buyer's Obligations.

The obligations of Buyer to purchase the Shares pursuant to this Agreement shall, at the option

10

of Buyer, be subject to the satisfaction, on or prior to the Closing Date, of the following conditions:

(a)     There shall have been no material breach by Seller in the performance of any of its covenants and agreements herein; each of the representations and warranties of Seller contained or referred to herein shall be true and correct on the Closing Date as though made on the Closing Date, except for changes therein specifically permitted by this Agreement and there shall have been delivered to Buyer a certificate to such effect, dated the Closing Date, signed by Seller, in addition to the other deliveries specified in Section 3.2.

(b)     Between the date hereof and the Closing Date, there shall have been (a) no material adverse change in the assets, business, operations, liabilities, profits, prospects or condition (financial or otherwise) of the Company or the Partnership; (b) no material adverse federal or state legislative or regulatory change affecting the Company or the Partnership or its business, products or services; and (c) no material damage to the assets or properties of the Partnership by fire, flood, casualty, act of God or the public enemy or other cause, regardless of insurance coverage for such damage; and there shall have been delivered to Buyer a certificate to such effect, dated the Closing Date and signed by Seller.

(c)     The parties shall have received all approvals and actions of or by all Governmental Bodies which are necessary to consummate the transactions contemplated hereby, which are otherwise required to be obtained prior to the Closing by applicable Requirements of Laws or which are necessary to prevent a material adverse change in the assets, business, operations, liabilities, profits, prospects or condition (financial or otherwise) of the Company or the Partnership.

(d)     The Partnership shall have received consents, in form and substance reasonably satisfactory to Buyer, to the transactions contemplated hereby from the other parties to all contracts, leases, agreements and permits to which the Partnership is a party or by which the Partnership or any of its assets or properties is affected or are otherwise necessary to prevent a material adverse change in the assets, business, operations, liabilities, profits, prospects or condition (financial or otherwise) of the Company.

6.10.   Conditions to Seller's Obligations.  The obligations of Seller to sell the Shares pursuant to this Agreement shall, at the option of Seller, be subject to the satisfaction, on or prior to the Closing Date, of the following conditions:

(a)     There shall have been no material breach by Buyer in the performance of any of its covenants and agreements herein; each of the representations and warranties of Buyer contained or referred to in this Agreement shall be true and correct on the Closing Date as though made on the Closing Date, except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Seller or any transaction contemplated by this Agreement; and there shall have been delivered to Seller a certificate to such effect, dated the Closing Date and signed on behalf of Buyer by the President or any Vice President of Buyer, in addition to the other deliveries specified in Section 3.3.

(b)     The parties shall have received all approvals and actions of or by all Governmental Bodies necessary to consummate the transactions contemplated hereby, which are required to be obtained prior to the Closing by applicable Requirements of Laws.

ARTICLE VII

TAX MATTERS

7.1.   Liability for Taxes.

(a)     Provided Seller's representations and warranties in Sections 4.3 and 4.4 are true, Buyer shall be liable for and pay, and pursuant to Article VIII shall indemnify Seller against, all Taxes imposed on the Company, or for which the Company may otherwise be liable, resulting solely from activities of the Partnership.

(b)     If Seller or any Affiliate thereof becomes entitled to a refund or credit of Taxes for which it is liable under paragraph (a) to indemnify Buyer, and such refund or credit is attributable to the carryback of losses, credits or similar items from a taxable year or period that begins after the Closing Date and is attributable to the Company, Seller shall promptly pay to Buyer the amount of such refund or credit actually received (or used to offset other tax obligations) together with any interest thereon.  In the event that any refund or credit of Taxes for which a payment has been made to Buyer is subsequently reduced or disallowed, Buyer shall indemnify and hold harmless the Seller for any Tax assessed against Seller by reason of the reduction or disallowance.

(c)     Seller and Buyer agree that no net operating loss or net capital loss carryovers of the Company shall be reattributed pursuant to Treas. Reg. § 1.1502-20(g) or any similar provision of state, local or foreign law.

7.2.   Tax Returns.  Buyer shall file or cause to be filed when due all Tax Returns that are required to be filed by or with respect to the Company for taxable years or periods ending after December 31, 2014; provided, however, Buyer shall remit (or cause to be remitted) any Taxes due in respect of such Tax Returns relating to periods after the Closing Date and, subject to Section 7.1(a), Buyer shall remit (or cause to be remitted) any Taxes due in respect of Tax Returns relating to periods ending on or before the Closing Date.  Seller or Buyer shall reimburse the other party the Taxes for which Seller or Buyer is liable pursuant to Section 7.1 but which are payable with any Tax Return to be filed by the other party pursuant to this Section 7.2 upon the written request of the party entitled to reimbursement setting forth in detail the computation of the amount owed by Seller or Buyer, as the case may be, but in no event earlier than 10 days prior to the due date for paying such Taxes.  All Tax Returns which Seller is required to file or cause to be filed in accordance with this Section 7.2 shall be prepared and filed in a manner consistent with past practice and, on such Tax Returns, no position shall be taken, elections made or method adopted that is inconsistent with positions taken, elections made or methods used in preparing and filing similar Tax Returns in prior periods (including, but not limited to, positions, elections or methods which would have the effect of deferring income to periods for which Buyer is liable under Section 7.1(b) or accelerating deductions to periods for which Seller is

liable under Section 7.1(a). Seller shall deliver copies of such Tax Returns to Buyer at least ten business days prior to filing such Tax Returns so as to provide Buyer an opportunity to review and comment on such Tax Return. Buyer shall cause to be prepared and filed all Tax Returns required to be filed by or with respect to the Partnership for taxable years ending on or after December 31, 2014; provided, however, that Seller shall be furnished with a copy of such Tax Return with respect to the taxable year ending on the Closing Date, at least ten business days before such return is to be filed so as to provide Seller an opportunity to review and comment on such Tax Return; and Seller shall, upon her reasonable concurrence with such return, sign such return and deliver it to Buyer for filing.

    7.3.   <u>Contest Provisions</u>.

    (a)   Buyer shall notify Seller in writing upon receipt by Buyer, any of its Affiliates or, after the Closing Date, the Company of notice of any pending or threatened federal, state, local or foreign Tax audits or assessments which may materially affect the Tax liabilities of the Company for which Seller would be required to indemnify Buyer pursuant to Section 7.1, provided that failure to comply with this provision shall not affect Buyer's right to indemnification hereunder except to the extent such failure materially impairs Seller's ability to contest any such Tax liabilities.

    (b)   Buyer shall have the sole right to represent the Company's interests in any Tax audit or administrative or court proceeding relating to taxable periods ending on or before the Closing Date, and to employ counsel of Buyer's choice at Buyer's expense. Nothing herein shall be construed to impose on Buyer or any Affiliate thereof any obligation to defend the Company in any Tax audit or administrative or court proceeding. Buyer shall have the sole right to defend the Company with respect to any issue arising with respect to any Tax audit or administrative or court proceeding relating to taxable periods ending on or before the Closing Date to the extent Buyer shall have agreed in writing to forego any indemnification under this Agreement with respect to such issue.

    7.4.   <u>Assistance and Cooperation</u>. After the Closing Date, each of Seller and Buyer shall (and cause their respective Affiliates to):

    (a)   timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Taxes described in Section 7.1(d) (relating to sales, transfer and similar Taxes);

    (b)   assist the other party in preparing any Tax Returns which such other party is responsible for preparing and filing in accordance with Section 7.2;

    (c)   cooperate fully in preparing for any audits of, or disputes with taxing authorities regarding, any Tax Returns of the Company;

    (d)   make available to the other and to any taxing authority as reasonably requested all information, records, and documents relating to Taxes of the Company; and

13

(e)      furnish the other with copies of all correspondence received from any taxing authority in connection with any Tax audit or information request with respect to any such taxable period.

7.5.    Survival of Obligations.  Notwithstanding anything to the contrary in this Agreement, and notwithstanding Article VIII of this Agreement, the obligations of the parties set forth in this Article VII shall be unconditional and absolute and shall remain in effect until the expiration of the applicable statute of limitations.

7.6.    Section 338(h)(10) Election.  At the request of Buyer, Seller and Buyer shall make a joint election for the Company under Section 338(h)(10) of the Code and under similar provisions of state or local law with respect to the purchase of the Shares contemplated by this Agreement (the "Section 338(h)(10) Election"); provided, however, that Seller may condition such obligation on Buyer reimbursing, indemnifying and holding harmless Seller for the increased Tax, if any, incurred by Seller as a result of the Section 338(h)(10) Election such that Seller will receive the same after-tax proceeds as if Seller had sold the Shares and no Section 338(h)(10) Election had been made.  Seller represents that the Company qualifies as an "S corporation" for purposes of Subchapter S of the Code.  If the Section 338(h)(10) Election is made, Seller and Buyer shall each deliver completed and executed copies of Internal Revenue Service Form 8023, required schedules thereto, and any similar state and local forms as soon as practicable but in no event later than 10 days prior to the due date thereof.

ARTICLE VIII

INDEMNIFICATION

8.1.    Indemnification by Seller.

(a)      Seller agrees to indemnify and hold harmless Buyer and its Affiliates from and against any and all Losses and Expense incurred by any of them in connection with or arising from:

(i)      any breach by Seller of any of its covenants in this Agreement;

(ii)      any failure of Seller to perform any of its obligations in this Agreement; or

(iii)      any breach of any warranty or the inaccuracy of any representation of Seller contained or referred to in this Agreement or any certificate delivered by or on behalf of Seller pursuant hereto.

(b)      The indemnification provided for in this Section 8.1 shall terminate one year after the Closing Date (and no claims shall be made by Buyer or any Affiliate under this Section 8.1 thereafter), except that the indemnification by Seller shall continue as to:

(i)      the representations and warranties set forth in Sections 4.1, 4.2, and this Article VIII, and the covenants of Seller set forth in Sections 7.1(a), 7.2, and 7.5, as to all of which the applicable statute of limitations shall apply;

14

any Loss or Expense of which any Buyer or its Affiliate has notified Seller in accordance with the requirements of Section 8.3 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 8.1, as to which the obligation of Seller shall continue until the liability of Seller shall have been determined pursuant to this Article VIII, and Seller shall have reimbursed Buyer or its Affiliate for the full amount of such Loss and Expense in accordance with this Article VIII.

8.2.   Indemnification by Buyer.

(a)   Buyer agrees to indemnify and hold harmless Seller from and against any and all Loss and Expense incurred by Seller in connection with or arising from:

(i)   any breach by Buyer of any of its covenants or agreements in this Agreement;

(ii)   any failure by Buyer to perform any of its obligations in this Agreement; or

(iii)   any breach of any warranty or the inaccuracy of any representation of Buyer contained or referred to in this Agreement.

(b)   The indemnification provided for in this Section 8.2 shall terminate one year after the Closing Date (and no claims shall be made by Seller under this Section 8.2 thereafter), except that the indemnification by Buyer shall continue as to:

(i)   The representations and warranties set forth in Section 5.1 and the covenants of Buyer set forth in Sections 7.1(b), 7.2 and 7.5 as to all of which the applicable statute of limitations shall apply;

(ii)   any Loss or Expense of which Seller has notified Buyer in accordance with the requirements of Section 8.3 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 8.2, as to which the obligation of Buyer shall continue until the liability of Buyer shall have been determined pursuant to this Article VIII, and Buyer shall have reimbursed Seller for the full amount of such Loss and Expense in accordance with this Article VIII.

(c)   Notwithstanding anything in this Agreement to the contrary, Buyer shall have no obligation under this Section 8.2 until the aggregate amount of indemnification that Seller is entitled to hereunder exceeds $50,000.  The maximum liability for indemnification hereunder by Seller shall not exceed the Purchase Price.

8.3.   Notice of Claims.

(a)   Any Party seeking indemnification hereunder (the "Indemnified Party") shall give to the party obligated to provide indemnification to such Indemnified Party (the "Indemnitor") a

15

notice (a "Claim Notice") describing in reasonable detail the facts giving rise to any claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such claim is based; provided, that (i) a Claim Notice in respect of any action at law or suit in equity by or against a third Person as to which indemnification will be sought shall be given promptly after the action or suit is commenced; and (ii) failure to give such notice shall not relieve the Indemnitor of its obligations hereunder except to the extent it shall have been prejudiced by such failure.

(b)     In calculating any Loss or Expense there shall be deducted (i) any insurance recovery in respect thereof (and no right of subrogation shall accrue hereunder to any insurer, and (ii) the amount of any tax benefit to the Indemnified Party (or any of its Affiliates) with respect to such Loss or Expense (after giving effect to the tax effect of receipt of the indemnification payments).

(c)     After the giving of any Claim Notice pursuant hereto, the amount of indemnification to which an Indemnified Party shall be entitled under this Article VIII shall be determined: (i) by the written agreement between the Indemnified Party and the Indemnitor; (ii) by a final judgment or decree of any court of competent jurisdiction; or (iii) by any other means to which the Indemnified Party and the Indemnitor shall agree. The judgment or decree of a court shall be deemed final when the time for appeal, if any, shall have expired and no appeal shall have been taken or when all appeals taken shall have been finally determined. The Indemnified Party shall have the burden of proof in establishing the amount of Loss and Expense suffered by it.

(d)     Indemnification Payments on After-Tax Basis.  Any indemnification payment hereunder with respect to any Loss or Expense shall be an amount which is sufficient to compensate the indemnified party for the amount of such Loss or Expense, after taking into account all increases in federal, state, local, foreign or other Taxes payable by the indemnified party as a result of the receipt of such payment (by reason of such payment being included in income, resulting in a reduction of tax basis, or otherwise increasing such Taxes payable by the indemnified party at any time). Buyer and Seller each agrees to report each indemnification payment hereunder as an adjustment to the Purchase Price for federal income tax purposes unless the indemnified party determines in good faith that such reporting position is incorrect (it being understood that if any reporting position is later disallowed in any administrative or court proceedings, the indemnifying party shall indemnify the indemnified party for the effects of such disallowance, and it being further understood that the obligations under this parenthetical clause shall remain in effect without limitation as to time).

8.4.    Third Person Claims.

(a)     Subject to Section 8.4(b), the Indemnified Party shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any third Person claim, action or suit against such Indemnified Party as to which indemnification will be sought by any Indemnified Party from any Indemnitor hereunder, and in any such case the Indemnitor shall cooperate in connection therewith and shall furnish such records, information

16

and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Indemnified Party in connection therewith; provided, that (i) the Indemnitor may participate, through counsel chosen by it and at its own expense, in the defense of any such claim, action or suit as to which the Indemnified Party has so elected to conduct and control the defense thereof; and (ii) the Indemnified Party shall not, without the written consent of the Indemnitor (which written consent shall not be unreasonably withheld), pay, compromise or settle any such claim, action or suit, except that no such consent shall be required if, following a written request from the Indemnified Party, the Indemnitor shall fail, within 14 days after the making of such request, to acknowledge and agree in writing that, if such claim, action or suit shall be adversely determined, such Indemnitor has an obligation to provide indemnification hereunder to such Indemnified Party.  Notwithstanding the foregoing, the Indemnified Party shall have the right to pay, settle or compromise any such claim, action or suit without such consent, provided that in such event the Indemnified Party shall waive any right to indemnity therefor hereunder unless such consent is unreasonably withheld.

(b)    If any third Person claim, action or suit against any Indemnified Party is solely for money damages or, where Seller is the Indemnitor, will have no continuing effect in any material respect on the Company, the Partnership or its business, assets or operations, then the Indemnitor shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any such third Person claim, action or suit against such Indemnified Party as to which indemnification will be sought by any Indemnified Party from any Indemnitor hereunder if the Indemnitor has acknowledged and agreed in writing that, if the same is adversely determined, the Indemnitor has an obligation to provide indemnification to the Indemnified Party in respect thereof, and in any such case the Indemnified Party shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Indemnitor in connection therewith; provided that the Indemnified Party may participate, through counsel chosen by it and at its own expense, in the defense of any such claim, action or suit as to which the Indemnitor has so elected to conduct and control the defense thereof.  Notwithstanding the foregoing, the Indemnified Party shall have the right to pay, settle or compromise any such claim, action or suit, provided that in such event the Indemnified Party shall waive any right to indemnity therefor hereunder unless the Indemnified Party shall have sought the consent of the Indemnitor to such payment, settlement or compromise and such consent was unreasonably withheld, in which event no claim for indemnity therefor hereunder shall be waived.

(c)    If there shall be any conflict between the provisions of this Section 8.4 and Section 7.3 (relating to Tax contests), the provisions of Section 7.3 shall control with respect to Tax contests.

ARTICLE IX

TERMINATION

9.1.    Termination.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing Date:

17

(a)     by the mutual consent of Buyer and Seller;

(b)     by Buyer or Seller if the Closing shall not have occurred on or before December 31, 2015, (or such later date as may be mutually agreed to by Buyer and Seller);

(c)     by Buyer in the event of any material breach by Seller of any of Seller's agreements, representations or warranties contained herein and the failure of Seller to cure such breach within seven days after receipt of notice from Buyer requesting such breach to be cured; or

(d)     by Seller in the event of any material breach by Buyer of any of Buyer's agreements, representations or warranties contained herein and the failure of Buyer to cure such breach within seven days after receipt of notice from Seller requesting such breach to be cured.

9.2.    Notice of Termination.  Any party desiring to terminate this Agreement pursuant to Section 11.1 shall give notice of such termination to the other party to this Agreement.

9.3.    Effect of Termination.  In the event that this Agreement shall be terminated pursuant to this Article IX, all further obligations of the parties under this Agreement (other than Section 10.1) shall be terminated without further liability of any party to the other, provided that nothing herein shall relieve any party from liability for its willful breach of this Agreement.

ARTICLE X

GENERAL PROVISIONS

10.1.   Survival of Obligations.  All representations, warranties, covenants, agreements and obligations contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement; provided, however, that, except as otherwise provided in Article VIII, the representations and warranties contained in Articles IV and V (other than the representations and warranties contained in Sections 4.1, 4.2 and 5.1 and the covenants and agreements contained in Sections 7.1, 7.2 and 7.5 and each of which shall survive until expiration of the applicable statute of limitations) shall terminate on the first anniversary of the Closing Date.  Except as otherwise provided herein, no claim shall be made for the breach of any representation or warranty contained in Article IV or V or under any certificate delivered with respect thereto under this Agreement after the date on which such representations and warranties terminate as set forth in this Section.

10.2.   Notices.  All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered (i) when delivered personally, (ii) if transmitted by Fax when confirmation of transmission is received, or (iii) if sent by registered or certified mail, return receipt requested, or by private courier when received; and shall be addressed as follows:

(a)     If to Seller:

> Allison Cryor DiNardo
> 526 King Street
> Suite 209
> Alexandria, Virginia  22314
> Telecopy #:   703-518-8993

> with a copy to:

> Thomas Gutierrez, Esq.
> Lukas, Nace, Gutierrez & Sachs, LLP
> 8300 Greensboro Drive, Suite 1200
> McLean, Virginia 22102
> Telecopy #:   703-584-8696

(b)     If to Buyer:

> Will Vail
> 7012 SE Highway 25A
> Belleview. FL  34420
> Office #:  352-693-4944

> with a copy to:

> Will Vail
> 17180 SE 115th Terrace Road
> Summerfield, FL  34491

or to such other address as such party may indicate by a notice delivered to the other party hereto.

10.3.   Successors and Assigns.

(a)     The rights of either party under this Agreement shall not be assignable by such party hereto prior to the Closing without the written consent of the other, except that the rights of Buyer hereunder may be assigned prior to the Closing, without the consent of Seller, to an Affiliate of Buyer; provided that (i) the assignee shall assume in writing all of Buyer's obligations to Seller hereunder, (ii) Buyer shall not be released from any of its obligations hereunder by reason of such assignment, and (iii) Seller's obligations under this Agreement shall be subject to the delivery by such assignee, on or prior to the Closing Date, of a certificate signed on its behalf containing representations and warranties similar to those made by Buyer in Article V.  Following the Closing, either party may assign any of its rights hereunder, but no such assignment shall relieve it of its obligations hereunder.

19

the Closing, either party may assign any of its rights hereunder, but no such assignment shall relieve it of its obligations hereunder.

(b)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns.  The successors and permitted assigns hereunder shall include without limitation, in the case of Buyer, any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, liquidation (including successive mergers or liquidations) or otherwise).  Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 10.3 any right, remedy or claim under or by reason of this Agreement.

10.4.   Entire Agreement; Amendments.  This Agreement and the Exhibits and Schedules referred to herein and the documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto.  This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto.

10.5.   Waivers.  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof.  Any such waiver shall be validly and sufficiently given for the purposes of this Agreement if, as to any party, it is in writing signed by an authorized representative of such party.  The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

10.6.   Partial Invalidity.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

10.7.   Execution in Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of Seller and Buyer.

10.8.   Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of Delaware.

10.9.   <u>Submission to Jurisdiction</u>.  Seller and Buyer hereby irrevocably submit in any suit, action or proceeding arising out of or related to this Agreement or any of the transactions contemplated hereby or thereby to the non-exclusive jurisdiction of the United States District Court for the District of Delaware and the jurisdiction of any court of the State of Delaware and waive any and all objections to jurisdiction that they may have under the laws of the State of Delaware or the United States and any claim or objection that any such court is an inconvenient forum.

\*        \*        \*        \*        \*

SIGNATURE PAGE FOLLOWS

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed the day and year first above written.

**WILL VAIL**

_____

**ALLISON CRYOR DINARDO**

Allison C. DiNardo

**Signature Page to Stock Purchase Agreement
between Allison Cryor DiNardo and Will Vail
regarding Nonesuch, Inc.**

22

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed the day and year first above written.

WILL VAIL

_____

ALLISON CRYOR DINARDO

_____

Signature Page to Stock Purchase Agreement
between Allison Cryor DiNardo and Will Vail
regarding Nonesuch, Inc.