# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**United States Attorney's Office**<br>**555 4th Street NW**<br>**Room 101-110**<br>**Washington, DC 20035**<br>**(202) 353-1555**<br><br>**EX REL. LAMPERT, O'CONNOR &**<br>**JOHNSTON, P.C.**<br>**1776 K Street, NW**<br>**Suite 700**<br>**Washington, DC 20006**<br>**(202) 887-6230**<br><br>           Plaintiff-Relator,<br><br>    **v.**<br><br>**CARROLL WIRELESS, L.P.; BARAT**<br>**WIRELESS, L.P.; KING STREET WIRELESS,**<br>**L.P.; CARROLL PCS, INC.; BARAT**<br>**WIRELESS, INC.; KING STREET WIRELESS,**<br>**INC.; ALLISON CRYOR DINARDO; USCC**<br>**WIRELESS INVESTMENT, INC.; UNITED**<br>**STATES CELLULAR CORPORATION; and**<br>**TELEPHONE AND DATA SYSTEMS, INC.**<br><br>           Defendants. | Case No. 07-0800 (JDB)<br><br>*Jury Trial Demanded*<br><br><u>**FILED UNDER SEAL**</u> |

<u>**AMENDED COMPLAINT**</u>

Plaintiff-Relator Lampert, O'Connor & Johnston, P.C., for its Amended Complaint

against defendants Carroll Wireless, L.P. ("Carroll Wireless"), Carroll PCS, Inc. ("Carroll Inc."),

Barat Wireless, L.P. ("Barat Wireless"), Barat Wireless, Inc. ("Barat Inc."), King Street

Wireless, L.P. ("King Street Wireless"), King Street Wireless, Inc. ("King Street Inc."), Allison

Cryor DiNardo ("DiNardo"), United States Cellular Corporation ("US Cellular"), USCC

Wireless Investment, Inc. ("USCCWI"), and Telephone and Data Systems, Inc. ("TDS") (collectively, the "Defendants") alleges as follows.

## I.    <u>INTRODUCTION</u>

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, claims and "reverse false claims" made and caused to be made by the Defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 <u>et</u> <u>seq</u>. ("the FCA" or "the Act").

2.     This <u>qui</u> <u>tam</u> case is brought against a group of sophisticated companies who knowingly defrauded the U.S. Treasury in connection with three Federal Communications Commission ("FCC") public auctions of spectrum licenses. As detailed below, the Defendants engaged in a complex and longstanding scheme to obtain federal "very small business" credits that they simply were not entitled to.

3.     Defendants US Cellular and USCCWI and their controlling parent, TDS (collectively, the "TDS Group"), formed sham "very small business" bidding entities for purposes of obtaining 25 percent credits against their gross winning bids in three FCC auctions: (1) the FCC's auction of broadband Personal Communications Services licenses conducted between January 26, 2005 and February 15, 2005 ("Auction 58"); (2) the FCC's auction of Advanced Wireless Services licenses conducted between August 9, 2006 and September 18, 2006 ("Auction 66"); and (3) the FCC's auction of licenses of 700 MHz spectrum conducted between January 24, 2008 and March 18, 2008 ("Auction 73"). The TDS Group fully funded the bidding and license acquisition costs of the "very small businesses" and, to date, has successfully avoided paying over $164 million to the United States Government in connection with Auctions

58, 66, and 73 by virtue of fraudulently obtained FCC auction credits. These sham entities were created solely to facilitate the acquisition of telecommunications licenses at substantial discounts to which the TDS Group and its affiliates were otherwise not entitled. The decision to form the sham entities was conceived from the "outside" by the TDS Group, rather than from the "inside" by the individuals who purportedly controlled those entities. The "bidders" were effectively fronts existing only on paper.

4.      In furtherance of their fraudulent scheme, the Defendants made material misstatements and omissions in their submissions to the FCC for each of the spectrum auctions. Among other things, US Cellular, USCCWI, and TDS were not identified as "real parties in interest" for the license acquisition in each spectrum auction nor were they identified as affiliates of the sham bidders. Because the TDS Group had the ability to - and did - effectively control the sham bidders, the revenues of the TDS Group (along with those of entities it controlled) were required to be disclosed and considered in determining the bidders' eligibility for "very small business" credits.

5.      Taken together, these material omissions and misstatements were made fraudulently to induce the FCC to award "very small business" credits that Defendants were not entitled to receive.

6.      A sham business is one that is owned or controlled by individuals or entities other than those who are its ostensible owners or controlling interests. In this case, Defendants US Cellular, USCCWI, and TDS were the actual parties in control, and Defendants Carroll Wireless, Carroll Inc., Barat Wireless, Barat Inc., King Street Wireless, King Street Inc., and DiNardo were simply proxies used to deceive the FCC.

7.      To induce the FCC and others to believe that the fronts were legitimate enterprises, the Defendants created records that wrongly represented that the sham "very small businesses" were organized to design, construct, develop, operate, manage and maintain spectrum licenses, and otherwise to engage in the business of providing telecommunications services, all under the control of Defendant Allison Cryor DiNardo.

8.      In fact, Defendants Carroll Wireless, Barat Wireless, and King Street Wireless did not seek to acquire licenses for the purpose of developing or providing telecommunications services for end-users.  Rather, they acted as fronts for the TDS Group to acquire licenses to complement US Cellular's existing wireless operating footprint and to block new entrants from competing with US Cellular.  As TDS described in its 2005 Annual Report filed with the U.S. Securities and Exchange Commission in August 2006:

> *Of the 16 licenses which were granted to Carroll Wireless, five are in markets in which U.S. Cellular currently owns similar spectrum; the other 11 markets represent markets which are incremental to U.S. Cellular's currently owned or acquirable markets.* (p. 8, n.2)

9.      US Cellular's business plan is to take "controlling interests" in strategic investments such as Carroll Wireless, Barat Wireless, and King Street Wireless.  As stated on page one of the TDS "Management's Discussion and Analysis of Financial Condition and Results of Operations" of the 2005 Annual Report:

> *U.S. Cellular's business development strategy is to purchase controlling interests in wireless licenses in areas adjacent to or in proximity to its other wireless licenses, thereby building contiguous operating market areas. Its largest contiguous service area is in the Midwest/Southwest, where it serves 3.4 million customers and owns licenses covering a total population of more than 32 million. U.S. Cellular's operating strategy is to strengthen the geographic areas where it can continue to build long-term operating synergies and to exit those areas where it does not have opportunities to build such synergies. U.S. Cellular's most recently completed transactions and service launches are summarized below.*

> *On January 6, 2006, Carroll Wireless was granted applications for*
> *16 licensed areas for which it was the successful bidder in the*
> *auction of wireless spectrum designated by the FCC as Auction 58,*
> *which ended on February 15, 2005. These 16 licensed areas cover*
> *portions of 10 states and are in markets which are either adjacent*
> *to or overlap current U.S. Cellular licensed areas.*

Further, with regard to the Carroll Wireless licenses, the US Cellular 2006 Annual Report states:

> *Through . . . Federal Communications Commission ("FCC") Auction 58 (as*
> *discussed below), U.S. Cellular owns, directly and indirectly, rights to wireless*
> *licenses covering territories in two additional states and has rights to commence*
> *service in those licensed areas in the future.*

10.     As a result of Defendants' deceptive conduct, they have fraudulently obtained "very small business" credits for which they were not qualified.  As a direct consequence, the Defendants have deprived the U.S. Treasury of over one hundred sixty-four million dollars ($164,000,000) of auction revenue.

11.     The FCA was originally enacted during the Civil War, and was amended substantially in 1986.  Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisal or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

12.     The Act provides that any person who knowingly makes, uses, or causes to be made or used a false or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the U.S. Government is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.  Liability attaches when a defendant knowingly makes, uses, or causes to be made or used, a false

record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the Government.

13.    The Act allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery.  The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time).  Based on these provisions, qui tam plaintiff and relator Lampert, O'Connor & Johnston, P.C., seeks through this action to recover damages and civil penalties arising from the Defendants' conspiracy to defraud the U.S. Government, and their knowing use of false statements and records to conceal, avoid, and decrease their obligations to pay the federal Government, in connection with their fraudulent claims for valuable purchase credits reserved for qualified "very small businesses" in Auction 58, Auction 66, and Auction 73.

## II.    PARTIES

### A.    Plaintiff-Relator Lampert, O'Connor & Johnston, P.C.

14.    Plaintiff-Relator Lampert, O'Connor & Johnston, P.C. -- known by the name of "Lampert & O'Connor, P.C." at the time the original Complaint in this action was filed -- is a law firm located in Washington, DC.  Lampert, O'Connor & Johnston, P.C. specializes in federal administrative and telecommunications law, and its attorneys have been involved in FCC auction matters since that agency first initiated auctions.  Lampert, O'Connor & Johnston, P.C., and its members have knowledge of the false claims contained in this Amended Complaint.  Plaintiff-Relator Lampert, O'Connor & Johnston, P.C. brings this action for violations of the False Claims Act on behalf of itself and the Government pursuant to 31 U.S.C. § 3730(b)(l).

**B.     The Defendants**

15.     Defendant Carroll Wireless, L.P. ("Carroll Wireless" or "FCC Applicant") was the vehicle that US Cellular and other Defendants used to participate in Auction 58.  Carroll Wireless is organized as a limited partnership under the laws of Delaware and its business address was listed as 100 N. Washington Street, Suite 301, Alexandria, Virginia 22314.  Carroll Wireless was registered as a Limited Partnership in Delaware on November 19, 2004, eleven days before the November 30, 2004, deadline to file an application to participate (referred to as the "Short-Form" or "Form 175" application) for Auction 58.  Carroll Wireless has one general partner, Defendant Carroll Inc., and one limited partner, Defendant USCCWI.  On November 30, 2004, Carroll Inc. and USCCWI executed both the Carroll PCS Limited Partnership Agreement ("Auction 58 LP Agreement") and an Investment Agreement ("Auction 58 Investment Agreement"), and Carroll Wireless, Carroll Inc., and USCCWI executed a Bidding Protocol Agreement ("Auction 58 Bidding Agreement").  On the same day, Carroll Wireless filed its Short-Form application to participate in FCC Auction 58.

16.     Aside from its activity in Auction 58, Carroll Wireless was engaged in no other lines of business, and had no operations, assets, or revenues.

17.      Defendant Carroll Inc. is the sole general partner of Defendant Carroll Wireless. Carroll Inc. is a Delaware corporation and its principal place of business address was listed as 310 West Myrtle Street, Alexandria, Virginia 22301, the same address as the personal residence of Defendant DiNardo.  Carroll Inc.'s sole shareholder is Defendant DiNardo.  Carroll Inc. was registered with the state of Delaware on November 19, 2004, eleven days before the Short-Form application filing deadline for Auction 58 and on the same day as the FCC Applicant, Carroll Wireless.

18.     Aside from its activity in the Auction 58, Carroll Inc. was engaged in no other lines of business, and had no other operations, assets, or revenues.

19.     Defendant Barat Wireless, L.P. ("Barat Wireless" or "FCC Applicant") was the vehicle that US Cellular and other Defendants used to participate in Auction 66. Barat Wireless is organized as a limited partnership under the laws of Delaware and its business address was listed as 105 North Pitt Street, Suite 206, Alexandria, Virginia 22314. Barat Wireless was registered in Delaware on May 5, 2006, forty-five days before the Short-Form application filing deadline for Auction 66. Barat Wireless has one general partner, Defendant Barat Inc., and one limited partner, Defendant USCCWI. Barat Wireless filed a Short-Form application for Auction 66 on June 19, 2006. Twenty days later, on July 11, 2006, Barat Inc. and USCCWI executed the Limited Partnership Agreement of Barat Wireless, L.P. ("Auction 66 LP Agreement") and a Bidding Protocol Agreement ("Auction 66 Bidding Agreement"), and Barat Inc., USCCWI, and US Cellular executed an Investment Agreement ("Auction 66 Investment Agreement").

20.     Aside from its activity in Auction 66, Barat Wireless was engaged in no other lines of business, and had no operations, assets, or revenues.

21.     Defendant Barat Inc. is the sole general partner of Defendant Barat Wireless. Barat Inc. is a Delaware corporation whose business address was listed as 310 West Myrtle Street, Alexandria, Virginia 22301, the same address as the personal residence of Defendant DiNardo. Barat Inc.'s sole shareholder is Defendant DiNardo. Barat Inc. was registered with the state of Delaware on May 5, 2006, forty-five days before the Short-Form application filing deadline for Auction 66 and on the same day as the FCC Applicant, Barat Wireless.

22.     Aside from its activity in Auction 66, Barat Inc. was engaged in no other lines of business, and has no operations, assets, or revenues.

23.     Defendant King Street Wireless, L.P. ("King Street Wireless" or "FCC Applicant") is the vehicle that US Cellular and other Defendants used to participate in Auction 73.  King Street Wireless is organized as a limited partnership under the laws of Delaware, formed on or about November 27, 2007, with its business address listed as 105 N. Washington Street, Suite 301, Alexandria, Virginia 22314.  King Street Wireless has one general partner, Defendant King Street Inc., and one limited partner, Defendant USCCWI.  On or about December 21, 2007, King Street Inc. and USCCWI executed both the King Street Wireless PCS Limited Partnership Agreement ("Auction 73 LP Agreement") and an Investment Agreement ("Auction 73 Investment Agreement"), and King Street Wireless, King Street Inc., and USCCWI executed a Bidding Protocol Agreement ("Auction 73 Bidding Agreement").  On December 3, 2007, less than a week after it was registered as a limited partnership with the State of Delaware, King Street Wireless filed its Short-Form application to participate in Auction 73.

24.     Defendant King Street Wireless, Inc. ("King Street Inc.") is the sole general partner of Defendant King Street Wireless, LP.  King Street Inc. is a Delaware corporation with its business address listed as 105 North Washington Street, Suite 301, Alexandria, Virginia 22314.  King Street Inc.'s sole shareholder is Defendant DiNardo.

25.     Defendant Allison Cryor DiNardo resides in Alexandria, Virginia.  She owns 100 percent of the equity of Defendants Carroll Inc., Barat Inc., and King Street Inc.  Defendant DiNardo has held no management positions in an operating telecommunications service company or a company that provides any services to the public.  She is active in Alexandria, Virginia politics and the local Republican Party.  Beginning in 2000, Defendant DiNardo was an officer of Kington Management Corporation ("KMC").  Through DiNardo's affiliation with KMC, Defendants US Cellular and USCCWI established contacts and a business affiliation with

her.  Defendant DiNardo has been an officer of other entities that have transferred other FCC "small business" wireless licenses to Defendant US Cellular.

26.     Defendant USCCWI is the sole limited partner and 90 percent owner of each of the FCC Applicants, Carroll Wireless, Barat Wireless, and King Street Wireless.  USCCWI is a Delaware corporation with its principal place of business at 8410 West Bryn Mawr, Suite 700, Chicago, Illinois 60631.  Through its limited partnership holdings, USCCWI holds 90 percent of the total equity of each of the FCC Applicants.

27.     Defendant US Cellular is a publicly-held Delaware corporation with its principal place of business at 8410 West Bryn Mawr, Suite 700, Chicago, Illinois 60631.  US Cellular wholly owns and controls Defendant USCCWI.  As of year-end 2005, US Cellular was the sixth largest mobile phone operator in the United States, serving 5.8 million customers in 189 markets across 26 states.  US Cellular has been in the cellular telecommunications business, operating cellular systems and selling wireless service to the public, since 1983.  US Cellular currently holds in its name over 100 FCC commercial wireless licenses by which it offers mobile phone service.  US Cellular's SEC-reported annual operating revenues for years 2002 through 2007 are as follows: for 2002, $2.1 billion; for 2003, $2.6 billion; for 2004, $2.8 billion; for 2005, $3.0 billion; for 2006, $3.5 billion; and for 2007, $3.9 billion.

28.     Defendant TDS is a publicly-held Delaware corporation with its principal place of business at 8410 West Bryn Mawr, Suite 700, Chicago, Illinois 60631.  TDS owns a substantial majority of Defendant US Cellular, which in turn through its wholly owned subsidiary USCCWI owns 90 percent of the FCC Applicants, Carroll Wireless, Barat Wireless, and King Street Wireless.  Through its subsidiaries and including US Cellular, TDS serves more than 6.1 million wireline and wireless customers in 36 states.  TDS has been in the telecommunications service

10

business since 1969.  TDS's SEC-reported annual operating revenues for years 2002 through

2006 are as follows: for 2002, $2.99 billion; for 2003, $3.4 billion; for 2004, $3.7 billion; for

2005, $4.0 billion; for 2006, $4.4 billion; and for 2007, $4.8 billion.

## III.    JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this action pursuant to both

28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on

this Court for actions brought pursuant to the FCA.

30.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §

3732(a) because that section authorizes nationwide service of process and because the

Defendants have minimum contacts with the District of Columbia.  Moreover, at least one of the

Defendants can be found in, resides or transacts or has transacted business in this District.  Both

the FCC's headquarters and the FCC's Wireless Telecommunications Bureau, Auctions

Division, which managed and supervised Auctions 58, 66, and 73, are located at 445 12th Street

SW, in the District of Columbia.  In this case, the Defendants have used the FCC and its

application and auction processes as an instrumentality of the fraud committed against the

federal Government.  Having committed the fraudulent acts and made the fraudulent statements

as alleged in this complaint within the District of Columbia to fraudulently claim and obtain

"very small business" bid credits in Auctions 58, 66, and 73, the Defendants are subject to the

jurisdiction of this Court.

31     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because at least

one Defendant in this action can be found in, transacts or has transacted business in this District.

Further, venue is appropriate because the Defendants committed the fraudulent acts and made

fraudulent statements as alleged in this complaint within the District of Columbia fraudulently to claim and obtain "very small business" bid credits in Auctions 58, 66, and 73.

## IV.    BACKGROUND AND APPLICABLE LAW

32      In 1993, Congress authorized the FCC to use competitive bidding in public auctions as a means of allocating commercial wireless telecommunications licenses among competing applicants.  47 U.S.C. § 309(j).  Congress also directed that the auctions must provide incentives to promote economic opportunity and to foster small business participation.  Congress intended to "ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women...."  Id., § 309(j)(3)(B).

33.      To effectuate Congress' intent and to create market entry opportunities for small companies that lacked access to capital, the FCC adopted rules providing that qualified "small businesses" and "very small businesses" could receive bidding credits, or discounts, of a specified percentage of the competitively determined actual value, *i.e.*, the "gross" bid, of a license available for auction.  Prior to each auction, the FCC establishes the specific discount percentages, and definitions of "small business" and "very small business," on a service-specific basis.  The FCC also has adopted a specific "revenue test," as set forth below, to determine whether an entity claiming "small business" or "very small business" status is eligible for bidding credits.  Only legitimate businesses that will participate in the wireless marketplace by offering facilities-based telecommunications services to the public are the intended beneficiaries of small business bidding discounts; entities that do not intend to offer service to the public and

12

instead hold licenses for the benefit of other unqualified entities are ineligible for bidding discounts.

34.     To ensure that entities claiming valuable federal benefits were legitimate small businesses, the FCC required that the applicant, its affiliates, its controlling interests and their affiliates be considered.  As described below, the annual revenues of applicants, their affiliates, their controlling interests and their affiliates are attributable to, and aggregated with, the annual revenues of the "small business" or "very small business" applicant to determine bidding credit eligibility.  The FCC repeatedly advised bidders not to conceal their affiliations or otherwise attempt to "game" the auction procedures. The purpose of these requirements is to ensure that no federal benefits were wrongly conferred on auction participants that appeared "small" but in fact were affiliated with, or controlled by, large companies that did not qualify for the credits.

35.     For all of the licenses available for bid in Auctions 66 and 73, and for specified licenses available for bid in Auction 58, FCC rules provided that a qualifying "very small business" would receive a 25 percent discount off of its gross winning bids.  A "very small business" applicant was entitled to the 25 percent bidding credit only if it represented and certified accurately to the FCC, in both its Short-Form and its post-auction application for a license ("Long-Form" or "FCC Form 601") and associated documentation, that the applicant, together with its affiliates, its controlling interest holders and their affiliates, had average annual gross revenues of not more than $15 million for the preceding three years.  The "gross revenues" of the entity, its affiliates and its controlling interests are considered on a cumulative and aggregated basis.  According to FCC regulations, "gross revenues" include all income of the applicant, its affiliates, its controlling interests and their affiliates from any source, including both earned and passive income.

36.     To ensure that bidders claiming "very small business" bidding credits are <u>bona fide</u>, federal law requires that the gross revenues of <u>de facto</u>, as well as <u>de jure</u>, affiliates and controlling interests be attributed to the applicant.

37.     FCC regulations define an "affiliate" as any individual or entity that (i) directly or indirectly controls or has the power to control the applicant, (ii) is directly or indirectly controlled by the applicant, (iii) is directly or indirectly controlled by a third party that also controls or has the power to control the applicant, or (iv) has an identity of interest with the applicant.

38.     <u>De jure</u> control typically is evidenced by ownership of more than 50 percent of an applicant's voting interests.

39.     <u>De facto</u> control is determined on the basis of all the circumstances of the particular case.  The analysis of <u>de facto</u> control aims to ascertain whether –  despite the existence of legal documents or other arrangements that place <u>de jure</u> control of an entity in the hands of one party – there exist relationships (<u>e.g.</u>, familial or business), practical realities (<u>e.g.</u>, indebtedness), or other factors (<u>e.g.</u>, experience) that place actual control of the applicant in the hands of another.

40.     Among the factors used to determine <u>de facto</u> control are: (a) who makes management and policy decisions for the applicant, including who determines the applicant's activities and actions; (b) who is in charge of financing of the applicant's business activities; (c) who controls the day-to-day operations; (d) who is in charge of employment decisions; (e) whether the applicant shares facilities and equipment; (f) the existence and nature of business and social relationships; and (g) the nature of stock ownership, contractual, employment and

other business relationships between the applicant and another entity or entities, including

lenders, investors and limited partners.

41.     Each applicant to participate in a spectrum auction must fully disclose to the FCC

the real party or parties in interest.  A "real party in interest" is a person or entity who has an

interest or relationship that allows that person or entity to be in a position to actually or

potentially control the operation of a license.

42.     Entities seeking to participate in spectrum auctions must submit to the FCC an

initial Short-Form application.  Entities whose Short-Form applications are accepted and who

timely submit an upfront payment become eligible to bid on licenses available in that auction.

After an auction ends, applicants that were the high bidder on licenses must complete and file

with the FCC a Long-Form application.  Both the Short-Form and Long-Form applications must

be signed by an authorized representative of the applicant as accurate and complete, under

penalty of perjury.  If the applicant is seeking credits as a "very small business" the applications

also must include certifications that the applicant is qualified to obtain a credit, that all real

parties in interest have been disclosed, and that annual gross revenues of the applicant, its

affiliates, its controlling interests and their affiliates, have been disclosed.

43.     Applicants place bids for licenses they wish to acquire in gross dollars.  A

winning bidder that claims "very small business" status, but fails to qualify for such benefits,

must pay for the license in gross dollars bid.  In Auctions 58, 66, and 73, if an applicant failed to

qualify as "very small business," then it would be ineligible for the 25 percent bid credit and

would be required to pay the federal Government the full amount of its gross winning bids.

44.     Once a license is awarded, federal "anti-trafficking" and "unjust enrichment"

restrictions prevent licensees from earning speculative profits through post-auction resale of

discounted licenses. Such restrictions are intended to prevent "shams" from frustrating Congressional policy favoring small business opportunity, by stopping "sham" licensees from acquiring licenses at a discount and then ceding control over the licenses to entities that are not qualified to obtain bid discounts, including large wireless telecommunications operators. Abusing spectrum auctions in this manner is also antithetical to federal policy goals of avoiding industry concentration, promoting build-out and the provision of service to the public, and disseminating spectrum licenses to a broad cross-section of the American public.

45.     Anti-trafficking restrictions are imposed through federal unjust enrichment regulations. Whenever control over a discounted license is transferred to an unqualified entity, unjust enrichment of the federal benefit is deemed to have occurred.

46.     When control over a discounted license is transferred to an ineligible entity, federal law requires that as much as 100 percent of the bidding credit must be reimbursed to the federal Government, plus interest at the rate for 10-year U.S. Treasury obligations as of the date the license was awarded. The amount of the bid credit that must be returned is determined on a service-specific basis and is based on the amount of time that has elapsed between issuance and transfer of the licenses. For Auction 58, very small businesses are subject to unjust enrichment penalties if, for a period of five years from the date of license grant, they sell or transfer control of their licenses to an entity that does not qualify for bidding discounts. For Auctions 66 and 73, very small businesses are subject to unjust enrichment penalties if, for a period of ten years from the date of license grant, they sell or transfer control of their licenses to an entity that does not qualify for bidding discounts.

47.     In all cases, the dollar amount that must be returned under federal law is based on the amount of the winning gross bid from the auction in which the license was acquired, *i.e.*, the

value of the license at the time the Long-Form application is filed. Accordingly, the federal

Government is entitled to the full value of the credit at the time the license was awarded. Any

market risk that a license will not retain its value in the future is borne solely by the licensee, and

not by the federal Government.

48.     Whenever discounted licenses are awarded to sham "very small businesses" that

are controlled by ineligible entities and individuals, 100 percent of the bidding credits must be

returned (plus interest). Because the purported "very small businesses" never had control of the

licenses, the "real parties in interest," who are ineligible for bid credits, control the licenses

beginning at the times that the licenses are granted.

49.     Defendants US Cellular, USCCWI, and TDS have maintained de facto control of

the FCC Applicants from their inception, with the result that the Defendants have been unjustly

enriched by the receipt of bidding discounts by each of the Defendant FCC Applicants.

50.     The Defendants have not reimbursed any bidding credits to the federal

Government.

## V.     THE DEFENDANTS' FRAUD

### A.     The Defendants Defrauded the Federal Treasury of Valuable Bid Credits by Creating Sham Entities to Pose as "Very Small Businesses"

51.     To carry out their fraud on the federal Treasury, the Defendants created and

participated in creating sham entities that held themselves out as legitimate "very small

businesses." In fact, the entities were mere fronts for the TDS Group, serving as vehicles for the

TDS Group to acquire, at substantial federal credits, valuable spectrum licenses complementary

to US Cellular's existing wireless markets.

52.     For Auctions 58, 66, and 73, qualified "very small businesses" received bid

credits of 25 percent of the gross high bid of the license. Thus, for example, if a "very small

business" applicant was declared the high bidder on a license based on a bid of $1 million, that bidder would be obligated to pay the federal government only the "net" high bid of $750,000.00. "Very small business" qualification is determined through "revenue testing." In Auctions 58, 66, and 73, an applicant was eligible for a 25 percent bid credit only if the average annual gross revenues of the applicant, its affiliates, its controlling interests and their affiliates did not exceed $15 million for the preceding three years.

53.     For Auctions 58, 66, and 73, none of Defendants US Cellular, USCCWI, or TDS would have qualified to receive "very small business" credits under the FCC's revenue test. Indeed, the average annual gross revenues of US Cellular and TDS far exceeded two billion dollars for the relevant years.

54.     In Auctions 58, 66, and 73, Defendants US Cellular and TDS created and have maintained the sham entities (i.e., Defendants Carroll Wireless, Barat Wireless, and King Street Wireless) to file FCC applications to qualify as "very small businesses" for bidding credits and to bid on licenses or to serve as "owners" of bidders. Defendants Carroll Wireless, Barat Wireless, and King Street Wireless were not created to develop or offer wireless services independent from US Cellular or TDS, or to operate actual independent business operations. They were created to acquire, using a federal discount, licenses that would block competitors to US Cellular markets, complement US Cellular's existing markets, and be available for use by US Cellular within its own discretion. Indeed, as noted in paragraph 9 above, US Cellular stated that its "business development strategy is to purchase *controlling interests* in wireless licenses in areas adjacent to or in proximity to its other wireless licenses" (emphasis added), citing its ownership of Carroll Wireless as a prime example of its execution of that business strategy. US Cellular's execution of this "controlling interest" strategy is just as plain in Auction 66 with

Barat Wireless, and in Auction 73 with King Street Wireless; in fact, US Cellular's ownership, financing, and control of Carroll Wireless, Barat Wireless, and King Street Wireless are identical in all material respects.

55.     To US Cellular and TDS, the ill-gotten federal credits represented potential increased profit margins, and insulated them against market risks associated with acquiring and owning wireless spectrum.

56.     Defendants' sham entities were intended to circumvent, and did circumvent, federal "affiliation" and "control" laws.  The sham businesses were created and controlled by the TDS Group, and effectively existed only on paper.  The FCC Applicants were not organized for independent and ongoing operation and service to the public.  Rather, they were created as vehicles to amass millions of dollars of federal benefits to accrue ultimately to the TDS Group.

57.     In addition to creating proxy bidders, the TDS Group also created entities that served as the 10 percent "general partners" (Carroll Inc., Barat Inc., and King Street Inc.) and a single 90 percent "limited partner" (USCCWI) for the three sham FCC Applicants.  These general and limited partners were also shams formed in an effort to shield further the TDS Group from federal "affiliation" and "control" laws.

58.     Defendants US Cellular, USCCWI, and TDS used Defendant DiNardo to front as an independent and unaffiliated "owner" of the general partner of each of the purported "very small business" FCC Applicants.  Ms. DiNardo, however, assumed neither the risks nor the benefits of ownership.  Moreover, Defendant DiNardo had an undisclosed and pre-existing business relationship with and ties of loyalty to the TDS Group, and had no experience or training in providing telecommunications services or managing the operations of a wireless service provider.

19

59.     The sham bidders and owners were created as part of the larger strategy of the TDS Group to acquire discounted licenses in Auctions 58, 66, and 73.  Defendants US Cellular, USCCWI, and TDS directed and coordinated the creation of the sham bidders and their direct and indirect owners.  As a result, the decision to form the FCC Applicants was not generated from inside those companies by the supposed controlling interests of those companies.  Rather, the bidders' formation was orchestrated by the TDS Group from the outside.

60.     The sham FCC Applicants and sham "general partners" were not ongoing and legitimate "very small businesses," but were created and registered with the state of Delaware just prior to the deadlines to participate in the FCC auctions.  In the case of Carroll Wireless, the limited partnership agreement was executed on the last day of the Auction 58 Short-Form application filing window.  In the case of Barat Wireless, the limited partnership was not formed (i.e., the partnership agreement was not signed) until weeks after Barat Wireless represented in its Auction 66 Short-Form application that it was a legitimate and qualified "very small business."

61.     Defendants Carroll Wireless, Barat Wireless, and King Street Wireless, and their respective general partners, did not and do not operate or function as actual businesses.  To induce the Government to believe that they were bona fide enterprises, however, the Defendants provided to the FCC addresses and telephone numbers that were associated with non-operating business fronts.  Moreover, a "business address" provided for some the FCC Applicants' general partners was not a business address at all; rather, it was Defendant DiNardo's residence.

62.     Although the FCC Applicants presented themselves to the FCC as distinct and independent business operations, in fact they were simply the instruments for the TDS Group's illegal control of discounted licenses.  The TDS Group's constructs of sham FCC Applicants, the

"general partners," and a "limited partner" entity were specifically designed to deceive the FCC and to evade federal affiliation and control requirements. To the U.S. Securities and Exchange Commission and to investors, however, US Cellular and TDS have made plain the true nature of these relationships:

* "U.S. Cellular's business development strategy is to operate controlling interests in wireless licenses in areas adjacent to or in proximity to its other wireless licenses, thereby building contiguous operating market areas. U.S. Cellular anticipates that grouping its operations into market areas will continue to provide it with certain economies in its capital and operating costs."

* "U.S. Cellular owns controlling interests in" all of the "11 licenses acquired through Carroll Wireless, L.P."

* "Carroll Wireless . . . [is] an entity in which U.S. Cellular owns a controlling interest for financial reporting purposes";

* Carroll Wireless licenses are included in US Cellular's "[c]onsolidated markets to be acquired pursuant to [an] existing agreement[]";

* "Through . . . Federal Communications Commission . . . Auction 58 . . ., U.S. Cellular owns, directly and indirectly, rights to wireless licenses covering territories in two additional states and has rights to commence service in those licensed areas in the future."

* Carroll Wireless' Auction 58 licenses are US Cellular's "*Key properties added in Midwest and other markets*" (emphasis in original);

* "As of December 31, 2006, U.S. Cellular has made capital contributions and advances to Carroll Wireless and/or its general partner of $129.9 million; of this amount, $129.7 million is included in Licenses on the Consolidated Balance Sheet as of December 31, 2006. U.S. Cellular consolidates Carroll Wireless and Carroll PCS, Inc., the general partner of Carroll Wireless, for financial statement purposes, pursuant to the guidelines of FIN 46R, as U.S. Cellular anticipates absorbing a majority of Carroll Wireless' expected gains or losses.";

* "TDS reported $1,365.1 million of licenses and $869.8 million of goodwill at December 31, 2005, as a result of the acquisition of wireless licenses and markets, and the acquisition of operating telephone companies. Licenses include those won by Carroll Wireless in the FCC auction completed in February 2005. . . .";

21

\* "As of December 31, 2006, U.S. Cellular has made capital contributions and advances to Barat Wireless and/or its general partner of $127.2 million to provide funding of Barat Wireless' participation in Auction 66; this amount is included in Licenses on the Consolidated Balance Sheet as of December 31, 2006.  U.S. Cellular consolidates Barat Wireless and Barat Wireless, Inc., the general partner of Barat Wireless, for financial statement purposes, pursuant to the guidelines of FASB Interpretation No. 46R, *"Consolidation of Variable Interest Entities"* ('FIN 46R'), as U.S. Cellular anticipates absorbing a majority of Barat Wireless' expected gains or losses.";

\* "U.S. Cellular is participating in Auction 73 indirectly through its interest in King Street Wireless, L.P. ('King Street Wireless'), which is participating in Auction 73.  A subsidiary of U.S. Cellular is a limited partner in King Street Wireless.  King Street Wireless intends to qualify as a 'designated entity,' and thereby be eligible for bid credits with respect to spectrum purchased in Auction 73.";

\* "In January 2008, U.S. Cellular made capital contributions and advances to King Street Wireless and/or its general partner of $97 million to allow King Street Wireless to participate in Auction 73.  King Street Wireless is in the process of developing its long-term business and financing plans.  Pending finalization of King Street Wireless' permanent financing plans, and upon request by King Street Wireless, U.S. Cellular may agree to make additional capital contributions and/or advances to King Street Wireless and/or its general partner.  U.S. Cellular will consolidate King Street Wireless and King Street Wireless, Inc., the general partner of King Street Wireless, for financial reporting purposes, pursuant to the guidelines of FIN 46(R), as U.S. Cellular anticipates benefiting from or absorbing a majority of King Street Wireless' expected gains or losses….";

\* "The licenses expected to be awarded to King Street Wireless cover areas that overlap or are proximate or contiguous to areas covered by licenses that U.S. Cellular currently owns, operates and/or consolidates."

**B.  Defendant DiNardo Had a Longstanding Business Relationship with the TDS Group, and Lacked Background, Training or Experience in Providing Telecommunications Services or Developing and Operating Wireless Licenses**

63.  The individual US Cellular, USCCWI, and TDS enlisted – Allison Cryor DiNardo – was a business associate of the TDS Group prior to the Auctions.  Ms. DiNardo had no experience or background in telecommunications operations or spectrum license development or

services and, under arms-length circumstances, could not have raised the many hundreds of

millions of dollars necessary to fund the acquisition of the spectrum licenses in Auction 58, 66,

or 73.  In this case, however, Ms. DiNardo had substantial prior business contacts and dealings

with the TDS Group.

64.    The business relationship between Defendant DiNardo and Defendants US

Cellular, USCCWI, and TDS was not disclosed to the FCC, even though the pre-existing

loyalties conferred upon US Cellular, USCCWI, and TDS a significant degree of influence and

de facto control over Ms. DiNardo and, therefore, the FCC Applicants.

65.    By virtue of these relationships, the sham bidders share an affiliation through an

"identity of interests" with, and direct or indirect control by, US Cellular, USCCWI, and TDS.

Under federal law, the affiliations between DiNardo and the TDS Group require that the

revenues of the TDS Group be attributed to the FCC Applicants.

66.    The failure to disclose the true nature of the relationships between the purported

controlling and non-controlling "owners" of the FCC Applicants was intended to induce the

federal Government to believe that the FCC Applicants were independent and legitimate

enterprises, when in fact they were not.

67.    In addition to her affiliation with the TDS Group, Defendant DiNardo lacked

experience or training in the telecommunications industry, including experience relevant to

operating, managing, or developing spectrum licenses.  Defendant DiNardo has not handled

daily and/or long-term business decisions, management or operation of the licenses that were the

subject of Auctions 58, 66, and 73.  Indeed, Ms. DiNardo failed even to keep up the pretense of

the corporate and limited partner structures for which she supposedly was responsible, by failing

to pay Delaware state taxes, to file annual reports, and/or to maintain good status for the "general

partners" and "limited partnerships." Her lack of experience further indicates that the "very small businesses" were fronts under de facto control from outside, rather than independent, viable telecommunications concerns. Compared with the vast wireless telecommunications operating experience and history of TDS and US Cellular, it is not surprising, and all but inevitable, that Defendant DiNardo never had de facto control over the FCC Applicants.

68. US Cellular's and TDS's affiliation with and de facto control over the FCC Applicants was not disclosed to the FCC, even though such disclosures were mandated by federal affiliation and attribution requirements.

### C. The TDS Group Dictated the Bidding Activities of the FCC Applicants.

69. The FCC Applicants' primary function, and their most significant activity to date, was to bid on licenses in Auctions 58, 66, and 73. The scope and terms of the FCC Applicants' bidding activity – including the amount of the upfront payment (establishing initial bid eligibility), the licenses and markets to bid on, and how much to bid – were essentially dictated to the FCC Applicants by the TDS Group. This activity was effectively ceded over to the TDS Group through Bidding Agreements for Auctions 58, 66, and 73, and the many subsequent amendments to those Agreements struck during the course of the auctions to grant the FCC Applicants authority to do the bidding of the TDS Group, including, where necessary, raising the maximum prices that the FCC Applicants were permitted to bid.

70. TDS and US Cellular have acknowledged that they controlled the FCC Applicants' bidding in such a manner as to complement US Cellular's operating strategies and to achieve the greatest value for US Cellular's existing wireless market properties. As both US Cellular and TDS have stated, "U.S. Cellular's business development strategy is to purchase controlling interests in wireless licenses in areas adjacent to or in proximity to its other wireless licenses, thereby building contiguous operating market areas." TDS specifically confirmed that,

with respect to Auction 58, Carroll Wireless' "16 licensed areas cover portions of 10 states and are in markets which are either adjacent to or overlap current U.S. Cellular licensed areas." The licenses that Barat Wireless obtained in Auction 66, and that King Street Wireless has sought to acquire in Auction 73, follow the same pattern, and cover markets that overlap with, are contiguous to, or otherwise complement US Cellular's operating wireless markets. Indeed, the unique license holdings of Barat Wireless and Carroll Wireless are complementary only to the US Cellular operating markets, and are not complementary to the markets of any other US wireless service provider.

71.    Defendant DiNardo's lack of telecommunications operating experience, as set forth in paragraph 67 above, in combination with her bidding activity in Auctions 58, 66, and 73, also confirms that she was not bidding for the purpose of establishing a competitive and independent provider of wireless services to the public. Rather, her role was to bid for, and in concert with, an existing large wireless service provider, US Cellular, for the purposes of obtaining licenses that complement US Cellular's existing and unique operating markets and of preventing other companies from obtaining a spectrum foothold in or adjacent to US Cellular's markets. In this context, the bidding activities of the FCC Applicants must be viewed as those of proxies or instrumentalities of the TDS Group, not of independent companies in control of their own destiny.

72.    The TDS Group's de facto control over the FCC Applicants' bidding activities was not fully disclosed to the FCC, even though such disclosure was mandated by federal affiliation and attribution requirements.

**D.    The TDS Group Provided All or Nearly All of the Financial Resources and Financial Decisions of the FCC Applicants, and Will Enjoy Virtually All of the Benefits and Risks of Ownership of the FCC Applicants.**

73.    To date, the TDS Group has provided all, or nearly all, of the funds necessary for the operation and activities of the FCC Applicants. Beginning with the formation of the limited partnerships, the TDS Group has provided the initial capital for its 90 percent share of the limited partnerships of the FCC Applicants, and loaned the monies to the general partners in order for those entities to make their own respective initial 10 percent equity capital contributions into the respective limited partnerships. The terms of the loan agreements between the TDS Group and the FCC Applicants and their respective general partners have not been reasonable "arms length" commercial lending terms, given the FCC Applicants' lack of operating experience and lack of financial performance history. Moreover, the FCC Applicants have presented their applications to the FCC in a manner designed to disguise the fact that the TDS Group has provided all, or nearly all, of the funds necessary for the operation and activities of the FCC Applicants.

74.    The TDS Group has provided all of the hundreds of millions of dollars necessary for the FCC Applicants' upfront payments and net winning bid payments. None of the other Defendants – DiNardo, Carroll Wireless, Carroll Inc., Barat Wireless, Barat Inc., King Street Wireless, and King Street Inc. – have contributed their own financial assets towards the FCC license acquisitions. The TDS Group also controlled virtually all of the FCC Applicants' financial obligations through its de facto control over the FCC Applicants' bidding decisions, as discussed above at paragraphs 69 to 72.

75.    Further, through restrictions placed on the FCC Applicants through various agreements, the TDS Group controls and limits the ability of the FCC Applicants and their general partners to obtain any ongoing or future financing from any entity not affiliated with the TDS Group.

26

76. The TDS Group also controls and limits the ability of the FCC Applicants to sell or otherwise transfer their ownership in nearly all of the licenses granted by the FCC. In the case of Carroll Wireless, for example, under the terms of an amendment to the Limited Partnership Agreement -- which terms were not disclosed to the FCC before the licenses were granted to Carroll Wireless -- the limited partner had <u>veto power</u> over a decision by the general partner involving "the sale, transfer, exchange, lease, mortgage, pledge, or assignment of any license [with the exception of four specific licenses]." In light of this amendment, and the fact that the sole activity of the limited partnership was the purchase of the spectrum licenses, it is unclear what, if any, real "control" over the activities of Carroll Wireless remained in the hands of general partner Carroll Inc. or Defendant DiNardo.

77. The terms of the Limited Partnership Agreements and Investment Agreements favor the limited partners and ensure that the TDS Group reaps the vast majority of any profits received by the FCC Applicants. These agreements also ensure that the TDS Group has the ability to manipulate and control the return and profits received by the sham "general partners" and Defendant DiNardo. Indeed, the financial arrangements ensure that the sham "general partners" and Defendant DiNardo receive little more than a salary for services performed as instruments of the TDS Group. The TDS Group also bears the hallmark of ownership over the FCC Applicants because the TDS Group would suffer almost all of the losses if the activities of the FCC Applicants were to prove to be unprofitable. For example, if the value of the licenses acquired in Auctions 58, 66, and 73 via the FCC Applicants were to fall to zero, it is the TDS Group – having proffered hundreds of millions of dollars for those licenses, and having a 90 percent equity stake in the licensees – that would suffer the loss most acutely, not the FCC Applicants or DiNardo, who have invested none of their money in the venture.

78.     In reality, US Cellular's debt financing was an equity investment.  However, because federal law barred it from obtaining "very small business" bid credits in Auctions 58, 66, and 73, US Cellular has deceptively structured its investments as "loans" to the FCC Applicants and their respective general partners.

79.     US Cellular's, USCCWI's, and TDS's de facto control over the FCC Applicants' finances, financial decisions and obligations, ability to alienate the FCC licenses, and enjoyment of the profits and risks of ownership was not fully disclosed to the FCC by the Defendants, notwithstanding that such disclosure was mandated by federal affiliation and attribution requirements.

**E.      Through Fraudulent Representations and Deceptive Omissions, the Defendants Appropriated "Very Small Business" Credits to Which They Were Not Legally Entitled**

80.     To induce the Government to award "very small business" credits, the FCC Applicants filed Short-Form and Long-Form applications with the FCC for Auction 58, Auction 66, and Auction 73 that included numerous fraudulent statements and omissions.

81.     The FCC Applicants falsely certified to the FCC on Forms 175 and 601 and Exhibits thereto that they were qualified to receive 25 percent "very small business" credits in Auctions 58, 66, and 73.  Each of Carroll Wireless, Barat Wireless, and King Street Wireless falsely represented that its average gross annual revenues, aggregated with the gross revenues of its affiliates, controlling interests and their affiliates, did not exceed $15 million for the three years preceding its Form 175 application.

82.     In particular, for Auction 58, Defendant DiNardo certified in Defendant Carroll Wireless' Short-Form application that the average annual gross revenues of Carroll Wireless, its affiliates, its controlling interests and their affiliates, were zero dollars on a cumulative basis for the preceding three years.  For Auction 66, Defendant DiNardo certified in Defendant Barat

Wireless' Short-Form application that the average annual gross revenues of Barat Wireless, its affiliates, its controlling interests and their affiliates were zero dollars on a cumulative basis for the preceding three years. For Auction 73, Defendant DiNardo certified in Defendant King Street Wireless' Short-Form application that the average annual gross revenues of King Street Wireless, its affiliates, its controlling interests and their affiliates were $16,666.67 on a cumulative basis for the preceding three years.

83. The FCC Applicants' certifications to the FCC were false, because their respective Form 175 and Form 601 applications knowingly failed to attribute the revenues of Defendants US Cellular, USCCWI, and TDS – revenues that were attributable because of US Cellular's, USCCWI's, and TDS's de facto control over and affiliation with the Auction 58, Auction 66, and Auction 73 sham entities.

84. To deceive the FCC as to the TDS Group's de facto control, the FCC Applicants' partnership agreements were designed to create the erroneous appearance before the FCC that the putative 10 percent general partner controlled the enterprises. These formal "controls" were contrived to deceive the FCC as to the legitimacy of the FCC Applicants' claims to "very small business" status. The Defendants had no expectation that the FCC Applicants would conduct actual business operations. The Defendants understood that DiNardo's formal paper badges of control were meaningless in practical terms. Indeed, through the FCC Applicants' FCC Short-Form and Long-Form applications and the associated documentation, the Defendants made knowingly false representations to the FCC concerning the actual de facto control of the TDS Group over the FCC Applicants. For example, in Exhibit C (amended) to its "disclosure of ownership information" (FCC Form 602), dated April 17, 2008, King Street Wireless falsely stated that DiNardo has "both *de jure* and *de facto* control" in King Street Inc., that she has a

"controlling interest" in the FCC Applicant, and that "[n]o other individual or entity has a controlling interest in the Applicant."

85.     The Defendants made these knowing omissions and false certifications with the intention to induce the FCC to award to the FCC Applicants "very small business" bidding credits of 25 percent off of their high bids.  Specifically, in Auction 58, FCC Applicant Carroll Wireless was the high bidder on 16 licenses with cumulative gross bids of $151,815,000.00 (excluding the winning bid on one license not granted), for which it paid a cumulative net total of $129,695,750.00.  The FCC granted these licenses to Defendant Carroll Wireless on January 6, 2006.  Thus, for licenses acquired in Auction 58, Carroll Wireless and other Defendants received from the FCC a bid credit in the amount of $22,119,250.00.  For Auction 66, FCC Applicant Barat Wireless was the high bidder on 17 licenses with cumulative gross bids of $169,520,000.00, for which it paid a cumulative net total of $127,140,000.00.  The FCC granted these licenses to Defendant Barat Wireless on April 30, 2007.  Thus, for licenses acquired in Auction 66, Barat Wireless and other Defendants obtained from the FCC total bid credits in the amount of $42,380,000.00.  For Auction 73, FCC Applicant King Street Wireless was the high bidder on 152 licenses with cumulative gross bids of $400,638,000.00, for which it paid a cumulative net total of $300,479,000.00.  Thus, for Auction 73, King Street Wireless and other Defendants claimed total bid credits in the amount of $100,159,500.00.  In total, the Defendants fraudulently appropriated $164,658,750.00 in auction funds properly owed to the federal Government.

**F.     The Defendants Have Failed to Return the Value of the Ill-Gotten Credits to the Federal Treasury**

86.     As shown above, federal law requires that the federal Government be reimbursed the full amount of the bidding credit -- valued at the time of auction -- when control over a

discounted license is transferred to an ineligible entity simultaneous with its issuance. Interest also must be assessed from the time the licenses came under the control of an ineligible entity.

87.     In this case, the TDS Group controlled the discounted Auction 58 and 66 licenses from the time they were issued. Licenses acquired by the Defendants in Auctions 58 and 66 were never under the <u>de facto</u> control of Defendant DiNardo or the putative "very small businesses" she asserted were under her control. Rather, with respect to all licenses acquired by Carroll Wireless and Barat Wireless, the TDS Group maintained <u>de facto</u> control as alleged above.

88.     Federal unjust enrichment laws mandate that the full bidding credits received by Defendants — valued at the time the licenses were awarded — be returned to the federal Treasury, plus interest from the date of issuance.

89.     No Defendant has returned any portion of the bidding credit the FCC Applicants received for licenses obtained through Auctions 58 and 66.

**COUNT ONE**
**<u>FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(1) and (2)</u>**

90.     Plaintiff-Relator Lampert, O'Connor & Johnston, P.C. re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 89 of this complaint.

91.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729, <u>et seq</u>., as amended.

92.     By virtue of the acts described above, the Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States Government, and knowingly failed to disclose material facts, in order to induce Government payment or approval.

93.     By virtue of the acts described above, the Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to the United States Government in order to induce the Government to pay or approve false and fraudulent claims.

94.     By reason of these credits, payments or license grants, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT TWO
## FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(3)

95.     Plaintiff-Relator Lampert, O'Connor & Johnston, P.C. repeats and re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 89 of this complaint.

96.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

97.     By virtue of the acts described above, the Defendants conspired to defraud the United States by inducing the Government to pay or approve false and fraudulent claims. Defendants, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making fraudulent representations, by preparing fraudulent records and by failing to disclose material facts to the United States Government.

98.     By reason of these payments or approvals, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT THREE
## FALSE CLAIMS ACT - 31 U.S.C. § 3729(a)(7)

99.     Plaintiff-Relator Lampert, O'Connor & Johnston, P.C. repeats and re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 89 of this complaint.

100.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

101.    By virtue of the acts described above, the Defendants knowingly made, used, or caused to be made or used, false or fraudulent records or statements to the United States Government in order to conceal, avoid or decrease an obligation to pay or transmit money or property to the federal Government.

102.    By reason of the Defendants' fraudulent concealment and/or avoidance, the United States has been damaged, and continues to be damaged, in substantial amount.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator Lampert, O'Connor & Johnston, P.C. prays for judgment against the Defendants as follows:

1.      that the Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.      that this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States has sustained because of the Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3.      that Plaintiff-Relator be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act;

4.      that Plaintiff-Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.      that the United States and Plaintiff-Relator recover such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

/S/

_____

Robert L. Vogel
*DC Bar # 414500*

VOGEL, SLADE & GOLDSTEIN, LLP
5225 Wisconsin Avenue, NW,  Suite 502
Washington, DC 20015
(202) 537-5900 tel
(202) 537-5905 fax

Attorneys for Relator

Date: April 25, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2008, I caused to be served a true copy of the foregoing

Amended Complaint by first class mail, postage prepaid, addressed to:

Ms. Laurie Weinstein
Assistant United States Attorney
United States Attorney's Office
555 4th Street NW
Washington, DC 20530

Mr. Gordon Jones
U.S. Department of Justice
Civil Div., Comm. Frauds Section
P.O. Box 261
Ben Franklin Station
Washington, DC 20044

/S/

_____

Robert L. Vogel
*DC Bar # 414500*

VOGEL, SLADE & GOLDSTEIN, LLP
5225 Wisconsin Avenue, NW,  Suite 502
Washington, DC 20015
(202) 537-5900 tel
(202) 537-5905 fax