# EXHIBIT L

REDACTED FOR PUBLIC INSPECTION

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

| | | |
|---|---|---|
| In re: Applications of | ) | |
| | ) | |
| | ) | |
| King Street Wireless, L.P. | ) | |
| | ) | File No. 0003379814 |
| | ) | |
| For licenses in the 700 MHz Lower Band | ) | |
| | ) | |

## RESPONSE TO INQUIRY FROM THE
## WIRELESS TELECOMMUNICATIONS BUREAU

Respectfully Submitted,

KING STREET WIRELESS, L.P.

By: Thomas Gutierrez, Esquire
Its Attorney

Lukas, Nace, Gutierrez & Sachs, LLP
1650 Tysons Blvd., Ste 1500
McLean, VA  22102
202-828-9470

May 8, 2009

## SUMMARY

The Complaint is a mere compilation of unfounded allegations and innuendo that bears no relationship to either controlling law or applicable facts.  It provides no basis to deny or otherwise question grant of the Licenses.  It is also procedurally defective on a number of grounds.  As such, the Bureau should dispose of the Complaint and grant the Application.

Procedurally, the Complaint lacks the specificity of fact required by Section 309 of the Act and Section 1.1208 of the Rules.  It is also woefully late and includes no showing that the Relator has standing or is otherwise a party in interest.

Substantively, each of Relator's charges is wholly lacking in merit. As demonstrated herein, all Organizational Documents were provided to, reviewed by and ultimately approved by the Bureau to the extent necessary for License grant.  Each of the Limited Partnerships has complied fully with the terms of the Organizational Documents.

Allison Cryor DiNardo's credentials to control the Limited Partnerships are impeccable and unimpeachable.  She holds an MBA from the Darden Graduate School of Business, where she was inducted into the prestigious Raven Society as a reflection of her academic excellence. After graduation, Ms. DiNardo held a number of important management positions, first in non-telecommunications areas, and later in wireless matters.  Many of her wireless activities involved TDS/USCC and helped create a mutual respect that carried over to her controlling role with the Limited Partnerships.

Ms. DiNardo has invested more than $300,000 in the Limited Partnerships.  These funds came from her savings and from family loans.  None of the funds she invested came from

- ii -

TDS/USCC or any affiliate.  None of the loans used to fund her investments have been repaid with funds from TDS/USCC.  Nor are there any plans for repayment, other than those set forth in the Organizational Documents approved by the Bureau.

Ms. DiNardo controlled all aspects of the auction process, from pre-auction research through market selection and actual bidding up to payment of monies to the Commission.  She also continued to control each of the Limited Partnerships after the close of the auctions.  She set up office space for the Limited Partnerships, was intimately involved in the prosecution and amendment of the various applications, established budgets, made capital calls, and organized and controlled partnership meetings.  She leased certain spectrum to third parties and undertook several pre-construction activities, including spectrum clearing and market build design. She has also advocated for the partnerships before the Commission and the Third Circuit and selected and oversaw the Limited Partnerships' accountants.

The Relator's claim that Ms. DiNardo's Limited Partner has acknowledged in separate filings mandated by the SEC that it somehow controls the partnerships is misleading and inaccurate.  The standard for control at the FCC is very different in nature than the control standards applied by the SEC.  The SEC requirements reflect the very conservative requirements of a complex accounting standard designed to protect investors in publicly-traded entities.

For all of the foregoing reasons, the Bureau should promptly grant the Application.

# TABLE OF CONTENTS

SUMMARY .................................................................................................................. ii

TABLE OF CONTENTS .......................................................................................... iv

I.      INTRODUCTION AND OVERVIEW ............................................................ 2

II.     ARGUMENT .................................................................................................... 2

A.      THE COMPLAINT IS PROCEDURALLY DEFECTIVE INSOFAR AS THE COMMISSION'S
        ADMINISTRATIVE CONSIDERATION IS CONCERNED ........................................... 2

B.      THERE IS NOTHING IN THE COMPLAINT THAT WARRANTS DELAY OF GRANT OF THE
        APPLICATION ............................................................................................................... 3

        1.    All of the Organization and Capitalization Documents of Each of the Limited
              Partnerships have Been Candidly Shared With, Negotiated with, and Signed Off
              by Commission Staff, and Demonstrate Complete Compliance With All Applicable
              Commission Rules. ................................................................................................ 4

        2.    Ms. DiNardo is Fully Qualified to Manage and Operate the General Partner and
              Has at all Times Controlled Partnership Operations ........................................... 6

        3.    Ms. DiNardo Controlled All Auction Activities for the Limited Partnerships. ..... 11

        4.    Relator's Grumblings Regarding Proximity of Licenses Bid Upon By the Limited
              Partnerships and Those Held By Their Limited Partner are Factually Inaccurate,
              Ingore Business Realities, and Present No Bona Fide Issues Regarding Control 16

        5.    Ms. DiNardo Has at All Times Controlled the Limited Partnership and Handled
              All Daily and Long-Term Partnership Decisions. ................................................ 17

        6.    Relator's Claim That the Limited Partner's Debt Should Be Treated As Equity is
              Absurd .................................................................................................................. 24

        7.    The Complaint's Distortions of the Statements in TDS/USCC's Public SEC
              Filings Do Not Undermine Ms. DiNardo's De Facto Control of each of the
              Limited Partnerships ............................................................................................ 24

III.    CONCLUSION AND RELIEF REQUESTED .......................................... 29

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

| | |
|---|---|
| In re: Applications of | ) |
| | ) |
| | ) |
| King Street Wireless, L.P. | ) |
| | )   File No. 0003379814 |
| | ) |
| For licenses in the 700 MHz Lower Band | ) |

## RESPONSE TO INQUIRY FROM THE
## WIRELESS TELECOMMUNICATIONS BUREAU

At the invitation of the Chief, Mobility Division, Wireless Telecommunications Bureau ("Bureau") to provide a "written response and any supporting documentation that you deem pertinent in responding to the allegations included in the First Amended Complaint" ("Complaint") as identified in the Bureau letter to counsel for King Street dated April 14, 2009 (DA 09-822),[1] King Street Wireless, L.P. ("King Street")[2] submits the following response:

---

[1] The United States District Court for the District of Columbia permitted partial disclosure and release of the Complaint so that it might be used "in connection with the Commission's administrative consideration of the applications for licenses."  See Order *United States of America, ex rel. v Carroll Wireless, L.P.*, *et al*, attached to the Bureau's letter of April 14, 2009.

[2] King Street, the participant in Auction 73, is a limited partnership whose sole general partner, King Street Wireless, Inc. is wholly-owned by Ms. DiNardo.  The sole limited partner of King Street is USCC Wireless Investment, Inc. ("USCCWI" or "Limited Partner"), a wholly-owned subsidiary of United States Cellular Corporation ("USCC"), which itself is owned approximately 80% by Telephone and Data Systems, Inc. ("TDS" and together with USCC, "USCC/TDS").  The Complaint makes identical and equally meritless allegations about Carroll Wireless, L.P. ("Carroll") and Barat Wireless, L.P. ("Barat"), licensees of spectrum awarded in Auction Nos. 58 and 66, respectively.  Ms. DiNardo also is the sole shareholder of the sole general partner (Carroll PCS, Inc., and Barat Wireless, Inc., respectively) of both of these licensees; USCCWI also is the sole limited partner of both Carroll and Barat (collectively and with King Street the "Limited Partnerships").

- 1 -

## I.     INTRODUCTION AND OVERVIEW

The Complaint is nothing more than a compilation of unfounded allegations and innuendo that bear no relationship to either controlling law or applicable facts.  As such, it provides no basis to deny or otherwise question the grant of the subject licenses (the "Licenses") to King Street.  Accordingly, King Street urges that the Commission staff promptly reject the Complaint with regard to any administrative consideration of the Licenses by the Commission, and promptly grant this application (the "Application").

## II.    ARGUMENT

### A.     The Complaint is Procedurally Defective Insofar as the Commission's Administrative Consideration Is Concerned

The Complaint is procedurally defective with respect to administrative consideration, regardless of whether it is considered a petition to deny or an informal request for Commission action.  The Complaint fails to meet the most basic evidentiary standard mandated by Congress and confirmed by the Commission: specific allegations of fact supported by a sworn statement of a person or persons with personal knowledge thereof.[3]  47 U.S.C. § 309(d); 47 C.F.R. §§ 1.2108(b).  The Complaint fails to provide any evidentiary facts that support Relator's

---

[3] Even though the Relator in the Complaint did not submit it to the Commission, this requirement is far more than a formality.  Under the two-step analysis for petitions to deny required by Section 309(d) and case precedent, any petitioner must do more than make summary conclusions of law; the petitioner must first establish a *prima facie* case that a grant of the application would be inconsistent with the public interest based on "concrete factual assertions" supported by sworn testimony from persons with first-hand knowledge, and then show that the "totality of the evidence" presents a substantial and material question of fact requiring an evidentiary hearing for resolution.  *See Gencom v. FCC*, 832 F.2d 171 (D.C. Cir. 1987); *Astroline Communications Co. Ltd. Partnership v. FCC*, 857 F.2d 1556 (D.C. Cir. 1988); *see also Minnesota PCS Limited Partnership*, 17 FCC Rcd. 126, 132 (CWD 2002); *Continental Satellite Corp.*, 10 FCC Rcd. 10473 (IB 1995); *Julie P. Miner*, 52 F.C.C.2d 684 (Rev. Bd. 1975); *Guy S. Erway*, 40 F.C.C.2d 956 (Rev. Bd. 1973) (allegations based solely on speculation and surmise do not meet the specificity requirements of the Commission's rules for designation of an issue with respect to an application).

arguments, and includes no sworn supporting statement.  As released, it fails to even identify the filer, *i.e.*, the Relator.[4]

The Complaint fares no better if viewed as an informal objection pursuant to Section 1.41 of Title 47 of the Code of Federal Regulations  (the "Rules") because such objections may be filed only where no formal filing procedures exist.  47 C.F.R. § 1.41.  Here, Section 309(d) of the Act and Section 1.2108 of the Rules applies, thus obviating any right to file informal objections in this proceeding.  The Commission should not ignore its rules and treat the Complaint as a formal petition or informal request for Commission action simply because it desires to do so. *See Reuters Limited v FCC*, 781 F.2d 946, 950-51 (D.C. Cir. 1986).[5]

**B.      There is Nothing in the Complaint that Warrants Delay of Grant of the Application**

The primary allegations of Relator are addressed below.  Its other allegations, which are immaterial, are not addressed in any detail because they do not warrant the Commission's attention.[6]

---

[4] There are numerous other procedural defects.  For instance, there is no demonstration of standing, which makes it impossible for King Street to assess, and possibly impeach, the credibility of the Relator.  It is also late-filed, without explanation.  King Street's long-form FCC Form 601 application was placed on public notice on April 22, 2008, and petitions to deny were due to be filed on or before May 2, 2008.  *See* 47 C.F.R. § 1.2108(b); Report No. AUC-73, DA 08-927, at 1-2.

[5] There, Judge Starr explained the obvious: that *ad hoc* deviations from established rules cannot be sanctioned without setting "the seeds of destruction of the orderliness and predictability which are the hallmarks of administrative action."

[6] Three of the more immaterial allegations are (a) the timing of the Limited Partnerships' lease for the corporate offices; (b) the late filing of certain corporate documents; and (c) the timing of certain initial corporate documentation.  With respect to the office lease, there is no significance to the fact that the terms of the office lease were formally agreed upon after initial filings, and that the earliest office address reported to the Commission was also Ms. DiNardo's home address.  Similarly, the fact that one or two ministerial corporate documents were filed late has no discernible significance.  Notably, both of these very minor matters were promptly corrected.  The Limited Partnerships and their partnership entities were formalized in a timely manner immediately after the final decision permitting them to participate in the auctions was rendered.

1.      **All of the Organization and Capitalization Documents of Each of the Limited Partnerships Have Been Openly Shared, Negotiated, and Signed Off by Commission Staff, and Demonstrate Complete Compliance with All Applicable Commission Rules.**

Relator's initial argument is that the very organization and capitalization provisions for each of the Limited Partnerships were not known and understood by the Commission, or somehow raise current questions regarding control.[7]  Complaint, ¶ 48.  There are multiple problems with that argument.

As is Relator's pattern throughout the Complaint, it has its basic facts wrong.  The pertinent facts involving the Limited Partnerships' organization or capitalization arrangement were not "disguised" or somehow "not disclosed" to the Commission.  To the contrary, the Organizational Documents were all submitted to Commission staff for review, were subjected to extensive review by the Commission staff, were renegotiated between Commission staff and King Street and were ultimately approved by the Commission staff to the extent necessary to permit license grants in the case of Carroll, Barat, and (soon we expect) King Street.[8]

Relator's purported understanding of the facts involving capitalization and distributions is equally errant.  Contrary to Relator's assertion, TDS/USCC has not "provided all of the hundreds

---

[7] The documents that the Commission reviewed for each or most of the Limited Partnerships include: the Agreement Establishing the Partnership; the Loan Agreement; the Loan and Security Agreement; the Investment Agreement; the Management Agreement; the Pledge Agreements; Promissory Notes; and the Bidding Protocol, with Amendments (collectively, the "Organizational Documents").

[8] In granting the applications, the Commission staff considered the totality of information provided to them.  One important factor likely considered was the limited partnership character of the applicants.  In this regard, and unlike other organizational structures that other applicants employed, the limited partnership structure provided an extra level of protection.  Under black letter partnership law principles, a limited partner cannot control or manage the operations of the limited partnership.  It is the general partner who has the authority and obligation to assume those responsibilities.

of millions of dollars necessary for the Commission Applicants' upfront payments and net winning bid payments."  Complaint, ¶ 74.  Rather, consistent with the provisions of the Organizational Documents, Ms. DiNardo and the Limited Partner were responsible for contributing, in aggregate, equity of 20% of funding needs, with the remainder being debt funding, provided that the Limited Partner agreed to loan the general partner certain levels of funds in the event that its contribution obligations exceed the initial equity contribution. Significantly, in King Street, as it is in each of the Limited Partnerships, Ms. DiNardo's initial equity contribution was at least $100,000.00.  The initial equity contributions from Ms. DiNardo to each of the entities came from Ms. DiNardo and her husband, an analyst with the Federal Bureau of Investigation.  Some of the funds were borrowed by them from family members, but no part of any contribution came from the Limited Partner or any of its affiliates.  Equally significant, no part of Ms. DiNardo's initial contributions has been repaid to her, in any manner, by the Limited Partner or any of its affiliates and there are no plans for such repayment (except as set forth in the Organizational Documents that were approved by Commission staff.)

Relator's arguments are also at odds with applicable law and the core policy underlying the Commission's designated entity ("DE") program.  Concerning equity investments, the Commission is clear that under applicable rules there is no minimum amount of equity that the controlling interests must hold.[9]  That is, of course, one reason why the Commission staff was

---

[9] Amendment of Part 1 of the Commission's Rules – Competitive Bidding Procedures, WT Docket No. 97-82, *Order on Reconsideration of the Third Report and Order, Fifth Report and Order, and Fourth Further Notice of Proposed Rulemaking*, 15 FCC Rcd. 15,293, ¶¶ 65-66 (2000).  *See Implementation of Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 FCC Rcd. 4753 (2006); *Applications of Alaska Native Wireless, L.L.C.*, 17 FCC Rcd. 4231 (WTB 2002) (confirming that non-controlling interest of approximately 80% did not require conclusion that interest holder assumed control even in the

comfortable granting licenses to Carroll and Barat.  Moreover, the Commission staff properly

considered and accepted the magnitude of the capital contributions made by Ms. DiNardo.

Indeed, the Commission staff's only stated concern was that her initial capital contributions did

not come from the Limited Partner or a related entity.  Each of the Limited Partnerships has

repeatedly confirmed to the Commission that the initial funding did not come from any such

source, and King Street hereby confirms that again.[10]  The Commission has correctly concluded

that the organizational structure and agreements of the Limited Partnerships do not adversely

impact their control by Ms. DiNardo, and as the facts demonstrate, she has not relinquished such

control.

**2.** **Ms. DiNardo Is Fully Qualified to Serve as General Partner**

With respect to Ms. DiNardo's qualifications, Relator incorrectly and inconsistently

claims that, at the time that each of the Limited Partnerships was formed, Ms. DiNardo, on one

hand, was unqualified to serve, and on the other hand, had too much prior, directly applicable

experience with the Limited Partner to be independent.  *See* Complaint, ¶¶ 65, 67.  Relator

cannot have it both ways and is factually wrong on both counts, in any event.

Ms. DiNardo's credentials are impeccable.  She graduated in 1988 from the Darden

Graduate School of Business at the University of Virginia, one of the Nation's most prestigious

graduate business schools.  There, she was inducted into the Raven Society in recognition of her

---

presence of rights held by limited liability member); *Minnesota PCS Limited Partnership*, 17 FCC Rcd. 126, 132
(CWD 2002) (confirming that non-controlling interest of approximately 85% did not require conclusion that interest
holder assumed control even in the presence of rights held by the limited partner).

[10] *See* Exhibit XXI  the Declaration of Allison Cryor DiNardo attesting to facts set forth in this Response.

academic achievement and leadership. That experience provided her with a top flight business

education and foundation in addition to vital contacts that would help her throughout her career.

After receiving her MBA, Ms. DiNardo worked as Deputy Associate Director for

Presidential Personnel in the White House. Subsequently, she created and oversaw a

$165,000,000 capital campaign at the University of Virginia in Charlottesville. In 1998, Ms.

DiNardo returned to Washington, D.C. to serve as Vice President for Development for Citizens

for a Sound Economy. There she managed a team of eight employees and an annual capital

campaign which raised $18,000,000 annually.

One of the significant business contacts that Ms. DiNardo made while earning her MBA

was fellow student Mark Kington. Through her association with Mr. Kington, Ms. DiNardo

came to manage a family office, a multi-million dollar foundation and to oversee an active,

working commercial farm. Among other things, she was hired as President and Chief Operating

Officer of Kington Management Corporation ("Kington Management") and was in charge of

hiring and managing staff, financial reporting, managing budgets, hiring and training accountants

and administrative staff and interfacing with tax professionals and legal counsel. Most

importantly, through her management of Kington Management, Ms. DiNardo became quite

familiar with the wireless industry.

Ms. DiNardo's association with Mr. Kington immersed her in the wireless business.

Starting in 2000, Ms. DiNardo managed the operations for the general partner and later entities

of Black Crow Wireless, L.P. ("Black Crow"), Eastern Shore Wireless Company, LLC ("Eastern

Shore"), Jackson Square Wireless, L.P. ("Jackson Square"), K-25 Wireless, L.P. ("K-25"), X-

10 Wireless, L.P. ("X-10") and Y-12 Wireless, L.P. ("Y-12"). In these businesses, Ms. DiNardo

oversaw system purchases, federal, state and local filings, market build-out, site leasing, interconnection and backhaul arrangements and overall system management.

Ms. DiNardo played a key role for Black Crow in Auction No. 35, conducted by the Commission, commencing in 2000.  She was directly involved in bidding strategy, market selection, office acquisition, bidding mechanics and technology utilization and financial management activities.  Black Crow was the high bidder for seventeen licenses in Auction No. 35, but due to matters involving prior issuance of the licenses there at issue, it ended up holding five licenses from Auction No. 35.

At the conclusion of Auction No. 35, Ms. DiNardo worked with investment banks to borrow some of the funds to pay for the licenses won by Black Crow.  Her responsibilities involved overseeing purchases and building out markets, including the review of tower site leases, securing T-1 lines, and the oversight of the engineering bid process.  In addition to her responsibilities managing Black Crow, Ms. DiNardo was responsible for the management of additional wireless properties controlled by Mark Kington, including wireless properties acquired and operated by Jackson Square, K-25, X-10 and Y-12.  For each of these DE licensees, Mr. Kington's corporations served as the general partner and USCCWI served as the limited partner.[11]  Through her management of these wireless entities, Ms. DiNardo gained valuable operational experience in the wireless industry.  For example, Ms. DiNardo learned about the

_____

[11]  The issue of whether TDS/USCC had assumed *de facto* control of X-10, Y-12 and K-25 was placed directly before the Commission in a "Petition for Investigation" of the assignment of licenses to those entities.  Treating the pleading as an untimely Petition to Deny, the Commission nevertheless also rejected it on the merits, finding that despite an 85% equity investment in the limited partnerships by TDS/USCC, and governing documents similar to those that govern the Limited Partnerships, Kington Management maintained *de facto* control of the entities.  *See Minnesota PCS Limited Partnership*, 17 FCC Rcd. 126, 132 (CWD 2002).

issues encountered in the rapid build-out of wireless operations with K-25, which purchased wireless interests in Minnesota with less than three months left to meet Commission build-out deadlines.  In addition, Ms. DiNardo obtained direct operational experience associated with the purchase by Y-12 of Amica Wireless, a wireless carrier with approximately 8,500 wireless subscribers at the time of purchase.  In connection with Y-12, Ms. DiNardo was involved in arranging for the building of new cell sites, changing the cash management system of the company, revamping customer service, training staff, reorganizing its four stores, and changing senior management.  Under her leadership, Y-12 experienced a 20% increase in its customer base in highly competitive markets and an increase in net operating profits.

Ms. DiNardo's involvement in Black Crow, X-10, Y-12, K-25 and Eastern Shore Wireless provided her with an opportunity to showcase her acumen and skills.  Ms. DiNardo's performance in each of these businesses was stellar in every way.  The businesses served the public and demonstrated that the Commission's fragile DE program could work.  Additionally, through the operation of these businesses, Ms. DiNardo and the entity that would become her Limited Partner in King Street and the other Limited Partnerships developed a trusting and respectful relationship.  In short, Ms. DiNardo's performance in these ventures formed the basis for her general partnership role in the Limited Partnerships.  Consequently, Relator's charges of some unspecified inappropriate business relationship border on the comical.  This is especially so

given that none of these business relationships carried with them any strings of any nature that carried over to future dealings.[12]

As a result of these experiences, Ms. DiNardo developed an interest in creating and running her own company to develop and operate a wireless business.  Thus, despite the financial risks inherent in foregoing her position with Kington Management, including the loss of considerable salary and the inherent risks in starting her own company, Ms. DiNardo opted to pursue opportunities in the wireless industry through the DE program.  In the fall of 2004, Ms. DiNardo approached TDS/USCC about forming a joint venture to participate in Auction No. 58.[13]  Given her considerable prior experience with TDS/USCC, and her knowledge of their operating styles, Ms. DiNardo believed that TDS/USCC would be a good partner in the wireless business, and anticipated that the respect may well be reciprocal.  She was familiar with the employees at TDS/USCC at many different levels and was comfortable with their business practices; in turn TDS/USCC had experience with her business style and operational expertise in wireless businesses, as well as a familiarity with her ability to participate in Commission auctions.

---

[12] Relator refuses to appreciate the difference between (a) the development of a strong, trusting business relationship based upon earned respect and demonstrable achievement, as developed here, and (b) the existence of some inappropriate tying relationship, as Relator speculates exist.  This refusal is evidenced by the Relator's deceptive use in the Complaint of the terms "identity of interest" and "material relationship," which are defined in Section 1.2110 of the Commission's rules, and in no way encompass the relationship between Ms. DiNardo and USCCWI, the Limited Partner.

[13] Relator's wholly speculative and unsupported theory that the formation was somehow "orchestrated" by Ms. DiNardo's Limited Partner is wildly inaccurate.  Complaint, ¶ 59.  Moreover, and to state the obvious, what matters with respect to applicant eligibility is not the genesis of an applicant, but rather its organization and operation.

3.      <u>**Ms. DiNardo Controlled All Auction Activities for the Limited Partnerships.**</u>

- 11 -





- 14 -

██████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

**4.** **Relator's Grumblings Regarding Proximity of Licenses Bid Upon By the Limited Partnerships and Those Held By Their Limited Partner are Factually Inaccurate, Ignore Business Realities, and Present No _Bona Fide_ Issues Regarding Control**

████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████

**5.      Ms. DiNardo Has at All Times Controlled the Limited Partnership and Handled All Daily and Long-Term Partnership Decisions.**

Relator next argues that "DiNardo has not handled daily and/or long-term business decisions, management or operation of the licenses that were the subject of Auction Nos. 58, 66 and 73."  Complaint, ¶ 67.  Like every other substantive allegation in the Complaint, this one is wholly at odds with the facts and cannot be used to support the Relator's summary conclusions of law.  To provide the Commission with an accurate factual accounting, below is a listing of certain of the major activities and responsibilities that Ms. DiNardo has undertaken with respect to the Limited Partnerships.[14]

---

[14] These activities are entirely consistent with the responsibilities and obligations of the general partner as set forth in the Limited Partnership Agreement, which include the conducting of the business and affairs of the Limited Partnerships on a day-to-day basis, including binding the Limited Partnerships, conducting their auction bidding activity, purchasing or leasing equipment, selling or leasing or otherwise assigning its assets in the ordinary course, borrowing funds, employing agents and independent contractors, negotiating and entering contracts, making payments on behalf of the Limited Partnerships or otherwise managing its finances and arranging for the filing of all necessary applications.  Ms. DiNardo is also responsible for preparing budgets and financial statements and the filing of tax returns.

a. Prior to the advent of each of the auctions, Ms. DiNardo assessed the primary auction parameters (markets, spectrum, number of licenses, etc.) and determined whether or not she would participate. She selected counsel for the Limited Partnerships. She also familiarized herself with the ever-changing technical and logistical rules for the auctions and participated in Commission -sponsored mock auctions.

b. Ms. DiNardo, with the assistance of her counsel, ran and controlled the application process. She was directly involved in the filing of the short-form (Form 175) applications, reviewing and approving each one prior to submission. She was equally involved in any minor amendments to the applications that the staff requested. She also controlled, both substantively and ministerially, the submission of pre-auction up-front payments (and later, full license payments). She directly arranged for the establishment of both the Limited Partnership and the general partner corporate entities.

c. Once a decision was made to participate in an auction, and as set forth in more detail in Section 3, *supra*, Ms. DiNardo ran and controlled the bidding for all of the Licenses. She personally participated in each of the many hundreds of rounds of bidding involved in the process. She participated in determining which markets would be primary bidding targets, and in negotiating bidding caps for various groups of markets. The final decision on markets that were the subject of Limited Partnership bids belonged to, and was exercised by, Ms. DiNardo.

d. After each auction, Ms. DiNardo, again with the assistance of her counsel, was directly involved with and controlled the process for obtaining Commission approval of the high-bid applications. She reviewed and approved the long-form (Forms 601 and 602) applications and their amendments. Through counsel, she negotiated with Commission staff numerous changes to

the organizational and funding documents associated with the licensees.  To illustrate, in one instance the Commission staff requested several dozen minor modifications to the Organizational Documents set forth in the long form application and Ms. DiNardo determined which changes could be made that were appropriate and acceptable.  Throughout this process, the involvement of her Limited Partner was primarily limited to understanding the overall magnitude of Commission staff on requests and signing off only on changes that limited the rights that it had previously negotiated with Ms. DiNardo.

    e.   Both before and after grant of any licenses, Ms. DiNardo undertook myriad organizational and management tasks, including, but not limited to, the following:

        i.      Ms. DiNardo obtained leased facilities for the Limited Partnerships and negotiated the terms of the facility leases;

        ii.     Ms. DiNardo prepared all quarterly and annual budgets for the Limited Partnerships;

        iii.    Ms. DiNardo prepared, delivered and processed all capital calls for each of the Limited Partnerships; and

        iv.     Ms. DiNardo scheduled, conducted and controlled all meetings of each Limited Partnership.

    f.   In the case of Barat, Ms. DiNardo surveyed several specialized entities to assist in the unique spectrum clearing needs for the spectrum at issue.  Ultimately, she retained ███████, a consulting firm with no prior business relationship with TDS/USCC.  She then worked and is still working with ███████ to assure that all necessary clearance activities are being

undertaken appropriately and in a timely manner.  Exhibits I through IX are a sampling of

communications and reports involving ██████████ and Ms. DiNardo.

g.      In the case of Carroll, Ms. DiNardo arranged for some of its spectrum to be leased to

other licensees.  Significantly, her counsel was the primary drafter of such leases.  Along with

counsel, Ms. DiNardo was primary negotiator for the leases.  She was the person who

determined what substantive terms were appropriate and acceptable, whether to lease the

spectrum and who executed the leases.  All proceeds from the leases were paid directly to

Carroll, and the funds are being used by Carroll for the benefit of Carroll.  Exhibits X and XI are

copies of these leases.

h.      In the case of King Street, Ms. DiNardo, again working with her counsel, retained

engineering consultants of her choosing to undertake an ever-evolving Channel 51 analysis in

order to ascertain and minimize King Street's interference protection obligations.  Significantly,

none of the consultants has any relationship to, nor has done any prior work for, the Limited

Partner.

i.      In the case of Carroll, Ms. DiNardo retained an engineering consultant, whom she used

while managing ████████████, to undertake an analysis of the five-year build out obligations

for the licensee.  This consultant has not done prior work for Ms. DiNardo's Limited Partner, and

the analysis was designed solely to complete construction efficiently and consistent with

applicable Commission rules without any consideration of any individual wants or needs of the

Limited Partner.

j.      On behalf of the Limited Partnerships that she controls, Ms. DiNardo has actively

participated in various Commission rulemaking and adjudicatory proceedings.  Exhibits XII –

XVI hereto are copies of rulemaking and ex parte submissions of Ms. DiNardo.  Exhibits XVII

and XVIII are copies of an adjudicatory proceeding in which Ms. DiNardo has caused one of her

Limited Partnerships to participate.

k.   Ms. DiNardo has also, working with counsel, overseen and controlled the filing of

numerous reports to the Commission.  Exhibits XIX and XX are examples of such reports.

l.   Ms. DiNardo has selected and interfaces almost exclusively with the Limited

Partnerships' accountants.  Ms. DiNardo is also responsible for cash management for the Limited

Partnerships, including the cash generated by the spectrum leases discussed above.  She prepares

and maintains all financial statements for each of the Limited Partnerships.

m.   Ms. DiNardo arranges for the preparation and filing of all federal, state and local tax

returns on behalf of each of the Limited Partnerships.

n.   Ms. DiNardo, alone, has controlled all hiring and firing decisions for employees (as well

as contractors) of the Limited Partnerships.

o.   Ms. DiNardo has met with and screened multiple potential venders for several of the

Limited Partnerships.

p.   Ms. DiNardo is a member of the Cellular Telecommunications and Internet Association

("CTIA") and is a regular attendee at CTIA Conferences.

q.   Ms. DiNardo has also repeatedly met with Congressional staff and with Commission

"Eighth Floor" staff to provide input and analysis regarding substantive industry activities.

Given these facts, it is difficult to comprehend how Relator, in good faith, could make the

allegations included in the Complaint.  Nevertheless, and recognizing that the above-listing of

Ms. DiNardo's activities on behalf of the Limited Partnerships has thoroughly debunked the

claim of Relator concerning control of the Limited Partnerships, several further comments are appropriate.

First, were the Limited Partnerships to have remained absolutely dormant, which they have not, no rule or policy would have been violated.  After all, the Commission's rules prescribe when activity is required: at the five-year mark for Carroll and at the ten-year mark for Barat and King Street.  None of those deadlines has yet arrived, and each of the Limited Partnerships will be compliant when they do.

Second, relatively low-key activity is the rule, rather than the exception, for most entities which acquired licenses in Auction Nos. 58, 66, or 73, particularly smaller ones.  A review of the Commission's ULS database reveals that, in the case of Auction No. 58 winners, only one-third of the licensees have reported meeting even their first build-out requirement, *i.e.* two-thirds have not completed and reported even preliminary build-out.  There is far less discernable build-out activity for the later auctions, which include the need for spectrum clearing.

Third, the King Street licenses have not yet been granted, even though they were paid for in full over one year ago.  Moreover, the time upon which 700 MHz licenses have unfettered access to their spectrum has not yet arrived.  Under such circumstances, no meaningful activity could be expected of any would-be licensee.

Fourth, in the case of Barat, the federal government has been slow to move off of its spectrum, with the corresponding effect that use of the spectrum has been delayed considerably on an industry-wide basis.

Finally, the interrelated nature of the auctions cannot be ignored.  In each instance, potential bidders understand that they must participate in the auction or risk losing the

opportunity to have access to the spectrum at issue. In addition, they must bid without any clear knowledge of what additional spectrum will become available in future auctions, or when.

In the case of the auctions at issue, they transpired in somewhat rapid fire order. Auction No. 58 was conducted during the first quarter of calendar year 2005; Auction No. 66 was conducted in the summer of 2006; and Auction No. 73 was conducted in the first quarter of calendar year 2008. Moreover, the processing of DE applications generally, and the Limited Partnerships' applications specifically, was lengthy. The Carroll applications were not granted until eleven months after the auction close. The Barat applications were not granted until almost eight months after auction close. The King Street applications have still not been granted. With respect to the Limited Partnerships, no sooner were applications granted than preparation for the next auction had to commence in earnest.

There is one final, very important factor that argues against quicker build-out of spectrum. Unless and until licensees have a reasonable understanding of what spectrum they ultimately will have to work with, it is simply not possible for them to know how to deploy spectrum already licensed to them most efficiently. For example, if a licensee holds PCS (Carroll) and AWS (Barat) spectrum and may come to hold 700 MHz (King Street) spectrum, before implementing either PCS or AWS spectrum it must keep in mind that the 700 MHz spectrum that it *may* obtain will be approximately four times as cost-efficient to build in a green field context and, due to vastly superior propagation and penetration characteristics, may well be deployable much more quickly, even with later license issuance dates. Moreover, given the vagaries and lack of certainty of when federal agencies will vacate AWS spectrum, it is impossible to plan reliably or implement systems using the spectrum at issue.

- 23 -

6.     **Relator's Claim That The Limited Partner's Debt Should Be Treated As Equity Is Absurd**

Relator also claims that any debt of the Limited Partnerships that is owed to the Limited Partner is the equivalent of equity.  It is not apparent whether that accusation reflects Relator's confusion regarding the facts, the law or both, but it is clear that the Relator 's assertion is simply wrong.

To begin with, the debt terms of the Limited Partnerships are standard debt terms, including the interest rate, duration, collateralization, lack of any convertibility option, and other basic terms.  The Commission has repeatedly held that, under such arrangements, debt will be treated as debt.  *See, e.g. NextWave Personal Communications, Inc.* 12 FCC Rec. 2030 (1997).  Moreover, the credit arrangements involved in the Limited Partnerships have been vetted thoroughly by the Commission before any license grants.  Lastly, even if some portion of the debt were deemed to be equity, it does not follow that any equity threshold would be violated here – as the Commission has both approved the arrangements at issue and has pronounced, without exception, that there are no minimum equity levels for DEs.

7.     **The Complaint's Distortions of The Statements in TDS/USCC's Public SEC Filings Do Not Undermine Ms. DiNardo's *De Facto* Control of Each of The Limited Partnerships**

Relator incorrectly asserts that various SEC filings by TDS and USCC (annual reports on Form 10-K, quarterly reports on Form 10-Q and Form 8-K filings) somehow demonstrate that TDS and USCC intend to take "controlling interests" in the Limited Partnerships.[15]  The

---

[15] Complaint, ¶¶ 8, 9.

Complaint summarily asserts that TDS and USCC constructed "sham FCC Applicants" as "general partners" and itself as a "limited partner" to "deceive the FCC." The Complaint continues that in contrast, "[t]o the U.S. Securities and Exchange Commission and to investors, … US Cellular and TDS have made plain the true nature of these relationships." This is followed by a series of unrelated quotations from various SEC filings which, out of context, make reference to TDS or USCC's business plans regarding the partnership licenses. In a number of places, the filings note that USCC "consolidates" the Limited Partnerships "for financial statement purposes, pursuant to the guidelines of FASB Interpretation No. 46R … as U.S. Cellular anticipates absorbing a majority of … expected gains or losses."[16]

The only sham here is the Relator's argument. The SEC filings do not establish that TDS/USCC controls the Limited Partnerships. In all cases, the SEC statements cited in the Complaint were made with the intention of insuring compliance with FASB Interpretation No. 46, commonly known as FIN 46.[17] FIN 46 establishes the term "controlling financial interest," (i) based on factors that are distinguishable from the Commission's standards for *de jure* or *de facto* control, and (ii) applies a new "risk and rewards" model for consolidating interests that would not be consolidated as controlling interests. Under FIN 46, a filer is deemed to have a "controlling financial interest" and is required to consolidate the Limited Partnerships with its financial statements if a two step test is met. First, the filer, in this case TDS/USCC, must

---

[16] Complaint, ¶ 62.

[17] A predecessor of FIN 46 had been guiding financial statement reporting since 1958. In 2003, however, following the collapse of Enron, FIN 46 was issued and substantially expanded the circumstances that would require the consolidation, on the balance sheet of a reporting company (e.g., TDS/USCC), of other entities (e.g., the Limited Partnerships), even when the reporting company does not control them.

determine whether TDS or USCC has a financial interest in the Limited Partnerships that increases and decreases in value according to increases and decreases in the value of the entity's assets and liabilities, including the Limited Partnerships' profits and losses, a "variable interest." If TDS or USCC has such a variable interest, the filer must next determine if it holds the majority of the risks and rewards associated with the Limited Partnerships.  If it does indeed hold a majority of the risks and rewards, the filer would be deemed, under FIN 46, to have a "controlling financial interest" and would be required to consolidate the Limited Partnerships with its financial statements.  The propriety of this analysis and treatment of the interest of TDS/USCC in the Limited Partnerships is confirmed in the declaration of Douglas Shuma, the Senior Vice President and Controller of TDS, attached as Exhibit XXII.

Although financial accounting rules require TDS/USCC to consolidate financial information of the Limited Partnerships with its financial statements, this does not equate to legal control, either *de facto* or *de jure*.  The legal control of Limited Partnerships is determined by its governing documents and applicable legal authority and not by accounting requirements even when mandated for SEC filings.   In particular, TDS/USCC is not permitted to exercise *de jure* or *de facto* control of the Limited Partnerships under the laws of the State of Delaware or under Commission's rules.  As demonstrated in this response, it has not done so.

The Complaint also erroneously asserts that—because TDS/USCC generally acknowledge that they maintain a business development strategy to purchase controlling interests in wireless licenses in areas adjacent to, or in proximity to, their other wireless licenses, thereby building contiguous operating market areas to take advantage of long-term operating synergies— TDS/USCC must control *every* partnership in which they acquire an interest, including the

- 26 -

Limited Partnerships.[18] As the Commission must recognize, having a general business plan and strategy to guide the corporate development strategy of one of the top five wireless service providers in the United States does not mean that *each and every* venture in which it engages will involve acquisition of a controlling interest. In no disclosure cited by the Relator does TDS/USCC state that it controls any of the Limited Partnerships. In fact, the TDS/USCC disclosures generally identify the Limited Partnerships as separate and distinct ownership interests of TDS/USCC spectrum, and do not indiscriminately lump them into the reports of TDS/USCC spectrum.[19]

It is deceptive and disingenuous for the Relator to quote general company policies (which are consistent with every conclusion regarding the wireless marketplace made by the Commission since the early 1980s), and take specific comments (including those required by FIN 46) about the non-controlled Limited Partnerships out of context and then state or imply that TDS/USCC *must* currently be controlling those properties or have an agreement in place to acquire or control them in the future. This simply is not the case. Ms. DiNardo is in control of that eventuality, just as she controls the Limited Partnerships' operations today.

Simply put, TDS/USCC does not have any unilateral right to acquire more than its limited partnership equity in any of the Limited Partnerships. Moreover, it has no right to control them. Indeed, TDS/USCC has recognized, that for periods from five to ten years, the Commission's rules severely limit the business transactions that TDS/USCC can enter into with

---

[18] *See* Complaint, ¶¶ 8, 9.

[19] Thus, as noted in ¶ 8 of the Complaint, TDS separately describes Carroll.

the Limited Partnerships, even in the absence of control, without triggering the obligation to make payments to the government for some or all of the value saved through receipt of the bidding credits. Instead of participating in the "sham" that is speculatively and irresponsibly alleged by the Relator, Ms. DiNardo sensibly decided primarily to acquire markets in which her Limited Partner likely will serve as a strategic partner and potential customer, and to avoid isolated stand-alone markets that other wireless carriers likely valued more highly than she did, or where the Limited Partnerships would have suffered significant difficulties in competing against independent and more geographically strategic wireless providers.

As discussed above, Ms. DiNardo did exercise the discretion afforded her as the president and sole shareholder of the controlling general partner, and acquired markets that TDS/USCC, if left to bid on its own, would likely not have acquired even though some portion of the market was proximate to a TDS/USCC market. Where Ms. DiNardo exercised such control on such an important matter as the purchase of a license, it can hardly be concluded that there is any legitimate question of fact concerning her control of the day-to-day operations of the Limited Partnerships, especially given the thorough range of her activities on behalf of the applicants and the Limited Partnerships.

### III.   CONCLUSION AND RELIEF REQUESTED

As demonstrated above, the Complaint is both substantively and procedurally infirm. Most certainly, it presents no basis to delay or otherwise impact upon grant of the captioned application.

WHEREFORE, King Street urges the Bureau to dispose of any administrative consideration of the Complaint and to grant promptly the Application.

Respectfully Submitted,

KING STREET WIRELESS, L.P.

By: Thomas Gutierrez, Esquire
Its Attorney

Lukas, Nace, Gutierrez & Sachs, LLP
1650 Tysons Blvd., Ste 1500
McLean, VA  22102
202-828-9470

May 8, 2009

- 29 -

## EXHIBITS TO RESPONSE

I.      ███████████████████████████

II.     ████████████████

III.    ████████████████████████

IV.     █████████████████████████

V.      ████████████████████████

VI.     █████████████████████████

VII.    ████████████████████████

VIII.   ██████████████████████████

IX.     ██████████████████████████

X.      ████████████████████████████████

XI.     ████████████████████████████████

XII.    Carroll Comments of February 24, 2006 in WT Docket No. 05-211

XIII.   DiNardo Comments of November 3, 2008 in WT Docket No. 06-150, etc.

XIV.    Barat and Carroll *ex parte* filing of June 28, 2007 in CC Docket No. 94-102, etc.

XV.     Barat and Carroll *ex parte* filing of July 24, 2007 in PS Docket No. 06-229, etc.

XVI.    DiNardo *ex parte* Comments of June 28, 2007 in WT Docket No. 03-264

XVII.   Response to Submissions of Ameer Flippen, dated April 11, 2005

XVIII.  Amici Brief in Case No. 06-2943 (Council Tree Appeal) in Support of the Federal Communications Commission, Oct 20, 2006

XIX.    Annual DE Report for Barat, dated April 29, 2009

XX.      Annual DE Report for Carroll, dated January 9, 2009

XXI.     Declaration of Allison Cryor DiNardo

XXII.    Declaration of Douglas Shuma

**EXHIBIT I**



**EXHIBIT II**

**EXHIBIT III**



**EXHIBIT IV**



**EXHIBIT V**



**EXHIBIT VI**



**EXHIBIT VII**



# EXHIBIT VIII



# EXHIBIT IX



**EXHIBIT X**

# EXHIBIT XI



**EXHIBIT XII**

**Carroll Comments of February 24, 2006
in WT Docket No. 05-211**

<div align="center">

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

</div>

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Implementation of the Commercial Spectrum | ) |
| Enhancement Act and Modernization of the | )   WT- Docket No. 05-211 |
| Commission's Competitive Bidding Rules and | ) |
| Procedures. | ) |

<div align="center">

**COMMENTS OF CARROLL WIRELESS, L.P.**

</div>

Carroll Wireless, L.P. ("Carroll"), by counsel, submits these comments in response to the Commission's Further Notice of Proposed Rule Making in WT Docket No. 05-211 ("Further Notice").[1]  There, the Commission sought specific comment on elements of a proposal raised by Council Tree Communications, Inc. ("Council Tree").  *Further Notice*, at para 1.  It also explained that it was "consider[ing] whether we should modify our general competitive bidding rules ("Part 1" rules) governing benefits reserved for designated entities ("DEs") (i.e. small businesses; rural telephone companies and businesses owned by women and minorities."  Id.

By these comments, Carroll generally supports the thrust of the Commission's proposal, i.e. to fine tune its DE program.  More significantly, Carroll also provides input with respect to several of the inquiries posed by the Commission, in order to close off potential loopholes in the Commission DE program without putting at risk the core program that has proven to be generally effective over the last decade.

---

[1] Implementation of the Commercial Spectrum Enhancement Act, __ FCC Rcd ___, FCC 06-8, 71 Fed. Reg. 6992 (Feb 10, 2006)

## I.    STATEMENT OF INTEREST

Carroll is a *bona fide* DE that is ultimately controlled by Ms. Allison Cryor DiNardo.  It holds sixteen (16) licenses that were awarded pursuant to Auction No. 58.[2]  Prior to granting the Carroll licenses, Commission staff in the Wireless Telecommunications Bureau and Office of the General Counsel's office reviewed carefully the Carroll application to assure compliance with the rules – and found there to be such compliance.

A significant component of the staff's review of the Carroll application focused on the relationship between the general partner in Carroll, Carroll PCS, Inc., and the limited partner, U.S. Cellular Corp. ("USCC").  Although USCC holds a considerable equity interest in Carroll, it is Carroll's general partner, and not USCC, that holds both *de facto* and *de jure* control over Carroll.  The Commission's grant of the Carroll application confirmed that.

In view of the above, there is no question but that Carroll complies with all existing Commission DE (and other) rules.  Nor would there be any issue of non-compliance even if the Commission were to adopt the Council Tree proposal that is at the heart of the NPRM.  (This is because the revenues of USCC fall below the caps proposed by Council Tree.)  Notwithstanding the above, Carroll urges the Commission to move carefully as it modifies its existing, carefully crafted, and largely successful DE rules.

---

[2] See Public Notice, DA 06-31, rel  January 6, 2006, listing each of the licenses granted to Carroll.

## II.   DISCUSSION

### A.   Rules that Permit Entities Such as Carroll to be Designated Entity Licensees are What the Communications Act Requires

At the outset, brief comment on the DE program, as contemplated by Congress and as has been implemented by the Commission to date, appears to be appropriate.  When the Congress authorized the Commission to license by auction, it expressly conditioned that authority on DEs "be[ing] ensured the opportunity to participate in the provision of such services."[3]  Thus, it is a *sine qua non* for the Commission's auction authority itself.  Its existence is not something that Congress left to the discretion of the Commission.

Yet, the Commission does have considerable authority, discretion and control over the nature and structure of the program – so long as it provides the opportunity mandated by Congress.  To date, the Commission has, as Congress has demanded, used its expertise and experience with auctions gained over time both to implement a program, then refine it time and again to smooth out unexpected (and largely unforeseeable) wrinkles in the program.[4]

Viewed as a whole, the Commission's program has worked well.  It has been responsible for a considerable portion of all licenses granted via auctions being licensed to designated

---

[3] Sixth Report and Order in PP Docket No. 93-253, 11 FCC Rcd 136,138 (1995), citing to the Omnibus Budget Reconciliation Act, Pub L. No 103-66, Title VI, § 6002(b), 107 Stat. 312 (1993) (the "Budget Act"), and 47 U.S.C. § 309(j)(4)(D) and 309(j)(3)(B).

[4] The first significant wrinkle appeared before any broadband auctions took place, when the Supreme Court issued its ruling in Adaradand Constructors v. Pena, 115 S. CT 2097 (1995).  Whereas that decision required overall revision of the Commission's DE rules, it did not erase the Congress overall mandate to be supportive of designated entities.

entities. Lest there be any doubt on this point, it must be appreciated that, without the program virtually no licenses of any meaningful value would have been awarded to small businesses.

**B.      The Commission's Designated Entity Program is Essential to Facilitating Meaningful Participation By Designated Entities.**

The Commission's DE program has served well its designed purpose of "ensuring the opportunity to participate" in auctions by designated entities. The Carroll experience aptly illustrates this. Carroll is controlled by a businesswoman who is unquestionably knowledgeable and experienced in wireless matters. Ms. Cryor actively participated in Auction No. 35 and served as the key executive for Black Crow Wireless, L.P., a licensee of five markets. She was also the key executive of X-10 Wireless, L.P., Pine Valley Wireless, L.P., and K-25 Wireless, L.P., all of which developed licenses purchased as a DE. Ms. Cryor also holds a Masters of Business Administration from the University of Virginia's Darden School of Business Administration.

Notwithstanding Ms. Cryor's credentials, without the Commission's DE program, Ms. Cryor would have had no meaningful opportunity to participate in the Commission's auction program. The reason, as the Commission acknowledged generally to be the case with DEs when it established its program, is simple: money! Auction No. 58 illustrates this point. In today's industry environment, a serious applicant must attempt to obtain at least a dozen or so markets to have a meaningful presence. In Carroll's case, sixteen (16) licenses were acquired. In order to accomplish that goal, in Auction No. 58, Carroll was required to provide an upfront deposit of $9,000,000 to the Commission on December 29th, 2004. Then, within 14 days of closure of the auction itself, an additional $120,923,750 was required to be paid to the Commission. Thus, the total spectrum investment by Carroll was $129,923,750.

- 4 -

An investment of that magnitude is not one that a *bona fide* small business can make without partnering with larger, more established carriers.[5]  As a general proposition, this is unassailable; it is also a matter that the Commission has formally, and repeatedly recognized. Given the realities of the auction process and system build and operational costs, this is even more compelling.  To illustrate:  due principally to the extremely high workload before the Commission, the Carroll application was granted on January 6, 2006 – more than one year after the upfront payment had to be made and more than nine months after the full payment had been paid to the Commission for the licenses at issue.  Even if a *bona fide* small business could alone come up with the full purchase price of licenses, it likely could not do so under any situation where that considerable investment would have to lie fallow for more than a year, without any licenses being awarded.  Most certainly, it could not be done where, as is here the case, operational and build expenses, conservatively estimated to be many times that amount, also need to be paid prior to any revenues being generated.

In short, there can be no genuine dispute that (a) the Act requires that the auction process provide meaningful opportunities for designated entities and (b) without a program such as now exists, no such opportunities would exist.

**C.**    **Criticisms of the Commission's Designated Entity Program have been Grossly Exaggerated**

It is virtually axiomatic that in today's politically charged environment, accomplishments are largely taken for granted and complications of any nature are magnified.  As such, and given

---

[5] Notwithstanding this, and as the record in Auction No. 58 demonstrates, the controlling entity in Carroll did make considerable equity contributions.

that the DE program (like any other program) has not been perfect, it is not surprising that it has been subject to some public criticism. Yet, from any objective vantage point, several points appear appropriate and necessary to present in order to put matters into perspective. First, the largest, previously existing, flaw in the program (the installment payment process) has long-ago been corrected. Second, the "concentration" argument that is at the focus of the Council Tree submission, is somewhat misleading. Concentration is a fact of life in the industry and is more extensive outside of the DE program than within it. Moreover, even if one takes the position that DE licensees should be viewed as being the same entity as their dominant investors (an assumption that is absolutely mistaken in the case of Carroll and, unless the Commission's careful examination of the DE licensees is inappropriately ignored, is equally inapplicable to all or virtually all other DE licensees), the DE program serves several public interest functions – in addition to ensuring FCC compliance with the Communications Act. It increases service attention to rural and other second-priority markets for nationwide carriers. It also facilitates involvement by women and minorities in wireless. Lastly, by increasing the number of potential bidders, it adds to the competitive nature of the auctions; increases auction revenues; and adds to the overall competitiveness of the industry.

**D.**     **The Commission Should Move Cautiously as It Revises its Designated Entity Program.**

Carroll does not take issue with the core component of the Council Tree proposal, i.e. that material involvement by the largest national carriers should be limited, and submits that the adoption of this proposal could well strengthen the DE program. Yet, the proposed five million dollar revenue cap appears to be lower than appropriate. More importantly, whatever cap is applied should be locked in as of a fixed date. Alternatively, it should be accompanied by an

- 6 -

automatic index adjustment to address growth over time. Without such provisions, a safeguard that may be valid today could well turn into an unnecessary and unintended restriction over time.

With respect to what constitutes a "material relationship" between a small business and a large investor Carroll submits that, if the concept is to be used at all, the most sensible approach is to very broadly define "material relationship," but provide that it is relevant only to entities over a given revenue cap, as discussed above.

With respect to the question of eligibility of non-carriers, Carroll submits that it would be both impractical and inequitable to single out existing wireless carriers for eligibility restrictions. After all, many of those carriers are in part responsible for current vibrant and competitive state of the wireless industry. Thus, if a revenue cap is to apply to investors of DEs, it should apply across the board to both new and existing wireless carriers.

With respect to the proposal for a net worth cap on individuals, that too seems both unnecessary and impractical. It is impractical because it is very difficult to measure and it would seem to eliminate many entrepreneurs who have been successful in wireless to date – and are the ones who can make a DE program work. It is unnecessary because, regardless of whether one's net worth is one million dollars or one hundred million dollars, he is "small" by virtue of the investment needed for wireless today.

Carroll strongly supports the Council Tree proposal that a third bidding credit level be added. Carroll submits that it should be at least 40%, and should be applicable to all applicants having less than one million dollars in attributable average annual revenues. In this regard, with the absence of any closed bidding, this greater credit is needed to permit designated entities to compete generally with larger carriers. Moreover, although closed bidding is not now applicable

for the AWS Auction, the Commission should clarify that this is a viable option for future auctions – especially if other DE provisions do not provide adequate protection to permit designated entities to have meaningful success in the auction.

Lastly, with respect to the Council Tree urging that the Commission expand its unjust enrichment rules to guard against future impermissible future relationships, Carroll submits that existing protection already exists on this issue and that no increased regulation is needed or appropriate.

### III.   CONCLUSSION

The Commission's DE program is not "broken."  Many of the proposed fixes that Council Tree has proposed are unnecessary.  As the Commission plots its DE course for the future, it should assure a continuing role for DEs and should proceed cautiously with any changes.  Should it limit investor participation by virtue of investor revenues, it should provide a mechanism so that future year revenues are not measured against a current year cap.  Any investor revenue caps that are instituted should apply to both new and existing carriers.  Lastly, Carroll supports the proposal to increase the bidding credit amounts and believes that such increases are particularly needed in the event there are no closed bidding opportunities.

Respectfully Submitted,

CARROLL WIRELESS, L.P.

By: Thomas Gutierrez, Esquire
Lukas, Nace, Gutierrez & Sachs Chartered
It's Attorney

February 24, 2006

**EXHIBIT XIII**

**DiNardo Comments of November 3, 2008
in WT Docket No. 06-150, etc.**

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Service Rules for the 698-746, 747-762 and 777-792 MHz Bands | ) ) ) | WT Docket No. 06-150 |
| | ) | |
| Implementing a Nationwide Broadband, Interoperable Public Safety Network in the 700 MHz Band | ) ) ) | PS Docket No. 06-229 |

## COMMENTS

Allison Cryor DiNardo, through counsel, hereby submits these Comments in response to the FCC's Third Further Notice of Proposed Rulemaking in the captioned proceeding.[1]

I am the General Partner of several FCC wireless licensees and high bidders, including Barat Wireless, L.P., Carroll Wireless, L.P., King Street Wireless, L.P., and Aquinas Wireless, L.P. Collectively, these entities have paid to the Commission more than one-half billion dollars for wireless licenses.

## I.    INTRODUCTION

Each of my license companies is a woman-controlled designated entity ("DE"). While we have been successful in partnering with well-funded entities, as is both encouraged and permitted by FCC rules, it is critical that we explore every potential wireless opportunity and strive to participate whenever cost-effective.

---

[1] In the matter of Service Rules for the 698-746, 747-762 and 777-792 MHz Bands (WT Docket No. 06-150) and Implementing a Nationwide Broadband, Interoperable Public Safety Network in the 700 MHz Band (PS Docket No. 06-229), 73 Fed Reg 57750 (October 3, 2008) ("Third Further Notice")

The D Block could be a cost-effective opportunity for businesses such as mine. Whereas, the spectrum is well-suited for a number of uses, there are enough novel aspects to it that prices in the auction could be reasonable for a DE, if the spectrum is ultimately licensed on a regional basis.

My companies want an opportunity to bid for at least some of the spectrum, and to pay the government for whatever we may obtain. But in order to be competitive with other, financially stronger, entities, it is critical that there be no unnecessary impediments placed before small businesses such as mine. As a result, and for the reasons set forth below, we urge that the restrictions on leasing spectrum set forth in Section 1.2110(b)(3) of the rules be made non-applicable to the D Block, in the event the D Block is licensed on a regional basis.

## II.    **DISCUSSION**

To be clear, the Commission has already recognized the need to remove leasing restrictions for the D Block and has provided certain beneficial relief on that front.[2] We applaud and thank the Commission for those efforts.

In the Frontline Waiver, the Commission found that the unique circumstances and obligations of the D Block justified a waiver of the 50% restriction on leasing that is included in Section 1.2110(b)(3)(iv), insofar as operation in the D Block is concerned. 22 FCC Rcd 20357. At the same time, the Commission elected to retain in place all other DE eligibility rules, including the limitation on leasing more than 25% of licensed spectrum to any single entity. Id.

---

[2] See, In the Matter of Waiver of Section 1.2110(b)(3)(iv)(A) of the Commission's Rules for the Upper 700 MHz Band D Block License, 22 FCC Rcd 20354, 57 (2007) (the "Frontline Waiver")

In its Third Further Notice, the Commission tentatively concluded to codify the Frontline Waiver, without making mention of any modifications to it. Third Further Notice at para. 279.

At the time that the Commission rendered its Frontline Waiver, the scope of the relief granted made perfect sense. It was anticipated that there would be a single nationwide D Block licensee. Accordingly, the waiver as granted permitted leasing to a single entity spectrum sufficient to cover over 75,000,000 persons. Moreover, given the sheer magnitude of scope associated with a nationwide licensee, there appeared to be less of a need to waive the 25% leasing restriction.

The current D Block environment is very different, and the rules going forward should reflect those differences. First and foremost, there is now the possibility of there being as many as 58 regional licensees. There is also the possibility that some, but not all, regional licenses will be awarded. And of course, we now know that there are a limited number of private carriers who are willing to accommodate the demands of working with public safety groups. Lastly, we are now in a very different economic environment and are likely to remain there for quite some time.

Given all of the above, and consistent with the overarching theme of the Third Further Notice to maximize the likelihood of a successful D Block auction, we submit that greater flexibility for DE leasing would serve the public interest. Simply put, no potentially viable lease option should be taken off the table for DEs. Accordingly, while supporting the Commission's tentative conclusion to codify the Frontline Waiver, we also urge the Commission to extend that relief to include, for the D Block only, removing the 25% leasing restriction in the event that the D Block is awarded on a regional basis.

## III.   <u>CONCLUSION</u>

WHEREFORE, we urge the Commission to remove, for the D Block only, both the 25% and 50% leasing restrictions set forth in Section 1.2110(b)(3) of its rules

Respectfully Submitted,

ALLISON CRYOR DINARDO

/s/_____
By: Thomas Gutierrez, Esquire
Lukas, Nace, Gutierrez & Sachs Chartered
1650 Tysons Blvd, Ste 1500
McLean, VA  22102
*Attorney for Allison Cryor DiNardo*

November 3, 2008

- 4 -

ECFS Comment Submission: CONFIRMATION                                Page 1 of 1



## The FCC Acknowledges Receipt of Comments From ...
# Allison Cryor DiNardo
### ...and Thank You for Your Comments

| | |
|---|---|
| **Your Confirmation Number is: '2008113977729 '** | |
| Date Received: | Nov 3 2008 |
| Docket: | 06-150 |
| Number of Files Transmitted: 1 | |

**DISCLOSURE**

This confirmation verifies that ECFS has received and accepted your filing. However, your filing will be rejected by ECFS if it contains macros, passwords, redlining, read-only formatting, a virus or automated links to source documents that is not included with your filing. Filers are encouraged to retrieve and view their filing within 24 hours of receipt of this confirmation. For any problems contact the Help Desk at    **202-418-0193** .

Initiate a Submission | Search ECFS | Return to ECFS Home Page

| FCC Home Page | Search | Commissioners | Bureaus/Offices | Finding Info |

*updated 12/11/03*

ECFS Comment Submission: CONFIRMATION                                   Page 1 of 1



## The FCC Acknowledges Receipt of Comments From ...
## Allison Cryor DiNardo
### ...and Thank You for Your Comments

| | |
|---|---|
| **Your Confirmation Number is: '2008113475383 '** | |
| **Date Received:** | Nov 3 2008 |
| **Docket:** | 06-229 |
| **Number of Files Transmitted: 1** | |

**DISCLOSURE**

This confirmation verifies that ECFS has received and
accepted your filing. However, your filing will be rejected
by ECFS if it contains macros, passwords, redlining,
read-only formatting, a virus or automated links to
source documents that is not included with your filing.
Filers are encouraged to retrieve and view their filing
within 24 hours of receipt of this confirmation. For any
problems contact the Help Desk at 202-418-0193.

Initiate a Submission | Search ECFS | Return to ECFS Home Page

**FCC Home Page** | **Search** | **Commissioners** | **Bureaus/Offices** | **Finding Info**

*updated 12/11/03*

**EXHIBIT XIV**

**Barat and Carroll *ex parte* filing of June 28, 2007
in CC Docket No. 94-102, etc.**

# LUKAS, NACE GUTIERREZ & SACHS

CHARTERED

1650 TYSONS BOULEVARD, SUITE 1500
MCLEAN, VIRGINIA 22102
703 584 8678 • 703 584 8696 Fax
WWW.FCCLAW.COM

RUSSELL D. LUKAS*
DAVID L. NACE*
THOMAS GUTIERREZ*
ELIZABETH R. SACHS*
GEORGE L. LYON, JR.
PAMELA L. GIST*
DAVID A. LaFURIA
B. LYNN F. RATNAVALE*
TODD SLAMOWITZ*
STEVEN M. CHERNOFF*

CONSULTING ENGINEERS
ALI KUZEHKANANI
LEROY A. ADAM
LEILA REZANAVAZ
SUMEET K. BHALOTIA

OF COUNSEL
JOHN J. McAVOY*
J.K. HAGE III*
LEONARD S. KOLSKY*
HON. GERALD S. McGOWAN*

*NOT ADMITTED IN VA

Writer's Direct Dial:
(202) 828-9470
tgutierrez@fcclaw.com

June 28, 2007

***Via Electronic Filing***
Marlene H. Dortch, Secretary
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

Re:   **Ex Parte Notice**
      **WT Docket No. 06-150; CC Docket No. 94-102; WT Docket No. 01-309;**
      **WT Docket No. 03-264; WT Docket No. 06-169; PS Docket No. 06-229;**
      **WT Docket No. 96-86**

Dear Ms. Dortch:

On June 28, 2007, Ms. Allison Cryor DiNardo and the undersigned, both representing Barat Wireless, L.P. ("Barat") and Carroll Wireless, L.P. ("Carroll"), met with Ms. Angela Giancarlo of Commissioner McDowell's office and discussed matters in the enclosed handout.

Pursuant to 47 C.F.R. § 1.1206(b)(2), this notice is being submitted electronically in the above-referenced docket. In addition, one copy of this notice is being transmitted via e-mail to Ms. Giancarlo.

Very truly yours,

*/s/  Thomas Gutierrez*
*Counsel for Barat Wireless, L.P.*
*and Carroll Wireless, L.P.*

Enclosure

cc:    Angela Giancarlo, Esq.

BEFORE THE
FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Service Rules for the 698-746, 747-762 and 777-792 MHz Bands | ) ) ) |
| | ) |
| Revision of the Commission's Rules to Ensure | ) ) |
| Compatibility with Enhanced 911 Emergency Calling Systems | ) ) ) ) |
| Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones | ) ) ) ) |
| Biennial Regulatory Review – Amendment of Parts 1, 22, 24, 27, and 90 to Streamline and Harmonize Various Rules Affecting Wireless Radio Services | ) ) ) ) ) |
| Former Nextel Communications, Inc. Upper 700 MHz Guard Band Licenses and Revisions to Part 27 of the Commission's Rules | ) ) ) ) ) |
| Implementing a Nationwide, Broadband, Interoperable Public Safety Network in the 700 MHz Band | ) ) ) ) ) |
| Development of Operational, Technical and Spectrum Requirements for Meeting Federal, State and Local Public Safety Communications Requirements Through the Year 2010 | |

WT Docket No. 06-150

CC Docket No. 94-102

WT Docket No. 01-309

WT Docket No. 03-264

WT Docket No. 06-169

PS Docket No. 06-229

WT Docket No. 96-86

<u>REPLY COMMENTS OF BARAT WIRELESS, L.P.
AND CARROLL WIRELESS, L.P.</u>

- 1 -

Barat Wireless, L.P. ("Barat") and Carroll Wireless, L.P. ("Carroll"), by counsel, hereby submit these Reply Comments in the captioned proceedings.[1]

By these Reply Comments, Barat and Carroll, (collectively, the "Commenters') focus on a single issue: the public interest need not to apply blind bidding in the upcoming 700 MHz Auction. In so doing, the Commenters bring to this debate their experience as a successful small business bidder in prior auctions (Auctions No. 58 and No. 66) and the corresponding need for small businesses to know who is bidding for what spectrum in an auction.

## I.  DISCUSSION

### A.  Bidder Identification Is Necessary In Order To Facilitate Small Carriers Obtaining Sufficient Financing To Bid Robustly

Both Barat and Carroll were successful bidders in recent FCC auctions. In those auctions, Barat and Carroll each entered into an initial bidding protocol agreement with a lender which, among other things, placed caps on the amount of money that could be borrowed and bid on particular licenses. During each auction, the agreed upon caps were increased multiple times during the course of the auction. The caps were increased as the amounts necessary for a bid to become the "high bid" for various licenses rose, higher than anticipated. But prior to lenders

---

[1] These reply comments are timely filed pursuant to the Commission's Order of May 25, 2007, (DA 07-2226).

and partners agreeing to an increase in the caps, a determination had to be made that the spectrum being bid upon was worth the heightened amount to be bid.

Heightened bid amounts often could not be justified simply by virtue of some unknown entity having bid up the price. After all, the Commission's experience with early auctions, particularly Auction No. 5, demonstrated that bidding frenzies are possible and that certain bidders, especially those without extensive wireless experience, could "overbid" significantly. It is for this reason that, when looking to other bids as an indicator of spectrum worth, it is the identity of the bidder, as well as the amount, that is important to small businesses such as Barat and Carroll. To illustrate, small carriers such as Barat and Carroll are far more likely to be able to rely upon bids by well known and respected entities, than by unknown and unproven entities, to justify increases in bidding caps.

**B.** **Knowledge Of Bidder Identification Is Equally, Important In Understanding Why Non-Bids May Not Reflect A Determination By Other Bidders That Spectrum Values Do Not Support An Increase In Bid Amounts For Certain Spectrum**

Just as bidders, and especially small business bidders, take notice of which bidders continue to bid for particular licenses, so too do they notice when bidders stop bidding for particular licenses. Oftentimes, this apparent knowledge constitutes a "false negative" in the sense that a party's determination to bid no more for a given license could reflect any number of different reasons, only one of which is the relationship between spectrum value and bid prices. For example, it could reflect a desire to move attention to an entirely different cluster of licenses. It

- 3 -

also could reflect the fact that given existing spectrum holdings, either directly or through an affiliate, in the market at issue, a de facto bidder discount was being applied for the additional spectrum at issue.  Lastly, it could reflect that bidder eligibility was being exhausted due to bids in other, more critical markets.

While each of these reasons is very different from the others, all have one thing in common: in the absence of bidder identification, it is not possible for one bidder to know why another has "backed off" from bidding for a particular license. Worse yet, some bidders (likely the larger, better financed entities) may know, while others may not.  Such inequality in knowledge runs contrary to the core concept of competitive spectrum auctions.

C.   **Knowledge Of Bidder Identification Is Critical To Small Bidders' Ability To Assess Roaming Issues**

The vast majority of small carriers submitting comments in the captioned proceeding opposed blind bidding. See, e.g., comments of Aloha Partners, L.P. and the Rural Telecommunications Group ("RTG"). As RTG explained in its comments:

> "Absent information regarding the identities of competing bidders, it is impossible for small carriers to make rational bidding decisions. Due to their heavy dependence upon roaming, rural carriers are uniquely dependent on knowledge of bidder identity in their neighboring markets in order to formulate a rational spectrum acquisition plan."

## II.   CONCLUSION

As discussed above, knowledge of bidder identity is essential for small businesses to bid successfully. Barat and Carroll know this, not through theory, but by virtue of extensive experience in auctions. The information is critical to obtaining

- 4 -

financing; to understanding why certain bidders stop bidding in a given market; and to understanding what roaming issues may or may not exist of a particular license is obtained.

For all of these reasons, Barat and Carroll urge the Commission not to adopt blind bidding.

> Respectfully Submitted,
>
> BARAT WIRELESS, L.P. &
> CARROLL WIRELESS, L.P.
>
> /s/ Thomas Gutierrez
>
> Thomas Gutierrez, Esquire
> *Its Attorney*

Lukas, Nace, Gutierrez & Sachs, Chartered
1650 Tysons Boulevard, Suite 1500
McLean, VA 22102
(202) 828-9470

June 4, 2007

- 5 -

**EXHIBIT XV**

**Barat and Carroll *ex parte* filing of July 24, 2007
in PS Docket No. 06-229, etc.**

# LUKAS, NACE GUTIERREZ & SACHS

CHARTERED

1650 TYSONS BOULEVARD, SUITE 1500
MCLEAN, VIRGINIA 22102
703 584 8678 • 703 584 8696 FAX
WWW.FCCLAW.COM

RUSSELL D. LUKAS*
DAVID L. NACE*
THOMAS GUTIERREZ*
ELIZABETH R. SACHS*
GEORGE L. LYON, JR.
PAMELA L. GIST*
DAVID A. LAFURIA
B. LYNN F. RATNAVALE*
TODD SLAMOWITZ*
STEVEN M. CHERNOFF*

CONSULTING ENGINEERS
ALI KUZEHKANANI
LEROY A. ADAM
LEILA REZANAVAZ
SUMEET K. BHALOTIA

OF COUNSEL
JOHN J. MCAVOY*
J.K. HAGE III*
LEONARD S. KOLSKY*
HON. GERALD S. MCGOWAN*

*NOT ADMITTED IN VA

(202) 828-9470
tgutierrez@fcclaw.com

July 24, 2007

***Via Electronic Filing***
Chairman Kevin J. Martin
Commissioner Michael J. Copps
Commissioner Deborah T. Tate
Commissioner Jonathan S. Adelstein
Commissioner Robert M. McDowell

    **Re:**    **WT Docket No. 06-150; CC Docket No. 94-102; WT Docket No. 01-309;
WT Docket No. 03-264; WT Docket No. 06-169; PS Docket No. 06-229;
WT Docket No. 96-86**

On behalf of Barat Wireless, L.P. ("Barat") and Carroll Wireless, L.P. ("Carroll"), we right to reiterate the importance of having an auction design that is fair to small bidders and compliant with the Telecom Act.

When Congress authorized the FCC to conduct spectrum auctions more than a decade ago, it specifically provided that the authority to do so was dependent upon giving small businesses a right to participate in a meaningful way. Judging from numerous published accounts of the draft item circulating regarding the upcoming 700 MHz item, that auction will pay only lip service to small carriers. Whereas, the reported provisions may well pass judicial scrutiny, they will neither serve the public interest nor comply with the intent of Congress in enacting auction legislation.

While the reported proposed band plans do provide some small markets, they are slanted towards larger markets. That is a good thing for large bidders, who will face much less competition for the markets than would otherwise be the case. It is bad in every other way. With less competition, there is less likelihood of new entry, and projected revenues will be lower than otherwise would be the case. Only a handful of applicants will have the financial resources to even bid for large markets. It is also unnecessary in that history is replete with examples of carriers assembling large (even nationwide) market licenses by accumulating multiple small markets. (Witness the success of Spectrum Co and Aloha Partners in prior, recent auctions.)

Unfortunately, an emphasis on larger markets brings other problems as well. History shows us that large market licensees do not service rural areas, electing instead to focus on the more rewarding more populous areas. Indeed, the submissions to the Commission made by large market PCS carriers at the time of initial license expiration show that, on average, after ten years of licensing they left unserved 20% of the population, even accepting the carriers very liberal interpretation of what constitute "coverage". In reality, they left unserved far more than 20% of

the population, and far more than that amount of the geographical coverage. Small markets alleviate that issue, without having to mandate anything, simply by virtue of every area in a small market being important to the carrier.

Other aspects of the decision reportedly being circulated serve to further exacerbate the plight of small companies. "Blind bidding" disadvantages small carriers far more than larger ones. This is because they need the added "barometer" of knowing who values various licenses in order to obtain needed lender support as prices rise during the course of an auction. The added cost of blind bidding to small carriers is particularly disappointing given that there is no demonstrated need for such revisions to the rules, and recent auctions have worked fine without it.

Combinatorial bidding, even if limited to select markets, further disserves small bidders. It also raises untested issues regarding eligibility and purchase obligations. Whereas, there may be mechanisms that the Commission can use to ameliorate these concerns, they are neither tried nor proven in large auction contexts. Indeed, when applied in the Air Ground auction of last year, they proved unavailing, with the result being a forced halt to the auction. The upcoming 700 MHz auction is too important to use as a test bed for those techniques. And to be clear, if there are problems associated with combinatorial bidding, in all likelihood they will cascade into other markets and thereby infiltrate much of the overall 1 auction.

In view of the above, Barat and Carroll urge the Commission to (1) cut into two the reportedly proposed 22 MHz block for the Upper Band, and make one available for smaller markets without any obligation for open access; (2) abandon combinatorial bidding; and (3) not utilize blind bidding in the 700 MHz auction. These actions will make the upcoming 700 MHz auction less uninviting to small applicants; and thereby further both Congress' intent and the public interest.

Respectfully Submitted,

BARAT WIRELESS, L.P. &
CARROLL WIRELESS, L.P.

/s/ Thomas Gutierrez

Thomas Gutierrez, Esquire
*Their Attorney*

Lukas, Nace, Gutierrez & Sachs, Chartered
1650 Tysons Boulevard, Suite 1500
McLean, VA 22102
(202) 828-9470

July 24, 2007

**EXHIBIT XVI**

**DiNardo *ex parte* Comments of June 28, 2007
in WT Docket No. 03-264**

# LUKAS, NACE GUTIERREZ & SACHS

CHARTERED

1650 TYSONS BOULEVARD, SUITE 1500
MCLEAN, VIRGINIA 22102
703 584 8678 • 703 584 8696 FAX

WWW.FCCLAW.COM

RUSSELL D. LUKAS*
DAVID L. NACE*
THOMAS GUTIERREZ*
ELIZABETH R. SACHS*
GEORGE L. LYON, JR.
PAMELA L. GIST*
DAVID A. LAFURIA
B. LYNN F. RATNAVALE*
TODD SLAMOWITZ*
STEVEN M. CHERNOFF*

CONSULTING ENGINEERS
ALI KUZEHKANANI
LEROY A. ADAM
LEILA REZANAVAZ
SUMEET K. BHALOTIA

OF COUNSEL
JOHN J. McAVOY*
J.K. HAGE III*
LEONARD S. KOLSKY*
HON. GERALD S. McGOWAN*

*NOT ADMITTED IN VA

Writer's Direct Dial:
(202) 828-9470
tgutierrez@fcclaw.com

June 28, 2007

***Via Electronic Filing***
Marlene H. Dortch, Secretary
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

> Re:   **Ex Parte Notice**
> **WT Docket No. 06-150; CC Docket No. 94-102; WT Docket No. 01-309;**
> **WT Docket No. 03-264; WT Docket No. 06-169; PS Docket No. 06-229;**
> **WT Docket No. 96-86**

Dear Ms. Dortch:

On June 28, 2007, Ms. Allison Cryor DiNardo and the undersigned, both representing Barat Wireless, L.P. ("Barat") and Carroll Wireless, L.P. ("Carroll"), met with Mr. Barry Ohlson of Commissioner Adelstein's office and discussed matters in the enclosed handout.

Pursuant to 47 C.F.R. § 1.1206(b)(2), this notice is being submitted electronically in the above-referenced docket. In addition, one copy of this notice is being transmitted via e-mail to Mr. Ohlson.

Very truly yours,

*/s/  Thomas Gutierrez*
*Counsel for Barat Wireless, L.P.*
*and Carroll Wireless, L.P.*

Enclosure

cc:     Barry Ohlson, Esq.

**EXHIBIT XVII**

**Response to Submissions of Ameer Flippen,
dated April 11, 2005**

BEFORE THE
FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554

| | |
|---|---|
| In Re: Application of | File No. 0002069855 |
| **Carroll Wireless, LP** | WT Docket No. 05-149 |
| | Report No. AUC-58 |
| For Grant of Licenses for Which it was the High Bidder in Auction 58 | |

## RESPONSE TO SUBMISSIONS OF AMEER FLIPPIN

By this submission, Carroll Wireless, LP ("Carroll Wireless"), by counsel and pursuant to 47 C.F.R. § 1.2108(c) and the Commission's *Public Notice*, DA 05-771, released March 25, 2005, urges the Commission to dismiss promptly the various documents submitted by Mr. Ameer Xenos Flippin[1] with reference to the high bidders in Auction No. 58.[2]

---

[1] The documents to which Carroll Wireless is responding include but may not be limited to: (a) Ex-Parte Motion and Petition to Deny Against All Long-Form Applications Of Opposing Entities Which Placed Bids Less Than Or Equal To In Value Of Bids Placed By Ameer Flippin, An Individual In Auction No. 58, In Accordance with 47 CFR 1.2108; Attached Listing of Long-Form Applications Being Motioned To Deny By Pro Se Bidder Ameer Flippin ("Flippin Petition to Deny"), dated March 10, 2005 (b) Affidavit in Support Of Flippin Petition To Deny ("Flippin Affidavit"), dated March 10, 2005 (c) Certificate of Mailing, dated March 14, 2005 (d) Ex Parte Motion And Petition To Stay The Issue Of All Broadband PCS Licenses in Auction No. 58, Pending An Emergency 'Review De Novo' Of All Actions, Decisions, And Orders Issued By The Federal Communications Commission Adversely Affecting Ameer Xenos Flippin And Designating The Case For Hearing By An Administrative Law Judge At The Federal Communications Commission; And Memorandum In Support Thereof By Pro Se Appellant Ameer Flippin" ("Flippin Stay Petition").

[2] Carroll Wireless is filing this response out of an abundance of caution and in doing so does not concede that any of the filings by Ameer Flippin constitute timely and duly filed objections to the Carroll Wireless application. If the Commission elects to treat the Carroll Wireless application as contested, Carroll Wireless asks the Commission to utilize its authority under 47 C.F.R. § 1.1200(a) and declare the "meet and disclose" *ex parte* rules specified in 47 C.F.R. Section 1.206 to apply to the Carroll Wireless application. This would be appropriate since Mr. Flippin has raised no application-specific issues with regard to Carroll Wireless.

The various filing, regardless of how labeled, are nothing more than follow-up challenges to the Commission's proper determination not to grant Mr. Flippin a waiver of the Commission's rules that would extend the time during which Mr. Flippin could apply for the auction and make the required up front payment. The Commission's reasoning for the denial was both sound and well articulated in the Commission's letter of denial released January 25, 2005.[3] Thus, other than to note that the Commission's rules regarding participation in an auction are both well-articulated and generally understood, there is no need for further comment on this matter.

There are at least three other threshold reasons why Mr. Flippin's Petition must be dismissed. First, Mr. Flippin is not a qualified applicant in Auction No. 58.[4] Consequently, he has no standing to challenge any of the winning bidders. *See e.g.* Nextel License Acquisition Corp., 13 FCC Rcd 11983, 19888 (WTB 1998); Western Communications Services, Inc., 17 FCC Rcd 24636, 24636-37 (CWD 2002). It is well settled in the law that "an entity that was not qualified to bid in particular markets in an auction has no standing to file a petition to deny the winning bidders' applications in those markets." Alaska Native Wireless L.L.C., 18 FCC Rcd 11640, 11644, para. 11 (2003). Second, Mr. Flippin has failed to comply with the most basic requirements of 47 U.S.C. § 309(d)(1), which govern petitions to deny. Among other things, he has failed to provide specific allegations of fact sufficient to show that petitioner is a party in

---

[3] *Letter from Gary D. Michaels, Deputy Chief, Auctions and Spectrum Access Division, Wireless Telecommunications Bureau, Federal Communications Commission, to Ameer Flippin,* DA 05-173, January 25, 2005. Mr. Flippin also moved for a stay of Auction No. 58 in the United States Court of Appeals for the District of Columbia Circuit ("DC Circuit"), but on January 25, 2005 that Court summarily denied that motion. *In re: Ameer Flippin, Petitioner,* No. 05-1026, Per Curiam Order, January 25, 2005.

[4] Mr. Flippin's name does not appear in either the December 10, 2004 notice listing parties who timely filed FCC Form 175 applications or in the January 11, 2005 notice listing the applicants deemed qualified to bid in Auction

interest and that a grant of the Application would be prima facia inconsistent with the public interest. <u>Alaska Native Wireless, L.L.C.</u>, 17 FCC Rcd 4231, 4235 (WTB 2002).  In the Petition, Mr. Flippin has provided no relevant or material facts or arguments.[5]

Additionally, Mr. Flippin has failed to abide by the specific detailed instructions for filing petitions to deny Auction No. 58 long form applications as set forth in 47 C.F.R. § 2108 and in the *Public Notice*, DA 05-771 released March 25, 2005.  That notice required petitions to be filed during a filing window that opened on March 25 and closed on April 4, and for the submission to be made electronically through the Commission's Electronic Comment Filing System (ECFS) or by paper at specific locations or addresses.  The various e-mail submissions made by Mr. Flippin do not satisfy these requirements.[6]

---

No. 58.  *See Public Notice*, DA 04-3270, released October 15, 2005; *Public Notice*, DA 04-3918, released December 16, 2004.

[5] Because there are no facts presented in the Petition, there are no allegations of fact or denials thereof that require an affidavit pursuant to 47 C.F.R. § 1.2108(c).

[6] 47 C.F.R. § 1.47(d) which governs the service of documents and proof of service, allows service by electronic e-mail only with the consent of the served party.  Carroll Wireless never consented to such service, and is aware of no such consent by the Commission (except to the extent that pleadings are duly filed through ECFS).

For all of the above reasons, the Petition must be dismissed. Given that (a) the auction has been complete; (b) long form Applications have been filed; (c) no other challenges of any nature have been raised against the captioned applications; and (d) the captioned applications have been paid for in full, the Commission should move promptly to dismiss the Petition, and to grant the Carroll Wireless application.

Respectfully Submitted,

CARROLL WIRELESS, LP

By: Thomas Gutierrez, Esquire
Lukas, Nace, Gutierrez & Sachs Chartered
It's Attorney

April 11, 2005

## CERTIFICATE OF SERVICE

I, David Crawford, do hereby certify that, on this 11th day of April, 2005, I caused the foregoing "RESPONSE TO SUBMISSIONS OF AMEER FLIPPIN" of Carroll Wireless, LP to be: (1) filed electronically with the Federal Communications Commission; and (2) served via email or first-class United States Mail, postage prepaid, on the following:

Mr. Ameer Flippin (via U.S. Mail)
2053 Wilson Road
Memphis, TN  38116

Best Copy and Printing, Inc. (via email)
fcc@bcpiweb.com

Ms. Erin McGrath (via U.S. Mail and email)
Mobility Division
Wireless Telecommunications Bureau
Federal Communications Bureau
445 12th Street, S.W.
Washington, D.C.  20554
erin.mcgrath@fcc.gov

Mr. Michael Connelly (via U.S. Mail and email)
Mobility Division
Wireless Telecommunications Bureau
Federal Communications Bureau
445 12th Street, S.W.
Washington, D.C.  20554
michael.connelly@fcc.gov

**EXHIBIT XVIII**

**Amici Brief in Case No. 06-2943 (Council Tree Appeal)
in Support of the Federal Communications Commission,
filed Oct 20, 2006**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

COUNCIL TREE COMMUNICATIONS, INC., )
BETHEL NATIVE CORPORATION, and )
THE MINORITY MEDIA AND )
TELECOMMUNICATIONS COUNCIL, )
           Petitioners, )
            )
          v. )   No. 06-2943
            )
FEDERAL COMMUNICATIONS )
COMMISSION and UNITED STATES )
OF AMERICA, )
           Respondents. )

**BRIEF OF AMICI CURIAE AMERICAN CELLULAR CORPORATION, ATLANTIC WIRELESS, L.P., BARAT WIRELESS, L.P.,, PALMETTO RURAL TELEPHONE COOPERATIVE, INC., PIEDMONT RURAL TELEPHONE COOPERATIVE, INC., PUBLIC SERVICE COMMUNICATIONS, INC., RED ROCK SPECTRUM HOLDINGS, LLC, AND WEST CAROLINA RURAL TELEPHONE COOPERATIVE, INC. IN SUPPORT OF RESPONDENTS**

Thomas Gutierrez
Lukas, Nace, Gutierrez & Sachs
Chartered
1650 Tysons Blvd., Suite 1500
McLean, VA  22102
(703) 584-8678

*Attorney for Atlantic Wireless, L.P,
and Barat Wireless, L.P.*

L. Andrew Tollin
Lawrence J. Movshin
Jonathan V. Cohen
Wilkinson Barker Knauer, LLP
2300 N Street, N.W., Suite 700
Washington, D.C.  20037
(202) 783-4141

*Attorneys for American Cellular
Corporation and Red Rock Spectrum
Holdings, LLC*

*(Additional Attorneys on Inside Cover)*       October 20, 2006

Donald L. Herman
Rebecca L. Murphy
Gregory W. Whiteaker
Kenneth R. Johnson
Bennet & Bennet, PLLC
10 G Street, NE, Suite 710
Washington, D.C.  20002
(202) 371-1500

*Attorneys for Palmetto Rural*
*Telephone Cooperative, Inc., Piedmont*
*Rural Telephone Cooperative, Inc.,*
*Public Service Communications, Inc.,*
*and West Carolina Telephone*
*Cooperative, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1.1, American Cellular Corporation ("ACC") submits the following corporate disclosure statement:

ACC is a Delaware corporation and is a wholly-owned subsidiary of Dobson Communications Corporation ("Dobson"), which is a publicly held company (NASDAQ:DCEL) organized under the laws of the State of Oklahoma.  Dobson and its subsidiaries (including ACC) engage in telecommunications and related businesses.

Respectfully submitted,

**AMERICAN CELLULAR CORPORATION**

By _____

L. Andrew Tollin
Lawrence J. Movshin
Jonathan V. Cohen
Wilkinson Barker Knauer, LLP
2300 N Street, N.W., Suite 700
Washington, D.C.  20037
(202) 783-4141

*Its Attorneys*

October 20, 2006

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1.1, Atlantic Wireless, L.P. ("Atlantic") submits the following corporate disclosure statement:

Atlantic is a limited partnership organized under the laws of the Delaware, which seeks to provide wireless telecommunications service. Atlantic was a participant in the Federal Communications Commission Auction No. 66. Atlantic has not issued any shares or debt securities to the public, and Atlantic has no parent companies, subsidiaries, or affiliates that have issued any shares or debt securities to the public.

Respectfully Submitted,

ATLANTIC WIRELESS, L.P.

By: _____
Thomas Gutierrez
Lukas, Nace, Gutierrez & Sachs
Chartered
1650 Tysons Blvd., Suite 1500
McLean, VA 22102
(703) 584-8678

*Its Attorney*

October 20, 2006

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1.1, Barat Wireless, L.P. ("Barat") submits the following corporate disclosure statement:

Barat is a limited partnership organized under the laws of the State of Delaware, and has not issued any shares or debt securities to the public. Barat was a participant in the Federal Communications Commission Auction No. 66 and seeks to provide wireless telecommunications service. Barat is controlled by an individual, but United States Cellular Corporation, a publicly held company organized under the laws of the State of Delaware, holds a ninety-percent non-controlling interest in Barat.

Respectfully Submitted,

BARAT WIRELESS, L.P.

By: _____
Thomas Gutierrez
Lukas, Nace, Gutierrez & Sachs
Chartered
1650 Tysons Blvd., Suite 1500
McLean, VA 22102
(703) 584-8678

*Its Attorney*

October 23, 2006

## CORPORATE DISCLOSURE STATEMENT

Palmetto Rural Telephone Cooperative, Inc. ("Palmetto") is a rural telephone company, *see* 47 U.S.C. § 153(37), certified by the state of South Carolina, to provide local exchange and exchange access service in South Carolina. Palmetto is a rural telephone cooperative owned by its member-subscribers. Palmetto has no parent company, and no publicly owned company has a 10% or greater ownership interest in Palmetto. Palmetto is not affiliated with any publicly owned corporation.

Respectfully submitted,

**PALMETTO RURAL TELEPHONE COOPERATIVE, INC.**

By: _____

Donald L. Herman
Rebecca L. Murphy
Gregory W. Whiteaker
Kenneth R. Johnson
Bennet & Bennet, PLLC
10 G. Street NE, Suite 710
Washington, D.C. 20002
(202) 371-1500

Its Attorneys

## CORPORATE DISCLOSURE STATEMENT

Piedmont Rural Telephone Cooperative, Inc.   ("Piedmont") is a rural telephone company, *see* 47 U.S.C. § 153(37), certified by the state of South Carolina, to provide local exchange and exchange access service in South Carolina.   Piedmont is a rural telephone cooperative owned by its member-subscribers.   Piedmont has no parent company, and no publicly owned company has a 10% or greater ownership interest in Piedmont.   Piedmont is not affiliated with any publicly owned corporation.

<div style="margin-left: 3em;">

Respectfully submitted,

**PIEDMONT RURAL TELEPHONE COOPERATIVE, INC.**

By: _____

Donald L. Herman
Rebecca R. Murphy
Gregory W. Whiteaker
Kenneth R. Johnson
Bennet & Bennet, PLLC
10 G. Street NE, Suite 710
Washington, D.C. 20002
(202) 371-1500

Its Attorneys

</div>

## CORPORATE DISCLOSURE STATEMENT

Public Service Communications, Inc. ("Public Service") is privately held.  It has
no parent company, and no publicly owned company has a 10% or greater
ownership interest in Public Service.  Public Service is not affiliated with any
publicly owned corporation.

Respectfully submitted,

**PUBLIC SERVICE COMMUNICATIONS, INC.**

By: _____

Donald L. Herman
Rebecca R. Murphy
Gregory W. Whiteaker
Kenneth R. Johnson
Bennet & Bennet, PLLC
10 G. Street NE, Suite 710
Washington, D.C. 20002
(202) 371-1500

Its Attorneys

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Rule 26.1.1, Red Rock Spectrum Holdings, LLC ("Red Rock") submits the following corporate disclosure statement:

Red Rock is a sole member limited liability company organized under the laws of the State of Delaware which engages in telecommunications and related businesses.

Respectfully submitted,

**RED ROCK SPECTRUM HOLDINGS, LLC**

By _____

L. Andrew Tollin
Jonathan V. Cohen
Lawrence J. Movshin
Wilkinson Barker Knauer, LLP
2300 N Street, N.W., Suite 700
Washington, D.C.  20037
(202) 783-4141

*Its Attorneys*

October 20, 2006

## CORPORATE DISCLOSURE STATEMENT

West Carolina Rural Telephone Cooperative, Inc. ("West Carolina") is a rural telephone company, *see* 47 U.S.C. § 153(37), certified by the state of South Carolina, to provide local exchange and exchange access service in South Carolina. West Carolina is a rural telephone cooperative owned by its member-subscribers. West Carolina has no parent company, and no publicly owned company has a 10% or greater ownership interest in West Carolina. West Carolina is not affiliated with any publicly owned corporation.

Respectfully submitted,

**WEST CAROLINA RURAL TELEPHONE COOPERATIVE, INC.**

By: _____

Donald L. Herman
Rebecca L. Murphy
Gregory W. Whiteaker
Kenneth R. Johnson
Bennet & Bennet, PLLC
10 G. Street NE, Suite 710
Washington, D.C. 20002
(202) 371-1500

Its Attorneys

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ................................................................................ ii

Preliminary Statement.................................................................................1

Introduction and Statement of Interest......................................................2

Argument.....................................................................................................3

    I.    Amici Have Expended Significant Time and Resources In Order
         To Participate in Auction 66 ...............................................................3

    II.   The Public Interest Strongly Weighs Against Any Cancellation of
         Auction 66 ...........................................................................................6

Conclusion ...................................................................................................9

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(B)

CERTIFICATE OF COMPLIANCE WITH L.A..R. 31.1

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## FCC CASES

Notice of Proposed Rulemaking, *Service Rules for Advanced Wireless Services in the 1.7 GHZ and 2.1 GHz Bands*, 17 FCC Rcd 24135 (2002)...................................................................................................8

Report and Order, *Service Rules for Advanced Wireless Services in the 1.7 GHz and 2.1 GHz Bands*, 18 FCC Rcd 25162 (2003)....................................8

Second Report and Order and Second Further Notice of Proposed Rule Making, *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 FCC Rcd 4753 (2006)............................................2

Order on Reconsideration of the Second Report and Order, *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the* Commission's Competitive Bidding Rules and Procedures, WT *Docket No.* 05-211, FCC 06-78 (rel. June 2, 2006)...........................................7

## STATUTES AND REGULATIONS

Pub. L. No. 108-494, Title II, 118 Stat. 3986 (2004) .....................................................7

47 U.S.C. § 309(j)(3)(A)......................................................................................9

47 C.F.R. § 1.2105 ...........................................................................................5

47 C.F.R. § 1.2105(c).........................................................................................6

47 C.F.R. § 1.2107 ...........................................................................................5

## ADDITIONAL SOURCES

"Auction of Advanced Wireless Services Licenses Scheduled for June 29, 2006; Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments and Other Procedures for Auction No. 66," Public Notice (rel. April 12, 2006) .........................................................................5

"Auction of Advanced Wireless Services Licenses; 168 Bidders Qualified to
Participate in Auction No. 66; Information Disclosure Procedures
Announced," Public Notice (rel. July 28, 2006) ............................................4

"Auction of Advanced Wireless Services Licenses Closes; Winning Bidders
Announced for Auction No. 66," Public Notice (rel. Sept. 20, 2006) ........4, 5

"FCC Advanced Wireless Services Auction No. 66 ***Final*** -- Bidder
Data for Round 161," Public Notice (rel. Sept. 18, 2006) .............................3

"Statement of Chairman Kevin J. Martin on the Conclusion of Advanced
Wireless Services Auction," News Release (rel. Sept. 18, 2006) ...................2

"Wireless Telecommunications Bureau Provides Guidance on the Anti-
Collusion Rule for D, E and F Block Bidders," 11 FCC Rcd 10134
(1996)................................................................................................................6

IN THE
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

COUNCIL TREE COMMUNICATIONS, INC.,  )
BETHEL NATIVE CORPORATION, and      )
THE MINORITY MEDIA AND              )
TELECOMMUNICATIONS COUNCIL,         )
                                    )
        Petitioners,                )
                                    )
        v.                          )    No. 06-2943
                                    )
FEDERAL COMMUNICATIONS              )
COMMISSION and UNITED STATES        )
OF AMERICA,                         )
                                    )
        Respondents.                )

**BRIEF OF AMICI CURIAE AMERICAN CELLULAR CORPORATION, ATLANTIC WIRELESS, L.P., BARAT WIRELESS, L.P., PALMETTO RURAL TELEPHONE COOPERATIVE, INC., PIEDMONT RURAL TELEPHONE COOPERATIVE, INC., PUBLIC SERVICE COMMUNICATIONS, INC., RED ROCK SPECTRUM HOLDINGS, LLC, AND WEST CAROLINA RURAL TELEPHONE COOPERATIVE, INC. IN SUPPORT OF RESPONDENTS**

**Preliminary Statement**

In August of this year, the Federal Communications Commission ("FCC" or "Commission") conducted an auction of wireless spectrum that promises to provide much-needed spectrum capacity for participants in the wireless telecommunications market, including small businesses and rural carriers that

provide valuable and, at times, life-saving services to consumers in rural and underserved areas. FCC Chairman Kevin Martin has noted that the auction was a success overall and in particular for small and rural companies and their customers. Noting that "more than half of the winning bidders were small businesses," Chairman Martin expressed the hope, which Amici share, that the spectrum won would help these winners "fulfill the promise of advanced wireless services in America's underserved and rural areas."[1] This goal would be thwarted if this Court accepted Petitioners' invitation to overturn Auction 66. Such action would irreparably harm the service providers who expended substantial resources to participate in Auction 66 and the consumers who rely on them.

## Introduction and Statement of Interest

Amici respectfully submit that the Court should not under any circumstances overturn the auction, as Petitioners request. Regardless of how this Court rules on the lawfulness of the rules enacted in the *Second Report and Order*,[2] the equities overwhelmingly disfavor disturbing the auction results.

---

[1]    "Statement of Chairman Kevin J. Martin on the Conclusion of Advanced Wireless Services Auction," News Release (rel. Sept. 18, 2006), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DOC-267473A1.pdf.

[2]    *See* Second Report and Order and Second Further Notice of Proposed Rulemaking, *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, 21 FCC Rcd 4753 (2006) (JA89) ("*Second Report and Order*").

Amici include 6 winning bidders in Auction 66, many of which qualified as "small" or "very small" businesses under the Commission's rules and thus received designated entity ("DE") bidding credits in the auction.[3/]  Collectively, Amici won 171 licenses, submitting total net bids of close to $300 million.[4/]  The additional spectrum capacity represented by these licenses will enable Amici to improve service to millions of consumers, many of whom reside in rural and remote areas that to date have been underserved by national wireless providers.  Amici have expended significant resources to arrange financing, prepare for the auction, and participate in the bidding.  As a result of the auction, Amici are poised to provide their customers with valuable new services.  Thus, any decision to overturn Auction 66 would irreparably harm Amici, their customers, and consumers nationwide.

---

[3/]     *See* "FCC Advanced Wireless Services Auction No. 66 ***Final*** -- Bidder Data for Round 161," Public Notice (rel. Sept. 18, 2006) *available at* http://wireless.fcc.gov/auctions/66/charts/66press_6.pdf.

[4/]     *Id.*

3

## Argument

I.   **Amici Have Expended Significant Time and Resources In Order To Participate in Auction 66**

For companies such as Amici, many of which have limited financial resources and a relatively small number of employees, participation in Auction 66 required a tremendous expenditure of effort and funds. All of this would be wasted —and might have to be duplicated—if the Court were to accept Petitioners' invitation to overturn the auction. Before the auction occurred, Amici were required to raise and then tie up millions of dollars in upfront payments to qualify to participate in the auction;[5] after the auction closed, Amici were required to submit their down payments for licenses.[6]   Even if the FCC were to refund all of these upfront and down payments, Amici would never recapture the funds expended to raise such financing, nor the opportunities and interest lost while those funds have been tied up—nor is there any guarantee that Amici could raise those

---

[5]     *See* "Auction of Advanced Wireless Services Licenses; 168 Bidders Qualified to Participate in Auction No. 66; Information Disclosure Procedures Announced," Public Notice (rel. July 28, 2006), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-06-1525A2.pdf.   Auction applicants earn no interest on monies deposited with the FCC as upfront or down payments.

[6]     *See* "Auction of Advanced Wireless Services Licenses Closes; Winning Bidders Announced for Auction No. 66," Public Notice (rel. Sept. 20, 2006), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-06-1822A1.pdf.

funds again if forced to participate in a reauction in order to compete for the same licenses.

On top of this, Amici also expended significant resources to devise bidding strategies, formulate business arrangements, and prepare and file short-form applications disclosing detailed information concerning their ownership structures and gross revenues.[7] And during the course of the auction, bidders were required to devote personnel and, in some cases, employ outside bidding consultants, for the formulation of bids and the monitoring of bidding activity as each round unfolded. At the close of the 28-day auction, the winning bidders were required to prepare and file detailed ownership and other information necessary for the Commission to review their qualifications to hold licenses.[8] For small and mid-sized companies with day-to-day businesses to run, this claim on company resources was significant and could not be compensated if the auction were undone.

---

[7]    *See "*Auction of Advanced Wireless Services Licenses Scheduled for June 29, 2006; Notice and Filing Requirements, Minimum Opening Bids, Upfront Payments and Other Procedures for Auction No. 66," Public Notice (rel. April 12, 2006), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-06-47A1.pdf; *see also* 47 C.F.R. § 1.2105 (setting forth bidding application and certification procedures).

[8]    *See* "Auction of Advanced Wireless Services Licenses Closes; Winning Bidders Announced for Auction No. 66," Public Notice (rel. Sept. 20, 2006), *available at* http://hraunfoss.fcc.gov/edocs_public/attachmatch/DA-06-1822A1.pdf; *see also* 47 C.F.R. § 1.2107 (setting forth requirements for submitting down payments and filing "long-form" applications).

Furthermore, as a result of their participation in the auction, Amici were constrained for more than four months from entering into business discussions with a wide variety of other companies. The Commission's anti-collusion rule[9] prohibits communications by auction participants with other market participants concerning any subject matter that could have a direct or indirect effect on their bidding strategies. As the FCC has recognized, the anti-collusion rule "may affect the way in which [auction participants] conduct their routine business during the auction," by placing "significant limitations upon an auction participant's ability to pursue business opportunities involving services in the geographic areas for which it has applied to bid for licenses."[10] These lost opportunities cannot be reclaimed, and would be for naught if the auction were undone.

---

[9]    47 C.F.R. § 1.2105(c).

[10]    *See* "Wireless Telecommunications Bureau Provides Guidance on the Anti-Collusion Rule for D, E and F Block Bidders," 11 FCC Rcd 10134 (1996), *available at* http://wireless.fcc.gov/auctions/11/releases/da961460.pdf, at 1-2 (providing guidance on the Commission's anti-collusion rule in advance of a 1996 spectrum auction). These limitations encompass, among other business matters, *any* "management, resale, roaming, interconnection, partitioning and disaggregation agreement negotiations," because these "all raise impermissible subject matter for discussion by applicants for the same geographic service areas during the auction." *Id.* at 2.

6

## II.   The Public Interest Strongly Weighs Against Any Cancellation of Auction 66

Accepting Petitioners' invitation to overturn Auction 66 also would do substantial harm to the public interest.  As the Commission has recognized, additional spectrum capacity is "desperately needed" to upgrade the nation's wireless infrastructure, which "lags dramatically behind other industrialized nations," and to provide service in "underserved rural regions of our country."[11] Auction 66 was the culmination of a complex, multi-year effort "by Congress, the Executive Branch, and the Commission to move AWS spectrum into the hands of wireless providers as quickly as possible."[12]  Indeed, since Congress passed the Commercial Spectrum Enhancement Act ("CSEA") in 2004,[13] the Commission, the National Telecommunications and Information Administration ("NTIA"), and other federal agencies have been taking steps to free up the AWS spectrum to enable it to be offered in Auction 66.[14]  Overturning the auction would upset these

---

[11]   Order on Reconsideration of the Second Report and Order, *Implementation of the Commercial Spectrum Enhancement Act and Modernization of the Commission's Competitive Bidding Rules and Procedures*, WT Docket No. 05-211, FCC 06-78 (rel. June 2, 2006) (JA167) ("*Order on Reconsideration*") (statement of Commissioner Michael J. Copps).

[12]   *See* Intervenors' Brief at 43-44.  *See also* Respondents Brief at 52.

[13]   Pub. L. No. 108-494, Title II, 118 Stat. 3986 (2004) (codified in various sections of Title 47 of the United States Code).

[14]   *See* Intervenors' Brief at 43-44.

initiatives and call into doubt the Commission's ability to ensure that adequate

spectrum will be available for commercial wireless services in the foreseeable

future.

There is no guarantee that, if the Court were to overturn Auction 66, the

spectrum would be reauctioned within a reasonable time frame.  If the Court were

to vacate the Commission's DE rules and overturn the auction results, the

Commission could not even fix a date for the reauction until it first established new

rules—a process that could take many months.[15]  All told, by any realistic

measure, it could take up to two years before the Auction 66 spectrum could be

reauctioned.  For many Amici, such a delay would do unfathomable harm to their

businesses and to the customers who rely on them for wireless services.

The harm to customers served by Amici—many of whom reside in rural and

remote areas, or are otherwise underserved by other carriers—would deprive

thousands of customers of the benefits of more spectrum, including improved

service quality and the introduction of new services.  This is directly contrary to

---

[15]    Indeed, it took the Commission approximately 12 months from the date on which it sought comment on proposed service rules for the AWS spectrum until the time final rules were adopted—not including the time it took for the Commission to adopt further revisions to those rules in response to administrative challenges. *See* Notice of Proposed Rulemaking, *Service Rules for Advanced Wireless Services in the 1.7 GHz and 2.1 GHz Bands*, 17 FCC Rcd 24135 (2002); Report and Order, *Service Rules for Advanced Wireless Services in the 1.7 GHz and 2.1 GHz Bands*, 18 FCC Rcd 25162 (2003).

the public interest as articulated by Congress in section 309, which specifically encourages "the development and rapid deployment of new technologies, products, and services for the benefit of the public," including specifically "those residing in rural areas."[16] Amici, among the many other small, rural, and regional carriers that won licenses in Auction 66, stand ready to help serve that goal; their customers have no obvious and ready substitute if the Auction 66 spectrum is suddenly rendered unavailable.

In sum, the public interest strongly favors leaving the auction results intact, even if the Court should conclude that the proceeding in which the challenged rules were adopted suffered from any APA defect. As the Commission and the Intervenors have argued, the appropriate remedy for any APA deficiency would be to remand the proceeding to the Commission, without vacating the new rules or invalidating the auction, "leaving the agency to decide what approach would best serve the public interest going forward."[17] In rejecting Petitioners' earlier request to stay the auction, this Court found that "[t]he public interest also militates strongly in favor of letting the auction proceed without altering the rules of the

---

[16]   *See* 47 U.S.C. § 309(j)(3)(A).

[17]   Intervenors' Brief at 34; *see also* Respondents' Brief at 51-52.

9

game at this late date."[18/]  That conclusion applies *a fortiori* now that Auction 66

has been held and the spectrum offered is on the verge of being deployed.

## Conclusion

For these reasons, the Court under no circumstances should upset the results

of Auction 66.

---

[18/]     *See* Per Curiam Order, Docket No. 06-2943 (June 29, 2006), at 6.

Respectfully submitted,

L. Andrew Tollin
Lawrence J. Movshin
Jonathan V. Cohen
Wilkinson Barker Knauer, LLP
2300 N Street, N.W., Suite 700
Washington, D.C.  20037
(202) 783-4141

*Attorneys for American Cellular*
*Corporation and Red Rock Spectrum*
*Holdings, LLC*

October 20, 2006

Respectfully submitted,

Thomas Gutierrez
Lukas, Nace, Gutierrez & Sachs
Chartered
1650 Tysons Blvd., Suite 1500
McLean, VA 22102
(703) 584-8678

*Attorney for Barat Wireless, L.P. and
Atlantic Wireless, L.P.*

October 20, 2006

Respectfully submitted,

Donald L. Herman
Rebecca L. Murphy
Gregory W. Whiteaker
Kenneth R. Johnson
Bennet & Bennet, PLLC
10 G Street, NE, Suite 710
Washington, D.C.  20002
(202) 371-1500

*Attorneys for Palmetto Rural*
*Telephone Cooperative, Inc., Piedmont*
*Rural Telephone Cooperative, Inc.,*
*Public Service Communications, Inc.,*
*and West Carolina Telephone*
*Cooperative, Inc.*

October 20, 2006

## CERTIFICATE OF BAR MEMBERSHIP

I, L. Andrew Tollin, certify that I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

L. Andrew Tollin
Wilkinson Barker Knauer, LLP
2300 N Street, N.W., Suite 700
Washington, D.C.  20037
(202) 783-4141

*Attorneys for American Cellular Corporation and Red Rock Spectrum Holdings, LLC*

October 20, 2006

# CERTIFICATE OF BAR MEMBERSHIP

I, Donald L. Herman, certify that I have filed an application for admission to the Bar of the United States Court of Appeals for the Third Circuit.

Donald L. Herman
Bennet & Bennet, PLLC
10 G Street, NE, Suite 710
Washington, D.C.  20002
(202) 371-1500

*Attorney for Palmetto Rural Telephone Cooperative, Inc., Piedmont Rural Telephone Cooperative, Inc., Public Service Communications, Inc., and West Carolina Telephone Cooperative, Inc.*

October 20, 2006

## CERTIFICATE OF BAR MEMBERSHIP

I, Rebecca L. Murphy, certify that I have filed an application for admission to the Bar of the United States Court of Appeals for the Third Circuit.

Rebecca L. Murphy
Bennet & Bennet, PLLC
10 G Street, NE, Suite 710
Washington, D.C.  20002
(202) 371-1500

*Attorney for Palmetto Rural Telephone Cooperative, Inc., Piedmont Rural Telephone Cooperative, Inc., Public Service Communications, Inc., and West Carolina Telephone Cooperative, Inc.*

October 20, 2006

## CERTIFICATE OF BAR MEMBERSHIP

I, Thomas Gutierrez, certify that I have filed an application for admission to the Bar of the United States Court of Appeals for the Third Circuit.

Thomas Gutierrez
Lukas, Nace, Gutierrez & Sachs
Chartered
1650 Tysons Blvd., Suite 1500
McLean, VA  22102
(703) 584-8678

*Attorney for Barat Wireless, L.P. and
Atlantic Wireless, L.P.*

October 20, 2006

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Appellate Rule 31.1(c), the undersigned attorney hereby certifies that the text of the electronic brief is identical to the text of the paper copies. The undersigned further certifies that a virus detection program has been run on the file and that no virus was detected. The undersigned relies on the virus detection program Symantec AntiVirus Corporate Edition, program version 10.0.2.2000, in making this representation. I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2000 in 14-point Times New Roman type.

Rebecca L. Murphy
Bennet & Bennet, PLLC
10 G Street, NE, Suite 710
Washington, D.C. 20002
(202) 371-1500

*Attorney for Palmetto Rural Telephone Cooperative, Inc., Piedmont Rural Telephone Cooperative, Inc., Public Service Communications, Inc., and West Carolina Telephone Cooperative, Inc.*

October 20, 2006

# CERTIFICATE OF SERVICE

I, Rebecca L. Murphy, hereby certify that I caused two bound copies of the

foregoing Motion for Leave to Participate as Amici Curiae and Brief of Amici

Curiae in Support of Respondents to be served upon the following counsel in the

manner indicated:

Samuel Feder
Lawrence N. Bourne
General Counsel
Federal Communications Commission
9300 East Hampton Drive
Capitol Heights, MD 20743
(via overnight courier and electronic mail)

Alberto Gonzales
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(via overnight courier)

S. Jenell Trigg
Dennis P. Corbett
David S. Keir
Philip A. Bonomo
Leventhal Senter & Lerman PLLC
2000 K Street, N.W. Suite 600
Washington, D.C. 20006-1809
*Counsel to Council Tree Communications, Inc.,*
*Bethel Native Corporation,*
*and the Minority Media and Telecommunications Council*
(via overnight courier and electronic mail)

William T. Lake
Lynn R. Charytan
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
*Counsel to Intervenor T-Mobile USA, Inc.*
(via overnight courier and electronic mail)

Ian Heath Gershengorn
JENNER & BLOCK LLP
601 Thirteenth Street, N.W.
Washington, D.C.  20005
*Counsel to Intervenor CTIA – THE WIRELESS ASSOCIATION®*
(via overnight courier and electronic mail)

      I also certify that the original and ten bound copies of the foregoing Motion

for Leave to Participate as Amici Curiae and Brief of Amici Curiae in Support of

Respondents were filed in the manner indicated below:

                Office of the Clerk
                United States Court of Appeals
                    for the Third Circuit
                U.S. Courthouse
                601 Market Street, Room No. 21400
                Philadelphia, Pennsylvania 19106-1790
                (via overnight courier)

      I also certify that one electronic copy, in PDF format, of the foregoing Brief

of Amici Curiae in Support of Respondents was filed with the Office of the Clerk

by electronic mail at the address indicated:

                electronic_briefs@ca3.uscourts.gov

Rebecca L. Murphy
Bennet & Bennet, PLLC
10 G Street, NE, Suite 710
Washington, D.C.  20002
(202) 371-1500

*Attorney for Palmetto Rural Telephone Cooperative, Inc., Piedmont Rural Telephone Cooperative, Inc., Public Service Communications, Inc., and West Carolina Telephone Cooperative, Inc.*

October 20, 2006

EXHIBIT XIX

**Annual DE Report for Barat,
dated April 29, 2009**

# New Designated Entity Annual Report

## General Information

Approved by OMB
3060-1092

### File Number

File Number:  **0003822186**

## Licensee Information

### Licensee FRN

Licensee FRN:  **15019003**

### Entity Type

Licensee is a(n):  **Limited Partnership**

### Licensee Name

Licensee Name:  **Barat Wireless, LP**
(if entity)
Licensee Name:
(if individual)

Attention To:  **Allison Cryor DiNardo**

### Address

P.O. Box:
Street Address:  **105 North Pitt Street, Suite 320**
City:  **Alexandria**
State:  **Virginia**
ZIP Code:  **22314**

Phone:  **(703)518-9902**
Fax:  **(703)518-8993**
Email:  **allison@varsitypartners.com**

### Demographics (Optional)

Race:
Ethnicity:
Gender:

## Contact Information

### Contact Name

Name:
Company Name:  **Lukas, Nace, Gutierrez & Sachs, LLP**

Attention To:      **Thomas Gutierrez**

**Address**

P.O. Box:
Street Address:    **1650 Tysons Boulevard, Suite 1500**
City:              **McLean**
State:             **Virginia**
ZIP Code:          **22102**

Phone:             **(703)584-8678**
Fax:               **(703)584-8696**
Email:             **tgutierrez@fcclaw.com**

## Designated Entity Information

|    | Call Sign | Radio Service Code | Initial Grant Date | Bidding Credits | Closed Bidding | Installment Payments |
|----|-----------|--------------------|--------------------|-----------------|----------------|----------------------|
| 1  | WQGV752   | AW                 | 04/30/2007         | Yes             |                |                      |
| 2  | WQGV753   | AW                 | 04/30/2007         | Yes             |                |                      |
| 3  | WQGV754   | AW                 | 04/30/2007         | Yes             |                |                      |
| 4  | WQGV755   | AW                 | 04/30/2007         | Yes             |                |                      |
| 5  | WQGV756   | AW                 | 04/30/2007         | Yes             |                |                      |
| 6  | WQGV757   | AW                 | 04/30/2007         | Yes             |                |                      |
| 7  | WQGV758   | AW                 | 04/30/2007         | Yes             |                |                      |
| 8  | WQGV759   | AW                 | 04/30/2007         | Yes             |                |                      |
| 9  | WQGV760   | AW                 | 04/30/2007         | Yes             |                |                      |
| 10 | WQGV761   | AW                 | 04/30/2007         | Yes             |                |                      |
| 11 | WQGV762   | AW                 | 04/30/2007         | Yes             |                |                      |
| 12 | WQGV763   | AW                 | 04/30/2007         | Yes             |                |                      |
| 13 | WQGV764   | AW                 | 04/30/2007         | Yes             |                |                      |
| 14 | WQGV765   | AW                 | 04/30/2007         | Yes             |                |                      |
| 15 | WQGV766   | AW                 | 04/30/2007         | Yes             |                |                      |
| 16 | WQGV767   | AW                 | 04/30/2007         | Yes             |                |                      |
| 17 | WQGV768   | AW                 | 04/30/2007         | Yes             |                |                      |

## Attachments

|   | Type  | Description | Date Uploaded |
|---|-------|-------------|---------------|
| 1 | Other | Exhibits    | 04/27/2009    |

## Certification Information

**Signature**

Name:       **Allison Cryor DiNardo**
Title:         **President of General Partner**

**Receipt Date**

Receipt Date:  **04/29/2009**

**EXHIBIT I**

## LISTING AND SUMMARY OF APPLICABLE AGREEMENTS

1. Limited Partnership Agreement of Barat Wireless, L.P. dated as of July 11, 2006 ("Barat LP Agreement")
2. Investment Agreement dated as of July 11, 2006
3. Loan Agreement dated as of July 11, 2006
4. Loan and Security Agreement dated as of July 11, 2006
5. Pledge Agreement from Barat Wireless, Inc. dated as of July 11, 2006
6. Pledge Agreement from Shareholders of Barat Wireless, Inc, dated as of July 11, 2006
7. Management Services Agreement between Barat Wireless, L.P. and United States Cellular Corporation, dated as of April 19, 2007 ("Management Agreement")

8.

**EXHIBIT II**

## SUMMARY OF APPLICABLE AGREEMENTS

Barat Wireless, L.P. ("Filer" or "Barat LP"), a designated entity licensee, acquired Advanced Wireless Service (AWS) licenses in Auction No. 66. Each of the Agreements described below was presented to Commission staff as part of Filer's Auction 66 long-form application (FCC Form 601). Commission staff reviewed and requested certain changes to these agreements which were made prior to grant of Filer's FCC Form 601. In addition, Filer has not entered into any agreements or arrangements (including proposed agreements and arrangements) that relate to Filer's eligibility for designated entity benefits for any designated entity license covered by this annual report.

1. Barat LP Agreement

This Agreement, establishes Barat LP as a Delaware Limited Partnership. It provides that Barat Wireless Inc. ("Barat Inc.") is the sole general partner ("General Partner") and USCC Wireless Investment, Inc. ("USCC Wireless") is the sole limited partner ("Limited Partner"). It also provides that the purpose of Barat LP is to fund, establish, and provide wireless service with respect to any AWS licenses acquired in Auction No. 66.

Barat Inc. controls Barat LP. Section 5.1 of the Agreement succinctly provides that

[t]he General Partner at all times shall exercise control over the Partnership in compliance with the FCC Rules. The General Partner shall have the exclusive right and power to manage, operate and control the Partnership and to make all decisions necessary or appropriate to carry on the business and affairs of the Partnership.

Additionally, Section 5.1 authorizes the General Partner to manage the day-to-day operations of Barat LP, which include, but are not limited to, the following rights and powers: (1) the conduct of bidding activity in Auction No. 66; (2) the borrowing of money from banks, or other lending institutions; (3) the hiring and terminating of employees; (4) the operation of the partnership business and enter into contracts for the management and operation of such business; (5) the acquisition, use and sale of real and personal property on behalf of the Partnership; (6) the making of all payments required of the Partnership; and (7) the arranging for all federal, state and local regulatory and tax filings. Section 6.2 of the Agreement provides that the General Partner "shall execute all contracts, agreements and instruments as the General Partner may reasonably deem necessary or desirable to carry on the purpose of the Partnership." Similarly, only the General Partner can make capital calls for the Partnership or call for the inclusion of new partners.

This Agreement also provides the General Partner with certain "put" rights, whereby it has the right to require the Limited Partner to buy the interest of the General Partner. Significantly, there is no corresponding "call" right on the General Partner's interest. This

Agreement also provides for a mutual, customary right of first refusal as well as tag-along rights in the event that either party desires to sell its interest to a third party.

2.    Investment Agreement

Barat Inc., USCC Wireless, and United States Cellular Corporation ("USCC") entered into an Investment Agreement on July 11, 2006 which addresses the funding of Barat LP. The Agreement provides that the Partnership (Barat LP) will be capitalized on a 20 percent equity, 80 percent debt basis (Section 1.1). Section 1.1 further indicates that the Partnership itself is responsible for obtaining financing and that neither partner to the Partnership is obligated to make loans to the Partnership. Further, with respect to the initial capital contributions, the Agreement provides that Barat Inc. will contribute $105,000 of its own funds (which Barat Inc. has already contributed). The remainder of its capital contribution would be in the form of a loan, the terms of which are discussed below, from the Limited Partner or an affiliate of the Limited Partner.

3.    Loan Agreement

Barat Inc., as the borrower, and USCC, the parent company of USCC Wireless, as the lender, entered into a loan agreement (the "Loan Agreement") on July 11, 2006. Pursuant to the Loan Agreement, USCC shall advance funds to Barat Inc. for the purpose of making required capital contributions to Barat LP. The aggregate amount of the advances shall not exceed $4,500,000. The interest rate on the advances is, consistent with industry standards for arm's length loans in transactions such as this one, 8 percent per annum, compounded annually. Principal and interest on the advances are due on the earlier of (1) July 11, 2016; (2) the sale of the capital stock in Barat Inc.; (3) the sale of all or substantially all of the Assets of Barat LP; (4) the sale of any or all of Barat Inc.'s interest in Barat LP (5) the date of return by the FCC of the Auction 66 deposit. Moreover, Barat Inc. has the option to prepay any or all of the advances made by USCC, or to obtain funding from other sources, but lender does not have the option to refuse to make the loan, subject to Barat Inc. satisfying the conditions of the Loan Agreement.

4.    Loan and Security Agreement

On July 11, 2006, Barat LP and USCC entered into a Loan and Security Agreement in which USCC shall advance funds to Barat LP for the sole purpose of making the AWS Auction deposit (initial upfront payment requirement and subsequent deposit equal to 20% of the net winning bids) required by the Commission and to also provide additional working capital. The Barat LP initially deposited $80,000,000.00 as an upfront payment and, at the down payment deadline, it had enough monies on deposit to cover the 20% down payment requirement. For this loan, the aggregate amount of the advances shall not exceed $101,952,000.00. The interest rate on the advances is, consistent with industry standards for arm's length loans in transactions such as this one, 8 percent per annum, compounded annually. Principal and interest on the advances are due on the earlier of (1) the 10th anniversary of the date of this Agreement; (2) the sale of the capital stock in Barat Inc.; (3) the sale of all or substantially all of the Assets of the Barat LP; (4) the sale of any or all of Barat Inc.'s interest in the Barat LP; or (5) the date of return by the FCC of the Auction 66 deposit. Moreover, Barat LP has the option to prepay any or all of the

advances made by USCC, or to obtain funding from other sources, but lender does not have the option to refuse to make the loan, subject to the Barat LP satisfying the conditions of the Loan Agreement.

In addition, Barat LP granted to USCC a continuing security interest in the Collateral described in Section 5.01 of this Agreement for all of its obligations incurred as a result of advances made pursuant to this Agreement. The collateral includes, to the extent permitted by law, all FCC licenses and permits held by the Barat LP.

5.    Pledge Agreement from Barat Wireless, Inc.

The Pledge Agreement, dated July 11, 2006, is between Barat Inc., as the Pledgor, in favor of USCC. Pursuant to the Agreement, Barat Inc., as a condition to the any advances made pursuant to the Loan Agreement, grants USCC a first priority security interest in its Partnership Interests in Barat LP (defined as 100% of the General Partnership Interests in Barat LP) and all proceeds of any and all of the collateral. Finally, Barat Inc. is restricted from selling, transferring, pledging, or otherwise encumbering or disposing of any of its Partnership Interests in Barat LP or any of the collateral.

6.    Pledge Agreement from Shareholders of Barat Wireless, Inc.

The Pledge Agreement, dated July 11, 2006, is between Allison Cryor DiNardo, as the Pledgor, in favor of USCC. Pursuant to the Agreement, Allison Cryor DiNardo, as a condition to any advances made pursuant to the Loan Agreement, grants USCC a first priority security interest in her interest in Barat Inc. (defined as 100% of all the issued and outstanding shares of Capital Stock in Barat Inc.) and all proceeds of any and all of the collateral. Finally, Allison Cryor DiNardo is restricted from selling, transferring, pledging, or otherwise encumbering or disposing of any of her interest in Barat Inc. or any of the collateral.

7.    Management Agreement

The Management Agreement delegates to USCC certain responsibilities as the manager of the CMRS systems licensed to, constructed, and operated by or on behalf of Barat LP utilizing licenses acquired in Auction No. 66. The Management Agreement specifies that USCC will manage any systems constructed under Barat LP's continuing oversight, review, supervision and control (Recitals), that control of the CMRS systems will remain in Barat LP, and that nothing in the Management Agreement will give USCC *de facto* or *de jure* control over Barat LP or its operations (§ 11.3). Barat LP retains authority and ultimate control over the determination and implementation of policy and business strategy, including Barat LP's business plans, budgets, technical service, construction schedules, service offerings, and other aspects of Barat LP's operation (§§ 3.2, 3.3, Article IV).

Under the Agreement, Barat LP is obligated to maintain its own bank accounts (§ 7.3). In addition, Barat LP will receive receipts associated with the operation of its systems that will be deposited to these Barat LP accounts (§ 7.3). There is to be no commingling of Barat LP's and USCC's funds. Barat LP is also responsible for the payment of all financial obligations and

operating expenses (except out-of-pocket expenses) (Article IV). Barat LP enjoys the profits and bears the risk of loss from the operation of the Barat LP systems (Article IV). Barat LP must approve key USCC employees responsible for the operation of the Barat LP systems (§ 5.1), and it has the right to require the removal of any USCC employee working on the Barat LP system (§ 5.1(a), (b), and (c)). Barat LP also has the right, for cause, to require USCC to discharge any independent contractor engaged to perform services under the Management Agreement (§ 5.2). Finally, Barat LP is responsible for the filing of federal, state and local tax returns, audits thereof, payment of all other fees and assessments, FCC filings and filings with other governmental entities (Article IV).

Barat LP also retains unfettered use of, and unimpaired access to, all facilities and equipment associated with the Barat LP systems (Article IV). Under Section 2.1, and subject to certain limitations of the Manager's authority described in Article IV, USCC will provide or arrange for the following services for the Barat LP systems:

- Administrative, accounting, billing, credit, collection, insurance, purchasing, clerical and such other general services as may be necessary to administer the Barat LP Systems;
- Operational, engineering, maintenance, repair and such other technical services as may be necessary to operate the Barat LP Systems;
- Marketing, sales, advertising and such other promotional services as may be necessary to market the products and services of the Barat LP Systems, *provided that* Barat LP shall determine the terms upon which the Barat LP Systems' services are offered and prices charged for its services.

In addition, Section 2.2 provides that, under the direction and guidance of Barat LP and pursuant to the business plan and budgets approved by Barat LP, USCC will also provide the following services for the Barat LP Systems:

- Negotiating, as agent for Barat LP, such agreements as may be necessary for the provision of services, supplies, office or other types of space, utilities, insurance, concessions and the like;
- Developing and implementing plans for the construction of the Barat LP Systems in accordance with the Technical Services Plan to be developed with Barat LP;
- Developing and implementing promotional programs, including, but not limited to, the negotiation, as agent for Barat LP, of resale and/or agency arrangements;
- Developing and implementing mechanisms and systems for billing for the products and services provided by the Barat LP Systems or entering into arrangements to procure on behalf of Barat LP such billing mechanisms and systems;
- Developing and implementing plans for the maintenance of the Barat LP Systems and for monitoring the performance of the Barat LP Systems;
- Developing and implementing sales and marketing plans for the services to be provided by the Barat LP Systems, including, but not limited to, arrangements for roaming agreements, arranging for necessary sales personnel and technical support for sales

operations, and arranging for appropriate marketing vehicles for the sales of Barat LP's services and associated equipment;

- Assisting Barat LP in the preparation of filings, applications, reports and other matters with Governmental Entities.

USCC is required to perform its services in accordance with the rules and with all other applicable legal requirements (§§ 13.4, 13.5). USCC is also required to perform its services in a diligent, professional, commercially reasonable and workmanlike manner, consistent with industry standards for the wireless telecommunications industry (§ 13.5). USCC is entitled to be reimbursed for out-of-pocket expenses incurred in its performance under the Management Agreement (§ 7.1) and to be paid a management fee (§ 7.2).

The Management Agreement has an initial term of eight years (§ 10.1). Barat LP may terminate the Management Agreement at will upon one year's written notice (§ 10.2(b)(iii)). In addition, Barat LP may terminate the Management Agreement upon, *inter alia*, USCC's breach of the agreement, after a specified cure period, or an FCC final order revoking, terminating, canceling or refusing to renew any Barat LP license due to any act of omission or commission by USCC (§ 10.2(b)(i)). Any termination of the Management Agreement will trigger the development of a transition program to assure continued operation of the Barat LP systems and to minimize any disruption to existing customers (§ 10.4).

**EXHIBIT III**

**RESPONSE TO SPECIFIC INFORMATION REQUESTS INCLUDED ON INFORMATION AND INSTRUCTIONS FOR COMPLETION OF FCC FORM 611-T**

Progress In Meeting Construction Requirements:   The subject licenses are not subject to a specific construction requirement other than a requirement, at the time of application for renewal, that the renewal applicant has provided "substantial" service during its past license term.  Filer's licenses are due to expire April 30, 2022. Barat LP is in the planning stages of construction and is considering equipment capabilities.

Services Provided or Planned:   Voice and data services, including Broadband Internet Access.

Number of Subscribers:  Currently none.

**EXHIBIT XX**

**Annual DE Report for Carroll,
dated January 9, 2009**

# New Designated Entity Annual Report

## General Information

Approved by OMB
3060-1092

### File Number

File Number: **0003698187**

## Licensee Information

### Licensee FRN

Licensee FRN: **12184834**

### Entity Type

Licensee is a(n): **Limited Partnership**

### Licensee Name

Licensee Name: **Carroll Wireless, LP**
(if entity)
Licensee Name:
(if individual)

Attention To: **Allison Cryor DiNardo**

### Address

P.O. Box:
Street Address: **100 North Pitt Street, Suite 320**
City: **Alexandria**
State: **Virginia**
ZIP Code: **22313**

Phone: **(703)518-9902**
Fax: **(703)518-8993**
Email: **allison@varsitypartners.com**

### Demographics (Optional)

Race:
Ethnicity:
Gender:

## Contact Information

### Contact Name

Name:
Company Name: **Lukas, Nace, Gutierrez & Sachs, LLP**

Designated Entity Annual Reports Reference Copy
Case 1:20-cv-02670-TSC Document 178-14 Filed 06/13/22 Page 130 of 151

| Attention To: | **Thomas Gutierrez** |
|---|---|

**Address**

| P.O. Box: | |
|---|---|
| Street Address: | **1650 Tysons Boulevard, Suite 1500** |
| City: | **McLean** |
| State: | **Virginia** |
| ZIP Code: | **22102** |

| Phone: | **(703)584-8678** |
|---|---|
| Fax: | **(703)584-8696** |
| Email: | **tgutierrez@fcclaw.com** |

## Designated Entity Information

| | Call Sign | Radio Service Code | Initial Grant Date | Bidding Credits | Closed Bidding | Installment Payments |
|---|---|---|---|---|---|---|
| 1 | WQEE467 | CW | 01/06/2006 | | Yes | |
| 2 | WQEE468 | CW | 01/06/2006 | | Yes | |
| 3 | WQEE469 | CW | 01/06/2006 | | Yes | |
| 4 | WQEE470 | CW | 01/06/2006 | | Yes | |
| 5 | WQEE471 | CW | 01/06/2006 | Yes | | |
| 6 | WQEE472 | CW | 01/06/2006 | | Yes | |
| 7 | WQEE473 | CW | 01/06/2006 | | Yes | |
| 8 | WQEE474 | CW | 01/06/2006 | | Yes | |
| 9 | WQEE475 | CW | 01/06/2006 | | Yes | |
| 10 | WQEE476 | CW | 01/06/2006 | Yes | | |
| 11 | WQEE477 | CW | 01/06/2006 | Yes | | |
| 12 | WQEE478 | CW | 01/06/2006 | Yes | | |
| 13 | WQEE479 | CW | 01/06/2006 | Yes | | |
| 14 | WQEE480 | CW | 01/06/2006 | | Yes | |
| 15 | WQEE481 | CW | 01/06/2006 | | Yes | |
| 16 | WQEE482 | CW | 01/06/2006 | Yes | | |

## Attachments

| | Type | Description | Date Uploaded |
|---|---|---|---|
| 1 | Other | Exhibits | 01/09/2009 |

## Certification Information

**Signature**

| Name: | **Allison Cryor DiNardo** |
|---|---|

Title:        **President of General Partner**

**Receipt Date**

Receipt Date:   **01/09/2009**

**EXHIBIT I**

## LISTING OF APPLICABLE AGREEMENTS[1]

1. Limited Partnership Agreement of Carroll Wireless, L.P. dated as of November 24, 2004 ("Carroll Wireless LP Agreement")

2. Investment Agreement dated as of November 24, 2004

3. Bidding Protocol dated as of November 24, 2004

4. Loan Agreement dated as of December 22, 2004

5. Loan and Security Agreement dated as of December 22, 2004

---

[1]   Many of the agreements listed above have been previously submitted to the Commission during licensee's initial licensing process (Applicant's licenses were acquired in Auction 58).  Each of these agreements pertain to each of the licenses set forth on the associated Form 611-T.

**EXHIBIT II**

**SUMMARY OF APPLICABLE AGREEMENTS**

Below is a summary of applicable agreements. Each of these agreements was presented to Commission staff as part of Filer's Auction 58 long-form application (FCC Form 601). Commission staff reviewed and requested certain changes to these agreements which were made prior to grant of Filer's FCC Form 601.

1.    Carroll Wireless LP Agreement[2]

This Agreement, establishes Applicant as a Delaware Limited Partnership. It provides that Carroll PCS, Inc. ("Carroll PCS") is the sole general partner ("General Partner") and USCCWI is the sole limited partner ("Limited Partner"). It also provides that the purpose of Applicant is to fund, establish, and provide wireless service with respect to any PCS licenses acquired in Auction No. 58.

Carroll PCS controls the Applicant. The Agreement succinctly provides that

[t]he General Partner at all times shall exercise control over the Partnership in compliance with FCC Rules. The General Partner shall have the exclusive right and power to manage, operate and control the Partnership and to make all decisions necessary or appropriate to carry on the business and affairs of the Partnership.

Additionally, the General Partner manages the day-to-day operations of the Applicant, which include, but are not limited to, the following rights and powers: (1) the conduct of bidding activity in Auction No. 58; (2) the borrowing of money from banks, or other lending institutions; (3) the hiring and terminating of employees; (4) the operation of the partnership business and enter into contracts for the management and operation of such business; (5) the acquisition, use and sale of real and personal property on behalf of the Partnership; (6) the making of all payments required of the Partnership; and (7) the arranging for all federal, state and local regulatory and tax filings. The Agreement further provides that the General Partner "shall execute all contracts, agreements and instruments as the General Partner may reasonably deem necessary or desirable to carry on the purpose of the Partnership." Similarly, only the General Partner can make capital calls for the Partnership or call for the inclusion of new partners.

This Agreement also provides the General Partner with certain "put" rights, whereby it has the right to require the Limited Partner to buy the interest of the General Partner. Significantly, there is no corresponding "call" right on the General Partner's interest. This Agreement also provides for a mutual, customary right of first refusal in the event that either party desires to sell its interest to a third party.

---

[2] The description of the LP Agreement includes the subsequent amendments dated December 22, 2004 and January 6, 2006.

In addition, certain traditional investor protections have been built into the Carroll Wireless LP Agreement in order to protect the legitimate interests of the non-controlling partner. For example, the General Partner is authorized to take certain major corporate actions only with the consent of those Partners holding at least fifty-five percent (55%) of the Partnership Interests, such as: (1) amending the governing organizational documents; (2) admitting new partners; (3) acting in contravention of applicable rules and law; (4), during the first five years following the issuance of a license, exceeding certain limitations on aggregate capital expenditures and aggregate negative cash flow amounts; (5) selling substantially all of the assets of the Applicant or liquidating or dissolving the Applicant or the sale, transfer, exchange, lease, mortgage, pledge, or assignment of any license other than the licenses for Asheville, NC, Columbus, IN, Hickory, NC, and West Plains, MO; and (6) make any expenditure or agree to make any expenditure which would cause expenditures to exceed by more than ten percent (10%) those expenditures budgeted in the annual budget in force at the time of the expenditure.

The Limited Partner also has rights of first refusal and tag-along rights with respect to the sale of another Partner's interest in or the assets of Carroll Wireless. These rights are subject to various limitations, including the time in which the right must be exercised, and the price paid to the other Partner with respect to the interests or assets being sold.

2.    Investment Agreement

Carroll PCS and USCCWI entered into an Investment Agreement on November 24, 2004 which addresses the funding of the Applicant. The Agreement provided that the Partnership (Applicant) will be capitalized on a 20 percent equity, 80 percent debt basis. Further, the Partnership itself is responsible for obtaining financing and that neither partner to the Partnership is obligated to make loans to the Partnership. In addition, with respect to the initial capital contributions, the Agreement provided that Carroll PCS would contribute $100,000 of its own funds (which Carroll PCS has already contributed). The remainder of its capital contribution would be in the form of a loan, the terms of which are discussed below, from the Limited Partner or an affiliate of the Limited Partner.

3.    Bidding Protocol

The Bidding Protocol, executed on November 24, 2004, by and between Carroll PCS, USCCWI, and Applicant, provided that Ms. Allison Cryor DiNardo had sole authority to determine which PCS licenses, and in which order, the Applicant would enter bids in each round, provided that the bids are consistent with the overall investment parameters set forth in the Applicant's governing documents.

The bidding agreement had several purposes. First, it prioritized all markets in Auction No. 58 by bid level. Second, the agreement as amended established an overall bidding cap that would not exceed $255 million. Third, the Agreement set forth the initial maximum price per pop for each PCS license available in the auction. Lastly, it provided generally for the partners to confer with each other (but not with other bidders) during the course of the auction.

4.   Loan Agreement[3]

Carroll PCS, as the borrower, and USCC, the parent company of USCCWI, as the lender, entered into a loan agreement (the "Loan Agreement") on December 22, 2004. Pursuant to the Loan Agreement, USCC advanced funds to Carroll PCS for the purpose of making required capital contributions to the Applicant. The aggregate amount of the advances would not exceed $2,501,900. The interest rate on the advances is, consistent with industry standards for arm's length loans in transactions such as this one, 8 percent per annum, compounded annually. Principal and interest on the advances are due on the earlier of (1) December 22, 2014; (2) the sale of the capital stock in Carroll PCS; (3) the sale of all or substantially all of the Assets of the Limited Partnership; (4) the sale of any or all of Carroll PCS' interest in the Limited Partnership; or (5) the date of return by the FCC of the Auction 58 deposit. Moreover, Carroll PCS has the option to prepay any or all of the advances made by USCC, or to obtain funding from other sources, but lender does not have the option to refuse to make the loan.

5.   Loan and Security Agreement[4]

On December 22, 2004, the Applicant and USCC entered into a Loan and Security Agreement in which USCC advanced funds to the Applicant for the sole purpose of making the PCS Auction deposit (initial upfront payment requirement and subsequent deposit equal to 20% of the net winning bids) required by the Commission and to also provide additional working capital. The Applicant initially deposited $9 million as an upfront payment and submitted an additional $16.985 million at the down payment deadline. For this loan, the aggregate amount of the advances shall not exceed $104,076,000. The interest rate on the advances is, consistent with industry standards for arm's length loans in transactions such as this one, 8 percent per annum, compounded annually. Principal and interest on the advances are due on the earlier of (1) the fifth anniversary of the date of this Agreement; (2) the sale of the capital stock of Carroll PCS; (3) the sale of all or substantially all of the Assets of the Limited Partnership; (4) the sale of any or all of Carroll PCS' interest in the Limited Partnership; or (5) the date of return by the FCC of the Auction 58 deposit. Moreover, Applicant has the option to prepay any or all of the advances made by USCC, or to obtain funding from other sources, but lender does not have the option to refuse to make the loan.

In addition, Carroll Wireless granted to USCC a continuing security interest in the Collateral described in this Agreement for all of its obligations incurred as a result of advances made pursuant to the this Agreement. The collateral includes, to the extent permitted by law, all FCC licenses and permits held by Carroll PCS.

---

[3] The description of the Loan Agreement includes subsequent amendments dated March 16, 2005, November 7, 2004 and January 6, 2006.

[4] The description of the Loan and Security Agreement includes subsequent amendments dated March 16, 2005, November 7, 2005 and January 6, 2006.

**EXHIBIT III**

**RESPONSE TO SPECIFIC INFORMATION REQUESTS INCLUDED ON
INFORMATION AND INSTRUCTIONS FOR COMPLETION OF FCC FORM 611-T**

<u>Progress In Meeting Construction Requirements:</u>  Applicant's licenses were acquired in
Auction 58 and granted on January 6, 2006.  All of Applicant's licenses have a five-year
construction benchmark of January 6, 2011.  Applicant is in the preliminary stages of
construction.

<u>Services Provided or Planned:</u>  Commercial Mobile Radio Service; Roaming.

<u>Number of Subscribers:</u>  None.

**EXHIBIT XXI**

**Declaration of Allison DiNardo**

## <u>DECLARATION OF ALLISON CRYOR DINARDO</u>

Allison Cryor DiNardo declares under penalty of perjury that the following facts are true to the best of her knowledge and belief:

1.  I am the president and sole shareholder of King Street Wireless, Inc., the general partner of King Street Wireless, L.P. ("King Street").  I am also the president and sole shareholder of Barat Wireless, Inc., the general partner of Barat Wireless, L.P. ("Barat"), and of Carroll PCS, Inc, the general partner of Carroll Wireless, L.P. ("Carroll"  and together with Barat and King Street, the "Limited Partnerships").  The sole limited partner of each of the Limited Partnerships is USCC Wireless Investment, Inc. ("USCCWII"), a subsidiary of United States Cellular Corporation ("USCC"), which in turn is an affiliate of Telephone and Data Systems, Inc. ("TDS" and together with USCCWII and USCC, "TDS/USCC").

2.  I graduated in 1988 from the Darden Graduate School of Business at the University of Virginia, where I was inducted into the Raven Society in recognition of my academic achievement and leadership.  After graduation, I worked as Deputy Associate Director for Presidential Personnel in the White House.  Subsequently, I created and implemented a $165,000,000 capital campaign at the University of Virginia in Charlottesville.  In 1998, I returned to Washington, D.C. to serve as Vice President for Development for Citizens for a Sound Economy, a nonprofit organization, where I managed a team of eight employees and an annual capital campaign that raised $18,000,000 annually.

3.  One of my fellow students in business school was Mark Kington, who hired me as the President and Chief Operating Officer of Kington Management Corporation ("Kington Management").  In that capacity, I was in charge of hiring and managing staff, financial reporting, managing budgets, hiring and training accountants and interfacing with tax professionals and various legal counsel.  My tasks included management of a family office, a commercial farm, a multi-million dollar family foundation and Mark Kington's wireless interests.  Through this job at Kington Management, I became quite familiar with the wireless industry.

4.  Beginning in 2000, I managed the operations for the general partner and later entities of Black Crow Wireless, L.P. ("Black Crow"): Eastern Shore Wireless Company, LLC ("Eastern Shore"),  Jackson Square Wireless, L.P. ("Jackson Square"), K-25 Wireless, L.P. ("K-25"), X-10 Wireless, L.P. ("X-10") and Y-12 Wireless, L.P. ("Y-12"). In these businesses, I oversaw system purchases, federal, state and local filings, market build-out, site leasing, interconnection and backhaul arrangements and overall system management.  I also played a key role for Black Crow in Auction No. 35.  I was directly involved in bidding strategy, market selection, office acquisition, bidding mechanics, technology utilization and financial management activities.

5.  At the conclusion of Auction No. 35, I worked with investment banks in an effort to borrow some of the funds to pay for the licenses won by Black Crow.  As with other wireless properties managed by Kington Management, my responsibilities involved overseeing purchases and building out markets, including the review of tower site leases, securing T-1 lines, and the oversight of the engineering bid process.  I was also responsible for the management of additional wireless properties controlled by Mark

Kington,  which were acquired from other designated entities ("DEs") including wireless properties acquired and operated by Jackson Square, K-25, X-10 and Y-12.  For each of these DE licensees, Mark Kington's corporations served as the general partner and USCCWII served as the limited partner.

6.   Through my management of these wireless entities, I gained valuable operational experience in the wireless industry.  I learned about the issues encountered in the successful rapid build-out of wireless operations with K-25, which purchased wireless interests with just under three months left to meet Federal Communications Commission ("Commission") build-out deadlines.  I also obtained direct operational experience associated with the wireless purchase by Y-12 of a wireless carrier with approximately 8,500 wireless subscribers, which operated under the name Amica Wireless.  In connection with Y-12, I was involved in arranging for the building of new cell sites, changing the cash management system, revamping customer service, training staff, reorganizing its four stores, cutting expenses and changing senior management.  Under my leadership, Y-12 experienced a twenty percent increase in its customer base and an increase in net operating profits.

7.   My involvement in Black Crow, Jackson Square, K-25, X-10 and Y-12 provided TDS/USCC with an opportunity to observe my abilities and skills since they invested in each of these projects.  Additionally, through the operation of these businesses, I developed a trusting and respectful relationship with the TDS/USCC personnel, with whom I dealt.

8.   As a result of these experiences, I decided that I wanted to lead my own company to develop and operate wireless businesses, despite the inherent financial risks

that were involved.  Consequently, I decided to pursue the opportunities presented by the DE program.  In the fall of 2004, I approached TDS/USCC about forming a limited partnership to participate in Auction No. 58.  I thought that TDS/USCC would be a good partner in the wireless business, and hoped my respect was reciprocated.  I had gotten to know many employees at TDS/USCC at various levels and was comfortable with their business practices.  They also knew me.

9.  In each of the three Limited Partnerships – Carroll, Barat and King Street – my initial equity contribution was at least $100,000.  The money came from my husband, a career analyst with the Federal Bureau of Investigations, and me.  Some of it was borrowed by us from family members.  None of it came from TDS, USCC, USCCWII or any of their affiliates.  Additionally, none of my initial contributions have been repaid by any of those entities or related sources in any manner, and there are no plans for such repayment (except as set forth in the organizational documents of the Limited Partnerships that were reviewed by the staff of the Commission before the grant of their applications).

10.

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

19.  My work on behalf of the Limited Partnerships encompasses much more than just the bidding, as complex as that task is.  With the assistance of my counsel, I ran and controlled the first phase of the auction application process, from start to finish.  I was directly involved in the filing of the short-form applications, reviewing and approving each one prior to submission.  I was equally involved in the amendments to the applications that the staff requested.  I controlled, both substantively and ministerially, the submission of pre-auction up-front payments and later, full license payments.  I also directly arranged for the establishment of the Limited Partnerships and the general partner corporate entities.

20.  After each auction, again with the assistance of my counsel, I was directly involved with and controlled the process for obtaining Commission approval of the high-bid applications.  I reviewed and approved the long-form applications and their amendments.  Through counsel, I negotiated with Commission staff on numerous changes to the organizational and funding documents associated with the licensees.  To illustrate, in one instance the Commission staff requested several dozen minor modifications to the organizational documents set forth in the long form application, and I determined which changes were appropriate and acceptable and could be made.  Throughout this process, the involvement of USCCWII was primarily limited to

understanding the Commission staff requests and signing off only on changes that limited the rights that had been previously negotiated.

21.   Both before and after grant of any licenses, I undertook myriad organizational and management tasks.  I directly arranged for the creation of the necessary legal entities, obtained leased facilities for the Limited Partnerships and negotiated the terms of the leases, prepared all quarterly and annual budgets for the Limited Partnerships, prepared, delivered and processed all capital calls for each of the Limited Partnerships and scheduled, conducted and controlled all meetings of each Limited Partnership.  In the case of Barat, I surveyed several specialized entities to assist in the unique spectrum clearing needs for the spectrum at issue.  Ultimately, I decided to retain ac-Cellerate, a consulting firm with no prior business relationship with USCC.  I am still working with ac-Cellerate to assure that all necessary clearance activities are being undertaken appropriately and in a timely manner.

22.   In the case of Carroll, I arranged for some of its licensed spectrum to be leased to other licensees.  Along with Carroll's counsel, I was the primary negotiator for the leases.  I determined what substantive terms were appropriate and acceptable, whether to lease the spectrum, and whether to execute the leases.  All proceeds from the leases were paid directly to Carroll, and the funds are being used for the benefit of that Limited Partnership.  I also retained an engineering consultant, whom I had used while managing Amica Wireless, to undertake an analysis of the five-year build out obligations for Carroll.  This consultant has not done prior work for USCCWII or its affiliates; the analysis is designed solely to complete construction efficiently and consistent with

applicable Commission rules, without any consideration of any individual wants or needs of the Limited Partner.

23.   In the case of King Street, again working with my counsel, I chose and retained engineering consultants to undertake an ever-evolving Channel 51 analysis to ascertain and minimize King Street's interference protection obligations.  Significantly, none of the consultants has any relationship to, or has done any prior work for, USCCWII or its affiliates.

24.   On behalf of the various partnerships that I control, I have participated in various Commission rulemaking and adjudicatory proceedings.  I have also, working with counsel, overseen and controlled the filing of numerous reports to the Commission. I also selected, and interfaced almost exclusively with, the Limited Partnerships' accountants.  I am responsible for cash management for the Limited Partnerships, including the sizable cash balances associated with the spectrum leases discussed above. I prepare and maintain all financial statements for each of the Limited Partnerships and arrange for the preparation and filing of all federal, state and local tax returns on behalf of each of the Limited Partnerships.  I alone control all hiring and firing decisions for employees as well as contractors of the Limited Partnerships.  I have also met and screened multiple potential venders for various of the Limited Partnerships.

25.   I am a member of the Cellular Telecommunications and Internet Association ("CTIA") and a regular attendee at CTIA conferences.  This has provided valuable information regarding emerging and changing issues facing the wireless industry.  I have also met with Congressional staff and with Commission "Eighth Floor" staff to provide input and analysis regarding substantive industry activities.  In my view, these activities

help assure that relevant decision makers know about and properly consider the needs

and wants of the Limited Partnerships.


Executed on May ___8___, 2009

_____
Allison Cryor DiNardo

# EXHIBIT XXII

# Declaration of Doug Shuma

## DECLARATION OF DOUG SHUMA

I, Doug Shuma, declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.     I am Senior Vice President and Controller for Telephone and Data Systems, Inc. ("TDS"), a diversified telecommunications company that provides wireless, telephone and broadband services to more than 7.4 million customers in 36 states through its business units United States Cellular Corporation ("USCC") and TDS Telecommunications Corporation.

2.     In my capacity as Senior Vice President and Controller for TDS, I am familiar with all of the filings made by TDS and USCC with the Securities and Exchange Commission ("SEC").

3.     The statements quoted in the Complaint that were made by TDS and USCC in their respective SEC filings were made with the intention of disclosing TDS's and USCC's compliance with FASB Interpretation No. 46, commonly known as "FIN 46."

4.     A predecessor of FIN 46 had been guiding financial statement reporting since 1958.  In 2003, however, following the collapse of Enron, FIN 46 was issued and substantially expanded the circumstances that would require the consolidation, on the balance sheet of a reporting company, of other entities, even when the reporting company does not determine their operations or otherwise control their day-to-day activities.

5.     Under FIN 46, TDS/USCC is deemed to have a "controlling financial interest" and is required to consolidate the partnerships with its financial statements if a two step test is met.

6.     First, TDS/USCC must determine whether it has a financial interest in the partnerships that increases and decreases in value according to increases and decreases in the

value of the entity's assets and liabilities, including the partnerships' profits and losses, a "variable interest."

7.      Second, if TDS/USCC has such a variable interest, it must next determine if it holds the majority of the risks and rewards associated with the partnerships.  If it does indeed hold a majority of the risks and rewards, TDS/USCC would be deemed, under FIN 46, to have a "controlling financial interest" and would be required to consolidate the partnerships with its financial statements.  With respect to Carroll Wireless, L.P., Barat Wireless, L.P., and King Street Wireless, L.P., TDS and USCC have concluded that disclosure and inclusion in its consolidated statements is appropriate under the standard set by FIN 46.

Executed on May 7, 2009 at Chicago, Illinois.


_____
Doug Shuma

2