# EXHIBIT M

EXECUTION COPY

# AGREEMENT ESTABLISHING
# FREQUENCY ADVANTAGE, L.P.

TABLE OF CONTENTS

Page

ARTICLE I
FORMATION OF LIMITED PARTNERSHIP

1.1     Formation ........................................................................................................... 2
1.2     Name and Office ................................................................................................ 2
1.3     Business Purpose ............................................................................................... 2
1.4     Effectiveness of the Agreement ........................................................................ 3

ARTICLE II
DEFINITIONS

2.1     Definitions .......................................................................................................... 3
2.2     Interpretation ..................................................................................................... 11

ARTICLE III
CAPITALIZATION OF PARTNERSHIP

3.1     Initial Capital Contribution ............................................................................ 12
3.2     Additional Capital Contributions .................................................................... 12
3.3     Form of Capital Contributions ........................................................................ 13
3.4     Additional Limited Partners ............................................................................ 13

ARTICLE IV
CAPITAL ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS

4.1     Capital Accounts ............................................................................................... 13
4.2     Return of Capital Contributions ...................................................................... 14
4.3     Interest ................................................................................................................ 14
4.4     Loans From Partners ......................................................................................... 14
4.5     Income ................................................................................................................ 15
4.6     Losses ................................................................................................................. 15
4.7     Special Allocations ........................................................................................... 16
4.8     Curative Allocations ......................................................................................... 17
4.9     Other Allocation Rules ..................................................................................... 18
4.10    Tax Allocations:  Code Section 704(c) ........................................................... 18
4.11    Distributions ...................................................................................................... 19

## ARTICLE V
### RIGHTS AND POWERS OF
### GENERAL PARTNER AND LIMITED PARTNER

5.1     Management and Powers of the General Partner ................................................. 19
5.2     Limitations of Authority of General Partner ..................................................... 21
5.3     Affirmative Voting Obligations ....................................................................... 22
5.4     Time Devoted to Partnership ........................................................................... 24
5.5     Fees and Expenses ........................................................................................... 24
5.6     Annual Budget ................................................................................................. 25
5.7     Rights of Limited Partner ................................................................................ 25
5.8     Ownership or Conduct of Other Businesses ..................................................... 26

## ARTICLE VI
### OBLIGATIONS OF GENERAL PARTNER

6.1     Duty of the General Partner ............................................................................. 27
6.2     Conduct of Business ........................................................................................ 27
6.3     Filings ............................................................................................................. 27
6.4     Maintain Accounts ........................................................................................... 27
6.5     Financial Reports ............................................................................................. 27
6.6     Performance of Partnership Obligations ........................................................... 28
6.7     Wireless Service in Other Areas ...................................................................... 28
6.8     [RESERVED] ................................................................................................... 28

## ARTICLE VII
### BANKING, ACCOUNTING, BOOKS AND RECORDS

7.1     Banking ........................................................................................................... 28
7.2     Maintenance of Books and Accounting ............................................................ 28
7.3     Fiscal Year:  Partnership Tax Returns .............................................................. 29

## ARTICLE VIII
### LIMITED PARTNERS

8.1     Limited Partner Not to Take Part in Business ................................................... 29
8.2     Limitation on Liability of Limited Partner ........................................................ 29
8.3     Wireless Service in Other Areas ...................................................................... 30

## ARTICLE IX
### TRANSFER OF GENERAL AND LIMITED PARTNER INTERESTS

9.1     Limitation on Transfers .................................................................................... 30
9.2     Substitute Partner ............................................................................................ 31
9.3     Indemnification ................................................................................................ 32
9.4     Allocation Subsequent to Transfer ................................................................... 32
9.5     General Partner's Put Option ........................................................................... 33
9.6     Option to Require Appraisal ............................................................................. 35
9.7     Right of First Refusal ....................................................................................... 40

9.8     Tag-Along Right ................................................................................................43
9.9     Admission of Transferee as Partner ...............................................................44
9.10    Purchase of Additional Partnership Interest ...................................................45

ARTICLE X
WITHDRAWAL BY LIMITED PARTNER

10.1    Withdrawal ........................................................................................................50
10.2    Distribution on Withdrawal .............................................................................51

ARTICLE XI
WITHDRAWAL BY GENERAL PARTNER

11.1    Withdrawal ........................................................................................................52

ARTICLE XII
DISSOLUTION AND TERMINATION OF LIMITED PARTNERSHIP

12.1    Dissolution ........................................................................................................52
12.2    Distribution Upon Dissolution ........................................................................53
12.3.   Compliance With Timing Requirements of Regulations ................................54
12.4    Rights of Limited Partner .................................................................................55
12.5    Notice of Dissolution .......................................................................................55
12.6    Distributions in Cash or in Kind .....................................................................56
12.7    Time for Liquidation ........................................................................................56
12.8    Termination .......................................................................................................56
12.9    General Partner Not Liable for Return of Distribution ..................................57
12.10   [RESERVED] ....................................................................................................57

ARTICLE XIII
POWERS OF ATTORNEY

13.1    Grant of Powers of Attorney ............................................................................57
13.2    Irrevocable and Coupled With an Interest; Copies to be Transmitted ............57
13.3    Survival of Powers of Attorney .......................................................................58
13.4    Limitation on Power of Attorney .....................................................................58

ARTICLE XIV
EXCULPATION AND INDEMNIFICATION

14.1    Exculpation of the General Partner ..................................................................58
14.2    Indemnification of the General Partner ...........................................................59

ARTICLE XV
AMENDMENTS

15.1    Amendments ......................................................................................................59
15.2    Execution of Amended Agreements .................................................................59

ARTICLE XVI
TECHNOLOGY AND INFORMATION

16.1   [RESERVED] ...........................................................................................59
16.2   Proprietary Information ............................................................................59

ARTICLE XVII
MISCELLANEOUS PROVISIONS

17.1   Warranties ...............................................................................................60
17.2   Table of Contents and Headings ..............................................................60
17.3   Successors and Assigns............................................................................60
17.4   Severability .............................................................................................61
17.5   FCC Rule Changes...................................................................................61
17.6   Non-Waiver .............................................................................................61
17.7   Applicable Law ........................................................................................62
17.8   Notices .....................................................................................................62
17.9   Arbitration................................................................................................63
17.10  Entire Agreement .....................................................................................64
17.11  Counterparts ............................................................................................64
17.12  Word Meanings........................................................................................64

AGREEMENT ESTABLISHING FREQUENCY ADVANTAGE, L.P.

THIS AGREEMENT is made as of the 29th day of August, 2014, by and between, Sunshine Spectrum, Inc. (the "General Partner"), a corporation organized and existing under the laws of the State of Delaware and having its principal place of business at 224 E. Garden St., Suite 5, Pensacola, FL  32502 and  Nonesuch, Inc. ("Nonesuch"), a corporation organized and existing under the laws of the State of Delaware and having its principal place of business at 526 King Street, Suite 209, Alexandria, Virginia 22314.  Nonesuch as a limited partner hereunder is sometimes referred to as the "Limited Partner."  The General Partner and the Limited Partner are herein sometimes collectively referred to as the "Partners."

WITNESSETH:

WHEREAS, General Partner and Limited Partner desire that this Partnership become the general partner of another partnership which shall qualify as a "Designated Entity" within the meaning of Part I of the Federal Communications Commission ("FCC") Rules and Regulations 47 C.F.R. §1.2110(a) (the "Auction Partnership") and as a very small business for purposes of being eligible to participate in wireless spectrum auctions conducted by the FCC for FCC Licenses ("Licenses") for Advanced Wireless Services-3 (as defined in Article II hereof) identified in the FCC Public Notice, DA 14-1018, released July 23, 2014 (the "Auction"); and

WHEREAS, the General Partner desires to obtain the services of the Limited Partner, subject to oversight, direction and control of the General Partner, to establish a bidding room and assist in the conduct the bidding activities of the Auction Partnership during the Auction;

NOW, THEREFORE, it is mutually agreed that:

## ARTICLE I
## FORMATION OF LIMITED PARTNERSHIP

1.1     Formation.  The Partners mutually covenant and agree and do hereby form a limited partnership (the "Partnership") pursuant to the provisions of the Delaware Revised Uniform Limited Partnership Act, in accordance with the further terms and provisions hereof, with the Partnership commencing upon the filing of a Certificate of Limited Partnership in the applicable office of the State of Delaware, which Certificate may be this Agreement.

1.2     Name and Office.

(a)     The name of the Partnership is Frequency Advantage, L.P., and its business shall be carried on in this name with such variations and changes as the General Partner deems necessary to comply with requirements of the jurisdictions in which operations are conducted or as the General Partner deems necessary to change for any reasonable business purpose.

(b)     The principal office and place of business of the Partnership shall be maintained at 224 E. Garden St., Suite 5, Pensacola, FL  32502, or at such other location as the General Partner may from time to time select, upon prior written notice to the Limited Partner.

1.3     Business Purpose.  The purposes of the Partnership shall be to invest in, and participate as the general partner in, a partnership which will construct and operate an AWS-3  system (an "AWS System") licensed under Part 27 of the rules of the FCC, with respect to each License won at the Auction, to do whatever is necessary or appropriate in connection therewith and to transact any and all lawful business for which limited partnerships may be organized under the Delaware Revised Uniform Limited Partnership Act.

     1.4    <u>Effectiveness of the Agreement</u>.  This Agreement shall be effective upon the latter to occur of: (i) the signing of this Agreement; or, (ii) the filing by the General Partner of a Certificate of Limited Partnership with the appropriate state authorities.

ARTICLE II
DEFINITIONS

     2.1    <u>Definitions</u>.  As used in this Agreement, the following terms shall each have the meaning set forth in this Article II, unless the context otherwise requires.

     **"<u>Act</u>"** means the Delaware Revised Uniform Limited Partnership Act, as set forth in Del. Code Ann. tit. 6, §§17-101 – 17-1111 (1983), as it may be amended from time to time, and any successor to such Act.

     **"<u>Advanced Wireless Service-3" or "AWS-3</u>"** means advanced wireless services licensed under Part 27 of the FCC's rules and the FCC's orders and any subsequent orders, rules or regulations promulgated thereunder.

     **"<u>Adjusted Capital Account</u>"** means, with respect to any Partner, the balance, if any, in such Partner's Capital Account as of the end of the relevant taxable year, after:  (i) crediting to such Capital Account any amounts that such Partner is obligated to restore pursuant to Section 1.704-1(b)(2)(ii)(c) of the Regulations (or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations) and (ii) debiting to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Regulations.

     **"<u>Affiliate</u>"** means, when used with reference to a specific Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is

3

under common control with such specific Person.  When not referring to a specific Person, "Affiliate" shall mean an Affiliate of a Partner.

"**Agreed Value**" means the fair market value of Partnership Property, as determined by the Super Majority Vote of the Partners using any reasonable method of valuation.

"**Agreement**" means this Agreement establishing the Frequency Advantage, L.P., including Schedule I, as originally executed and as subsequently amended from time to time in accordance with the provisions hereof.

"**Aggregate Contributions**" means, at any time, the sum of the Capital Contributions of all Partners theretofore made to the Partnership.

"**Auction**" has the meaning set forth in the first Whereas clause above.

"**Auction Partnership**" has the meaning set forth in the first Whereas clause above.

"**Business Day**" means any day other than a Saturday, Sunday and those legal public holidays specified in 5 U.S.C. § 6103(a), as may be amended from time to time.

"**Capital Account**" means, with respect to the General Partner or the Limited Partner, the Capital Account maintained for such Partner pursuant to Article IV.

"**Capital Contribution**" means, with respect to the General Partner or the Limited Partner, the total amount of cash, including Initial Capital Contributions and optional additional cash contributions, if any, contributed to the Partnership by all the Partners or any one Partner, as the case may be.

4

"**Certificate of Limited Partnership**" means the Certificate of Limited Partnership of the Partnership described in Section 1.1.

"**Code**" means the Internal Revenue Code of 1986, as now in effect or as hereafter amended.

"**Depreciation**" means for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that (a) with respect to any such asset the Gross Asset Value of which differs from its adjusted basis for federal income tax purposes and which difference is being eliminated by use of the "remedial method" pursuant to Section 1.704-3(d) of the Regulations, Depreciation for such period shall be the amount of Gross Asset Value recovered under the rules prescribed by Section 1.704(d)(2) of the Regulations, and (b) with respect to any other asset the Gross Asset Value of which differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

"**FCC**" means the Federal Communications Commission.

"**FCC Rules**" means the rules and policies of the FCC adopted pursuant to the provisions of the Communications Act of 1934, as amended, 47 U.S.C., §§ 151-et seq.

**"General Partner's Partnership Interest"** means the Partnership Interest of the General Partner.

**"Gross Asset Value"** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset shall be the gross fair market value of such asset, as determined by the General Partner;

(b)     The Gross Asset Values of all Partnership assets shall be adjusted to equal their respective Agreed Values as of the following times:  (i) the acquisition of an additional interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Partnership to a General Partner or Limited Partner of more than a de minimis amount of Partnership Property as consideration for an interest in the Partnership; and (iii) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) above shall be made only if the Partners, by Super-Majority Vote, reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the General Partner and Limited Partner in the Partnership;

(c)     The Gross Asset Value of any Partnership asset distributed to any General Partner or Limited Partner shall be the gross fair market value of such asset on the date of distribution and

(d)     The Gross Asset Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken

6

into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (d) to the extent that the General Partner determines that an adjustment pursuant to clause (b) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (a), (b) or (d) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Income and Losses.

"**Income and Losses**" means, for each fiscal year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Income or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Income or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to clause (b) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Income or Losses;

(d)     Gain or loss resulting from any disposition of Partnership Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Partnership Property disposed of, notwithstanding that the adjusted tax basis of such Partnership Property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition of Depreciation; and

(f)     Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.7 or Section 4.8 shall not be taken into account in computing Income or Losses.

**"License"** has the meaning set forth in the first Whereas clause above.

**"Limited Partner's Partnership Interest"** means the Partnership Interest of a Limited Partner.

**"Majority Vote"** means, with respect to actions to be taken by Partners, the affirmative vote or consent of Partners holding at least a majority of the Partnership Interests then outstanding.

"**Minimum Gain**" means the amount determined by computing with respect to each Nonrecourse Liability of the Partnership the amount of gain, if any, that would be realized by the Partnership if it disposed of the property securing such liability in full satisfaction thereof and by then aggregating the amounts so computed.

"**Notification**" means all notices permitted or required to be given to any Person hereunder.  Such Notification must be given in writing and shall be deemed to be duly given on the date of delivery if delivered in person or sent by facsimile transmission or on the earlier of actual receipt or three (3) Business Days after the date of mailing if mailed by registered or certified mail, first class postage prepaid, return receipt required, to such Person, at the last known address of such Person on the Partnership records.

"**Partner Nonrecourse Debt**" means any liability (or portion thereof) of the Partnership that constitutes debt which, by its terms, is nonrecourse to the Partnership and the Partners for purposes of Section 1.1001-2 of the Regulations, but for which a Partner bears the economic risk of loss, as determined under Section 1.704-2(b)(4) of the Regulations.

"**Partner Nonrecourse Debt Minimum Gain**" means an amount of gain characterized as "partner nonrecourse debt minimum gain" under Section 1.704-2(i)(2) and 1.704-2(i)(3) of the Regulations.  Subject to the preceding sentence, Partner Nonrecourse Debt Minimum Gain shall mean an amount, with respect to each Partner Nonrecourse Debt, equal to the minimum gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability.

"**Partners**" means, at any time, the Persons who then own Partnership Interests in the Partnership.

"**Partnership**" means the limited partnership formed pursuant to this Agreement.

"**Partnership Interest**" means, with respect to any Partner at any time, the entire interest of such Partner in the Partnership at such time.  Such interest includes, without limitation, (a) all rights of a Partner to receive distributions of revenues, allocations of income and loss and distributions of liquidation proceeds under this Agreement and (b) all voting rights and rights to consent.

The Partnership Interest of each Partner at the time of the Initial Capital Contribution shall be determined by the ratio which such Partner's Initial Capital Contribution bears to the Aggregate Contributions of the Partners, as established in Schedule I.  In the event of a non-pro rata Subsequent Capital Contribution (including a Capital Contribution by a new Partner) or a non-pro rata distribution of cash or property to any Partner, the Partnership Interests of all Partners shall be appropriately adjusted and Schedule I shall be revised accordingly to reflect the then applicable Partnership Interest of each Partner.

"**Partnership Property or Properties**" means all interests, properties, whether real or personal, tangible or intangible, and rights of any type owned or held by the Partnership at the date of its formation or thereafter acquired.

"**Person**" means any general partnership, limited partnership, corporation, limited liability company, joint venture, trust, business trust, governmental agency, cooperative, association, individual or other entity and the heirs, executors, administrators, legal representatives, successors and assigns of such person, as the context may require.

"**Put Exercise Dates**" means the fifth and the sixth anniversaries of the issuance of any License to the Auction Partnership.

"**Regulations**" means the Income Tax Regulations, including Temporary Regulations, promulgated by the U.S. Treasury Department pursuant to the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Schedule I**" means the schedule attached hereto and labeled "Schedule I."

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subsequent Capital Contribution**" means a Capital Contribution of any Partner or of all the Partners, as the case may be, other than an Initial Capital Contribution.

"**Super-Majority Vote**" means, with respect to actions to be taken by the Partners, the affirmative vote or consent of Partners holding at least fifty-five percent (55%) of the Partnership Interests then outstanding.

"**Transfer**" means any change in the record or beneficial ownership of a Partnership Interest, whether made voluntarily or involuntarily by operation of law, and any sale, transfer or assignment of a majority of the equity ownership interests in any Partner or parent company of a Partner.

"**Wireless Service**" means any and all service authorized by the FCC under Part 24 or Part 27 of its rules, as modified or amended from time to time.

2.2    Interpretation.  Each definition in this Agreement includes the singular and the plural, and reference to the neuter gender includes the masculine and feminine where appropriate.  References to any statute or Regulations mean such statute or regulations as amended at the time and include any successor legislation or regulations.  The headings to the

Articles and Sections are for convenience of reference and shall not affect the meaning or interpretation of this Agreement. Except as otherwise stated, reference to Articles, Sections and Schedules mean the Articles, Sections and Schedules of this Agreement. The Schedules are hereby incorporated by reference into and shall be deemed a part of this Agreement.

ARTICLE III
CAPITALIZATION OF PARTNERSHIP

3.1     Initial Capital Contribution.  The Initial Capital Contribution shall be as set forth in Schedule I hereto. Such Initial Capital Contribution shall result in the following respective initial Partnership Interests for the Partners:

(A)  Fifty One percent (51%) for the General Partner and

(B)  Forty Nine percent (49%) for Nonesuch as Limited Partner.

The Initial Capital Contribution shall be made on or before October 1, 2014. The Partners understand that the Initial Capital Contribution set forth in Schedule I hereto does not reflect the full level of expenditures (or Capital Contributions) which may be necessary for the ongoing business of the Partnership.

3.2     Additional Capital Contributions.  From time to time, additional capital may be required to be invested in the Partnership. In the event the General Partner determines that additional capital is so needed, each Partner shall be entitled to provide all (but not part) of its share of additional capital in proportion to its then current Partnership Interest. This additional funding is due and payable on the date set forth in a written notice requesting an additional Capital Contribution given by the General Partner to a Partner, which date shall not be less than sixty (60) days from the date of the notice. Should any Partner decline to make such

additional Capital Contribution or fail to pay its additional Capital Contribution when due, some or all of the other Partners may contribute pro rata, according to their then current respective Partnership Interests (excluding the Partnership Interests of the declining Partners), an aggregate amount equal to the additional Capital Contribution declined by the non-participating Partner(s), (it being understood that the General Partner may make such additional Capital Contribution as a Limited Partner, if it desires).  In such event, the Partnership Interest of each of the Partners shall be adjusted to equal that percentage of the aggregate Capital Account balances of all Partners represented by each such Partner's then current Capital Account balance, and thereafter the Partners shall be permitted to provide future additional Capital Contributions according to their Partnership Interests as so adjusted.

      3.3    <u>Form of Capital Contributions</u>.  Funding of both initial and additional Capital Contributions to the Partnership shall be in cash and not real or personal property.

      3.4    <u>Additional Limited Partners</u>.  The General Partner may invite one or more persons to become additional limited partners hereunder subject to written approval by all Limited Partners.  In the event of any such addition (i) the new limited partners shall participate in the Partnership on the same terms and conditions as described herein (or as hereafter amended), and (ii) the Partnership Interests of each of the Partners shall be adjusted to equal that percentage of the aggregate Capital Account balances of all Partners (including any additional limited partners) represented by each such Partner's then current Capital Account balance.

## ARTICLE IV
### CAPITAL ACCOUNTS, ALLOCATIONS AND DISTRIBUTIONS

      4.1    <u>Capital Accounts</u>.  A Capital Account shall be established and maintained for each Partner.  Each Partner's Capital Account shall reflect each Partner's Capital Contributions made pursuant to Article III and the allocations and distributions made pursuant to

13

Article IV and otherwise shall be adjusted in accordance with Section 704 of the Code and the principles set forth in Sections 1.704-1(b) and 1.704-2 of the Regulations.  This Section 4.1 is intended to comply with Section 1.704-1(b)(2)(iv) of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations.  Upon the Transfer of a Partnership Interest after the date of this Agreement, the Capital Account of the transferor Partner that is attributable to the transferred interest will be carried over to the transferee Partner or assignee of a Partner upon written notice to the Partnership from such Partner but, if the Partnership has an election in effect under Section 754 of the Code, the Capital Account will be adjusted to reflect any adjustment required as a result thereof by the Regulations promulgated pursuant to Section 704(b) of the Code.

  4.2 <u>Return of Capital Contributions</u>.  Except as otherwise provided herein or in the Act, no Partner shall have the right to withdraw, or receive any return of, all or any portion of such Partner's Capital Contribution.

  4.3 <u>Interest</u>.  No interest shall be paid by the Partnership on Capital Contributions or on balances in Partners' Capital Accounts.

  4.4 <u>Loans From Partners</u>.  Loans by a Partner to the Partnership shall not be considered Capital Contributions.  If any Partner shall advance funds to the Partnership in excess of the amounts required hereunder to be contributed by such Partner to the capital of the Partnership, the making of such advances shall not result in any increase in the amount of the Capital Account of such Partner.  The amounts of any such advances shall be a debt of the Partnership to such Partner and shall be payable or collectible only out of the Partnership assets in accordance with the terms and conditions upon which such advances are made.  The

repayment of loans from a Partner to the Partnership upon liquidation shall be subject to the order of priority set forth in Section 12.2.

4.5     Income.  After giving effect to the special allocations set forth in Section 4.7 and Section 4.8, Income for any fiscal year shall be allocated in the following order and priority:

(a)     First, to the Partners, in proportion to the cumulative Losses allocated to each Partner pursuant to Section 4.6(a)(ii) for all prior fiscal years until the cumulative income allocated pursuant to this Section 4.5(a) for the current and all prior fiscal years is equal to the cumulative Losses allocated pursuant to Section 4.6(a)(i) for all prior fiscal years and

(b)     The balance, if any, to the Partners in proportion to their Partnership Interests.

4.6     Losses.  After giving effect to the special allocations set forth in Section 4.7 and Section 4.8, Losses for any fiscal year shall be allocated as set forth in Section 4.6(a) below, subject to the limitation in Section 4.6(b) below.

(a)     Losses for any fiscal year shall be allocated in the following order and priority:

(i) First, to the Partners in proportion to the cumulative Income allocated to each Partner pursuant to Section 4.5(b) for all prior fiscal years until the cumulative Losses allocated pursuant to this Section 4.6(a)(i) for the current and all prior fiscal years is equal to the cumulative Income allocated pursuant to Section 4.5(b) for all prior fiscal years; and (ii) the remaining Losses, if any, to the Partners in proportion to their Partnership Interests.

(b)      The Losses allocated pursuant to Section 4.6(a) shall not exceed the

maximum amount of Losses that can be so allocated without causing the Limited Partner to have

or increase an Adjusted Capital Account deficit at the end of any fiscal year.  All Losses in

excess of the limitations set forth in this Section 4.6(b) shall be allocated to the General Partner.

4.7      Special Allocations.  The following special allocations shall be made in

the following order:

(a)      In the event that there is a net decrease in the Partnership's Minimum Gain

during a fiscal year of the Partnership, the minimum gain chargeback described in Sections

1.704-2(f) and (g) of the Regulations shall apply.

(b)      If during a fiscal year of the Partnership there is a net decrease in Partner

Nonrecourse Debt Minimum Gain, any Partner with a share of that Partner Nonrecourse Debt

Minimum Gain (determined under Section 1.704-2(i)(5) of the Regulations) as of the beginning

of the year must be allocated items of income and gain for the year (and, if necessary, for

succeeding years) equal to that Partner's share of such net decrease in accordance with Section

1.704-2(i) of the Regulations.

(c)      If any Partner unexpectedly receives an adjustment, allocation, or

distribution of the type contemplated by Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the

Regulations, items of income and gain shall be allocated to such Partner in an amount and

manner sufficient to eliminate any resulting deficit balance of such Partner's Adjusted Capital

Account, as quickly as possible, to the extent required by such Regulation; provided that an

allocation pursuant to this Section 4.7(c) shall be made only if and to the extent that such Partner

would have a deficit balance in such Partner's Adjusted Capital Account after all other

16

allocations provided for in this Section 4.7 have been tentatively made as if this Section 4.7(c) were not in this Agreement.

(d)     Items of loss and deduction attributable, under Section 1.704-2(i) of the Regulations, to Partner Nonrecourse Debt shall be allocated, as provided in Section 1.704-2(i) of the Regulations, to the Partners in accordance with the ratios in which they bear the economic risk of loss for such debt for purposes of Section 1.752-2 of the Regulations.

4.8     Curative Allocations. The "Regulatory Allocations" shall consist of (i) allocations pursuant to the last sentence of Section 4.6(b) and (ii) allocations pursuant to Section 4.7. Notwithstanding any other provision of this Agreement, the Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the General Partner and Limited Partner so that, to the extent possible and consistent with the Regulations promulgated pursuant to Section 704(b) of the Code, the net amount of such allocations of other items and the Regulatory Allocations to each General Partner and Limited Partner shall be equal to the net amount that would have been allocated to each such General Partner and Limited Partner if the Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this Section 4.8 shall only be made with respect to allocations pursuant to Section 4.7(c) to the extent the General Partner reasonably determines that such allocations shall otherwise be inconsistent with the economic agreement among the parties to this Agreement.  The General Partner shall have reasonable discretion, with respect to each Partnership fiscal year, to (i) apply the provisions of this Section 4.8 in whatever order is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations and (ii) divide all allocations pursuant to this Section 4.8 between the General Partner and Limited Partner in a manner that is likely to minimize such economic distortions.

4.9     Other Allocation Rules.

(a)     All items of income, gain, loss, deduction and credit (including items of tax preference) of the Partnership for federal income tax purposes shall be apportioned ratably to each day of the Partnership's taxable year, and each day's share of such items shall be allocated to the Limited Partner and to the General Partner in proportion to their respective Partnership Interests on such days.  Income, Losses or any other items allocable to any period shall be determined on a daily, monthly or other basis, as determined by the General Partner using any permissible method under Code Section 706 and the Regulations thereunder.

(b)     Except as otherwise provided in this Agreement, all items of Partnership income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the General Partner and Limited Partner in the same proportions as they share Income or Losses, as the case may be, for the year.

(c)     The Partners are aware of the income tax consequences of the allocations made by this Article IV and hereby agree to be bound by the provisions of this Article IV in reporting their shares of Partnership income and loss for income tax purposes.

4.10    Tax Allocations:  Code Section 704(c).

In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the General Partner and Limited Partner so as to take into account any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial Gross Asset Value (computed in accordance with part (a) of the definition of Gross Asset Value).

18

In the event the Gross Asset Value of any Partnership asset is adjusted pursuant to part (b) of the definition of Gross Asset Value, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Code Section 704(c) and the Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.  Allocations pursuant to this Section 4.10 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Income, Losses, other items or distributions pursuant to any provision of this Agreement.

4.11   <u>Distributions</u>.  Funds of the Partnership from all sources, less appropriate reserves as are determined by the General Partner consistent with budgets established under Section 5.6 to be reasonably necessary for future administrative and operating expenses, loan payments, other costs and expenses and contingencies shall be distributed on a fiscal quarterly basis as promptly as practicable after the end of each quarter.  Each distribution pursuant to this Section 4.11 shall be apportioned ratably to each day of the relevant quarterly time period and each day's share shall be allocated to the Partners in proportion to their respective Partnership Interests on such days.

ARTICLE V
RIGHTS AND POWERS OF
GENERAL PARTNER AND LIMITED PARTNER

5.1   <u>Management and Powers of the General Partner</u>.  The General Partner at all times shall exercise control over the Partnership in compliance with FCC Rules.  The General

Partner shall have the exclusive right and power to manage, operate and control the Partnership and to make all decisions necessary or appropriate to carry on the business and affairs of the Partnership.  In addition to the specific rights and powers herein granted to the General Partner, the General Partner shall possess and enjoy and may exercise all the rights and powers of a general partner as provided in the Act, subject to the limitations of this Agreement, including the full and exclusive power and authority to act for and to bind the Partnership.  In addition to any other rights and powers that the General Partner may possess, the General Partner shall have all specific rights and powers required or appropriate to the day-to-day management of the Partnership's business, which may include, but are not limited to, the right and power to:

(a)     Oversee, direct and control the conduct of the Auction Partnership's bidding activity in the Auction;

(b)     Acquire, by purchase or lease, contract for the acquisition or construction of property, including real property and improvements thereto, for Partnership use; hold Partnership Properties in the name of the Partnership and transfer, sell, lease or assign in the ordinary course of business any Partnership Property for any Partnership purpose;

(c)     Borrow money from banks, other lending institutions or other sources for Partnership purposes, issue evidences of indebtedness in connection therewith and, in connection therewith, mortgage, pledge or create other security interests in any or all of the Partnership's properties and income therefrom to secure or provide for the repayment of such borrowing;

(d)     Employ and dismiss from employment any and all employees, agents, independent contractors, attorneys and accountants;

(e)     Operate the Partnership business and enter into contracts for the management or operation of such business, including contracts for supplies, materials, labor, manufacture and distribution;

(f)     Enter into and carry out contracts and agreements of all kinds and execute on behalf of the Partnership any and all documents or instruments of any kind which the General Partner may deem appropriate for carrying out the purposes of the Partnership;

(g)     Make all payments required of the Partnership pursuant to this Agreement and for all direct and indirect costs and expenses incurred in the conduct of its business;

(h)     Arrange for the preparation and filing of all federal, state and local tax and information returns which the Partnership may be required to file and make all elections in connection therewith;

(i)     Institute, prosecute and compromise lawsuits and proceedings in the name and on behalf of the Partnership;

(j)     Apply for and acquire any and all local, state or federal licenses, permits or the like that are necessary to conduct the business of the Partnership, including, without limitation, FCC approvals and licenses, and contest any determination by any government agency, including, without limitation, those of the FCC; and

(k)     Execute, acknowledge and deliver any and all contracts or instruments necessary to provide for or effectuate the foregoing.

5.2     <u>Limitations of Authority of General Partner</u>.  Notwithstanding anything to the contrary in this Agreement, the General Partner shall have no authority to:

(a)     Do any act in contravention of this Agreement, the Act or FCC Rules;

(b)     Do any act which would make it impossible to carry on the ordinary business of the Partnership;

(c)     Possess Partnership Property or assign its General Partner's rights in specific Partnership Property, for other than a Partnership purpose;

(d)     Admit a person as a Limited Partner or as a General Partner otherwise than pursuant to Article IX; or

(e)     Amend this Agreement or the Certificate of Limited Partnership otherwise than pursuant to Article XV.

5.3     <u>Affirmative Voting Obligations</u>.  Notwithstanding anything to the contrary in this Agreement, the Partnership may not take, and the General Partner shall not cause the Partnership to take, any of the following actions without the affirmative consent of the Partners holding at least fifty-five percent (55%) of the Partnership Interests:

(a)     Issue interests in the Partnership directly from the Partnership to any Person and admit any such Person to the Partnership as a General Partner or an additional Limited Partner, provided, however, that this provision shall not apply to transfers of existing interests in the Partnership, which shall be governed by Article IX;

(b)     [RESERVED]

(c)     [RESERVED]

(d)      Make any expenditure, or agree to make any expenditure, which would cause expenditures to exceed, by more than ten percent (10%), those expenditures budgeted in the annual budget in force at the time of the expenditure, except for expenditures made pursuant to any agreement or program properly authorized by the General Partner or previously approved pursuant to this Article V and expenditure increases consistent with corresponding increases in revenues in excess of budgeted amounts;

(e)      Incur any indebtedness in the name of the Partnership; modify, extend, renew, refinance or restructure any debt; pledge, assign or otherwise utilize any assets of the Partnership as security for any indebtedness (except for (i) indebtedness arising out of an individual or a related series of transactions from time to time in the aggregate principal amount of $500,000 or less, or in the aggregate principal amount of $100,000 or less during any period in which the final award of any License or the Auction is stayed, enjoined or otherwise prohibited by any court or governmental body of competent jurisdiction, or (ii) any indebtedness approved or contemplated by the annual budget in force at the time the indebtedness is approved) or obligate the Partnership as a surety, guarantor or accommodation party to any obligation or to any other Person, other than is contemplated by the annual budget in place at the time of such obligation;

(f)      Sell, transfer, exchange, lease, mortgage, pledge or assign or enter into any agreement for the sale, transfer, exchange, lease, mortgage, pledge or assignment of all or substantially all of the Partnership's assets;

(g)      Liquidate or dissolve the Partnership, file a petition for bankruptcy, consolidate or merge the Partnership into or with any other Person or acquire any interest in any

other Person or, except in the ordinary course of business, any significant portion of the assets of any other Person or agree to enter into any partnership or joint venture;

(h)      [RESERVED]

(i)      Make, authorize or adopt any agreement between the Partnership and any Partner or Affiliate of any Partner that provides for payments in excess of $500,000 in the aggregate or accept any loan from any Partner or any Affiliate thereof; and

(j)      Make any change to the initial budget or the annual budget in force, where such change would cause an expenditure to be increased by more than 10% above its budgeted amount in the initial or annual budget in force.

5.4    <u>Time Devoted to Partnership</u>.  The General Partner shall devote so much of its time to the business of the Partnership as in its reasonable judgment the conduct of the Partnership's business reasonably requires.

5.5    <u>Fees and Expenses</u>.

(a)      For a period of ten (10) years beginning on the date of the grant of the Licenses won by Auction Partnership in the Auction, the Partnership shall pay to the General Partner an annual fee of $50,000, payable in equal annual installments, first immediately upon grant of any license to the Auction Partnership, then on the anniversary date of the grant of Licenses to the Auction Partnership, for its services to the Partnership.  In addition, if Auction Partnership (i) fails to obtain any License in the Auction, or (ii) if the control of this Partnership changes within two (2) years of the date of this Agreement, then the Partnership shall pay to the General Partner a lump-sum payment of $100,000.

24

(b)      Management of the General Partner shall not receive any other compensation for their services as employees of the General Partner or Partnership.

(c)      All out-of-pocket expenses incurred directly in connection with transactions effected or positions held for the Partnership's account (including, without limitation, brokerage commissions, custodial fees, interest and commitment fees on loans and debit balances and withholding or transfer taxes) shall be borne by the Partnership.  In addition, the Partnership, not the General Partner, will pay all operating and overhead costs of the Partnership, including office rent, staffing costs and IT services.

(d)      The Partnership shall reimburse the General Partner for any expenses incurred by it in the operation and management of the Partnership; provided, however, that such expenses are contemplated by the initial budget, the Partnership's then-effective annual budget or an agreement or program properly authorized by the General Partner or previously approved pursuant to Section 5.3.

5.6      <u>Annual Budget</u>.  Prior to October 15 of each Fiscal Year following the close of the Auction, and within ninety (90) days following the close of the Auction, with respect to the partial year that includes the close of the Auction, the General Partner, shall create and adopt an annual budget of revenues, expenses and capital expenditures, together with a five (5) year forecast for such items, which shall be distributed to the Limited Partner.

5.7      <u>Rights of Limited Partner</u>.  The Limited Partner shall have the right to:

(a)      At its cost, inspect and copy, upon ten (10) Business Days' notice to the General Partner, any of the Partnership books of record, accounting records, financial statements or other records or reports at the place or places such records are kept;

(b)     At its cost, inspect and copy, upon ten (10) Business Days' notice to the General Partner, the books of record, accounting records, financial statements or other records or reports of the General Partner relating to its operations of the Partnership;

(c)     Have on demand true and full information of all things affecting the Partnership and a formal account of Partnership affairs whenever circumstances render it just and reasonable;

(d)     Audit, at its own expense, once every calendar year, the Partnership books of record, accounting records and financial statements;

(e)     Apply for dissolution and winding up by decree of court when permitted under the Act; and

(f)     Meet with representatives of the General Partner, (i) quarterly by teleconference at a time designated by the General Partner not less than five (5) days prior to the meeting date and (ii) annually within thirty (30) days after receipt of the operating budgets provided pursuant to Section 5.6 at a time and place designated by the General Partner by written notice mailed to the Limited Partner not less than fifteen (15) days prior to the meeting date, provided, that any such meeting may be waived upon agreement of the Limited Partner; to consult with or advise the General Partner as to the operation of the Partnership in a manner consistent with its status as a limited partner under the Act and FCC Rules; and take any other action permitted under this Agreement or by law regarding the affairs of the Partnership.

5.8     <u>Ownership or Conduct of Other Businesses</u>.  Subject to the provisions of Sections 6.7 and 8.3, the Partners may engage in or possess an interest in other business ventures of every kind and description.  Neither the Partnership nor any Partner shall have any rights by

virtue of this Agreement in such independent business ventures or to the income or profits therefrom.

## ARTICLE VI
## OBLIGATIONS OF GENERAL PARTNER

6.1     Duty of the General Partner.  The General Partner shall at all times act in the best interests of the Partnership.

6.2     Conduct of Business.  The General Partner shall manage and provide or arrange for the provision of administrative services to the Partnership and shall execute all contracts, agreements and instruments as the General Partner reasonably may deem necessary or desirable to carry on the purpose of this Partnership.

6.3     Filings.  The General Partner shall file all certificates, notices, statements or other instruments required by law for the formation, operation and termination of the Partnership and its business in all appropriate jurisdictions and shall prepare and file all necessary Partnership tax returns.  The General Partner shall advise the Limited Partner of any elections under applicable tax laws that may affect Partnership Income or Losses.

6.4     Maintain Accounts.  Pursuant to the provisions of this Agreement, the General Partner shall maintain or cause to be maintained Capital Accounts on the books and records of the Partnership in respect of each Partnership Interest.

6.5     Financial Reports.  The General Partner shall furnish or cause to be furnished annual audited Partnership financial statements examined by a recognized firm of independent certified public accountants and quarterly unaudited Partnership financial statements to the Limited Partner.

6.6     <u>Performance of Partnership Obligations</u>.  The General Partner shall use its best efforts to cause the Partnership to observe and perform each and every obligation under all agreements and undertakings made by the Partnership or imposed on the Partnership by law or regulatory authority.

6.7     <u>Wireless Service in Other Areas</u>.  Nothing herein shall preclude any General Partner or an Affiliate thereof from providing or participating in the provision of Wireless Service independently from the Partnership in any areas.

6.8     [RESERVED]

## ARTICLE VII
## BANKING, ACCOUNTING, BOOKS AND RECORDS

7.1     <u>Banking</u>.  All funds of the Partnership shall be deposited in a separate bank account or accounts as shall be established and designated by the General Partner. Withdrawals from any such bank account shall be made upon such signature or signatures as the General Partner may designate.

7.2     <u>Maintenance of Books and Accounting</u>.  The General Partner shall keep or cause to be kept full and accurate accounts of the transactions of the Partnership in proper books of account in accordance with generally accepted accounting principles as varied by appropriate regulatory authorities.  Such books and records shall be maintained or available on request at the principal place of business of the General Partner, or such other place designated by the General Partner, and be made available for reasonable inspection, examination and copying by the Limited Partner or its respective duly authorized agents or representatives upon ten (10) Business Days' notice to the General Partner.

28

7.3   <u>Fiscal Year:  Partnership Tax Returns</u>.  The fiscal year of the Partnership shall begin on the 1st day of January in each year and end on the 31st day of December in each year.  The General Partner shall cause to be filed the federal income tax partnership return and all other tax returns required to be filed for the Partnership for each applicable tax year and shall furnish as promptly as practicable a statement of the Limited Partner's allocated share of income, gains, losses, deductions and credits for each tax year as well as copies of the Partnership's federal, state and local income tax returns as soon as they become available for each tax year.

ARTICLE VIII
LIMITED PARTNERS

8.1   <u>Limited Partner Not to Take Part in Business</u>.  The Limited Partner, acting in its capacity as Limited Partner, shall not, except as otherwise provided in this Agreement, take part in, or interfere in any manner with, the conduct or control of the Partnership business, nor shall the Limited Partner have any right or authority to act for or bind the Partnership; provided, that the Limited Partner shall provide bidding services to the Auction Partnership subject to the oversight, direction and control of the General Partner.

8.2   <u>Limitation on Liability of Limited Partner</u>.  The liability of the Limited Partner to provide funds or any other property to the Partnership shall be limited to the amount of Capital Contributions which the Limited Partner is obligated to make pursuant to Article III hereof, and the liability of the Limited Partner to return any distributions previously made shall be as set forth in the statutes governing this Agreement.  Subject to the provisions of the Act, the Limited Partner shall have no further liability to contribute money to the Partnership and shall not be personally liable for any obligations of the Partnership.

8.3     Wireless Service in Other Areas.  Nothing herein shall preclude the Limited Partner or an Affiliate thereof from providing or participating in the provision of Wireless Service independently from the Partnership in any areas.

ARTICLE IX
TRANSFER OF GENERAL AND LIMITED PARTNER INTERESTS

9.1     Limitation on Transfers.

(a)     No Partnership Interest may be transferred, directly or indirectly, including by way of a transfer of a majority of the equity ownership interests in a Partner or any direct or indirect parent company of a Partner, to any Person, except with the written consent of all other Partners.  In the event that any Partner desires to transfer all or part of such Partner's Partnership Interest, or any interest therein, such Partner shall be responsible for compliance with all conditions of transfer imposed by this Agreement and under applicable law and for any expenses incurred by the Partnership for legal and/or accounting services in connection with reviewing any proposed Transfer or issuing opinions in connection therewith.  Until a transferee is admitted as a Partner pursuant to Section 9.9, the transferor Partner shall continue to be a Partner and to be entitled to exercise any rights or powers of a Partner with respect to the Partnership Interest transferred.

(b)     Except in the case of a Transfer involuntarily by operation of law, a Transfer shall not be permitted under Section 9.1(a) unless the transferor furnishes to the Partnership an opinion of counsel, which counsel and opinion shall be satisfactory to the Partnership, that the Transfer shall not cause the Partnership to terminate for federal income tax purposes, that the Transfer shall not cause the Partnership to be a publicly traded partnership within the meaning of Code Section 7704 and that the Transfer shall not cause the application of

Code Sections 168(g)(1)(B) and 168(h) (generally referred to as the "tax exempt entity leasing rules") or similar rules to apply to the Partnership, Partnership Property or the Partners.

    (c)     Notwithstanding the provisions of this Section 9.1, a Partner may effect a Transfer of its Partnership Interest to an Affiliate of such Partner.

    (d)     Sections 9.5, 9.6, 9.7 and 9.8 govern only the Transfer of a Partner's economic rights in the Partnership.  With respect to the admission of a transferee as a Partner, the provisions of Section 9.9 shall govern.

    9.2    <u>Substitute Partner</u>.  No transferee of the whole or any portion of the Limited Partner's or General Partner's Partnership Interest shall have the right to become a substitute Limited or General Partner, unless:

    (a)     The transferring Limited Partner or General Partner has designated such intention in a written instrument of assignment, sale or transfer, a copy of which has been delivered (i) in the case of a Transfer of a Limited Partner's Partnership Interest, to the General Partner or (ii) in the case of a Transfer of a General Partner's Partnership Interest, to the Limited Partner;

    (b)     The person acquiring the Limited Partner's or General Partner's Partnership Interest has adopted and agreed in writing to be bound by all of the provisions hereof, as the same may have been amended;

    (c)     All documents reasonably required by the General Partner and the Act to effect the substitution of the person acquiring the Limited Partner's or General Partner's Partnership Interest as a Limited Partner or General Partner, as appropriate, shall have been executed and filed at no cost to the Partnership; and

(d)     Any necessary prior consents have been obtained from any regulatory authorities.

9.3     <u>Indemnification</u>.  Each Limited Partner or General Partner transferring a Limited Partner's or General Partner's Partnership Interest hereby indemnifies the Partnership and the other Partners against any and all loss, damage or expense (including, without limitation, tax liabilities or loss of tax benefits) arising, directly or indirectly, as a result of any Transfer or purported Transfer in violation of any provision contained in this Article IX.

9.4     <u>Allocation Subsequent to Transfer</u>.

(a)     The Income and Losses of the Partnership attributable to any Partnership Interest acquired by reason of the assignment of the Partnership Interest or substitution of a Partner with respect to that Partnership Interest shall be allocated between the assignor and assignee based upon the length of time during any fiscal year of the Partnership, as measured by the effective date of the assignment or substitution, that the Partnership Interest so assigned or with respect to which there is a substitution, was owned by each of them.  Each item of income or loss, and all other items attributable to the transferred interest, for the period before and after the Transfer shall be determined on a daily, monthly or other basis, as determined by the General Partner using any permissible method under Code Section 706(d) and the Regulations thereunder.  All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, the Partnership shall recognize such Transfer as provided in Section 9.4(b), provided that if the Partnership does not receive a notice stating the date such Partnership Interest was transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the accounting period during

32

which the Transfer occurs, then all of such items shall be allocated and all distributions shall be made to the person who, according to the books and records of the Partnership, on the last day of the accounting period during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor the General Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 9.4, whether or not any General Partner or the Partnership has knowledge of any Transfer of ownership of any interest.

(b)     The effective date of an assignment, sale or Transfer of a Partnership Interest or any portion thereof under this Article IX shall be the first day of the calendar month following either the date on which written consent has been obtained from the General Partner as provided in Section 9.1(a) or, where no such consent is required, the date the General Partner receives written notice of the Transfer.

9.5     General Partner's Put Option.

(a)     For the ninety (90) day period beginning on each of the Put Exercise Dates, the General Partner shall have the right to require the Limited Partner to purchase all, but not less than all, of the Partnership Interests owned by the General Partner and its Affiliates (the "General Partner Interests") in the Partnership upon the terms and conditions set forth in this Section 9.5 (the "Put Option").  The General Partner shall exercise the Put Option by giving Notification to the Limited Partner, which notice shall state that it is notice of exercise of the General Partner's right pursuant to this Section 9.5.

(b)     In payment for the General Partner Interests, the Limited Partner shall deliver to the General Partner, cash payable by wire transfer of immediately available funds.

33

(c)     The purchase price for the General Partner Interests (the "Put Price") pursuant to the Put Option shall be the sum of the General Partner's Capital Contribution compounded by ten percent (10%) per year through date of the closing of any such sale of the General Partner Interests.

(d)     The closing of any purchase of the General Partner Interests pursuant to the Put Option shall take place at the law offices of Lukas, Nace, Gutierrez & Sachs, LLP, 8300 Greensboro Drive, Suite 1200, McLean, Virginia 22102 at 10:00 a.m., eastern time on the date determined as follows:  (i) if the transaction is subject to any prior regulatory approval, then the closing shall take place on the tenth (10th) day following the receipt of all such regulatory approvals; (ii) if the transaction is not subject to regulatory approval, the closing shall take place on the twentieth day after the Limited Partner's receipt of the Notification provided for in Section 9.5(a); (iii) if the date of the closing falls on a weekend or on a federal holiday, the closing shall take place on the next regular Business Day and (iv) if the Partners agree to another place and time for the closing, the closing may take place at such other place and time as mutually agreed.

(e)     For the ninety (90) day period beginning on the date the General Partner receives from the Limited Partner a request for dissolution pursuant to Section 12.1(b), the General Partner shall have the right to require the Limited Partner to purchase all, but not less than all, of the outstanding capital stock of the General Partner for an amount equal to the amount of the General Partner's own funds that were used for the Initial Capital Contribution. The parties shall negotiate and execute a stock purchase agreement containing customary representations, warranties and covenants and the General Partner shall not be subject to any liability or obligation other than those in this Agreement and pursuant to any loan agreement with respect to any borrowings made to fund capital contributions to the Partnership.

34

9.6     <u>Option to Require Appraisal</u>.

(a)     In the event that the General Partner does not exercise the Put Option, then, for a two (2) year period beginning on the seventh anniversary of the date of formation of the Partnership, the General Partner shall have the right, but not the obligation, to require a determination of the fair market value of the Partnership as of the end of the preceding month ("Appraisal Anniversary").  The General Partner shall exercise this right by providing Notification to the Limited Partner, which notice shall state that it is notice of exercise of the General Partner's right pursuant to this Section 9.6.

(b)     In the event that the General Partner provides the Limited Partner with the Notification provided for in Section 9.6(a), the Partners shall thereafter proceed to determine the purchase price for the General Partner Interests.  Upon such determination of the fair market value of the Partnership as set forth herein, the Limited Partner shall have the right (the "Appraised Value Option"), but not the obligation, to purchase all, but not less than all, of the General Partner Interests.  Such purchase price for the General Partner Interests shall be equal to the product derived by multiplying (A) the fair market value of the Partnership as of the Appraisal Anniversary (the "Fair Market Value"), determined as set forth below, by (B) the percentage of the Partnership (determined by the Partnership's accountants on a fully-diluted basis) represented by the General Partner Interests.  In payment for the General Partner Interests, the Limited Partner shall deliver to the General Partner, cash payable by bank check or wire transfer.

(i)     In the Notification referred to in Section 9.6(a), the General Partner shall set forth its good faith estimate of the Fair Market Value.  In the event that, no later than sixty (60) days after the Appraisal Anniversary, the Limited Partner provides Notification to the

General Partner of its agreement to the General Partner's estimate of the Fair Market Value (the "Limited Partner FMV Acceptance Notice"), such determination of the Fair Market Value shall be final and binding on the General Partner and the Limited Partner (the "Appraisal Option Parties") as the Fair Market Value for the purposes hereof.

(ii)     In the event that (A) the Limited Partner provides Notification to the General Partner no later than sixty (60) days after the Appraisal Anniversary of its rejection of the General Partner's estimate of the Fair Market Value or (B) the Limited Partner fails to provide any notice to the General Partner within sixty (60) days after the Appraisal Anniversary with regard to the General Partner's estimate of the Fair Market Value, the Appraisal Option Parties shall use commercially reasonable efforts to appoint within seventy-five (75) days after the Appraisal Anniversary a mutually acceptable appraiser (the "Joint Appraiser") for the purpose of determining the Fair Market Value.  In the event of such appointment, the Joint Appraiser shall determine the Fair Market Value and submit a written report setting forth such Fair Market Value as determined by such appraiser, the methodologies for valuation employed by such appraiser, all information pertinent to the determination of such Fair Market Value with regard to each such methodology and the relative weights afforded to each such methodology by such appraiser (an "FMV Report") to each of the Appraisal Option Parties no later than one hundred twenty (120) days after the Appraisal Anniversary.  All costs and expenses of such appraisal shall be borne equally by the Appraisal Option Parties.  The Joint Appraiser's determination of the Fair Market Value shall be final and binding on the Appraisal Option Parties as the Fair Market Value for the purposes hereof.

(iii)     If the Appraisal Option Parties are unable to agree on a Joint Appraiser within seventy-five (75) days after the Appraisal Anniversary, each of the Appraisal

Option Parties shall independently appoint, within ninety (90) days after the Appraisal

Anniversary, an appraiser (the "Independent Appraisers") for the purpose of determining such

Fair Market Value.  Each Independent Appraiser shall determine the Fair Market Value and

submit an FMV Report to each of the Appraisal Option Parties no later than one hundred twenty

(120) days after the Appraisal Anniversary.  All costs and expenses for each such appraisal shall

be borne by the party on behalf of which the appraisal is being performed.  In the event that the

Independent Appraisers' determinations of the Fair Market Value are equal, such determination

of the Fair Market Value shall be final and binding on the Appraisal Option Parties as the Fair

Market Value for the purposes hereof.  In the event that the Independent Appraisers'

determinations of the Fair Market Value differ such that the greater exceeds the lesser by no

more than ten percent (10%) of the lesser, the average of the two determinations shall be final

and binding on the Appraisal Option Parties as the Fair Market Value for the purposes hereof.  In

the event that either of the Independent Appraisers fails to make a determination of the Fair

Market Value and to submit an FMV Report no later than one hundred twenty (120) days after

the Appraisal Anniversary, the determination of the Fair Market Value by the other of the

Independent Appraisers shall be final and binding on the Appraisal Option Parties as the Fair

Market Value for the purposes hereof.

(iv)     In the event that the Independent Appraisers' determinations of the

Fair Market Value differ such that the greater exceeds the lesser by more than ten percent (10%)

of the lesser, then the Independent Appraisers shall jointly appoint no later than one hundred

thirty (130) days after the Appraisal Anniversary an additional appraiser (the "Additional

Appraiser") for the purpose of determining the Fair Market Value.  The Additional Appraiser

shall determine the Fair Market Value and submit an FMV Report no later than one hundred

sixty (160) days after the Appraisal Anniversary.  In the event that the Independent Appraisers

fail to jointly appoint the Additional Appraiser no later than one hundred thirty (130) days after the Appraisal, either of the Appraisal Option Parties may initiate an arbitration proceeding with JAMS in the District of Columbia for the purpose of appointing a replacement for the Additional Appraiser.  The appointment of such replacement for the Additional Appraiser (who, for the purposes of the remainder of this Section 9.6, shall also be known as the "Additional Appraiser") and the determination of the Fair Market Value and the submission of an FMV Report to each of the Appraisal Option Parties by such appraiser shall occur as promptly as reasonably practicable. All costs and expenses for the appraisal performed by the Additional Appraiser shall be borne equally by the Appraisal Option Parties.  In the event that the Additional Appraiser's determination of the Fair Market Value is no more than ten percent (10%) greater than the higher and no more than ten percent (10%) less than the lower of the Independent Appraisers' determinations of the Fair Market Value, the average of the three (3) determinations shall be final and binding on the Appraisal Option Parties as the Fair Market Value for the purposes hereof.  In the event that the Additional Appraiser's determination of the Fair Market Value is no more than ten percent (10%) greater than or no more than ten percent (10%) less than one of the Independent Appraisers' determinations of the Fair Market Value and is more than ten percent (10%) greater than or more than ten percent (10%) less than the other of the Independent Appraisers' determinations of the Fair Market Value (the "Non-Conforming Appraisal"), the Non-Conforming Appraisal shall be discarded, and the average of the remaining determinations shall be final and binding on the Appraisal Option Parties as the Fair Market Value for the purposes hereof.  In the event that the Additional Appraiser's determination of the Fair Market Value is more than ten percent (10%) greater than the higher or more than ten percent (10%) less than the lower of the Independent Appraisers' determinations of the Fair Market Value, the closer of the Independent Appraisers' determinations of the Fair Market Value to the Additional

Appraiser's determination of the Fair Market Value shall be final and binding on the Appraisal Option Parties as the Fair Market Value for the purposes hereof.

(v)     Any appraiser appointed hereunder shall be a member of a nationally recognized business appraisal organization and shall have experience in valuing wireless telecommunications enterprises.  In determining the Fair Market Value, any appraiser appointed hereunder shall determine the value of the Partnership as a whole and shall not apply any valuation premiums or discounts to the value of the Partnership Interests (such as for minority interest, control or lack of marketability).  At any time prior to final determination of the Fair Market Value as set forth hereunder, each of the Appraisal Option Parties shall be entitled to submit to any appraiser (and, if such right is exercised, shall also submit to the other of the Appraisal Option Parties) any information related to the valuation of the Partnership that such Appraisal Option Party considers relevant, and such information shall be accorded the weight that such appraiser deems appropriate.  Each of the Appraisal Option Parties shall have an opportunity to comment on all information provided to any appraiser by the other of the Appraisal Option Parties.

(c)     The closing of any purchase of the General Partner Interests pursuant to this Section 9.6 shall take place at the offices of Lukas, Nace, Gutierrez & Sachs, LLP, 8300 Greensboro Drive, Suite 1200, McLean, VA  22102 at 10:00 a.m. eastern time, on the twentieth (20th) day after (i) in the event of determination of the Fair Market Value pursuant to Section 9.6(b)(i), the effective date of the Limited Partner FMV Acceptance Notice or (ii) in the event of determination of the Fair Market Value pursuant to Sections 9.6(b)(ii)-(iv), the effective date of the submission of the FMV Report applicable to the final determination of the Fair Market Value; provided, however, that (i) if the transaction is subject to any prior regulatory approval,

then the closing shall take place on the tenth (10th) day following the receipt of such regulatory approval, (ii) if the date of the closing falls on a weekend or on a federal holiday, the closing shall take place on the next regular Business Day, and (iii) if the General Partner and the Limited Partner agree to another place and time for the closing, the closing may take place at such other place and time as mutually agreed.

       9.7     <u>Right of First Refusal</u>.

       (a)     In the event that any Partner desires to transfer any of its Partnership Interests (such Partner being herein referred to as the "Transferor Partner"), to any Person who shall have made a <u>bona</u> <u>fide</u> written offer to purchase such Partnership Interests, the Transferor Partner shall promptly furnish to the Partnership and all other Partners (the "Partner Offerees") a Notification (the "Notice of Transfer") of such desire to transfer such Partnership Interests together with a copy of the <u>bona</u> <u>fide</u> written offer for such Partnership Interests proposed to be transferred, which reflects the offered price, the method of payment of such offered price, the identity of the prospective purchaser or purchasers (the "Proposed Purchaser") and all other pertinent terms and conditions of such <u>bona</u> <u>fide</u> offer.

       (b)     For a period of sixty (60) days commencing on the date of its receipt of the Notice of Transfer, the Partnership shall have the exclusive right by a Majority Vote of the Partners to agree to purchase all or any portion of such Partnership Interests proposed to be transferred upon the same terms and conditions as described in the Notice of Transfer.  If the Partnership desires so to purchase Partnership Interests, it shall give Notification of such desire to the Transferor Partner and all other Partners confirming such desire and the proposed terms of purchase.

(c)     In the event that the Partnership does not purchase, in accordance with the provisions of clause (b) above, all of the Partnership Interests proposed to be transferred by the Transferor Partner, then for an additional period of thirty (30) days commencing on the earlier of the date that (i) the Partnership's right to purchase such Partnership Interests has expired or the Partnership notifies the Transferor Partner in writing that the Partnership has determined not to exercise such right or (ii) the Partnership has determined to exercise such right only with respect to a portion of such Partnership Interests, the Partner Offerees shall have the right to purchase for cash, and on the same terms and conditions offered by the Proposed Purchaser, all or any portion of the Partnership Interests not so purchased by the Partnership even if the purchase price offered by the Proposed Purchaser was for non-cash consideration.  The specific portion of such Partnership Interests which each Partner Offeree shall be so entitled to purchase shall be determined on a pro rata basis in proportion to the respective Partnership Interests of each Partner Offeree desiring to purchase the offered Partnership Interests remaining available for purchase.  Any Partner Offeree desiring so to purchase Partnership Interests shall give Notification of such desire to the Transferor Partner, the Partnership and all Partner Offerees confirming such desire and the proposed terms of purchase.  In the event that any Partner Offeree does not purchase its full pro rata share of any such Partnership Interests proposed to be transferred, such unpurchased Partnership Interests shall be offered by the Transferor Partner to the Partner Offerees subscribing to purchase Partnership Interests on a pro rata basis for cash. No such Partnership Interests shall be made available for purchase by any non-Partner pursuant to the remaining provisions of this Section 9.7 unless and until all Partner Offerees shall have had an opportunity to purchase all such Partnership Interests in accordance with the provisions of this clause (c).

(d)     The closing of any purchase by the Partnership or any Partner Offerees of any offered Partnership Interests as provided in this Section 9.7 shall take place at the offices of Lukas, Nace, Gutierrez & Sachs, LLP, 8300 Greensboro Drive, Suite 1200, McLean, VA  22102 at 10:00 a.m., eastern time (i) if the transaction is subject to any prior regulatory approval, on the tenth (10th) day following the receipt of such regulatory approval, (ii) if such date falls on a weekend or on a federal holiday, the closing shall take place on the next regular Business Day, and (iii) if the Transferor Partner and the Purchasing Partners agree to another place and time for the closing, the closing may take place at such other place and time as mutually agreed.  At such closing, the Transferor Partner shall deliver to the Partnership or such Partner Offeree, as the case may be, such documentation as the Partnership or such Partner Offeree shall reasonably request to evidence the Transfer of such offered Partnership Interests, against payment therefor by the Partnership or such Partner Offeree.

(e)     In the event that, after compliance with the foregoing provisions of this Section 9.7, the Partnership and the Partner Offerees, taken together, fail to purchase all of the Partnership Interests proposed to be transferred by the Transferor Partner, then for a period of sixty (60) days commencing on the date that neither the Partnership nor any Partner Offeree remains entitled to exercise its right to purchase any offered Partnership Interests in accordance with the foregoing provisions of this Section 9.7, the Transferor Partner may transfer or enter into a binding agreement to transfer to the Proposed Purchaser any of the Partnership Interests described in the Notice of Transfer which the Partnership and the Partner Offerees are not purchasing; provided, however, that any such Transfer to the Proposed Purchaser must be made for the consideration and upon the terms and conditions set forth in the Notice of Transfer.  If the Transferor Partner shall not consummate the Transfer of such remaining Partnership Interests to the Proposed Purchaser within such sixty (60)-day period, such Partnership Interests shall remain

42

subject to the provisions of this Agreement and the Transferor Partner shall not thereafter Transfer any such Partnership Interests to any Person without again first complying with all of the provisions of this Agreement.

      9.8    <u>Tag-Along Right</u>.

      (a)    Neither the General Partner nor the Limited Partner shall enter into a binding agreement with a third party to effectuate a Transfer of its Partnership Interest unless the General Partner or the Limited Partner, as the case may be, is given the opportunity to sell to the third party all, but not less than all, of such Partner's Interest, such sale to be concurrent with the consummation of the Transfer, at the same price and on substantially the same terms and conditions that are obtained by the General Partner or the Limited Partner, as the case may be, in such Transfer.

      (b)    In the event that the right provided for in this Section 9.8 is exercised, the General Partner and the Limited Partner agree to take all reasonable steps necessary to enable such Partner to comply with the provisions of this Section 9.8, including executing and performing a purchase and sale, merger or other agreement on substantially the same terms as the General Partner or Limited Partner, as the case may be.  Each of the General Partner and the Limited Partner agree to make full disclosure to the other concerning the details of any relationship or dealings it may have with the other party to the proposed Transfer.  Each of the General Partner and the Limited Partner agree to keep the other advised in writing, and consult on a timely basis with the other concerning, any proposed Transfer with respect to which either the General Partner or the Limited Partner has exercised the right provided in this Section 9.8.

      (c)    The right provided by this Section 9.8 shall be exercised by either the General Partner or the Limited Partner giving written notice of such exercise to the other, within

43

fifteen (15) days after receipt of written notice from the General Partner or the Limited Partner, as the case may be, of such proposed Transfer. The written notice shall include a copy of the binding agreement with the third party and shall summarize, in reasonable detail, the proposed purchase price, terms of payment and other material terms of the proposed Transfer. If either the General Partner or the Limited Partner exercises the right provided for under this Section 9.8, the General Partner or the Limited Partner, as the case may be, shall be obligated to sell to such third party all, but not less than all, of its Partnership Interest.

9.9 <u>Admission of Transferee as Partner</u>. A transferee of a Partnership Interest desiring to be admitted as a Partner must execute a counterpart of, or an agreement adopting, this Agreement. The admission of such transferee (including, without limitation, a transferee by reason of the death of a Partner) is subject to the unanimous written consent of the non-transferring Partners. Any Partner may freely withhold such consent in such Partner's absolute discretion. Upon admission of the transferee as a Partner, the transferee shall have, to the extent of the Partnership Interest transferred, the rights and powers and shall be subject to the restrictions and liabilities of a Partner under this Agreement, the Certificate of Limited Partnership and the Act. The transferee shall also be liable, to the extent of the Partnership Interest transferred, for the unfulfilled obligations, if any, of the Transferor Partner to make Capital Contributions but shall not be obligated for liabilities unknown to the transferee at the time such transferee was admitted as a Partner and that could not be ascertained from this Agreement. Whether or not the transferee of a Partnership Interest becomes a Partner, the Transferor Partner is not released from any liability to the Partnership under this Agreement, the Certificate of Limited Partnership or the Act.

9.10    Purchase of Additional Partnership Interest.

(a)     In the event that the General Partner does not exercise the Put Option, then, for a thirty (30) day period beginning on the day following the expiration of the Put Option, the General Partner shall have the right, but not the obligation, to require a determination of the fair market value of the Partnership as of the end of the preceding month ("Claw Back Valuation Date"). The General Partner shall exercise this right by providing Notification to the Limited Partner, which notice shall state that it is notice of exercise of the General Partner's right pursuant to this Section 9.10.

(b)     In the event that the General Partner provides the Limited Partner with the Notification provided for in Section 9.10(a), the Partners shall thereafter proceed to determine the purchase price for the additional Partnership Interest. Upon such determination of the fair market value of the Partnership as set forth herein, the General Partner shall have the right (the "Claw Back Option"), but not the obligation, to purchase all or a portion of an additional Partnership Interest equal to the excess, if any, of (i) ten percent (10%) over (ii) the Partnership Interest owned by the General Partner immediately before the Claw Back Valuation Date (the "Available Percentage"). Such purchase price for the additional Partnership Interest shall be equal to the product derived by multiplying (A) the fair market value of the Partnership as of the Claw Back Valuation Date (the "Claw Back Value"), determined as set forth below, by (B) the Available Percentage or such lesser percentage as the General Partner shall specify in a further Notification within five (5) days of final determination of the Claw Back Value. In payment for the additional Partnership Interest, the General Partner shall deliver to the Partnership cash payable by bank check or wire transfer.

(i)       In the Notification referred to in Section 9.10(a), the General

Partner shall set forth its good faith estimate of the Claw Back Value.  In the event that, no later

than sixty (60) days after the Claw Back Valuation Date, the Limited Partner provides

Notification to the General Partner of its agreement to the General Partner's estimate of the Claw

Back Value (the "Limited Partner CBV Acceptance Notice"), such determination of the Claw

Back Value shall be final and binding on the General Partner and the Limited Partner (the "Claw

Back Option Parties") as the Claw Back Value for the purposes hereof.

(ii)      In the event that (A) the Limited Partner provides Notification to

the General Partner no later than sixty (60) days after the Claw Back Valuation Date of its

rejection of the General Partner's estimate of the Claw Back Value or (B) the Limited Partner

fails to provide any notice to the General Partner within sixty (60) days after the Claw Back

Valuation Date with regard to the General Partner's estimate of the Claw Back Value, the Claw

Back Option Parties shall use commercially reasonable efforts to appoint within seventy-five

(75) days after the Claw Back Valuation Date a mutually acceptable appraiser (the "Claw Back

Appraiser") for the purpose of determining the Claw Back Value.  In the event of such

appointment, the Claw Back Appraiser shall determine the Claw Back Value and submit a

written report setting forth such Claw Back Value as determined by such appraiser, the

methodologies for valuation employed by such appraiser, all information pertinent to the

determination of such Claw Back Value with regard to each such methodology and the relative

weights afforded to each such methodology by such appraiser (a "CBV Report") to each of the

Claw Back Option Parties no later than one hundred twenty (120) days after the Claw Back

Valuation Date.  All costs and expenses of such appraisal shall be borne equally by the Claw

Back Option Parties.  The Claw Back Appraiser's determination of the Claw Back Value shall be

final and binding on the Claw Back Option Parties as the Claw Back Value for the purposes hereof.

(iii)      If the Claw Back Option Parties are unable to agree on a Claw Back Appraiser within seventy-five (75) days after the Claw Back Valuation Date, each of the Claw Back Option Parties shall independently appoint, within fifteen (15) days after the expiration of such seventy-five (75) day period, an appraiser (the "Party Appraisers") for the purpose of determining such Claw Back Value.  Each Party Appraiser shall determine the Claw Back Value and submit a CBV Report to each of the Claw Back Option Parties no later than one hundred twenty (120) days after the Claw Back Valuation Date.  All costs and expenses for each such appraisal shall be borne by the party on behalf of which the appraisal is being performed.  In the event that the Party Appraisers' determinations of the Claw Back Value are equal, such determination of the Claw Back Value shall be final and binding on the Claw Back Option Parties as the Claw Back Value for the purposes hereof.  In the event that the Party Appraisers' determinations of the Claw Back Value differ such that the greater exceeds the lesser by no more than ten percent (10%) of the lesser, the average of the two determinations shall be final and binding on the Claw Back Option Parties as the Claw Back Value for the purposes hereof.  In the event that either of the Party Appraisers fails to make a determination of the Claw Back Value and to submit a CBV Report no later than one hundred twenty (120) days after the Claw Back Valuation Date, the determination of the Claw Back Value by the other of the Party Appraisers shall be final and binding on the Claw Back Option Parties as the Claw Back Value for the purposes hereof.

(iv)      In the event that the Party Appraisers' determinations of the Claw Back Value differ such that the greater exceeds the lesser by more than ten percent (10%) of the

lesser, then the Party Appraisers shall jointly appoint no later than one hundred thirty (130) days

after the Claw Back Valuation Date an additional appraiser (the "Neutral Appraiser") for the

purpose of determining the Claw Back Value.  The Neutral Appraiser shall determine the Claw

Back Value and submit a CBV Report no later than one hundred sixty (160) days after the Claw

Back Valuation Date.  In the event that the Party Appraisers fail to jointly appoint the Neutral

Appraiser no later than one hundred thirty (130) days after the Claw Back Valuation Date, either

of the Claw Back Option Parties may initiate an arbitration proceeding with JAMS in the District

of Columbia for the purpose of appointing a replacement for the Neutral Appraiser.  The

appointment of such replacement for the Neutral Appraiser (who, for the purposes of the

remainder of this Section 9.10, shall also be known as the "Neutral Appraiser") and the

determination of the Claw Back Value and the submission of a CBV Report to each of the Claw

Back Option Parties by such appraiser shall occur as promptly as reasonably practicable.  All

costs and expenses for the appraisal performed by the Neutral Appraiser shall be borne equally

by the Claw Back Option Parties.  In the event that the Neutral Appraiser's determination of the

Claw Back Value is neither more than ten percent (10%) greater than the higher nor more than

ten percent (10%) less than the lower of the Party Appraisers' determinations of the Claw Back

Value, the average of the three (3) determinations shall be final and binding on the Claw Back

Option Parties as the Claw Back Value for the purposes hereof; provided, that in the event that

the Neutral Appraiser's determination of the Claw Back Value is no more than ten percent (10%)

greater than or no more than ten percent (10%) less than one of the Party Appraisers'

determinations of the Claw Back Value but is more than ten percent (10%) greater than or more

than ten percent (10%) less than the other of the Party Appraisers' determinations of the Claw

Back Value (the "Non-Conforming Claw Back Appraisal"), the Non-Conforming Claw Back

Appraisal shall be discarded, and the average of the remaining determinations shall be final and

binding on the Claw Back Option Parties as the Claw Back Value for the purposes hereof.  In the event that the Neutral Appraiser's determination of the Claw Back Value is more than ten percent (10%) greater than the higher or more than ten percent (10%) less than the lower of the Party Appraisers' determinations of the Claw Back Value, the closer of the Party Appraisers' determinations of the Claw Back Value to the Neutral Appraiser's determination of the Claw Back Value shall be final and binding on the Claw Back Option Parties as the Claw Back Value for the purposes hereof.

      (v)      Any appraiser appointed hereunder shall be a member of a nationally recognized business appraisal organization and shall have experience in valuing wireless telecommunications enterprises.  In determining the Claw Back Value, any appraiser appointed hereunder shall determine the value of the Partnership as a whole and shall not apply any valuation premiums or discounts to the value of the Partnership Interests (such as for minority interest, control or lack of marketability).  At any time prior to final determination of the Claw Back Value as set forth hereunder, each of the Claw Back Option Parties shall be entitled to submit to any appraiser (and, if such right is exercised, shall also submit to the other of the Claw Back Option Parties) any information related to the valuation of the Partnership that such Claw Back Option Party considers relevant, and such information shall be accorded the weight that such appraiser deems appropriate.  Each of the Claw Back Option Parties shall have an opportunity to comment on all information provided to any appraiser by the other of the Claw Back Option Parties.

      (c)      The closing of the purchase of the General Partner Interests pursuant to this Section 9.10 shall take place at the offices of Lukas, Nace, Gutierrez & Sachs, LLP, 8300 Greensboro Drive, Suite 1200, McLean, VA  22102 at 10:00 a.m. eastern time, on the twentieth

(20th) day after (i) in the event of determination of the Claw Back Value pursuant to Section 9.10(b)(i), the effective date of the Limited Partner CBV Acceptance Notice or (ii) in the event of determination of the Claw Back Value pursuant to Sections 9.10(b)(ii)-(iv), the effective date of the submission of the CBV Report applicable to the final determination of the Claw Back Value; provided, however, that (i) if the transaction is subject to any prior regulatory approval, then the closing shall take place on the tenth (10th) day following the receipt of such regulatory approval, (ii) if the date of the closing falls on a weekend or on a federal holiday, the closing shall take place on the next regular Business Day and (iii) if the General Partner and the Limited Partner agree to another place and time for the closing, the closing may take place at such other place and time as mutually agreed.

## ARTICLE X
## WITHDRAWAL BY LIMITED PARTNER

10.1    Withdrawal.

(a)    Effective upon one-hundred eighty (180) days prior written notice to each Partner, the Limited Partner may withdraw from the Partnership subject to any required regulatory approval.

(b)    The Limited Partner shall promptly withdraw from the Partnership upon the occurrence of default in performance by such Limited Partner of any obligation under this Agreement if such default shall not be corrected within sixty (60) days after the same shall be called to the attention of such Limited Partner by the General Partner by written notice specifying the thing or matter in default and that the General Partner chooses to insist upon such withdrawal.  The General Partner shall notify each non-defaulting Limited Partner of such default in performance.

(c)     The Limited Partner shall promptly withdraw upon the bankruptcy or assignment for the benefit of creditors of such Limited Partner.

(d)     The Limited Partner shall promptly withdraw upon failure by such Limited Partner to make its Initial Capital Contribution pursuant to Section 3.1.

(e)     Upon withdrawal pursuant to (a), (b) or (c), above, the Limited Partner so withdrawing shall, subject to the provisions of Section 10.2, receive distribution of its Capital Account in cash.

(f)     Upon withdrawal pursuant to (a), (b), (c) or (d) above, the proportionate Partnership Interest of the remaining Partners shall be increased pro rata to reflect such withdrawal.

(g)     Withdrawal under this Article X shall not include a Transfer under Article IX.

10.2     <u>Distribution on Withdrawal</u>.  If a distribution is made pursuant to Section 10.1, amounts payable to the Limited Partner so withdrawing shall be paid to such Limited Partner by the Partnership and may at the General Partner's option and consistent with regulatory and other legal constraints, be paid in equal annual payments, including interest, over a period not to exceed three (3) years in order to provide the Partnership sufficient time to raise capital to replace that capital being withdrawn.  Such interest shall be calculated at a rate equal to the applicable "Federal rate" in effect under Code Section 1274(d), as amended (as of the effective day of withdrawal of such Limited Partner), compounded semi-annually, as applied to the outstanding balance due.  No Partner shall have liability for the distribution, which shall be payable solely out of Partnership assets.

## ARTICLE XI
## WITHDRAWAL BY GENERAL PARTNER

11.1    <u>Withdrawal</u>.  Withdrawal of the General Partner (other than pursuant to

Article IX hereof) shall cause the dissolution and termination of the Partnership in accordance

with the terms of Article XII, unless at the time of withdrawal, there is at least one (1) other

general partner to carry on the business of the Partnership.  The General Partner may not

withdraw until (i) it obtains FCC approval for a transfer of control of the Partnership, and (ii) it

has given the other Partner(s) one hundred eighty (180) days prior written notice.  If during that

time the other Partner(s) unanimously designate a substitute General Partner who shall agree

both to purchase the General Partner's Partnership Interest (including its Limited Partnership

Interest, if any) on terms acceptable to the General Partner and continue the business of the

Partnership, subject to required regulatory approval, the General Partner agrees to transfer or

assign its Partnership Interest to the designated General Partner.  The General Partner shall not

unreasonably withhold its acceptance of terms for purchase of its Partnership Interest proposed

by the substitute General Partner.  The purchase of a General Partner's Partnership Interest under

this Section 11.1 shall not be subject to the provisions of Section 9.1.

## ARTICLE XII
## DISSOLUTION AND TERMINATION OF LIMITED PARTNERSHIP

12.1    <u>Dissolution</u>.  The Partnership shall be dissolved and terminated upon the

first to occur of any of the following ("Liquidating Events"):

(a)    If FCC approval is required, the FCC conditions approval of this

Agreement on additional terms and conditions that are unacceptable to both the General Partner

and one Limited Partner which is not also the General Partner, and all available administrative

and judicial appeals of such FCC approval have been finally exhausted;

(b)     If Auction Partnership is dissolved.

(c)     The Partnership applies for and is finally denied state or other regulatory approvals or granted such approval subject to terms and conditions that are unacceptable to both the General Partner and one Limited Partner that is not also the General Partner on the grounds that such denial or conditional grant has a materially adverse impact upon the Partnership's ability to conduct its business;

(d)     The Partners unanimously agree to dissolve and terminate the Partnership and receive any approvals required by the FCC or any other regulatory authority for such dissolution and termination; or

(e)     May 1, 2113.

Regarding (c) above, any such denial of regulatory approval shall not be considered finally denied until all available administrative and judicial appeals of such denial have been finally exhausted.

12.2    <u>Distribution Upon Dissolution</u>.  Upon the occurrence of a Liquidating Event, the Partnership shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors and Partners.  No Partner shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Partnership's business and affairs.  The General Partner (or, in the event there is no remaining General Partner, any Person elected by a majority in interest of the Limited Partners) shall be responsible for overseeing the winding up and dissolution of the Partnership and shall take full account of the Partnership's liabilities and Partnership Property, and the Partnership Property shall be liquidated as promptly as is consistent with obtaining the fair value

thereof, and the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order:

(a)     First, to the payment and discharge of all of the Partnership's debts and liabilities to creditors other than liabilities for payments by the Partnership under Articles X and XI;

(b)     Second, to Partners and former Partners in satisfaction of liabilities for payments under Articles X and XI; and

(c)     The balance, if any, to the General Partner and the Limited Partner in accordance with their Capital Accounts, after giving effect to all contributions, distributions and allocations for all periods.  No General Partner shall receive any additional compensation for any services performed pursuant to this Article XII.

12.3    Compliance With Timing Requirements of Regulations.  In the event the Partnership is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), (a) distributions shall be made pursuant to this Article XII to the General Partner and Limited Partner who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2) and (b) if any General Partner's Capital Account has a deficit balance (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such General Partner shall contribute to the capital of the Partnership the amount necessary to restore such deficit balance to zero in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(3).  If the Limited Partner has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidations occurs), such Limited Partner shall have no obligation to make any contribution to the capital of the Partnership with respect to

54

such deficit, and such deficit shall not be considered a debt owed to the Partnership or to any other Person for any purpose whatsoever.  In the discretion of the General Partner, a pro rata portion of the distributions that would otherwise be made to the General Partner and Limited Partner pursuant to this Article XII may be:

(a)     Distributed to a trust established for the benefit of the General Partner and Limited Partner for the purposes of liquidating Partnership assets, collecting amounts owed to the Partnership and paying any contingent or unforeseen liabilities or obligations of the Partnership or of the General Partner arising out of or in connection with the Partnership.  The assets of any such trust shall be distributed to the General Partner and Limited Partner from time to time, in the reasonable discretion of the General Partner, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the General Partner and Limited Partner pursuant to this Agreement or

(b)     Withheld to provide a reasonable reserve for Partnership liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Partnership, provided that such withheld amounts shall be distributed to the General Partner and Limited Partner as soon as practicable.

12.4    <u>Rights of Limited Partner</u>.  Except as otherwise provided in this Agreement, (a) the Limited Partner shall look solely to the assets of the Partnership for the return of its Capital Contribution and shall have no right or power to demand or receive property other than cash from the Partnership and (b) no Limited Partner shall have priority over any other Limited Partner as to the return of its Capital Contributions, distributions or allocations.

12.5    <u>Notice of Dissolution</u>.  In the event a Liquidating Event occurs or an event occurs that would, but for the provisions of this Article XII, result in a dissolution of the

Partnership, the General Partner shall, within thirty (30) days thereafter, provide written notice thereof to each of the Partners and to all other parties with whom the Partnership regularly conducts business (as determined in the discretion of the General Partner) and shall publish notice thereof in a newspaper of general circulation in each place in which the Partnership regularly conducts business (as determined in the discretion of the General Partner).

   12.6 Distributions in Cash or in Kind.  Upon dissolution, the General Partner shall liquidate all of the Partnership assets (the "Partnership Assets").  Thereafter, the General Partner shall hire an independent recognized appraiser to appraise the value of the Partnership Assets.  The General Partner shall distribute the Partnership Assets to the Limited Partner and shall distribute the proceeds from the liquidation of the Partnership Assets in the priorities set forth in Section 12.2; provided, however, that if such proceeds are insufficient, after the payment of obligations under Sections 12.2(a) and 12.2(b), to pay to the General Partner an amount equal to its proportionate share of the total Remaining Partnership Asset (the Partnership Assets plus the amount distributable pursuant to Section 12.2(c)), then the Limited Partner shall pay to the Partnership an amount sufficient to assure that the General Partner receives its allocable share of the Remaining Partnership Assets.

   12.7 Time for Liquidation.  A reasonable amount of time shall be allowed for the orderly liquidations of the assets of the Partnership and the discharge of liabilities to creditors so as to enable the General Partner to minimize any losses which otherwise might be incurred.

   12.8 Termination.  Upon compliance with the foregoing distribution plan, the Partnership shall cease to be such, and the General Partner shall execute, acknowledge and cause to be filed a certificate of cancellation of the Partnership pursuant to the power of attorney contained in Article XIII.

12.9    <u>General Partner Not Liable for Return of Distribution</u>.  The General Partner shall not be liable for any distribution required pursuant to Sections 12.2(b) and 12.2(c), and such distribution shall be made solely from available Partnership assets, if any.

12.10   [RESERVED]

ARTICLE XIII
POWERS OF ATTORNEY

13.1    <u>Grant of Powers of Attorney</u>.  The Limited Partner hereby irrevocably constitutes and appoints the General Partner as its true and lawful attorney and agent, in its name, place and stead, to make, execute, acknowledge and, if necessary, file and record:

(a)     Any certificates or other instruments or amendments thereof which the Partnership may be required to file under the laws of each state governing this Agreement or pursuant to the requirements of any governmental authority having jurisdiction over the Partnership or which the General Partner shall deem it advisable to file, including, without limitation, this Agreement, any amended Agreement (subject to Section 15.1) and a certificate of cancellation as provided in Section 12.8; and

(b)     Any certificates or other instruments or amendments (subject to Section 15.1) thereto which the General Partner deems appropriate or necessary to qualify, or continue the qualification of, the Partnership as a limited partnership (or a partnership in which the Limited Partner has limited liability) and to preserve the limited liability status of the Partnership in the jurisdictions in which the Partnership may own properties, conduct business and acquire investment interests.

13.2    <u>Irrevocable and Coupled With an Interest; Copies to be Transmitted</u>.  The powers of attorney granted under Section 13.1 shall be deemed irrevocable and to be coupled

57

with an interest.  A copy of each document executed by the General Partner pursuant to the powers of attorney granted in Section 13.1 shall be transmitted to the Limited Partner promptly after the date of the execution of any such document.

13.3   Survival of Powers of Attorney.  The powers of attorney granted in Section 13.1 or otherwise by a Limited Partner shall survive delivery of an assignment of a Limited Partner's Partnership Interest, except that if such assignment was of all of a Limited Partner's Partnership Interest and the substitution of the assignee as a Limited Partner has been consented to by the General Partner and is in accordance with this Agreement, the foregoing powers of attorney shall survive the delivery of such assignment for the purpose of enabling the General Partner to execute, acknowledge and file any and all certificates and other instruments necessary to effect the substitution of the assignee as a Limited Partner.  Such powers of attorney shall survive the dissolution or termination of a Limited Partner and shall extend to such Limited Partner's successors and assigns.

13.4   Limitation on Power of Attorney.  The General Partner may not modify the terms of this power of attorney or this Agreement without the written consent of the Limited Partner.  The powers of attorney granted under Section 13.1 cannot be utilized by the General Partner to increase or extend any financial obligation or liability of the Limited Partner or alter, change or eliminate any right or power of the Limited Partner without the written consent of such Limited Partner.

ARTICLE XIV
EXCULPATION AND INDEMNIFICATION

14.1   Exculpation of the General Partner.  The General Partner shall not be liable for any loss to the Partnership or the Limited Partner by reason of any act or failure to act unless the General Partner was guilty of willful misconduct or gross negligence.

58

14.2    Indemnification of the General Partner.  The Partnership shall indemnify the General Partner against any loss or damage incurred by the General Partner (including legal expenses) by reason of any acts performed or not performed by the General Partner for and on behalf of the Partnership, unless the General Partner was guilty of willful misconduct or gross negligence.  The General Partner shall indemnify the Partnership against any damages incurred by reason of the General Partner's willful misconduct or gross negligence.

## ARTICLE XV
## AMENDMENTS

15.1    Amendments.  Except for amendments made in accordance with this Agreement in connection with assignments of Partnership Interests by Partners to their Affiliates and to reflect additional or substitute Partners or changes in Capital Contributions, this Agreement may not be amended except upon unanimous written consent of the Partners.

15.2    Execution of Amended Agreements.  The Limited Partner agrees to execute or cause to be executed promptly any amendments to this Agreement and certificates of the Partnership reasonably requested by the General Partner and authorized under Section 15.1.

## ARTICLE XVI
## TECHNOLOGY AND INFORMATION

16.1    [RESERVED]

16.2    Proprietary Information.  All information, including but not limited to, specifications, microfilm, photocopies, keypunch cards, magnetic tapes, drawings, sketches, models, samples, tools, technical information, data, employee records, maps, customer information, financial reports and market data marked or identified in writing as proprietary (all hereinafter designated as "Proprietary Information") furnished to or obtained by a Partner from any other Partner, whether written, oral or in other form shall remain the disclosing Partner's

property.  All copies of such information, whether in written, graphic or other tangible form, shall be returned to the disclosing Partner upon the disclosing Partner's request, except that one copy may be retained for archival purposes.  Unless otherwise agreed, no obligations hereunder shall extend beyond five years from date of receipt of such information, and no obligations hereunder apply to Proprietary Information which was previously known to the receiving Partner free of any obligation to keep it confidential or which has been or is subsequently made public by the disclosing Partner or a third party.  Such Proprietary Information shall be kept confidential by the receiving Partner and shall be used only in the exercise of the powers and in furtherance of the purposes set forth in this Agreement, except as may otherwise be agreed upon between the disclosing Partner and receiving Partner in writing.

## ARTICLE XVII
## MISCELLANEOUS PROVISIONS

17.1    <u>Warranties</u>.  Each Partner warrants as follows:

(a)    It has the legal capacity to enter into and execute this Agreement; and

(b)    This Agreement does not breach or conflict with any of its existing agreements with other parties.

17.2    <u>Table of Contents and Headings</u>.  The table of contents and the headings of the sections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

17.3    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the Partners and any additional or substitute Limited Partner or General Partner and to their respective successors and assigns, except that nothing contained in this Section 17.3

60

shall be construed to permit any attempted assignment or other transfer which would not be authorized by, or would be void pursuant to, any other provision of this Agreement.

17.4   <u>Severability</u>.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of the Agreement and the Partners shall negotiate in good faith to modify this Agreement to bring the terms hereof into compliance with FCC rules and regulations; provided, however, that such modification does not result in a material adverse effect on the rights, duties and obligations of each party hereto.

17.5   <u>FCC Rule Changes</u>.  To the extent the FCC rules and regulations are modified from time to time hereafter in a manner that would permit greater flexibility in the operations of the Partnership, including the timing of any transfers of control of the Partnership without the imposition of unjust enrichment payments, the Partners shall negotiate in good faith to modify this Agreement to achieve such greater flexibility; provided, however, that such modification does not result in a material adverse effect on the relative rights, duties and obligations of each party hereto.  At all times, the Partners and their respective affiliates shall comply fully with both the letter and the spirit of all FCC rules and policies, and refrain from taking any action which would result in the imposition on the Partnership of any forfeitures of any kind, including any unjust enrichment payment obligations.

17.6   <u>Non-Waiver</u>.  No provision of this Agreement shall be deemed to have been waived unless such waiver is contained in a written notice given to the Partner claiming such waiver, and no such waiver shall be deemed to be a waiver of any other or further obligation or liability of the Partner or Partners in whose favor the waiver was given.

17.7    Applicable Law.  This Agreement and the rights and obligations of the Partners shall be interpreted in accordance with the Laws of the State of Delaware.  The Partnership shall be bound by and fully comply with any applicable provisions of the equal employment opportunity laws, including any executive orders issued thereunder.

17.8    Notices.  All notices given by any Partner to any other Partner under this Agreement shall be in writing, by registered or certified mail, postage prepaid, addressed as follows or delivered personally, or if sent by telecopier transmission, with transmission confirmed by telephone to (or to such other address as a Partner may specify in such a notice to all other Partners):

General Partner

Sunshine Spectrum, Inc.
Attn:  Will Vail
224 E. Garden St., Suite 5
Pensacola, FL  32502
Tel:  (224) 645-6768
Fax: (850) 857-9610

with a copy to:

Lukas, Nace, Gutierrez & Sachs, LLP
8300 Greensboro Drive, Suite 1200
McLean, VA  22102
        Attention:  Thomas Gutierrez, Esq.
Tel:  (202) 828-9470
Fax: (703) 584-8696

Limited Partner

Nonesuch, Inc.
Attn:  Allison Cryor DiNardo
526 King Street
Suite 209
Alexandria, Virginia 22314
Tel:  (703) 518-9902
Fax: (703) 518-8993

with a copy to:

Lukas, Nace, Gutierrez & Sachs, LLP
8300 Greensboro Drive, Suite 1200
McLean, VA  22102
        Attention:  Thomas Gutierrez, Esq.
Tel:  (202) 828-9470
Fax: (703) 584-8696

Such notices shall be effective on the third Business Day subsequent to the date of mailing.

17.9    Arbitration.

(a)    In case any disagreement with respect to this Agreement, which cannot be resolved by negotiation, shall arise between the Limited Partner and the General Partner, the General Partner or the Limited Partner may initiate proceedings to submit such disagreement to arbitration by serving written notice of arbitration on the other parties, which notice shall include appointment of an arbitrator, naming such arbitrator.  Within thirty (30) days after the date that such notice is deemed to be given, pursuant to the provisions of this Section 17.9, the General Partner (if the party initiating the arbitration is a Limited Partner) or the Limited Partner (if the party initiating arbitration is the General Partner) to whom such notice is given shall similarly appoint an arbitrator by giving like written notice to the initiating Partner or Partners; or, failing to make such appointment, the arbitrator initially appointed shall be empowered to act as the sole arbitrator and to render a binding decision.  In such event, such sole arbitrator shall set a date for hearing and dispute not later than ninety (90) days after the date of his or her appointment and shall render his or her decision in writing to the disputing Partners not later than sixty days after the last hearing date.

(b)    In the event that the disputing Partners duly appoint arbitrators pursuant to subparagraph (a) above, the two (2) arbitrators so appointed shall, within thirty days after the appointment of the later of them to be appointed, select a third arbitrator who shall act as Chairman of the arbitration panel.  Such arbitration panel shall set a time for the hearing of the dispute which shall be not later than sixty (60) days after the date of appointment of the third

arbitrator, and the final decision of the arbitrators shall be rendered in writing to the disputing Partners not later than sixty (60) days after the last hearing date.

(c)     In the event that the arbitrators appointed by the disputing Partners are not able, within thirty (30) days after the appointment of the later of them, to agree on the selection of a third arbitrator, either one of them may request JAMS to select a third arbitrator, and the selection of such arbitrator by JAMS shall be binding.

(d)     The place of any arbitrations shall be in the District of Columbia or at such other place as agreed to by the disputing Partners.

(e)     The arbitrations shall be conducted in accordance with the rules of JAMS then prevailing, and the decision of the arbitrator or arbitrators, as the case may be, shall be final and binding on the disputing Partners and shall be enforceable in the courts of the United States.

17.10   Entire Agreement.  This Agreement constitutes the entire Limited Partnership Agreement between the Partners and shall supersede all previous negotiations, commitments, representations and writings.

17.11   Counterparts.  The Agreement may be executed in any number of counterparts, each of which shall be considered an original.

17.12   Word Meanings.  In this Agreement, the singular shall include the plural and vice-versa, and the masculine shall include the feminine and vice-versa, unless the context requires otherwise.

*     *     *     *     *

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed by their duly authorized representatives.

GENERAL PARTNER:
SUNSHINE SPECTRUM, INC.
By: _____
Name:  Will Vail
Title:    President


LIMITED PARTNER:
NONESUCH, INC.
By: _____
Name:  Allison Cryor DiNardo
Title:    President


SIGNATURE PAGE OF AGREEMENT ESTABLISHING FREQUENCY ADVANTAGE, L.P.

**SCHEDULE I**

| Name | Partnership Interest | Initial Capital Contribution |
|---|---|---|
| Sunshine Spectrum, Inc. | 51% | $51,000.00 |
| Nonesuch, Inc. | 49% | $49,000.00 |