## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT COURT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, *ex rel.* **MARK J. O'CONNOR** and **SARA F. LEIBMAN**<br><br>Plaintiffs,<br><br>v.<br><br>**UNITED STATES CELLULAR CORPORATION**, *et al.*,<br><br>Defendants. | ORAL HEARING REQUESTED<br><br>Civil Action No. 20-cv-2070 (TSC) |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ADVANTAGE SPECTRUM, L.P., SUNSHINE SPECTRUM, INC., AND NONESUCH, INC.'S MOTION TO DISMISS AMENDED COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

BACKGROUND ................................................................................................................ 3

A.   The DE Program ....................................................................................................... 3

B.   The FCC's Review Of DE Submissions .................................................................. 6

C.   Post-Licensing Regulations ...................................................................................... 6

D.   Advantage's Participation In Auction 97 And Relevant Disclosures ....................... 8

E.   Advantage's Licenses and Post-Licensing Submissions to the FCC ...................... 11

F.   Relators' Allegations ................................................................................................ 12

G.   The Prior 2008 *Qui Tam* Lawsuit ......................................................................... 14

H.   Proceedings In This Case ......................................................................................... 15

LEGAL STANDARD ....................................................................................................... 16

ARGUMENT .................................................................................................................... 17

I.   Relators' Claims Must Be Dismissed Pursuant To The Public Disclosure Bar. .............. 17

  A.   The Public Disclosure Bar Applies Where Publicly Disclosed Information
       Was Sufficient To Alert The Government To Potential Fraud. ............................ 18

  B.   Advantage's FCC Filings And Other Relevant Materials Trigger The
       Public Disclosure Bar. ......................................................................................... 20

    1.   Advantage's Public Filings Disclosed An Ample Basis Upon
         Which To Investigate. ................................................................................... 20

    2.   Advantage's More Recent FCC Filings Do Not Help Relators With
         The Public Disclosure Bar. ........................................................................... 23

    3.   The Prior FCA Case Against U.S. Cellular And Ms. DiNardo
         Confirms That The Public Disclosure Bar Applies. ..................................... 25

  C.   Relators Are Not An Original Source. ................................................................. 26

II.  Relators Do Not Plausibly Allege Facts Establishing Required Elements Of The
     FCA. ...................................................................................................................... 27

i

A.      Relators Do Not Allege A False Statement. ...........................................27

B.      Relators Have Failed To Plausibly Allege Scienter...............................28

C.      The Amended Complaint Lacks Plausible Allegations Of Materiality. ................30

III.   All Claims Must Be Dismissed.........................................................................32

CONCLUSION..................................................................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Alaska Native Wireless, L.L.C.,*
17 FCC Rcd. 4231 (Mar. 4, 2002) ...................................................................5, 29

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...........................................................................................3

*W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.,*
235 F.3d 629 (D.C. Cir. 2001) .........................................................................21

*United States ex rel. Bettis v. Odebrecht Contractors of Cal.,*
297 F. Supp. 2d 272 (D.D.C. 2004) .................................................................28

*United States ex rel. Burke v. Record Press, Inc.,*
816 F.3d 878 (D.C. Cir. 2016) .........................................................................30

*United State ex rel. Doe v. Staples, Inc.,*
773 F.3d 83 (D.C. Cir. 2014) .......................................................................20, 21

*United States ex rel. Doe v. Staples, Inc.,*
932 F. Supp. 2d 34 (D.D.C. 2013) ...................................................................27

*United States ex rel. Findley v. FPC- Boron Employees' Club,*
105 F. 3d 675 (D.C. Cir. 1997) ...........................................................19, 23, 25, 27

*United States ex rel. Harman v. Trinity Industries Inc.,*
872 F.3d 645 (5th Cir. 2017) ...........................................................................28

*United States ex rel. Harris v. Bernad,*
275 F. Supp. 2d 1 (D.D.C. 2003) .....................................................................17

*United States ex rel. Hawkins v. ManTech Int'l Corp.,*
No. 15-2105(ABJ), 2020 WL 435490 (D.D.C. Jan. 28, 2020).........................17, 30

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,*
498 F. Supp. 2d 25 (D.D.C. 2007) ...................................................................19

*United States ex rel. Hutchins v. DynCorp Int'l, Inc.,*
342 F. Supp. 3d 32 (D.D.C. 2018) ...................................................................33

*In the Matter of Implementation of Section 309(j) of the Communications Act –
Competitive Bidding,*
Fifth Report & Order, 9 FCC Rcd. 5532 ...........................................................4

*United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.,*
    422 F. Supp. 2d 225 (D.D.C. 2006) ............................................................19

*United States ex rel. Janssen v. Lawrence Mem'l Hosp.,*
    949 F.3d 533 (10th Cir. 2020) ..................................................................33

*Jones v. Bock,*
    549 U.S. 199 (2007) ...................................................................................16

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.,*
    929 F.3d 721 (D.C. Cir. 2019) ..................................................................34

*Marshall Cnty. Health Care Auth. v. Shalala,*
    988 F.2d 1221 (D.C. Cir. 1993) ..................................................................8

*United States ex rel. McBride v. Halliburton Co.,*
    848 F.3d 1027 (D.C. Cir. 2017) ................................................................32

*In the Matter of Northstar Wireless, LLC,*
    30 FCC Rcd. 8887 (Aug. 18, 2015) ....................................................5, 6, 29

*O'Connor et al. v. U.S. Cellular Corp., et al.,*
    No. 20-cv-2071 (D.D.C. filed April 8, 2015) ...........................................13

*United States ex rel. Oliver v. Philip Morris USA Inc. ("Oliver II"),*
    826 F.3d 466 (D.C. Cir. 2016) ........................................................... *passim*

*United States ex rel. Oliver v. Philip Morris USA Inc.,*
    763 F.3d 36 (D.C. Cir. 2014) ....................................................................18

*Poindexter v. EMI Record Grp. Inc.,*
    No. 11 CIV. 559 LTS JLC, 2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012)............21

*United States ex rel. Purcell v. MWI Corp.,*
    807 F.3d 281 (D.C. Cir. 2015) ..............................................................29, 31

*United States ex rel. Reed v. Keypoint Gov't Solutions,*
    923 F.3d 729 (10th Cir. 2019) ..................................................................26

*Repetto v. Huerta,*
    71 F. Supp. 3d 69 (D.D.C. 2014) ..............................................................17

*SEC v. RPM Int'l, Inc.,*
    282 F. Supp. 3d 1 (D.D.C. 2017) ................................................................8

*United States ex rel. Settlemire v. District of Columbia,*
    198 F.3d 913 (D.C. Cir. 1999) ..................................................................19

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*,
   214 F.3d 1372 (D.C. Cir. 2000) ............................................................28

*Singletary v. Howard Univ.*,
   939 F.3d 287 (D.C. Cir. 2019) .............................................................17

*Slovinec v. Georgetown Univ.*,
   268 F. Supp. 3d 55 (D.D.C. 2017) (Chutkan, J.) ..................................8

*SNR Wireless LicenseCo, LLC v. FCC*,
   868 F.3d 1021 (D.C. Cir. 2017) .......................................................6, 30

*Tel. & Data Sys. Inc. v. FCC*,
   19 F.3d 42 (D.C. Cir. 1994) .................................................................30

*United States ex rel. Totten v. Bombardier Corp.*,
   286 F.3d 542 (D.C. Cir. 2002) ............................................................17

*United Health Services, Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ...................................................................29, 32

*United States ex rel. Vermont Nat'l Tel. Co.*,
   34 F.4th 29, 2022 WL 1548488 (D.D. Cir. March 3, 2022) ..............31

*United States v. Comstor*,
   308 F. Supp. 3d 56 (D.D.C. 2018) .................................................32, 33

*United States v. DRC, Inc.*,
   856 F. Supp. 2d 159 (D.D.C. 2012) .....................................................31

*United States v. Sci. Applications. Int'l Corp.*,
   626 F.3d 1257 (D.C. Cir. 2010) ..........................................................29

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
   525 F.3d 370 (4th Cir. 2008) ..............................................................28

**Statutes**

31 U.S.C. § 3729(a)(1)(A) and (B) .........................................................33

31 U.S.C. §§ 3729 et seq. .......................................................................17

31 U.S.C. § 3730(e)(4) ...........................................................................19

31 U.S.C. § 3730(e)(4)(A) ......................................................................18

31 U.S.C. § 3730(e)(4)(B) ......................................................................27

31 U.S.C. §§ 7370(e)(4)(A)(i), (ii) ........................................................21

47 U.S.C. § 309(j)(3)(B) ..................................................................................................3

False Claims Act .................................................................................................... *passim*

**Other Authorities**

47 C.F.R. § 1.2110 ............................................................................................................4

47 C.F.R. § 1.2110(b)(1)(i) (2014) ..................................................................................4

47 C.F.R. § 1.2110(b)(3) ..................................................................................................3

47 C.F.R. §§ 1.2110(c)(2)(i) .............................................................................................5

47 C.F.R. § 1.2110(c)(2)(ii)(J) ....................................................................................8, 12

47 C.F.R. § 1.2110(c)(2), (5) ...........................................................................................4

47 C.F.R. § 1.2110(f)(2)(i)-(iii) (2014) .........................................................................4, 6

47 C.F.R. § 1.9020(a) .......................................................................................................7

47 C.F.R. § 1.9020(d)(5)(i) ...................................................................................8, 13, 25

47 C.F.R. § 1.9020(e)(1)(ii) ..............................................................................................7

47 C.F.R. § 27.14(k) .........................................................................................................7

FCC, Online Systems, Application Search, Universal Licensing System,
    https://wireless2.fcc.gov/UlsApp/ApplicationSearch/searchAppl.jsp (last
    accessed June 12, 2022) ..........................................................................................7

Fed. R. Civ. P. 9(b) ...................................................................................................17, 32

Fed. R. Civ. P. 12(b)(6) ....................................................................................................3

## INTRODUCTION

Relators, despite superficially rewriting their pleading, have added nothing to cure the defects that caused this Court to dismiss the last version.  As the Court found, the crux of Relators' False Claims Act theory—that U.S. Cellular secretly controlled Advantage Spectrum, L.P. ("Advantage") and used it as a "front" to acquire spectrum licenses for U.S. Cellular's benefit—is precluded by the public disclosure bar.  However Relators attempt to re-package that theory, they cannot avoid Advantage's public disclosures of its multiple agreements with U.S. Cellular.  Those agreements made clear that U.S. Cellular had a close relationship with Advantage, including as its majority owner, sole lender, and veto-holder over certain corporate decisions.  Those disclosures were more than enough to enable the government to investigate and evaluate skeptically whether U.S. Cellular had an impermissible degree of influence over Advantage.  As the Court put it:  those "public FCC filings would have given the Government sufficient notice to adequately investigate the case and to make a decision whether to prosecute," triggering the public disclosure bar.  March 31, 2022 Order, ECF. No. 170 at 10 (quotation marks omitted).

The Court allowed Relators to amend their complaint in order to incorporate information they said they left out, but Relators have not added anything that changes the Court's analysis.  The main thing Relators have done is eliminated many of their express assertions that Advantage's FCC filings alone revealed Advantage to be a "front" for U.S. Cellular.  *E.g.*, ECF No. 2 ¶¶ 58, 74-77.  But of course, if Relators could infer an alleged fraud from those public filings when they filed their initial complaint, they cannot make the inference disappear by leaving it out of their amendment.  The same public filings continue to trigger the public disclosure bar.

Beyond that transparent tactical change, Relators have added little of substance.  They have added a few more allegations about Advantage's supposedly inactive office space, but, as the Court already found, the allegation that Advantage did not have an active physical presence "fail[s] to

1

materially add" to the public facts about Advantage's limited operations.  March 31 Order at 12.
Relators have also added allegations about Advantage's July 2020 leases of spectrum to U.S.
Cellular, but those allegations only confirm that the public disclosure bar applies because those
same leases were *disclosed* to the FCC and the public.  If, as Relators allege, the leases are
"evidence" of U.S. Cellular's control, Am. Compl. ¶ 131, Advantage's public disclosures of the
leases were more than sufficient to allow the government to investigate any alleged fraud.

        In short, the FCC had before it a robust record of public filings disclosing all of the facts
that Relators allege are indicia of fraud.  The issue of U.S. Cellular's relationship with Advantage
was front-and-center in those filings.  With all of that information, the FCC elected to permit
Advantage to go forward as a "Designated Entity," use bidding credits in Auction 97, and
ultimately lease some of its spectrum to U.S. Cellular.  Relators can disagree with the FCC's
decisions, but they are not entitled to use public information to purport to assert claims of fraud on
behalf of the United States.

        Indeed, Relators' complaint is best understood, not as an allegation of fraud against the
government, but as a misplaced challenge to a regulatory structure developed by Congress and the
FCC.  The DE program, by design, allows for close relationships between small businesses that
bid for licenses and the large companies that necessarily must back them if they are to have any
chance at competing.  Companies that back DEs with millions of dollars naturally demand some
degree of influence over how their money is used.  The FCC examines those relationships on a
case-by-case basis, allowing some arrangements that permit some influence, and disallowing
others found to confer impermissible control.  Here, Advantage made no secret about U.S.
Cellular's role with respect to Advantage's financing, auction participation, and business

decisions, to name a few.  If there was any question about U.S. Cellular's influence over Advantage, the FCC had more than enough information to set it on the investigative trail.

Relators' amended complaint also fails (again) for multiple other reasons.  Relators fail to allege adequate facts to plausibly make out the required elements of falsity, scienter, and materiality.  Those failures provide separate and independent grounds for why Relators' amended complaint should be dismissed with prejudice.

## **BACKGROUND**[1]

### A.    **The DE Program**

The Court summarized the Designated Entity program in its March 31 Order.  Briefly, in authorizing the FCC to auction wireless spectrum, Congress also directed the FCC to "disseminat[e] licenses among a wide variety of applicants, including small businesses."  47 U.S.C. § 309(j)(3)(B).  To further that goal, the FCC established the "Designated Entity" program, which provides "bidding credits" to small or very small business for use in competing in spectrum auctions.  Am. Compl. ¶ 36; *see also* 47 C.F.R. § 1.2110(b)(3).  Businesses that qualify for the program are known as "Designated Entities" or "DEs."  *See* Am. Compl. ¶ 36.

The FCC has long recognized that because DEs are smaller businesses, the "primary impediment" they face in attempting to bid for wireless spectrum is "lack of access to capital."  *In the Matter of Implementation of Section 309(j) of the Communications Act – Competitive Bidding*, Fifth Report & Order, 9 FCC Rcd. 5532 ¶ 10 (July 15, 1994).  The FCC thus sought to design the Designated Entity program in part "to encourage large companies to invest in designated entities."

---

[1] The following facts are as alleged in Relators' amended complaint and the public documents referenced in the amended complaint and are accepted as true only for purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Id.* ¶ 15.  The FCC anticipated that some DEs would obtain backing from other, larger companies and investors.  *Id.*

To qualify as a very small business for purposes of the DE program, an applicant was required to establish that it had annual revenues below a certain threshold.  47 C.F.R. § 1.2110(f)(2)(i)-(iii) (2014).  But, in recognition of the reality that some applicants would need backing from other, larger companies, the FCC enacted a set of "size attribution" rules to determine whether a bidder qualified as a very small business notwithstanding its arrangements with investors and other companies.  *See* 47 C.F.R. § 1.2110.  The size attribution regulations and their implementing orders run to hundreds of pages.  *E.g.*, *In the Matter of Implementation of Sec. 309(j) of the Communications Act*, 9 FCC Rcd. 5532 (July 15, 1994).  Of relevance here, however, is the FCC's rule that an applicant's revenue for purposes of calculating its size must be aggregated with certain other related entities, including the applicant's "affiliates" and its "controlling interests." 47 C.F.R. § 1.2110(b)(1)(i) (2014).

Under the FCC's regulations, whether one entity is an "affiliate" or a "controlling interest" of an applicant depends on whether the entity (or a common owner) has *de jure* or *de facto* control over the applicant.  47 C.F.R. § 1.2110(c)(2), (5).  *De jure* control is generally defined as owning a majority of the voting stock in an entity or other formal controlling interest.  *Id.* § 1.2110(c)(2). *De facto* control is more complex.  Under the FCC's rules, *de facto* control is "determined on a case-by-case basis."  47 C.F.R. §§ 1.2110(c)(2)(i).  There is no single test for determining *de facto* control under the FCC's regulations.  The FCC has identified various factors and indicia that it will consider in connection with questions of *de facto* control, such as whether one entity has authority to hire and fire the management of the applicant, but the FCC has stressed that the ultimate question turns on "the particular facts and circumstances" of a given applicant.  *In the*

*Matter of Northstar Wireless, LLC*, 30 FCC Rcd. 8887, 8889 n.10 (Aug. 18, 2015).[2]  The FCC has

stressed that it will look to "the totality of circumstances in a particular case," and that *de facto*

control determinations "must be made individually for a particular applicant." *In re Alaska Native*

*Wireless, L.L.C.*, 17 FCC Rcd. 4231, 4238 (Mar. 4, 2002).

The FCC also has recognized that larger companies that back DEs may negotiate "investor

protection provisions" that give them a degree of influence and involvement in the DE's business.

*Id.* at 4239.  The FCC has held that "certain types of investor protection provisions generally are

acceptable and do not *per se* confer control" on the investor, including input on "the business plan

and budget," "approving the compensation of executive salaries," and the right to veto "significant

expenditures" and the "incurrence of significant corporate debt." *Id.*  On the other hand, in a

different case, a combination of other investor protections and circumstances were found by the

FCC to create *de facto* control, even though the FCC recognized that under different facts "[a]ny

one of these [same] factors or even combinations of them might not amount to *de facto* control."

*In re Northstar Wireless*, 30 FCC Rcd. at 8890.

Reviewing the above FCC rules and decisions, the D.C. Circuit held that "there was

considerable uncertainty at the time of Auction 97 [the same auction at issue here] about the degree

of [investor] control [the FCC's] rules would tolerate." *SNR Wireless LicenseCo, LLC v. FCC*,

868 F.3d 1021, 1044 (D.C. Cir. 2017).

---

[2] The primary factors considered are known as the *Intermountain Microwave* factors and consist of: (1) who controls daily operations; (2) who is in charge of employment, supervision, and dismissal of personnel; (3) whether the licensee has unfettered use of all facilities and equipment; (4) who is in charge of the payment of financing obligations, including expenses arising out of operating; (5) who receives monies and profits from the operation of the facilities; and (6) who determines and carries out the policy decisions, including preparing and filing applications with the Commission. *See In re Northstar Wireless*, 30 FCC Rcd. at 8911 (*citing Intermountain Microwave*, Public Notice, 12 F.C.C. 2d 550 (1963)).

**B.      The FCC's Review Of DE Submissions**

Prospective DEs participate in auctions like any other entity, except that they can factor "bidding credits" into the bids they offer at the auction.  *See* Am. Compl. ¶ 36.  These credits discount the amount of money DEs must pay to the U.S. Treasury for licenses they win.  *Id.*; *see* 47 C.F.R. § 1.2110(f)(2)(i)-(iii) (2014).  Once an auction is completed, the winning bidder must file a Long Form Application to obtain the licenses.  Am. Compl. ¶ 50 (citing 47 C.F.R. § 1.2107(c)).  Winning bidders that wish to claim bidding credits as DEs must certify in their Long Form Applications that they qualify as DEs and provide substantial supporting documents.  *Id.* ¶¶ 50-53.[3]

The FCC reviews the Long Form Application to determine whether a winning bidder is eligible for the DE licenses and bidding credits.  *Id.* ¶ 54.  When an applicant certifies that it is a DE, the FCC "closely examines the totality of the facts and circumstances of each case to ensure that the applicant is truly a small business unaffiliated with or controlled by entities that do not qualify as such."  *In re Northstar Wireless*, 30 FCC Rcd. at 8889.

Importantly, each DE's submissions and the FCC review process are public.  Any member of the public can review the contents of each submission on the FCC's website.[4]

**C.      Post-Licensing Regulations**

Once a DE is granted a license, for the next five years, the DE must file annual reports certifying that it continues to qualify as a DE.  Am. Compl. ¶ 56 (citing 47 C.F.R. § 1.2110(n)).  If, during the five-year period, the DE loses its eligibility for DE status or assigns or transfers

---

[3] Before the auction, prospective DEs file a Short Form Application with some of the same information.

[4] See FCC, Online Systems, Application Search, Universal Licensing System, https://wireless2.fcc.gov/UlsApp/ApplicationSearch/searchAppl.jsp (last accessed June 12, 2022).

control of its license to an entity that does not meet the DE criteria, it must reimburse the U.S. Treasury for the bidding credit it received, or a portion of the credit, plus interest. *Id.* ¶¶ 60-61 (citing 47 C.F.R. § 1.2111(b)). At the end of the five-year period, the licensee may assign or transfer the license without restrictions or penalties. *Id.* ¶ 62.

Licensees must also comply with certain requirements related to network construction and offering cellular coverage. As relevant here, within six years of obtaining a license, the licensee must "provide reliable signal coverage and offer service . . . to at least forty (40) percent of the population in each of its licensed areas." Am. Compl. ¶ 64 (quoting 47 C.F.R. § 27.14(s)(1)). This is known as the "Interim Buildout Requirement." *Id.* The licensee must file a construction notice with the FCC certifying its compliance with the Interim Buildout Requirement, along with supporting information. 47 C.F.R. § 27.14(k).

Licensees may also lease their licensed spectrum to other telecommunications companies, pursuant to agreements known as "spectrum manager leasing arrangements." 47 C.F.R. § 1.9020(a). Parties to a spectrum manager lease must file a notification of the lease with the FCC prior to commencing the lease. 47 C.F.R. § 1.9020(e). A licensee that leases its spectrum may rely on the lessee's construction and coverage activities to satisfy the licensee's build-out obligations. *Id.* § 1.9020(d)(5)(i). For example, a licensee can meet its Interim Buildout Requirement by leasing its spectrum to another company that provides the required coverage. *Id.*

As a related matter, a DE is permitted to lease up to 25 percent of the capacity of a license to a party that holds an interest in the DE without attributing the lessee's revenues to the DE for purposes of the size attribution rules. 47 C.F.R. § 1.2110(c)(2)(ii)(J). In other words, a DE may lease a portion of its spectrum to one of its backers without losing its DE status. *Id.*

**D.     Advantage's Participation In Auction 97 And Relevant Disclosures**

In late 2014 and early 2015, the FCC held an auction for spectrum licenses known as Auction 97.  Am. Compl. ¶¶ 74, 85.  Advantage—a Delaware limited partnership with partners as described below—participated in the auction.  *Id.* ¶¶ 85-86, 89.  Auction 97 closed on January 29, 2015, and the FCC determined that Advantage was the provisionally high bidder for 124 licenses.  *Id.* ¶¶ 85, 95.  Altogether, there were 31 winning bidders in Auction 97.  *See* fcc.gov/auction/97 (last accessed June 12, 2022).[5]

On February 12, 2015, Advantage filed its Long Form Application with the FCC.  Am. Compl. ¶ 96 & Ex. 7.[6]  In its Long Form Application, Advantage certified that it was a DE— stating that an individual, William Vail, "has both *de jure* and *de facto* control of Advantage."  *Id.* ¶ 99 & Ex. 8, ECF No. 174-8 at 5.  As further detailed below, Mr. Vail was a former telecommunications industry executive who, as Advantage's Long Form Application disclosed, owned a company, Sunshine Spectrum, Inc. ("Sunshine"), which controlled the general partner of Advantage.  Am. Compl. ¶ 17 & Ex. 8.  As required by FCC rules, Advantage also included in its

---

[5] The Court may consider "not only the facts alleged in the [amended] complaint, but also documents attached to or incorporated by reference in the [amended] complaint and documents attached to a motion to dismiss for which no party contests authenticity.  Therefore, where a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment . . . .  Moreover, a document need not be mentioned by name to be considered 'referred to' or 'incorporated by reference' into the [amended] complaint."  *Slovinec v. Georgetown Univ.*, 268 F. Supp. 3d 55, 59 (D.D.C. 2017) (Chutkan, J.) (internal citations and quotation marks omitted).  This Court may also "take judicial notice of public records, including SEC filings."  *See, e.g.*, *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 10 n.4 (D.D.C. 2017); *see also Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993) ("[A]s matters of public record, statements in the Federal Register can be examined on 12(b)(6) review.").

[6] Advantage had previously filed a Short Form Application with the FCC on November 11, 2014.  *See* Am. Compl. ¶ 77 & Ex. 3.

Long Form Application summaries of documentation supporting its eligibility for DE status, Am. Compl. at Ex. 8, and publicly filed those documents in their entirety on March 20, 2015, Ex. A.[7]

The documents Advantage filed with its Long Form Application detailed its ownership structure and governance, finances, and management.   Advantage's relationships with other parties, including Defendants U.S. Cellular and Allison DiNardo, were spelled out in detail in those documents.   Ex. A.   Four documents in particular merit note:

Advantage LP Agreement: Advantage's limited partnership agreement, filed publicly with the FCC, identified its two partners: (1) its general partner, Delaware limited partnership Frequency Advantage, L.P. ("Frequency"), and (2) its limited partner, United States Cellular Corporation Wireless Investment, Inc. ("USCC Wireless").[8]   Am. Compl. ¶¶ 15-16, 21; Ex. B at 1 (Agreement Establishing Advantage Spectrum, L.P. ("Advantage LP Agreement")).   The Advantage LP Agreement outlined that USCC Wireless owned 90% of the equity in Advantage, with the remaining 10% owned by the general partner, Frequency.   Ex. B at § 3.1.   The Advantage LP Agreement also laid out multiple "investor protection" mechanisms in favor of USCC Wireless in the governance of Advantage, including approval over major decisions, *id.* at § 5.3, restrictions on the size of Advantage's management team and pay, *id.* at §§ 5.4, 5.5, and limits on the amount the company could spend without approval from USCC Wireless, *id.* at §§ 5.6, 5.3(i).

Frequency LP Agreement: Advantage also filed publicly the partnership agreement of its general partner Frequency, which identified Frequency's partners: (1) its general partner Sunshine,

---

[7] Exhibits denoted by letter refer to exhibits filed with this motion, which are all materials filed publicly with the FCC.   Exhibits denoted by number refer to exhibits attached to the amended complaint.

[8] USCC Wireless is wholly owned by Defendant United States Cellular Corporation ("USCC"), which is a commercial mobile phone operator and a subsidiary of Defendant Telephone and Data Systems, Inc. ("TDS") (collectively, "U.S. Cellular"). Am. Compl. ¶¶ 12-14.

a Delaware corporation 100% owned by Mr. Vail, and (2) its limited partner Nonesuch, Inc.

("Nonesuch"), a Delaware corporation 100% owned by Ms. DiNardo.  Am. Compl. ¶¶ 17-18; Ex.

C at 1 (Agreement Establishing Frequency Advantage, L.P. ("Frequency LP Agreement")).  The

Frequency LP Agreement described in detail the business relationship between Mr. Vail's and Ms.

DiNardo's companies, including that Ms. DiNardo's company would "establish a bidding room"

for purposes of participating in the wireless auction and "provide bidding services" to Advantage.

Ex. C at 1, § 8.1.[9]  The Frequency LP Agreement also made clear that Ms. DiNardo had certain

rights to approve financing and other capital activities of Frequency.  *Id.* at §§ 3.4, 5.3, 9.1.

Bidding Protocol: Advantage also filed publicly a "Bidding Protocol," which governed its

ability to bid in Auction 97.  Am. Compl. ¶ 84; Ex. D.  The Bidding Protocol was agreed between

Advantage, Frequency (Advantage's general partner), and USCC Wireless (its limited partner).

Ex. D at 1.  Advantage agreed "to be bound by [the] limitations set forth in" the Protocol.  *Id.* at

§ 2.  The Bidding Protocol disclosed that the "Partners" in Advantage, including USCC Wireless,

"have agreed to a list of markets which [Advantage] will seek to acquire [licenses for] in the

Auction."  *Id.* at § 1 & Ex. A.  The Bidding Protocol further established a "bidding council" to

"review the bids to be submitted" by Advantage.  *Id.* at § 3.  The council was comprised of Mr.

Vail, Ms. DiNardo, and a U.S. Cellular representative.  *Id.* at § 2.  The Bidding Protocol also set

the maximum price that Advantage could bid for particular licenses without further approval from

the bidding council (including USCC Wireless).  *Id.* at §§ 5-6 & Ex. A.  For multiple "blocks" of

---

[9] After the original complaint was filed in May 2015, on February 7, 2016, Advantage filed documents with the FCC informing the agency that Mr. Vail had purchased all of Ms. DiNardo's shares of Nonesuch.  *See* Ex. G.  In its 2017 Annual Report, Advantage informed the FCC that Nonesuch had merged into Sunshine and Frequency was dissolved.  Am. Compl. at Ex. 11 at Ex. II.  This merger left Sunshine as Advantage's general partner.  Am. Compl. ¶ 20.  Relators have added Sunshine as a Defendant in their amended complaint.  *Id.* ¶ 17.

licenses, the maximum bid Advantage was permitted to make was expressly higher for licenses with greater overlap with U.S. Cellular's own licenses, and lower for licenses with less overlap with U.S. Cellular.  *Id.* at Ex. A.

Loan Agreements: Advantage also filed publicly the loan and security agreements for itself and Frequency and related documents spelling out its financing arrangements with U.S. Cellular. *See* Exs. A, E.  Those agreements disclosed that Advantage borrowed $272,448,600.00 from a U.S. Cellular affiliate, which, in addition to USCC's equity investment, represented nearly all of the money available to Advantage.  *See* Ex. F at § 1.  The loan agreement carried additional restrictions on Advantage's business, including a prohibition on transferring Advantage's assets or obtaining any other financing without U.S. Cellular's approval.  Ex. E at §§ 4.01(b), 4.02(a), 4.02(b).

## E.      Advantage's Licenses and Post-Licensing Submissions to the FCC

After reviewing Advantage's filings, the FCC granted Advantage 124 spectrum licenses for which it was the high bidder on July 5, 2016.  *See* Am. Compl. ¶¶ 3, 111.  Based on that July 5, 2016 date, Advantage's five-year non-transfer period ended July 5, 2021, and Advantage's deadline to satisfy the Interim Buildout Requirement is July 5, 2022.  *Id.* ¶¶ 62, 66.

Since obtaining its licenses in 2016, Advantage has publicly filed annual reports with the FCC, certifying its continuing eligibility as a DE.  *Id.* ¶¶ 112-14, 116-17 & Exs. 10-14.

In 2020, Advantage entered into three spectrum manager leases with USCC Services, LLC ("USCC Services"), a wholly owned subsidiary of U.S. Cellular, and filed the requisite lease notifications with the FCC.  *Id.* ¶ 124 & Ex. 15.  Pursuant to the leases, USCC Wireless leased portions of Advantage's licensed spectrum and provided wireless coverage in portions of Advantage's licensed geographic areas.  *Id.* at Ex. 15.  Under two of the leases, covering 45 licenses in total, Advantage disclosed that it would lease more than 25% of the spectrum capacity

available under the licenses to USCC Services, triggering a requirement that Advantage repay 25% of the bidding credits it received from the government because Advantage had not satisfied the five-year non-transfer period. *Id.* ¶ 125 & Ex. 15; *see also* 47 C.F.R. § 1.2110(c)(2)(ii)(J).

Under the third lease, covering 76 licenses, Advantage disclosed that it had authorized USCC Services to use a portion of the licensed spectrum (5MHz) in a portion of the licensed territory, to "allow [USCC Services] to improve and enhance its voice and data service offerings" in those areas. Am. Compl. at Ex. 15, ECF No. 174-15 at 2. In their filings concerning the lease, Advantage and USCC Services further disclosed that U.S. Cellular "already provides wireless service" in "a number of [the] Advantage license areas" and "currently directly holds, or has attributed to it, various amounts of [wireless] spectrum . . . in markets overlapping the leased Advantage license areas." *Id.* at 3. In other words, U.S. Cellular was leasing Advantage's spectrum to augment its existing service. *Id*.

Since executing the leases, Advantage has filed notices with the FCC disclosing that Advantage has met the Interim Buildout Requirement in certain markets by relying on the wireless coverage provided by U.S. Cellular in markets where U.S. Cellular is leasing spectrum from Advantage. Am. Compl. ¶¶ 129-30 & Ex. 16. Advantage disclosed that it is relying on "a spectrum management lease agreement with USCC Services" to meet the buildout requirement, as permitted under 47 C.F.R. § 1.9020(d)(5)(i). *See id.* at Ex. 16, ECF No. 174-16 at 2.

## F.   Relators' Allegations

Relators are two former communications lawyers based in Washington, D.C. *Id.* ¶¶ 10-11. They do not allege that they ever worked for any of the Defendants or were otherwise in a position to acquire "inside" information. One month before filing this case, Relators also filed a qui tam action against certain of the Defendants (but not Advantage) regarding a different FCC wireless spectrum auction that took place in 2008, Auction 73. *See O'Connor et al. v. U.S. Cellular Corp.,*

*et al.*, No. 20-cv-2071 (D.D.C. filed April 8, 2015).  Advantage, Frequency, Sunshine, and Mr. Vail did not participate in Auction 73 and are not parties to that action.

Relators filed this case on May 11, 2015, ECF No. 2, which was about a month after Advantage filed its Long Form Application and the supporting documents reviewed above, but *more than a year* before the FCC granted Advantage's application on July 5, 2016.

Relators' central allegation is that Advantage failed to disclose to the FCC that Advantage was a "front" for U.S. Cellular, *i.e.*, a "sham" company actually controlled by U.S. Cellular for the purpose of acquiring wireless licenses at a discount for the benefit of U.S. Cellular.  Am. Compl. ¶¶ 2-4, 7-9, 83.  In their initial complaint, Relators attributed U.S. Cellular's alleged control over Advantage to the written agreements between Advantage and U.S. Cellular.  *E.g.*, ECF No. 2 at ¶¶ 58-61, 65, 74-78, 87.  In their amended complaint, Relators embellish those allegations with references to supposed "undisclosed agreements" providing U.S. Cellular with even more control.  *E.g.*, Am. Compl. ¶ 137.  Relators nowhere explain how these "undisclosed agreements" differ from the many *disclosed* agreements outlining a U.S. Cellular role with respect to Advantage's financing, governance, and auction participation, among other areas.  *E.g.*, Ex. B at § 3.1, *id.* at § 5.3, Ex. F at § 1; Ex. D at §§ 5-6 & Ex. A.

As in their initial complaint, Relators also allege that Advantage did not maintain an active office presence at various times.  *E.g.,* Am. Compl. ¶ 120.  Advantage's public filings, however, disclosed that Advantage would have a small team:  *i.e.,* only "*one* of [Frequency's] principal officers" would devote only "*one-half* of [his or her] work time" to the business through the launch of wireless service, and compensation for all "Management" would not exceed $50,000.  Ex. B §§ 5.4(a), 5.5(a)-(b) (emphasis added).  Relators alleged in their initial complaint that those disclosures meant that Advantage could not "hir[e] and form[] a management team or even hir[e]

a single full-time employee."  ECF No. 2 ¶ 75.  An "investigation" indicating that Advantage did not have a bustling in-person office presence did not materially add to those disclosures.

Finally, Relators allege that U.S. Cellular's control over Advantage is established by the 2020 spectrum manager leases that Advantage entered into with U.S. Cellular.  Am. Compl. ¶¶ 123-31.  Relators, however, ignore that Advantage disclosed those lease arrangements in public filings with the FCC.  *E.g.,* Am. Compl. at Ex. 15.  Even assuming (as Relators contend) that the spectrum leases raised an inference of potential control by U.S. Cellular, the FCC was on notice of the issue nearly two years before Relators included it in their amended pleading.

## G.    The Prior 2008 *Qui Tam* Lawsuit

Nearly eight years before the FCC granted licenses to Advantage following Auction 97, a relator with connections to the Relators in this case sued U.S. Cellular, Ms. DiNardo, and others under the FCA, alleging they had created "sham" small businesses that won other spectrum auctions and had been falsely certified as DEs.  *See* Am. Compl. No. 1:07-cv-00800-JDB (D.D.C. Apr. 24, 2008), ECF No. 11 (the "2008 Complaint").[10]  Advantage was not a party to that lawsuit or the other spectrum auctions.  The core theory of the 2008 Complaint—that U.S. Cellular and Ms. DiNardo created "sham" DEs to acquire licenses for the benefit of U.S. Cellular—is indistinguishable from the theory Relators pursue here.  *Compare* Am. Compl. ¶¶ 9, 42-59, 51-54 *with* 2008 Complaint ¶¶ 3-10, 23-26, 51-68, 80-85.[11]

---

[10]  The relator in the prior lawsuit was a law firm at which one of the current Relators (Mr. O'Connor) was a partner.

[11]  The 2008 Complaint is further described in the motions filed by U.S. Cellular and related defendants and King Street and related defendants.

**H.      Proceedings In This Case**

Relators initiated this action in the Western District of Oklahoma on May 11, 2015.  ECF

No. 2.  The United States investigated Relators' claims against Defendants and, on December 4,

2019, declined to intervene.  ECF No. 44.[12]  On May 26, 2020, all Defendants filed a joint motion

to transfer this case to the United States District Court for the District of Columbia.  ECF No. 103.

On July 29, 2020, the court granted the motion to transfer.  ECF No. 127.  On October 26, 2020,

all Defendants filed motions to dismiss Relators' complaint, ECF Nos. 151, 153, 155.

The Court granted Defendants' motions to dismiss on March 31, 2022.  ECF No. 170.  The

Court found that the FCA's public disclosure bar presented an "insurmountable defense" to

Relators' claims.  *Id.* at 7.  As the Court held, Relators themselves alleged that Advantage's own

public filings "reveal[ed] U.S. Cellular's direct and indirect control of Advantage," including, for

example, that the Bidding Protocol represented a "cession of all control over Advantage's bids to

U.S. Cellular."  *Id.* at 9.  As a result, Advantage's filings "would have given the Government

sufficient notice to adequately investigate the case and . . . make a decision whether to prosecute."

*Id.* at 10 (quotation marks omitted).

The Court also evaluated whether Relators' alleged "independent investigation" was

sufficient to invoke the "original source" exception to the public disclosure bar, holding that it was

not.  *Id.* at 13.  As the Court found, Relators' various allegations about U.S. Cellular's and King

Street's involvement in Advantage's Auction 97 bidding, and their contention that Advantage

---

[12] The Defendants named in Relators' original complaint are not the same as the Defendants named in the amended complaint.  First, Mr. Vail, who was named as a Defendant in the original complaint, was dismissed from this action on April 24, 2020.  ECF No. 85.  Second, with their amended complaint, Relators have added Sunshine as a Defendant.  *See supra* note 9.

lacked an independence office presence "do not materially add to what has been publicly disclosed sufficient to be an 'original source' for FCA purposes." *Id.*

The Court thus held that the public disclosure bar precluded Relators' claims, but noted that Relators argued that they possessed additional information about U.S. Cellular's alleged control of Advantage, which they claimed was "pleaded in their related complaint, *O'Connor II*." *Id.* In light of that argument, the Court permitted Relators leave to amend. *Id.* at 14. Relators filed their amended complaint on April 29, 2022. ECF No. 174.

## LEGAL STANDARD

"A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief." *Jones v. Bock*, 549 U.S. 199, 215 (2007). "To survive a motion to dismiss, the pleading must contain enough factual allegations to 'state a claim to relief that is plausible on its face.'" *Repetto v. Huerta*, 71 F. Supp. 3d 69, 71 (D.D.C. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Because claims under the FCA must allege fraud, Relators' claims must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551–52 (D.C. Cir. 2002). "[A] party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A complaint alleging violations of the FCA must "plead with sufficient particularity 'the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud.'" *United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. 15-2105(ABJ), 2020 WL 435490, at *4 (D.D.C. Jan. 28, 2020) (quoting *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004)).

Relators' claims arise under Sections 3729(a)(1)(A), (B), and (G) of the FCA.  31 U.S.C. §§ 3729 et seq.  To establish claims under any of those sections, Relators must allege facts establishing that Advantage:  1) made a false statement or claim, 2) that was knowingly false or otherwise made with scienter, and 3) the false statement or claim was material.  *Singletary v. Howard Univ.*, 939 F.3d 287, 293 (D.C. Cir. 2019); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 5-6 (D.D.C. 2003).

## ARGUMENT

The public disclosure bar prohibits each of Relators' claims because the information Advantage disclosed publicly about its relationship with U.S. Cellular was more than sufficient to alert the government to Relators' FCA theory—namely, that Advantage was subject to agreements with U.S. Cellular that rendered Advantage a "front" for the larger company.  Separately, Relators have failed to plead claims against Advantage that meet the requirements of the FCA with plausible allegations of fact.  The amended complaint should be dismissed with prejudice.

## I.    Relators' Claims Must Be Dismissed Pursuant To The Public Disclosure Bar.

All of Relators' claims again fail under the public disclosure bar.  As the Court correctly held, the public disclosure bar precludes Relators' claims because "Advantage's public FCC filings would have given the Government sufficient notice to adequately investigate the case and to make a decision whether to prosecute."  March 31 Order at 10 (quotation marks omitted).  That holding continues to apply.  As shown below:  (a) the public disclosure bar applies where public information was sufficient to alert the government to an alleged fraud; (b) Advantage's public disclosures were more than sufficient to permit the government to investigate Advantage's relationship with U.S. Cellular; and (c) Relators do not qualify as an "original source."

**A.**     **The Public Disclosure Bar Applies Where Publicly Disclosed Information Was Sufficient To Alert The Government To Potential Fraud.**

Congress has long recognized that the treble damages and other incentives offered by the FCA can have the unintended effect of encouraging "parasitic lawsuits brought by opportunistic litigants seeking to capitalize on public disclosures." *United States ex rel. Oliver v. Philip Morris USA Inc.*, 763 F.3d 36, 39 (D.C. Cir. 2014). To prevent that misuse of the statute, the FCA provides that a court "*shall* dismiss an action or claim under this section . . . *if substantially the same allegations or transactions* as alleged in the action or claim were publicly disclosed" through certain specified channels. 31 U.S.C. § 3730(e)(4)(A) (emphasis added). This is because "[o]nce the information is in the public domain," the government can undertake its own investigation and prosecutorial decisions; "[a]llowing *qui tam* suits after that point may either pressure the government to prosecute the cases when it has good reasons not to or reduce the government's ultimate recovery." *United States ex rel. Findley v. FPC- Boron Emps.' Club*, 105 F.3d 675, 685 (D.C. Cir. 1997).

Courts have interpreted 31 U.S.C. § 3730(e)(4) and its predecessors to enact a "public disclosure bar," which precludes an FCA claim where the "publicly disclosed information could have formed the basis for a governmental decision on prosecution" or at least "alerted law-enforcement authorities to the likelihood of [alleged] wrongdoing." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999) (quotation marks omitted). Under the public disclosure bar, an FCA claim is prohibited if "the allegation of fraud itself" *or* "the transactions that give rise to an inference of fraud" are already in the public domain. *United States ex rel. Oliver v. Philip Morris USA Inc. ("Oliver II")*, 826 F.3d 466, 471 (D.C. Cir. 2016). This standard does not require a complete "identity of facts" between the disclosed facts and the FCA claim. *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d

25, 49 (D.D.C. 2007).  Rather, the bar can be triggered even when "a *qui tam* suit [is] even partly based upon publicly disclosed allegations or transactions."  *United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225, 235 n.10 (D.D.C. 2006) (quotation marks omitted).

The D.C. Circuit has repeatedly held that the public disclosure bar does not require that the publicly disclosed information actually "*prove* a case of fraud," but rather merely "raise the inference of fraud" that "enable[s] the government to adequately investigate the case and to make a decision whether to prosecute."  *Settlemire*, 198 F.3d at 919 (emphasis added) (quotation marks omitted); *see also Findley*, 105 F.3d at 687.  Thus, even if a relator alleges "specific instances of fraud" or "more specific details about" what happened that are not in the public record, the public disclosure bar requires dismissal so long as "a hypothetical government investigator aware of the [public facts] . . . would be alerted to the likelihood that the [defendant] was falsely certifying compliance with the relevant provisions."  *Oliver II*, 826 F.3d at 472–74 (quotation marks and alterations omitted).

Importantly, the public disclosure bar "focuses *not* on the additional [allegedly] incriminating information a relator supplies, but instead on whether 'the quantum of information *already in the public sphere*' was sufficient to 'set government investigators on the trail of fraud.'"  *United State ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 87 (D.C. Cir. 2014) (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654–55 (D.C. Cir. 1994)) (emphasis added). Thus, for example, a public disclosure of a cigarette company's "general practice" of selling cigarettes at lower prices to some customers was sufficient to preclude an FCA claim based on an allegedly false "most favored customer" representation to the government.  *Oliver II*, 826 F.3d at 471, 473.  The relator's allegations of "more specific details about th[e] general practice" not found

in the public record, such as specific price differentials and sales locations "d[id] not mean the transaction was not already publicly disclosed."  *Id*. at 473.  Similarly, in *Staples*, a case that concerned alleged fraudulent customs declarations regarding imported pencils, public reports disclosed some characteristics of pencils manufactured in China, whereas the relator's complaint "catalogue[d] characteristics . . . that are unmentioned in the [public] reports."  773 F.3d at 87. The public disclosure bar applied because, despite the detail supplied by the relators, the information in the public reports was "sufficient to 'enable the government adequately to investigate the case.'"  *Id.* at 88.

As shown next, the information disclosed by Advantage in its public filings was more than sufficient to meet the same standard.

### B.     Advantage's FCC Filings And Other Relevant Materials Trigger The Public Disclosure Bar.

#### 1.     Advantage's Public Filings Disclosed An Ample Basis Upon Which To Investigate.

Advantage's FCC filings, as well as other public documents, were more than sufficient to permit the government to investigate all of Relators' accusations.[13]  The crux of Relators' FCA theory is that Advantage was a "sham entity controlled by U.S. Cellular," with U.S. Cellular and Ms. DiNardo "controll[ing] the facilities Advantage used to participate in the auction, its bidding strategy and the selection of which licenses to bid on, the personnel needed to conduct the auction," as well as "controll[ing] the construction of the networks [and] use of Advantage's licensed spectrum." Am. Compl. ¶¶ 8, 133.  Relators allege that those facts made Advantage's certifications regarding *de facto* control false.  But as Relators themselves made clear in their initial complaint, Advantage's FCC filings contained ample disclosures about Advantage's relationship with U.S.

---

[13] Relators have not contested that Advantage's FCC filings qualify as public disclosures as filings in an "administrative hearing" or as "Federal report[s]."  *See* 31 U.S.C. § 3730(e)(4)(A)(i), (ii).

Cellular—disclosures that Relators alleged were "wholly inconsistent with that of an independent DE general partner."  ECF No. 2 ¶ 75.[14]  Those disclosures were more than enough to "set government investigators on the trail" of the allegation that Advantage was a mere extension of U.S. Cellular.  *See Staples,* 773 F.3d at 87 (quotation marks omitted).  For example, Advantage disclosed all of the following:

- U.S. Cellular owned 90% of Advantage, Ex. B at § 3.1;

- Substantially all of Advantage's funding, more than $270 million, was loaned to Advantage by U.S. Cellular, Ex. F at 1;

- Advantage, U.S. Cellular, and Ms. DiNardo agreed in the Bidding Protocol as to which markets Advantage would bid on in Auction 97, Ex. D at § 5 & Ex. A;

- Advantage's bids during Auction 97 were subject to advance "review" by U.S. Cellular, *id.* at § 3;

- Advantage, U.S. Cellular, and Ms. DiNardo agreed that Advantage could bid more for licenses that had a greater overlap with U.S. Cellular's operating territories, *id.* at Ex. A[15];

- Advantage could not sell or transfer its assets without U.S. Cellular's permission, Ex. E at § 4.02(b);

- U.S. Cellular had the right to veto major business decisions by Advantage, including with respect to transferring or leasing any license, making any significant expenditure, or obtaining additional financing from another source, Ex. B at § 5.3; and

---

[14] In evaluating the Amended Complaint, the Court may consider and credit Relators' admissions in the original complaint.  *See W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 634 (D.C. Cir. 2001) (the original complaint remains part of the record and may be examined by the court to interpret the allegations in the amended complaint); *Poindexter v. EMI Record Grp. Inc.*, No. 11 CIV. 559 (LTS) (JLC), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) (district court "may still credit admissions in the original complaint" when an amended pleading is filed).

[15] In addition, a few days after Auction 97, U.S. Cellular disclosed in a press release and Form 8-K filed with the SEC that the licenses won by Advantage "overlap or are proximate or contiguous to areas covered by licenses that U.S. Cellular currently owns."  U.S. Cellular Corp., Current Report (Form 8-k) (Feb. 2, 2015).

- If Frequency planned to sell its interest in Advantage to another party, U.S. Cellular had the right to cause Advantage to purchase that interest through a right of first refusal, leaving U.S. Cellular as the sole owner, Ex. C at § 9.7.

Advantage further disclosed that it had limited capabilities of its own. For instance:

- Advantage was relying on DiNardo's company to supply a "bidding room and assist in the conduct of the bidding activities," *id.* at 1;

- Frequency, as Advantage's general partner, anticipated that only "one-half of the work time of one of its principal officers [would] be devoted to wireless business activities," Ex. B at § 5.4(a); and

- The compensation of Advantage's management was limited absent the agreement of U.S. Cellular, *id.* at § 5.5(a)-(b).

Those public disclosures made clear to the FCC and anyone else who cared to look that U.S. Cellular had a degree of influence with respect to Advantage's auction participation, business activities, and ability to enter into agreements with parties other than U.S. Cellular. None of this information was hidden. The parties do not agree on whether those facts and circumstances added up to allowable "investor protections" or impermissible control under the FCC's case-by-case approach, but, in all events, the issue of potential sway over Advantage was put front-and-center in Advantage's public FCC filings. That was more than enough to "enable the government to adequately investigate the case." *See Findley*, 105 F.3d at 688.

Relators attempt to avoid that result by sprinkling into their amended complaint allegations of "secret agreements" between U.S. Cellular and Advantage, which supposedly provided that Advantage would hold the spectrum licenses for U.S. Cellular's benefit, until U.S. Cellular could acquire the licenses from Advantage after the "unjust enrichment" period. *E.g.*, Am. Compl. ¶¶ 83, 103, 110, 137. But this is merely a variation on the already-alleged theme that Advantage's publicly disclosed agreements with U.S. Cellular meant that "Vail's role [wa]s that of a caretaker of licenses for U.S. Cellular's benefit." ECF No. 2 ¶ 74. That is, the *non*-secret disclosures in the public record made clear that Advantage was buying licenses that largely overlapped with U.S.

22

Cellular's territories, using money provided by U.S. Cellular, and was not permitted to enter into material agreements with parties other than U.S. Cellular unless U.S. Cellular agreed. *E.g.*, Ex. E at § 4.02(a)-(b), Ex. F at § 1. Those disclosures were more than sufficient to cause a "hypothetical government investigator" to assess the possibility that U.S. Cellular stood to be the ultimate beneficiary of the licenses. *See Oliver II*, 826 F.3d at 473-74 (quotation marks omitted).

Relators also include in their amended complaint a retread of various alleged tidbits concerning Advantage from their initial complaint, such as that Advantage allegedly did not have an active office presence, or an employee of King Street was one of Advantage's designated bidders. Am. Compl. ¶¶ 91, 120-21. But as the Court already found, none of this collateral information is "enough to make plaintiff-Relators' allegations substantially dissimilar from what had already been publicly disclosed." March 31 Order at 11; *see also Oliver II*, 826 F.3d at 473 ("these additional details do not mean the transaction was not already publicly disclosed").

### 2. Advantage's More Recent FCC Filings Do Not Help Relators With The Public Disclosure Bar.

Relators have also attempted to bolster their claims by making reference to Advantage's post-licensure FCC filings, which disclosed that Advantage had entered into spectrum manager lease arrangements with an affiliate of U.S. Cellular. *See* Am. Compl. ¶¶ 123-28. Those filings, however, only confirm that the public disclosure bar prohibits Relators' claims.

In essence, Relators allege that Advantage's status as a "front" for U.S. Cellular was confirmed by the fact that Advantage leased part of its licensed spectrum to a U.S. Cellular affiliate in 2020 and then relied on U.S. Cellular's construction and coverage to satisfy Advantage's build-out requirements. *See* Am. Compl. ¶¶ 115-119, 123-128. According to Relators, Advantage falsely certified that it was "in the planning stages of construction" and retained *de facto* control

of the licenses, when, in fact "U.S. Cellular, not Advantage or Vail, planned and constructed the networks." *Id.* ¶ 115 (quotation marks omitted).

The trouble with Relators' theory, however, is that Advantage's own public filings again disclosed the alleged inference of wrongdoing. The only purported basis for Relators' allegations about construction and the use of Advantage's licensed spectrum is Advantage's own public filings disclosing that: (a) Advantage entered into spectrum manager leases with U.S. Cellular covering substantially all of the licenses Advantage won in Auction 97; and (b) Advantage was "rely[ing] on the USCC coverage in its licensed area to meet the interim-term build obligation." *See* Am. Compl. at Ex. 15 (lease notifications); Am. Compl. at Ex. 16, ECF No. 174-16 at 2 (construction notice). Those activities comply with the FCC's regulations. *See* 47 C.F.R. § 1.9020(d)(5)(i) ("[t]he licensee may attribute to itself the build-out or performance activities of its spectrum lessee(s)"). But even crediting Relators' (incorrect) claim that the leases prove that Advantage is a sham, the leases and Advantage's reliance upon them are all matters of public record, filed with the FCC. Relators thus merely "repeat what the public already knows," running square into the public disclosure bar once again. *See Findley*, 105 F.3d at 687.

Relators nonetheless attempt to embellish upon those allegations by alleging that there is an inconsistency between one of Advantage's lease disclosures, which describes a lease to U.S. Cellular for 5 MHz of spectrum, and one of Advantage's construction disclosures, which states that U.S. Cellular is providing 4G-LTE coverage in a particular service area subject to the lease. Am. Compl. ¶ 131. According to Relators, those two disclosures were a tip-off for fraud because 4G-LTE coverage allegedly requires 10 MHz of spectrum, more than the 5 MHz Advantage leased to U.S. Cellular. *Id.* Here, Relators are ignoring that Advantage *also* disclosed that U.S. Cellular had its own licensed spectrum "ranging from 10 MHz to 161 MHz in markets overlapping the

leased Advantage license areas"—*i.e.*, U.S. Cellular had other spectrum to draw upon.  Am. Compl. at Ex. 15, ECF No. 174-15 at 3.  As stated in the lease notifications filed with the FCC, U.S. Cellular would use the 5MHz of leased spectrum as "*additional* spectrum in its existing license area, thus *enhancing* its provision of wireless telecommunications services in the relevant geographic area."  *Id.* (emphasis added).  But in all events, an alleged inference of fraud drawn from comparing two different public disclosures—*i.e.*, the lease disclosure and the construction disclosure—is a paradigmatic case of a claim precluded by the public disclosure bar.  *See Oliver*, 826 F. 3d at 473-74 ("a hypothetical government investigator" aware of "discrepancies" between public disclosures "would be alerted to the likelihood" of fraud (quotation marks and alterations omitted)).  For this reason too, Advantage's public filings preclude Relators' claims.

### 3. The Prior FCA Case Against U.S. Cellular And Ms. DiNardo Confirms That The Public Disclosure Bar Applies.

Although everything above far exceeds the threshold for the public disclosure bar, there is even more, because the 2008 FCA complaint against U.S. Cellular and Ms. DiNardo's companies put squarely in the public record Relators' allegation that U.S. Cellular controls the DEs that it backs.  *See* 2008 Compl. ¶¶ 4, 6-9.  Relators themselves allege that their claims in this case are directly related to the misconduct alleged against U.S. Cellular and Ms. DiNardo in the prior suit.  Am. Compl. ¶ 19 (alleging that "DiNardo was the owner and shareholder of various alleged 'very small businesses,' associated or formed in partnership with U.S. Cellular"); *id.* ¶ 68 ("In every instance, these entities have ceded control . . . to U.S. Cellular[.]").  Thus, by the time of Auction 97, the FCC had known about Relators' theory regarding U.S. Cellular's arrangements with DE applicants for many years, yet granted Advantage's application after a full disclosure by Advantage of its own agreements with U.S. Cellular.  The prior lawsuit thus represents an additional public disclosure that alerted the government as to Relators' allegations, further

precluding Relators' subsequent claims here.  *E.g.*, *United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 752-53 (10th Cir. 2019) (prior *qui tam* suits represent public disclosure barring subsequent complaint).

### C.    Relators Are Not An Original Source.

Relators previously attempted to avoid the public disclosure bar by arguing that they were an "original source" for the allegations in the complaint, but the Court correctly rejected that contention.  March 31 Order at 11-13.  Nothing in the amended complaint changes that result.

As the Court held previously, the "original source" inquiry "comes down to whether Plaintiff-Relators' surveillance and private investigations materially add to the allegations and transactions already in the public domain."  *Id.* at 11.  Here, as the Court already found, Relators' allegations about Advantage's office space and its reliance on King Street for assistance during the auction "merely add information to that contained in the public FCC filings."  *Id.*  Relators' new allegations about Advantage's spectrum leases and construction notices also cannot establish Relators as an "original source" because "a person who learns of fraud from a public disclosure can never be an original source."  *See Findley* 105 F.3d at 690 (quotation marks omitted).

Relators' "original source" argument has another, independent deficiency.  To qualify as an original source, a relator must provide its alleged independent information to the government *before* the public disclosures giving rise to an inference of fraud or *before* filing suit.  31 U.S.C. § 3730(e)(4)(B).  Relators' amended complaint, however, merely recites that "Relators have independent material knowledge of the information on which the allegations are based and have voluntarily provided the information to the Government before filing this *qui tam* action based on that information."  Am. Compl. ¶ 26.  Other than this rote assertion, the amended complaint contains no information about the "independent material knowledge" that Relators allegedly disclosed to the government, when they disclosed it, and what agency or person they disclosed it

to.  Alleging "mere conclusions" cannot satisfy the requirements of original source status.  *United States ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34, 41-42 (D.D.C. 2013).  For each reason, the public disclosure bar requires dismissal again.

## II.   Relators Do Not Plausibly Allege Facts Establishing Required Elements Of The FCA.

As an independent matter, the amended complaint lacks plausible allegations of facts necessary to establish three required elements of each of Relators' claims:  falsity, scienter, and materiality.  Each deficiency, on its own, requires dismissal.

### A.   Relators Do Not Allege A False Statement.

The amended complaint lacks allegations establishing a false statement by Advantage, a required element of the FCA.  "Disputed legal issues do not constitute fraud" under the statute.  *United States ex rel. Bettis v. Odebrecht Contractors of Cal.*, 297 F. Supp. 2d 272, 291 (D.D.C. 2004).  Similarly, "argumentation and possibility" about legal conclusions under an uncertain legal regime cannot establish a false statement.  *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1378 (D.C. Cir. 2000).  Where there is a "disputed legal question," any "imprecise statements or differences in interpretation growing out of" that question are simply "not false under the FCA."  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 377 (4th Cir. 2008) (quotation marks omitted).  Similarly, "disagreement" regarding a regulatory provision that leaves room for discretion "is not the stuff of fraud."  *United States ex rel. Harman v. Trinity Indus. Inc.,* 872 F.3d 645, 656 (5th Cir. 2017).

Here, most of Relators' allegations regarding supposed false statements boil down to the issue of *de facto* control—*i.e.*, Advantage certified that Mr. Vail had *de facto* control over Advantage, whereas Relators contend that U.S. Cellular actually had control.  *E.g.*, Am. Compl. ¶¶ 77-82, 96, 99-100, 127-28.  But, as reviewed above (Background § A), the FCC's approach to assessing matters of *de facto* control is complex, fact-specific, and open to highly discretionary

conclusions.   The FCC has identified multiple factors that it may consider, but the FCC also explained that it looks to the "totality of circumstances" in each case, and that determinations about control "must be made individually for a particular applicant." *In re Alaska Native Wireless L.L.C.*, 17 FCC Rcd. at 4238.   Some types of "investor protections" that limit the management of a DE in terms of functions like budgeting and executive compensation "generally are acceptable." *Id.* at 4239.   In another case (decided after the auction at issue here), a different set of protections and circumstances was found to transfer *de facto* control, but the FCC stressed that "[a]ny one of these [same] factors or even combinations of them might not amount to *de facto* control" under different facts.  *In re Northstar Wireless*, 30 FCC Rcd. at 8890.

In this context of highly individualized and variable regulatory determinations, Advantage's certification that it was not subject to the *de facto* control of another entity under the FCC's rules could not be a false statement for purposes of the FCA.   Relators disagree with Advantage's legal conclusion about *de facto* control, but a disputed question of regulatory application cannot support Relators' claims here.

### B.   Relators Have Failed To Plausibly Allege Scienter.

For similar reasons, Relators have not—and cannot—allege facts supporting the required element of scienter.   An entity acts with the requisite knowledge under the FCA only when it has (1) actual knowledge, (2) deliberate ignorance, or (3) reckless disregard of both the falsity of the relevant statements and their materiality.  *See United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015).   Negligence is insufficient.   "Congress clearly had no intention to turn the FCA, a law designed to punish and deter fraud, into a vehicle for . . . punish[ing] honest mistakes or incorrect claims submitted through mere negligence." *United States v. Sci. Applications. Int'l Corp.*, 626 F.3d 1257, 1274 (D.C. Cir. 2010) (alteration in original) (quotation marks omitted).   The Supreme Court also has made clear that the FCA's scienter requirement must

be "strict[ly] enforce[d]," including at the motion to dismiss stage.  *See United Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016); *see also Hawkins*, 2020 WL 435490, at *7 ("[C]ourts require plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent" and enforce the scienter requirement strictly. (quotation marks omitted)).

Relators have failed to allege facts meeting those demanding standards, for two principal reasons.  First, the fact that Advantage filed with the FCC multiple agreements that Relators themselves alleged showed that Advantage was under the control of U.S. Cellular precludes any plausible inference that Advantage acted with an intention to deceive the FCC.  As the D.C. Circuit has found, a defendant's voluntary disclosure of the allegedly misstated facts to the government can preclude an inference of scienter.  *See United States ex rel. Burke v. Record Press, Inc.,* 816 F.3d 878, 881 (D.C. Cir. 2016) ("'[T]he knowledge possessed by officials of the United States may be highly relevant' under the False Claims Act because it 'may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth.'" (citation omitted)).  The same analysis applies here.

Second, as discussed above, the alleged "false statement" at the core of Relators' complaint was a matter of regulatory interpretation concerning the FCC's multifactor and case-by-case assessment of *de facto* control.  Am. Compl. ¶¶ 77-82, 96, 99-100, 127-28.  The D.C. Circuit has repeatedly noted the wide flexibility—and thus, uncertainty—inherent in the FCC's multifactor approach.  *E.g.*, *SNR Wireless*, 868 F.3d at 1044 (finding that the FCC "has emphasized the flexibility of the *de facto* control test" and, as a result, there was "considerable uncertainty" about the test at the time of Auction 97); *Tel. & Data Sys., Inc. v. FCC*, 19 F.3d 42, 50 (D.C. Cir. 1994) (holding that the FCC's *de facto* control factors can be applied to "find compliance or

noncompliance" depending on how each factor is weighed in a given case). This Court has similarly recognized that "interpret[ing] ambiguous contract language . . . cannot satisfy the requirement to show that the defendant presented claims knowingly." *United States v. DRC, Inc.*, 856 F. Supp. 2d 159, 168 (D.D.C. 2012); *see also Purcell*, 807 F.3d at 288 (holding that where the alleged falsity "turns on a disputed interpretive question," "establishing even the loosest standard of knowledge [reckless disregard] . . . is difficult." (quotation marks omitted)).

Here, while Relators allege that *they* would apply the FCC's multifactor balancing test to mean that Advantage was "controlled" by the other Defendants, they do not allege any facts giving rise to an inference that *Advantage* knew or should have known that its own contrary view was supposedly wrong. Nothing in the amended complaint, for example, suggests that Advantage was "warned away" from its interpretation by some pronouncement by a court or the FCC. *See Purcell*, 807 F.3d at 287-89. To the contrary, the amended complaint alleges that the FCC has granted licenses to small businesses with similar corporate structures for decades. Am. Compl. ¶¶ 68-70. In light of those alleged facts, and in light of Advantage's voluntarily disclosure of its underlying arrangements related to control, the amended complaint fails to allege a plausible inference of scienter.

###### C.  The Amended Complaint Lacks Plausible Allegations Of Materiality.

Relators' claims also lack plausible allegations of materiality, another required element under the FCA. Advantage acknowledges that the D.C. Circuit recently reversed a dismissal of an FCA claim regarding Auction 97 that was predicated in part on a finding that materiality had not been alleged. *United States ex rel. Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29 (D.C. Cir. 2022). That case, however, did not present the unique circumstances of this case, in which:  (a) Relators filed their complaint in this action *before* the FCC awarded Advantage its licenses, and the FCC awarded the licenses to Advantage nonetheless; and (b) Relators themselves

allege that, since 2002, the FCC has repeatedly awarded DE status to other entities that Relators allege were controlled by U.S. Cellular and Ms. DiNardo, even though each of those entities allegedly transferred control of their licensed spectrum to U.S. Cellular.  Am. Compl. ¶ 68.  Those allegations establish that the government was well aware of Relators' allegations in this case, yet those facts did not alter its decision-making.

Relators have failed to plausibly allege materiality in those circumstances.  As the Supreme Court has stressed, under the FCA, it is not enough to allege that the government *could have* rejected a claim had it known about an alleged violation; the complaint must allege facts establishing that the government likely would have done so.  *Escobar*, 136 S. Ct. at 2003 ("Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay . . . .").  The materiality requirement is "rigorous," subject to a heightened pleading standard under Rule 9(b), and an appropriate basis on which "to dismiss [FCA] cases on a motion to dismiss."  *Id.* at 2004 n.6; *see also United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 85 (D.D.C. 2018).

Under those principles, the government's knowledge of the facts underlying an alleged false claim and its approval of the claim notwithstanding that knowledge creates a high bar to plausibly alleging materiality under the FCA.  As the Supreme Court explained, "materiality look[s] to the effect on the *likely or actual behavior* of the recipient of the alleged misrepresentation."  *Escobar*, 136 S. Ct. at 2002 (emphasis added) (quotation marks omitted) (alteration in original).  Thus, facts showing that the government "pa[id] a particular claim in full despite its actual knowledge that certain requirements were [allegedly] violated" contradict alleged materiality.  *Id.* at 2003; *see also United States ex rel. McBride v. Halliburton Co.,* 848 F.3d 1027, 1032, 1034 (D.C. Cir. 2017) (finding no materiality: "courts need not opine in the abstract when

31

the record offers insight into the Government's actual payment decisions."). Courts therefore dismiss FCA claims where the allegations of the complaint establish that the alleged misstatement did not likely alter the government's decision. *E.g., Comstor Corp.*, 308 F. Supp. 3d at 86-88 (dismissing for lack of materiality where "the government was fully informed for years about the relator's allegations regarding the defendants' purported role in the fraudulent scheme" and continued payment); *United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F. Supp. 3d 32, 55 n.22 (D.D.C. 2018) (dismissing claim where materiality was lacking because "the Army was aware of the practice and paid [the defendant] anyway").

In the same way here, Relators' amended complaint fails to meet the FCA's "demanding" materiality requirement. As reviewed, the public record establishes that the FCC had before it virtually every fact about Advantage's business that Relators allege made Advantage ineligible to be a DE, yet the FCC granted Advantage's application. *See* Argument § I, above. Moreover, the FCC had Relators' complaint in this case because Relators filed it in May 2015, more than a year before the FCC granted Advantage's application in July 2016, yet Relators' allegations did not change the FCC's view. Further, the amended complaint and the 2008 Complaint establish that, for *decades*, the FCC has granted DE status to other entities that Relators have similarly alleged were controlled by U.S. Cellular. *E.g.*, Am. Compl. ¶¶ 68-70. In short, far from plausibly establishing materiality, Relators' allegations instead show that the FCC was well aware of Relators' theory, yet found no reason to change its decisions. That is the opposite of materiality, precluding Relators' claims.

## III.    All Claims Must Be Dismissed.

Relators' Counts Two and Three, for alleged false claims pursuant to 31 U.S.C. § 3729(a)(1)(A) and (B), fail for all the reasons outlined above. Count Four, a so-called "reverse false claim" under § 3729(a)(1)(G), similarly fails because this claim too requires allegations

establishing materiality, scienter, and falsity, which the amended complaint lacks.  *See United States ex rel. Janssen v. Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 & n.7 (10th Cir. 2020).  Finally, Count One, for an alleged conspiracy to make a false claim under § 3729(a)(1)(C), fails because a claim for conspiracy under the FCA requires "an underlying FCA violation."  *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019).  Because Relators' claims for primary violations fail, their conspiracy claims fail as well.  Relators' claims against Sunshine are derivative of their claims against Advantage and fail for the same reasons.

## **CONCLUSION**

For all of the above reasons, Defendants respectfully request that this Court grant this Motion to Dismiss and enter an order dismissing this case with prejudice.

Dated:  June 13, 2022

Respectfully submitted,

By:   /s/  David W. DeBruin

David W. DeBruin
David Bitkower
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001
Telephone: 202.639.6000
Fax: 202.639.6066
ddebruin@jenner.com
dbitkower@jenner.com

Daniel J. Weiss
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60618
Telephone: 312.222.9350
Fax: 312.527.0484
dweiss@jenner.com

*Attorneys for Defendants Advantage Spectrum, LP, Sunshine Spectrum, Inc., and Nonesuch, Inc.*