# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.*
MARK J. O'CONNOR and SARA F.
LEIBMAN,

               Plaintiffs/Relators,

    v.

UNITED STATES CELLULAR
CORPORATION, *et al.*,

               Defendants.

Case No. 20-CV-2070 (TSC)

**ORAL HEARING REQUESTED**

**DEFENDANTS UNITED STATES CELLULAR CORPORATION, USCC WIRELESS INVESTMENT, INC., AND TELEPHONE AND DATA SYSTEMS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS/RELATORS' AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................1

Background .........................................................................................................2

      A.    Statutory and Regulatory Background ........................................2

      B.    FCC Auction 97 and Advantage Spectrum's Partnership with U.S. Cellular ......................................................................................4

      C.    The Prior Qui Tam Action ..........................................................6

      D.    The Present Qui Tam Action ........................................................8

Standard of Review ............................................................................................11

Argument ..........................................................................................................11

    I.    The Public Disclosure Bar Still Requires Dismissal ...............................12

      A.    The Amended Complaint is Still Based on Public Information ...............14

          1.    Public Disclosures in FCC Filings ................................14

          2.    Public Disclosures in the Prior Qui Tam Amended Complaint ...........................................................19

      B.    Relators Are Still Not An Original Source ...............................21

    II.    Relators Fail to Plead Essential Elements of a False Claims Act Violation .........24

      A.    Relators Have Not Plausibly Alleged That U.S. Cellular Made Any Actionable False Statements ..........................................24

          1.    Relators Have Not Plausibly Alleged that Advantage Spectrum Concealed from the FCC Agreements Relevant to Its DE Status ...........................................26

          2.    Relators Have Not Plausibly Alleged that Advantage Spectrum Misrepresented U.S. Cellular's Role in Its Network Buildout ...........................................30

      B.    Relators Have Not Plausibly Alleged That U.S. Cellular Acted With Scienter ..........................................................35

   C.  Relators Have Not Plausibly Alleged That Any False Statement
     Was Material to the FCC's Approval Decision ........................................38

  III.  The Amended Complaint Should Be Dismissed with Prejudice .........................41

Conclusion ....................................................................................................................................42

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anchor Sav. Bank, FSB v. United States*,
  81 Fed. Cl. 1 (2008) ...................................................................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..............................................................................................11, 38

*\*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................11, 26, 27, 31

*Corp. Sys. Res. v. Wash. Metro. Area Transit Auth.*,
  31 F. Supp. 3d 124 (D.D.C. 2014) ...........................................................................41

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
  407 F.3d 1220 (D.C. Cir. 2005) .................................................................................7

*Cover v. Windsor Surry Co.*,
  2016 WL 520991 (N.D. Cal. Feb. 10, 2016) ...........................................................32

*United States ex rel. Davis v. District of Columbia*,
  679 F.3d 832 (D.C. Cir. 2012) .................................................................................13

*\*United States ex rel. Doe v. Staples, Inc.*,
  932 F. Supp. 2d 34 (D.D.C. 2013), *aff'd*, 773 F.3d 83 (D.C. Cir. 2014) ........................ *passim*

*United States ex rel. Folliard v. Comstor Corp.*,
  308 F. Supp. 3d 56 (D.D.C. 2018) ...........................................................................12

*United States ex rel. Gardner v. Vanda Pharm., Inc.*,
  2020 WL 2542121 (D.D.C. May 19, 2020) ..............................................................24

*In re Interbank Funding Corp. Sec. Litig.*,
  629 F.3d 213 (D.C. Cir. 2010) .................................................................................41

*United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*,
  422 F. Supp. 2d 225 (D.D.C. 2006) .........................................................................12

*United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*,
  530 F.3d 980 (D.C. Cir. 2008) .................................................................................37

*United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*,
  929 F.3d 721 (D.C. Cir. 2019) .................................................................................24

*United States ex rel. Lamers v. City of Green Bay*,
  168 F.3d 1013 (7th Cir. 1999) ..................................................................................35

*United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*,
  540 F.3d 1180 (10th Cir. 2008) ................................................................................20

*Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
  276 F.3d 1032 (8th Cir. 2002) ..................................................................................20

*In re Nat. Gas Royalties*,
  562 F.3d 1032 (10th Cir. 2009) ................................................................................20

*United States ex rel. Oliver v. Philip Morris USA Inc.*,
  826 F.3d 466 (D.C. Cir. 2016) ............................................................................13, 20

*United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*,
  2020 WL 686009 (D.D.C. Feb. 11, 2020) ...........................................................11, 34

*Perry Capital LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) ..................................................................................35

*\*United States ex rel. Purcell v. MWI Corp.*,
  807 F.3d 281 (D.C. Cir. 2015) .....................................................................24, 35, 37

*United States ex rel. Reed v. Keypoint Gov't Sols.*,
  923 F.3d 729 (10th Cir. 2019) .............................................................................13, 20

*SEC v. RPM Int'l, Inc.*,
  282 F. Supp. 3d 1 (D.D.C. 2017) ...........................................................................8, 14

*United States ex rel. Shea v. Verizon Commc'ns, Inc.*,
  160 F. Supp. 3d 16 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v.
  Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017) ........................................................12

*United States ex rel. Smith v. The Boeing Co.*,
  825 F.3d 1138 (10th Cir. 2016) ................................................................................37

*SNR Wireless LicenseCo, LLC v. Federal Communications Commission*,
  868 F.3d 1021 (D.C. Cir. 2017) ...........................................................................27, 39

*\*United States ex rel. Springfield Terminal Ry. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ...............................................................................13, 14

*In re Toyota Motor Corp.*,
  785 F. Supp. 2d 883 (C.D. Cal. 2011) .....................................................................32

*United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675 (D.C. Cir.
  1997) ..........................................................................................................................13

*Winter ex rel. United States v. Gardens Reg'l Hosp. and Med. Ctr.*,
  953 F.3d 1108 (9th Cir. 2020) ...........................................................................25

*United States v. Kellogg Brown & Root Servs., Inc.*,
  800 F. Supp. 2d 143 (D.D.C. 2011) ....................................................................25

*\*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016)...................................................................35, 38, 39, 40

*United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless LLP*,
  34 F.4th 29 (D.C. Cir. 2022)........................................................27, 29, 35

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
  389 F.3d 1251 (D.C. Cir. 2004) ...........................................................................11

*Zukerman v. U.S. Postal Serv.*,
  961 F.3d 431 (D.C. Cir. 2020) .............................................................................11

**Statutes & Rules**

*31 U.S.C. § 3729.............................................................................................35

*31 U.S.C. § 3730......................................................................................... *passim*

47 U.S.C. § 301................................................................................................2

47 U.S.C. § 309................................................................................................2

Fed. R. Civ. P. 8......................................................................26, 34, 35, 38

Fed. R. Civ. P. 9......................................................................11, 33, 34, 38

Fed. R. Civ. P. 12...........................................................................................11

**Regulations**

*47 C.F.R. § 1.2110 (2014) .........................................................................2, 3, 26

47 C.F.R. § 1.2110..........................................................................................3, 33

47 C.F.R. § 1.2111............................................................................................4

*47 C.F.R. § 1.9010.................................................................................33, 34, 37

*47 C.F.R. § 1.9020.......................................................................................6, 36

47 C.F.R. § 27.14.............................................................................................6

**FCC Orders**

*Amendment of the Commission's Rules With Regard to Commercial Operations
    in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands,
    29 FCC Rcd. 4610 (2014) ...........................................................................6, 19, 32

Expanding the Economic and Innovation Opportunities of Spectrum Through
    Incentive Auctions,
    29 FCC Rcd. 6567 (2014) ...........................................................................32

Implementation of Section 309(j) of the Communications Act—Competitive
    Bidding,
    9 FCC Rcd. 5532 (1994).............................................................................3

Northstar Wireless, LLC,
    2020 WL 6955431 (F.C.C. Nov. 23, 2020), petition for review filed sub nom.
    Northstar Wireless, LLC v. Federal Communications Commission, No. 20-
    1508 (D.C. Cir. Dec. 18, 2020).....................................................................27, 28

Northstar Wireless, LLC,
    30 FCC Rcd. 8887 (2015)............................................................................27

Stratos Global Corp.,
    22 FCC Rcd. 21328 (2007)..........................................................................36

Updating Part 1 Competitive Bidding Rules,
    30 FCC Rcd. 7493 (2015)............................................................................3

**Other Authorities**

3GPP Global Initiative, Specifications, https://bit.ly/3MoXtL0 (last visited June
    10, 2022) .................................................................................................32

FCC, Universal Licensing System, https://bit.ly/3x3A77T ...........................................4

Jeannette Wannstrom, 3GPP Global Initiative, Carrier Aggregation Explained
    (June 2013), https://bit.ly/395qv4R. ............................................................32

*Asterisks indicate those cases or authorities on which counsel chiefly relies. Local Civ. R. 7(a).

## INTRODUCTION

After Relators suggested that they could re-plead their False Claims Act ("FCA") claims by alleging new non-public information "in great detail," Opinion Granting Motion to Dismiss, ECF 170 at 13 ("MTD Opinion"), the Amended Complaint remains devoid of *any* facts that "materially add to the allegations and transactions already in the public domain," *id.* at 11. At its core, the Amended Complaint is a mere repackaging of the exact claims the Court has already dismissed once under the public disclosure bar, and in which the Department of Justice ("DOJ") has declined to intervene—claims based on allegations and transactions that have been public for years and of which the Government has long been fully aware. This is altogether unsurprising, since Relators are not company insiders purporting to "blow the whistle" on undisclosed conduct; rather, they are private telecom lawyers whose claims are based on agreements publicly filed with the Federal Communications Commission ("FCC") and who do nothing more than reiterate and attempt to extend allegations of a supposedly fraudulent scheme that was alleged in an earlier, failed *qui tam* suit dismissed more than a decade ago. Relators' Amended Complaint remains parasitic of the public record on multiple fronts, and it must be dismissed under the FCA's public-disclosure bar. *See* 31 U.S.C. § 3730(e)(4).

The Amended Complaint also fails because it does not adequately allege the essential FCA elements of falsity, scienter, and materiality. It does not plead that Defendants made *any* false statement, let alone one that misrepresented an objective fact. Indeed, the challenged statements— certifications that certain businesses were qualified to receive small-business subsidies to participate in FCC spectrum auctions—were factually true, legally reasonable, and based on a series of agreements filed *in full* with the FCC. Nor do Relators present well-pled allegations that those certifications were knowingly or even recklessly false. And it is clear from the FCC's own conduct that *if* any of the statements Relators challenge were false (and they were not), they were

1

not material to the Agency's decision to grant the benefits at issue. The FCC had before it all relevant facts underlying the statements and it *still* granted the challenged licenses, and indeed has granted other licenses to the Defendants under similar circumstances.

Each of these defects in the Amended Complaint provides an independent basis for dismissal. This case is ultimately about policy disagreements that Relators purport to have with the FCC's licensing and enforcement decisions; it is categorically not about any fraud on the Government. A policy disagreement cannot establish an FCA violation. U.S. Cellular[1] therefore moves to dismiss Relators' claims with prejudice.

## BACKGROUND

### A.    Statutory and Regulatory Background

Under the Communications Act, the FCC grants geographic licenses to use particular cellular radio frequencies—known as spectrum—through competitive auctions. *See* 47 U.S.C. § 301. Because demand for cellular services is high and the supply of spectrum is limited, auctions for commercial licenses garner hundreds of millions of dollars. In order to encourage smaller businesses to participate in the wireless spectrum market, Congress and the FCC created the Designated Entity ("DE") Program, which provides subsidies to eligible small businesses that participate in spectrum auctions. *See id.* § 309(j)(4)(D).

As relevant here, the DE Program provides eligible businesses with "bidding credits" (i.e., payment discounts) against the purchase price of licenses they win at auction. 47 C.F.R.

---

[1] "U.S. Cellular" in this memorandum refers to defendants United States Cellular Corporation, USCC Wireless Investment, Inc., and Telephone and Data Systems, Inc. Telephone and Data Systems, Inc. owns approximately 82 percent of the equity of United States Cellular Corporation, which owns 100 percent of the equity of USCC Wireless Investment, Inc. USCC Wireless Investment, Inc. is a limited partner and 90% equity owner of defendant Advantage Spectrum.

§ 1.2110(f)(1) (2014).[2] To be eligible for bidding credits, a business's gross revenues must not exceed thresholds set by the FCC. *Id.* § 1.2110(f)(2) (2014).

In calculating eligibility, DE applicants must aggregate their own revenues with other "attributable" revenues and holdings. As relevant here, a DE must aggregate the revenues of its "affiliates," its "controlling interests," and the "affiliates of [its] controlling interests" for purposes of its general eligibility, *id.* § 1.2110(b)(1)(i)-(ii) (2014), as well as—only for determining eligibility on a license-by-license basis—the revenues of any entity that holds both (a) a 10% or greater equity interest in the DE and (b) an "agreement to use[] more than 25 percent of the spectrum capacity of a[ny] license awarded with bidding credits," 47 C.F.R. § 1.2110(c)(2)(ii)(J); *see also id.* § 1.2110(b)(3)(ii) (distinguishing between loss of "eligibility for size-based benefits for one or more licenses" and of "general eligibility for size-based benefits"). Ownership interests that fall outside the definition of "attributable" are not required to be aggregated.

Importantly, these regulations are *not* intended to prevent large wireless companies from investing in DEs. Just the opposite—the FCC recognized that "the primary impediment to participation by designated entities is lack of access to capital," and it explained that the purpose of bid credits is not to bring auction pricing down to a level DEs could afford on their own, but to "encourage large companies to invest in [those] entities." *Implementation of Section 309(j) of the Communications Act—Competitive Bidding*, 9 FCC Rcd. 5532 ¶¶ 10, 15 (1994).

---

[2] Although the relevant FCC rules were amended in late 2015, those changes applied only prospectively. *See Updating Part 1 Competitive Bidding Rules*, 30 FCC Rcd. 7493, 7516 (2015). Advantage Spectrum was subject to the pre-2015 rules with respect to its *original* applications for auction participation and licensure—both of which were filed before the amendments' July 21, 2015 effective date. *Id.* Subsequent "spectrum leases or . . . [other] events affecting . . . [Advantage Spectrum's] ongoing eligibility," however, were subject to the amended rules. *Id.* For the avoidance of any confusion, this memorandum specifies each time it cites to the *2014* edition of the Code of Federal Regulations, and uses undated citations to refer to the *current* edition.

Using a two-step application process consisting of a pre-auction "short-form" application for all participants (FCC Form 175) and a post-auction "long-form" application for successful bidders (FCC Form 601), the FCC exhaustively reviews a DE's eligibility for small business benefits. The FCC has also established a number of rules with which DEs must comply after they are granted a license. Those rules disincentivize DEs from quickly transferring their subsidized spectrum licenses to businesses that would have been ineligible for subsidies in the first instance.

For five years after its initial licensure, if a DE enters into an attributable relationship with an entity that is not eligible for DE treatment, the FCC's "unjust enrichment rule" requires the DE to pay back some of the bid credits it previously received. *See generally* 47 C.F.R. § 1.2111(b). The rules also require the DE to submit an annual report which, *inter alia*, certifies its continuing eligibility for the bid credits. Crucially, all of the submissions required to show a DE's initial and continuing eligibility for benefits—including its Form 175, its Form 601, and its annual reports— are *publicly filed* with the FCC. *See generally* FCC, Universal Licensing System, https://bit.ly/3x3A77T (searchable public databases of licenses and license applications).

### B.    FCC Auction 97 and Advantage Spectrum's Partnership with U.S. Cellular

U.S. Cellular partnered with the other Defendants to support Advantage Spectrum's participation as a DE in FCC Auction 97. Amended Complaint ¶¶ 12-21 (ECF 174) ("Am. Compl."). Under that partnership, USCC Wireless Investment, Inc. was the limited partner in Advantage Spectrum, L.P. and owned 90% of its equity. Frequency Advantage, L.P. was the controlling general partner and owned 10% of Advantage Spectrum's equity. *Id.* ¶¶ 15-16.

Frequency Advantage, in turn, was owned by its general partner, William Vail, and its limited partner, Allison DiNardo. *Id.* ¶¶ 17-18.[3]

Advantage Spectrum submitted its FCC Form 175 short-form application for Auction 97 on November 11, 2014, and it was the high bidder on 124 licenses. *Id.* ¶ 3, ¶ 77 & Ex. 3. Advantage Spectrum received bid credits as a "very small business" but did not receive the actual licenses at that time. *See id.* ¶ 95.

Advantage Spectrum filed its Form 601 long-form application with the FCC on February 12, 2015. *Id.* ¶ 96. It amended its application twice, submitting its final Form 601 on March 31, 2016, nearly one year *after* Relators filed their original Complaint in this case.[4] *See id.* ¶¶ 96, 106-107. After reviewing that application and supporting documents, on July 5, 2016 the FCC granted Advantage Spectrum the licenses it had won in Auction 97.[5]

Importantly, the spectrum licenses that Advantage Spectrum won covered so-called "paired" spectrum. Wireless voice and data services require communication both from the user's device to the tower ("uplink") and from the tower back to the user's device ("downlink"), but simultaneous two-way transmission on a single band of spectrum is generally not possible. To address that need, the FCC frequently auctions spectrum intended for wireless service in paired blocks, with one block dedicated to uplink and one to downlink. As relevant here, during

---

[3] Vail and DiNardo held their respective stakes in Frequency Advantage through wholly-owned corporations. Am. Compl. ¶¶ 17-18. For simplicity, this memorandum refers only to Vail and DiNardo.

[4] Relators refer to this final version of Advantage Spectrum's application in the Amended Complaint, *see* Am. Compl. ¶¶ 106-107, but did not attach it as an exhibit. It is publicly available and was previously filed as Volpe Decl. Ex. I. Citations to "Volpe Decl. Ex. __" refer to the exhibits to the Declaration of Frank R. Volpe in Support of U.S. Cellular's Motion to Dismiss, previously filed in the present case at ECF 155-2.

[5] *See* FCC File No. 0006668843, https://bit.ly/3NL8pnl (last visited June 10, 2022) (noting grant of application on July 5, 2016).

Auction 97 the FCC paired blocks of spectrum in the 2155-2180 MHz band (reserved for downlink) with blocks in the 1755-1780 MHz band (reserved for uplink).[6] *Amendment of the Commission's Rules With Regard to Commercial Operations in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Bands* ("*AWS-3 Order*"), 29 FCC Rcd. 4610, 4612 (2014).

Once Advantage Spectrum received its licenses, FCC regulations required that it "provide reliable signal coverage and offer service within six (6) years . . . to at least forty (40) percent of the population in each of its licensed areas." 47 C.F.R. § 27.14(s)(1). Under regulations that allowed a DE to satisfy its construction obligations by first leasing spectrum to a larger partner and then "attribut[ing] [that partner's coverage] to itself," *id.* § 1.9020(d)(4), (5)(i), Advantage Spectrum disclosed to the FCC in July 2020 that with respect to all or part of its spectrum under 121 different licenses, it would enter into such spectrum manager lease agreements with a U.S. Cellular affiliate. Am. Compl. ¶¶ 124-126 & Ex. 15. As Advantage Spectrum acknowledged, that arrangement triggered unjust enrichment payments for the 43 licenses that were leased in their entirety. *Id.* Ex. 15 at 4, 6 (citing the 25% attribution rule discussed *supra,* at 3).[7]

### C.  The Prior *Qui Tam* Action

On May 2, 2007, a Washington, D.C. law firm named Lampert & O'Connor filed a *qui tam* FCA complaint against U.S. Cellular and DiNardo (among other defendants), which they amended about one year later. *See* Amended Complaint, *United States ex rel. Lampert O'Connor & Johnston P.C. v. Carroll Wireless, L.P.*, ECF 11, No. 1:07-cv-800 (JDB) (D.D.C. Apr. 24, 2008) (this action is hereinafter referred to as the "Prior *Qui Tam* Action," and the Amended Complaint

---

[6] MHz is short for "megahertz," and indicates the frequency of a radio wave. Each spectrum license that Advantage Spectrum won in Auction 97 covered two 5 MHz-wide blocks of spectrum—one dedicated to uplink and one to downlink.

[7] Relators do not allege that Advantage Spectrum failed to make the unjust enrichment payments related to those 43 licenses. *See* Am. Compl. ¶ 125.

therein is hereinafter referred to as the "Prior *Qui Tam* Amended Complaint") (Volpe Decl. Ex. A).[8] Mark J. O'Connor, one of the two relators in the present case, was an attorney at Lampert & O'Connor at that time, and he represented the relator firm in that case. However, neither O'Connor nor Sara F. Leibman (the other relator in the present case) was a relator in, or otherwise a party to, the Prior *Qui Tam* Action.

The Prior *Qui Tam* Amended Complaint made the same core allegations, against many of the same defendants, as Relators do in the present action. *See* Prior *Qui Tam* Amended Complaint ¶¶ 15-28. Specifically, it alleged the same central theory of fraud—that participants in FCC auctions falsely certified themselves as eligible for DE treatment when they were in fact controlled by or otherwise affiliated with U.S. Cellular. *See, e.g.*, *id.* ¶¶ 2-10, 49, 54, 56-57, 59, 60, 62, 64-68. The Prior *Qui Tam* Amended Complaint itself alleged that the actions of the specific defendants in the challenged auctions were not unique, but rather part of a broader "*modus operandi*" by U.S. Cellular. *See id.* ¶¶ 9, 70. That very same "*modus operandi*" is what Relators allege and challenge in the present case.

Both DOJ and the FCC Office of Inspector General ("OIG") investigated the allegations in the Prior *Qui Tam* Amended Complaint, and the FCC asked one of the DEs in that case, King Street Wireless, L.P., to address the prior relator's allegations while King Street's license applications were still pending before the FCC. King Street's public response, published on the FCC docket, has previously been filed in this matter. *See* Response to Inquiry from the Wireless Telecomms. Bureau, *Applications of King Street Wireless, L.P. for Licenses in the 700 MHz Lower*

---

[8] The Court may take judicial notice of this federal court record. *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

*Band*, File No. 0003379814 (May 8, 2009) (Volpe Decl. Ex. B).[9] DOJ and the FCC OIG closed

their investigations without taking any action against U.S. Cellular or any other defendant, and on

October 13, 2009, DOJ formally declined to intervene in the Prior *Qui Tam* Action. After the FCC

granted King Street's spectrum licenses, relator Lampert & O'Connor voluntarily dismissed the

Prior *Qui Tam* Action in January 2010.

     **D.**    **The Present *Qui Tam* Action**

     Relators filed their original Complaint in this case on May 11, 2015. They alleged that

Advantage Spectrum's public FCC filings showed that U.S. Cellular controlled it, and that Relators

had conducted certain minimal surveillance to confirm those already-public facts. *See generally*

Complaint (ECF 2) ("Compl"). In a memorandum opinion filed March 31, 2022, the Court held

that the original Complaint failed to clear the FCA's public disclosure bar, and the Court dismissed

Relators' claims with leave to amend. *See generally* MTD Opinion. The Court's decision rested

on three main grounds:

     **First**, the Court observed that *all six* of the agreements supporting the original Complaint's

allegations of improper control were publicly available. *Id.* at 9-10. By definition, claims that U.S.

Cellular controlled Advantage Spectrum under the terms of those public documents were subject

to the public-disclosure bar because the filings themselves "would have given the Government

sufficient notice to 'adequately investigate the case and to make a decision whether to prosecute.'"

*Id.* at 10 (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1377 (D.C. Cir. 1981)).

     **Second**, the Court held that Relators' "surveillance and private investigations of

Defendants' offices and employees" did not "provide enough [non-public] information to make

the *entire body of evidence* in [their] claim[s] not 'substantially the same' as what ha[d] already

---

[9] The Court may take judicial notice of this document, which was publicly filed with the FCC. *See, e.g.*, *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 10 n.4 (D.D.C. 2017).

been publicly disclosed." *Id.* (quoting 31 U.S.C. § 3730(e)(4)(A)). To the extent those alleged activities revealed any non-public material at all—that U.S. Cellular and King Street employees were involved in the Auction 97 bidding, that the bidding took place at King Street's offices, and that Advantage Spectrum's offices "were unused"—they "merely add[ed] information to that contained in the public FCC filings." *Id.* at 11.

**Third**, the Court concluded that Relators were not the "original source of the information" upon which the original Complaint was based, because their surveillance had uncovered no *new* information beyond allegations "that Advantage [Spectrum]'s offices were vacant and that [one of Advantage Spectrum's designated bidders] was a King Street employee." *Id.* at 12. That smattering of non-public information "d[id] not significantly expand the court's understanding of the essential factual background of this case," and was not "information that might have otherwise influenced the Government." *Id.*

In opposing Defendants' motions to dismiss, Relators told the Court that they had more to offer—"information showing 'in great detail' the degree to which U.S. Cellular actually controlled Advantage [Spectrum]." *Id.* at 13. Based on those assurances, the Court granted Relators leave to file an amended complaint. *Id.* at 14. Because the Court held that Advantage Spectrum's FCC filings alone required application of the public disclosure bar, it did not reach U.S. Cellular's additional argument that the Prior Amended *Qui Tam* Complaint was a public disclosure in its own right. *Id.* at 11 n.6. For the same reason, the Court did not address U.S. Cellular's additional arguments that Relators had in any case failed plausibly to allege the FCA elements of an objectively false statement, scienter, and materiality. *Id.* at 7.

Relators filed their Amended Complaint (ECF 174) on April 29, 2022. Their basic claims remain unchanged from the original Complaint as well as the Prior *Qui Tam* Action—that

Defendants conspired to violate the False Claims Act by abusing the DE program, Am. Compl. ¶¶ 139-146 (Count One); that they falsely claimed auction discounts by misrepresenting Advantage Spectrum's eligibility for bid credits, *id.* ¶¶ 147-150 (Count Two); that they submitted false records and statements in order to deceive the FCC into granting bid credits, *id.* ¶¶ 151-154 (Count Three); and that they made additional false statements in order to avoid returning those credits to the Government, *id.* ¶¶ 155-157 (Count Four).

The main difference between the original Complaint and Relators' second effort is that where the original Complaint alleged that the agreements that Advantage Spectrum disclosed during Auction 97 were the *basis* of its alleged control by U.S. Cellular, *see, e.g.*, Compl. ¶¶ 58-59, 61, 74-78, 84, 87, 91-93, Relators now allege that those agreements *concealed* the control that U.S. Cellular allegedly exercised pursuant to an undefined web of purportedly "secret agreement[s] and understanding[s]," *see* Am. Compl. ¶¶ 70-71, 83, 86, 91-94, 102-104, 107-110, 133-135, 143(c), 143(g).

Unsurprisingly, however, the Amended Complaint still shares its predecessors' fundamental shortcoming. Neither Relator was ever an insider to the alleged scheme, or played any part in the facts giving rise to any of the claims alleged. That is why the Amended Complaint offers no details regarding any of the alleged secret agreements that it posits, and no explanation of how Relators came to discover them. Relators are not whistleblowers. They are private citizens who first claimed that public records *showed* misconduct in Auction 97, but now have made the purely tactical decision to reframe their lawsuit in terms of sheer speculation about what those same filings allegedly *concealed*.

Relators' real disagreement is with the policies and judgment of the FCC Wireless Telecommunications Bureau, which granted the challenged credits and licenses, and with the FCC

OIG, which investigated near-identical allegations against many of the Defendants in the two cases and took no action. Relators' obsession has not persuaded the Government. Indeed, more than a year after Relators filed the present case launching their attack on Defendants' conduct in Auction 97, the FCC granted Advantage Spectrum the licenses—and credits—it won in that proceeding.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12, a complaint must be dismissed unless it contains factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted); *see also, e.g.*, *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 441 (D.C. Cir. 2020) ("[T]o survive . . . [a] motion to dismiss for failure to state a claim . . . , [the] complaint [must] 'contain[] sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'"). Although the Court "assume[s] the truth" of the complaint's allegations and draws all reasonable inferences in favor of the plaintiff, *Zukerman*, 961 F.3d at 441, bare legal conclusions in a complaint are not entitled to the assumption of truth; rather, "they must be supported by factual allegations" to state a claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

For claims sounding in fraud, like those under the FCA, Rule 9(b)'s particularity standard applies. *United States ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1255-56 (D.C. Cir. 2004). FCA claims comply with Rule 9(b) when they plead "the who, what, when, where, and how with respect to the circumstances of the fraud." *United States ex rel. PCA Integrity Assocs., LLP v. NCO Fin. Sys., Inc.*, 2020 WL 686009, at *21 (D.D.C. Feb. 11, 2020).

## ARGUMENT

Relators' Amended Complaint should be dismissed for two reasons. First, the allegations and transactions at the heart of Relators' Amended Complaint were publicly disclosed before the

complaint was filed, and Relators are not an original source under the FCA. *See* 31 U.S.C. § 3730(e)(4). Relators' amendments have not cured the shortcomings identified in this Court's initial ruling, and the Amended Complaint is barred for essentially the same reasons as the original. Second, the Amended Complaint fails to plead, either plausibly or with particularity, key elements of Relators' FCA claims, including objective falsity, scienter, and materiality. Even if the Amended Complaint cleared the public disclosure bar (and it does not), each of those failures to plead an essential element of an FCA violation would still be an independent ground for dismissal.

## I.    The Public Disclosure Bar Still Requires Dismissal[10]

The FCA's public disclosure bar prohibits relators from bringing "parasitic" lawsuits based—even in part—on information already in the public domain. *United States ex rel. J. Cooper & Assocs., Inc. v. Bernard Hodes Grp., Inc.*, 422 F. Supp. 2d 225, 235 n.10 (D.D.C. 2006) ("The FCA's [public disclosure] bar precludes suits by 'individuals who base *any part of their allegations* on publicly disclosed information.'"). "The court shall dismiss" *qui tam* claims "if *substantially* the same allegations or transactions as alleged in the action or claim were publicly disclosed" unless the relator qualifies as an "original source" of the information. 31 U.S.C. § 3730(e)(4)(A), (B) (emphasis added).[11]

"Substantially the same" does not mean "identical"—the bar is triggered where "the relator . . . describe[s] allegations or transactions substantially similar to those in the public

---

[10] The public disclosure bar applies to any *qui tam* "action or claim" brought under the FCA's enforcement provisions, and therefore to each of Relators' causes of action. *See* 31 U.S.C. § 3730(e)(4)(A).

[11] The public disclosure bar was amended in 2010, and the amended version applies to claims "based on post-March 23, 2010 conduct." *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp. 3d 16, 24 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017). Where the former version of the statute imposed a jurisdictional bar, the 2010 amendments "merely deprive[] the plaintiff of his claim." *Id.* at 24. The relevant analysis, however, is unchanged. *See, e.g. United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 3d 56, 71-72 (D.D.C. 2018).

domain." *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997). The question is whether "the government already ha[d] enough information 'to investigate the case and to make a decision whether to prosecute' or whe[ther] the information 'could at least have alerted law-enforcement authorities to the likelihood of wrongdoing.'" *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012). If that standard is met, the public disclosure bar applies even if a relator does provide some new information. "Merely providing 'more specific details' about what happened does not negate substantial similarity." *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 472 (D.C. Cir. 2016). Nor does "a relator's ability to reveal [additional] specific instances of fraud where the general practice has already been publicly disclosed." *Id.* Finally, the public disclosures need not allege any False Claims Act violations. It is enough to reveal "the critical elements of the fraudulent transaction themselves." *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 654 (D.C. Cir. 1994). The D.C. Circuit has framed the inquiry in terms of a formula: "[I]f X+Y=Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.* the conclusion that fraud has been committed." *Id.*

"Public disclosures" for purposes of the Act include disclosures made "in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party," in a "Federal report, hearing, audit, or investigation," and in the "news media." 31 U.S.C. § 3730(e)(4)(A)(ii)–(iii). Because the Government or a relator acting as its agent is a party to every *qui tam* action, a filed *qui tam* complaint is a public disclosure. *Id.* § 3730(e)(4)(A)(i); *see United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 752-53 (10th Cir. 2019).

13

To be an original source under the FCA the relator must, *inter alia*, have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and must have "voluntarily provided the information to the Government before filing" a *qui tam* action. 31 U.S.C. § 3730(e)(4)(B)(2). "[A] relator is not an original source 'simply because he conducted some collateral research and had background knowledge that allowed him to understand the significance of publicly disclosed information.'" *United States ex rel. Doe v. Staples, Inc.*, 932 F. Supp. 2d 34, 41 (D.D.C. 2013), *aff'd*, 773 F.3d 83 (D.C. Cir. 2014).[12]

### A.    The Amended Complaint is Still Based on Public Information

#### 1.    Public Disclosures in FCC Filings

With certain changes in emphasis, the Amended Complaint is based on essentially the same public knowledge as was the original. As in that prior pleading, *all* of the core facts that Relators now allege support an inference of fraud were publicly disclosed, in FCC filings, well before they were first alleged in this Court.[13] Notably, while these publicly-disclosed *facts* remain largely unchanged, Relators have stripped from the Amended Complaint most of the *citations* to the public record, leaving the implicit impression that these allegations trace back to Relators themselves. As summarized in the chart below, however, that is not the case—the allegations are still sourced in public information:

---

[12] The original source exception may also apply where a relator establishes that, "prior to a public disclosure . . . [he or she] has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." 31 U.S.C. § 3730(e)(4)(B). Relators in the present case, however, do not allege that they made such a disclosure. *See* Am. Compl. ¶ 26 (alleging only that they made a disclosure to the Government "before filing this *qui tam* action").

[13] Regulatory filings are public disclosures under the FCA, and an FCC auction is a "Federal . . . administrative hearing in which the Government or its agent is a party" under Section 3730(e)(4)(A)(i). *See Quinn*, 14 F.3d at 652. The records of such a proceeding are publicly-filed and subject to judicial notice. *See, e.g., RPM Int'l*, 282 F. Supp. 3d at 10 n.4.

| Allegation | Amended Complaint | Original Complaint | Public FCC Filing(s) |
|---|---|---|---|
| 1. DiNardo had a history of involvement in DEs (including King Street) in which U.S. Cellular was an investor. | ¶ 68 | ¶¶ 46-47, 51-54 | • Short Form Application (FCC Form 175) of Carroll Wireless, LP, FCC Auction No. 58 (Dec. 23, 2004).[14]<br>• Short Form Application (FCC Form 175) of Barat Wireless, LP, FCC Auction No. 66 (May 10, 2006).[15]<br>• Short Form Application (FCC Form 175) of King Street Wireless, LP, FCC Auction No. 73 (Jan. 2, 2008).[16] |
| 2. U.S. Cellular had acquired spectrum licenses won by Carroll Wireless and Barat Wireless— two earlier DiNardo-affiliated DEs in which it was an investor— shortly after the end of their unjust enrichment periods. | ¶ 68 | ¶¶ 46-47 | • Application for Assignments of Authorization and Transfers of Control (FCC Form 603) from Carroll Wireless, LP to U.S. Cellular Corporation (Sept. 7, 2012).[17]<br>• Application for Assignments of Authorization and Transfers of Control (FCC Form 603) from Barat Wireless, LP to U.S. Cellular Corporation (May 24, 2012).[18] |

---

[14] *Available at* https://bit.ly/3x9kHzd (select "Auction 58," search for file number 0581536056, click on hyperlink under "File Number," click on "Reference Copy," click on "Attachment – Revised Exhibit A").

[15] *Available at* https://bit.ly/3x9kHzd (select "Auction 66," search for file number 0002605271, click on hyperlink under "File Number," click on "Reference Copy," click on "Attachment – Indirect Ownership).

[16] *Available at* https://bit.ly/3x9kHzd (select "Auction 73," search for file number 0003247597, click on hyperlink under "File Number," click on "Reference Copy," click on "Attachment – Exh 2 – Indirect Ownership (Revised)").

[17] *See* FCC File No. 0005379116, https://bit.ly/3O5xCZC (click on "Reference Copy"); *see also* FCC File No. 0005538664, https://bit.ly/3x934zy (click on "Reference Copy") (noting consummation of transfer on December 5, 2012).

[18] *See* FCC File No. 0005231405, https://bit.ly/3aywvTP (click on "Reference Copy"); *see also* FCC File No. 0005383190, https://bit.ly/3xheZfS (click on "Reference Copy") (noting consummation of transfer on September 7, 2012).

15

| Allegation | Amended Complaint | Original Complaint | Public FCC Filing(s) |
|---|---|---|---|
| 3.  U.S. Cellular entered into an agreement with the DiNardo-affiliated King Street, under which U.S. Cellular managed the provision of cellular service using King Street's spectrum, beginning in or around 2011. | ¶ 70 | ¶ 52 | • Long-Form Application (FCC Form 680) of U.S. Cellular at Ex. 2, FCC Auction 901 (June 5, 2013) (disclosing and summarizing provisions of Network Sharing Agreement between King Street and U.S. Cellular).[19] <br>• King Street Wireless, L.P. Notice of *Ex Parte* Communication re: Application of AT&T Inc. and Qualcomm Inc. for Consent to Assign Licenses and Authorizations ("King Street, in conjunction with USCC, plans to provide LTE services in select markets, likely commencing in the first quarter of 2012.")[20] <br>• U.S. Cellular *Ex Parte* Presentation re: Lower 700 MHz Service Rules ("King Street Wireless, L.P. . . . is partnering with U.S. Cellular to deliver high speed 4G LTE service to U.S. Cellular's customers in several of the carrier's markets.").[21] |
| 4.  DiNardo and U.S. Cellular both invested in Advantage Spectrum. | ¶¶ 13-18 | ¶ 16 | • Short Form Application (FCC Form 175) of Advantage Spectrum, LP, |

---

[19] *Available at* https://bit.ly/3x9kHzd (select "Auction 901," search for file number 0005476908, click on hyperlink under "File Number," click on "Winning Bids" tab, select "Show" in "Attachments" column, click on "Amended Exhibit 2 – REDACTED.").

[20] *See Notice of Ex Parte Meeting Held November 29, 2011*, FCC WT Docket 11-18 (Nov. 30, 2011), https://bit.ly/3mHuGXD.

[21] *See The Importance of Lower 700 MHz Interoperability to the Development of the LTE Ecosystem*, FCC WT Docket 12-268 (Dec. 3, 2012), https://bit.ly/3aLlTB7.

| Allegation | Amended Complaint | Original Complaint | Public FCC Filing(s) |
|---|---|---|---|
| | | | FCC Auction No. 97 (Sept. 9, 2014).[22] |
| 5.   King Street/DiNardo provided support to Advantage's bidding process. | ¶¶ 89-92 | ¶¶ 60, 62 | • Frequency Advantage, LP Partnership Agreement (disclosing as part of Advantage Spectrum's Long Form Application that DiNardo would provide "bidding services" to "establish a bidding room and assist in the conduct [of] the Auction Partnership during the Auction").[23] |
| 6.   The licenses Advantage bid on and won in Auction 97 overlapped with or bordered U.S. Cellular's existing coverage areas. | ¶ 94 | ¶ 43 | • Exhibit A to Advantage Spectrum Bidding Protocol (disclosing agreement between U.S. Cellular, Frequency Advantage, and Advantage Spectrum to devote greatest amount of bidding resources to licenses that overlapped with U.S. Cellular's holdings).[24]<br>• Each spectrum license is associated with a particular geographic area, the boundaries of which are maintained in the FCC's publicly-available records.[25] |

---

[22] *Available at* https://bit.ly/3x9kHzd (select "Auction 97," search for file number 0006457325, click on hyperlink under "File Number," click on "Reference Copy," click on "Attachment – Exhibit 2 – Indirect Ownership").

[23] *See* Frequency Advantage, LP Partnership Agreement at 2nd Whereas Clause & § 8.1 (Volpe Decl. Ex. C), *available at* FCC File No. 0006668843, https://bit.ly/3x4mVQd (Mar. 20, 2015) (Click on "Reference Copy," scroll to attachments listed on page 39, click on "LP Agreement – Frequency Advantage").

[24] *See* Advantage Spectrum Bidding Protocol at § 1 and Ex. A (Volpe Decl. Ex. E), *available at* FCC File No. 0006668843, https://bit.ly/3x4mVQd (Mar. 20, 2015) (Click on "Reference Copy," scroll to attachments listed on page 39, click on "Bidding Protocol").

[25] *See, e.g.*, https://bit.ly/3aGj18O (FCC Advanced License Search); FCC File No. 000668853, https://bit.ly/3mgdRTA (listing Advantage Spectrum licenses by callsign and market area; to

| Allegation | Amended Complaint | Original Complaint | Public FCC Filing(s) |
|---|---|---|---|
| 7. Advantage Spectrum satisfied its interim construction requirements by relying on U.S. Cellular to provide 4G LTE service under the terms of spectrum manager lease agreements. | ¶ 115, ¶¶ 124-128 | N/A[26] | • Application or Notification for Spectrum Leasing Arrangement (FCC Form 608) (July 9, 2020) (FCC File No. 0009142976).[27] <br>• Application or Notification for Spectrum Leasing Arrangement (FCC Form 608) (July 9, 2020) (FCC File No. 0009142955).[28] <br>• Application or Notification for Spectrum Leasing Arrangement (FCC Form 608) (July 9, 2020) (FCC File No. 0009146825).[29] <br>• Construction notices disclosing Advantage Spectrum's intent to "rely on the [U.S. Cellular] coverage in its licensed area to meet the interim-term build obligation."[30] |
| 8. With respect to 76 licenses, U.S. Cellular and Advantage Spectrum signed spectrum manager lease agreements that covered a 5 MHz downlink-only band, without the corresponding 5 MHz of uplink spectrum included in | ¶¶ 126, 129-131 | N/A[31] | • Application or Notification for Spectrum Leasing Arrangement (FCC Form 608) (July 9, 2020) (FCC File No. 0009146825) (disclosing agreements to lease spectrum in the 2155-2180 MHz band).[32] |

determine geographic boundaries of a license, click first on callsign hyperlink and then on the "map" tab).

[26] The lease agreements in question post-date the filing of Relators' original Complaint.

[27] Available at https://bit.ly/3alJEQa (click on "Reference Copy").

[28] Available at https://bit.ly/3PTo6KW (click on "Reference Copy").

[29] *Available* at https://bit.ly/3Q0M2Mv.

[30] *See, e.g.*, Application for Radio Service Authorization (FCC Form 601) – Call Sign WQXW444, FCC File No. 0009978232 (Mar. 30, 2022), https://bit.ly/38R8gjs (click on "Reference Copy," scroll to attachments listed on page 9, click on "Build out Demonstration").

[31] The lease agreements in question post-date the filing of Relators' original Complaint.

[32] *Available at* https://bit.ly/3Q0M2Mv (click on "Admin" tab, click on "All Attachments," click on "List and Description of Licenses").

| Allegation | Amended Complaint | Original Complaint | Public FCC Filing(s) |
|---|---|---|---|
| each license under the FCC's spectrum allocation plan. | | | • *AWS-3 Order*, 29 FCC Rcd. at 4612 (ordering that the 2155-2180 MHz band be used for downlink only, and auctioned on a paired basis with uplink-only spectrum in the 1755-1780 MHz band). |

These are the essential bases on which Relators ask the Court to infer that Advantage Spectrum was an illegal front for U.S. Cellular—that it was backed by a limited partner (DiNardo) with whom U.S. Cellular had a long history; that DiNardo provided important support to its bidding decisions; that it decided to bid on licenses geographically proximate to U.S. Cellular's coverage areas; and that U.S. Cellular—consistent with FCC rules—leased those licenses several years later. Notwithstanding Relators' strategic choice not to cite the public records showing each of these points, each is revealed in FCC filings that trigger the FCA's public disclosure bar.

### 2.    Public Disclosures in the Prior *Qui Tam* Amended Complaint

Relators' claims are also barred because they challenge the same purported core "scheme" that was alleged in the Prior *Qui Tam* Action. The Prior *Qui Tam* Action alleged—just like this one—that U.S. Cellular caused entities it controlled to certify falsely that they were eligible for bid credits and other DE benefits.

The only real difference between this case and the Prior *Qui Tam* Action is that this case focuses on an FCC auction that occurred *after* those at issue in the Prior *Qui Tam* Action. U.S. Cellular's central role in the alleged scheme and the core conduct, however, are essentially identical. Indeed, the Amended Complaint in the present case specifically portrays the conduct it alleges as part of a continuing pattern that includes the conduct at issue in the Prior *Qui Tam* Amended Complaint. *See* Am. Compl. ¶¶ 19, 68. The present case merely alleges another example

of what Relators have for years maintained (incorrectly) is U.S. Cellular's fraudulent *modus operandi*.[33] Compl. ¶ 87.

It is irrelevant that the Relators' allegations cover a different auction that occurred after those challenged in the Prior *Qui Tam* Action. The law is clear that claims may be substantially similar to public disclosures, thus triggering the bar, even where a relator "provid[es] 'more specific details'" about a known scheme, *Oliver*, 826 F.3d at 472, or "had background knowledge that allowed him to understand the significance of publicly disclosed information," *Staples*, 932 F. Supp. 2d at 41. And the D.C. Circuit holds specifically that "a relator's ability to reveal [additional] specific instances of fraud where the general practice has already been publicly disclosed is insufficient to prevent operation of the [public disclosure] bar." *Oliver*, 826 F.3d at 472; *see also United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1187 (10th Cir. 2008) ("a subsequent lawsuit can be 'based upon' allegations made in a prior lawsuit even when the two suits cover different periods of time, [if] the 'essential claim[s]' [are] substantially 'similar'" (second alteration in original)). That is precisely the case here.

Thus, the Prior *Qui Tam* Amended Complaint undoubtedly provided the Government with the "essence of" the allegations brought here and was "sufficient to set the Government 'on the trail of the alleged fraud.'" *Reed*, 923 F.3d at 744. That is all the public disclosure bar requires.

---

[33] Even if Relators were to argue that Relator O'Connor was essentially the relator in the Prior *Qui Tam* Action—an argument that would be strikingly at odds with the fact that in the earlier case O'Connor affirmatively chose to be the attorney for the relator law firm and not the relator himself—that would not preclude the Prior *Qui Tam* Action from qualifying as a dispositive public disclosure. The statutory definition of "original source" "does not distinguish between those who first bring a claim to light and others who later make the same discovery independently," *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1048 & n.11 (8th Cir. 2002), and there is "no basis . . . for such an exception" to the public disclosure bar even for prior *qui tam* actions by the *same* relator, *In re Nat. Gas Royalties*, 562 F.3d 1032, 1039 n.3 (10th Cir. 2009).

B.      **Relators Are Still Not An Original Source**

Because their claims are substantially similar to prior public disclosures, Relators must qualify as an "original source" under the FCA in order to maintain this action. 31 U.S.C. § 3730(e)(4)(B). To do so, they must show *both* that they have some "independent knowledge" in addition to what has been publicly disclosed, and that such knowledge "materially adds" to the public record. *Id.* Satisfying the "independent knowledge" prong requires Relators to allege "specific facts—as opposed to mere conclusions—showing exactly how and when [they] . . . obtained direct and independent knowledge of the [nonpublic] fraudulent acts" that they allege. *Staples*, 932 F. Supp. 2d at 41-42. Courts have reached different conclusions on what is required to allege a "material addition." *See* MTD Opinion at 11-12 (summarizing circuit split). This Court need not choose among them because Relators' additions to the public record are neither a "significant[] expan[sion]" of the essential factual basis for their claims, nor "information that might have otherwise influenced the Government." *Id.* at 12.

The Amended Complaint identifies three categories of supposedly non-public and independent allegations. None of them satisfies both requirements for applying the original source exception.

**First**, even though the Court has *already rejected* it as a basis for original source treatment, *id.* at 12, Relators continue to rely on their investigation into Vail's alleged lack of an active permanent business address, Am. Compl. ¶¶ 87-88, 120-121, and the fact that one of Advantage Spectrum's designated bidders for Auction 97 (Stephen Hinz) was a King Street employee, *see id.* ¶ 91. The Amended Complaint adds nothing of substance to the allegations this Court already addressed. It provides a few more immaterial details about how Vail allegedly ran Advantage Spectrum (it did not have a dedicated phone number, and its address apparently moved to other locations Relators believe were unoccupied or unsuitable), *compare* Compl. ¶ 64, *with* Am.

Compl. ¶ 120-121, and simply rephrases identical allegations about Hinz, *compare* Compl. ¶ 62, *with* Am. Compl. ¶ 91. This is still not enough to make Relators an original source.

**Second**, Relators assert, *see* Am. Compl. ¶ 131, that they are an original source because they have "independently verified" that in order to provide the 4G LTE service disclosed in certain of Advantage Spectrum's construction notices, *see supra* at 18 & n.30, U.S. Cellular must be using a greater proportion of Advantage Spectrum's spectrum capacity than the 5 MHz downlink band disclosed in lease notifications filed with the FCC, *see supra* at 18-19 & n.32. Even if this were a factually plausible inference (and it is not, *see infra* at 31-33), it would still fail to satisfy the original source exception because inferences from public information are not materially additive as a matter of law.

Relators pointedly fail to allege that they *actually observed* U.S. Cellular using spectrum not subject to a publicly-filed lease. *Compare* Am. Compl. ¶ 131 (asserting without explanation that Relators "independently verified" their allegations), *with id.* ¶ 72 (alleging that Relators discovered facts about U.S. Cellular's spectrum usage by conducting "engineering field tests"). Rather, they appear to have reviewed the public disclosures discussed *supra* at 18-19—notices alerting the FCC to leases covering spectrum between 2155 and 2180 MHz, FCC orders reserving the 2155-2180 MHz band for downlink use, and reports that U.S. Cellular was using that downlink spectrum to provide 4G LTE service—and concluded based on their understanding of the underlying technology (which requires two-way communication to function) that U.S. Cellular must be using Advantage Spectrum's uplink spectrum as well.[34]

---

[34] In any event, as discussed *infra* at 31-33, relators—who are attorneys and not engineers—base their theory on only a portion of the relevant technical principles, and wholly ignore FCC filings in which Advantage Spectrum made clear that U.S. Cellular would be using the downlink spectrum in question to enhance service it already provided, using uplink spectrum it already had the right to use. *See* Description of Transaction and Public Interest Statement at 2, Application or

That does not materially add to the public record. A relator is not an original source "simply because he . . . had background knowledge that allowed him to understand the significance of publicly disclosed information," *see Staples*, 932 F. Supp. 2d at 41, and that is all Relators did here. Put in terms of the D.C. Circuit's formula, X—Advantage Spectrum's statement that it had only leased U.S. Cellular downlink spectrum— and Y—Advantage Spectrum's statement that U.S. Cellular would use that leased spectrum to provide two-way cellular service—had been publicly disclosed, and Relators added nothing at all on their way to Z—the (incorrect) conclusion that Advantage Spectrum must have lied about the amount of its spectrum that U.S. Cellular had a right to use.

**Third**, Relators repeatedly allege, without explanation or elaboration, the existence of various "secret agreement[s] and understanding[s]" that supposedly contradicted Advantage Spectrum's representations to the Government. *See, e.g.*, Am. Compl. ¶ 83 (secret agreement that Advantage would be acquired by U.S. Cellular after unjust enrichment period), ¶ 102 (Bidding Protocol submitted to FCC allegedly "was a false document . . . created to conceal the undisclosed agreements . . . between U.S. Cellular, Vail, and DiNardo that ceded control of the bidding to U.S. Cellular and DiNardo"), ¶ 103 (alleging the existence of "numerous undisclosed agreements, arrangements, and understandings" bearing on Advantage Spectrum's DE eligibility), ¶ 110 (alleging "numerous agreements that were never disclosed").

Even if the Court accepts them as plausibly pled (which they are not, *see infra* Part II.A.1), that muddle of vague accusations cannot make Relators an original source because they have alleged no facts showing—or even suggesting—"exactly how and when [they] . . . obtained *direct*

---

Notification for Spectrum Leasing Arrangement (FCC Form 608) (July 9, 2020) (FCC File No. 0009146825) (emphasis added), *available at* https://bit.ly/3Q0M2Mv (click on "Admin" tab, click on "All Attachments," click on "Description of Transaction and Public Interest Statement").

*and independent knowledge*" of these supposed secret agreements. *Staples*, 932 F. Supp. 2d at 41-42 (emphasis added). Nor could they—Relators are not insiders to the transactions they claim were fraudulent. They are telecom lawyers who reviewed public FCC filings and drew inferences of covertly coordinated action that the Government was perfectly capable of drawing—or not drawing, as actually happened in this case after multiple investigations—on its own. Relators thus cannot avail themselves of the original source exception to the FCA's public disclosure bar.

## II.     Relators Fail to Plead Essential Elements of a False Claims Act Violation

Each of the FCA counts[35] in Relators' Amended Complaint shares three common elements: they require Relators to plead facts demonstrating that Defendants (1) made a false statement of objective fact, (2) with scienter, (3) that was material to the Government's decision to pay. *See United States ex rel. Gardner v. Vanda Pharm., Inc.*, 2020 WL 2542121, at \*6-7 (D.D.C. May 19, 2020) ("[A]n FCA claim requires the trifecta of falsity, materiality, and scienter."); *see also United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 929 F.3d 721, 728 (D.C. Cir. 2019) (conspiracy liability depends on "establish[ing] an underlying FCA violation"). The Amended Complaint here should be dismissed because Relators have failed adequately to plead any of these three elements.

### A.     Relators Have Not Plausibly Alleged That U.S. Cellular Made Any Actionable False Statements

"[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States ex rel. Purcell v. MWI*

---

[35] *See* Am. Compl. Count One (conspiracy to violate the False Claims Act under § 3729(A)(1)(C) § 3729(a)(1)(A)); *id.* Count Two (knowingly presenting false claims for payment under § 3729(a)(1)(A)); *id.* Count Three (knowingly making false records and statements material to false claims under § 3729(a)(1)(B)); *id.* Count Four (knowingly making false statements to retain money or property owed to the Government under § 3729(a)(1)(G)).

*Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015) (citation omitted); *cf. United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 155 (D.D.C. 2011) (the FCA reaches both factual and legal *falsity*). Here, Relators allege that *as a legal matter* U.S. Cellular's revenues were attributable to Advantage Spectrum, rendering it ineligible for credits, and that Defendants' representations to the contrary were therefore *legally* false. But even claims based on so-called "legally false" certifications ultimately depend on showing that the submissions "implie[d] the existence of *facts* . . . that d[id] not exist." *See Winter ex rel. United States v. Gardens Reg'l Hosp. and Med. Ctr.*, 953 F.3d 1108, 1119 (9th Cir. 2020) (emphasis added) (citing *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742–43 (10th Cir. 2018); *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019)). The Amended Complaint makes no such showing.

Relators assert two primary theories of falsity, both aimed at establishing that U.S. Cellular and/or King Street's revenues were legally attributable to Advantage Spectrum as to all or some of its licenses, rendering Advantage Spectrum ineligible for bid credits (and rendering its corresponding certifications false). First, Relators assert that Advantage Spectrum's certifications of overall eligibility for DE benefits were false because it had actually entered into secret agreements which, if disclosed, would have required attribution of U.S. Cellular and/or King Street's revenues. *See infra* Part II.A.1. Second, Relators claim that Advantage Spectrum's certifications related to its compliance with FCC's construction requirements were false as to certain licenses, because they misrepresented U.S. Cellular's role in providing the service that Advantage Spectrum relied upon to satisfy those obligations. *See infra* Part II.A.2. Both theories fail.

### 1.    Relators Have Not Plausibly Alleged that Advantage Spectrum Concealed from the FCC Agreements Relevant to Its DE Status

Relators gesture toward several legal theories, under different FCC rules, for why U.S. Cellular and/or King Street's revenues should have been attributed to Advantage Spectrum. *See, e.g.*, Am. Compl. ¶¶ 41-42 (*de facto* control under 47 C.F.R. § 1.2110(c)(2)(i) (2014)), ¶¶ 43-45 (affiliation under 47 C.F.R. § 1.2110(c)(5)(ii), (v)-(viii) (2014)), ¶ 46 (joint venturers under 47 C.F.R. § 1.2110(c)(5)(x) (2014)). Factually, however, these are different labels for the same claim—that a purported web of agreements among U.S. Cellular, DiNardo, and Advantage Spectrum should have rendered those revenues attributable but were never disclosed to the FCC.[36]

To the extent this claim relies on a hazy web of allegedly secret agreements, described in general and conclusory terms, it fails because it is not pled with the plausibility that Rule 8 requires. Indeed, the basic inference upon which Relators rely—that because Defendants' publicly-observable actions were arguably *consistent* with the existence of hidden agreements, such agreements must in fact have been made—is indistinguishable from the allegations that the Supreme Court rejected as inadequate in *Twombly*. Here, as in *Twombly*, Relators are outsiders to the alleged conspiracy, who "rest their . . . claim on descriptions of . . . conduct and not on any independent allegation of actual agreement." *See Twombly*, 550 U.S. at 564. Here, as in *Twombly*,

---

[36] *See* Am. Compl. ¶¶ 83, 143(g) (affiliation through alleged secret agreement to merge, *see* 47 C.F.R. § 1.2110(c)(5)(v) (2014)), ¶¶ 86, 91-94, 102, 143(c) (de facto control through alleged secret agreement that U.S. Cellular and DiNardo would control bidding strategy, *see* 47 C.F.R. § 1.2110(c)(2), (c)(5)(ii) (2014)), ¶¶ 103, 109-110, 133 (de facto control through alleged secret agreement that U.S. Cellular would manage and control construction and operations under Advantage Spectrum's licenses during the unjust enrichment period, *see* 47 C.F.R. § 1.2110(c)(2), (c)(5)(ii) (2014)), ¶ 135 (joint venture established through alleged secret agreements to carry on a business for joint profit, *see* 47 C.F.R. § 1.2110(c)(5)(x) (2014)), ¶¶ 86, 91-94, 134 (affiliation based on identity of interest arising from alleged secret agreement that Advantage Spectrum would carry out a bidding strategy "solely for U.S. Cellular's benefit," *see* 47 C.F.R. § 1.2110(c)(5)(iii) (2014)), ¶ 70-71, 104, 107-108 (alleged secret agreement for U.S. Cellular to lease King Street's spectrum).

the few allegations that do "speak directly of agreement . . . are merely legal conclusions resting on the prior allegations." *Id.* And here, as in *Twombly*, where the Defendants' public conduct does not in and of itself "suggest conspiracy"—the FCC reviewed and approved it, and has taken no contrary action during the years-long pendency of this litigation—Relators' "conclusory allegation[s] of agreement at some unidentified point do[] not supply facts adequate to [state a plausible claim]." *Id.* at 556-57.

The D.C. Circuit's recent decision in *United States ex rel. Vermont National Telephone Co. v. Northstar Wireless LLP*, 34 F.4th 29 (D.C. Cir. 2022), illustrates the sort of plausible allegations that are lacking here. *Vermont National* also arose out of Auction 97. Unlike here, the FCC has repeatedly found that the two purported DEs involved in *Vermont National* are *not* entitled to bidding credits because they are *de facto* controlled by their largest investor. *See Northstar Wireless, LLC*, 30 FCC Rcd. 8887 (2015) (denying credits); *SNR Wireless LicenseCo, LLC v. Federal Communications Commission*, 868 F.3d 1021, 1028 (D.C. Cir. 2017) (remanding to FCC with instructions to allow DEs to attempt to cure their ineligibility); *Northstar Wireless, LLC*, 2020 WL 6955431 (F.C.C. Nov. 23, 2020) (finding that DEs remained ineligible for bidding credits), *petition for review filed sub nom. Northstar Wireless, LLC v. Federal Communications Commission*, No. 20-1508 (D.C. Cir. Dec. 18, 2020)*.*

In the *Vermont National* FCA suit, which unsurprisingly followed the FCC's initial denial of bidding credits, the relator alleged that the DEs—purportedly independent from each other and both backed by DISH Network (a large communications provider)—had obtained bid credits by "fail[ing] to disclose agreements to act on DISH's behalf and transfer spectrum rights to DISH." *Id.* at 38. After Judge Kollar-Kotelly granted a motion to dismiss on other grounds, the D.C. Circuit reversed, holding in the process that the relator had plausibly pled its claims.

Unlike the Amended Complaint in this case, the pleadings in *Vermont National* alleged facts that were more than merely *consistent* with an undisclosed agreement that the two DEs would engage in a coordinated strategy to acquire spectrum that DISH would ultimately control:

- Although bidding in Auction 97 was anonymous, the two DISH DEs bid for the same licenses 744 times;

- When the two DISH DEs submitted identical high bids, they frequently accepted the FCC's random selection of the winner, without the random loser submitting a larger bid in the next round as permitted by auction rules;

- The two DISH DEs bid on licenses that left economically irrational gaps in each DE's individual coverage, but would have "afforded complete coverage . . . when combined";

- When each of the two DISH DEs defaulted on its obligation to pay for a portion of the licenses it won, those defaults created more gaps in each individual DE's coverage—but preserved the continuity of their combined holdings; and

- DISH covered the civil penalties each DE incurred as a result of its economically irrational defaults.

*Id.* The D.C. Circuit held that these allegations—which in combination "ma[de] little sense *unless* [the DEs] agreed in advance that DISH would ultimately control the[ir] licenses"—stated a plausible claim that the defendants had concealed their true arrangements from the FCC. *Id.* at 39 (emphasis added).

The Amended Complaint in the present case does no such thing. There is only one allegation in this case remotely similar to the facts the D.C. Circuit found dispositive in *Vermont National*—that Advantage Spectrum only won licenses that overlapped existing U.S. Cellular holdings. *See* Am. Compl. ¶ 94. But Advantage Spectrum's intent to target such licenses as the core of its bidding strategy was *publicly disclosed to the FCC* as part of its license application, *see supra* at 17 & n.24, and the fact that it acted accordingly during Auction 97 can hardly support an

inference that it was really following a different, secret, plan.[37] Nor was that a strategy that would have "ma[de] little sense" without a hidden side deal providing for U.S. Cellular's ultimate control of the licenses. *See Vermont National*, 34 F.4th at 39. Advantage Spectrum had ample reason to focus on geographic areas where its partner had experience operating and assets in place. Indeed, the *entire point* of the DE program is to encourage partnerships in which incumbents like U.S. Cellular make their capital assets and expertise available to new entrants like Advantage Spectrum. *See supra* at 3. Relators cannot claim that Advantage Spectrum falsely withheld relevant agreements from the FCC without alleging any plausible basis to infer that such agreements existed.

Relators likewise fail to state a claim based on the fact that U.S. Cellular's Network Sharing Agreement with *King Street*, *see supra* at 16 & nn.19-21, was not listed in *Advantage Spectrum*'s FCC filings. Specifically, Relators argue that this purported omission rendered false Advantage Spectrum's certification in long-form application that, as required by FCC Form 601, it had disclosed "all agreements and understandings . . . relevant to [Advantage Spectrum's] eligibility as a very small business under the applicable Designated Entity [regulations]." Am. Compl. ¶¶ 107-108 & Ex. 9. That is incorrect. Relators have not explained what conceivable relevance an agreement between U.S. Cellular and King Street, regarding the utilization of King Street's licenses, could have to whether Advantage Spectrum was controlled by or otherwise affiliated with U.S. Cellular within the meaning of the FCC's regulations. And they could not—Form 601

---

[37] Because the *Vermont National* defendants withdrew their public-disclosure arguments in the district court, *see* Reply in Support of Dismissal, ECF 80 at 2 n.2, *United States ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, LLC*, No. 1:15-cv-00728-CKK (D.D.C. June 3, 2019), neither Judge Kollar-Kotelly nor the D.C. Circuit considered whether a "secret agreement" claim could survive the public disclosure bar when alleged by outsiders who allege the existence of such an agreement based on inferences from information in the public domain.

expressly required disclosure only of agreements to which *Advantage Spectrum* was a party. *See* FCC Form 601 Schedule B – Instructions at 2 (rev. Dec. 5, 2014), *archived at* https://bit.ly/3mjJKKG (click "View Information Collection (IC) List," click "Schedule for Geographically Licensed Services"). Advantage Spectrum made *no* certification, in other words, that could have been rendered false merely by omitting to disclose the U.S. Cellular/King Street Network Sharing Agreement.

### 2. Relators Have Not Plausibly Alleged that Advantage Spectrum Misrepresented U.S. Cellular's Role in Its Network Buildout

Relators' new backup theory of falsity is that even if Advantage Spectrum's *initial* certifications regarding its DE status were truthful (they were), the Defendants are nevertheless liable based on three allegedly false certifications made following the end of Auction 97. Each of these post-auction certifications related to U.S. Cellular's role in Advantage Spectrum's construction activities pursuant to the terms of spectrum manager lease agreements publicly disclosed to the FCC. However, none of them is plausibly alleged to have been false.

**First**, Relators allege that Advantage Spectrum falsely represented during its unjust enrichment period that it was engaged in construction planning, when in fact that construction would be carried out by U.S. Cellular. *See* Am. Compl. ¶ 115. But there is nothing *objectively* inconsistent about those statements—the fact that construction was ultimately performed by U.S. Cellular does not conflict with the statement that Advantage Spectrum was involved in planning the buildout process. Indeed, that is exactly the role described in the Advantage Spectrum Partnership Agreement filed with the FCC before Auction 97, which assigned Frequency Advantage (Advantage Spectrum's general partner) the task of "develop[ing] a build-out plan

consistent with the FCC's license retention and renewal provisions." *See* Advantage Spectrum, LP Partnership Agreement § 5.6 (Volpe Decl. Ex. D).[38]

**Second**, Relators claim that Advantage Spectrum avoided unjust enrichment payments on 76 of its licenses by falsely certifying that U.S. Cellular was using less than 25% of each one's spectrum capacity. Am. Compl. ¶¶ 126, 129, 131. As explained *supra*, at 5-6 & 22, Relators' theory is that Advantage Spectrum must have been lying about how much spectrum U.S. Cellular actually used, because it represented both that U.S. Cellular was leasing spectrum licensed for *downlink only*, and that such spectrum was being used in order to provide *two-way* LTE service as required by FCC's buildout rules. There are two reasons, however, that Relators cannot "nudge th[is] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

At the threshold, the public record shows that Advantage Spectrum's portion of the 2155-2180 MHz downlink band was not the *only* spectrum that U.S. Cellular was using to deliver service in the relevant markets. Rather, the lease notification filed by Advantage Spectrum made clear that U.S. Cellular would be using the leased downlink spectrum, on a supplemental basis, to "*enhanc*[*e*] its provision of wireless . . . service" by "utiliz[ing] *additional* spectrum in its *existing* license area." *See* Description of Transaction and Public Interest Statement at 2, Application or Notification for Spectrum Leasing Arrangement (FCC Form 608) (July 9, 2020) (FCC File No. 0009146825) (emphasis added).[39]

To be sure, this meant that U.S. Cellular would be mating Advantage Spectrum's downlink band with spectrum outside the set of uplink frequencies (1755-1780 MHz) with which FCC had

---

[38] *Available at* FCC File No. 0006668843, https://bit.ly/3x4mVQd (Mar. 20, 2015) (click on "Reference Copy," scroll to attachments listed on page 39, click on "LP Agreement – Advantage Spectrum").

[39] *Available at* https://bit.ly/3Q0M2Mv (click on "Admin" tab, click on "All Attachments," click on "Description of Transaction and Public Interest Statement").

paired it for auction. Relators do not allege facts showing any practical or legal obstacle to doing so. *See* Am. Compl. ¶ 131 (concluding without explanation that U.S. Cellular would have had to "control *both* the downlink *and* the uplink spectrum" from Advantage Spectrum's licenses in particular).

Nor do any such obstacles exist. From a technical perspective, the LTE standard (documentation of which is publicly available on the website of the standard-setting organization that maintains it, *see* 3GPP Global Initiative, *Specifications*, https://bit.ly/3MoXtL0 (last visited June 10, 2022), permits wireless carriers to mix and match spectrum groupings, and to add downlink frequencies without also incorporating a symmetrical uplink band, *see* Jeannette Wannstrom, 3GPP Global Initiative, *Carrier Aggregation Explained* (June 2013), https://bit.ly/395qv4R.[40] And from a regulatory perspective, the FCC has repeatedly clarified that nothing in its rules prevents telecommunications providers from taking advantage of that technical flexibility. *See, e.g.*, *AWS-3 Order*, 29 FCC Rcd. at 4625 ("We note that no regulation would prohibit licensees from pairing this uplink band with another present or future licensed downlink band. Indeed, our secondary markets and flexible use policies are designed to facilitate the configuration of licenses in their most productive economic use."); *Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auctions*, 29 FCC Rcd. 6567, 6589-90

---

[40] The Court may take judicial notice of the contents of widely-used technical standards that are readily ascertainable from publications issued by the standard-setting organization that maintains them. *See, e.g.*, *Cover v. Windsor Surry Co.*, 2016 WL 520991, at *1 n.1 (N.D. Cal. Feb. 10, 2016) (taking judicial notice of "technical standards published by [the] American Society of the International Association for Testing and Materials"); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 901-02 (C.D. Cal. 2011) (taking judicial notice of standard promulgated by the International Organization for Standardization); *Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. 1, 97 n.40 (2008) (taking judicial notice of standard promulgated by Federal Accounting Standards Board— a "transparent, reliable professional organization" that offered "the court . . . no cause to question the accuracy of the financial accounting standards posted on the organization's website").

(2014) ("[I]n practice, wireless providers may choose to aggregate 600 MHz downlink-only blocks with [existing holdings in] a high-spectrum band").

In sum, the public record says that U.S. Cellular is leasing Advantage Spectrum's downlink band to "enhance" its LTE services in areas where Relators acknowledge that U.S. Cellular already has other licensed spectrum, and there is no technical or regulatory reason it would have to surreptitiously use Advantage Spectrum's uplink band in order to do so. There is no plausible basis to conclude that Advantage Spectrum falsely underrepresented the scope of that lease.

**Third**, Relators assert that Advantage Spectrum falsely certified that it retained *de facto* control of the licenses covered under its spectrum manger leases with U.S. Cellular. *See* Am. Compl. ¶¶ 119-122, 127. While FCC regulations expressly permitted Advantage Spectrum to enter into spectrum manager leases with U.S. Cellular, 47 C.F.R. § 1.9010(d)(4), it could maintain its status as a valid DE only if it retained *de facto* control of its licenses under the special FCC rules governing such arrangements, *see id.* § 1.9010(a) (defining *de facto* control as element of a valid spectrum manager lease), § 1.2110(b)(4) (providing that a DE "must retain . . . *de facto* control over the spectrum associated with the license(s) for which it seeks small business benefits"). Relators allege that Advantage Spectrum's certifications of continuing eligibility for benefits were false because it surrendered *de facto* control of its licenses to U.S. Cellular. That claim fails because it is implausible, and because Relators have failed to plead it with particularity under Rule 9(b).

The FCC has promulgated specific regulations defining *de facto* control of a license for spectrum leasing purposes. *See id.* § 1.9010.[41] As relevant here, a licensee that enters into a

---

[41] These rules address whether a licensee has retained *de facto* control over (and can thus retain bidding credits associated with) a *particular license* subject to a spectrum lease. They do not address the separate issue of identifying who exercises *de facto* control over the DE *as a whole* for

spectrum lease will be deemed to have kept *de facto* control of the underlying licenses so long as it "act[s] in a manner sufficient to ensure" that the lessee complies with applicable FCC rules through "actual oversight and enforcement of [contractual] provisions," *id.* § 1.9010(b)(1)(i), and "maintain[s] a reasonable degree of actual working knowledge about the spectrum lessee's activities and facilities that affect its ongoing compliance with the Commission's policies and rules," *id.* § 1.9010(b)(1)(ii).

To begin with, Relators do not plausibly allege that Advantage Spectrum either did not or could not fulfill those responsibilities. The Amended Complaint's only factual basis for that claim elevates form over function—Relators rely on allegations that Advantage Spectrum did not have a fixed office or phone line, or a permanent staff. *See* Am. Compl. ¶ 118-122. But Vail, by Relators' own allegation, was a prior "general manager of local [and] regional cellular telephone systems," *id.* ¶ 90—there is no plausible basis to infer that he was incapable of maintaining *de facto* control per FCC's rules.

Moreover, even if that were a plausible inference (it is not), the claim would still fail for lack of particularity under Rule 9(b). Since Relators allege fraud, it is not enough to claim broadly that Advantage Spectrum lacked certain attributes that Relators have arbitrarily decided are "indicia of a wireless company in *de facto* control" of its licenses. *See id.* ¶ 119. Rather, Relators must allege the "who, what, when, where, and how," of Vail's actual failure to meet his obligations under FCC's rules. *See PCA Integrity*, 2020 WL 686009, at \*21. They have not done so, and this final theory of falsity fails under both Rule 8 and Rule 9(b).

---

purposes of its *overall eligibility* for bidding credits. The latter point is analyzed under the FCC's longstanding six-factor test for *de facto* control, discussed *infra* at n.42.

## B.   Relators Have Not Plausibly Alleged That U.S. Cellular Acted With Scienter

Even if Defendants were legally mistaken, however, as to whether Advantage Spectrum was a valid DE, there would be no liability under the FCA because Relators have not pled the scienter the Act requires. *Cf. Vermont National*, 34 F.4th 29 (not reaching scienter issues). The FCA punishes only false statements made with knowledge, deliberate ignorance, or reckless disregard of their falsity, and "does not reach an innocent, good-faith mistake about the meaning of an applicable rule." *Purcell*, 807 F.3d at 287; *see also* 31 U.S.C. § 3729(b). "The FCA is a fraud prevention statute," not a "vehicle for policing technical compliance with administrative regulations," *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999), and there is no liability under the statute for "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations," *Purcell*, 807 F.3d at 288. The Supreme Court has reiterated the need for "strict enforcement" of the FCA's scienter requirement. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016). Relators' claims fall far short of adequately alleging scienter, for three reasons.

**First**, the Amended Complaint essentially fails to allege scienter at all. The Amended Complaint alleges without explanation or differentiation that "the Defendants" had knowledge that Advantage Spectrum was not a valid DE. *See* Am. Compl. ¶¶ 104, 146, 148, 152, 156. It contains no well-pleaded *facts* as to how, why, or when any defendant knew this. Nor could it—as discussed *supra*, Relators are outsiders to the alleged fraud whose lawsuit is based on public documents, not first-hand knowledge of Defendants' decisions. This sparse legal conclusion does not pass muster under Rule 8. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 610 n.9 (D.C. Cir. 2017) ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement") (quoting *Iqbal*, 556 U.S. at 678).

**Second**, Relators cannot plausibly allege scienter because they have not pled an objectively *unreasonable* application of FCC regulations to the Amended Complaint's handful of well-pled facts. There is no objective basis to conclude, for example, that it was anything *but* reasonable for Advantage Spectrum to omit from its FCC filings an agreement to which it was not a party. *See* Am. Compl. ¶¶ 107-108 & Ex. 9 (discussed *supra* at 29-30). Nor would it have been objectively unreasonable for Advantage Spectrum to represent that it was "in the planning stages of construction" during its unjust enrichment period—*even if* it expected at the time that U.S. Cellular would ultimately conduct the required buildout as a spectrum lessee. *See* Am. Compl. ¶ 115 (discussed *supra* at 6). FCC rules permit a licensee to "attribute to itself the build-out or performance activities of its spectrum lessee(s) for purposes of complying with *any* applicable performance or build-out requirement," 47 C.F.R. § 1.9020(d)(5)(i) (emphasis added). Since the applicable regulations deem construction *pursuant* to a spectrum lease to *be* construction by the licensee, it would have been reasonable for Advantage Spectrum to certify that it was "planning" for construction by contemplating entry into an appropriate leasing arrangement. The fact that these interpretations of the FCC's rules were at least objectively reasonable conclusively negates scienter.

The Amended Complaint likewise does not support an inference of scienter as to U.S. Cellular's alleged "control" over Advantage Spectrum as a whole. The FCC evaluates "control" over a DE's overall business according to a complex six-factor balancing test.[42] In light of the

---

[42] *See, e.g.*, *Stratos Global Corp.*, 22 FCC Rcd. 21328, 21343 (2007) ("(1) does the licensee have unfettered use of all the facilities and equipment? (2) who controls daily operations? (3) who determines and carries out the policy decisions, including preparing and filing applications with the Commission? (4) who is in charge of employment, supervision, and dismissal of personnel (5) who is in charge of the payment of financing obligations, including expenses arising out of operations and (6) who receives monies and profits derived from the operation of the facilities?"). These factors are used to evaluate whether a DE's *overall business* is *de facto* controlled by a

FCC's repeated prior approval of similar arrangements, and the disclosure of all the agreements between Advantage and U.S. Cellular, Relators have failed to show that U.S. Cellular's belief that there was no improper control under that open-ended standard was so "indisputably [in]correct as to render [its] certifications '*knowingly* false as a matter of law.'" *United States ex rel. Smith v. The Boeing Co.*, 825 F.3d 1138, 1151 (10th Cir. 2016) (emphasis added); *see also Purcell*, 807 F.3d at 287-88 ("[T]he FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations."); *United States ex rel. K&R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 982-84 (D.C. Cir. 2008) (finding no inference of scienter based on defendant's reasonable interpretation of ambiguous mortgage note, even if defendant's was not ultimately "the better reading").

Advantage Spectrum's conclusion that it was not "controlled" by either U.S. Cellular or DiNardo, per FCC regulations, was not unreasonable as a matter of law. So even if that certification were later determined to be legally wrong, there is no basis to infer that it was *knowingly* wrong when made. The Amended Complaint's conclusory allegations that Advantage Spectrum was party to numerous secret agreements make no difference. *See supra* (discussing implausible allegations lacking particularity). The *well-pled facts* do not show any objective measure of improper control under the FCC's open-ended test.

---

person or entity that is ineligible for bidding credits. With respect to whether a DE that enters into spectrum lease agreements has retained *de facto* control of the *specific underlying licenses* at issue, the FCC has replaced these factors with a specific test codified at 47 C.F.R. § 1.9010. *See supra* at 33-34 & n.41.

**C.     Relators Have Not Plausibly Alleged That Any False Statement Was Material to the FCC's Approval Decision**

"[A] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar*, 579 U.S. at 192. The FCA's "materiality standard is demanding," because the statute is not "a vehicle for punishing garden-variety . . . regulatory violations." *Id.* at 194. And as with scienter, the Supreme Court has emphasized that the materiality requirement should be "rigorous[ly]" enforced. *Id.* at 192.

A false certification is not material if it would not affect the Government's payment decision—this means not only that the Government *could* deny payment based on the false certification, but in fact *would* deny payment if it knew the certification were false. *Id.* at 195 (rejecting Government's suggestion that materiality depends on whether "the government *could* lawfully withhold payment") (emphasis added). In assessing materiality, the Supreme Court directs courts to take into account the Government's actual behavior. If the "Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material." *Id.* Likewise if the Government regularly "pay[s] claims in the mine run of cases" despite that type of noncompliance, it is presumptively not material. *Id.* Relators' allegations of materiality fail for two reasons:

**First**, the Amended Complaint alleges materiality only in conclusory terms. *See, e.g.*, Am. Compl. ¶¶ 153 (alleging that "records and statements" "were material to the Defendants' claims for benefits as a DE"). Simply restating the elements of an FCA claim is facially insufficient under either Rule 8(a) or Rule 9(b). *Iqbal*, 556 U.S. at 687. Likewise, the Amended Complaint stops short of alleging facts to show that the FCC *actually would have denied or reclaimed the bidding credits or denied the licenses* based upon Defendants' purportedly false certifications. Bare recitals

38

that Advantage Spectrum "would have [been] disqualified" from receiving bidding credits under FCC's regulations, *see* Am. Compl. ¶ 81, or that the Commission awarded bid credits "[i]n reliance on" its certifications are insufficient, *see id*. ¶ 144. "A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular . . . requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194.

**<u>Second</u>**, facts alleged in the Amended Complaint—along with others of which this Court can take notice—demonstrate that *if* any of the statements or certifications in issue were false, that falsity was not material to FCC's decision to grant Advantage Spectrum's bid credits and, later, its spectrum licenses as a matter of law.

Here, as the Amended Complaint and public record demonstrate, the FCC unquestionably knew of all of the facts alleged in the Amended Complaint and the alleged scheme, and it *still* decided to grant Advantage's bid credits and spectrum licenses. *See supra* Part I.A.1. The fact that the Government still granted the auction benefits with actual and complete knowledge of the alleged misstatements is the clearest evidence that the Government either disagreed that the statement in issue was false or, if it was false, that it was immaterial to the Government's decision to grant the auction benefits. *See Escobar.* 579 U.S. at 195 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were [allegedly] violated, that is very strong evidence that those requirements are not material."). This inference is particularly strong in the case of Auction 97, where FCC actually scrutinized purported DEs and concluded that two *other* bidders were *de facto* controlled by a large business and therefore not entitled to DE status. *See SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1028 (D.C. Cir. 2017).

The FCC's payment decisions on other auctions confirms this point. Advantage Spectrum was not the first FCC-approved designated entity in which U.S. Cellular had invested—Relators allege it was the fourth in a purported ongoing scheme with DiNardo. Am. Compl. ¶ 68. But the FCC, with full information, approved those arrangements too. The fact that the FCC approved licenses to similarly-structured DEs *four times* over more than a decade strongly suggests that its practice "in the mine run of cases" was to not deny licenses in the face of the type of allegations in Relators' Amended Complaint. Either the FCC did not view any statements or certifications as false, or it viewed any misstatements as immaterial. Regardless, the FCC's decisions to grant licenses, when armed with the facts raised in the Amended Complaint, precludes any finding of an FCA violation here. *See Escobar*, 579 U.S. at 195.

*Vermont National*—in which the D.C. Circuit recently reversed the grant of a motion to dismiss Auction 97-related FCA claims on materiality grounds—does not require a different result. The finding of materiality in that case turned on the relator's plausible allegations of outright hidden agreements between the DISH DEs and their patron, *see supra* at 28, a violation of FCC rules that would (if true) have unambiguously violated the DE program's basic design. There was no doubt, in other words, that the *Vermont National* relator had plausibly alleged a misrepresentation that was at least plausibly material. That is not the case here. As discussed *supra*, at 28-29, the conclusory allegations of secret agreements presented in this case are anything but plausible. And after disregarding those unsupported allegations (as this Court is required to do on a motion to dismiss, *see* Standard of Review, *supra*), what is left is not a claim that Advantage Spectrum concealed or misstated any facts—only a dispute over whether it reached the right legal conclusions as to the propriety of a business model of which the FCC was well aware.

40

Relators' only remaining complaint, in other words, is that Advantage reached the wrong legal conclusion based upon facts that have been repeatedly disclosed to the FCC, in multiple auctions, with respect to multiple DEs. Whatever the ultimate merits of that legal dispute (and Defendants have the better of it for the reasons explained in Part II.A, *supra*), they were manifestly immaterial to the FCC's payment decisions and therefore cannot support a valid claim under the FCA.

## III.    The Amended Complaint Should Be Dismissed with Prejudice

Dismissal with prejudice is appropriate because Relators have already had two chances to state their claims, *see* ECF 176, and any further opportunity would be futile. *See Corp. Sys. Res. v. Wash. Metro. Area Transit Auth.*, 31 F. Supp. 3d 124, 135 (D.D.C. 2014). Amendment is futile if the complaint would be subject to dismissal even as amended, *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010), and that is plainly the case here.

As to the public disclosure bar, the Court gave Relators a second chance to plead, with clear instructions as to what they needed to add if it were possible. They failed to cure the basic defect that led to the first dismissal, and their revised legal theories are no help to their case. There is no basis to believe further amendments would be a productive exercise or would have any chance of stating a valid claim.

The same is true of the other bases for dismissing the Amended Complaint. The public nature of the Prior Amended *Qui Tam* Complaint, the full disclosure to the FCC of the facts at the center of Relators' case, and FCC's continuing approval are not subject to alteration in a new pleading. The Complaint challenges an arrangement that was publicly disclosed years before this case, and which the FCC approved years after. Amendment would be futile, DOJ has already declined to intervene, and the Court should close the book on Relators' last-gasp efforts to keep this meritless suit alive.

**CONCLUSION**

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.


Dated: June 13, 2022                    Respectfully submitted,

                                        /s/ *Frank R. Volpe*

                                        Frank R. Volpe
                                        Robert Joseph Conlan, Jr.
                                        SIDLEY AUSTIN LLP
                                        1501 K Street, NW
                                        Washington, DC 20005
                                        Telephone: 202-736-8000
                                        Fax: 202-736-8711
                                        fvolpe@sidley.com
                                        rconlan@sidley.com

42