**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA**

*ex rel.,*

 **MARK J. O'CONNOR AND SARA F. LEIBMAN,**

Plaintiffs-Relators,

v.

**UNITED STATES CELLULAR CORPORATION,** *et al.*

Defendants.

**Civil Action No.: 20-2070 (TSC)**

**PLAINTIFFS/RELATORS' CONSOLIDATED RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ............................................................................................... 1

I.     BACKGROUND ....................................................................... 2

     A.   Regulatory Framework .................................................. 2

     B.   Statement of Facts ....................................................... 5

II.    STANDARD OF REVIEW ...................................................... 8

III.   ARGUMENT ........................................................................ 11

     A.   The Public Disclosure Bar Does Not Preclude the Amended
         Complaint ................................................................. 11

         1.   The Amended Complaint Alleges that Defendants
             Engaged in a Scheme to Defraud the Government of
             $112,768,000 in DE Bid Credits ................................ 13

         2.   Advantage's FCC Filings Do Not "Publicly Disclose"
             "Substantially the Same Allegations or Transactions"
             Alleged in the Amended Complaint ........................... 15

             a.   Advantage's FCC Filings are not "Public
                 Disclosures" Under the FCA ........................... 15

             b.   Advantage's FCC Filings do not "Disclose" the
                 "Allegations or Transactions" of Fraud that are
                 Alleged in the Amended Complaint. ................ 19

                 i.   The Agreements that Advantage Provided
                     to the FCC Do Not Disclose the
                     "Allegations or Transactions" of Fraud in
                     the Amended Complaint ..................................... 21

                 ii.   Other FCC Filings Unrelated to
                     Advantage's Applications also did not
                     "Disclose" the "Allegations or
                     Transactions" of Fraud Involving
                     DiNardo that are Alleged in the Amended
                     Complaint. .......................................................... 26

                 c.   The FCC Filings do not Disclose "Substantially
                 the Same Allegations or Transactions" as the
                   "Allegations or Transactions" that are Alleged in
                   the Amended Complaint .................................... 29

3.      Relator O'Connor's 2008 Complaint Also Did Not "Publicly Disclose" "Substantially the Same" "Allegations or Transactions" Alleged in the Amended Complaint. ................................................. 30

4.      Relators are the Original Source of the Allegation that Defendants Engaged in a Scheme to Defraud the Government of $112,768,000 in DE Bid Credits ..................... 33

B.   Relators Have Fully and Sufficiently Pleaded All Claims in the Amended Complaint ................................................................. 36

1.      The Amended Complaint Satisfies the Pleading Requirements for Falsity ............................................. 38

2.      The Amended Complaint Satisfies the Requirements for Pleading Materiality .................................................. 42

3.      The Amended Complaint Satisfies the Pleading Requirements for Scienter ......................................... 47

4.      The Amended Complaint Satisfies the Pleading Requirements for Conspiracy ..................................... 51

5.      The Amended Complaint Satisfies the Pleading Requirements for Reverse False Claims ................................... 52

6.      The King Street Defendants Are Liable for False and Fraudulent Claims Regarding Advantage ............................... 53

C.   The Relators Should Be Permitted to Proceed with Their Case Against Defendants ................................................................. 55

IV.   CONCLUSION ................................................................. 55

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States ex rel. Absher v. Momence Meadows Ctr., Inc.*,
   764 F.3d 699 (7th Cir. 2014) ..................................................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................................9, 37

*United States ex rel. Barko v. Halliburton Co.*,
   952 F. Supp. 2d 108 (D.D.C. 2013) ..........................................................................9

*United States ex rel. Beauchamp v. Academi Training Ctr.*,
   816 F.3d 37 (4th Cir. 2016) .......................................................................................9

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................41

*United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*,
   393 F.3d 1321 (D.C. Cir. 2005) .........................................................................38, 45

*United States ex rel. Bid Solve, Inc. v. CWS Marketing Group, Inc.*,
   567 F.Supp.3d 59 (D.D.C. 2021)..................................................................38, 45, 46

*U.S. ex rel. Booker v. Pfizer, Inc.*,
   9 F. Supp. 3d 34 (D. Mass. 2014) ...........................................................................30

*Burnside v. Dep't of Justice*,
   N20-cv-02309, 2022 WL 715181 (D.D.C. Mar. 10, 2022) (Chutkan, J.) ...........................1, 10

*United States ex rel. Campie v. Gilead Sciences, Inc.*,
   862 F.3d 890 (9th Cir. 2017) ...................................................................................44

*Cause of Action v. Chicago Transit Auth.*,
   815 F.3d 267 (7th Cir. 2016) ...................................................................................17

*United States ex rel. Cimino v. Int'l Bus. Machs. Corp.*,
   3 F.4th 412 (D. C. Cir. 2020).............................................................................44, 45

*United States ex rel. Doe v. Staples, Inc.*,
   773 F.3d 83 (D.C. Cir. 2014) .............................................................................20, 36

*United States ex rel. Findley v. FPC-Boron Employees' Club*,
   105 F.3d 675 (D.C. Cir. 1997)...........................................................................29, 31

iii

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.,*
  722 F. Supp. 2d 20 (D.D.C. 2010) ....................................................................37, 47

*United States ex rel. Gear v. Emergency Med. Assoc.,*
  436 F.3d 726 (7th Cir. 2006) ...................................................................................18

*United States ex rel. Groat v. Bos. Heart Diagnostics Corp.,*
  255 F. Supp. 3d 13 (D.D.C. 2017), *amended on reconsideration in part*, 296
  F. Supp. 3d 155 (D.D.C. 2017) ................................................................................38

*United States ex rel. Heath v. AT&T, Inc.,*
  791 F.3d 112 (D.C. Cir. 2015) ................................................................................47

*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.,*
  498 F. Supp. 2d 25 (D.D.C. 2007) .....................................................................11, 15

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.,*
  874 F.3d 905 (6th Cir. 2017) ...................................................................................30

*United States ex rel. Jones v. Sutter Health,*
  18-cv-02067-LHK, 2021 WL 3665939 (N.D. Cal. Aug. 18, 2021) ........................17

*United States ex rel. K & R Limited P'ship v. Mass. Hous. Fin. Agency,*
  530 F.3d 980 (D.C. Cir. 2008) ................................................................................48

*U.S. ex rel. Kester v. Novartis Pharms. Corp.,*
  43 F. Supp. 3d 332 (S.D.N.Y. 2014).................................................................29, 31

*Landau v. Lucasti,*
  No. 1:06-CV-1229, 2010 WL 502972 (D.N.J. Feb. 8, 2010) .................................36

*United States ex rel. Landis v. Tailwind Sports Corp.,*
  160 F. Supp. 3d 253 (D.D.C. 2016) .........................................................................52

*Leveski v. ITT Educ. Servs., Inc.,*
  719 F.3d 818 (7th Cir. 2013) ...................................................................................31

*United States ex rel. Liotine v. CDW Gov't, Inc.,*
  No. 05-33-DRH, 2009 WL 3156704 (S.D. Ill. Sept. 29, 2009).............................18

*U.S. ex rel. Mateski v. Raytheon Co.,*
  816 F.3d 565 (9th Cir. 2016) ............................................................................29, 31

*United States ex rel. Maur v. Hage-Korban,*
  981 F.3d 516 (6th Cir. 2020) ...................................................................................31

*United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.,*
  540 F.3d 1180 (10th Cir. 2008) .........................................................................16, 32

iv

*United States ex rel. McBride v. Halliburton Co.*,
   848 F.3d 1027 (D.C. Cir. 2017) ............................................................38

*United States ex rel. Meyer v. Horizon Health Corp.*,
   565 F.3d 1195 (9th Cir. 2009) .............................................................16

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*,
   608 F.3d 871 (D.C. Cir. 2010) ........................................................38, 51

*In re Minnesota PCS, L.P.*,
   17 FCC Rcd. 126 (2002) .....................................................................50

*United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*,
   812 F.3d 294 (3d Cir. 2016) ............................................................9, 36

*United States ex rel. Morsell v. Symantec Corp.*,
   No. CV 12-800 (RC), 2020 WL 5651277 (D.D.C. Mar. 30, 2020) ........................47

*Nat'l City Mortg. Co. v. Navarro*,
   220 F.R.D. 102 (D.D.C. 2004) ..............................................................10

*United States ex rel. Nevyas v. Allergan, Inc.*,
   Civ. A. No. 09-432, 2015 WL 4064629 (E.D. Pa. July 2, 2015) ..........................48

*North v. Catholic University of America*,
   310 F. Supp. 3d 89 (D.D.C. 2018) .........................................................44

*Northstar Wireless, LLC v. FCC*,
   ___ F.4th __, 2022 WL 2203808 (D.C. Cir. 2022) ................................17, 21, 47

*United States ex rel. Oliver v. Philip Morris USA, Inc. ("Oliver II")*,
   826 F.3d 466 (D.C. Cir. 2016) ....................................................... *passim*

*United States ex rel Oliver v. Phillip Morris (Oliver I)*,
   *763 F.3d 36 (D.C. Cir. 2014)* ....................................................11, 16, 32

*United States ex rel. Osheroff v. Humana Inc.*,
   776 F.3d 805 (11th Cir. 2015) ..............................................................9

*Patterson v. United States*,
   999 F.Supp.2d 300 (D.D.C. 2013) ..........................................................10

*United States ex rel. Paulos v. Stryker Corp.*,
   762 F.3d 688 (8th Cir. 2014) ..........................................................18, 36

*Pencheng Si v. Laogai Research Foundation*,
   71 F. Supp. 3d 73 (D.D.C. 2014) ....................................................9, 37, 52

*United States ex rel. Phalp v. Lincare Holdings, Inc.*,
    857 F.3d 1148 (11th Cir. 2017) ..................................................................48

*United States ex rel. Poehling v. UnitedHealth Grp., Inc.*,
    No. 2:16-CV-08697, 2018 WL 1363487 (C.D. Cal. Feb. 12, 2018) ........................45

*United States ex rel. Prather v. AT&T, Inc.*,
    847 F.3d 1097 (9th Cir. 2017) ....................................................................9

*United States ex rel. Purcell v. MWI Corp.*,
    807 F.3d 281 (D.C. Cir. 2015) ..................................................................48

*U.S. ex rel. Purcell v. MWI Corp.*,
    824 F. Supp. 2d 12 (D.D.C. 2011), *rev'd and remanded*, 807 F.3d 281 (D.C.
    Cir. 2015) ..........................................................................................20

*United States ex rel. R. C. Taylor v. Mario Gabelli, et al.*,
    345 F. Supp. 2d 313 (S.D.N.Y. 2004) ..............................................20, 49, 50, 52

*United States ex rel. Reed v. Keypoint Gov't Sols.*,
    923 F.3d 729 (10th Cir. 2019) ........................................................... *passim*

*United States ex rel. Riedel v. Boston Heart Diagnostics Corp.*,
    332 F. Supp. 3d 48 (D.D.C. 2018) ..............................................................53

*City of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.*,
    No. 15 C 08271, 2016 WL 4203835 (N.D. Ill. Aug. 8, 2016), *aff'd*, 884 F.3d
    798 (7th Cir. 2018) ................................................................................29

*United States ex rel. Rost v. Pfizer, Inc.*,
    507 F.3d 720 (1st Cir. 2007) ....................................................................16

*Schindler Elevator Corp. v. United States ex rel. Kirk*,
    563 U.S. 401 (2011) ..........................................................................17, 19

*United States ex rel. Scollick v. Narula*,
    No. 14-cv-1339 (RCL), 2020 WL 6544734 (D.D.C. Nov. 6, 2020)
    .......................................................................................38, 45, 46, 55

*United States ex rel. Scott v. Pac. Architects and Eng., Inc.*,
    No. 13-1844, 2020 WL 224504 (D.D.C. Jan. 15, 2020) ......................................17

*United States ex rel. Settlemire v. District of Columbia*,
    198 F.3d 913 (D.C. Cir. 1999) ..............................................................20, 31

*United States ex rel Shea v. Cellco Partnership*,
    863 F.3d 923 (D.C. Cir. 2014) ..................................................................19

*United States ex rel. Shea v. Verizon Commc'ns, Inc.*,
  160 F. Supp.3d 16 (D.D.C. 2015) ...........................................................9

*Silbersher v. Allergan Inc.*,
  506 F. Supp. 3d 772 (N.D. Cal. 2020) ..................................................18

*Smith v. Athena Constr. Grp.*,
  18-cv-2080 (APM), 2022 WL 888188 (D.D.C. Mar. 25, 2022)..............9

*United States ex rel. Smith v. The Boeing Co.*,
  825 F.3d 1138 (10th Cir. 2016) ...........................................................48

*SNR Wireless LicenseCo, LLC v. FCC*,
  868 F.3d 1021 (D.C. Cir. 2017)...........................................................47

*United States ex rel. Springfield Terminal Ry. Co. v. Quinn*,
  14 F.3d 645 (D.C. Cir. 1994) ...............................................................19

*United States ex rel. Staggers v. Medtronic, Inc.*,
  15-cv-392 (TSC), 2019 WL 13132849 (D.D.C. Mar. 25, 2019) ..........37

*United States ex rel. Streck v. Bristol-Myers Squibb Co.*,
  No. CV 13-7547, 2018 WL 6300578 (E.D. Pa. Nov. 29, 2018)............48

*United States ex rel. Tran v. Computer Sciences Corp.*,
  53 F. Supp. 3d 104 (D.D.C. 2014) .......................................................54

*United States v. Chattanooga-Hamilton Cty. Hosp. Auth.*,
  782 F.3d 260 (6th Cir. 2015) ...............................................................16

*United States v. Coloplast Corp.*,
  327 F. Supp. 3d 358 (D. Mass. 2018) ..................................................30

*United States v. Comstor Corp.*,
  308 F. Supp. 3d 56 (D.D.C. 2018) ............................................. *passim*

*United States v. DynCorp Int'l, LLC*,
  253 F. Supp. 3d 89 (D.D.C. 2017)........................................................47

*United States v. Kellogg Brown & Root Servs., Inc.*,
  800 F. Supp. 2d 143 (D.D.C. 2011) .....................................................38

*United States v. Newman*,
  No. 16-1169 (CKK), 2017 WL 3575848 (D.D.C. Aug. 17, 2017) ........48

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016)..............................................................44, 45, 46

*United States ex rel. v. Foreman v. AECOM,*
   19 F.4th 85 (2d Cir. 2021) ........................................................................16

*Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC,*
   34 F.4th 29 (D.C. Cir. 2022) ...............................................32, 40, 43, 44

*Vierczhalek v. MedImmune Inc.,*
   803 F. App'x 522 (2d Cir. 2020) ............................................................17

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.,*
   685 F. Supp. 2d 129 (D.D.C. 2010) ......................................................51

*United States ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.,*
   777 F.3d 691 (4th Cir. 2015) ..................................................................16

*United States ex rel. Winkelman v. CVS Caremark Corp.,*
   827 F.3d 201 (1st Cir. 2007) ..................................................................18

**Statutes**

31 U.S.C. §§ 3729(a)(1)(A), (B), (G) ...........................................................54

31 U.S.C. § 3729(a)(1)(C) ............................................................................51

31 U.S.C. § 3729(a)(1)(G) .....................................................................45, 52

31 U.S.C. § 3729(b) ......................................................................................47

31 U.S.C. § 3729(b)(3) .................................................................................53

31 U.S.C. § 3730(e)(4)(A) ............................................................................29

31 U.S.C. § 3730(e)(4)(A)(i)-(iii) ...........................................................11, 16

31 U.S.C. § 3730(e)(4)(A)(iii) ......................................................................33

31 U.S.C. § 3730(e)(4)(B) ............................................................................33

47 U.S.C. § 309(j)(1) ..................................................................................2, 3

**Other Authorities**

47 C.F.R. § 1.945(c) .....................................................................................17

47 C.F.R. §§ 1.2110(b)(1)-(3), 1.2111(b)(1), 27.1106(a) ........................3, 4

47 C.F.R. § 1.2110(c)(5)(i) ...........................................................................12

47 C.F.R. § 1.2110(c)(5)(viii) .......................................................................34

47 C.F.R. § 1.2110(n) ..................................................................................................4

47 C.F.R § 1.2111(b)(1) ..............................................................................................5

47 C.F.R. § 1.2112(b)(2)(ii) .......................................................................................28

47 C.F.R. § 27.14(s)(1)-(2) ..........................................................................................5

47 C.F.R. § 27.14(s)(3) .................................................................................................5

*Application of Ellis Thompson Corp.*, 9 FCC Rcd. 7138 (1994) ................................50

Fed. R. Civ. P. 15(a)(2) ..............................................................................................55

https://www.fcc.gov/licensing-databases/licensing*;*
    https://www.fcc.gov/wireless/universal-licensing-system and
    https://auctionfiling.fcc.gov/form175/search175/index.htm ................................18

*In Application of Baker Creek Comm's, L.P.*, 13 FCC Rcd 18709 (1998) .............34, 50

Local Civil Rule 5.4(d) ...............................................................................................57

*Public Notice*, 29 FCC Rcd 8386, ¶¶ 79-89 (2014) ...................................................50

Rule 8(a) .....................................................................................................................37

Rule 8(a) and Rule 9(b) ...............................................................................................11

Rule 9(b) ...............................................................................................................37, 47

Rule 12(b)(6)......................................................................................................9, 10, 11, 37

## INTRODUCTION

Relators filed their original complaint (the "2015 Complaint") in the Western District of Oklahoma on May 11, 2015. Following the Government's decision not to intervene, the complaint was unsealed on December 5, 2019. On July 30, 2020, the case was transferred from the Western District of Oklahoma to the District for the District of Columbia. Defendants moved to dismiss the complaint on various grounds on October 26, 2020. The Court granted the motion on public disclosure grounds on March 31, 2022, and directed that an amended complaint be filed no later than April 29, 2022. Relators filed their Amended Complaint ("Amended Complaint") on April 29, 2022, and Defendants have again moved to dismiss on public disclosure grounds and for failure to state a claim.

The Amended Complaint, which alleges a complete scheme to defraud the Government between 2014 and continuing through the present, adds substantial new information and expands significantly upon the allegations in the 2015 Complaint. Ignoring the differences between the two complaints, and mischaracterizing the allegations in the Amended Complaint, however, Defendants effectively ask the Court to reissue its opinion dismissing the 2015 Complaint.

While the Court previously found that Advantage's FCC filings in 2014-2015 "publicly disclosed" U.S. Cellular and DiNardo's de facto control of Advantage, neither the Defendants' early filings, nor their later FCC filings, "publicly disclosed" the scheme to defraud that is actually alleged in the Amended Complaint. A comparison of the information disclosed in the filings with the allegations in the Amended Complaint demonstrates that the filings do not "publicly disclose" the fraudulent scheme underlying the filings. The filings, which are neither "public," nor "disclosures of the allegations or transactions," as those terms are defined in the False Claims Act ("FCA"), are the instrumentalities of the scheme, not the means by which it has been exposed. The evidence of the fraud alleged in the Amended Complaint, e.g., that the filings were, in fact, false

representations of Advantage's de facto control; that, since 2014 through the present, Advantage has never functioned as anything other than as a front for U.S. Cellular; and that the licenses and the bid credits were always intended for, and to benefit, U.S. Cellular, came from Relators' independent investigation, information, experience, and knowledge of the wireless industry.

The Amended Complaint includes substantial new evidence and allegations that Advantage's certifications that it was a legitimate, independent Designated Entity under the FCC rules were false; that these certifications were prerequisites for the Government to provide Advantage with $112,768,000 in bid credits toward the purchase of 124 wireless spectrum licenses, and, thus, material; and that Defendants, particularly U.S. Cellular and DiNardo with their long history in the industry, had the requisite scienter. The Amended Complaint adds allegations that, after Advantage received the licenses and bid credits, Defendants continued their fraudulent scheme by filing false and fraudulent DE Annual Reports, spectrum lease notifications, and Construction Notices, which establish their liability for reverse false claims, and further support Relators' allegations of conspiracy and false claims under the FCA. The Amended Complaint amply satisfies the pleading requirements for this case to proceed.

## I.     BACKGROUND

### A.     Regulatory Framework

The FCC allocates spectrum licenses to commercial wireless companies through auctions. 47 U.S.C. § 309(j)(1). Congress has directed the FCC to design auction and licensing rules for wireless spectrum licenses to promote (i) an equitable distribution of licenses and services among geographic areas, (ii) economic opportunity for a wide variety of applicants, including small businesses, and (iii) investment in and rapid deployment of new technologies and services. *Id.* at § 309(j)(4)(C)-(D).

To allow small businesses to compete in the wireless market, the statute directs the FCC to ensure that small businesses "are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures." *Id*. Accordingly, the FCC provides bid credits to "very small businesses" and "small businesses," known as Designated Entities ("DEs"), which are expressed as percentage discounts in the prices they are required to pay for the licenses they win at auction. To prevent large providers from using sham businesses as fronts to acquire these licenses, Congress also directed the FCC to "require such transfer disclosures and anti-trafficking restrictions and payment schedules as may be necessary to prevent unjust enrichment as a result of the methods employed to issue licenses and permits." *Id*. at § 309(j)(4)(E); § 309(j)(3).

The FCC has established eligibility requirements for small business and very small business auction bidders to obtain bidding credits. DEs must: (1) meet the small or very small business size standard, which is measured by their attributable revenues, for the previous three years; *and* (2) retain control over the spectrum associated with the licenses for which it received small business benefits, for the first five years of the license term (*i.e.*, the unjust enrichment period). 47 C.F.R. §§ 1.2110(b)(1)-(3), 1.2111(b)(1), 27.1106(a). In FCC Auction 97, a very small business was eligible for 25% bid credits if its aggregated average gross revenues did not exceed $15 million.

Attributable revenues include the average gross revenues of the applicant, its affiliates, its controlling interests, and the affiliates of its controlling interests, as those terms are defined in the regulations, and must be disclosed in the Short-Form Application (Form 175) to compete in the auction, and in the Long-Form Application (Form 601) to receive the licenses. *Id.* To be eligible for DE status, an applicant must meet the applicable business size standard, and retain both *de jure*

and *de facto* control, as those terms are defined in the statute, over the spectrum associated with the licenses for which it seeks small business benefits. *Id.* at §§ 1.2110(b)(1)-(3), 1.2111(b)(1).

An "affiliate" holds an attributable interest in an applicant if it (a) directly or indirectly controls or has the power to control the applicant; *or* (b) is directly or indirectly controlled by the applicant; *or* (c) is directly or indirectly controlled by a third party (or parties) that also controls or has the power to control the applicant; *or* (d) has an "identity of interest" with the applicant. *Id.* at § 1.2110(c)(5)(i). Entities are affiliates if: (1) they share common management or key employees; (2) they share office space, employees, or other facilities, "particularly where [they] … are in the same or related industry or field of operations;" (3) they are engaged in a joint venture; or (4) one entity is dependent upon the other for contracts and business to such a degree that the other entity has control, or potential control, over the other. *Id.* at § 1.2110(c)(5)(vii)-(x). "Controlling interests" are held by those with either *de jure* control, *i.e.,* holders of more than 50 percent of the voting stock, or *de facto* control, which is determined on a case-by-case basis. *Id.* at § 1.2110(c)(2)(i).

DEs are responsible for the continuing accuracy and completeness of information furnished in a pending application, or in FCC proceedings involving a pending application. *Id.* at § 1.65(a). Once a company has been issued a license as a DE, it must file regular reports and express certifications that it continues to meet the eligibility requirements for five years after receiving the licenses. These "DE Annual Reports" must include "a list and summaries of all agreements and arrangements (including proposed agreements and arrangements) that relate to eligibility for designated entity benefits." 47 C.F.R. § 1.2110(n). If, during the five-year post-licensing period, a DE licensee transfers control of a license to an entity that does not qualify as a DE, it will be

required to repay the bid credits for that license, which are adjusted based on the length of time remaining in the unjust enrichment period. 47 C.F.R § 1.2111(b)(1).

For the licenses in this case, the FCC required the licensee to "provide reliable signal coverage and offer service within six (6) years from the date of the initial license to at least forty (40) percent of the population in each of its licensed areas ('Interim Buildout Requirement')," and to "provide reliable signal coverage and offer service within twelve (12) years from the date of the initial license to at least seventy-five (75) percent of the population in each of its licensed areas ('Final Buildout Requirement')." 47 C.F.R. § 27.14(s)(1)-(2). Failure to meet the Interim Buildout Requirement for a particular licensed area will result in an acceleration of the Final Buildout Requirement and a reduction in the license term from twelve to ten years. 47 C.F.R. § 27.14(s)(3).

## B.    Statement of Facts

In 2015, Defendant U.S. Cellular was the fifth largest wireless company in the United States, with billions of dollars in annual revenues. (*Amended Complaint,* ¶ 1).[1] Notwithstanding its size and resources, U.S. Cellular has repeatedly used sham "very small business" DEs to acquire licenses using several hundred million dollars in Government-provided bid credits. Since at least 2002, Defendant DiNardo has owned various businesses, including Defendant King Street Wireless[2] ("King Street"), that have participated in FCC spectrum auctions as very small business DE fronts for U.S. Cellular to acquire spectrum licenses with DE bid credits while evading the obligation to pay back the bid credits to the U.S. government. (¶ 68). Between 2014 and 2016, the Defendants formed and used Defendant Advantage Spectrum ("Advantage") as another DE front for U.S. Cellular to acquire more spectrum licenses with DE bid credits. (¶¶ 2-3).

---

[1] Unless otherwise noted, all paragraph references (¶) are to the Amended Complaint.
[2] Defendants DiNardo and King Street are variously referred to as "the King Street Defendants," "King Street," and "DiNardo."

On May 19, 2014, the FCC announced an auction of 1614 spectrum licenses in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz bands (the "AWS-3" bands), FCC Auction 97, scheduled to begin on November 13, 2014. (¶ 74). At that time, King Street was the nominal holder of 152 spectrum licenses, which were secretly leased to U.S. Cellular, and were still in the unjust enrichment period. (¶ 69). To prevent FCC scrutiny of DiNardo/King Street, and safeguard King Street's bid credits against an unjust enrichment repayment, U.S. Cellular and DiNardo, engaged with William Vail to form Advantage. (¶¶ 2, 75-76). Through his company, Sunshine Spectrum, Inc., Vail owned 51%, and through her company, Defendant Nonesuch, Inc., DiNardo owned 49%, of Defendant Frequency Advantage, L.P., which owned 10% of Advantage. Through USCC Wireless Investment, Inc. ("USCC"), U.S. Cellular owned the remaining 90% of Advantage. (¶¶ 12-19).

On September 11, 2014, USCC, Frequency Advantage, and Advantage entered into a Bidding Protocol Agreement with respect to FCC Auction 97. (¶¶ 21, 84). On November 11, 2014, Advantage submitted its Short-Form Application to participate in FCC Auction 97 as a very small business DE, falsely certifying that U.S. Cellular and DiNardo did not have controlling interests in, and were not affiliates of, Advantage and, thus, that their revenues, which each exceeded the "very small business" limits, were not attributable to Advantage. (¶¶ 77-79).

FCC Auction 97 began on November 14, 2014, and concluded on January 29, 2015. (¶ 85). Advantage's bidding strategy was controlled and directed by U.S. Cellular and DiNardo, and the licenses selected by U.S. Cellular and DiNardo were in markets overlapping with or adjacent to spectrum already licensed to U.S. Cellular. (¶¶ 86, 94). Advantage conducted its bidding at King Street's offices in Alexandria, Virginia, and DiNardo instructed one of her own King Street

employees to serve as one of the purported DE's two designated bidders. With total gross bids of $451,072,000, Advantage was the high bidder for 124 spectrum licenses in 23 states. (¶ 95).

On February 12, 2015, Advantage submitted its Long-Form Application for the licenses, falsely and repeatedly certifying its eligibility for DE bid credits, including that its sole controlling interest was held by Vail, and that its only affiliates were two Vail-owned entities. (¶¶ 96-103). In the application, Advantage provided false and misleading summaries of its agreements with U.S. Cellular and DiNardo/Nonesuch, which emphasized Advantage's *de facto* control of its operations, and attached the agreements, which, as a whole, painted a mixed picture of Advantage's controlling interests, to the application.

While Advantage's licensing application was pending, the FCC issued a Memorandum Opinion and Order disqualifying two other purported DEs in FCC Auction 97 from receiving DE bid credits, based on controlling interest grounds. (¶ 106, fn. 4). Shortly thereafter, to further shield Advantage from scrutiny, on December 31, 2015, DiNardo/Nonesuch sold her interest in Frequency Advantage to Sunshine Spectrum, making Vail appear to be the sole owner of Frequency Advantage and, thus, of its 10% interest in Advantage. (¶ 105). In February and March 2016, Vail submitted two unusual certifications, stating that Advantage had provided the FCC with all the agreements it had entered into that were required to be listed in the application, and that neither he nor any party acting on his behalf had discussed or contemplated with any person or entity any future agreements or arrangements, including management services agreements. (¶ 106).

On July 5, 2016, relying on Advantage's numerous false certifications of its eligibility, the FCC issued the licenses with $112,768,000 in DE bid credits. (¶ 111). The $338,304,000 net cost was ultimately paid by U.S. Cellular. (¶ 95). Under the FCC rules, Advantage's unjust enrichment period ended on July 5, 2021, and the Interim Buildout date was July 5, 2022. (¶¶ 111, 123).

To retain the licenses without having to repay the DE bid credits during the five-year unjust enrichment period, Defendants also made numerous post-licensing false statements to the FCC. In DE Annual Reports from 2016-2020, Advantage and U.S. Cellular falsely certified and caused to be certified that they had submitted all agreements relating to Advantage's DE benefits, and that Vail had the only controlling interest in Advantage. (¶¶ 112-117). In fact, Advantage was never more than a name with purported business addresses that were either an unmarked storefront or Vail's own residence in a retirement community in Florida. Advantage never functioned as a true business, much less a telecommunications company holding 124 spectrum licenses in 23 states. Between 2016 and 2020, the licenses were simply "parked" with Advantage, which had no means of meeting the conditions attached to them. (¶¶ 112-122).

To meet the six-year Interim Buildout Requirements in time, therefore, Advantage and U.S. Cellular were forced to enter into an arrangement whereby U.S. Cellular could begin to build the networks before the five-year unjust enrichment period had ended. Once the licenses were in Year 5 of the unjust enrichment period, Advantage and U.S. Cellular entered into three purported spectrum manager leases for Advantage's licenses, thereby limiting any unjust enrichment repayments as much as possible under the rules. For forty-three of the licenses, Advantage acknowledged that it might be required to repay the remaining portion of the bid credits; for seventy-six of the licenses, however, Advantage purported to lease less than 25% of the licenses' spectrum capacity, which, under the FCC rules, would not require any unjust enrichment payment for these licenses. (¶¶ 124-128). Since March 2022, Advantage has filed Construction Notices falsely representing that it has met the Interim Buildout requirements. (¶¶ 129-130).

## II.    STANDARD OF REVIEW

Defendants move to dismiss the Amended Complaint on public disclosure grounds and, variously, for alleged failures to plead materiality, scienter, falsity, conspiracy, reverse false

claims, and presentment. Since it was amended as part of the Affordable Care Act in 2010, the public disclosure bar has been construed as providing an affirmative defense under Rule 12(b)(6), placing the burden of establishing it on the Defendants.[3] *United States ex rel. Shea v. Verizon Commc'ns, Inc.,* 160 F. Supp. 3d 16, 24 (D.D.C. 2015), *aff'd sub nom. United States ex rel. Shea v. Cellco P'ship*, 863 F.3d 923 (D.C. Cir. 2017). In reviewing all of Defendants' various motions, therefore, the Court "must view the complaint in [the] light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Pencheng Si v. Laogai Research Foundation*, 71 F. Supp. 3d 73, 85 (D.D.C. 2014). As in any case, the Court must "assume all the allegations in the complaint are true (even if doubtful in fact) and must give [Relators] the benefit of all reasonable inferences derived from the facts alleged." *United States ex rel. Barko v. Halliburton Co.*, 952 F. Supp. 2d 108, 111 (D.D.C. 2013).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the parties have previously briefed, and the Court has granted, Defendants' motions to dismiss the 2015 Complaint on public disclosure grounds, the Amended Complaint supersedes it, and is now the operative complaint in the case. *Nat'l City Mortg. Co. v. Navarro*, 220 F.R.D. 102, 106 (D.D.C. 2004).

---

[3] *See, e.g., Smith v. Athena Constr. Grp.,* 18-cv-2080 (APM), 2022 WL 888188, at *15-16 (D.D.C. Mar. 25, 2022); *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, 160 F. Supp.3d 16, 24 (D.D.C. 2015); *United States ex rel. Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir. 2017); *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 40 (4th Cir. 2016); *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016); *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 810 (11th Cir. 2015); *United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 738 n.1 (10th Cir. 2019).

Defendants' arguments rest largely on assertions of facts outside the Amended Complaint, denials of the allegations in the Amended Complaint based on these assertions, and summary judgment cases decided post-discovery.[4] As the Court has previously noted, "[i]n considering a Rule 12(b)(6) challenge, a court is generally limited to consideration of the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which a court may take judicial notice, and matters of public record." *Burnside v. Dep't of Justice*, N20-cv-02309 (TSC), 2022 WL 715181, at *3 (D.D.C. Mar. 10, 2022) (Chutkan, J.). "Even if, [however], a court considers a document attached to a motion to dismiss, the court must still construe all well-pleaded factual allegations in the plaintiff's favor, *especially if the parties disagree about the nature of the evidence*."[5] *Patterson v. United States*, 999 F.Supp.2d 300, 306 (D.D.C. 2013) (emphasis added). A relator need only "provide the 'who,' 'what,' 'when,' and 'where' with respect to the circumstances of the fraud," and allege "sufficient information to allow for preparation of a response." *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 68 (D.D.C. 2018)

The Amended Complaint, which describes in detail the independent bases for Relators' allegations of fraud, is not subject to, and easily clears the public disclosure bar, while the detailed

---

[4] *See, e.g., King Street Wireless ("KSW") Memo* pp. 21, 25, 26 (asserting that the DOJ and FCC investigated the 2008 Complaint and then granted the licenses to King Street as support for the claim that the earlier investigation put the Government on notice of the 2014-2022 fraud alleged in the Amended Complaint, where these alleged facts are disputed); *Advantage Memo*, p. 25 (asserting that the FCC granted the licenses to Advantage even though it was aware of previous allegations involving U.S. Cellular and the use of DEs, where there has been no discovery into the FCC's decision regarding Advantage, and the decision was, as the D.C. Circuit has noted, *see infra*, a "wholly unexplicated ruling"); *U.S. Cellular ("USC") Memo*, pp. 29, 37 (asserting reasons why Advantage would have selected overlapping spectrum to deny the allegation that the licenses were purchased for U.S. Cellular's use and eventual integration with its existing networks).

[5] *KSW Memo, Exhibits E through J, Exhibit L*, and *USC Memo*, pp. 15-16, fns. 14-21 all direct the Court to documents regarding issues that are beyond the scope of this motion to dismiss, and the nature of which, as well as the inferences to be drawn from them, are very much in dispute. *See infra*, at pp. 27-28, and fn. 21.

allegations describing the fraudulent scheme and the manner in which it has been carried out are more than sufficient to satisfy the pleading requirements in both Rule 8(a) and Rule 9(b). The Amended Complaint clearly states "a claim upon which relief can be granted" under Rule 12(b)(6).

## III.   ARGUMENT

### A.   The Public Disclosure Bar Does Not Preclude the Amended Complaint

Defendants first argue that Relators' claims are precluded by the FCA's public disclosure bar, which, as amended in 2010, provides that:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> > (iii) from the news media,
> > unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A)(i)-(iii).

The bar applies only when the "disclosure" has been made "public" through one of the channels listed in the statute, and the alleged "public disclosure" consists of "allegations or transactions" that are "substantially the same" as those alleged in the complaint. *See, e.g., United States ex rel Oliver v. Phillip Morris (Oliver I), 763 F.3d 36, 42 (D.C. Cir. 2014); United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 41 (D.D.C. 2007). The court reaches the "original source" inquiry only if these statutory requirements have been met. *See Oliver I, 763 F.3d at 39 n.3 (citing United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653 (D.C. Cir. 1994)); *Reed,* 923 F.3d at 743 n.5.

Defendants argue that certain provisions in the various agreements that were attached to Advantage's Long-Form Application, as well as the subsequent spectrum manager lease

notifications, "publicly" disclosed "substantially the same allegations or transactions" that are alleged in the Amended Complaint.[6] (*USC Memo*, pp. 14-19; *Advantage Memo*, pp. 20-25; *KSW Memo*, pp. 10-18). These agreements are not "public disclosures" as the statute defines them, and did not "disclose the allegations or transactions" of fraud in the Amended Complaint as the statute requires.[7] Furthermore, the provisions cited were contradicted by other provisions in the same agreements, and denied by the repeated false and fraudulent certifications expressly attesting to Advantage's qualifications as a DE, while the summaries of the agreements, which were included in the application itself, either failed to mention or obscured the cited provisions, and emphasized provisions that purportedly supported Advantage's DE claims.[8] (*Amended Complaint, Exhibit 8*, pp. 5, 6, 10-20).

Defendants also argue that the 2008 Complaint, for which Relator O'Connor was a source and, through his law firm, also a relator, alleged substantially the same allegations as the Amended Complaint, and further bars the Amended Complaint. (*USC Memo*, pp. 19-20; *Advantage Memo*, pp. 25-26; *KSW Memo*, pp. 21-27). Based on the facts and circumstances of the two cases, however, as well as the seven-year lapse in time, the 2008 Complaint clearly does not disclose, as

---

[6] The allegations in the Amended Complaint are not, as Defendants would have it, mere "policy disagreements" with "the FCC's licensing and enforcement decisions," (*USC Memo*, p. 2; *see also KSW Memo*, pp. 36-37), but well-documented allegations of fraud.

[7] Relators understand the Court's prior ruling on this point, however, and respectfully request that the Court consider the additional evidence and added allegations in the Amended Complaint, in light of the arguments and case law in this memorandum.

[8] Relators have also alleged that, based on the "true" facts of its relationship with U.S. Cellular, U.S. Cellular and King Street were *affiliates* of Advantage, 47 C.F.R. § 1.2110(c)(5)(i), and engaged in a *joint venture* with Advantage, *id,* at § 1.2110(c)(5)(x)(A)-(B), and, thus, ineligible on these bases as well. (¶¶ 81, 132, 134, 135). Defendants have not argued, however, that information disclosing Advantage's affiliation and joint venture relationships was "publicly disclosed" in the FCC filings.

the statute requires, "substantially the same allegations or transactions" that are alleged in the Amended Complaint.

The Amended Complaint adds sufficiently to the allegations in the 2015 Complaint that it clears the public disclosure bar, and Defendants' arguments reflect their misreading of the allegations in the Amended Complaint. Even if substantially the same allegations or transactions in the Amended Complaint were publicly disclosed as the statute requires, however, the statute still precludes dismissal because the Relators are the "original source" of the information.

1.    **The Amended Complaint Alleges that Defendants Engaged in a Scheme to Defraud the Government of $112,768,000 in DE Bid Credits**

As preface, and the underlying premise for their public disclosure arguments, Defendants argue that the Amended Complaint contains the same allegations, and relies on the same or similar evidence that the Court previously considered in its earlier decision.[9] (*USC Memo*, pp. 1, 8-10, 14-19; *Advantage Memo*, pp. 1, 22-23, 26; *KSW Memo*, pp. 1, 9-14). In general, and in particular with respect to the public disclosure bar, Defendants misread the Amended Complaint.[10]

---

[9] Defendants seem to suggest that an amended complaint may not allege the same scheme or fraud that was alleged in an original complaint, (*USC Memo,* pp. 14-19*; KSW Memo,* pp. 12-13) but offer no support for this assertion. Furthermore, it is not clear why neither of King Street's charts alleging similarities between the 2015 Complaint and the Amended Complaint, and between the 2008 Complaint and the Amended Complaint, (*KSW Memo,* pp. 12-13, 23-24) mention or address the new allegations in the Amended Complaint.

[10] Defendants assert that the Amended Complaint deleted references to the agreements described in the 2015 Complaint. (*KSW Memo*, pp. 11-14; *USC Memo*, p. 14). In fact, the Amended Complaint refers throughout to the agreements Defendants entered into, the false and fraudulent summaries of the agreements that were provided to the FCC, and the agreements that were concealed from the FCC. The 2015 Complaint alleged an auction and pre-licensing scheme to defraud, while the Amended Complaint adds substantial new allegations of the full scheme to defraud that was carried out between 2014 and 2022, including that, while the agreements were submitted once in 2015, Defendants made repeated submissions of the false and fraudulent summaries between 2015 and 2020. (¶¶ 101-104; 106-110; 112-117). Relators' independent evidence demonstrates the falsity in the submissions, even as it establishes which provisions in the agreements were intended to be enforced and which were window-dressing for the FCC's benefit.

The "core allegation" in the Amended Complaint is not, as Defendants would limit it, that U.S. Cellular controlled Advantage and its licensed spectrum, but that the Defendants established and used Advantage as a vehicle for U.S. Cellular to fraudulently obtain, use, and retain spectrum licenses with $112,768,000 in DE bid credits. (*See, e.g., ¶¶ 2-9; 69, 71, 73, 75, 76, 83, 86, 94, 103, 118-122; 124-126; 135, 136, 137, 141*). The Amended Complaint alleges that the Defendants carried out their scheme to defraud, in part:

- by forming a shell company, Advantage, that never functioned as anything *but* a front for U.S. Cellular, (*See, e.g., ¶¶* 5, 75-77, 83-84, 94, 118-122, 136);

- by filing false and fraudulent documents and certifications of *de facto* control with the FCC, (*See, e.g., ¶¶* 8, 9, 77-82, 84, 96-102, 106-110, 112-117, 126-128, 129-131);

- by minimizing, concealing, and misrepresenting evidence of *de facto* control in the agreements they disclosed, (*See, e.g., ¶¶* 7, 48, 51-55, 84, 93, 102, 104, 106); and

- by entering into numerous secret agreements that they never disclosed to the FCC, despite being required to do so. (*See, e.g., ¶¶* 4, 7, 52, 53, 55-58, 60, 70-73, 83, 97, 101, 103, 104, 106-110, 112-117, 135, 137, 141, 142).

Defendants also overlook the numerous allegations of Defendants' *continuing* fraudulent scheme, which materially add to the already substantial allegations made by Relators in the 2015 Complaint, including that:

- after questions had been raised regarding other purported DEs in FCC Auction 97, and while Advantage's Long-Form application was pending, DiNardo was removed from Advantage to prevent scrutiny of her/U.S. Cellular's other DEs;

- after they were granted, the licenses were simply "parked" with Advantage;

- Advantage never acted as the owner of the licenses, or as a wireless company;

- Advantage existed only on paper;

- Advantage continued to file false and fraudulent certifications and documents with the FCC to preserve the bid credits for U.S. Cellular;

- Advantage and U.S. Cellular entered into the spectrum manager lease agreements at the latest possible time to minimize any unjust enrichment payment and to prevent the license terms from being reduced; and

- the spectrum manager leases confirmed that Defendants always intended, and had entered into secret agreements, to transfer the licenses formally to U.S. Cellular without having to repay the bid credits.

(*See, e.g., ¶¶* 4, 5, 7, 70-73, 75, 83, 105, 112-122; 124-131).

### 2. Advantage's FCC Filings Do Not "Publicly Disclose" "Substantially the Same Allegations or Transactions" Alleged in the Amended Complaint

Advantage's FCC filings were submitted over an 8-year period, and are located in different databases that are accessible only through the FCC's Universal Licensing System (ULS) and Auction Application Search databases. The question here is whether Advantage's statements attesting to its eligibility for Government-provided DE benefits qualify as "public disclosures" "of the sort contemplated by the statute"—and the clear answer is that they do not. *Hockett*, 498 F. Supp. 2d at 46.

a.   Advantage's FCC Filings are not "Public Disclosures" Under the FCA.

Advantage's FCC filings were submitted *to* the FCC's Wireless Telecommunications Bureau as part of the FCC's spectrum licensing process. A disclosure requires both "an affirmative act" and a "recipient to whom the information is revealed;" here, the "recipient" is the Government; and, as the courts have noted, "the Government is not the equivalent of the public." *United States*

*ex rel. Wilson v. Graham Cty. Soil & Water Conservation Dist.,* 777 F.3d 691, 696 (4th Cir. 2015); *see also United States ex rel. v. Foreman v. AECOM,* 19 F.4th 85, 123 (2d Cir. 2021) ("the phrase 'public disclosure' would be superfluous" if 'providing information to the government were enough to trigger the bar'"); *United States v. Chattanooga-Hamilton Cty. Hosp. Auth.,* 782 F.3d 260, 268 (6th Cir. 2015) ("§ 3730(e)(4) requires some affirmative act of disclosure to the public outside the government"); *United States ex rel. Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1201 (9th Cir. 2009) ("even when the government has the information, it is not publicly disclosed under the Act until it is actually disclosed to the public"); *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, 540 F.3d 1180, 1186 (10th Cir. 2008); *United States ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 728 (1st Cir. 2007) ("a 'public disclosure' requires that there be some act of disclosure to the public outside of the government"). As the D.C. Circuit has said, the "plain text of the public disclosure bar delineates three channels" through which information is public "for purposes of invoking the bar," and "[t]he government's own, internal awareness of the information is not one such channel." *Oliver I,* 763 F.3d at 42.

More specifically, the FCA requires that the alleged "disclosure" have been made "public" (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media. 31 U.S.C. § 3730(e)(4)(A)(i)-(iii). "If the public disclosure did not occur through a statutorily enumerated channel, the jurisdictional bar does not operate." *United States ex rel. Oliver v. Philip Morris USA, Inc. ("Oliver II")*, 826 F.3d 466, 474 (D.C. Cir. 2016).

Advantage's FCC filings were not made through the required channels. First, the FCC's licensing proceedings are not "Federal criminal, civil, or administrative hearing[s]." The FCC's

Wireless Telecommunications Bureau, which received the filings, processes applications for licenses and other filings. Under the FCC rules, the Bureau determines whether bidders are eligible for DE bid credits based on the bidders' certifications in required filings, and, if the application is proper upon its face, "*without a hearing.*" 47 C.F.R. § 1.945(c). (emphasis added). The Bureau's decision to award bid credits to Advantage was based on the Long-Form Application, and decided without a hearing. Indeed, the D.C. Circuit specifically noted in another case involving FCC Auction 97, that the FCC's approval of Advantage's licenses was a "wholly unexplicated ruling." *Northstar Wireless, LLC v. FCC*, ___ F.4th __, 2022 WL 2203808, at *50 (D.C. Cir. 2022).

Second, Advantage's FCC filings are not "Federal reports, hearings, audits, or investigations." A "report is something that gives information or a notification, or an official or formal statement of facts or proceedings." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011) (information released in response to a FOIA request was a public disclosure). *See, e.g., United States ex rel. Scott v. Pac. Architects and Eng., Inc*., No. 13-1844, 2020 WL 224504 (D.D.C. Jan. 15, 2020) (allegations were previously addressed in a publicly disclosed State Department audit report); *United States ex rel. Jones v. Sutter Health*, 18-cv-02067-LHK, 2021 WL 3665939 at *10 (N.D. Cal. Aug. 18, 2021) (information was based on Centers for Medicare and Medicaid Services' response to FOIA request); *Vierczhalek v. MedImmune Inc.*, 803 F. App'x 522, 525-526 (2d Cir. 2020) (allegations were the subject of a state complaint); *Cause of Action v. Chicago Transit Auth.,* 815 F.3d 267, 282 (7th Cir. 2016); (commissioned audit report provided a sufficient basis to infer fraud); *United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 692-693 (8th Cir. 2014) (disclosures included numerous media reports and FDA reports, as well as federal regulatory disclosures); *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 209 (1st Cir. 2007) (allegations were previously disclosed in a Congressional

Research Services report, and were the subject of a publicly announced state investigation); *United States ex rel. Gear v. Emergency Med. Assoc.,* 436 F.3d 726, 728-729 (7th Cir. 2006) (fraud clearly entered the public domain through a series of government audits covered by the news media). The filings are *Advantage's* statements in support of its application for DE benefits, *not* federal (or any kind of) government reports that (1) synthesize and organize the data; (2) are readily available; and (3) easily navigable. *Silbersher v. Allergan Inc*., 506 F. Supp. 3d 772, 800-805 (N.D. Cal. 2020) (the term "Federal report" should not be construed so broadly as to encompass documents that are publicly available on a government website).

Third, Advantage's FCC filings were not reported in the "news media," and the ULS and Auction Application databases are not examples of any type of "news media." *Id.* at 806-07 (public docket of patent prosecutions on government website was not "news media"). Where, as here, it requires foreknowledge, as well as several steps to locate a document on the website, and is not readily accessible, information is not a public disclosure by the "news media."[11] *United States ex rel. Liotine v. CDW Gov't, Inc*., No. 05-33-DRH, 2009 WL 3156704, at *6 n.5 (S.D. Ill. Sept. 29, 2009).

Advantage's FCC filings do not qualify as *public disclosures* under the statute, and Defendants do not plausibly argue that they do.[12]

---

[11] *See* https://www.fcc.gov/licensing-databases/licensing*;* https://www.fcc.gov/wireless/universal-licensing-system and https://auctionfiling.fcc.gov/form175/search175/index.htm. As Defendant U.S. Cellular's detailed instructions for how to find this information (*USC Memo*, pp. 15-18; fns. 18-31) demonstrate, this information is neither "readily available" nor "easily navigable."

[12] King Street simply labels the filings as "public FCC filings," and cites cases in which: (1) the alleged disclosure (a State Department audit) was made through a channel specifically enumerated in the statute (*see Scott above*), and (2) in a FOIA response, which the Supreme Court has found in *Schindler* is a "report" for purposes of the statute (*see Jones above*). (*KSW Memo,* pp. 13-14). U.S. Cellular asserts flatly in a footnote that "Regulatory filings are public disclosures under the FCA, and an FCC auction is a 'Federal … administrative hearing in which the Government or its agent is a party,'" and cites *Springfield Terminal,* 14 F.3d at 652. (*USC*

      b.      <u>Advantage's FCC Filings do not "Disclose" the "Allegations or
Transactions" of Fraud that are Alleged in the Amended Complaint.</u>

"[I]n common parlance, allegation connotes a conclusory statement implying the existence of provable supporting facts." *Springfield Terminal* 14 F.3d at 653. "'Transaction' in this sense 'refers to two or more elements that, when considered together, give rise to an inference that fraud has taken place.'" *Oliver II*, 826 F.3d at 471 (*quoting Oliver I*, 763 F.3d at 40).

The public disclosure analysis has long been expressed through the formula, X + Y = Z:

> [I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit qui tam actions only when either the allegation of fraud [Z] or the critical elements of the fraudulent transaction themselves [X and Y] were in the public domain.

*Springfield Terminal*, 14 F.3d at 654.[13] "If the allegation of fraud (Z) is not itself in the public domain, then the bar applies only if both X and Y are publicly known." *United States ex rel Shea v. Cellco Partnership*, 863 F.3d 923, 933 (D.C. Cir. 2014); *United States ex rel. Doe v. Staples, Inc.,* 773 F.3d 83, 86 (D.C. Cir. 2014).

---

*Memo,* p. 14 n.13). In fact, *Springfield Terminal* dealt with the narrow question of whether documents, obtained in discovery, filed with the Court, and not subject to a protective order, fell within the pre-ACA definition of a "civil hearing," and did not mention, much less address, the subject of regulatory filings made in order to obtain a benefit from the Government. Advantage simply remarks in a footnote that Relators "have not contested" the characterization of the filings as made "'in an administrative hearing' or as 'Federal report[s],'" which, in fact, they do. (*Advantage Memo,* p. 20 n.13).

[13] *See, e.g.*, *Comstor,* 308 F. Supp. 3d 56, 72 (D.D.C. 2018) (the fact that the defendants were selling TAA non-compliant products to the government (X), plus the fact that the defendants falsely certified that they were complying with the TAA (Y), permits the inference that the defendants committed fraud (Z)); *Oliver II,* 826 F.3d at 471("the fact that Philip Morris was not providing the Exchanges with the best price for cigarettes (X) plus the fact that Philip Morris falsely certified that it complied with the Most Favored Customer provisions (Y)" gives rise to "the conclusion Philip Morris committed fraud (Z)").

The public disclosure "inquiry focuses *not* on the additional incriminating information a relator supplies, but instead on whether the *quantum* of information already in the public sphere was sufficient to set government investigators on the trail of fraud." *Staples,* 773 F.3d at 86 (emphasis added). The key questions are "whether the potentially disabling public disclosures in fact disclosed allegations or transactions of fraud, or made actual allegations of fraudulent conduct," *Reed*, 923 F.3d at 745 n.7, and whether the "information could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 918 (D.C. Cir. 1999); *Comstor,* 308 F. Supp. at 75. "The FCA's public disclosure bar prohibits qui tam actions only when enough information exists in the public domain to expose the fraudulent transaction." *U.S. ex rel. Purcell v. MWI Corp.*, 824 F. Supp. 2d 12, 24 (D.D.C. 2011), *rev'd and remanded*, 807 F.3d 281 (D.C. Cir. 2015).

Neither Z, nor X + Y, were "disclosed" in the FCC filings. The *quantum* of information contained in the filings did not include information exposing that Advantage was and is a *fraudulent* DE acting for U.S. Cellular, as alleged in the Amended Complaint. *See United States ex rel. R. C. Taylor v. Mario Gabelli, et al.*, 345 F. Supp. 2d 313, 337 (S.D.N.Y. 2004) (FCA claim was well-pleaded where plaintiff alleged that defendants falsely certified (or conspired to do so) that they were a very small business, entitled to federal discounts, even if they otherwise truthfully disclosed information to the FCC).

i.    The Agreements that Advantage Provided to the FCC[14] Do Not Disclose the "Allegations or Transactions" of Fraud in the Amended Complaint

Defendants argue that various provisions in the agreements attached to the Long-Form Application could have disclosed the circumstances of the alleged fraud, even as they also argue that these "facts and circumstances [also could have] added up to allowable 'investor protections' . . . under the FCC's case-by-case approach." (*Advantage Memo,* pp. 3-5, 21; *see USC Memo,* p. 3; *KSW Memo,* p. 4). As the Wireless Bureau's "wholly unexplicated" decision granting Advantage the DE credits attests (*Northstar Wireless,* 2022 WL 2203808 at *50), the agreements, which failed to alert the Wireless Bureau that Advantage did not comply with the controlling interest rules for legitimate DEs, could not, without more, have led, directly or logically, to the inference that Defendants were engaged in a scheme to defraud the Government of $112,768,000 in bid credits. *See United States ex rel. Absher v. Momence Meadows Ctr., Inc.*, 764 F.3d 699, 703 (7th Cir. 2014).

Defendants' arguments that the filings provided a sufficient quantum of information to reveal the alleged fraud to the Bureau staff require closer scrutiny of the information Defendants actually disclosed to the FCC, the information that Defendants now claim was disclosed, and the manner and circumstances in which these alleged disclosures were made to the FCC.

First, the provisions in the agreements that the Defendants claim as disclosures that could have alerted the FCC to the alleged fraud do not, in fact, disclose the scheme alleged in the Amended Complaint and, furthermore, were carefully buried in multiple different documents that

---

[14] In its previous decision, the Court included U.S. Cellular's 2014 Annual Report describing its investment in Advantage as a further public disclosure. The Annual Report to the SEC has no bearing on the public disclosure bar here. U.S. Cellular's statements of its "investment" in Advantage did not disclose the fraud allegations surrounding Advantage's participation in FCC Auction 97.

were *attached* to the application. Second, the required summaries of the agreements did not refer to these provisions, but instead described the provisions that supported their assertions of Advantage's *de facto* control. Third, while the agreements were provided only once and as *attachments* to the Long-Form Application, the false and fraudulent *summaries* of the agreements were included *in the application*, provided again in the 2016 and 2017 DE Annual Reports, and expressly referred to in the 2018, 2019, and 2020 DE Annual Reports, all in support of Advantage's continuing claims of its eligibility for the bid credits. Fourth, between 2014 and 2022, in the most visible parts of the application and in the subsequent filings, Defendants made and caused to be made under penalty of perjury numerous repeated false and fraudulent certifications of Advantage's DE eligibility under the FCC rules. (¶¶ 96-110).[15]

Advantage's FCC filings, which were designed to exploit the FCC's "totality of circumstances" DE analysis emphasized and promoted the falsity, while concealing and minimizing the truth. Furthermore, the information that was actually disclosed in the agreements falls far short of disclosing what Defendants now claims they disclosed to the FCC, as demonstrated by the following examples. (*See USC Memo*, p. 17*; Advantage Memo*, p. 22).

While Defendants argue that the "whereas" provision in the Frequency Advantage LP Agreement informed the FCC of DiNardo/King Street's role in Advantage's bidding, the provision actually stated that *Nonesuch*[16] would provide services "to establish a bidding room and assist in

---

[15] *See also,* ¶ 106 and fns. 2-4 of the Amended Complaint, which allege that, after the FCC had issued a Memorandum Opinion and Order disqualifying two other DE bidders in Auction 97 from receiving bid credits on *de facto* control grounds, Vail made two further and unusual certifications that the agreements provided to the FCC "consist of the entirety of agreements, oral and written, including letters of intent entered into by the Applicant and/or its current or former disclosable interest holders."

[16] Nonesuch, not DiNardo, was the Limited Partner in Advantage Spectrum, and DiNardo's name only appears in the agreement for notice (p. 62), and signature purposes (p. 64). The minimization of any references to DiNardo/King Street was, as Relators have alleged, by design. (*See ¶¶ 75-*

the conduct [of Advantage's] bidding activities during the Auction," while emphasizing that these services were "subject to [Vail's] oversight, direction and control." Section 8.1 stated merely that Nonesuch "shall provide bidding services" to Advantage Spectrum, again, however, "subject to [Vail's] oversight, direction and control."[17] Far from disclosing DiNardo's role and control of Advantage's bidding on behalf of U.S. Cellular, neither the Frequency Advantage LP Agreement, *nor the Bidding Protocol Agreement (BPA),* disclosed that, as the Amended Complaint alleges, the bidding was conducted from offices controlled by DiNardo; rather than appear as a bidder herself, DiNardo selected a King Street employee, who had no connection to Advantage, as an authorized bidder for Advantage; Advantage had no offices, no employees, and none of the resources to conduct the bidding activities; U.S. Cellular had to hire experts to educate Vail on how to place bids; or that both DiNardo and an employee from U.S. Cellular's office in Chicago were present for and controlled the bidding. Furthermore, the BPA "discloses" only that the prices Advantage would pay for its licenses varied based on their proximity to U.S. Cellular's existing licenses; not, as the Amended Complaint alleges, that these licenses were being purchased for U.S. Cellular and their eventual integration with U.S. Cellular's wireless networks.

---

*76.*) There are very few references to DiNardo in Advantage's FCC filings, the most notable being in the Bidding Protocol Agreement and the Short-Form Application, where she is identified merely as a 4.9% Disclosable Interest Holder in Advantage Spectrum through her ownership of Nonesuch, and as having a 10% interest in King Street.

[17]  Other provisions in the agreement also purport to subject Nonesuch/DiNardo's role in Advantage, including § 8.1's statement that Nonesuch "shall not . . . take part in, or interfere in any manner with, the conduct or control of the Partnership business, nor shall the Limited Partner have any right or authority to act for or bind the Partnership." *See also* § 5.1, Management and General Powers of the General Partner, stating that [Vail] shall "exercise control over the Partnership in compliance with FCC Rules;" "have the exclusive right and power to manage, operate and control the Partnership and to make all decisions necessary or appropriate to carry on the business and affairs of the Partnership;" *"[o]versee, direct and control the conduct of the Auction Partnership's bidding activity in the Auction;"* and "[e]mploy and dismiss from employment any and all employees, agents, independent contractors, attorneys and accountants." (emphasis added).

Likewise, the Advantage Spectrum LP Agreement § 5.4 states merely that Frequency has the discretion to determine how much time it will devote to Advantage[18] in furtherance of its business purpose, stated in § 1.3, "to construct and to operate an AWS-3 [wireless] system." The Amended Complaint alleges, however, that Advantage is a sham—that it has never had any officers or employees other than Vail and has never entered into a Management Agreement for its spectrum (¶ 118); that Advantage has none of the indicia of a wireless company (¶ 119); that its only business presence is on paper (¶ 120); and that Advantage did nothing with its licenses until it became necessary to begin constructing the networks, whereupon it transferred control of the licenses to U.S. Cellular through the purported spectrum leases. (¶¶ 83, 124). Furthermore, the agreement does not state that Vail's compensation "was limited absent the agreement of U.S. Cellular," but masked U.S. Cellular's role in any decision with the actual statement that "[Advantage] shall pay to [Frequency Advantage] an annual fee of $50,000."

While the loan and security agreements restricted Advantage's options, they did not disclose that, in fact, with the nominal exception of the licenses, Advantage owned none of the alleged collateral for the $400+ million in "loans" described in § 5.01 of the Loan Agreement, and that the only way Advantage could ever repay the so-called loans would be to transfer the licenses to U.S. Cellular.

Finally, the listed agreements did not include, and Defendants concealed from the FCC, the underlying agreements establishing Advantage, and, in particular, the agreement to eventually

---

[18] The "General Partner [Frequency] shall devote so much of its time to the business of [Advantage] as in its reasonable judgment the conduct of [Advantage's] business reasonably requires, it being [Frequency's] current anticipation that approximately one-half of the work time of one of its principal officers will be devoted to wireless business activities generally through the launch of [Advantage's] service." (*Advantage Memo,* pp. 22-23*; Exhibit B).*

transfer the licenses to U.S. Cellular without having to make an unjust enrichment payment[19] (*See, e.g., Amended Complaint,* ¶¶ 97, 101, 103, 106-107, 109), an agreement that was confirmed when the need to meet the construction requirements forced Advantage and U.S. Cellular to enter into the purported spectrum manager leases. (¶¶ 123-128).

Defendants' arguments that the spectrum lease notifications properly informed the FCC that Advantage was "rely[ing] on the USCC coverage in its licensed area to meet the interim-term build obligation," also miss the mark. (*Advantage Memo*, p. 24). The Amended Complaint alleges that Defendants entered into the leases "[t]o enable Advantage to begin to appear to meet the construction and service requirements without risking a reduction in the license terms from twelve to ten years" (¶ 124), and because Advantage could never have satisfied the construction requirements, even in partnership with another company. The Amended Complaint further alleges (¶¶ 125, 127, 128) that Defendants entered into the lease agreements *when* they did in order to reduce the unjust enrichment payments as much as possible, even though U.S. Cellular already controlled Advantage (and its licenses) when the lease notifications were filed.

Defendants argue, in effect, that the information necessary to discern U.S. Cellular's and King Street's *de facto* control, and, from that, the entire fraudulent scheme, was disclosed by the Defendants themselves in their agreements, and that Relators are parasitically relying on these agreements for their allegations of fraud. The Defendants have it backwards. Advantage repeatedly and expressly certified that its statements in the Short-Form and Long-Form Applications were "true, complete, correct, and made in good faith." A license application is not a puzzle for the FCC

---

[19] In this case, a true *de facto* control test would have required an evaluation of the concealed agreements, and arrangements alleged in the Complaint, which were discovered through Relators' independent efforts.

to investigate and uncover which statements are *not* true, *not* complete, *not* correct, and *not* made in good faith, and which statements *are* true, complete, correct, and made in good faith.

Evidence that could have raised the question of U.S. Cellular's *possible de facto control* of Advantage, particularly when that evidence was minimized and denied on its face under penalty of perjury, does not disclose or alert the Government to the allegations in the Amended Complaint that Defendants were using Advantage as a DE front in a *conspiracy* and *scheme to defraud* the Government of $112,768,000 in bid credits. The fact that Relators were able, with additional information obtained through significant independent investigation, to distinguish truth from falsity in Advantage's applications does not transform Advantage's FCC filings into public disclosures sufficient to bar this action.

  ii.  Other FCC Filings Unrelated to Advantage's Applications also did not "Disclose" the "Allegations or Transactions" of Fraud Involving DiNardo that are Alleged in the Amended Complaint.

In addition to relying on the agreements discussed above, Defendant U.S. Cellular argues that *information* in *other* FCC filings involving DiNardo's other DEs also could have exposed the fraudulent scheme alleged in the Amended Complaint. [20] (*USC Memo,* pp. 14-19).

First, these FCC filings are no more "public" under the public disclosure bar than the FCC filings previously discussed. Second, by design, Advantage's Short-Form Application barely mentioned DiNardo and, thus, would not have alerted anyone to search for filings related to King Street, much less Carroll and Barat, that were submitted years before Advantage was created.

---

[20] As the numerous citations to these filings (*see USC Memo, pp. 15-19, fns. 14-32*) attest, the information is neither "easily accessible," nor "readily navigable." Moreover, as the directions for accessing the filings also attest (*Id.*), searching for the information requires independent knowledge and experience.

Third, Defendant U.S. Cellular's chart misstates and strips the allegations in the Amended Complaint of their actual content, as demonstrated, in particular, by the following example:

| Allegation, per U.S. Cellular | Actual Allegation in the Amended Complaint |
| --- | --- |
| U.S. Cellular entered into an agreement with the DiNardo- affiliated King Street, under which U.S. Cellular managed the provision of cellular service using King Street's spectrum, beginning in or around 2011. | ¶ 70. In 2011, U.S. Cellular and DiNardo/King Street had entered into a secret leasing agreement under which U.S. Cellular had, inter alia, incorporated the King Street spectrum into its own mobile 4G LTE network, was providing service to its own customers using the King Street spectrum, and was financing/building the required networks.<br><br>*See also* ¶¶ 71-73, 104. |

U.S. Cellular and King Street both argue that the 2011 leasing agreement between U.S. Cellular and King Street referred to above, and alleged in the Amended Complaint (¶¶ 70-73), was disclosed to, or known to, (and accepted by) the FCC. (*USC Memo,* pp. 16, 18*; KSW Memo,* pp. 17-21). It was not - and the agreement U.S. Cellular claims as constituting disclosure of the arrangement was not the actual 2011 lease agreement, but a 2012 agreement that was drafted to cover only a small portion of King Street's licenses to avoid triggering the unjust enrichment rule for the spectrum, while still allowing U.S. Cellular to apply for and qualify for the government subsidies offered in FCC Auction 901. Furthermore, the alleged "disclosures," *e.g.,* the 2012 agreement and the statements cited by both Defendants as further evidence of public disclosures, were filed in FCC dockets unrelated to the FCC's DE program, did not identify the relevant licenses as King Street's DE licenses, and did not disclose any other facts of "partnering" or work "in conjunction" that would suggest a violation of the DE rules. The facts involving the 2011 secret agreement are very much in dispute, both here, in terms of whether it could have triggered the

public disclosure bar,[21] and, generally, in terms of the role it played in the fraudulent scheme alleged in the Amended Complaint.

U.S. Cellular and DiNardo were Disclosable Interest Holders in Advantage, and their spectrum manager leases were among the agreements required to be disclosed as part of Advantage's Long-Form Application for the licenses. 47 C.F.R. § 1.2112(b)(2)(ii). The disclosure of the 2011 agreement, however, would have triggered the unjust enrichment payment for the King Street licenses, and the gross revenues that DiNardo/King Street purportedly derived from it, would have had to be attributed to Advantage, making Advantage ineligible for DE benefits. (¶ 104). As the Amended Complaint alleges, it was for these reasons that Defendants needed to establish Advantage as "a DE that could be made to appear to be controlled by someone other than DiNardo." (¶¶ 70-73).

Neither Advantage's FCC Filings in FCC Auction 97 between 2014 and 2022, nor the many FCC Filings made by U.S. Cellular and DiNardo for different companies in other FCC proceedings between 2004 and 2013, disclosed the core allegation in the Amended Complaint that Defendants created and used Advantage in a fraudulent scheme to acquire and retain $112,768,000 in DE bid credits and licenses for U.S. Cellular between 2014 and 2022.

---

[21] Both Defendants also point to various press releases and public announcements that U.S. Cellular and King Street had "partnered" to provide wireless services as evidence that the alleged secret leasing arrangement was "publicly disclosed" to the FCC and also as evidence that DiNardo's past DEs did not affect its consideration of Advantage's application. (*See, e.g., USC Memo*, p. 16; *KSW Memo*, p. 18-19.) While this is, of course, a factual argument outside the scope of this motion, statements of a "partnership" between U.S. Cellular and King Street in 2012 and 2013 would not have alerted the FCC that the Defendants were using Advantage as a front for U.S. Cellular to acquire 124 spectrum licenses using DE bid credits.

c.   The FCC Filings do not Disclose "Substantially the Same Allegations or Transactions" as the "Allegations or Transactions" that are Alleged in the Amended Complaint.

The public disclosure bar requires that the allegations or transactions in the complaint must be "substantially the same" as the publicly disclosed information.[22] 31 U.S.C. § 3730(e)(4)(A). As the previous sections demonstrate, the FCC filings were neither "public" nor disclosures of the actual "allegations or transactions" in the Amended Complaint, and, thus, were not "substantially the same."

Relators' allegations are significantly different from the information in the FCC filings. Allegations that are "genuinely new and material" are not substantially the same. *U.S. ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 576 (9th Cir. 2016). "Genuinely new and material" means "information that expands what is publicly known about the scheme's fraudulent nature, or its scope, objectives, duration, and the like." *City of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.*, No. 15 C 08271, 2016 WL 4203835, at *12 (N.D. Ill. Aug. 8, 2016), *aff'd*, 884 F.3d 798 (7th Cir. 2018). This is particularly true where, as here, there is no allegation of wrongdoing in the alleged public documents. *See U.S. ex rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 357 (S.D.N.Y. 2014).

---

[22] The 2010 amendments to the statute redefined the question from whether an action was "based upon" the public disclosure of allegations or transactions, to whether the relator's allegations are "substantially the same" as publicly available information. This reformulated "substantially the same" standard drew on the "substantially similar" standard previously developed by the D.C. Circuit and adopted by others. *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997). Because the language in the amendment paraphrases the standard already in place in the D.C. Circuit, the pre-2010-amendment cases holding that the "allegations" or "transactions" must be "substantially similar" to the cited public disclosure still offer guidance on whether "substantially the same allegations or transactions" were previously publicly disclosed.

**3.      Relator O'Connor's 2008 Complaint Also Did Not "Publicly Disclose" "Substantially the Same" "Allegations or Transactions" Alleged in the Amended Complaint.**

Defendants argue that the disclosure of the 2008 Complaint also bars the Amended Complaint. *(USC Memo,* p. 20*; see also Advantage Memo,* p. 25)*.* In fact, the two complaints are factually distinct, different in scope, and separated in time by more than seven years.

The fact that a 2008 complaint alleged that U.S. Cellular was using a DiNardo-owned DE, King Street Wireless, to acquire licenses with DE bid credits does not inoculate U.S. Cellular against liability for using a different DE purportedly controlled by another person to obtain bid credits in a different auction seven years later. "The government's awareness of fraud that occurred entirely in the past . . . may not alert the government to future fraud, and thus that awareness does not bar other potential qui tam litigants from bringing additional instances of fraud to light." *U.S. ex rel. Booker v. Pfizer, Inc*., 9 F. Supp. 3d 34, 45 (D. Mass. 2014). This is especially true where, as here, (1) the Defendants aggressively (and falsely) denied the allegations to the FCC, after which (2) the FCC granted the DE licenses to King Street, and (3) the case was voluntarily dismissed by the relators.[23] Furthermore, the Defendants took steps to conceal a possible connection between the cases by using Vail, instead of DiNardo, to create Advantage, such that the FCC filings contained very few references to DiNardo or King Street, and, after controlling interest questions were raised regarding other purported DEs in FCC Auction 97, Defendants took further precautions by having DiNardo sell her interest in Advantage to Vail, and having Vail make the unusual certifications described in ¶ 106 and fns. 2-4 in the Amended Complaint. "[T]he public

---

[23] *See United States ex rel. Ibanez v. Bristol-Myers Squibb Co*., 874 F.3d 905, 919 (6th Cir. 2017) (scheme that was similar to one resolved years earlier was not subject to the public disclosure bar); *United States v. Coloplast Corp*., 327 F. Supp. 3d 358, 363 (D. Mass. 2018) (bar did not apply where relators alleged specific instances of fraud after the publicly disclosed litigation had ceased).

disclosure provision is not meant to deprive whistleblowers of their role . . .  when they come forward with evidence of a new fraudulent activity—*even new fraud that is perpetuated by old modus operandi.*" *Id.* at 46 (emphasis added). *See also United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 529 (6th Cir. 2020) ("engaging in a scheme to defraud cannot immunize a fraudulent action from *qui tam* suits regarding related forms of fraud in perpetuity; what was once a hot trail of fraud must cool at some point."); *Novartis Pharms. Corp.*, 43 F. Supp. 3d at 353 (information disclosed in 2007 was not a public disclosure or substantially similar to allegations occurring after 2010 because "[o]therwise, the public disclosure of a certain type of fraudulent conduct by a defendant would effectively immunize that defendant from qui tam liability in perpetuity"); *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 830 (7th Cir. 2013) (allegations were not substantially the same where, among other things, "there is no temporal overlap"). [24]

The question is not simply whether the scheme alleged in one complaint is similar to a scheme that was alleged in another complaint made years earlier. Indeed, courts have rejected analyzing substantial similarity with such a high level of generality because it wipes out *qui tam* suits that rest on genuinely new and material information, such as differing actors, circumstances, duration, and execution. *Mateski*, 816 F.3d at 577; *Leveski*, 719 F.3d at 831.

---

[24] The D.C. Circuit's statement in *Oliver II*, 826 F.3d at 43 that it "ha[s] found disclosures going back as far as forty years prior to the relator's lawsuit . . . sufficient to disclose the practices which formed the basis of the relator's suit" is not as straightforward as King Street claims. (*KSW Memo*, p. 25). The language, which first appeared in *Settlemire*, 198 F.3d at 919, referred to the D.C. Circuit's earlier decision in *Findley*, 105 F.3d at 685-687, in which the court found that a 1952 GAO Report, the 1974 legislative history behind a statute that responded to concerns similar to those raised in the complaint, and a reported decision by the Federal Circuit in 1987 analyzing similar issues were public disclosures. *Findley* found that the information in these disclosures qualified as public disclosures, but did not actually address the effect of the forty-year interval on the question.

While the 2008 complaint alleged *pre-licensing fraud* by U.S. Cellular and DiNardo/King Street, the Amended Complaint alleges a much broader scheme by U.S. Cellular, DiNardo, and Advantage, in which, in addition to filing false and fraudulent applications for DE bid credits, Defendants filed false and fraudulent DE Annual Reports and spectrum lease notifications to retain the credits (¶¶ 112-117, 123-128, 142, 143, 152, 156); filed false and fraudulent network service and construction notices (¶¶ 129-131,143(i)); concealed the extent of U.S. Cellular's construction and control over the wireless networks using Advantage's licensed spectrum (¶¶ 118-122, 133); failed to disclose the 2011 spectrum leasing agreement between U.S. Cellular and King Street (¶¶ 70-73); and concealed Advantage's complete lack of a management team, employees, and even a recognizable legitimate business office for six years after the licenses were issued (¶¶ 119-122).[25]

In short, the 2008 Complaint alleged auction fraud (much like the fraud alleged in Vermont Telephone's case against DISH)*,* while the Amended Complaint alleges a continuing fraud scheme in which bid credits were awarded, and which has been carried out over almost eight years. *See Vermont Nat'l Tel. Co. v. Northstar Wireless, LLC*, 34 F.4th 29, 37-38 (D.C. Cir. 2022).

---

[25] Defendants' reliance on *Oliver II* on this point is misplaced. (*USC Memo,* p. 20*; Advantage Memo*, p. 19). While Relators here have alleged a different, discrete scheme that occurred years after the first alleged scheme, and involved new defendants, as well as a different auction and different course of conduct, the complaint in *Oliver* alleged the same *continuing* conduct by the *same defendant*. *Id.* at 472. As in *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp*., 540 F.3d 1180, 1187 (10th Cir. 2008), cited for, but not supportive of, Defendants' position, the Amended Complaint was filed substantially after the 2008 litigation had ended. *See id* ( "because Mr. Maxwell's suit is based upon conduct occurring *after* the period of time covered in the Johnson litigation and a *distinct* fraudulent scheme, Mr. Maxwell's allegations are not 'based upon' that suit.") (emphasis added). *Reed*, 923 F.3d at 752-53 (10th Cir. 2019) (*Advantage Memo*, p. 26), is similarly unsupportive because, in addition to a prior lawsuit, an OPM audit had found that the defendant had falsification issues, and there were news reports suggesting fraud mere months before relator filed suit. *Id.* at 739, 750.

**4.      Relators are the Original Source of the Allegation that Defendants Engaged in a Scheme to Defraud the Government of $112,768,000 in DE Bid Credits**

Even if the FCC filings could have amounted to public disclosures under the statute, the statute still precludes dismissal because Relators are the "original source" of the information under 31 U.S.C. § 3730(e)(4)(A)(iii). The statute defines an "original source" as an individual . . . (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section."[26] 31 U.S.C. § 3730(e)(4)(B).

As the Court noted in its earlier opinion:

> The First and Tenth Circuits have held that relators materially add to public disclosures when their information is "sufficiently important to influence the behavior of the recipient," i.e., the Government. *Reed*, 923 F.3d at 755-59 (quoting *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211-13 (1st Cir. 2016)). By contrast, the Second, Seventh and Eighth Circuits do not distinguish between what is "substantially similar" and what "materially adds." *Vierczhalek v. MedImmune Inc.*, 803 Fed. Appx. 522, 525-26 (2d Cir. 2020) (quoting *United States ex rel. Paulos v. Stryker Corp.*, 762 F. 3d 688, 694-95 (8th Cir. 2014); *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 283 (7th Cir. 2016). And the Third Circuit has held that a relator makes a material addition when it provides information that "adds in a significant way to the essential factual background: 'the who, what, when, where, and how of the events at issue.'" *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016).

Doc. No. 170 at 11-12. The Amended Complaint establishes Relators' original source status under each of these standards.

---

[26] Prior to the 2010 amendments, the 1986 amendments to the FCA defined an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B). The question is no longer whether the relator has "direct and independent knowledge," but whether the relator has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions."

Relators have alleged the following material facts, none of which were disclosed to the FCC, and which add materially to the core allegation that Defendants were engaged in a scheme to defraud the government of $112,768,000 in DE bid credits: (1) in the past six years since the licenses were awarded, Advantage has never had a legitimate place of business; employed anyone other than Vail, or conducted itself in any way as if it were a business (¶¶ 87-88; 118-122, 133); (2) Advantage's bidding was conducted from King Street's offices, and under the control of U.S. Cellular and DiNardo/King Street[27] (¶¶ 89, 92); (3) U.S. Cellular hired experts to educate Vail on the mechanics of placing bids (¶ 90); (4) one of the two Advantage designated bidders was a King Street employee with no known relationship with, or duty to, Advantage and controlled by DiNardo (¶ 91); (5) Advantage and U.S. Cellular entered into and concealed their agreement to transfer the licenses to U.S. Cellular (¶ 103); (6) pursuant to that undisclosed agreement, Advantage has transferred control of the licenses to U.S. Cellular through the purported spectrum manager leases (¶¶ 124-128); and (7) the spectrum manager lease for 76 licenses was falsely and fraudulently drafted to cover as little spectrum as possible to avoid the unjust enrichment payment, notwithstanding that U.S. Cellular already controlled the licenses. (¶ 126).

Relators' independent information established that, while Defendants held Advantage out as an independent DE wireless communications company holding 124 spectrum licenses in 23 states, it was, in fact, a shell that literally did not exist, except on paper and in the person of William Vail. Relators' information provided evidence that U.S. Cellular and DiNardo *controlled*

---

[27] FCC regulations are quite clear that sharing of premises and employees is a significant factor in determining DE eligibility. 47 C.F.R. § 1.2110(c)(5)(viii). A DE's independent control of its premises and employees is critical to the "totality of circumstances" evaluation of *de facto* control. *Intermountain Microwave*, 24 Rad. Reg. (P&F) 983 (1963). *See In Application of Baker Creek Comm's, L.P.*, 13 FCC Rcd 18709 (1998) (sharing of "the common business offices," and the DE's "avail[ing] itself of [the allegedly controlling entity's] bidding facilities" were significant factors in denying the DE bidding credits.) *Id.* ¶ 21.

Advantage's bidding in FCC Auction 97, contradicted the false and fraudulent express certifications that Vail had sole authority to determine which licenses to bid on, and supports the allegations that Defendants secretly agreed to create Advantage as part of a conspiracy and scheme for U.S. Cellular to acquire discounted licenses using DE bid credits. Without Relators' independent evidence that Advantage existed in name only and that U.S. Cellular had previously appropriated King Street's spectrum for its own use under a secret leasing agreement, the alleged public disclosures did not, directly or logically, provide a basis for inferring that the certifications were false and fraudulent, or that Advantage was not an independent DE controlled by Vail.

Defendants misconstrue the allegations regarding the spectrum manager leases. The leases were crafted to allow U.S. Cellular to construct the networks for Advantage without triggering an unjust enrichment payment for the last year of the DE licensing term. (¶¶ 122-126). Relators have consistently alleged that Defendants planned and always intended to transfer the licenses to U.S. Cellular without incurring an unjust enrichment payment, and the spectrum manager leases confirmed that the bid credits, as well as the licenses were always intended for U.S. Cellular's use.[28] Relators' independent information that, *after* the licenses were granted, Advantage took no further steps to function as a company, much less as a wireless provider, adds materially to the allegation that Advantage was never more than a DE front for U.S. Cellular to acquire licenses with DE bid credits. (¶¶ 118-124).

Defendant Advantage argues further that Relators do not qualify as an original source because the Amended Complaint merely makes a "rote assertion" and "contains no information about the 'independent material knowledge' that Relators allegedly disclosed to the government,

---

[28] Furthermore, to avoid paying even 25% of the remaining bid credits for 76 of the 121 licenses, Defendants filed a lease notification with the FCC asserting that the lease was for less than 25% of the spectrum capacity of each license. (¶ 126).

when they disclosed it, and what agency or person they disclosed it to." (*Advantage Memo,* p. 26).

Neither the statute, nor the pleading requirements, require relators to disclose the contents of their

pre-filing communications with the government in order to qualify as an original source.[29]

Relators' information was "sufficiently important to influence the behavior of the

recipient," *i.e.,* the FCC,[30] *Reed*, 923 F.3d at 757; "substantially" and "considerably" adds to the

alleged publicly disclosed information, *Paulos*, 762 F. 3d at 694-95; and "adds in a significant way

to the essential factual background: 'the who, what, when, where and how of the events at issue.'"

*Majestic Blue Fisheries, LLC*, 812 F.3d at 307.

**B.     Relators Have Fully and Sufficiently Pleaded All Claims in the Amended Complaint**

Defendants also move to dismiss the Amended Complaint for failure to state a claim,

variously arguing that Relators have failed to sufficiently plead materiality, scienter, falsity,

conspiracy, reverse false claims, and presentment. The question here is whether the pleadings are

sufficient to state a plausible claim of fraud, and the Court may not resolve factual issues, except

in Relators' favor. The Amended Complaint, which describes in detail the fraudulent scheme and

---

[29] Defendant's reliance on *Staples,* 932 F. Supp. 2d at 41-42 (D.D.C. 2013) is singularly misplaced as the decision relied on the pre-2010 statute and the court found that the "conclusory" allegations were based on "hearsay," "not on "first-hand knowledge," and, therefore, did not meet the requirement for "direct knowledge."

[30] The question, as *Reed* makes clear, is whether Relators' information could have influenced the *FCC's* decision whether to grant the licenses to Advantage or not; it is not whether the Relators' information could have influenced the Department of Justice's decision whether to intervene in the case or not. All of the Defendants draw, and thereby ask the Court to draw adverse inferences, from the Government's decision not to intervene in this case. (*See USC Memo,* pp. 1, 41; *Advantage Memo,* p. 15; *KSW Memo,* pp. 7, 21, 26). The Court is not permitted to draw any inferences from a decision not to intervene, as the Department's standard letter expressly states its decision "should not be construed as a statement about the merits of the case," and that it retains "the right to intervene at a later date upon a showing of good cause." *See Landau v. Lucasti*, No. 1:06-CV-1229, 2010 WL 502972, at *6 (D.N.J. Feb. 8, 2010). Furthermore, under the statute, public disclosure questions primarily arise in cases where the government has declined to intervene, and to draw an adverse inference from that circumstance would effectively nullify the original source exception.

the manner in which it has been carried out, is more than sufficient to satisfy the pleading requirements in both Rule 8(a)[31] and Rule 9(b)[32], and clearly states "a claim upon which relief can be granted" under Rule 12(b)(6).

Fed. R. Civ. P. 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Iqbal*, 556 U.S. at 677-78. While a detailed factual allegation is not required, "it demands more than an unadorned, the-defendant-unlawfully-harmed me accusation." *Id.* at 678.  Where, as here, fraud is alleged, Fed. R. Civ. P. 9(b) requires that the pleading state "with particularity the circumstances constituting fraud or mistake." *United States ex rel. Staggers v. Medtronic, Inc.*, 15-cv-392 (TSC), 2019 WL 13132849, at *1 (D.D.C. Mar. 25, 2019).

The FCA recognizes different causes of action for liability.  A "presentment" claim brought under § 3729(a)(1)(A) requires that: "(1) the defendant submitted a claim [for payment] to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 26 (D.D.C. 2010). A "false statement" claim under § 3729 (a)(1)(B) requires that the defendant "made a false statement to the government, as opposed to the submission of a false claim for payment." *Pencheng Si,* 71 F. Supp. 3d at 87. Finally, liability for conspiring to violate the False Claims Act requires that: (1) an agreement existed to have false or fraudulent claims allowed or paid by the government; (2) each alleged member of the conspiracy joined the agreement; and (3) one or more conspirators

---

[31] Under Fed. R. Civ. P. 8(a), "[a] pleading that states a claim for relief must contain: (1) a short and plain statement of the grounds for the court's jurisdiction, . . . (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for the relief sought, which may include relief in the alternative or different types of relief."

[32] Under Fed. R. Civ. P. 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

knowingly committed one or more overt acts in furtherance of the object of the conspiracy. *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010).

The Amended Complaint meets all pleading requirements for each of the claims under the FCA.

### 1.     The Amended Complaint Satisfies the Pleading Requirements for Falsity

While the FCA does not define "false" or "fraudulent," courts have recognized three ways that a claim can be false. *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1031 (D.C. Cir. 2017). A claim is "false" if it includes "an incorrect description of goods or services provided" or a "request for reimbursement for goods or services never provided." *Id.* Such claims typically involve express certifications of compliance with the requirements for payment. Alternatively, under the so-called "implied certification" theory of liability, a claim is "false" if it "rests on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term." *Id.* Finally, a claim can also be "false or fraudulent" if it is submitted pursuant to a contract that was "procured by fraud," *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005), or through "fraud in the inducement," *United States ex rel. Bid Solve, Inc. v. CWS Marketing Group, Inc.*, 567 F.Supp.3d 59 (D.D.C. 2021); *United States ex rel. Scollick v. Narula*, No. 14-cv-1339 (RCL), 2020 WL 6544734, at *7 (D.D.C. Nov. 6, 2020). A claim is "factually false," where a claimant submits information "that is untrue on its face," *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011), and legally false, where the claim "rest[s] on a false representation of compliance with an applicable federal statute, federal regulation, or contractual term," *United States ex rel. Groat v. Bos. Heart Diagnostics Corp.*, 255 F. Supp. 3d 13, 23 (D.D.C. 2017), *amended on reconsideration in part*, 296 F. Supp. 3d 155 (D.D.C. 2017).

The Amended Complaint contains numerous allegations of factually and legally false certifications and statements by Defendants, including the false and fraudulent certifications in Advantage's Short- and Long-Form Applications (¶¶ 77-81, 83, 84, 97-103); Vail's unusual certifications of *de facto* control in early 2016 (¶¶ 106, fns. 2-4, 107-110); Advantage's DE Annual Reports (¶¶ 112-117); and Advantage's Spectrum Lease Notifications and Construction Notices (¶¶ 129-131).

In each of these instances, the alleged false and fraudulent certifications and statements attested to Advantage's independence and viability as a "very small business" wireless telecommunications company eligible for millions of dollars in DE bid credits from the government. Contrary to Defendant U.S. Cellular's claim, the evidence of the alleged falsity in Advantage's certifications and statements does not rely on "a hazy web of allegedly secret agreements," (*USC Memo,* pp. 26-29), but lies in facts and circumstances that are expressly alleged in the Amended Complaint.

Allegations exposing the falsity of Defendants' claims that Advantage was a legitimate DE include, *e.g.*, (1) U.S. Cellular's previous history of acquiring licenses through DEs owned by DiNardo (¶¶ 19, 68-69); (2) the need to make it appear that someone other than DiNardo controlled Advantage (¶¶ 75-76); (3) U.S. Cellular had to hire experts and consultants to educate Vail on spectrum auctions (¶ 90); (4) Advantage's bidding was done from King Street's offices (¶ 89); (5) the only other authorized bidder for Advantage was a King Street employee who reported to DiNardo and had no association with, or duty to, Advantage (¶ 91); (6) U.S. Cellular and DiNardo chose which licenses to bid on for Advantage (¶ 94); (7) after the auction and while Advantage's licensing application was pending, Defendants further limited DiNardo/King Street's visible connection to Advantage by selling her interest to Vail (¶ 104); (8) even six years after being

granted 124 wireless spectrum licenses, Advantage had no employees other than Vail (¶ 118-19); (9) other than when it was in Vail's home, Advantage's purported places of business were unoccupied (¶ 87, 88, 120, 122); (10) the landlord thought Vail was using the space he rented in a strip mall as storage space for an on-line business (¶ 120); (11) Advantage, which purported to be a wireless telecommunications company providing wireless services, did not even have a business phone number (¶ 121); (12) despite having none of the indicia of an actual telecommunications company, much less one holding 124 licenses in 23 states, Advantage has never disclosed or reported entering into a Management Agreement involving its licenses with U.S. Cellular or any other entity (¶ 118); and (13) in order to meet the construction requirements for the licenses, while also minimizing any unjust enrichment payments, Advantage leased its spectrum to U.S. Cellular only after the last year of the unjust enrichment period had already begun (¶ 124).

Furthermore, Relators' allegations of the secret agreements that were necessary to carry out the scheme, including particularly the agreement to eventually transfer the licenses to U.S. Cellular, are even more plausible than the same allegations in *Vermont Telephone*. *See generally Vermont Nat'l Tel. Co. v. Northstar Wireless,* 34 F.4th at 37-38. Advantage only bid on and won licenses that were adjacent to and overlapped with U.S. Cellular's spectrum, and Defendants' actions "make little sense unless [Advantage] agreed in advance that [U.S. Cellular] would ultimately control [its] licenses."[33] *Id.* at 39. The only significant difference between the two cases is that the Amended Complaint adds allegations of the Defendants' *post*-licensing activities, which

---

[33] U.S. Cellular's argument (*USC Memo,* p. 29) that it made sense for Advantage to acquire licenses that overlapped with US Cellular's geographic areas because its partner U.S. Cellular had assets in place also fails in light of the fact that Advantage took no steps to develop the licenses, and simply ceded them to U.S. Cellular.

confirm and corroborate the allegations of the underlying secret agreement to transfer the licenses to U.S. Cellular.

This is not a case in which the Relators have "proceed[ed] exclusively via allegations of parallel conduct," consistent with the existence of an illegal agreement, as in *Twombly.* 550 U.S. at 565 n.11; (*USC Memo,* pp. 26-27). Relators have alleged the existence of undisclosed agreements, substantial evidence supporting the existence of these undisclosed agreements, *and* conduct consistent with the existence of the undisclosed agreements. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

The 2018-2020 DE Annual Reports, which certify Advantage's "progress in meeting construction requirements," falsely assert that Advantage "is in the planning stages of construction and is considering equipment capabilities." (¶ 115). The Construction Notices falsely state that "Advantage has met the build-out construction requirements." (¶¶ 129-130). The alleged falsity in these certifications of compliance with the FCC requirements lies in the underlying claims that Advantage was an independent entity that exercised *de facto* control of its business decisions, including decisions of how the buildout requirements would be met; a falsity that is not removed by the statement in the Construction Notices that "Advantage is permitted to rely on the USCC [4G LTE] coverage in its licensed area to meet the interim-term build obligation." (¶ 129, *Exhibit 16*). With no employees, no real place of business, and no evidence of any business operations (¶ 90), the argument that Advantage, and not U.S. Cellular, controlled, planned, or, indeed, had any significant role in the buildout decisions is highly improbable, while the allegation that the buildout

was entirely controlled by and in U.S. Cellular's interest exclusively is not only highly plausible, but virtually certain.

Defendants challenge the allegations of falsity in the 76-license agreement by arguing that it would have been possible for U.S. Cellular to lease only the downlink spectrum from Advantage, and still provide service by mating it with U.S. Cellular's *own* uplink spectrum. (*USC Memo*, pp. 5-6, 31-33; *KSW Memo*, p. 17). Notably, Defendants do not assert that U.S. Cellular is actually pairing Advantage's 5 MHz downlink block with an uplink on U.S. Cellular's own, overlapping spectrum, but merely that "Relators do not allege facts showing any practical or legal obstacle to doing so." (*USC Memo,* p. 32; *see also KSW Memo*, p. 17). Even if, however, as Defendants argue, the 76-license lease covered less than 25% of the spectrum capacity, Advantage's Construction Notices, *which are required to specify the frequency blocks being used by the licensee*, include *both* the downlink and uplink blocks, as well as the results (*i.e.*, the maximum allowable path loss) generated by the engineer's propagation tool for *both* links.[34]

### 2.      The Amended Complaint Satisfies the Requirements for Pleading Materiality

The FCC awarded $112,768,000 in DE bid credits and 124 licenses in FCC Auction 97 to Advantage based on false and fraudulent representations that Advantage was legitimately a DE, and eligible for DE benefits. (*See, e.g.,* ¶¶ 3, 8, 74-137). Defendants' false and fraudulent claims of eligibility for DE status were indisputably "material," as they were both express false certifications and fraudulent inducements for the FCC to award the credits and licenses to Advantage.

---

[34] Furthermore, the Advantage Construction Notices for the 76 licenses are identical in every relevant way to its Construction Notices associated with its other two leases in which U.S. Cellular clearly has access to both the downlink and uplink spectrum, and acknowledges that unjust enrichment payments may be required.

Defendants' false and fraudulent certifications were "expressly material because, *inter alia*, they were specifically identified as material in the application, applicants were required to certify that they were material, they were made under penalty of perjury, and the FCC would not have awarded Advantage Spectrum DE bid credits without Advantage's repeated false and fraudulent certifications that it was eligible for the credits as a very small business with less than $15 million in revenue." (¶ 81). Both Congress and the FCC have identified the DE requirements as prerequisites for the payment of bid credits, (¶¶ 33-35, 37-59), and the application requires applicants to expressly certify that all statements made in the application and in the exhibits, attachments, or documents, are "material, are part of this application, and are true, complete, correct, and made in good faith." (¶ 51).

In *Vermont Telephone,* the D.C. Circuit specifically found that allegations of "alleged false certifications and failures to disclose agreements central to their eligibility for bidding credits," *which mirror the allegations in the Amended Complaint*, satisfied the pleading requirements for materiality. *Vermont Telephone,* 34 F.4th at 37-38.

> Vermont Telephone alleged that Northstar and SNR "knowingly failed to disclose all of their instruments, agreements, and understandings with . . . DISH" and "falsely certified" that they had disclosed all instruments, agreements, and understandings relevant to their claimed bidding credits in Auction 97. [*See, e.g.,* ¶¶ 4, 7, 9, 50, 52, 56, 97, 101, 103, 104, 106, 107-110, 112-114, 116-118, 137, 141].
>
> Specifically, Vermont Telephone alleged that the two companies failed to disclose their agreement to transfer or resell their spectrum to DISH after a five-year non-transfer period. [*See, e.g.*, ¶¶ 4, 6, 7, 86, 101, 103, 109, 110, 137, 141].
>
> Because an applicant's attributable revenues in Auction 97 included those of any entity to which the applicant had agreed to resell "more than 25 percent of the spectrum capacity of any individual license," *id.* ¶ 56, Northstar's and SNR's undisclosed spectrum-resale arrangements would have increased their attributable revenues beyond the $15-million cap for very-small-business credits. [*See, e.g.*, ¶¶ 38-46, 132-136].

*Id.* at 36-37.

Defendants argue, however, that, unlike Northstar's and SNR's certifications, Advantage's certifications were not material because, under *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016), certifications are not material "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." Based on the 2008 Complaint and the 2015 Complaint, as well as earlier bid credit awards to other DEs associated with U.S. Cellular and DiNardo, Defendants argue that the Government granted Advantage's DE bid credits with "actual knowledge" of the relationship between Advantage and U.S. Cellular.[35] (*USC Memo,* p. 39; *Advantage Memo,* pp. 30-31*; KSW Memo*, p. 38). Claims of "actual knowledge," however, raise questions of fact that cannot be resolved on a motion to dismiss. *See United States ex rel. Campie v. Gilead Sciences, Inc.*, 862 F.3d 890, 906-07 (9th Cir. 2017) (where "the parties dispute exactly what the government knew and when, calling into question its 'actual knowledge' the issues are matters of proof, not legal grounds to dismiss relators' complaint"). The question here is whether Relators have plausibly *pleaded* materiality, *see, e.g., Vermont Telephone,* 34 F.4th at 38; *United States ex rel. Cimino v. Int'l Bus. Machs. Corp.,* 3 F.4th 412, 423 (D. C. Cir. 2020), and it requires that all reasonable inferences be drawn in Relators favor. *North v. Catholic University of America*, 310 F. Supp. 3d 89, 94-95 (D.D.C.

---

[35]King Street claims that the FCC granted King Street's licenses, allegedly after an investigation of the allegations in the 2008 Complaint, and, thus, that the FCC knew of, and accepted the arrangement between U.S. Cellular and Advantage when it granted Advantage's licenses in 2016. (*KSW Memo*, pp. 38-39.) First, if as King Street appears to assert, but Relators dispute, the FCC actually investigated and approved the King Street arrangement in full, then neither the investigation nor the 2008 Complaint could have "disclosed" the allegations in the Amended Complaint for purposes of the public disclosure bar. Second, as evidence of materiality or the lack thereof *in Advantage's claims*, the alleged investigation and subsequent grant of the licenses to King Street, including particularly *Exhibit L,* King Street's 150-page Response to the Wireless Telecommunications Bureau's inquiry into Relators' 2008 Complaint (Doc. No. 178-14), present questions of facts that are disputed and outside the scope of a motion to dismiss.

2018). Defendants, however, have asked the Court to resolve disputed issues of fact by drawing *unreasonable* inferences in *their* favor.

Neither the two complaints, nor the FCC's previous awards to other DEs associated with DiNardo, much less the denial of bid credits to the other two purported DEs in FCC Auction 97, support the inferences the Defendants ask the Court to make. First, the 2015 Complaint was not even unsealed until December 2019, three years after the licenses were granted. (Docket No. 45). Second, it is not clear how the 2008 Complaint involving King Street, which was voluntarily dismissed in 2010, could reasonably have given the FCC "actual knowledge" in 2015 that Advantage was a DE front for U.S. Cellular.

As other courts in this district have noted, however, *Escobar* applies "in the context of discussing an implied certification theory of liability, *not* [as alleged here] a fraudulent inducement theory."[36] *United States ex rel. Bid Solve, Inc. v. CWS Marketing Group, Inc.*, 567 F.Supp.3d 59 (D. D.C. 2021); *Scollick*, 2020 WL 6544734, at *9 (*Escobar's* "materiality standard does not apply, however, when a plaintiff pleads falsity under the fraud in the inducement theory of falsity."); *see also Cimino*, 3 F.4th 412, 423 (D. C. Cir. 2020) (explicitly distinguishing *Escobar* as discussing a false presentment theory of liability, not a fraudulent inducement theory).

By definition, "fraud in the inducement," which requires that the award have been "procured by fraud," incorporates materiality. *Bettis*, 393 F.3d at 1326.

> Thus, plaintiffs suing under the fraud in the inducement theory need only allege that false statements induced the government to award the contract, not also that those false statements were material to the government's *decision to pay the party*

---

[36]It also is not clear that *Escobar's* materiality standard applies to reverse false claims, as alleged in the Amended Complaint. *See United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, No. 2:16-CV-08697, 2018 WL 1363487, at *12 (C.D. Cal. Feb. 12, 2018) ("*Escobar* does not explicitly distinguish claims brought under § 3729(a)(1)(A) from claims brought under § 3729(a)(1)(G), but the circumstances before the Court in *Escobar* did concern only § 3729(a)(1)(A), and the opinion refers only to that provision.").

*under the contract*. In other words, showing that the government continues to pay claims despite a contractual or regulatory violation hardly undermines a claim of fraudulent inducement. If the fraud had a "tendency to influence" the government in signing the contract, a plaintiff has properly pled materiality even if the government continued to pay claims.

*Bid Solve*, 567 F.Supp.3d at 73. (emphasis in original). Where, as here, Defendants' certifications of DE eligibility were the prerequisites to participating in FCC Auction 97, to receiving the DE bid credits, and to keeping the bid credits, those certifications necessarily had a "tendency to influence" the FCC. *Id. See Scollick* 2020 WL 6544734, at *10 ("a fraudulent statement that secures a government contract *will always be material* to the government's decision to pay the contractor under that agreement").

The Amended Complaint alleges that Advantage did not comply with the requirements for a legitimate DE, Defendants knew that Advantage was not a proper DE, Defendants falsely certified that Advantage complied with the DE requirements, and that these certifications were required to induce the government to award $112,768,000 in bid credits to Advantage.[37] In support of these allegations, Relators have alleged the DE eligibility requirements and regulations (¶¶ 36-55), their importance in the FCC's decisions to award bid credits and licenses to DEs, as well as their importance in allowing Advantage to retain the credits (¶¶ 32-46, 56-65), the falsity in the certifications of compliance with the DE eligibility rules (¶¶ 74-137), the dates of the awards (¶ 111), and the amounts and licenses awarded to Defendants as a result of the false certifications (¶¶ 2-3). The Amended Complaint satisfies even the "demanding" *Escobar* standard for materiality.

---

[37] The Amended Complaint differs significantly in this respect from the complaint in *Comstor*, 308 F. Supp. 3d 56, where the relator presented no allegations (aside from the regulatory requirements) that the Government consistently refused to pay claims in the mine run of cases based on noncompliance with requirements, and acknowledged, moreover, that there were exceptions to the rules requiring compliance so that the GSA would work with vendors to address compliance issues instead of outright rejecting claims, and thus the Government often continued payments even when violations were known. *Id.* at 86, 87.

Finally, the FCC's decision denying bid credits to the other purported Auction 97 DEs on controlling interest grounds is clear evidence that, as the D.C. Circuit has confirmed, compliance with these rules *is* material to the FCC's bid award decisions. *Northstar Wireless, LLC v. FCC*, 2022 WL 2203808, at *22 (D.C. Cir. 2022), and *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021 (D.C. Cir. 2017).

### 3.    The Amended Complaint Satisfies the Pleading Requirements for Scienter

Liability under the FCA requires that the alleged false claims be made knowingly, either by "(1) having actual knowledge, (2) acting in deliberate ignorance, or (3) acting in reckless disregard." *Folliard,* 764 F.3d at 29; 31 U.S.C. § 3729(b). The complaint must allege both knowledge of a regulatory or contractual violation, and knowledge that the violation or noncompliance would be material to the government's decision to pay. *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 103 (D.D.C. 2017). Under Rule 9(b), scienter may be "averred generally" as long as the plaintiff pleads "the factual basis which gives rise to a strong inference of fraudulent intent." *Comstor,* 308 F. Supp. 3d at 88. A relator has adequately pled scienter when the complaint provides factual specificity concerning the type of fraud, how it was implemented, and a concrete example corroborating the pattern of fraud as alleged. *United States ex rel. Heath v. AT&T, Inc.,* 791 F.3d 112, 125 (D.C. Cir. 2015). Because scienter is a fact-intensive inquiry, however, it generally cannot be resolved on a motion to dismiss or a motion for summary judgment. *See United States ex rel. Morsell v. Symantec Corp.*, No. CV 12-800 (RC), 2020 WL 5651277, at *29 (D.D.C. Mar. 30, 2020) (citing *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003)).

The Amended Complaint specifically alleges in considerable detail that the Defendants made and filed numerous false statements in order to obtain and retain benefits for which they were ineligible, and took affirmative steps to further their conspiracy to defraud the Government.

Defendants assert, however, that they lacked scienter because the FCC rules are complex, and that Relators have not alleged that Defendants' interpretation of the rules was "objectively unreasonable." (*USC Memo,* pp. 36-37*; KSW Memo*, pp. 34-35*; see also Advantage Memo,* pp. 27-30 (which raises the argument in the context of falsity). As this court has explained, however, a defendant's claim that it was innocently confused by the rules "requires the development of a factual record." *United States v. Newman*, No. 16-1169 (CKK), 2017 WL 3575848, at *8 (D.D.C. Aug. 17, 2017).[38]

Furthermore, "scienter is not determined by the ambiguity of a regulation, and can exist even if a defendant's interpretation is reasonable." *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017); *Newman*, 2017 WL 3575848, at *8 (same); *United States ex rel. Nevyas v. Allergan, Inc.*, Civ. A. No. 09-432, 2015 WL 4064629, at *6 (E.D. Pa. July 2, 2015) (defendant's "reasonable interpretation of the law and applicable regulatory framework may well be a defense to liability, but it is not appropriate at the motion to dismiss stage when there are reasonable interpretations to the contrary"). Moreover, where a relator can point to "interpretive guidance that might have warned [defendant] away from the view it took," dismissal is not warranted. *See, e.g.*, *United States ex rel. Streck v. Bristol-Myers Squibb Co.*, No. CV 13-7547, 2018 WL 6300578, at *13 (E.D. Pa. Nov. 29, 2018).

Notably, Relators allege that Defendants *deliberately* violated FCC regulations by creating a sham company (Advantage) to acquire licenses with government-provided bid credits, and

---

[38] All the cases cited by Defendant U.S. Cellular were dismissed well past the pleading stage based on the factual records developed through the proceedings. *See, e.g.*, *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-89 (D.C. Cir. 2015) (overturning jury verdict); *United States ex rel. Smith v. The Boeing Co.*, 825 F.3d 1138, 1151 (10th Cir. 2016) (reviewing summary judgment); *United States ex rel. K & R Limited P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983-84 (D.C. Cir. 2008) (reviewing summary judgment).

making false and fraudulent statements to the FCC to accomplish this, not that Defendants (particularly U.S. Cellular and DiNardo with their experience of FCC auctions) misinterpreted the DE rules. (¶¶ 2, 8, 9, 83). *See Gabelli*, 345 F. Supp. 2d at 336-37 (rejecting argument that because defendants merely had different interpretation of *de facto* control, FCA claim was not well pled, and finding instead that allegations that "defendants *deliberately* violated FCC regulations by concealing relevant financial relationships and falsely certifying that they were eligible for federal monies" were sufficient to state FCA claim) (emphasis in original).

The King Street Defendants argue that the Amended Complaint fails to allege scienter as to them, because it does not allege that King Street or DiNardo knew the contents of Advantage's false claims. (*KSW Memo,* p. 33). Apart from the implausibility of this claim in light of DiNardo's previous experience filing the same applications for other DEs, the Amended Complaint alleges that Defendants filed and *caused* to be filed with the FCC numerous false records and statements, as part of their scheme to use Advantage as a sham "very small business" to acquire bid credits, and that they did so knowingly. (¶¶ 9, 83, 104, 146, 148, 152, 156). The Amended Complaint specifically alleges that DiNardo had a history of fronting DEs for U.S. Cellular (¶¶ 19, 68); that Vail's role in Advantage was necessitated by the need to limit DiNardo's visibility in yet another DE associated with U.S. Cellular (¶¶ 75-76 ); that Advantage's participation in FCC Auction 97 was conducted under the auspices and control of DiNardo/King Street (as well as U.S. Cellular) (¶¶ 86, 89, 91-92); that DiNardo (as well as U.S. Cellular) controlled Advantage before, during and after the time that the Short- and Long-Form Applications certifications were filed (¶¶ 4, 81, 83-86, 103,); and that Vail lacked the experience and qualifications to conduct the bidding on his own. (¶ 90). Without DiNardo/King Street to staff, guide, and control Advantage's bidding for

U.S. Cellular, Advantage could not have participated in the auction as a DE, including the filing of the applications with the false certifications.[39]

Advantage's argument that Relators have not alleged scienter because Advantage filed multiple agreements and disclosures with the FCC also fails. (*Advantage Memo,* p. 29). The Amended Complaint specifically alleges that these disclosures were summary, incomplete, misleading, and are further evidence of Defendants' intent to conceal their *de facto* control of Advantage from the FCC. (¶ 9). *See Gabelli*, 345 F. Supp. 2d at 337 (it is enough that plaintiff alleged that defendants falsely certified (or conspired to do so) that they were a very small business, entitled to federal discounts, even if they otherwise truthfully disclosed information to the FCC).

In this case, the FCC's rules and orders provided clear guidance to Defendants that their actions were in violation of the DE rules. Indeed, the *de facto* control standard has been explained in FCC precedent and court cases for decades,[40] and the standards have not changed since the DE program began in 1994.

---

[39] Defendants also argue that, because the FCC has granted DE bid credits to DiNardo's companies since 2002, Defendants "had no reason to doubt the propriety of [the] Advantage arrangement." (*KSW Memo,* pp. 42-43; *see also USC Memo,* p. 44.) The fact that U.S. Cellular and DiNardo were successful in in the past does not mean they lacked knowledge of its impropriety, nor does FCC silence equal approval. Moreover, the examples King Street Defendants cite of the FCC approving similar arrangements involving U.S. Cellular (*KSW Memo,* p. 43 n.13) are easily distinguishable as the challenge was untimely, lacked standing, and featured completely different indicia of control. *In re Minnesota PCS, L.P.*, 17 FCC Rcd. 126 (2002).

[40] *See Application of Ellis Thompson Corp.*, 9 FCC Rcd. 7138, ¶¶ 9-10 (1994); *Intermountain Microwave*, 24 Rad. Reg. 7 (P & F) 983 (1963); *Application of Baker Creek Communications, L.P.*, 13 FCC Rcd. 18709 (1998) (finding that non-DE investor had de facto control of DE). Furthermore, the FCC's Auction 97 *Public Notice*, 29 FCC Rcd 8386, ¶¶ 79-89 (2014) fully explained the DE rules and precedent to Auction 97 bidders, and warned that "applicants should review carefully the Commission's decisions regarding the designated entity provisions." *Id*. at ¶ 79.

**4.      The Amended Complaint Satisfies the Pleading Requirements for Conspiracy**

Any person who "conspires to commit a violation of" any of the provisions in the FCA is liable under the Act. 31 U.S.C. § 3729(a)(1)(C). Liability requires that: "(1) 'an agreement existed to have false or fraudulent claims allowed or paid' to the government, (2) each alleged member of the conspiracy 'joined that agreement,' and (3) 'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'" *Miller*, 608 F.3d at 899. "General civil conspiracy principles apply to FCA conspiracy claims." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 140 (D.D.C. 2010).

The Amended Complaint alleges that U.S. Cellular, DiNardo, and Advantage entered into numerous agreements to violate the FCA, including the arrangements establishing the corporate and financial relationships between and among them, and the concealment of these relationships from the FCC, and that each of the Defendants was a party to these various agreements. (*See, e.g.*, ¶¶ 2, 4, 6-7, 103). Furthermore, as also alleged in the Amended Complaint, Defendants performed numerous overt acts in furtherance of the conspiracy, including, but not limited to: (a) filing a false and fraudulent Short-Form Application (¶¶ 77-82); (b) entering into Bidding Protocol Agreements, and agreeing to bid on licenses that were adjacent to or overlapped with U.S. Cellular's pre-existing licenses (¶¶ 84, 86, 94); (c) filing a false and fraudulent Long-Form Application (¶¶ 96-104); (d) entering into, and concealing, Management Services Agreements (¶ 109); and (e) making false and misleading statements regarding the nature of their association (¶¶ 78-81).

The King Street Defendants' claim that U.S. Cellular was the "hub" and that Relators have not alleged any particularized allegations linking them and Advantage (*KSW Memo*, p. 32) is simply not true. Advantage and Vail used King Street offices for the auction (¶ 89), the other authorized bidder was a King Street employee (¶ 91), DiNardo was present during the auction (¶

51

92), DiNardo, along with U.S. Cellular, determined what licenses to bid on (¶ 86), and, through

Nonesuch, DiNardo had an economic stake in the conspiracy.

Accordingly, Relators have sufficiently pled that Defendants engaged in a conspiracy to

violate the FCA. *See Gabelli*, 345 F. Supp. 2d at 337-38 (where complaint alleged that defendants

conspired to get fraudulent claims allowed by the Government and the bidder defendants

affirmatively acted to get false claims paid by certifying that they were eligible for discounts,

conspiracy pleading was sufficient).

### 5.    The Amended Complaint Satisfies the Pleading Requirements for Reverse False Claims

Reverse false claims facilitate the improper withholding of money or property to which the

United States is legally entitled. *See United States ex rel. Landis v. Tailwind Sports Corp*., 160 F.

Supp. 3d 253, 255–56 (D.D.C. 2016). Direct and reverse false claims are mirror images of one

another—both result in a loss to the Government. *Id*. (citing *United States ex rel. Ervin & Assocs.,

Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 37 (D.D.C. 2005) (Congress intended §

3729(a)(7) "to treat 'an individual who makes a material misrepresentation to avoid paying money

owed to the Government ... as if he submitted a false claim to receive money'")). The statute

applies to any person who "knowingly conceals or knowingly and improperly avoids or decreases

an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

The 2009 FERA amendments to the FCA "expanded the type of conduct underlying a reverse false

claim action to include presentment (i.e., making a claim-related submission), as well as a material

false statement, thereby mirroring sections 3729(a)(1)(A) and 3729(a)(1)(B)." *Pencheng Si*, 71 F.

Supp. 3d at 88–89. They also broadened the relevant payment obligation by defining "obligation"

as "an established duty, whether or not fixed, arising from an express or implied contractual,

grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

Relators have properly alleged reverse false claims in Count Four of the Amended Complaint. As thoroughly discussed, *supra*, the allegations more than meet the requirements for materiality, scienter, and falsity. With respect to Count Four specifically, Relators have sufficiently pled that Defendants knowingly made, used, and caused to be made and used false records and statements, including false and fraudulent DE Annual Reports and Construction Notices, that were material to their obligation to pay and transmit money and property to the Government. These knowing concealments and false statements were made to avoid and decrease their statutory obligation to pay and transmit money and avoid unjust enrichment payments to the Government. *See United States ex rel. Riedel v. Boston Heart Diagnostics Corp.*, 332 F. Supp. 3d 48, 82 (D.D.C. 2018) ("[A] typical reverse false claim action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due.").

### 6. The King Street Defendants Are Liable for False and Fraudulent Claims Regarding Advantage

There is no basis for the King Street Defendants' claims that they are not liable for the false statements in the Advantage Short-Form and Long-Form Applications, because DiNardo sold her interest in Advantage before the licenses were granted, or because the Amended Complaint does not allege that DiNardo or King Street actually filed or signed the statements in the application. (*KSW Memo,* pp. 35-39). First, the false statements in the Short Form and Long Form Applications regarding Advantage's DE eligibility for bidding credits were filed before DiNardo allegedly sold her 49% ownership interest in Advantage. Similarly, liability does not turn on whether DiNardo's or King Street's name was on the signature line of the Advantage applications. To the contrary, the plan to have Vail sign and file the documents, and thereby conceal DiNardo and King Street's

role, is, as alleged in the Amended Compliant, another instance of Defendants' conspiracy to hide the locus of *de facto* control and affiliation. Further, it is premature at this stage to rule out whether DiNardo actually prepared or filed the applications for Advantage with Vail's signature, especially given her years of prior experience with FCC filings and Vail's lack of experience with such filings. (¶¶ 89, 90).

Moreover, even if King Street and DiNardo did not physically submit the false statements, they are still liable for having **caused** them to be submitted. 31 U.S.C. §§ 3729(a)(1)(A), (B), (G). (¶ 9). FCA liability "extends beyond the person making the false claim to one who engages in a fraudulent course of conduct that induces payment by the government" or who "knowingly assisted in causing the government to pay claims which were grounded in fraud." *United States ex rel. Tran v. Computer Sciences Corp.*, 53 F. Supp. 3d 104, 126 (D.D.C. 2014). Such actions are "a substantial factor in causing, if not the but-for cause of, submission of false claims." *Id.* Courts have found a non-submitting party **caused** false claims "where the non-submitter was the driving force behind an allegedly fraudulent scheme," or even if it was not the "prime mover," where, as DiNardo did, it "agreed to take certain critical actions in furtherance of the fraud." *Id.* at 127.

Here, King Street and DiNardo were essential actors in (and the but-for cause of) the alleged fraud. They did this by using Advantage as a "sham" very small business to acquire bid credits (¶¶ 2, 8, 83), determining the bidding strategy and which licenses to bid on (¶¶ 4, 86, 94, 133), providing the offices from which Vail purportedly bid (¶ 89), providing a King Street employee, Hinz, to be the only other authorized bidder (¶ 91), being present during bidding (¶ 92), and controlling Advantage's FCC filings (¶ 133).[41]

---

[41] King Street's claim that Relators' allegations regarding "DiNardo/King Street" necessarily means "DiNardo and/or King Street," and thus that Relators have not pled with the requisite particularity, misses the mark. (*KSW Memo, p.* 38.) First, the use of a backslash means "and," not

C.      **The Relators Should Be Permitted to Proceed with Their Case Against Defendants**

In the event this Court finds that Relators' Amended Complaint should be dismissed, such dismissal should be without prejudice. Relators should not be deprived of the opportunity to correct any defects this Court may find in the current Complaint. Such an opportunity would hardly represent a "futile" exercise, as Defendants contend, but would better serve the interest of justice. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

### IV.      CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss should be denied in their entirety.

Dated: July 27, 2022                    Respectfully submitted,

                                        */s/ Sara M. Lord*

                                        Sara M. Lord
                                        ARNALL GOLDEN GREGORY LLP
                                        1775 Pennsylvania Avenue NW, Suite 1000
                                        Washington, DC 20006
                                        Telephone:  202.677.4058
                                        Fax:  202.677.4059
                                        sara.lord@agg.com

                                        Benjamin James Vernia, DC Bar No. 441287
                                        THE VERNIA LAW FIRM
                                        1455 Pennsylvania Avenue NW, Suite 400
                                        Washington, DC 20004
                                        Telephone:  202.349.4053
                                        Fax:  866.572.6728

---

"or," and is appropriate when talking about an individual and a related entity whose actions are intertwined. This is in contrast to the *Scollick* case King Street cites which used "and/or" when referring to the actions of two different *individuals* and so failed to identify with particularity the individuals involved. *Scollick,* 2021 WL 737077, at *10. Further, unlike *Scollick* where "most" of the fraud allegations used "and/or," only a handful of allegations in the Amended Complaint use a backslash between DiNardo and King Street. *Id.*

Email: bvernia@vernialaw.com

*Attorneys for Relators Mark J. O'Connor*
 *and Sara F. Leibman*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on this 27th day of July, 2022, she caused an electronic copy of the foregoing document, the Plaintiffs/Relators' Consolidated Response in Opposition to Defendants' Motions to Dismiss, to be served on counsel listed below by filing it in the court's electronic-filing (CM/ECF) system, as Local Civil Rule 5.4(d) authorizes:

*Attorneys for Defendants Advantage Spectrum, L.P. and Sunshine Spectrum, Inc. (as successor to Nonesuch, Inc.)*

David W. DeBruin, Esq.
David Bitkower, Esq.
JENNER & BLOCK LLP
1099 New York Avenue, N.W., Suite 900
Washington, DC 20001
Telephone: 202.639.6048
Fax: 202.639.6066
ddebruin@jenner.com
dbitkower@jenner.com

Daniel J. Weiss, Esq.
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60618
Telephone: 312.222.9350
Fax: 312.527.0484
dweiss@jenner.com

*Attorneys for Defendants King Street Wireless, L.P., King Street Wireless, Inc., and*

Andrew S. Tulumello, Esq.
Chantale Fiebig
Weil, Gotshall & Manges LLP
2001 M Street, N.W.
Suite 600
Washington, DC 20036-5306
Drew.tulumello@weil.com
Chantale.fiebig@weil.com

*Attorneys for Defendants United States Cellular Corporation, USCC Wireless Investment, Inc., and Telephone and Data Systems, Inc.*

Frank R. Volpe, Esq.
Robert Joseph Conlan, Jr., Esq.
Benjamin M. Mundel
Gabriel Schonfeld
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: 202-736-8000
Fax: 202-736-8711
fvolpe@sidley.com
rconlan@sidley.com

*Attorney for Interested Party United States of America*

Darrell C. Valdez
DOJ-USAO
Patrick Henry Building
601 D Street, N.W.
Washington, DC 20530
(202) 252-2507
darrell.valdez@usdoj.gov

*/s/ Sara M. Lord*
Sara M. Lord