**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA**, *ex rel.*, **MARK J. O'CONNOR** and **SARA F. LIEBMAN**,

        Plaintiff-Relators,

      v.

**U.S. CELLULAR CORPORATION**, *et al.*,

        Defendants.

No. 20-cv-2070 (TSC)

---

**<u>MEMORANDUM OPINION</u>**

In this *qui tam* action under the False Claims Act, Relators Mark O'Connor and Sara Liebman allege that U.S. Cellular Corporation—acting through its proxy, Allison DiNardo, and a sham company, Advantage Spectrum, L.P.—purchased spectrum licenses at auctions conducted by the Federal Communications Commission ("FCC") using nearly $113 million in fraudulently obtained small business bidding credits.  At the time, U.S. Cellular was the "fifth largest commercial mobile phone operator in the United States," and ineligible for small business credits.  *See* Am. Compl. ¶ 13, ECF No. 174.  Defendants now move to dismiss.  *See* ECF Nos. 212, 213.  For the following reasons, the court will DENY the motions.

## I.     BACKGROUND

### A.  False Claims Act

"Enacted in 1863, the False Claims Act 'was originally aimed . . . at stopping the massive frauds perpetrated by large contractors during the Civil War.'"  *Universal Health Servs., Inc., v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) (quoting *United States v. Bornstein*, 423 U.S. 303, 309 (1976)).  To that end, the FCA made it unlawful, among other things, for an

individual to "knowingly present[], or cause[] to be presented, a false or fraudulent claim for payment or approval" to the government. 31 U.S.C. § 3729(a)(1)(A). "A violator faces civil penalties up to $10,000 per claim and treble damages." *United States ex rel. Cimino v. IBM*, 3 F.4th 412, 415 (D.C. Cir. 2021).

If the government declines to proceed with an FCA claim, private individuals—called "relators"—may pursue *qui tam* actions on the government's behalf. 31 U.S.C. § 3730(b). A prevailing relator can receive up to 30 percent of any settlement or judgment. *See id.* § 3730(d). The FCA's decision to authorize *qui tam* actions—which have "been used throughout American and English history as a means to discover and to prosecute fraud against the national treasuries"—"was precipitated by a desire to combat widespread corruption and fraud amongst defense contractors who supplied the Union Army." *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 752 (5th Cir. 2001) (en banc).

## B.  Spectrum Auctions

Telecommunications companies provide cellular and other wireless services by "transmit[ing] sound, data, and video" across radio frequencies that form part of the "electromagnetic spectrum." *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1025 (D.C. Cir. 2017) (cleaned up). Under the Communications Act of 1934, no company may use radio spectrum without an FCC license. *See* 47 U.S.C. §§ 301, 307. To "apportion spectrum licenses among competing companies, the [FCC] holds auctions that involve a two-step license application process." *United States ex rel. Vermont Nat'l Tele. Co. v. Northstar Wireless*, LLC, 34 F.4th 29, 31 (D.C. Cir. 2022). First, "companies submit streamlined, short-form applications . . . concerning their eligibility to bid in the auction." *Id.* at 32 (cleaned up). "Second, winning

bidders file a more comprehensive long-form application to demonstrate their qualifications to hold spectrum licenses[.]" *Id.* (cleaned up).

Spectrum licenses are expensive—one of the many "high barriers to entry in the telecommunications market." *United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 281–82 (D.C. Cir. 2025) ("*King Street*"). To "avoid[] excessive concentration of licenses" among deep-pocketed corporations, Congress directed the FCC to develop "competitive bidding system[s]" to promote the dissemination of licenses "among a wide variety of applicants, including small businesses." 47 U.S.C. § 309(j)(3). "To implement this statutory goal, the FCC established a program that provides qualifying small businesses, *i.e.*, designated entities, with bidding credits that effectively discount the cost of their licenses." *King Street*, 128 F.4th at 281–82. Although "the FCC . . . encourages larger companies to invest in and support designated entities," *id.* at 282, "FCC regulations specify that bidding credits can only be used by genuine small businesses—not by small sham companies that are managed by or affiliated with big businesses." *SNR Wireless*, 868 F.3d at 1026. Companies claiming bidding credits must certify certain information regarding their eligibility for those credits—under penalty of perjury—in both their short-form and long-form applications. *See Northstar Wireless*, 34 F.4th at 32.

In May 2014, the FCC announced Auction 97. *SNR Wireless*, 868 F.3d at 1026. "The Auction Notice explained that small businesses would be eligible to receive bidding credits [that] would depend on the amount of the designated entities' 'attributable' revenues over the preceding three years." *Id.* So-called "very small businesses"—*i.e.*, "entities with less than $15 million in attributable annual revenues"—"could receive a twenty-five percent discount" on their winning bids. *Id.*

"As relevant here, attributable revenues included the revenues of the small business itself[,] the revenues of any entity with '*de facto* control' over" the small business, and the revenues of any entity with an "attributable material relationship" to the small business. *SNR Wireless*, 868 F.3d at 1026 (quoting *Auction Notice*, 29 F.C.C. Rcd. 8386, 8412–13 (2014)); *see also* 47 C.F.R. § 1.2110(b)(1)(i) (2012)). *De facto* control "turns on whether the allegedly controlling entity appoints a majority of the [small business]'s board of directors, has authority to appoint its senior executives, or plays an integral role in its management." *United States ex rel. O'Connor v. U.S. Cellular Corp.*, 153 F.4th 1272, 1276 (D.C. Cir. 2025) ("*Advantage Spectrum*"). "An 'attributable material relationship' exists if the applicant agrees to lease at least '25 percent of the spectrum capacity' of any license to another company." *Id.* (quoting 47 C.F.R. § 1.2110(b)(3)(iv)(A) (2012)). Under the "unjust enrichment rule," any designated entity that receives a small business bidding credit must repay some or all of that credit if the entity sells its spectrum license to, or becomes subject to the control of, "another entity that is ineligible for the credit" "within five years of obtaining [that] license." *Id.* (cleaned up).

## C. Factual Allegations

This *qui tam* action is based on allegations "that U.S. Cellular controlled and had an attributable material relationship with Advantage" Spectrum, L.P.—a relationship "which these companies concealed from the FCC" in order to appear eligible for small business bidding credits for use at Auction 97. *Advantage Spectrum*, 153 F.4th at 1276. Specifically, Relators allege that since 2002, U.S. Cellular has worked with Defendant Allison DiNardo to form "small business . . . fronts" "secretly" controlled by U.S. Cellular. Am. Compl. ¶ 68, ECF No. 174. These fronts, nominally controlled by DiNardo, purchased spectrum licenses at several FCC auctions using small business bidding credits for which U.S. Cellular was ineligible. *Id.* ¶¶ 68–

69.  When the unjust enrichment periods ended, the sham companies formally transferred their licenses to U.S. Cellular.  *Id.* ¶ 68.

After the FCC announced Auction 97 in May 2014, U.S. Cellular and DiNardo engaged William Vail, a retiree living in Florida.  Am. Compl. ¶ 76.  Because several designated entities were already registered in DiNardo's name, U.S. Cellular and DiNardo needed to establish a designated entity that appeared to be controlled by "someone other than DiNardo."  *Id.* ¶ 75.  In August 2014, Vail registered Advantage Spectrum as a limited partnership and listed himself, through two corporate intermediaries, as its general partner.  *Id.* ¶¶ 17, 21.  Through a web of intermediaries, Vail owned 5.1% of Advantage, DiNardo owned 4.9%, and U.S. Cellular owned the remaining 90%.  *Id.* ¶¶ 12–19.  Although DiNardo and U.S. Cellular were purported to be limited partners, Relators allege that under "undisclosed agreements," DiNardo and U.S. Cellular controlled Advantage's bidding activities, U.S. Cellular built out Advantage's network during the unjust enrichment period, and Vail agreed that he would "formally transfer" Advantage and its "licenses to U.S. Cellular" after the unjust enrichment period ended.  *Id.* ¶¶ 102–03.

In November 2014, Advantage submitted its short-form application to participate in Auction 97 and claimed bidding credits as "a very small business."  Am. Compl. ¶ 77.  To obtain those credits, Vail "falsely and fraudulently" certified that he had controlling interests in Advantage, and that no one else had any such interest.  *Id.* ¶ 78.  Although Vail disclosed that U.S. Cellular and DiNardo had non-controlling interests in Advantage, he "falsely and fraudulently" certified that their revenues "were not attributable to Advantage" because "they were not affiliates."  *Id.* ¶ 79.

At the auction, Advantage submitted winning bids for 124 spectrum licenses totaling $451 million, for which it claimed nearly $113 million in small business bidding credits.  Am.

Compl. ¶ 95.  U.S. Cellular provided the remaining $338 million.  *Id.*  Having won the licenses, Advantage submitted a long-form application which again falsely claimed that Vail was Advantage's sole controlling interest holder, and that Vail had "sole authority" to determine Advantage's bids.  *Id.* ¶¶ 96–103.

According to Relators, these various assertions were fraudulent because "U.S. Cellular and DiNardo were and had the controlling interests in Advantage Spectrum," such that Advantage was ineligible for the small business bidding credits that it received, and U.S. Cellular and DiNardo effectively controlled Advantage's bidding.  Am. Compl. ¶ 81.  Relators allege that they observed Advantage's purported place of business at the time of the auction and discovered that the office suite was "vacant without any furniture or signage."  *Id.* ¶ 87.  Through "surveillance," Relators concluded that Advantage's bidding was actually conducted from DiNardo's offices on King Street in Alexandria, Virginia.  *Id.* ¶ 89.  Moreover, although Vail had worked "as a general manager of local or regional cellular telephone systems" before retiring to Florida, he had no prior "experience in spectrum auctions" and thus was unqualified to lead Advantage's bidding.  *Id.* ¶ 90.  U.S. Cellular thus "arranged for DiNardo to oversee Vail's" bidding activities.  *Id.*  To facilitate DiNardo's supervision, one of her employees, Stephen Hinz, was listed on Advantage's auction registration as Advantage's only authorized bidder other than Vail.  *Id.* ¶ 91.  Relators further allege that DiNardo and other U.S. Cellular employees were present at the auction and "participated in the bidding decisions."  *Id.* ¶ 92.  These allegations therefore undercut Vail's certification to the FCC that he had "sole authority" to determine Advantage's bidding activities.  *Id.* ¶ 102.

While Advantage's long-form application was pending, the FCC disqualified two purported small businesses from receiving bidding credits because it found that those entities

were "*de facto* controlled by their large investor, DISH Network." *Id.* ¶ 106 n.4. Shortly thereafter, DiNardo sold her interest in Advantage to Vail to further shield Advantage from FCC scrutiny. *Id.* ¶ 105. In July 2016, the FCC issued the licenses to Advantage with nearly $113 million in small business bidding credits, with the unjust enrichment period set to end in July 2021. *Id.* ¶ 111. Those licenses were conditioned on compliance with certain buildout requirements. *See* 47 CFR § 27.14(s)(1)–(2). Specifically, Advantage was required to offer reliable signal coverage and service to at least 40 percent of the population living in the licensed areas within six years—exactly one year after the unjust enrichment period ended. *Id.*

Relators claim that because Advantage "never had any employees other than William Vail" and subsequently "claimed as its business addresses an unoccupied interior room in a condo complex, a storefront in a strip mall, and a home address in a retirement community," Advantage had no real capacity to meet the six-year buildout requirements. Am. Compl. ¶¶ 118, 122, 124. "To enable Advantage to begin to appear to meet" these requirements, U.S. Cellular entered into leases with Advantage. *Id.* ¶ 124. At the same time, to "prevent U.S. Cellular's gross revenues from being attributed to Advantage," Advantage falsely and fraudulently certified in FCC lease notifications that U.S. Cellular's leases allowed U.S. Cellular to use less than 25% of Advantage's licensed spectrum. *Id.* ¶¶ 126–28. Between 2016 and 2020, Advantage submitted annual reports to the FCC falsely certifying that "it had not entered into any agreements or arrangements . . . related to its eligibility" as a designated entity. *Id.* ¶¶ 112–17.

### D. Procedural History

In 2015, Relators filed their initial Complaint in this case. *See* Compl., ECF No. 2. In 2019, the Justice Department declined to pursue the claims itself, allowing Relators to press forward on the government's behalf. *See* Notice of Election to Decline Intervention, ECF No.

42.  Defendants then moved to dismiss, arguing in part that Relators' claims were barred under the public disclosure doctrine because Relators' allegations were substantially the same as and did not materially add to information already publicly disclosed by Advantage's FCC filings, which had revealed U.S. Cellular's investments in Advantage.  This court agreed with Defendants and dismissed the Complaint without prejudice.  *See* Mem. Op. at 14, ECF No. 170. Because Relators' Amended Complaint, ECF No. 174, did not materially alter the initial Complaint, this court dismissed that pleading as well.  *See* 2d Mem. Op. at 5, ECF No. 189 ("Advantage's FCC filings and other publicly available documents continue to bar Plaintiffs-Relators' claims.").

The D.C. Circuit reversed, explaining that to secure dismissal based on public disclosure, a defendant must show that "'substantially the same allegations or transactions as alleged'" by the relators "were 'publicly disclosed'" through certain "public channels."  *Advantage Spectrum*, 153 F.4th at 1277 (quoting 31 U.S.C. § 3730(e)(4)(A)).  Even if the allegations are substantially the same, the public disclosure bar does not apply if the relator "'has knowledge that is independent of and materially adds to the publicly disclosed allegations' and has 'voluntarily provided' it to the Government before filing the *qui tam* action."  *Id.* at 1280 (quoting 31 U.S.C. § 3730(e)(4)(B)(2)).

The D.C. Circuit expressed skepticism that Advantage's FCC filings disclose "substantially the same fraud" alleged by Relators, but declined to resolve the issue.  *See Advantage Spectrum*, 153 F.4th at 1279.  Instead, the Circuit held that even if the Amended Complaint focuses on substantially the same fraud, it nevertheless "adequately alleges facts that materially add to information already publicly disclosed."  *Id.* at 1280.  Specifically, Relators "identified significant new evidence that Advantage never functioned as an independent

business"—that is, Relators identified evidence that Advantage "never had a legitimate place of business, employed anyone, or conducted itself in any way as if it were a business," that Vail lacked "the experience to run a wireless company," and that Vail was purporting to run Advantage from his "Florida retirement community." *Id.* at 1281. The Circuit also credited Relators' allegations that Vail entered into "an undisclosed agreement" with U.S. Cellular to transfer Advantage to U.S. Cellular once the unjust enrichment period ended. *Id.* at 1282. Those allegations are plausible, the Circuit explained, because the Amended Complaint specifically detailed facts which, if proven, would show that "Advantage entirely failed to build up a telecommunications company capable of functioning independent of U.S. Cellular" and this behavior would make "little sense unless [it] had agreed in advance" to eventually transfer its licenses to U.S. Cellular. *Id.* (cleaned up).

On remand, Defendants U.S. Cellular and its affiliated companies, and Allison DiNardo again move to dismiss, raising arguments not directly addressed by the D.C. Circuit. *See* U.S. Cellular MTD, ECF No. 212; DiNardo MTD, ECF No. 213. Because neither motion persuades, they will both be DENIED.

## II.    LEGAL STANDARDS

"Because the FCA is an antifraud statute, relators must satisfy both the 'plausibility' standard of Federal Rule of Civil Procedure 8 and the heightened 'particularity' standard of Rule 9." *Advantage Spectrum*, 153 F.4th at 1277. "Under Rule 8, the complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Under Rule 9, the complaint 'must state with particularity the circumstances constituting fraud.'" *Id.* (quoting Fed. R. Civ. P. 9(b)).

## III.   ANALYSIS

### A.  Public Disclosure Bar

Defendants now contend that Relators' claims are barred by a different public disclosure—a 2008 complaint filed by O'Connor's former law firm against U.S. Cellular and DiNardo.  *See* U.S. Cellular MTD at 19–26; DiNardo MTD at 10–15.  That earlier complaint alleged that U.S. Cellular created three sham entities—King Street, Carroll, and Barat—"all under the control of Defendant Allison Cryor DiNardo," as fronts for U.S. Cellular to fraudulently obtain small business bidding credits.  *See* DiNardo MTD – Ex. C at 4, ECF No. 213-5 ("2008 Complaint"); *see also King Street*, 128 F.4th at 282.  Defendants argue that Relators' current allegations are substantially the same as the 2008 allegations because the formation of another sham entity—now with Vail as the frontperson—is merely a continuation of the scheme disclosed in 2008.  U.S. Cellular MTD at 5.  Thus, in Defendants' view, the 2008 allegations gave the government "enough information to investigate" or at least alert authorities to U.S. Cellular's allegedly fraudulent formation of Advantage Spectrum as a sham small business fronted by Vail.  U.S. Cellular MTD at 20 (quoting *United States ex rel. Winnon v. Lozano*, 146 F.4th 1197, 1208 (D.C. Cir. 2025)).

Defendants' argument is not wholly without merit.  The D.C. Circuit has "long held that identifying additional examples of an already-exposed scheme does not breathe new life into an otherwise barred claim."  *Winnon*, 146 F.4th at 1209 (citing *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 838 (D.C. Cir. 2012)).  And in Defendants' telling, Advantage Spectrum is merely a new example of "U.S. Cellular's purported general practice . . . of forming sham entities" to obtain bidding credits.  U.S. Cellular MTD at 23; *see also United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 919 (D.C. Cir. 1999) (A relator

does not overcome the public disclosure bar by "reveal[ing] specific instances of fraud where the general practice has already been disclosed.").

But Defendants fall short of showing that the 2008 Complaint alleged a general practice by U.S. Cellular of which Advantage Spectrum is just one more example.  Instead, the 2008 complaint focused on a more bounded scheme involving three specific companies all fronted by DiNardo for use in three specific auctions.  At this early stage in the litigation, Relators have plausibly alleged that Advantage Spectrum constitutes a new, distinct, and restructured scheme to create a sham entity "controlled by someone other than DiNardo"—not the already-exposed scheme of shell companies with DiNardo as the figurehead.  Am. Compl. ¶ 75.

To start, Defendants have failed to show that the 2008 Complaint alleged a sweeping general practice whereby U.S. Cellular created sham companies fronted by various people to participate in numerous auctions.  To the contrary, the 2008 Complaint framed the case narrowly around "three . . . public auctions of spectrum licenses," and alleged that U.S. Cellular created three sham companies—"all under the control of . . . DiNardo"—to fraudulently obtain bidding credits "in connection with" those three auctions, "Auctions 58, 66, and 73."  2008 Compl. at 2–4.  Thus, unlike the prior public disclosure at issue in *Winnon*, the 2008 Complaint was not as "broad and encompassing" as Defendants suggest.  U.S. Cellular Reply at 6, ECF No. 220 (quoting *Winnon*, 146 F.4th at 1209 (describing an earlier public disclosure which alleged "fraud spann[ing]" nursing home locations "across the United States" (cleaned up))).

Defendants' contrary reading of the 2008 Complaint rests in part on the complaint's reference to "U.S. Cellular's business plan."  U.S. Cellular MTD at 23 (quoting 2008 Compl. at 4).  Defendants describe the Complaint as alleging that U.S. Cellular had a business plan to acquire bidding discounts through sham companies.  *Id.*  But the 2008 Complaint used "business

plan" to refer to U.S. Cellular's strategy of purchasing licenses adjacent to its existing licenses to build contiguous markets.  2008 Compl. at 4–5.  The Complaint mentioned this only to show that U.S. Cellular stood behind DiNardo's businesses, which had acquired licenses next to U.S. Cellular's own.  It was not an allegation that U.S. Cellular had a standing practice of forming sham companies to fraudulently obtain bidding credits across numerous auctions.  As discussed above, the 2008 Complaint alleged something narrower: three specific companies fronted by DiNardo participating in three specific auctions.  *See* 2008 Compl. at 2–4.

The scheme alleged here falls outside those bounds.  Unlike with the three companies at issue in 2008, DiNardo was not Advantage's front person; she was initially cast as a limited partner in Advantage.  *Compare* Am. Compl. ¶ 79 *with* 2008 Complaint at 4 (alleging that the sham companies were "all under the control of . . . DiNardo").  And after the FCC disqualified other companies from receiving small business bidding credits, DiNardo allegedly sold her interest in Advantage to Vail to further obscure her involvement.  *Id.* ¶ 105.  That is not to say that a new front person will always create a new scheme if a defendant has an alleged general practice of using front people.  Rather, the 2008 Complaint alleged a bounded scheme of sham companies fronted by DiNardo and DiNardo alone.  *See* 2008 Compl. at 4.  What Relators allege here is a different scheme: a different sham company fronted by an entirely new person formed more than five years later for a different auction.  *See* Am. Compl. ¶ 79.  Given these differences and the absence of an allegation that U.S. Cellular had a general practice of using various frontpeople, the allegations of the 2008 Complaint would not have "alerted authorities to . . . the likelihood" that Advantage Spectrum was engaged in fraud.  *United States ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836 (D.C. Cir. 2012).

Consequently, Defendants' reliance on *King Street*, 128 F.4th 276, is misplaced.  *See*

U.S. Cellular MTD at 20; DiNardo MTD at 12; *see also* U.S. Cellular Reply at 5 ("The conclusion in *King Street* all but resolves this case too.").  *King Street* is inapposite because relators there merely alleged additional details about the same three shell companies propped up by the same front person participating in the same three auctions.  128 F.4th at 285–86.

Defendants' reliance on *Settlemire*, 198 F.3d 913, is similarly misplaced.  There, D.C. police officials "disclosed in public Congressional hearings that they were using the funds" appropriated by Congress in the D.C. Police Authorization and Expansion Act of 1989 "for purposes beyond those listed in the Expansion Act."  198 F.3d at 919.  The police chief testified that "the District believed the funds were 'virtually unencumbered in the way that the Congress intended us to use it, as long as it was used . . . for law enforcement purposes.'"  *Id.*  Because the District's "general practice" of spending 1989 Act funds for nonapproved purposes "had already been disclosed," the relator's ability to identify specific expenditures of those funds did not expose a new fraud, but merely detailed a known one.  *Id.*  *Settlemire* thus stands for the more limited proposition that a relator cannot revive a barred claim by cataloguing specific examples of a known practice; it does not hold that a later fraud is "substantially the same" as a previous one merely because they share a similar *modus operandi*.  The 2008 Complaint did not allege a similar general practice of which Advantage is one more example; it focused on three companies fronted by DiNardo participating in three auctions.  Relators do not merely add details regarding the DiNardo frauds in Auctions 58, 66, and 73; they allege an entirely different shell company using a different front person in a different auction.

Defendants similarly miss the mark by relying on *United States ex rel. Findley v. FPC-Boron Emps.' Club*, 105 F.3d 675 (D.C. Cir. 1997).  There, government reports had publicly disclosed a practice, documented and widespread across the government, whereby federal

employees' clubs stocked vending machines on federal property and kept the profits—to the chagrin of private vendors. *Id.* at 678–79.  The relators sued one club that had engaged in this practice, and the D.C. Circuit held that the suit was barred because relators "substantially repeat[ed] what the public already kn[ew]" and merely identified one member of the class of entities already known to have engaged in the "previously documented generic practice." *Id.* at 687.  The 2008 Complaint, by contrast, documented no comparable generic practice.  It did not allege that U.S. Cellular deployed a rotating cast of shell companies fronted by different people across numerous auctions.  It alleged a bounded scheme involving three specific entities, all fronted by DiNardo, in three specific auctions.  Advantage Spectrum and William Vail are therefore not one more example of "a previously documented generic practice"—they constitute a new scheme that merely used a similar *modus operandi*.  *Id.*

Finally, *United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466 (D.C. Cir. 2016), is also inapposite.  That case held that "time difference does not undermine the disclosure of [a defendant's] general practice." *Id.* at 473.  But again, the 2008 Complaint did not disclose a general practice by U.S. Cellular of forming sham companies with various front people across numerous transactions.  Had it done so, the fact that this particular sham company was established more than half a decade after the 2008 Complaint would not matter.  But Advantage Spectrum constituted a new and distinct scheme allegedly designed to obscure any connection with the previous scheme involving sham companies fronted by DiNardo.  And because the 2008 Complaint did not disclose a general practice by U.S. Cellular but instead alleged a discrete one, the time difference between that complaint and the instant allegations does affect the analysis.  "[W]hat was once a hot trail of fraud must cool at some point." *United States ex rel. Maur v. Hage-Korban*, 981 F.3d 516, 529 (6th Cir. 2020) (cleaned up).  Because allegations from 2008

regarding the scheme fronted by DiNardo would not have alerted authorities to a separate scheme fronted by Vail more than five years after the 2008 Complaint, Defendants have failed to show that the public disclosure bar applies here.

### B. Undisclosed Agreements

Defendants next argue that Relators failed to plead with particularity the alleged undisclosed agreements between U.S. Cellular, DiNardo, and Vail, through which U.S. Cellular would secretly control Advantage's bidding (through DiNardo), manage the buildout of the spectrum during the unjust enrichment period, and then take formal control of the licenses once that period ended. *See* U.S. Cellular MTD at 35; *see also* DiNardo MTD at 22 (arguing that Relators' conspiracy claim fails against her because the Amended Complaint "does not plausibly plead" with particularity "that Ms. DiNardo entered an agreement with the other defendants"). Defendants fault Relators for not specifying who was involved in that agreement, and where, when, and how it was made. U.S. Cellular MTD at 35.

Under Rule 9(b), Relators must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This usually means identifying "the who, what, when, where, and how of the alleged fraud." *United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 35 (D.D.C. 2016) (cleaned up). But "Rule 9(b) does not inflexibly dictate adherence to a preordained checklist of 'must have' allegations." *U.S. ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) (citing *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir. 2009) ("Rule 9(b)'s ultimate meaning is context-specific, and thus there is no single construction of Rule 9(b) that applies in all contexts.")). "Instead, the point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *Id.* The Amended

Complaint satisfies this standard:  It has given Defendants enough details to notify them of the alleged fraudulent scheme and raised a strong enough inference of fraud to warrant further proceedings.

To start, Relators allege how the agreements came about:  U.S. Cellular and DiNardo, who had long formed sham companies on U.S. Cellular's behalf, resolved to engage a new front person to prevent FCC scrutiny of their existing sham companies, and thus approached William Vail.  *See* Am. Compl. ¶¶ 68, 75–76.  Relators also allege that the scheme was hatched sometime between the FCC's announcement of Auction 97 in May 2014 and Vail's registration of Advantage Spectrum as a limited partnership in August 2014.  *See id.* ¶¶ 74–76.  This reasonably narrow three-month period "adequately specifie[s] the time frame"—absolute precision is not required.  *See FTC v.* Cantkier, 767 F. Supp. 2d 147, 155 n.9 (D.D.C. 2011); *see also United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 123 (D.D.C. 2014) ("To be sure, the complaint does not relate the specific dates on which [the defendant] submitted each of the invoices, but Rule 9(b) does not require as much."); *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) ("Because [the Rule 9(b)] standard does not require *absolute* particularity . . . , a complaint need not allege a precise time frame." (cleaned up)).

Relators also plainly alleged who was involved in the agreement:  U.S. Cellular, DiNardo, and Vail.  Although Defendants fault Relators for not identifying a specific person within U.S. Cellular, the D.C. Circuit has held that naming the precise actor within a corporation "is not an inexorable requirement of Rule 9(b)" in False Claims Act cases.  *Heath*, 791 F.3d at 125 ("Where the corporation is the defendant in a False Claims action, we hold that a relator need not always allege the specific identity of the natural persons within the defendant corporation[.]" (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493,

509 (6th Cir. 2007) (cleaned up)).  Moreover, Relators provided some specificity by alleging that DiNardo, a businesswoman with a long-established relationship to U.S. Cellular, has functioned as U.S. Cellular's "proxy" in overseeing Vail.  *See* Am. Compl. ¶¶ 76, 86, 89–92.  These details suffice to put Defendants on notice as to the scheme it must defend against.

Moreover, the D.C. Circuit has already concluded that Relators "plausibly alleged" the existence of undisclosed agreements to carry out a fraudulent scheme by detailing in the Amended Complaint how "Advantage entirely failed to build up a telecommunications company capable of functioning independent of U.S. Cellular."  *Advantage Spectrum*, 153 F.4th at 1282. According to the Circuit, Advantage's alleged "behavior" as a company in name only would make "little sense unless [Vail] had agreed in advance that [U.S. Cellular] would ultimately control the licenses won at auction."  *Id.* (cleaned up).  For similar reasons and given the allegations regarding who entered what agreements when, this court concludes that the Amended Complaint contains enough "particular details" to support "a strong inference" at this stage that undisclosed agreements existed between U.S. Cellular, DiNardo, and Vail.  *Heath*, 791 F.3d at 126 (cleaned up).

This conclusion also disposes of DiNardo's related contention that Relators fail to state a conspiracy claim against her under 31 U.S.C. § 3729(a)(1)(C), which is Count One of the Amended Complaint.  *See* DiNardo MTD at 22–24.  To plead an FCA conspiracy, Relators must allege "(1) an agreement . . . to have false or fraudulent claims allowed or paid by the United States; (2) that [Defendants] willfully joined that agreement . . . ; and (3) that one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy."  *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010) (per curiam).  As described above and in Part III.D, the Amended Complaint

adequately alleges that DiNardo entered an undisclosed agreement with U.S. Cellular and Vail to defraud the FCC, Am. Compl. ¶¶ 68, 75–76, and that DiNardo and others committed several overt acts to advance that agreement, including acting as U.S. Cellular's proxy in directing Vail's bidding. *Id.* ¶ 86.

### C. Materiality

"To be actionable under the FCA, 'a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision.'" *Northstar Wireless*, 34 F.4th at 36 (quoting *Escobar*, 579 U.S. at 192). "A misrepresentation is 'material' . . . if it has a 'natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *Id.* (quoting 31 U.S.C. § 3729(b)(4)). Pointing to the Supreme Court's decision in *Escobar*, Defendants emphasize that when "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements were not material." DiNardo MTD at 27 (quoting *Escobar*, 579 U.S. at 195); *see also* U.S. Cellular MTD at 31 (quoting the same). Thus, Defendants argue, because the FCC knew of Relators' allegations from the initial complaint filed in 2015, the FCC's subsequent decision in 2016 to approve Advantage's licenses and bidding credits shows that Relators' allegations were not material to the government. *See* DiNardo MTD at 27; U.S. Cellular MTD at 31. That argument is unavailing.

Although the FCC may have known of Relators' *allegations* in 2015 that U.S. Cellular and Advantage Spectrum had violated the bidding credit regulations, that does not mean the FCC had "actual knowledge that [those] requirements *were violated*." *Escobar*, 579 U.S. at 195 (emphasis added). Knowledge of allegations is not knowledge of an actual violation. *See United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016)

(explaining on remand from the Supreme Court that "mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance"); *United States ex rel. Heath v. Wisconsin Bell*, 92 F.4th 654, 665 (7th Cir. 2024) ("The government's knowledge of a pending lawsuit making allegations simply does not indicate actual knowledge of actual violations."). The FCC may have approved Advantage's bidding credits because it did not believe Relators' allegations, not because it deemed the alleged violations, if true, immaterial.

The materiality of a violation and an agency's belief about whether that violation occurred are separate questions. The materiality inquiry asks whether a misrepresentation, *if it was made*, would have influenced the government's payment decision. *See Northstar Wireless*, 34 F.4th at 36. The materiality requirement prevents the FCA from being used as "a vehicle for punishing garden-variety breaches of contract or regulatory violations"—it distinguishes material violations from trivial ones, not credible allegations from incredible ones. *Escobar*, 579 U.S. at 194. *Escobar*'s reference to the government's conduct does not change that focus: it "looked to the government's 'actual behavior' *only* to assess whether the government attaches importance to a particular statutory, regulatory, or contractual requirement." *Northstar Wireless*, 34 F.4th at 37 (quoting *Escobar*, 579 U.S. at 194) (emphasis added). *Escobar* did not look to the government's behavior to see whether the government believed the allegations of noncompliance. Because the court can at most conclude that the FCC knew of allegations, not actual violations, *Escobar*'s inference does not apply. *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 115 (2d Cir. 2021) ("At the pleadings stage, such generalized assertions that the government is aware of the relator's lawsuit but nevertheless continued payment under the contract will not suffice to overcome a relator's detailed allegations of materiality.").

Indeed, "[t]he question" at this stage is "whether [Relators] plausibly *pleaded*

materiality," and they have. *Cimino*, 3 F.4th at 423. At the pleading stage, Rule 12(b)(6) "requires [this court] to accept [Relators'] factual allegations as true, and those allegations plausibly plead that [Advantage's false certifications were] material to the" FCC's approval of the bidding credits. *Id.* Relators alleged, for example, that during Auction 97, the FCC disqualified two other designated entities from receiving bidding credits "because they were *de facto* controlled by their large investor, DISH Network Corporation." Am. Compl. ¶ 106 n.4; *see also SNR Wireless*, 868 F.3d at 1025 (upholding the FCC's determination that two purported small businesses were not entitled to bidding credits because DISH exercised *de facto* control over them). That strongly supports an inference that if the FCC believes a designated entity is not compliant with the bidding credit regulations, it regards that noncompliance as material. *See Escobar*, 579 U.S. at 194–95 ("[P]roof of materiality can include . . . evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular . . . regulatory . . . requirement."). The D.C. Circuit has already recognized that a designated entity's "alleged false certifications and failures to disclose agreements central to their eligibility for bidding credits" were material because they "were certainly '*capable* of influencing' the Commission's bidding-credit-eligibility determination." *Northstar Wireless*, 34 F.4th at 36–37 (quoting *Cimino*, 3 F.4th at 423)) (emphasis in original).

Nor does the D.C. Circuit's decision in *McBride* aid Defendants. *See United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027 (D.C. Cir. 2017). There, the relator claimed that a government contractor provided inflated headcount data to the government, possibly to justify excessive staffing costs. *Id.* at 1033. But the D.C. Circuit credited evidence that the "headcount data (false or not) had no bearing on costs billed to the government." *Id.* "Absent any connection between headcounts and cost determinations," the Circuit found it "difficult to

imagine how the maintenance of false headcounts would be relevant, much less material to the

Government's decision to pay." *Id.* *McBride*'s holding thus turned on the fact that the alleged

misrepresentation, true or not, was immaterial. The certifications at issue here are different. Far

from being irrelevant to the FCC's payment decision, Advantage's representations regarding its

qualifications as a very small business not under U.S. Cellular's control went to the core of its

eligibility for the bidding credits the FCC awarded.

McBride's further observation—that the agency awarded the contractor for "exceptional

performance" after learning of the relator's allegations and investigating—does not rescue

Defendants. 848 F.3d at 1034. That observation carried weight for reasons absent here.

Because the Circuit had already determined that the headcount data bore no relation to the

amounts billed, the exceptional performance award and continued payment merely corroborated

the conclusion that "the requirements allegedly violated" were "not material." *Id.*; *see also*

*Northstar Wireless*, 34 F.4th at 37 (noting that *McBride* looked to the government's conduct only

to assess whether the government attached importance to a particular regulatory requirement).

The *McBride* Court also had before it a summary judgment record showing that the agency

"investigated [the] allegations and did not disallow any charged costs." 848 F.3d at 1034. The

D.C. Circuit has since emphasized the distinction between the summary judgment posture in

*McBride* and the pleading stage here. *Cimino*, 3 F.4th at 423. And here, there is no comparable

record of any FCC investigation into Relators' allegations regarding Advantage and Auction 97,

followed by a decision to grant the credits anyway.[1] The facts Defendants identify—that

---

[1] Defendants' suggestion that the FCC had already investigated the allegations set forth in the 2008 Complaint is not evidence that the FCC investigated Spectrum Advantage. Any FCC investigation into the 2008 allegations would have concerned different entities in different auctions propped up by a different front person, and thus would not have revealed that

Relators filed their complaint in 2015 and that the FCC approved Advantage's bidding credits in 2016—show, at most, that the FCC was aware of Relators' allegations, not that it investigated them and awarded the credits anyway. "At a later stage in the litigation, evidence" regarding what the FCC knew and when "might be used to demonstrate" immateriality. "But the resolution of these questions is for another day." *Id.*

Finally, Defendants point to the FCC's decision in 2025 approving the transfer of control over Advantage from Vail to U.S. Cellular. *See* U.S. Cellular MTD at 32; DiNardo MTD at 30. Relators did petition the FCC to deny the transfer based on the alleged fraud, and the FCC denied the petition. But the FCC did not adjudicate the veracity of Advantage's earlier certifications regarding its eligibility for bidding credits. To the contrary, by U.S. Cellular's own telling, the FCC declined to consider "most of [Relators'] allegations" because those allegations concerned "actions taken . . . before Advantage was granted the licenses." U.S. Cellular MTD at 32. Thus, the 2025 approval order reflects, at most, the FCC's decision not to resolve the Relators' allegations, not actual knowledge that the bidding credit regulations had earlier been violated.

### D. Presentment and Scienter

Count Two of the Amended Complaint asserts that Defendants "knowingly presented, and caused to be presented, false and fraudulent claims and applications" for the payment of bidding credits, in violation of 31 U.S.C. § 3729(a)(1)(A). Am. Compl. ¶ 148. Count Three similarly asserts that Defendants "knowingly made, used, and caused to be made or used, false records or statements material to a false or fraudulent claims to the FCC" in violation of 31 U.S.C. § 3729(a)(1)(B). Am. Compl. ¶ 152. DiNardo contends that both claims must be

---

Spectrum Advantage, an entity created years later under different circumstances, violated the bidding credit regulations. *See supra* Part III.A.

dismissed against her because Relators fail to plausibly allege her knowing role in the presentment of false claims and statements. DiNardo MTD at 19, 24. The court disagrees.

Although the Amended Complaint does not allege that DiNardo herself presented any false claims to the government, the Amended Complaint adequately pleads that DiNardo knowingly *caused* Vail and Advantage Spectrum to present such claims. And "under the plain language of the False Claims Act," liability "extends beyond the person making a false claim" and "attaches to one who '*causes*'" such a claim to be made, including by "engag[ing] in a fraudulent course of conduct that induces payment by the government." *United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003) (quoting 31 U.S.C. § 3729(a)(1)) (emphasis added) (cleaned up). A defendant need not be "the but-for cause" of the "submission of false claims" so long as her "conduct was at least a substantial factor in causing" such submission. *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011) (cleaned up). "[I]n examining whether a non-submitting party has 'caused' the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission." *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 128 (D.D.C. 2014). Even when the non-submitter is not "the driving force behind an allegedly fraudulent scheme," courts have still found their involvement sufficiently significant where "they had agreed to take certain critical actions in furtherance of the fraud." *United States ex rel. Scollick v. Narula*, 215 F. Supp. 3d 26, 39 (D.D.C. 2016) (quoting *Tran*, 53 F. Supp. 3d at 128). This participation in the fraudulent scheme must still be knowing. *See* 31 U.S.C. § 3729(a)(1)(A), (B) (imposing liability only on those who "knowingly . . . cause[]" a fraudulent claim "to be presented" or "knowingly . . . cause[]" a false statement "to be made").

Here, accepting Relators' well-pleaded factual allegations as true, the court finds it "abundantly clear that [DiNardo's] participation in the scheme was sufficient to constitute a 'substantial factor in causing' [Advantage's] submission of the false claims" and that her participation was knowing. *Tran*, 53 F. Supp. 3d at 128 (quoting *Toyobo*, 811 F. Supp. 2d at 48). "[T]he complaint is replete with allegations regarding [DiNardo's] role in the [bidding credit] scheme, such that there is no doubt that [DiNardo] was fully aware of, and an active participant in, the arrangement that facilitated [Advantage's] eventual submission of allegedly false claims and false statements," even if she was not the primary driver. *Id.*

Among other allegations, the Amended Complaint asserts that DiNardo had a long history of working with U.S. Cellular to form sham designated entities, Am. Compl. ¶¶ 19, 68, 71, that she helped originate the scheme to form a designated entity fronted by a different individual to "prevent FCC scrutiny" of sham companies already in existence, *id.* ¶ 75, and that, in conjunction with U.S. Cellular, she "engaged with William Vail" to form Advantage. *Id.* ¶ 76. These allegations, accepted as true, all indicate that DiNardo was well aware of the purpose of the scheme.

The Amended Complaint goes on to allege that DiNardo took additional "critical actions" in furtherance of the scheme. *Scollick*, 215 F. Supp. 3d at 39 (quoting *Tran*, 53 F. Supp. 3d at 128). She acted as "U.S. Cellular's proxy" and directed Vail's bidding strategy. Am. Compl. ¶ 86. That bidding was in fact conducted "from DiNardo's offices" on King Street with Stephen Hinz, DiNardo's employee, acting as Advantage's "only authorized bidder[]" other than Vail, *id.* ¶¶ 89, 91, and DiNardo, along with U.S. Cellular, controlled "the filings" that Advantage "submitted to the FCC"—providing further indication that she knew the contents of the false statements being submitted to the FCC. *Id.* ¶ 133. These allegations detail DiNardo's

involvement in the scheme with adequate particularity and are plausible because unlike Vail, who had "no prior involvement or experience in spectrum auctions," DiNardo had extensive experience working with U.S. Cellular to obtain spectrum licenses and thus plausibly could have acted as U.S. Cellular's proxy in overseeing Vail and Advantage. *Id.* ¶¶ 68–69, 90.

DiNardo emphasizes that she "had transferred her entire indirect, minority, and non-controlling interest in Advantage" to Vail in December 2015, before the FCC granted Advantage bidding credits. DiNardo MTD at 20 (citing Am. Compl. ¶ 20). But this hardly helps her case. The Amended Complaint alleges that DiNardo "sold her ownership interest" only to "further limit[] Advantage's visible connection to King Street," DiNardo's company, after the FCC disqualified designated entities associated with DISH Network—not to end her involvement in the scheme. Am. Compl. ¶¶ 105–06 & n.4. In any event, Advantage had already submitted its allegedly fraudulent short- and long-form applications to the FCC before DiNardo sold her interest, and it is these two allegedly fraudulent applications that form the linchpin of Relators' presentment claims. *See id.* ¶¶ 96–104, 148, 152. The Amended Complaint thus adequately pleads that DiNardo knowingly caused false claims to be presented.

### E. Reverse False Claim

The FCA also imposes liability for so-called "reverse false claims"—that is, "fraudulent conduct that deprives the government of money that it is owed." *United States ex rel. Kini v. Tata Consultancy Servs.*, 146 F.4th 1184, 1188 (D.C. Cir. 2025); *see also* 31 U.S.C. § 3729(a)(1)(G). Count Four alleges such conduct. *See* Am. Compl. ¶ 156. Under the unjust enrichment rule, any designated entity that receives a small business bidding credit must repay some or all of that credit if the entity sells its spectrum license to, or becomes controlled by, "another entity that is ineligible for the credit" "within five years of obtaining [that] license."

*Advantage Spectrum*, 153 F.4th at 1276 (cleaned up).  Relators allege that Defendants made or caused to be made false statements to the FCC during the unjust enrichment period to conceal the extent of U.S. Cellular's control over Advantage Spectrum and its licenses to evade Advantage's obligation to repay the bidding credits it used to obtain those licenses.  *See, e.g.*, Am. Compl. ¶¶ 123–131, 156.

DiNardo first contends that Count Four cannot proceed against her because she had no obligation to pay the government.  *See* DiNardo MTD at 22.  But a claim under § 3729(a)(1)(G) can proceed against a person who "knowingly . . . causes to be made" a false "statement material to an obligation to pay."  Nothing in the statute requires that Defendant herself owe the obligation.  It is enough that she knowingly caused the making of false statements with respect to "*an* obligation." 31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Just as a defendant may be liable for causing the presentment of a false claim she did not herself submit, *see supra* Part III.D, so too may she be liable for causing the making of a false statement material to an obligation she does not herself bear.

DiNardo also contends that this claim cannot proceed against her because she transferred her interest in Advantage before those false statements during the unjust enrichment period were made.  *See* DiNardo MTD at 22; DiNardo Reply at 18–19.  But as explained above, the Amended Complaint alleges that DiNardo sold her interest only to conceal her involvement in the scheme—not to end it.  *See* Am. Compl. ¶¶ 105–06 & n.4.  Given the ample allegations described above that DiNardo was deeply involved in originating and running the scheme, *see supra* Part III.D, the court can reasonably infer that DiNardo, even if she did not directly make any false statements to the FCC during the unjust enrichment period, nevertheless was a substantial factor in causing such statements to be made, in violation of 31 U.S.C.

§ 3729(a)(1)(G).

### F.  Constitutionality of the FCA's *Qui Tam* Provisions

"Since its enactment" in 1863, "the FCA has empowered . . . private citizens acting on the government's behalf—known as *qui tam* relators—to sue persons who defraud the United States." *United States ex rel. Doe v. Staples, Inc.*, 773 F.3d 83, 84 (D.C. Cir. 2014) (citing 31 U.S.C. § 3730).  Because the government cannot prosecute every meritorious FCA case itself, the FCA's *qui tam* provisions "serve as a critical supplement to government enforcement." *Id.*; *see also Seal 1 v. Seal A*, 255 F.3d 1154, (9th Cir. 2001) (Congress has recognized "that the government simply lacks the resources to prosecute all viable claims, even when it knows of fraudulent conduct.").

These provisions are not only critical, but also constitutional—at least according to every U.S. Court of Appeals to address the question.  *See United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 804–07 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753–58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749–59 (9th Cir. 1993).  Defendants' contrary arguments fail to overcome the weight of this authority and the centuries of historical practice that support it.  *See Vermont Ag. of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 774, 776 (2000) (recognizing "the long tradition of *qui tam* actions in England and the American Colonies" and noting that "the First Congress enacted a considerable number" of *qui tam* provisions); *see also CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) ("The practice of the First Congress . . . provides contemporaneous and weighty evidence of the Constitution's meaning." (cleaned up)).

To start, the FCA's *qui tam* provisions do not violate the Appointments Clause, which

provides that "only the President, a court of law, or a head of a department" may appoint

"'Officers of the United States.'" *Lucia v. SEC*, 585 U.S. 237, 244–45 (2018) (quoting U.S.

Const. Art. II) (cleaned up).  But the Appointments Clause does not apply to relators because

they are not "Officers of the United States."  "Supreme Court precedent has established that the

constitutional definition of an 'officer' encompasses, at a minimum, a continuing and formalized

relationship of employment with the United States Government." *Riley*, 252 F.3d at 757; *see*

*also United States v. Germaine*, 99 U.S. 508, 511 (1879) (holding that the term "officer"

"embraces the ideas of tenure, duration, emolument, and duties"); *Lucia*, 585 U.S. at 245

("Stressing ideas of tenure and duration, the Court [has] made clear that an individual must

occupy a continuing position established by law to qualify as an officer." (cleaned up)).  "There

is no legislatively created office of . . . relator under the FCA."  *Stone*, 282 F.3d at 805.  Nor are

relators "entitled to the benefits of officeholders, such as drawing a government salary." *Id.*

"Indeed, the provision that authorizes *qui tam* suits is entitled 'Actions by Private Persons.'"

*Cochise Consultancy v. United States ex rel. Hunt*, 587 U.S. 262, 272 (2019) (quoting 31 U.S.C.

§ 3730(b)).  "Although that provision explains that the action is brought 'for the person and for

the United States Government' and 'in the name of the Government,' it does not make the relator

anything other than a private person." *Id.* (quoting 31 U.S.C. § 3730(b)).

Moreover, "to qualify as an office, the position must not depend on the identity of the

person occupying it, and the duties should 'continue, though the person be changed.'" *United*

*States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (quoting *United States v. Maurice*, 26 F.

Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, C.J.)).  If an individual can "be replaced without

the duties of the positions terminating," that, by contrast, supports a finding that there is a

continuing office. *Id.*  But once a particular relator brings a *qui tam* action, they cannot be

replaced.  *See* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.").  At most, relators assist the government on "a temporary, episodic basis"—suing on its behalf in a particular case.  *Freytag v. Comm'r*, 501 U.S. 868, 881 (1991).  Although DiNardo notes the independent counsel in *Morrison v. Olson*, 487 U.S. 654 (1988), was focused on a single individual, *see* DiNardo Reply at 22, that individual could be (and had been) replaced, occupied an office created by Congress within the Justice Department, drew a salary, and had access to significant government resources.  A relator lacks this continuing, formalized relationship with the government, and thus is a private person suing on behalf of the United States, not an Officer thereof.

Nor do the FCA's *qui tam* provisions violate Article II's Vesting and Take Care Clauses. *See* DiNardo MTD at 34–36.  Although those Clauses vest the Executive with the power and responsibility of enforcing the laws of the United States, they do "not require Congress to prescribe litigation by the Executive as the *exclusive* means of enforcing federal law."  *Riley*, 252 F.3d at 753.  A contrary view is impossible to square with centuries of historical practice. "Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our government."  *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n.4 (1943) (quoting *Marvin v. Trout*, 199 U.S. 212, 225 (1905)).  As mentioned, the First Congress enacted a "considerable number" of statutes authorizing *qui tam* actions, demonstrating how the founding generation understood the original meaning of the Constitution.  *Stevens*, 529 U.S. at 774–77.  The Supreme Court has already recognized that the illustrious historical pedigree of *qui tam* statutes "was 'well nigh conclusive'

with respective to resolving the question of whether *qui tam* relators . . . under the FCA have Article III standing," and "it is logically inescapable that the same history . . . is similarly conclusive with respect to the Article II question" raised by Defendants.  *Riley*, 252 F.3d at 752 (quoting *Stevens*, 529 U.S. at 792).  Defendants' constitutional arguments are therefore unavailing.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss will be DENIED.  A separate order will follow this opinion.

Date: August 7, 2026

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge